UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE MARK A. BARNETT, CHIEF JUDGE; CLAIRE R. KELLY, JENNIFER CHOE-GROVES, JUDGES

_____
:
:
IN RE SECTION 301 CASES       : Court No. 21-00052-3JP
:
_____:

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION LIMITED TO SUSPENSION

BRIAN M. BOYNTON
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

L. MISHA PREHEIM
Assistant Director

OF COUNSEL:

MEGAN GRIMBALL
Associate General Counsel
PHILIP BUTLER
Associate General Counsel
EDWARD MARCUS
Assistant General Counsel
Office of General Counsel
Office of the U.S. Trade Representative
600 17th Street N.W.
Washington, D.C. 20508

PAULA SMITH
Assistant Chief Counsel
EDWARD MAURER
Deputy Assistant Chief Counsel
VALERIE SORENSEN-CLARK
Attorney
Office of the Assistant Chief Counsel
International Trade Litigation
U.S. Customs and Border Protection

JUSTIN R. MILLER
Attorney-In-Charge,
International Trade Field Office

JAMIE L. SHOOKMAN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
26 Federal Plaza, Room 346
New York, NY 10278
Tel: 212-264-2107
Fax: 212-264-1916

SOSUN BAE
Senior Trial Counsel
ANN C. MOTTO
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480

26 Federal Plaza, Room 258          Ben Franklin Station
New York, NY 10278             Washington, D.C. 20044

May 14, 2021                   *Attorneys for Defendants*

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

STATEMENT OF FACTS .......................................................................................... 3

    A.  Statutory Framework ...................................................................................... 3

    B.  The Section 301 Investigation ....................................................................... 8

    C.  The Section 301 Determination And Subsequent Tariffs ................................ 9

        1.  List 3 ................................................................................................... 10

        2.  Lists 4A-4B .......................................................................................... 14

ARGUMENT ............................................................................................................. 17

    A.  Standard of Review ....................................................................................... 17

    B.  Plaintiffs Have Not Demonstrated A Likelihood Of Success On The Merits ................ 19

        1.  The President And The USTR Possess Authority To Modify The Original Action When The Foreign Government Refuses To Eliminate And Actually Worsens Its Unfair Trade Practices ...................................................................... 20

        2.  Plaintiffs Fail To Address The Anticipated Defenses Set Forth In Defendants' Master Answer .................................................................................. 25

    C.  The Public Interest And Balance Of Hardships Compel Denial Of Injunctive Relief .... 28

        1.  The Public Interest Weighs Against Suspending Liquidation ............................. 29

        2.  The Balance Of Hardships Favors The Government ........................................... 32

        3.  Defendants' Alternative Proposed Order Does Not Change The Balance Of Hardships ......................................................................................... 32

    D.  Plaintiffs Have Not Demonstrated Irreparable Harm ...................................... 33

        1.  Plaintiffs' Allegations Of Irreparable Harm Are Undermined By Their Delay .. 33

        2.  Economic Harm Is Insufficient To Demonstrate Irreparable Harm ................... 34

3. Regardless Of Whether Reliquidation Is Available, The Harm Factor Still Does Not Weigh In Plaintiffs' Favor ........................................................................... 35

CONCLUSION ................................................................................................................ 42

## TABLE OF AUTHORITIES

### Cases

*Agro Dutch Indus. Ltd. v. United States*,
589 F.3d 1187 (Fed. Cir. 2009) .................................................................................. 41

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
239 F.3d 1343 (Fed. Cir. 2001) .......................................................................... 18, 28

*Am. Ass'n of Exps. And Imps.-Textile and Apparel Grp. v. United States*,
751 F.2d 1239 (Fed. Cir. 1985) .................................................................................. 27

*Am. Signature, Inc. v. United States*,
598 F.3d 816 (Fed. Cir. 2010) .............................................................................. 39, 40

*Apple, Inc. v. Samsung Elecs. Co.*,
678 F.3d 1314 (Fed. Cir. 2012) .......................................................................... 33, 34

*Armstrong v. Bush*,
924 F.2d 282 (D.C. Cir. 1991) .................................................................................. 26

*Baker v. Carr*,
369 U.S. 186 (1962) .......................................................................................... 26, 27

*Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negots. v. United States*,
393 F. Supp. 3d 1271 (Ct. Int'l Trade 2019) .......................................................... 33

*Corus Grp. PLC v. Bush*,
217 F. Supp. 2d 1347 (Ct. Int'l Trade 2002) .......................................................... 34

*Corus Grp. PLC v. Int'l Trade Comm'n*,
352 F.3d 1351 (Fed. Cir. 2003) .................................................................................. 20

*Dupuch-Carron v. Sec'y of Health & Hum. Servs.*,
969 F.3d 1318 (Fed. Cir. 2020) .................................................................................. 24

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) .................................................................................................... 26

*Gilda Indus., Inc. v. United States*,
625 F. Supp. 2d 1377 (Ct. Int'l Trade 2009), *aff'd* 622 F.3d 1358 (Fed. Cir. 2010) ............... 38

*Haggar Co. v. Helvering*,
    308 U.S. 389 (1940) ........................................................................................... 24

*High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*,
    49 F.3d 1551 (Fed. Cir. 1995) .......................................................................... 34

*Home Prods. Int'l, Inc. v. United States*,
    405 F. Supp. 3d 1368 (Ct. Int'l Trade 2019), *appeal dismissed*, Appeal No. 2020-1202, 2021
    WL 560757 (Fed. Cir. Feb. 16, 2021) .............................................................. 41

*J. Conrad LTD v. United States*,
    Ct. Int'l Trade No. 20-00052, Docket Entry No. 42 .......................................... 36
    Ct. Int'l Trade No. 20-00052, Docket Entry No. 56 .......................................... 36
    457 F. Supp. 3d 1365 (Ct. Int'l Trade 2020) ............................................... 18, 19

*Maple Leaf Fish Co. v. United States*,
    762 F.2d 86 (Fed. Cir. 1985) .................................................................. 20, 21, 22

*Mast Indus., Inc. v. Regan*,
    596 F. Supp. 1567 (Ct. Int'l Trade 1984) ......................................................... 27

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997) .................................................................................... 17, 18

*Milavetz, Gallop & Milavetz, P.A. v. United States*,
    559 U.S. 229 (2010) ......................................................................................... 24

*Munaf v. Green*,
    553 U.S. 674 (2008) ......................................................................................... 18

*Nken v. Holder*,
    556 U.S. 418 (2009) ......................................................................................... 28

*Oakland Tribune, Inc. v. Chronicle Publ'g Co.*,
    762 F.2d 1374 (9th Cir. 1985) .......................................................................... 34

*Severstal Emp. GmbH v. United States*,
    Ct. Int'l Trade No. 18-57, Docket Entry No. 30 ................................................ 36

*Shandong Huarong Gen. Grp. v. United States*,
    122 F. Supp. 2d 143 (Ct. Int'l Trade 2000) ................................................. 18, 34

*Shinyei Corp. of Am. v. United States*,
    355 F.3d 1297 (Fed. Cir. 2004) ................................................................. *passim*

*Silfab Solar, Inc. v. United States*,
  892 F.3d 1340 (Fed. Cir. 2018) ................................................ 18, 19, 20

*S. J. Stile Assoc. v. Snyder*,
  646 F.2d 522 (C.C.P.A. 1981) ........................................................ 33

*Sumecht NA, Inc. v. United States*,
  Fed. Cir. No. 2019-1015, Docket Entry No. 28 ........................... 35, 36
  923 F.3d 1340 (Fed. Cir. 2019) .......................................................... 40

*Trump v. Hawaii*,
  138 S. Ct. 2392, 201 L. Ed. 2d 775 (2018) ...................................... 18

*Ugine and Alz Belgium v. United States*,
  452 F.3d 1289 (Fed. Cir. 2006) .................................................... 39, 40

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ............................................... 18, 19, 28, 29, 33

*Yakus v. United States*,
  321 U.S. 414 (1944) ............................................................................ 30

*Yancheng Baolong Biochem. Prods. Co. v. United States*,
  406 F.3d 1377 (Fed. Cir. 2005) .......................................................... 41

*Zenith Radio Corp. v. United States*,
  710 F.2d 806 (Fed. Cir. 1983) .................................................. *passim*

**Statutes, Regulations, and Rules**

5 U.S.C. § 553(a) ............................................................................... 27

5 U.S.C. § 553(a)(1) ........................................................................... 27

5 U.S.C. § 702 ..................................................................................... 26

19 U.S.C. § 1514(a) ............................................................... 37, 38, 42

19 U.S.C. § 1514(c)(3) ........................................................................ 37

19 U.S.C. § 1516a ................................................................. 36, 37, 41

19 U.S.C. § 1516a(c)(2) ...................................................................... 38

19 U.S.C. § 1675(a)(2)(C) ...................................................... 38, 39, 40

19 U.S.C. § 2171(a) ............................................................................. 4

19 U.S.C. § 2171(c)(1)(A) .................................................................... 3

19 U.S.C. § 2171(c)(1)(C) .................................................................... 4

19 U.S.C. § 2171(c)(1)(D) .................................................................... 4

19 U.S.C. § 2411(b)(1) ......................................................................... 4

19 U.S.C. § 2411(b)(2) ........................................................... 4, 5, 22, 23

19 U.S.C. § 2411(c)(1)(B) ............................................................. 5, 23

19 U.S.C. § 2411(c)(3) ...................................................................... 23

19 U.S.C. § 2412(b) ............................................................................ 4

19 U.S.C. § 2414(a)(2)(B) ................................................................... 5

19 U.S.C. § 2416 ............................................................................... 21

19 U.S.C. § 2417 ................................................................................. 1

19 U.S.C. § 2417(a) ............................................................................ 5

19 U.S.C. § 2417(a)(1) ........................................................... 5, 23, 26

19 U.S.C. § 2417(a)(1)(B) ............................................................ *passim*

19 U.S.C. § 2417(a)(1)(C) ........................................................ 2, 5, 13

19 U.S.C. § 2417(c) ........................................................................... 21

28 U.S.C. § 1581(a) ........................................................................... 38

28 U.S.C. § 1581(c) ..................................................................... 37, 38

28 U.S.C. § 1581(i) ................................................ 26, 36, 38, 40, 41

28 U.S.C. § 2631(i) ........................................................................... 26

28 U.S.C. § 2636(a)(1) ...................................................................... 37

Omnibus Foreign Trade and Competitiveness Act of 1988,
   Pub. L No. 100-418, 102 Stat. 1107 ............................................ 6

Trade and Tariff Act of 1984,
     Pub. L. No. 98-573, 98 Stat. 2948 ................................................................. 6

Trade Agreements Act of 1979,
     Pub. L. No. 96-39, 93 Stat. 144 ..................................................................... 6

19 C.F.R. § 159.1 .......................................................................................... 36

USCIT Rule 65 ................................................................................................ 1

## Other Authorities

*Reorganization Plan No. 3 of 1979*,
     44 Fed. Reg. 69,273 (President of the United States Dec. 3, 1979), *codified in* 5 U.S.C.A. § APP.
     1 REORG. PLAN 3 1979 (West) ...................................................................... 4

S. REP. NO. 93-1298 (1974), *reprinted in* 1974 U.S.C.C.A.N. 7186 .................. 6

H.R. REP. NO. 99-581, pt. 1 (1986) ................................................................. 7

