UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE MARK A. BARNETT, CHIEF JUDGE; CLAIRE R. KELLY, JENNIFER CHOE-GROVES, JUDGES

| | |
|---|---|
| IN RE SECTION 301 CASES | : <br> : <br> : Court No. 21-00052-3JP <br> : <br> : |

**DECLARATION OF THOMAS OVERACKER
IN SUPPORT OF DEFENDANTS'
<u>OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION</u>**

I, Thomas Overacker, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and information made known to me in the course of my employment, hereby make the following declaration with respect to the above-captioned matter:

1. I am the Executive Director, Cargo and Conveyance Security, Office of Field Operations, U.S. Customs and Border Protection (CBP). I have held this position since February 2018. Prior to serving in this role, I served as Assistant Director for Cargo Targeting, National Targeting Center, CBP, from 2013 to 2018.

2. As the Executive Director, Cargo and Conveyance Security, I will be responsible for overseeing the personnel at the Centers of Excellence and Expertise ("Centers") and/or Office of Field Operations Headquarters who will be effectuating suspensions of liquidation.

3. This declaration is made to provide further context regarding the administrative burden CBP would face should the Court order CBP to suspend liquidation on entries covered by the over 3,600 cases challenging Section 301 duties on List 3 and List 4A products ("Section 301 challenges"). I have been advised that the 3,600 cases involve over 6,500 importers, as explained in more detail below.

4. The following statistics are collected on a fiscal quarterly basis. The end of the last fiscal quarter was March 31, 2021. As of March 31, 2021, over 12.7 million entries have been made that are subject to Section 301 duties under List 3 or List 4A (for all importers, not just those importers in the Section 301 challenges). Of these entries, over 4.9 million remain unliquidated as of March 31, 2021.

5. When merchandise is imported into the United States, the importer of record files an entry in CBP's Automated Commercial Environment ("ACE"), which is CBP's entry processing system. Regular consumption entries are filed as entry type "01," and consumption entries that contain merchandise subject to antidumping and/or countervailing duties ("AD/CVD") are filed using entry type "03."

6. ACE is programmed to automatically ascertain estimated duties at the rate provided for under the applicable provision of the Harmonized Tariff Schedule of the United States ("HTSUS") at entry, and CBP collects those estimated duties at entry. A final assessment of duties is made upon liquidation. Liquidation often occurs approximately 314 days after entry, unless suspended or extended. The liquidation of type "01" entries is not automatically suspended or extended at the time of entry. The liquidation of type "03" entries is automatically suspended at the time of entry under standard AD/CVD procedures. Entries of merchandise subject to Section 301 duties, including List 3 and List 4A, that do not contain merchandise subject to an AD/CVD order are typically filed as type "01" entries, which are *not* automatically suspended at the time of entry.

7. Should the court order a suspension of liquidation of the entries filed by the plaintiffs in the over 3,600 Section 301 challenges, CBP would have to implement the order on an

importer-by-importer basis. To suspend liquidation of unliquidated entries filed by plaintiffs in these actions, CBP would need to perform the following steps:

a. All of the importers ("subject importers") and their importer of record numbers ("IOR numbers") associated with the plaintiffs in the Section 301 challenges would need to be identified. Many of the actions have more than one plaintiff, meaning that CBP would need to identify, by number, well over 3,600 IOR numbers. As of April 30, 2021, there were over 6,500 individual plaintiffs. Moreover, an importer may not have the same name as the plaintiff with which it is associated (for example, a named plaintiff could be the parent company of the relevant importer), and some plaintiffs may have multiple affiliated importers, resulting in multiple IOR numbers being associated with a single plaintiff.

b. Once all the relevant importers and IOR numbers are identified, CBP would then have to identify the relevant Center that handles the account of each importer, as the Centers are responsible for suspending liquidation. Alternatively, CBP may establish a task force at Office of Field Operations Headquarters to handle the mass suspensions from one central location.

c. Next, CBP would have to identify all the unliquidated entries of merchandise subject to List 3 and/or List 4A for each individual importer. To do this, CBP would have to generate a report for each IOR number identifying all entries filed during the relevant time period by liquidation status, and the relevant headings of Chapter 99 of the Harmonized Tariff Schedule of the United States ("HTSUS") (headings 9903.88.03, 9903.88.04, 9903.88.09, 9903.88.23, or 9903.88.27, HTSUS, for List 3 goods and headings 9903.88.15, 9903.88.24, or 9903.88.28,

      HTSUS, for List 4A goods). Thus, CBP would need to run over 6,500 reports just to identify the unliquidated entries filed by each individual importer in question. Until it runs these reports and tabulates the results, CBP is unable to determine which entries would be subject to a court-ordered suspension. Further, it would not be until that point that CBP would know what percentage of the over 4.9 million unliquidated entries subject to List 3 and List 4A duties are entries filed by the plaintiffs in these actions. CBP anticipates that it is a significant percentage.