H.R. 4750, 99th Cong. (1986) ........................................................................ 7

*Trade Reform Legislation: Hearing Before the H. Subcomm. on Trade of the Comm. on Ways and Means*,
     99th Cong. 99-78 (1986) .............................................................................. 7

H.R. REP. NO.  100-40, pt. 1 (1987) ...................................................... 2, 6, 7, 24

S. REP. NO. 100-71 (1987) ................................................... 5, 6, 7, 24, 25

133 CONG. REC. 20486 (1987) ....................................................................... 5

*Conference on H.R. 3, To Enhance the Competitiveness of American Industry: Hearing Before the Comm. of Ways and Means*,
     100th Cong. (1987) ..................................................................................... 6

H.R. CONF. REP. 100-576 (1988) ............................................................. 7, 24

*Addressing China's Laws, Policies, Practices, and Actions Related to Intellectual Property, Innovation, and Technology,*
     82 Fed. Reg. 39,007 (President of the United States Aug. 17, 2017) ......................... 8

*Initiation of Section 301 Investigation; Hearing; and Request for Public Comments: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation,*
     82 Fed. Reg. 40,213 (U.S. Trade Rep. Aug. 24, 2017) ....................................... 8, 9

*Findings of the Investigation into China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation Under Section 301 of the Trade Act of 1974*, (U.S. Trade Rep. Mar. 22, 2018) ............................................................. 8, 9, 29, 30

*Actions by the United States Related to the Section 301 Investigation of China's Laws, Policies, Practices, or Actions Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 13,099 (President of the United States Mar. 22, 2018) ....................................... 9

*Notice of Determination and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 14,906 (U.S. Trade Rep. Apr. 6, 2018) .................................................... 9, 29, 30

White House, *Statement on Steps to Protect Domestic Technology and Intellectual Property from China's Dicriminatory and Burdensome Trade Practices*, (May 29, 2018) ................................................................................................ 9, 10

President of the United States, *Statement from the President Regarding Trade with China*, (June 18, 2018) .......................................................................................................... 10

*Notice of Action and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 28,710 (U.S. Trade Rep. June 20, 2018) .......................................... 10

*Request for Comments Concerning Proposed Modification of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 33,608 (U.S. Trade Rep. July 17, 2018) ...................................... 10, 11

*Extension of Public Comment Period Concerning Proposed Modification of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 38,760 (U.S. Trade Rep. Aug. 7, 2018) ...................................... 11, 12

*Notice of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 40,823 (U.S. Trade Rep. Aug. 16, 2018) ............................................. 10

President of the United States, *Statement from the President*, (Sept. 17, 2018) .......................................................................................................... 12

*Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 47,974 (U.S. Trade Rep. Sept. 21, 2018) ......................................... 12, 13, 21, 22

White House, *Statement from Press Secretary Regarding the President's Working Dinner with China*,
    (Dec. 1, 2018) ................................................................................................................ 14

*Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*,
    83 Fed. Reg. 65,198 (U.S. Trade Rep. Dec. 19, 2018) .................................................... 13, 14

*Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*,
    84 Fed. Reg. 7,966 (U.S. Trade Rep. Mar. 5, 2019) .............................................................. 14

*Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*,
    84 Fed. Reg. 20,459 (U.S. Trade Rep. May 9, 2019) ............................................................ 14

*Request for Comments Concerning Proposed Modification of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*,
    84 Fed. Reg. 22,564 (U.S. Trade Rep. May 17, 2019) .......................................................... 14

U.S. Dep't of the Treasury, *Treasury Designates China as a Currency Manipulator*,
    (Aug. 5, 2019) ............................................................................................................. 15, 16

*Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*,
    84 Fed. Reg. 43,304 (U.S. Trade Rep. Aug. 20, 2019) ................................................ 15, 16, 22

*Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*,
    84 Fed. Reg. 45,821 (U.S. Trade Rep. Aug. 30, 2019) .......................................................... 16

*Notice of Modification of Section 301 Action: China's Acts, Polices, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*,
    84 Fed. Reg. 69,447 (U.S. Trade Rep. Dec. 18, 2019) .......................................................... 16

*Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*,
    85 Fed. Reg. 3,741 (U.S. Trade Rep. Jan. 22, 2020) ............................................................ 17

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE MARK A. BARNETT, CHIEF JUDGE; CLAIRE R. KELLY, JENNIFER CHOE-GROVES, JUDGES

_____
                                                  :
                                                  :
IN RE SECTION 301 CASES            :  Court No. 21-00052-3JP
                                                  :
_____:

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION LIMITED TO SUSPENSION

### INTRODUCTION

Pursuant to United States Court of International Trade Rule 65, defendants, the United States, et al., respectfully request that the Court deny the motion for preliminary injunction filed by plaintiffs, HMTX Industries, LLC, Halstead New England Corp., Metroflor Corporation, and Jasco Products Company LLC (collectively "plaintiffs").  *See* Plaintiffs' Motion For Preliminary Injunction Limited To Suspension of Liquidation (hereinafter "Pl. Mot.").

Injunctive relief is unwarranted because plaintiffs cannot demonstrate any of the four required factors.  First, plaintiffs' limited discussion of the merits fails to demonstrate any chance of success.  Plaintiffs allege that the Office of the United States Trade Representative (USTR) exceeded its modification authority under section 307 of the Trade Act of 1974 (Trade Act), as amended (19 U.S.C. § 2417), in promulgating List 3 and List 4A.  This claim, however, is based on a flawed view of section 307 that misconstrues the statute's text and congressional intent.

The USTR's promulgation of Lists 3 and 4A, at the President's direction, was made under section 307's authority to modify an action, which does not impose a one-year time limit.  Nor does the statutory text support plaintiffs' contention that, in enacting section 307(a)(1)(B), Congress intended to render the USTR (acting either on its own, or at the direction of the President) a completely ineffective negotiator.  China's refusal to cease its unlawful practices

and, instead, its adoption of measures intended to pressure the United States to drop its section 301 trade action, revealed that the initial action was insufficient.  Thus, modification of the action under section 301(a)(1) was appropriate and authorized.  19 U.S.C. § 2417(a)(1)(B)-(C).

Plaintiffs' other argument, that section 307(a)(1) grants the USTR (acting on its own, or at the President's direction) the discretion only to "delay, taper or terminate such actions," (rather than to take increased measures, for example) is simply wrong.  Pl. Mot. 13.  The provision explicitly applies in situations where the burden of the unfair practice has *increased*.  Moreover, the U.S. House of Representative Committee on Ways and Means report accompanying H.R. 3 states:  "Any modification may be ***either an increase*** or a reduction in the level or the form of action, ***as appropriate***" and "[m]odifications could ***either*** be reduction or elimination of the action, if it has achieved the desired objective or continuation is not in the U.S. economic interest, ***or additional or increased measures if further leverage or offsetting action is deemed necessary and appropriate***."  H.R. REP. NO. 100-40, pt. 1, at 75-76 (1987) (emphasis added).[1]

The public interest and balance of harms also weigh heavily in favor of the United States.  The USTR, at the President's direction, has determined that the acts, policies, or practices of the Chinese government are unreasonable or discriminatory and burden United States commerce.  It is undisputed that China initially refused to change its unfair trade practices in response to Lists 1 and 2, and that China instead took further action to maintain those acts, policies, and practices through the imposition of tariffs on U.S. goods, which further burdened United States commerce.

Furthermore, the challenged modifications to the action resulted in concrete progress in addressing China's unfair and harmful policies.  In response to the increase in trade coverage

---

[1]  H.R. 3 was the bill that was debated prior to the 1988 amendment to the Trade Act.  H.R. 3 was ultimately reintroduced with two modifications (that are not at issue in the Section 301 Cases) as H.R. 4848, which is the bill that was ultimately signed into law.

resulting from the modifications, China agreed to enter into serious negotiations, resulting in the landmark Phase One trade agreement that addresses some of the issues covered in the section 301 investigation. The Administration is currently engaged in enforcing that agreement, and further U.S.-China negotiations will address additional concerns identified in the section 301 investigation. Those compliance and negotiation activities should not be impaired by plaintiffs' litigation, or the cloud that would be cast over the section 301 action were the Court to order suspension of liquidation of the entries. The public's interest in protecting United States commerce from China's unfair trade practices, and in maintaining a strong negotiating position to pressure China to change its practices, outweighs the possible harm alleged by plaintiffs (*i.e.*, the inability to recover certain of the assessed duties should plaintiffs prevail on the merits).

Finally, implementing an order to suspend the liquidation of millions of entries subject to the List 3 and List 4A tariffs would impose an enormous administrative burden on the Government. This burden has only been amplified by plaintiffs' years-long delay in challenging these tariffs and bringing issues of relief before the Court, as millions of entries have been made during this time that are subject to the challenged tariffs. This delay undermines plaintiffs' claim that they will suffer immediate, irreparable harm absent extraordinary injunctive relief.

Accordingly, the Court should deny plaintiffs' motion, as it fails to satisfy any of the four required factors that must be established to obtain preliminary injunctive relief.

## STATEMENT OF FACTS

### A.  Statutory Framework

The President, through the USTR, has responsibility for developing and coordinating United States trade policy. 19 U.S.C. § 2171(c)(1)(A). In matters of international trade, the USTR is the chief representative of the United States responsible for negotiations and policy

guidance. 19 U.S.C. § 2171(c)(1)(C), (D). However, the USTR is established within the Executive Office of the President, and all decisions made by the USTR are made subject to the direction of the President. 19 U.S.C. § 2171(a); *see also Reorganization Plan No. 3 of 1979*, 44 Fed. Reg. 69,273 (President of the United States Dec. 3, 1979) at 69,274, *codified in* 5 U.S.C.A. § APP. 1 REORG. PLAN 3 1979 (West). The section 307 modification authority at issue here is explicitly subject to the direction of the President, and the President provided that direction with respect to the specific modifications at issue.

This litigation concerns the President's authority, and the USTR's authority, "subject to the specific direction, if any, of the President," under sections 301, 304 and 307 of the Trade Act. Under section 301, the USTR possesses the discretionary authority to initiate an investigation to determine whether (1) a foreign country is engaging in "an act, policy or practice . . . [that is] unreasonable or discriminatory and burdens or restricts United States Commerce"; and (2) "action by the United States is appropriate." 19 U.S.C. §§ 2411(b)(1)-(2); *see* 19 U.S.C. § 2412(b) (authorizing an investigation by means other than a petition from the domestic industry).

If, as here, the President or the USTR, determines that it is "appropriate" to take initial action in response to an investigation conducted by the USTR, the President (or the USTR acting at the President's direction) is granted broad discretion in order to obtain the elimination of the act, policy, or practice. Specifically, section 301(b)(2) provides that:

> [T]he Trade Representative **shall take all appropriate and feasible action authorized under subsection (c) of this section, subject to the specific direction, if any, of the President regarding any such action, and all other appropriate and feasible action within the power of the President that the President may direct the Trade Representative to take under this subsection, to obtain the elimination of that act, policy, or practice.**

4

19 U.S.C. § 2411(b)(2) (emphasis added). The USTR must determine an initial action within "12 months after the date on which the investigation is initiated." 19 U.S.C. § 2414(a)(2)(B).