   d. Once CBP has generated a report identifying the relevant unliquidated entries for each subject importer, CBP would have to effectuate a suspension for every entry by entering a suspension code in the ACE record for that entry. Each entry record may also have to be notated to indicate the specific reason for the suspension. CBP could do this on either an entry-by-entry basis or by utilizing the "mass processing" function of ACE, which would currently permit CBP to change up to 5,000 entries at a time to "suspended" status, on an importer-by-importer basis. The mass update function requires Excel spreadsheets individually prepared by CBP that identify batches of subject entries.

   e. It is not uncommon for "mass processing" to identify entries that need to be individually evaluated and addressed, adding an additional layer of time.

8. The process described in paragraph 7 is further complicated if liquidation of an entry is already suspended pursuant to an AD/CVD order (i.e., a type "03" entry), which as of May 4, 2021, numbered approximately 81,000 entries also subject to Section 301 List 3 or List 4A duties. CBP would not only have to identify which entries are already

suspended pursuant to an AD/CVD order, but also have to ensure that these entries are not prematurely liquidated if suspension is lifted for only one of the two applicable bases. If the Commerce Department provides notice of the lifting of suspension pursuant to an AD/CVD order, there is a significant risk that a user will overlook the indication that an additional suspension of liquidation is in place, and that an entry will liquidate even though the Court's order suspending liquidation is still in effect. Conversely, if an injunction in this litigation is lifted, but a suspension pursuant to an AD/CVD order is still in place, the risk also exists that CBP may prematurely liquidate that entry, creating problems in any corresponding AD/CVD proceedings. Finally, if an injunction in this litigation is lifted, there will likely be a large backlog of entries for which the suspension of liquidation in an AD/CVD proceeding will have lifted while this court's injunction was in place, and these entries will need to be liquidated within a short period of time to avoid becoming deemed liquidated.

9. For entries inadvertently liquidated during the injunction, CBP would have to undertake the manual process of returning those entries, one-by-one, to unliquidated status upon order of the Court. If there is even a small delay in the implementation of an injunction, CBP's resources to void inadvertent liquidations may be overwhelmed.

10. Furthermore, CBP would need to suspend liquidation on *all future entries* subject to Section 301 duties made by the over 6,500 subject importers in the Section 301 litigation, plus any additional plaintiffs that may file cases. ACE does not have the functionality to automatically suspend the liquidation of type "01" entries. Therefore, suspension of liquidation of future entries would not occur automatically at entry, but would need to be done on an importer-by-importer basis until any decision issued in the Section 301

challenges becomes final.  To suspend newly-filed entries, CBP would likely need to run reports again, every 30 days, for each of the over 6,500 importers, plus any new importers, and then repeat the steps in Paragraph 7 for entries filed during the 30-day period.

11. To suspend liquidation on future entries, CBP would need to again run the reports described in paragraph 7 above, approximately every 30 days, to capture all new entries filed by the over 6,500 subject importers and any relevant post-summary corrections ("PSCs") where an entry not previously subject to Section 301 List 3 or List 4A duties is corrected to be subject to those duties.  To account for PSCs, these follow-up reports would need to reach back to the first implementation of either the List 3 or List 4A Section 301 duties.  The newly-identified entries would then be manually suspended either entry-by-entry, or by using the "mass processing" function.

12. When litigation is completed and the suspension of liquidation is lifted for the millions of entries that would be suspended pursuant to Court order, pursuant to 19 U.S.C. § 1504(d), CBP would only have six months to liquidate those entries before they liquidate by operation of law.  It would be nearly impossible for CBP to liquidate millions of entries within the time period of § 1504(d), and the risk that they would deem liquidate is very high.

13. CBP is an agency of limited resources with a broad mission entailing many competing priorities.  Having to suspend the liquidation of past and future entries covered by List 3 and List 4A for all plaintiffs would divert agency resources away from other priority trade functions, thus compromising the agency's ability to perform them properly.  Those functions include: Enforcement of intellectual property rights; enforcement and

implementation of AD/CVD orders, including combatting transshipment and ensuring that duties are properly assessed and entries are timely liquidated; assisting in Enforce and Protect Act investigations; enforcement of forced labor laws; instituting penalties and referring appropriate matters to Homeland Security Investigations; reviewing prior disclosures; conducting free trade agreement verifications; overseeing discretionary targeting efforts; and processing the dramatic increase in protests filed in the last year.

14. Creating new programming within ACE to automate some of the processes described above is not a feasible alternative for implementation in the short term. Planning, developing, and testing such programming would take significant time and could not be completed within the time frame for implementing an injunction.

I declare that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 13th day of May, 2021.

_____
Thomas Overacker
Executive Director
Cargo and Conveyance Security
Office of Field Operations
U.S. Customs and Border Protection