Section 301(c) specifies specific types of initial action the USTR, subject to the direction of the President, may take to obtain the elimination of the acts, policies, or practices under investigation. For example, under section 301(c)(1)(B), the USTR possesses the discretion to:

> impose duties or other import restrictions on the goods of, and notwithstanding any other provision of law, fees or restrictions on the services of, such foreign country for such time as the Trade Representative deems appropriate.

19 U.S.C. § 2411(c)(1)(B).

If the USTR takes initial action, the President and the USTR retain the discretion to determine whether to "modify or terminate any action." 19 U.S.C. § 2417(a). Section 307(a) states:

> (1)     The Trade Representative may modify or terminate any action, subject to the specific direction, if any, of the President with respect to such action, that is being taken under section 2411 of this title if –
>        …
>
> (B) the burden or restriction on United States commerce of the denial rights, or of the acts, policies, and practices, that are the subject of such action has increased or decreased, or
>
> (C) such action is being taken under section 2411(b) of this title and is no longer appropriate.

Section 301 is best described as a "negotiating tool to ensure that foreign countries adhere to their trade agreement obligations benefitting the United States and to obtain the elimination of other unjustifiable, unreasonable, or discriminatory foreign practices." S. REP. NO. 100-71, at 73 (1987); *see* 133 CONG. REC. 20486 (1987) (statement of Sen. Lautenberg). In enacting section 301, Congress stated its expectation that "these [section 301] powers be exercised vigorously to

insure fair and equitable conditions for U.S. commerce."  S. Rep. No. 93-1298 (1974), *reprinted in* 1974 U.S.C.C.A.N. 7186, 7302.

Section 301 was amended in 1979, 1984, and 1988.  *See* Trade Agreements Act of 1979, Pub. L. No. 96-39, 93 Stat. 144; Trade and Tariff Act of 1984, Pub. L. No. 98-573, 98 Stat. 2948; Omnibus Foreign Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, 102 Stat. 1107 (Trade Act of 1988).  Each subsequent amendment strengthened the section 301 provision.  By the late 1980s — when Congress enacted section 307 — Congress was frustrated with Presidential inaction, stating "[t]oo often U.S. Presidents have opted to do nothing in the face of provocative foreign trade barriers and trade-distorting practices."  S. Rep. No. 100-71 (1987), at 73-74.  Concerned that the President "ha[d] the option to do nothing," Congress "substantially strengthen[ed] section 301 of the 1974 Trade Act, the provision which authorizes the President to address unjustifiable, unreasonable and discriminatory foreign actions."  *Id*. at 6, 74; *see Conference on H.R. 3, To Enhance the Competitiveness of American Industry: Hearing Before the Comm. of Ways and Means*, 100th Cong. 4 (1987) (statement of Sen. Bentsen) ("For too many years, we have seen trade in this country used as a handmaiden for other foreign policy objectives for our country.").

For example, to compel action against foreign unfair trade practices, the 1988 Trade Act transferred the authority to decide whether and what type of action is appropriate to the USTR, "subject to the specific direction, if any, from the President."  Trade Act of 1988, § 1301(a), 102 Stat. at 1164; *see* H.R. Rep. No. 100-40, pt. 1 (1987) at 59.  For investigations under section 301(b), which cover a broader range of unreasonable practices (such as those involved in the section 301 investigation), the 1988 Trade Act provides the USTR with discretionary authority "subject to the specific direction, if any, of the President" to take "all appropriate and feasible

action," as authorized by section 301(c).  Trade Act of 1988 § 1301(a), 102 Stat. at 1164-1165; H.R. Rep. No. 100-40, pt. 1 (1987) at 60-62; Sen. Rep. No. 100-71 (1987) at 13-15.

Finally, and most importantly for purposes of this litigation, the 1988 Trade Act gave the USTR, "subject to the specific direction, if any, of the President," the express authority to "modify or terminate a section 301 action" at any time if certain conditions were met.  H.R. Rep. 100-40, pt. 1 (1987) at 75-76; Trade Act of 1988 § 1301(a), 102 Stat. at 1174.  Those conditions include situations where the burden on U.S. commerce has *increased* since the time the initial action was taken.  19 U.S.C. 2417(a)(1)(B).  Consistent with the plain text, H.R. 3 (the House Report for a bill that was similar to the one ultimately signed into law) explained that "*[a]ny modification may be either an increase or a reduction in the level or the form of action, as appropriate.*"  H.R. REP. NO. 100-40, pt. 1, at 75 (1987) (emphasis added).  Put differently, "[m]odification could either be reduction or elimination of the action if it has achieved the desired objective or continuation is not in the U.S. economic interest, *or additional or increased measures if further leverage or offsetting action is deemed necessary and appropriate.*"  *Id.* at 76 (emphasis added); *see also* Sen. REP. NO. 100-71 (1987) at 84; H.R. CONF. REP. 100-576 (1988) at 564-65.[2]

---

[2]  This was not the first time the U.S. House of Representatives had sought to add the authority to impose "increased measures."  A prior bill, H.R. 4750, 99th Cong. (1986), also sought to add the authority to "modify or terminate" an action under section 301 and contained identical language.  H.R. REP. NO. 99-581, pt. 1 (1986) at 43 ("The amendments will provide the USTR specific authority to modify or terminate section 301 actions if . . . the action is ineffective.  Modifications could either be reduction or elimination of the action . . . *or additional or increased measures if further leverage or offsetting action is deemed necessary and appropriate.*") (emphasis added).

In 1986, the USTR actually opposed amendments to add modification authority as unnecessary, stating, "[w]e . . . already have authority to modify actions taken under Section 301."  *Trade Reform Legislation: Hearing Before the H. Subcomm. on Trade of the Comm. on Ways and Means*, 99th Cong. 99-78 (1986) at 348 (statement of Ambassador Clayton Yeutter).

### B.    The Section 301 Investigation

On August 14, 2017, the President notified the USTR that China engages in certain actions related to intellectual property, innovation, and technology that may negatively impact United States industries. *Findings of the Investigation into China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation Under Section 301 of the Trade Act of 1974* (U.S. Trade Rep. Mar. 22, 2018) (*Section 301 Findings*) at 4, *available at* https://ustr.gov/sites/default/files/Section%20301%20FINAL.PDF; *Addressing China's Laws, Policies, Practices, and Actions Related to Intellectual Property, Innovation, and Technology*, 82 Fed. Reg. 39,007, 39,007 (President of the United States, Aug. 17, 2017). The President directed the USTR to determine whether to investigate under section 301 China's law, policies, practices, or actions that may be harming American interests. *Id.*

On August 18, 2017, the USTR initiated a section 301 investigation into a wide range of allegedly unfair practices by the Chinese government. *Section 301 Findings* at 5; *Initiation of Section 301 Investigation; Hearing; and Request for Public Comments: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 82 Fed. Reg. 40,213, 40,213 (U.S. Trade Rep. Aug. 24, 2017) (*Initiation of Section 301 Investigation*). The initiation notice outlined the major areas of focus of the investigation, including the Chinese government's:  (1) use of tools, such as "opaque and discretionary administrative approval processes," to "regulate or intervene in U.S. companies' operations in China, in order to require or pressure the transfer of technologies and intellectual property to Chinese companies"; (2) acts, policies, and practices that  "deprive U.S. companies of the ability to set market-based terms in licensing and other technology-related negotiations with Chinese companies and undermine U.S. companies' control over their technology in China"; (3) direction and unfair facilitation of the

"systematic investment in, and/or acquisition of, U.S. companies and assets by Chinese companies" to obtain cutting-edge technologies and intellectual property; and (4) purported unauthorized intrusions into U.S. commercial networks and other theft of intellectual property. *Initiation of Section 301 Investigation*, 82 Fed. Reg. at 40,213-14.

C.     **The Section 301 Determination And Subsequent Tariffs**

Based on the information gathered, the USTR examined the four categories of acts, policies, and practices identified in the initiation notice and made specific findings as to each one. *Notice of Determination and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 14,906 (U.S. Trade Rep. Apr. 6, 2018) (*Notice of 301 Determination*). The USTR determined that China's technology transfer policies — including systemic pressures to transfer U.S. technology to Chinese firms, as well as outright cyber-theft — were inconsistent with United States and international norms and caused billions of dollars in estimated harm to the United States economy every year. *Id*. at 14,907; *see also Section 301 Findings* at 17-18.

After making the initial section 301 determination, the USTR, at the direction of the President, determined it would be appropriate to impose an additional 25 percent *ad valorem* duty on products of China, with an annual trade value of approximately $50 billion. *Notice of 301 Determination*, 83 Fed. Reg. at 14,907; *see also Actions by the United States Related to the Section 301 Investigation of China's Laws, Policies, Practices, or Actions Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 13,099, 13,100 (President of the United States Mar. 22, 2018); *Statement on Steps to Protect Domestic Technology and Intellectual Property from China's Discriminatory and Burdensome Trade Practices* (May 29,

2018), *available at* https://china.usembassy-china.org.cn/statement-on-steps-to-protect-domestic-technology-and-intellectual-property-from-chinas-discriminatory-and-burdensome-trade-practices/; *Notice of Action and Request for Public Comments Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 28,710, 28,711 (U.S. Trade Rep. June 20, 2018) (*June 2018 Notice of Action*).

The additional duties were applied in two tranches or "Lists." List 1 covered 818 tariff subheadings, with an approximate annual trade value of $34 billion. *June 2018 Notice of Action*, 83 Fed. Reg. at 28,711. List 2 covered 279 tariff subheadings, with an approximate annual trade value of $16 billion. *Notice of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 40,823, 40,823-24 (U.S. Trade Rep. Aug. 16, 2018).

## 1.   List 3

Unfortunately, Lists 1 and 2 did not have their desired effect of persuading China to eliminate its unfair practices. Instead, in June 2018, China announced its intent to raise tariffs on $50 billion worth of United States exports. *See* President of the United States, *Statement from the President Regarding Trade with China* (June 18, 2018), *available at* https://china.usembassy-china.org.cn/statement-from-the-president-regarding-trade-with-china/ (*June 2018 Presidential Directive*); *Request for Comments Concerning Proposed Modification of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 33,608, 33,608 (U.S. Trade Rep. July 17, 2018) (*Request for Comments for List 3*). In response, the President explained that China had "no intention of changing its unfair practices related to the acquisition of American intellectual property and

technology" and that, "[r]ather than altering those practices, it is now threatening United States companies, workers, and farmers who have done nothing wrong." *June 2018 Presidential Directive.*  Thus, the President "directed the United States Trade Representative to identify $200 billion worth of Chinese goods for additional tariffs at a rate of 10 percent." *Id*.  China subsequently retaliated by imposing 25 percent *ad valorem* tariffs on $50 billion in United States goods implemented in two stages of $34 billion and $16 billion at the same time the United States implemented Lists 1 and 2.  *Request for Comments for List 3*, 83 Fed. Reg. at 33,608-09.

As a result, and at the express direction of the President, on July 17, 2018, the USTR proposed to modify the section 301 action by imposing an additional 10 percent *ad valorem* duty on products from China with an annual trade value of approximately $200 billion.  *Id* at 33,609.  In announcing this modification, the USTR explained that further supplemental action was required because, "[i]n light of China's response to the $50 billion action . . . it has become apparent that U.S. action at this level is not sufficient to obtain the elimination of China's acts, policies, and practices covered in the investigation." *Id*.  The USTR further explained that such action was "appropriate in light of the statutory goal of obtaining the elimination of the acts, policies, and practices covered in the investigation" because China's response had shown that the initial action was inadequate to promote the desired response.  *Id.*  As part of this process, the USTR announced that it was seeking public comment and would hold a public hearing regarding this proposed modification.  *Id.*

Subsequently, and at the direction of the President, the USTR announced that it was considering increasing the duties from 10 percent to 25 percent *ad valorem*.  *Extension of Public Comment Period Concerning Proposed Modification of Action Pursuant to Section 301: China's*

*Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 38,760, 38,760 (U.S. Trade Rep. Aug. 7, 2018).

On September 17, 2018, the President released a statement that "[t]oday, following seven weeks of public notice, hearings, and extensive opportunities for comment, I directed [the USTR] to proceed with placing additional tariffs on roughly $200 billion of imports from China." President of the United States, *Statement from the President* (Sept. 17, 2018), *available at* https://trumpwhitehouse.archives.gov/briefings-statements/statement-from-the-president-4/. The President further directed that "[t]he tariffs will take effect on September 24, 2018, and be set at a level of 10 percent until the end of the year. On January 1, [2019], the tariffs will rise to 25 percent." *Id.* In his directive, the President stated that the United States had given China multiple opportunities to change its trade practices and had "given China every opportunity to treat us more fairly" but that, "so far, China has been unwilling to change its practices" and had "recently imposed new tariffs in an effort to hurt the United States economy." *Id.* As a warning to the Chinese government not to engage in further retaliation and to encourage the Chinese government to phase out its unfair trade practices, the President also warned that, "if China takes retaliatory action against our farmers or other industries, we will immediately pursue phase three, which is tariffs on approximately $267 billion of additional imports." *Id.*

In accordance with the Presidential directive, on September 21, 2018, the USTR announced it was imposing List 3 and implementing the two-phase implementation of duties described in the President's September directive. *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 47,974, 47,974-75 (U.S. Trade Rep. Sept. 21, 2018) (*Notice Imposing List 3*). In the *Federal Register* notice announcing List 3, the USTR explained that, at the

direction of the President, it was modifying the initial section 301 action pursuant to sections 307(a)(1)(B)-(C) (19 U.S.C. § 2417(a)(1)(B)-(C)). *Id.* at 47,974. Specifically, and in accordance with section 307(a)(1)(B), the USTR explained that the "burden or restriction on United States commerce" of the actions that were the subject of the section 301 investigation "continues to increase, including following the one-year investigation period." *Id.* The USTR further stated that China's actions included not only the initial practices that were the subject of the section 301 investigation, "but also China's subsequent defensive actions taken to maintain those policies," including "impos[ing] approximately $50 billion in tariffs on U.S. goods." *Id.*

The USTR further explained that it was also acting pursuant to section 307(a)(1)(C), which permits the USTR, subject to the direction of the President, to modify the section 301 action when the action taken pursuant to section 301(b) is "no longer appropriate." *Id.* In doing so, the USTR explained that:

> China's response . . . has shown that the current action no longer is appropriate. China has made clear – both in public statements and in government-to-government communications – that it will not change its policies in response to the current Section 301 action. . . . The United States has raised U.S. concerns repeatedly with China, including in Ministerial level discussions, but China has been unwilling to offer meaningful modifications to its unfair practices. Furthermore, China openly has responded to the current action by choosing to cause further harm to the U.S. economy, by increasing duties on U.S. exports to China.

*Id.* at 47,975.

Following the imposition of List 3, the USTR and China engaged in several rounds of negotiations, and, as a result of perceived progress in those negotiations, and taking into account comments received from both interested parties and the advisory committees, the USTR, in accordance with direction from the President, delayed the imposition of the List 3 duties by twice postponing the date they would take effect. *Notice of Modification of Section 301 Action:*

*China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 65,198, 65,198-99 (U.S. Trade Rep. Dec. 19, 2018); White House, *Statement from Press Secretary Regarding the President's Working Dinner with China*, (Dec. 1, 2018) (*December 2018 White House Statement*), *available at* https://trumpwhitehouse. archives.gov/briefings-statements/statement-press-secretary-regarding-presidents-working-dinner-china/; *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 7,966, 7,966-67 (U.S. Trade Rep. Mar. 5, 2019).

On May 9, 2019, the USTR announced that the 25 percent duties would take effect on May 10, 2019, and that the increase was required because, in the most recent round of negotiations with China, "China has chosen to retreat from specific commitments agreed to in earlier rounds." *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 20,459, 20,459-60 (U.S. Trade Rep. May 9, 2019).

## 2. Lists 4A-4B

In response to China's retreat from its prior commitments and announcement that it intended to take further retaliatory action, and in accordance with direction from the President, the USTR again announced its intent to modify the section 301 action pursuant to section 307(a) by imposing an additional *ad valorem* duty of up to 25 percent on products of China, with an approximate annual trade value of $300 billion (List 4). *Request for Comments Concerning Proposed Modification of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 22,564, 22,564 (U.S. Trade Rep. May 17, 2019). Specifically, the USTR explained that the modification

was necessary "[i]n light of China's failure to meaningfully address the acts, policies, and practices that are subject to this investigation and its response to the current action being taken." *Id.*

On August 1, 2019, the President announced that he was directing the USTR to impose List 4 tariffs that would become effective on September 1, 2019, and at a rate of 10 percent, *ad valorem*. *HMTX Industries LLC et. al. v. United States*, Ct. Int'l Trade No. 20-00177 (Docket Entry No. 12, Pls.' Am. Compl. at ¶ 55) (hereinafter "Am. Compl."). Accordingly, the USTR again modified the section 301 action by announcing the imposition of tariffs on List 4, imposing tariffs immediately on List 4A and delaying the additional tariffs on List 4B. *Notice of Modification to Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 43,304, 43,304-05 (U.S. Trade Rep. Aug. 20, 2019) (*Notice Imposing Lists 4A-B*).

In promulgating Lists 4A-B, the USTR again explained that, "[i]n accordance with the specific direction of the President," it was taking these actions pursuant to sections 307(a)(1)(B)-(C), because the burden on United States commerce continued to increase as a result of both China's unfair trade practices, as well as its "subsequent defensive actions taken to maintain those unfair acts, policies, and practices . . ." *Id.* at 43,304. The USTR noted that China had "impose[d] tariffs on approximately $110 billion worth of U.S. goods" in order to pressure the United States, and that its actions resulted in "increased harm to the U.S. economy." *Id.* Thus, the USTR explained that "the current action no longer is appropriate," particularly in light of China's unwillingness to address its trade practices, retreat from prior commitments, and its decision to devalue its currency. *Id.* at 43,304-5 (citing U.S. Dep't of the Treasury, *Treasury*

*Designates China as a Currency Manipulator* (Aug. 5, 2019), *available at* https://home.treasury. gov/news/press-releases/sm751).

The *Notice Imposing Lists 4A-B* stated that List 4A would be subject to an additional duty of 10 percent *ad valorem*, effective September 1, 2019, and that the merchandise on List 4B would also be subject to the same duty, but that, because that list "includes products where China's share of U.S. imports from the world is 75 percent or greater," the USTR was delaying the tariffs until December 15, 2019 "to provide for a longer adjustment period." *Id.* at 43,305.

Subsequently, and at the express direction of the President, the USTR determined to increase the additional duties on Lists 4A-B to 15 percent. *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 45,821, 45,821 (U.S. Trade Rep. Aug. 30, 2019). Again, the USTR stated that it was modifying the action pursuant to section 307(a)(1)(B)-(C), and that China's unfair trade practices and subsequent defensive actions, including the imposition of further retaliatory tariffs, continued to harm United States commerce and rendered the prior action no longer appropriate. *Id.* at 45,822.

In December 2019, "following months of negotiations, the United States and China reached a historic and enforceable agreement on a Phase One trade deal that requires structural reforms and other changes to China's economic and trade regime, including with respect to certain issues covered in this Section 301 investigation." *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 69,447, 69,447 (U.S. Trade Rep. Dec. 18, 2019). Consequently, at the direction of the President, the USTR suspended the additional 15 percent in duties covered by List 4B on December 18, 2019, because, given the progress in the negotiations

to eliminate China's unfair practices, the President concluded that the additional tariffs were "no longer appropriate." *Id.*

On January 22, 2020, the USTR announced that, at the direction of the President, he was reducing the duties of List 4A to 7.5 percent based on continued progress in trade negotiations with China. *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 85 Fed. Reg. 3,741, 3,471 (U.S. Trade Rep. Jan. 22, 2020). In particular, the USTR explained that the Phase One agreement was scheduled to enter into force on February 14, 2020, and that the reduction in the additional tariff rate on List 4A would take effect on that date. *Id.*

The Phase One Agreement entered into force as scheduled. China has committed in the Agreement to addressing some — though not all — of the issues covered in the section 301 investigation. This includes commitments by China to stop its ongoing policy of using informal pressures to coerce technology transfer. The Administration is currently engaged in the process of enforcing the Agreement, which involves constant monitoring and, when appropriate, raising compliance issues with the Government of China. Further U.S.-China negotiations will address additional concerns identified in the section 301 investigation. And as it has previously stated, the current Administration is conducting a review of the U.S.-China policy, including with respect to the section 301 tariffs. While this review is being undertaken, the tariffs on Lists 3 and 4A remain in effect.

## ARGUMENT

### A.    <u>Standard Of Review</u>

Injunctive relief is "an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*,

520 U.S. 968, 972 (1997) (emphasis in original) (quotations and citations omitted).  A preliminary injunction is "never awarded as of right."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citing *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008)).  To obtain a preliminary injunction, a party must establish each of four elements:  "(1) likelihood of success on the merits, (2) irreparable harm absent immediate relief, (3) the balance of interests weighing in favor of relief, and (4) that the injunction serves the public interest."  *Silfab Solar, Inc. v. United States*, 892 F.3d 1340, 1345 (Fed. Cir. 2018) (citing *Winter*, 555 U.S. at 20).

If a plaintiff "fails to prove any one of these factors, its motion must fail."  *Shandong Huarong Gen. Grp. v. United States*, 122 F. Supp. 2d 143, 145 (Ct. Int'l Trade 2000); *see also Winter*, 555 U.S. at 24-33 (denying injunctive relief based on public interest in national security, without considering the other three factors); *Trump v. Hawaii*, 138 S. Ct. 2392, 2423, 201 L. Ed. 2d 775 (2018)  (citing *Winter* and declining to address other preliminary injunction factors when the plaintiff failed to establish a likelihood of success on the merits); *J. Conrad LTD v. United States*, 457 F. Supp. 3d 1365, 1381 (Ct. Int'l Trade 2020) (citing *Winter* and declining to address other preliminary injunction factors when the plaintiff failed to establish irreparable harm); *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001) (plaintiff cannot be granted preliminary relief "unless it establishes *both* of the first two factors, *i.e.*, likelihood of success on the merits and irreparable harm.") (emphasis in original) (citation omitted).

Below, we address each of the factors in turn.  As we explain, three of the four factors — likelihood of success on the merits, balance of harms and the public interest — weigh strongly against plaintiffs' request for injunctive relief.  Because plaintiffs have clearly failed to satisfy three of the four requirements for preliminary relief, the Court need not address the irreparable

harm factor and/or the question of whether reliquidation would be available if plaintiffs were to prevail on the merits of their claims.  *Winter*, 555 U.S. at 31-33.  However, below we explain why the irreparable harm factor also weighs against granting a preliminary injunction.

**B.** **Plaintiffs Have Not Demonstrated A Likelihood Of Success On The Merits**

Plaintiffs claim that, under the "sliding-scale approach," they need only show "at least a fair chance of success on the merits," because "the balance of irreparable harm tilts sharply" in their favor.  Pl. Mot. 12.  As a result, only two pages of plaintiffs' motion address the likelihood of success on the merits.  This discussion fails to show even "a fair chance" of success on the merits, and notably in the case that plaintiffs cite as authority for this standard, *see* Pl. Mot. 12, the Federal Circuit affirmed the denial of a motion for preliminary injunction on the basis that the movant had "not shown any probability of success on the merits," and therefore, "a preliminary injunction would not be appropriate even under the most lenient sliding-scale standard."  *Silfab Solar*, 892 F.3d at 1345.[3]

---

[3] The Court in *Silfab Solar* also questioned whether the sliding-scale approach is good law, in light of the Supreme Court's holding in *Winter*.  *Silfab Solar*, 892 F.3d at 1345 (holding that a preliminary injunction would not be appropriate, "[e]ven accepting (without deciding) the theory that our sliding-scale jurisprudence remains good law after *Winter*").  The Court in *J. Conrad* also noted that "[t]he question reserved by *Silfab Solar*," *i.e.*, "whether *Winter* permits relaxation of the success on the merits element under the sliding scale standard," is at the center of an unresolved circuit split.  457 F. Supp. 3d at 1374, fn. 8.  "The Third and Ninth Circuits read *Winter* as not abrogating circuit precedent permitting relaxation of the likelihood of success element under the sliding scale standard when there is a strong showing of irreparable harm," whereas the Fourth and Tenth Circuits construed *Winter* as "precluding relaxation of any of the four preliminary injunction elements," and "[t]he Fifth and Eleventh Circuits applied this standard prior to *Winter*."  *Id*. (citations omitted).  "The Second Circuit holds that its own unique balancing test survives *Winter*," but "in cases where the government is the party against whom preliminary injunctive relief is sought, the Second Circuit declines for separation of powers reasons to relax the likelihood of success element even when there is a strong showing of irreparable harm."  *Id*. (citations omitted).  Finally, the Sixth, Seventh, and D.C. Circuits have not confronted whether the sliding scale approach "is congruent with *Winter*."  *Id*. (internal citations omitted).

Plaintiffs have failed to satisfy the success factor, regardless of the standard employed by the Court — likelihood of success on the merits or "a fair chance of success on the merits." *Silfab Solar*, 892 F.3d at 1345. Rather than addressing the merits of their claims, plaintiffs' motion simply repeats several allegations in their complaint: (1) section 304 of the Trade Act required the USTR to determine what action to take, if any, within 12 months of initiating a section 301 investigation; (2) the "modification" authority under section 307 of the Trade Act does not permit the USTR to expand the imposition of tariffs to other imports from China for reasons untethered from those investigated under section 301; and (3) the authority to modify a trade action when it is "no longer appropriate" only permits the USTR to delay, taper or terminate — not increase — the actions already taken. Pl. Mot. 12-13; *see also* Am. Compl. at ¶¶ 2, 17, 28, 67-69. Plaintiffs' cursory treatment of these allegations falls far short of satisfying the likelihood of success on the merits factor, and thus warrants denial of their motion.

### 1. The President And The USTR Possess Authority To Modify The Original Action When The Foreign Government Refuses To Eliminate Or Actually Worsens Its Unfair Trade Practices

Plaintiffs cannot meet the high bar that the Federal Circuit has set for successfully challenging the President's (or the USTR's) actions. In *Maple Leaf Fish Co. v. United States*, 762 F.2d 86, 89 (Fed. Cir. 1985) the Federal Circuit confirmed that "[i]n international trade controversies of this highly discretionary kind — involving the President and foreign affairs . . . [f]or a court to interpose, there has to be a clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority." *See Silfab Solar*, 892 F.3d at 1346 ("[T]here are limited circumstances when a presidential action may be set aside if the President acts beyond his statutory authority, but such relief is only rarely available.") (citing *Corus Grp. PLC v. Int'l Trade Comm'n*, 352 F.3d 1351, 1356 (Fed. Cir. 2003)).

Here, plaintiffs have failed to establish *any* violation of the statute much less a "clear misconstruction." *Maple Leaf*, 762 F.2d at 89. Instead, plaintiffs incorrectly allege that the USTR, at the direction of the President, was precluded from taking action because more than a year had passed since the section 301 investigation was initiated. Section 307(a), however, does not contain a one-year time limit — or any time limit at all. To the contrary, within the statutory structure, section 307(a) serves the necessary role of allowing for a resolution of the issues under investigation, and the consequent termination of the trade action. If section 307(a) were somehow construed as having the same one-year time limit as is applicable to the initial investigation, the statute would provide no mechanism for lifting a trade action upon a successful resolution. In fact, section 307(c) provides that a 301 action will not otherwise terminate for — at the earliest — four years.

Furthermore, section 307(a) provides that the USTR may, for example, "modify" an action if the "burden or restriction on United States commerce of the denial rights, or of the acts, policies, and practices, that are the subject of such action has increased or decreased." 19 U.S.C. § 2417(a)(1)(B). The fact that the USTR is authorized to take action if the burden on United States commerce subsequently *increases* supports both that the level of the action could increase, and that Congress envisioned that the USTR would continue to monitor section 301 investigations and react if the initial action was ineffective at resolving the unfair or discriminatory trade practice. *See also* 19 U.S.C. § 2416 (providing for ongoing monitoring of certain types of section 301 actions); 19 U.S.C. § 2417(c) (calling for a four-year review of section 301 actions, including a consideration of "other actions that could be taken").

The other asserted grounds briefly alluded to in plaintiffs' motion for challenging the USTR's authority fare no better. As explained in the *Notice Imposing List 3*, 83 Fed. Reg. at

47,974-95, and in the *Notice Imposing Lists 4A-B*, 84 Fed. Reg. at 43,304-05, the increase in the tariffs was necessary to further encourage China to eliminate the unfair polices identified in the USTR's investigation (that List 1 and List 2 had demonstrably failed to do), and thus to further support the effectiveness of the initial section 301 action. Indeed, these notices stated that China sought to pressure the President and the USTR to drop the initial section 301 action — through China's adoption of tariffs successively on $50 billion and $110 billion of United States goods, as well as other measures such as the devaluation of its currency — and that if China were successful, this would only allow it to perpetuate its discriminatory and harmful practices. *Id.*

These actions fall squarely within the President and the USTR's authority to "modify . . . any action . . . if . . . the burden on United States commerce . . . of the acts, policies, and practices, that are the subject of such action has increased." 19 U.S.C. § 2417(a)(1)(B). The President's and the USTR's construction of these statutory terms is not "a clear misconstruction of the governing statute, a significant procedural violation, or action outside of delegated authority." *Maple Leaf*, 762 F.2d at 89. Plaintiffs' misreading of the statute — which would deny the President and the USTR the flexibility to respond to a trading partner's refusal to eliminate its unfair trade practices and, instead, to retaliate in hope of pressuring the United States to withdraw its initial action — is fundamentally inconsistent with the purpose of taking action under section 301 in the first place, which is implementing whatever measures are "appropriate" to obtain the elimination of the unfair "act, policy, or practice." 19 U.S.C. § 2411(b)(2).

Nor can the statute be read to require the President and the USTR, in modifying an action under section 307, to direct tariffs to specific categories of goods, particularly if they determine other action is more "appropriate" to eliminate the unfair act, policy, or practice. 19 U.S.C.

§§ 2417(a)(1); 2411(b)(2).  Notably, in imposing the initial tariffs following the section 301

investigation, the President and the USTR were not restricted to imposing tariffs on certain

categories of goods from a particular economic sector.  Instead, they possess the discretion to

"impose duties or other import restrictions on the goods of, and notwithstanding any other

provision of law, fees or restrictions on the services of, such foreign country for such time as the

Trade Representative determines appropriate."  19 U.S.C. § 2411(c)(1)(B).  Furthermore, the

statute specifically provides that "[t]he actions the Trade Representative is authorized to take

under subsection (a) or (b) may be taken against any goods or economic sector … (B) without

regard to whether or not such goods or economic sector were involved in the act, policy, or

practice that is the subject of such action."  19 U.S.C. § 2411(c)(3).

Plaintiffs are also wrong that section 307(a)(1) limits Presidential authority so that the

President, or the USTR at his direction, can only "delay, taper, or terminate" the initial section

301 action.  Pl. Mot. 13.  This interpretation is at odds with the plain text of the provision, which,

as noted, includes modifications to address situations in which the burden on U.S. commerce has

*increased.*  Furthermore, the legislative history makes abundantly clear that Congress did not

intend the word "modify" to restrict the President's and the USTR's discretion.  As mentioned

above, the House Committee on Ways and Means directly addressed this issue, indicating that it

was adding section 307, and stated the following:

> Any modification may be either an ***increase*** or a reduction in the
> level or the form of action, ***as appropriate***.
>     . . .
> Modifications could either be reduction or elimination of the action
> if it has achieved the desired objective or continuation is not in the
> U.S. economic interest, ***or additional or increased measures if
> further leverage or offsetting action is deemed necessary and
> appropriate.***

H. REP. NO. 100-40 (1987) at 75-76 (emphasis added).  The Senate Report further confirms this position, as does the Conference Report.  *See* S. REP. NO. 100-71 (1987) at 84; H.R. CONF. REP. NO. 100-576 (1988) at 564.

Moreover, plaintiffs' interpretation begs the question:  What kind of negotiator would the President (or the USTR) be if he could only "delay, taper, or terminate" the initial section 301 action if he subsequently concluded the initial action was ineffective?[4]  This interpretation would require the President (or the USTR) to take the most aggressive action imaginable at the outset, risking diplomatic turmoil, rather than proceeding cautiously and only taking the minimum action necessary to eliminate the foreign unfair trade practices.  In enacting section 307, Congress did not cabin the President's (or the USTR's) discretion in this way.

Plaintiffs' statutory construction also fails because it would produce "absurd results inconsistent with the statute's context."  *See Dupuch-Carron v. Sec'y of Health & Hum. Servs.*, 969 F.3d 1318, 1330 (Fed. Cir. 2020); *see also Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 252 (2010) (declining to "adopt a view of the statute that . . . would produce an absurd result"); *Haggar Co. v. Helvering*, 308 U.S. 389, 394 (1940) (explaining that a reading of a statute that "would lead to absurd results is to be avoided when [it] can be given a reasonable application consistent with [its] words and with the legislative purpose.").  Indeed, Congress enacted the Trade Act of 1988 and strengthened section 301 because it wanted the United States to "vigorously pursue appropriate action whenever necessary . . . to respond to  . . . unfair foreign acts, policies, or practices determined by the USTR to be actionable under section

---

[4]  The Conference Report on H.R. 3 shows that the original language was "the action is not effective or its continuation is not in the national economic interest."  H.R. CONF. REP. 100-576 (1988) at 564.  The Senate's amendment added the language that is now codified at 19 U.S.C. § 2417(a)(1)(B).

301." S. Rep. No. 100-71 (1987) at 80. In discussing the amendments to section 301 as part of

H.R. 3, Senator Lautenberg aptly stated:

> But if section 301 is to pack any punch against unfair trading
> practices, we must do more than launch investigations. We must
> be ready to retaliate. Because if a referee blows his whistle and
> never walks off the yardage, pretty soon the game deteriorates.
> That's what's happening now in trade.

133 Cong. Rec. (1977) at 20,486 (statement of Sen. Lautenberg).

It would make no sense for Congress to give the USTR (and the President in directing the

USTR) expansive authority initially for "vigorous[ ]" action, only to "let the game deteriorate" if

the foreign country refused to eliminate the unfair trade practices or retaliated. *Id.*; S. Rep. No.

100-71 (1987) at 80. If plaintiffs' reading of the statute were correct, it would mean that

Congress intended the United States to have ***no leverage*** in conducting trade negotiations.

Countries with unfair trade practices would know that the President and the USTR would have

only one opportunity to determine what action would be "appropriate" to eliminate an unfair

trade policy or practice and could not revisit that decision if the initial action did not have the

desired effect, or the foreign country's trade practices actually worsened. Such an interpretation

would only incentivize other countries to refuse to negotiate and take wide-ranging retaliatory

measures knowing that the President and the USTR would be powerless to respond without

conducting a new investigation. This would leave the United States ***worse off*** for attempting to

obtain the elimination of unfair and discriminatory practices than if it had never taken action in

the first place. This patently absurd result is plainly not what Congress intended.

### 2. Plaintiffs Fail To Address The Anticipated Defenses Set Forth In Defendants' Master Answer

Plaintiffs' motion also fails to address the anticipated defenses raised in defendants'

Master Answer, namely, that: (1) the USTR was acting at the direction of the President in

promulgating List 3 and List 4, and the President is not subject to the APA; (2) Review of the President's discretionary decisions, and the USTR's implementation of those decisions, present a non-justiciable, political question; (3) Alternatively, if the challenged actions constitute agency action, they are exempt from the APA's informal rulemaking requirements, because they qualify for the foreign affairs function exception; and (4) Even if the APA's informal rulemaking requirements apply, the USTR's actions in promulgating List 3 and List 4 complied with all statutory requirements, and they were not arbitrary and capricious, contrary to law, or in excess of statutory authority. We will fully brief each of these issues in our upcoming dispositive motion, but we summarize each defense below.

*President Not Subject to APA.* Congress has constrained this Court's section 1581(i) jurisdiction through the corresponding standing statute, 28 U.S.C. § 2631(i). That statute provides that only those who have been "adversely affected or aggrieved by agency action within the meaning of section 702" of the APA have standing to bring a challenge pursuant to 28 U.S.C. § 1581(i). Plaintiffs do not challenge *agency* action; rather, they challenge the action of the President in *directing* the USTR. As we explained above, the USTR acted at "the specific direction . . . of the President," *see* 19 USC § 2417(a)(1), rather than exercising independent discretion, in imposing Lists 3 and 4, and in suspending, increasing, or reducing the tariff rates on those lists. Thus, the APA is unavailable to challenge these presidential actions because the President is not an "agency" within the meaning of the APA. *Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992); *see also Armstrong v. Bush*, 924 F.2d 282, 2889 (D.C. Cir. 1991) ("[W]e refuse to hold that the President is an 'agency' within the meaning of the APA").

*Review of President's Discretionary Decisions Presents a Non-Justiciable, Political Question.* The political question doctrine encompasses subject matter deemed inappropriate for

judicial review, despite otherwise meeting jurisdictional requirements. *Baker v. Carr*, 369 U.S. 186, 210-17 (1962). Courts review the existence of a non-justiciable political question by evaluating six factors identified in *Baker*, including "a lack of judicially discoverable and manageable standards for resolving [an issue]." *Id.* at 217. Here, given the highly discretionary nature of what is "appropriate" to obtain the elimination of a trading partner's unfair trade practices, section 307 of the Trade Act lacks a "judicially discoverable and manageable standard [ ] for resolving it." *Id.* It is not for the judiciary to insert itself into the highly political process of negotiating and resolving a trade dispute, and to limit the President's international negotiating flexibility. *Id.* at 210-11. Accordingly, the USTR's actions, as specifically directed by the President, are beyond the review of this Court.

*Alternatively, the Challenged Actions Qualify for the Foreign Affairs Function Exception.* In certain circumstances, agency action is exempt from the APA's notice-and-comment requirements. *See* 5 U.S.C. § 553(a). One exception is the foreign affairs function exception. *See* 5 U.S.C. § 553(a)(1). Numerous types of agency action fall within the foreign affairs function exception, including the negotiation and/or administration of international agreements, *see*, *e.g.*, *Mast Indus., Inc. v. Regan*, 596 F. Supp. 1567, 1582 (Ct. Int'l Trade 1984), and actions related to the President's power to conduct foreign policy. *Am. Ass'n of Exps. and Imps.-Textile and Apparel Grp. v. United States,* 751 F.2d 1239, 1249 (Fed. Cir. 1985). Here, the challenged actions were part of the negotiation of an international trade agreement, as well as the President's "overall political agenda concerning relations with another country." *Id.* Thus, these actions fall squarely within the foreign affairs function exception to the APA's rulemaking requirements.

*Even if the APA Applies, the USTR's Actions were not Arbitrary and Capricious, Contrary to Law, or in Excess of Statutory Authority.* The USTR followed all of the APA's

notice-and-comment requirements. First, the USTR provided sufficient notice of the proposed rulemaking by publishing notices in the *Federal Register* announcing the promulgation of List 3 and List 4. Second, the USTR solicited comments on a public rulemaking docket. Third, the USTR held a public hearing, even though none is required when modifying an action pursuant to section 307(a)(2). When promulgating Lists 3 and 4, the USTR took into account public comments, which is evidenced by revisions made to the original proposed Lists 3 and 4 following the public hearings and the review of the public comments. Finally, the USTR's actions were not contrary to law or in excess of statutory authority, for the reasons set forth above.

For all of these reasons, plaintiffs have failed to demonstrate any chance of success on the merits, let alone a likelihood of success. Plaintiffs' superficial treatment of the merits factor — basically relying on the existence of their complaints without even considering our Master Answer — warrants denial of their motion for a preliminary injunction. *Winter*, 555 U.S. at 31-33; *Amazon.com*, 239 F.3d at 1350.

### C. The Public Interest And Balance Of Hardships Compel Denial Of Injunctive Relief

Even if plaintiffs could establish that they are likely to succeed on the merits and will suffer irreparable harm, that showing would still be "outweighed" by the balance of hardships and the public interest, *see Winter*, 555 U.S. at 33, factors that "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Turning to these factors, the balance of hardships does not weigh in plaintiffs' favor, nor is it in the public interest to enjoin the collection of tariffs designed to counteract China's unfair and retaliatory trade policies.

It has long been recognized that the Court "should pay particular regard for the public consequences" when "employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24

28

(quotations and citations omitted).  Indeed, in *Winter*, the Supreme Court reversed the lower courts, concluding that, even if petitioners were likely to succeed on the merits and had shown irreparable harm, the public interest and balance of equities weighed decisively against injunctive relief.  *Id*. at 23-31.  The Court held that "the balance of equities and consideration of the public interest . . . are pertinent in assessing the propriety of any injunctive relief," as "[a]n injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course."  *Id*. at 32 (citation omitted).

### 1.   <u>The Public Interest Weighs Against Suspending Liquidation</u>

Plaintiffs' assertions of irreparable harm (*i.e.*, the inability to recover certain of the assessed duties should plaintiffs prevail on the merits) are far outweighed by the public interest in maintaining the challenged section 301 trade actions.  The USTR's section 301 investigation found that China's technology transfer policies were inconsistent with United States and international norms and caused billions of dollars in damages to the United States economy every year.  *Notice of 301 Determination*, 83 Fed. Reg. at 14,907; *see also Section 301 Findings at 17-18*.  Specifically, the USTR determined:

1.   China uses foreign ownership restrictions, such as joint venture requirements and foreign equity limitations, and various administrative review and licensing processes, to require or pressure technology transfer from U.S. companies.

2.   China's regime of technology regulations forces U.S. companies seeking to license technologies to Chinese entities to do so on non-market-based terms that favor Chinese recipients.

3.   China directs and unfairly facilitates the systematic investment in, and acquisition of, U.S. companies and assets by Chinese entities to obtain cutting-edge technologies and intellectual property and generate large-scale technology transfer in industries deemed important by China.

> 4. China conducts and supports unauthorized intrusions into, and theft from, the computer networks of U.S. companies to access their sensitive commercial information and trade secrets.

*Id*.

In these circumstances, the Trade Act directs the USTR to take all appropriate and feasible action to obtain the elimination of China's policies. And where, as here, the Government is acting at the direction of Congress, adding its constitutional authority to regulate trade to the President's constitutional authority over foreign affairs, the "public interest" is the policy underlying the specific legislation. *Yakus v. United States*, 321 U.S. 414, 442 (1944). Injunctive relief interfering with action authorized by Congress and taken by the President, after following all of the procedures set forth in the operative statute, would plainly contravene the public interest.

Moreover, the actions taken in response to the section 301 investigation, including the challenged List 3 and List 4A tariffs, provide strong incentives for China to end the unfair trade practices that hurt United States competitiveness in international markets and harm United States workers and businesses every day. A suspension of liquidation would encourage China to maintain its harmful practices while awaiting a resolution of the section 301 cases. In addition, a suspension of liquidation may even encourage importers to purchase goods from China, which could also undermine the effectiveness of the challenged trade actions.

Not only would a suspension of liquidation adversely affect the public interest, it would also impose an unprecedented and enormous burden on the Government, and in particular CBP, the agency that would be tasked with effectuating such an order. As outlined in the attached declaration, it is simply untrue, as plaintiffs allege, that the Government would only incur "routine administrative costs" implementing an order to suspend liquidation of the entries at issue. Pl. Mot. at 14. Indeed, as of March 31, 2021, over 12.7 million entries have been made

that are subject to section 301 duties under List 3 or List 4A, over 4.9 million of which remain unliquidated as of March 31, 2021. Declaration of Thomas Overacker, Executive Director, Cargo & Conveyance Security, Office of Field Operations, CBP (hereinafter "CBP Decl."). Section 301 entries are generally filed as Type "01," and their liquidation is not automatically suspended in CBP's Automated Commercial Environment (ACE). CBP Decl. ¶ 5-6. Thus, suspending the liquidation of all of the relevant entries would be an extremely resource-intensive and burdensome task, which would include, among other steps: identifying all of the thousands of importers and importer of record numbers (IOR numbers) associated with plaintiffs in the section 301 cases; identifying all of the unliquidated entries of merchandise subject to List 3 and/or List 4A for each of those thousands of importers; effectuating a suspension for each and every entry by entering a suspension code in ACE for each entry; and suspending liquidation on an importer-by-importer basis *on all future entries* subject to section 301 duties made by the thousands of subject importers throughout the duration of this litigation. *Id*. at ¶¶ 7, 10. CBP will need to undertake this same process for any additional plaintiffs that may also file section 301 cases in the future. Should CBP inadvertently liquidate any entries during the course of this litigation, it would then need to manually return those entries to unliquidated status upon order of the Court, which may only be accomplished one entry at a time. *Id*. at ¶ 9. Moreover, upon conclusion of the litigation, CBP would be faced with the overwhelming task of having to liquidate the millions of entries for which liquidation was enjoined pursuant to court order within a very short period of time, and the risk that entries would deem liquidated is high. *Id*. at ¶ 12.

CBP is an agency with limited resources, but with a broad mission that entails many competing priorities. *Id*. at ¶ 13. Suspending the liquidation of all future entries and unliquidated past entries at issue here would divert agency resources away from other priority

functions, thus compromising the agency's ability to perform them properly. This resource concern weighs heavily against plaintiffs' motion.

### 2. The Balance Of Hardships Favors The Government

This factor also weighs in the Government's favor. Especially given that plaintiffs waited years to challenge the List 3 and List 4 trade actions — during which time over 12.7 million entries subject to the challenged duties were made, and about 7.8 million of these entries were liquidated — the balance of hardships strongly favors denying plaintiffs' motion. The fact that plaintiffs seek what they describe as "narrow relief" does not change the significant administrative burden that their requested relief would impose on the Government, or the fact that they could have significantly mitigated any such burden by bringing a timely challenge to the List 3 and List 4 trade actions (*i.e.*, before millions of entries had been made that are subject to the challenged tariffs).

### 3. Defendants' Alternative Proposed Order Does Not Change The Balance Of Hardships

As requested by the Panel during the April 26, 2021 status conference, we have endeavored to identify ways to reduce the cataclysmic impact that a suspension of liquidation in this mammoth litigation would have on CBP. Our alternative proposal is attached as an addendum to this opposition. We appreciate the Panel's sensitivity to reducing the administrative burdens any preliminary injunction would impose, and we have responded in good faith to the Panel's request. Nevertheless, we urge the Panel to deny plaintiffs' motion because it fails to satisfy any of the four required factors for preliminary injunctive relief, including irreparable harm as discussed below, and we reserve our rights to appeal.

### D. **Plaintiffs Have Not Demonstrated Irreparable Harm**

Because plaintiffs' failure to satisfy the other factors required for a preliminary injunction is clear, this Court need not consider irreparable harm. Nonetheless, this factor also weighs against plaintiffs' request for interim relief. A plaintiff seeking an injunction bears an "extremely heavy burden" to establish irreparable injury. *Shandong Huarong*, 122 F. Supp. 2d at 146 (citation omitted). Critically, "irreparable harm may not be speculative, or determined by surmise." *Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negots. v. United States v. United States*, 393 F. Supp. 3d 1271, 1276 (Ct. Int'l Trade 2019) (citations omitted). As the Federal Circuit has explained: "A preliminary injunction will not issue simply to prevent a mere possibility of injury, even where prospective injury is great. A presently existing, actual threat must be shown." *Zenith Radio Corp. v. United States*, 710 F.2d 806, 809 (Fed. Cir. 1983) (quoting *S. J. Stile Assoc. v. Snyder*, 646 F.2d 522, 525 (C.C.P.A. 1981)). Thus, courts must deny a preliminary injunction unless the movant demonstrates "that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (citations omitted) (emphasis in original).

#### 1. **Plaintiffs' Allegations Of Irreparable Harm Are Undermined By Their Delay**

Plaintiffs claim that the threat of irreparable harm is "obvious." Pl. Mot. at 5-6, 10. Specifically, they claim that the risk of "permanently los[ing] the ability to recover any entries that liquidated prior to final judgment" constitutes irreparable harm. *Id.* at 11.

First, any claim of irreparable harm is undercut by the fact that plaintiffs waited over two years to challenge the List 3 and List 4 tariffs. In addition, plaintiffs waited seven months from the filing of their complaint to raise issues regarding relief before the Court. When deciding a motion for a preliminary injunction, it is "reasonable for the [trial] court to consider the issue of delay and to find that [the plaintiff] had not proceeded as quickly as it could have in seeking

preliminary injunctive relief." *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, 678 F.3d 1314, 1326 (Fed. Cir. 2012); *High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1557 (Fed. Cir. 1995) (same). Delay in requesting an injunction "implies a lack of urgency and irreparable harm." *Oakland Tribune, Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985). Thus, plaintiffs' lengthy delay in bringing suit severely undermines any claimed need for injunctive relief.

### 2. <u>Economic Harm Is Insufficient To Demonstrate Irreparable Harm</u>

To the extent that plaintiffs claim that they will be financially harmed as a result of paying the tariffs, the Court repeatedly has declined to find irreparable harm based merely on claims of financial losses. *See*, *e.g.*, *Corus Grp. PLC v. Bush,* 217 F. Supp. 2d 1347, 1355 (Ct. Int'l Trade 2002) (threat of "economic injury" does not constitute irreparable harm). In *Corus*, despite testimony that "sound business principles would require [the company] to close the plant rather than operate at a loss," the Court concluded that the plaintiff had failed to establish irreparable harm because there was no evidence the plant was "in danger of imminent closure." *Id.* And, in *Shandong Huarong*, the Court concluded that the plaintiff failed to establish irreparable harm when it submitted an affidavit from its "major customer" in the United States stating that it would cancel all existing and future orders if cash deposits were required. *Shandong Huarong*, 122 F. Supp. 2d at 146-47. Noting that "affidavits submitted by interested parties are weak evidence, unlikely to justify a preliminary injunction," the Court found that the plaintiff did not meet its burden because the affidavits were not supported by evidence "indicating exactly how and when these lost sales would force it out of business." *Id.* at 147 (quotations and citations omitted).

Here, the plaintiffs did not even attempt to support their irreparable harm arguments with affidavits purporting to show that, without an order suspending liquidation, their very existence

would be threatened.  Indeed, they do not even protest the requirement that they continue to pay the contested tariffs through the conclusion of the litigation.  Thus, their "irreparable harm" arguments, the sole pillar upon which their request for injunctive relief rests, boil down to the fact that they will not be able to recover tariffs imposed largely during periods during which they slept on their claims.

### 3.   Regardless Of Whether Reliquidation Is Available, The Harm Factor Still Does Not Weigh In Plaintiffs' Favor

The Court need not reach the issue whether reliquidation would be available as a remedy should plaintiffs ultimately prevail, given that plaintiffs' assertion of irreparable harm is undermined by their delay, and by their failure to show more than some potential economic losses.  Moreover, as we explained, plaintiffs have failed to prove the other three factors required to obtain a preliminary injunction.  However, in light of plaintiffs' focus on the availability of reliquidation in their motion, we set forth our views on this issue.  As explained below, we recognize that this Court, and the litigants, are bound by *Shinyei Corp. of Am. v. United States,* 355 F.3d 1297 (Fed. Cir. 2004), which held that the rule of finality is not as far reaching as may be implied by *Zenith* (discussed below).

We also acknowledge that, in three recent cases, the Government relied on *Shinyei* for the proposition that reliquidation is available in appropriate circumstances, and did not seek to challenge the validity of that decision in those cases.  *See Sumecht NA, Inc. v. United States*, Fed. Cir. No. 2019-1015 (Docket Entry No. 28, Br. for Def.-Appellee at 25) ("[W]e have represented unequivocally that, should Sumec prevail on the merits of this case, the trial court has the power to grant Sumec relief, including the authority to order the Government to reliquidate Sumec's entries")*; see also id.* at 24 ("First, the Court 'limited' the general rule regarding injunctions 'to section 516 actions[.]' *Shinyei*, 355 F.3d at 1309.  This holding is not only in accordance with

the plain meaning of 19 U.S.C. § 1516a, but it is clear, predictable, and easily applied by the trading community and the courts…."); *Severstal Exp. GmbH v. United States*, Ct. Int'l Trade No. 18-57 (Docket Entry No. 30, Def.'s Mot. To Dismiss and Opp. To Prelim. Req. for Injunctive Relief at 36); *J. Conrad Ltd. v. United States*, Ct. Int'l Trade No. 20-00052 (Docket Entry No. 42, Defs.' Resp. to Pls.' Mots. for a Prelim. Inj. at 3 and Docket Entry No. 56, Defs.' Resp. to the Court's Order of April 7, 2020 at 1-2). In other section 1581(i) cases, the Government has either agreed to stipulations whereby the Court ordered CBP to reliquidate entries with refunds or otherwise has not objected to the Court's authority to order CBP to reliquidate entries with refunds.

While the Government opposed the outcome in *Shinyei*, we have also recognized that it is binding precedent. Therefore, we have relied on its holding in defending against certain requests to suspend the liquidation of entries. However, given the magnitude of the section 301 trade program and the number of Government stakeholders involved, as well as the significance of the section 301 litigation, we have taken a close look at the issue of the availability of reliquidation under *Shinyei*. In light of the uncertainty surrounding its application, and consistent with our initial opposition to *Shinyei*, we have determined not to concede its applicability here and to preserve our right to appeal a decision ordering suspension based on the holding of *Shinyei*. Below we set forth why, in our view, the case should not serve as the basis for relief here, either at the preliminary injunction stage or, if plaintiffs prevail, when final judgment is entered.

When goods are imported into the United States, CBP is obligated to "fix the final amount of duty to be paid on such merchandise and determine any increased or additional duties, taxes, and fees due[.]" 19 U.S.C. § 1500(c). CBP calculates the "final computation or ascertainment of duties" through a process called "liquidation." 19 C.F.R. § 159.1. Liquidation

generally occurs approximately 314 days after entry of the merchandise. To the extent CBP errs in its computation or ascertainment of duties, Congress provided a remedy. Specifically, importers may file an administrative protest against liquidation within 180 days of the liquidation. 19 U.S.C. § 1514(c)(3). Section 1514(a) broadly describes the types of matters that may be protested, but once an entry has liquidated, the statute provides that it

> **shall be final and conclusive** upon all persons (including the United States and any officer thereof) unless a protest is filed in accordance with this section, or unless a civil action contesting the denial of a protest, in whole or in part, is commenced in the United States Court of International Trade in accordance with chapter 169 of title 28 within the time prescribed by section 2636 of that title.

*See* 19 U.S.C. § 1514(a) (emphasis added). If CBP agrees with the importer, CBP will correct the error by granting the protest and reliquidating the entry.

If CBP denies the protest, in whole or in part, an importer may commence a civil action within 180 days from the mailing of the notice of the denial. 28 U.S.C. § 2636(a)(1). If the importer prevails in its challenge, the trial court has the authority to correct any errors by ordering, in part, the reliquidation of entries. If, however, an importer does nothing to challenge a liquidation, it becomes "final and conclusive" 180 days from the date of liquidation. 19 U.S.C. § 1514(a). Once a liquidation becomes final and conclusive, generally neither CBP nor the Courts may alter or set aside the transaction, including the assessment of duties.

Federal Circuit case law demonstrates that the rule of finality of liquidations is not limited to Customs decisions that can be protested pursuant to 19 U.S.C. § 1514(a). Specifically, in *Zenith Radio Corp. v. United States*, 710 F.2d 806 (Fed. Cir. 1983), the Federal Circuit analyzed the availability of reliquidation in an action brought pursuant to 28 U.S.C. § 1581(c) to challenge a determination by the Department of Commerce (Commerce). The Court found that 19 U.S.C. § 1516a, the statute governing judicial review in countervailing duty and antidumping

37

duty proceedings, authorizes it "to enjoin liquidation of entries pending the court's decision." *Zenith*, 710 F.2d at 811 (citing 19 USC § 1516a(c)(2)).  However, "[t]he statutory scheme has no provision permitting reliquidation in this case or imposition of higher dumping duties after liquidation."  *Id*. at 810.  Thus, "[o]nce liquidation occurs, a subsequent decision by the trial court on the merits of [a claimant's] challenge can have no effect on the dumping duties assessed on entries …."  *Id*.  *Zenith* shows that, in the absence of an injunction enjoining liquidation, an entry will liquidate in the normal administrative course and that liquidation will become final and conclusive.  Moreover, while *Zenith* involved an action brought pursuant to section 1581(c), its holding demonstrates that the rule of finality is not limited to liquidations that are protestable in accordance with section 1581(a).  If reliquidation is not available upon a successful challenge under section 1581(c), *Zenith* indicates that reliquidation should not be available upon a successful challenge under section 1581(i) either.

Nevertheless, the Court in *Shinyei* rejected the Government's reliance on the rule of finality, as applied to actions brought under section 1581(i) and the APA alleging a violation of 19 U.S.C. § 1675(a)(2)(C), and seeking corrected instructions from Commerce.  The Court explained that section 1514(a) "is fairly construed to prohibit a challenge to 'decisions' of the Customs Service 'as to' liquidation outside the protest provisions of section 1514(a)."  *Shinyei*, 355 F.3d at 1311.  "It is not, however, fairly construed to prohibit reliquidation in all cases, particularly when the alleged error is with Commerce instructions . . . , not 'decisions of the Customs Service' as to liquidation."  *Id*.; *see also Gilda Indus., Inc. v. United States*, 625 F.Supp.2d 1377, 1385 (Ct. Int'l Trade 2009), *aff'd* 622 F.3d 1358 (Fed. Cir. 2010) (ordering CBP to reliquidate entries with refunds, and holding that "reliquidation is not prohibited where a decision of Customs is not being challenged") (citing *Shinyei,* 355 F.3d at 1311).

Since *Shinyei*, however, three Federal Circuit decisions have cast uncertainty as to the applicability of *Shinyei* beyond the specific facts of that case. *Ugine and Alz Belgium v. United States*, 452 F.3d 1289 (Fed. Cir. 2006) involved another challenge to Commerce instructions implementing antidumping and countervailing duties. *Id*. at 1291. The Federal Circuit held that 19 U.S.C. § 1514 "does not provide a basis for an importer to challenge the lawfulness of a liquidation instruction of the Department of Commerce, as opposed to the lawfulness of an action of Customs." *Id.* at 1295. The Court also noted that, "at first blush, *Shinyei* appears to provide [the importer] with an avenue for seeking a judicial remedy even if liquidation occurs, because [the importer], like Shinyei, challenges only Commerce's liquidation instructions." *Id*. at 1296. However, the Court was uncomfortable denying injunctive relief, given that the importer in *Shinyei* challenged Commerce's instructions based on having "alleged a violation of 19 U.S.C. § 1675(a)(2)(C)," whereas the importer in *Ugine* raised a different type of challenge that was not based on the same statute. *Id.* The Court found that the "difference between the two cases — and the possibility that *Shinyei* will not be interpreted to encompass the sort of claim at issue here — raises doubt whether [the importer] will have the opportunity to obtain reliquidation once its entries are liquidated, even if it is ultimately found to have a strong case on the merits." *Id*.

The Federal Circuit took a similar approach in a case challenging Commerce's authority to issue certain corrected liquidation instructions resulting from "a computer programming error in Commerce's antidumping margin calculation." *American Signature, Inc. v. United States*, 598 F.3d 816, 821 (Fed. Cir. 2010). The Court again reversed the trial court's denial of a motion for a preliminary injunction, holding "that the possibility of *Shinyei* relief does not defeat

[plaintiff's] claim of irreparable harm." *Id.* at 829. However, the appellate court did not explain why *Shinyei* relief might be lacking in that case. *Id.*

Most recently, in *Sumecht NA, Inc. v. United States*, 923 F.3d 1340 (Fed. Cir. 2019), the Federal Circuit acknowledged that "neither [*Ugine* or *American Signature*] is a model of clarity for establishing when *Shinyei* relief may be unavailable in § 1581(i) actions challenging Commerce's liquidation instructions or when a sufficient showing of irreparable harm can be established by the potential of such relief being unavailable." *Sumecht NA, Inc.*, 923 F.3d at 1348. At the same time, the Court stated that it does "not read *Ugine* and *American Signature* as creating a presumption that, in the preliminary injunction context, *Shinyei* relief is uncertain for purposes of irreparable harm in § 1581(i) actions because such a presumption runs counter to *Shinyei*'s holding that the CIT has 'broad remedial powers,' including the ability to order reliquidation." *Id.* (citing *Shinyei*, 355 F.3d at 1312). Ultimately, the Federal Circuit upheld the trial court's denial of the motion for a preliminary injunction, noting the Government's representation that such relief would be available based on *Shinyei*. *Id.*

Viewed through the lens of developments since *Shinyei*, the relief in *Shinyei* could be seen as necessary to protect a judgment of this Court, rather than authority for reliquidation as a garden variety remedy in any case brought pursuant to section 1581(i). Indeed, the liquidation instructions at issue in *Shinyei* contravened this Court's judgment in the underlying Commerce administrative review. *Shinyei*, 355 F.3d at 1301-03, 1312 ("to accept the government's argument would preclude enforcement of court orders as to duty determinations as soon as entries subject to those orders are liquidated, even where liquidation was under erroneous instructions that fail to reflect the amended administrative review results implementing the courts' determinations, as required by section 1675(a)(2)(C)"). It is now clear that the Court

possesses authority to order reliquidation if necessary to enforce and protect the integrity of its own judgments or orders. *See*, *e.g.*, *Home Prods. Int'l, Inc. v. United States,* 405 F. Supp. 3d 1368, 1376 (Ct. Int'l Trade 2019) (declaring Customs' liquidation of the entries unlawful, and ordering that each entry be reliquidated in accordance with the judgment), *appeal dismissed*, Appeal No. 2020-1202, 2021 WL 560757, at *1 (Fed. Cir. Feb. 16, 2021); *see also Agro Dutch Indus. Ltd. v. United States*, 589 F.3d 1187, 1191-92 & n.1 (Fed. Cir. 2009) ("While the *Zenith* rule ordinarily renders moot court actions in which liquidation has already occurred, we have acknowledged that there are exceptions to that general rule. For example, mootness does not occur when steps are required to enforce a valid injunction.") (citing *Yancheng Baolong Biochem. Prods. Co. v. United States,* 406 F.3d 1377, 1381-82 (Fed. Cir. 2005) and *Shinyei*, 355 F.3d at 1312). Indeed, the *Agro Dutch* Court characterized *Shinyei* as declining "to find that the statute [imposing finality upon liquidations] as a whole was intended to preclude judicial enforcement of court orders after liquidation." *Id.* at 1191-92 (alteration in original). Unlike the cited cases, upholding the finality of liquidation in the section 301 cases would not "preclude judicial enforcement of court orders after liquidation."[5] *Id.*

Regardless, as noted, we believe that reliquidation is not available under the relevant statutory framework, and that *Shinyei* conflicts with the Federal Circuit's holding in *Zenith*. Indeed, no statutory provision allows the liquidation of entries to be enjoined by the Court in section 1581(i) actions, and the liquidation of any entries at issue in the section 301 cases should

---

[5] The Court in *Agro Dutch* did not decide whether the *Zenith* rule extends beyond the context of cases governed by 19 U.S.C. § 1516a. *See* 589 F.3d at 1190 (*Zenith* establishes a general rule, "at least in the context of judicial review under 19 U.S.C. § 1516a," that liquidation moots a party's claims pertaining to the liquidated entries). However, for the reasons set forth in this section, and notwithstanding the holding of *Shinyei,* an injunction to preserve a court order is not warranted in this case.

therefore be held to be final and conclusive. 19 U.S.C. § 1514(a); *Zenith*, 710 F.2d at 810 (in the absence of a statutory provision permitting reliquidation, "[o]nce liquidation occurs, a subsequent decision by the trial court on the merits of [a claimant's] challenge can have no effect on the dumping duties assessed on entries …."). Accordingly, should the Court determine that reliquidation is available as a remedy if plaintiffs prevail on their claims, we reserve our right to appeal this issue.

In sum, plaintiffs' motion for a preliminary injunction should be denied without reference to the availability, or not, of reliquidation as a remedy at the end of the case.[6] Plaintiffs have failed to demonstrate any of the requisite factors required for such relief, all of which weigh in the Government's favor and warrant denial of plaintiffs' motion.

## CONCLUSION

For these reasons, we respectfully request that the Court deny plaintiffs' motion.

<div style="margin-left: 50%;">

BRIAN M. BOYNTON
Acting Assistant Attorney General

/s/ Jeanne E. Davidson
JEANNE E. DAVIDSON
Director

/s/ L. Misha Preheim
L. MISHA PREHEIM
Assistant Director

/s/ Justin R. Miller
JUSTIN R. MILLER
Attorney-In-Charge,
International Trade Field Office

</div>

OF COUNSEL:

MEGAN GRIMBALL
Associate General Counsel
PHILIP BUTLER
Associate General Counsel

---

[6] Should the Panel declare, as plaintiffs request, that reliquidation would be available as a remedy if plaintiffs prevail in the litigation, then it should be unnecessary for the Court to also impose the tremendous burden and cost of a suspension of liquidation on potentially millions of unliquidated (including future) entries of Lists 3 and 4A merchandise from China imported by plaintiffs.

EDWARD MARCUS
Assistant General Counsel
Office of General Counsel
Office of the U.S. Trade Representative
600 17th Street N.W.
Washington, D.C. 20508

PAULA SMITH
Assistant Chief Counsel
EDWARD MAURER
Deputy Assistant Chief Counsel
VALERIE SORENSEN-CLARK
Attorney
Office of the Assistant Chief Counsel
International Trade Litigation
U.S. Customs and Border Protection
26 Federal Plaza, Room 258
New York, NY 10278

/s/ Jamie L. Shookman
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
26 Federal Plaza, Room 346
New York, NY 10278
Tel: 212-264-2107
Fax: 212-264-1916

SOSUN BAE
Senior Trial Counsel
ANN C. MOTTO
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044

May 14, 2021                    *Attorneys for Defendants*

**CERTIFICATE OF COMPLIANCE**

I, Jamie L. Shookman, an attorney in the Office of the Assistant Attorney General, Civil Division, Commercial Litigation Brach, International Trade Field Office, who is responsible for the Government's opposition to plaintiffs' motion for preliminary injunction limited to suspension, dated March 14, 2021, relying upon the word count feature of the word processing program used to prepare the memorandum, certify that this memorandum complies with the word count limitation under the Court's chambers procedures, and contains 13,419 words.

/s/ Jamie L. Shookman