## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:    THE HONORABLE MARK A. BARNETT, CHIEF JUDGE
                THE HONORABLE CLAIRE R. KELLY, JUDGE
                THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

_____
                                       :
                                       :
*In Re* Section 301 Cases               :         Court No. 21-00052
                                       :
_____:

### PROPOSED REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION LIMITED TO SUSPENSION OF LIQUIDATION

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

ARGUMENT ......................................................................................................................3

I.    PLAINTIFFS HAVE ESTABLISHED A LIKELIHOOD OF SUCCESS ..........................3

    A.    Plaintiffs Are Likely To Succeed On Their Claim That The Trade Act Does Not Permit The "Supplemental" List 3 And List 4A Tariff Actions (Count One)..................................................................................................................3

        1.    The Legal Framework Governing Imposition and Modification of Section 301 Trade Actions ..........................................................................4

        2.    Section 307 Does Not Authorize USTR To Increase The Original Tariff Action In The Circumstances Present Here .......................................5

            a.    Section 307(a)(1)(B) does not authorize List 3 and List 4A............6

            b.    Section 307(a)(1)(C) does not authorize List 3 and List 4A............8

            c.    Unbroken prior practice bolsters USTR's limited modification authority..................................................................11

        3.    The Government Reliance On Legislative History, Policy, And The Absurdity Canon Defies The Statute's Plain Text. ...................................12

    B.    Plaintiffs Are Also Likely To Succeed On Their Claim That Defendants Violated The APA (Count Two) ...................................................................16

    C.    The Government's Meritless "Anticipated Defenses" Have Been Consistently Rejected By This And Other Courts ..................................18

II.   DEFENDANTS CANNOT DODGE THE INEVITABLE RISK OF IRREPARABLE HARM ABSENT INTERIM RELIEF ...................................................20

III.  DEFENDANTS FAIL TO REFUTE THAT THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST WEIGH IN PLAINTIFFS' FAVOR...........................24

CONCLUSION..................................................................................................................25

# TABLE OF AUTHORITIES

<u>C</u>ASES:

*Adams v. Freedom Forge Corp.*,
   204 F.3d 475 (3d Cir. 2000)...........................................................................................23

*Almond Bros. Lumber Co. v. United States*,
   721 F.3d 1320 (Fed. Cir. 2013)......................................................................................18

*American Coll. of Emergency Physicians v. Price*,
   264 F. Supp. 3d 89 (D.D.C. 2017) .................................................................................16

*American Signature, Inc. v. United States*,
   598 F.3d 816 (Fed. Cir. 2010)........................................................................................21

*Asiana Airlines v. FAA*,
   134 F.3d 393 (D.C. Cir. 1998) .......................................................................................16

*Auto. Parts & Accessories Ass'n v. Boyd*,
   407 F.2d 330 (D.C. Cir. 1968) .......................................................................................16

*Azar v. Allina Health Servs.*,
   139 S. Ct. 1804 (2019)...................................................................................................14

*California v. Azar*,
   911 F.3d 558 (9th Cir. 2018) .........................................................................................23

*Chamber of Com. of U.S. v. Reich*,
   74 F.3d 1322 (D.C. Cir. 1996) .......................................................................................19

*City of Portland v. EPA*,
   507 F.3d 706 (D.C. Cir. 2007) .......................................................................................17

*City of Waukesha v. EPA*,
   320 F.3d 228 (D.C. Cir. 2003) .......................................................................................17

*Dai Glob. v. Administrator of the United States Agency for Int'l Dev.*,
   945 F.3d 1196 (Fed. Cir. 2019)......................................................................................14

*Davis v. Michigan Dep't of Treasury*,
   489 U.S. 803 (1989).........................................................................................................8

*Enterprise Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*,
   762 F.2d 464 (5th Cir. 1985) .........................................................................................23

*Gilda Indus., Inc. v. United States*,
   622 F.3d 1358 (Fed. Cir. 2010)......................................................................................18

*Gilead Scis., Inc. v. Lee*,
    778 F.3d 1341 (Fed. Cir. 2015).........................................................................14

*Gonzalez v. United States*,
    553 U.S. 242 (2008).........................................................................................10

*Greater Yellowstone Coal. v. Flowers*,
    321 F.3d 1250 (10th Cir. 2003) ......................................................................23

*Gundy v. United States*,
    139 S. Ct. 2116 (2019).....................................................................................10

*Haggar Co. v. Helvering*,
    308 U.S. 389 (1940)..........................................................................................15

*Hamer v. Neighborhood Hous. Servs. of Chi.*,
    138 S. Ct. 13 (2017).........................................................................................14

*Invenergy Renewables LLC v. United States*,
    422 F. Supp. 3d 1255 (Ct. Int'l Trade 2019) .................................................19
    476 F. Supp. 3d 1323 (Ct. Int'l Trade 2020) .................................................19

*J. Conrad Ltd. v. United States*,
    457 F. Supp. 3d 1365 (Ct. Int'l Trade 2020) .................................................23

*Lilliputian Sys., Inc. v. Pipeline & Hazardous Materials Safety Admin.*,
    741 F.3d 1309 (D.C. Cir. 2014)......................................................................17

*Morton v. Ruiz*,
    415 U.S. 199 (1974).........................................................................................20

*O.A. v. Trump*,
    404 F. Supp. 3d 109 (D.D.C. 2019).................................................................19

*Ohio Oil Co. v. Conway*,
    279 U.S. 813 (1929).........................................................................................23

*Panama Refining Co. v. Ryan*,
    293 U.S. 388 (1935).........................................................................................10

*Shinyei Corp. of Am. v. United States*,
    355 F.3d 1297 (Fed. Cir. 2004).......................................................................21

*Silfab Solar, Inc. v. United States*,
    892 F.3d 1340 (Fed. Cir. 2018).......................................................................20

*Ugine & Alz Belgium v. United States*,
    452 F.3d 1289 (Fed. Cir. 2006).......................................................................21

*United States v. Gulla*,
   833 F. Supp. 274 (S.D.N.Y. 1993) ...................................................................10

*Webster v. Doe*,
   486 U.S. 592 (1988) ...........................................................................................11

*Whitman v. American Trucking Ass'n*,
   531 U.S. 457 (2001) ...........................................................................................12

*Zenith Radio Corp. v. United States*,
   710 F.2d 806 (Fed. Cir. 1983)...........................................................................20

## CONSTITUTION AND STATUTES:

U.S. CONST. art. I .....................................................................................................4

5 U.S.C.
   § 553(a) ..............................................................................................................19
   § 704 ..................................................................................................................18
   § 706 ..................................................................................................................20

19 U.S.C.
   § 2411(a)(2)(B)(iv) ..............................................................................................9
   § 2411(a)(2)(B)(v) ...............................................................................................9
   § 2411(b) ..............................................................................................................8
   § 2411(b)(1) ..........................................................................................................4
   § 2411(b)(2) ..........................................................................................................4
   § 2411(c)(1)(B) .....................................................................................................5
   § 2412 ...................................................................................................................4
   § 2414(a)(2)(B) .....................................................................................................5
   § 2416(b)(2)(B) ...................................................................................................13
   § 2417 .............................................................................................................5, 10
   § 2417(a)(1) ...........................................................................................................5
   § 2417(a)(1)(A) .....................................................................................................9
   § 2417(a)(1)(B) .................................................................................................6, 7
   § 2417(a)(1)(C) ..............................................................................................6, 8, 9
   § 2417(a)(2) ....................................................................................................5, 20

28 U.S.C.
   § 1581(i) ..............................................................................................................21
   § 2640(e) .............................................................................................................18

## OTHER AUTHORITIES:

83 Fed. Reg. 33,608 (July 17, 2018) .......................................................................6

83 Fed. Reg. 47,974 (Sept. 21, 2018) ............................................................6, 7, 17

84 Fed. Reg. 22,564 (May 17, 2019) ................................................................6

84 Fed. Reg. 43,304 (Aug. 20, 2019)...................................................6, 7, 17

*Implementation of the U.S.-EC Beef Hormones Memorandum of Understanding*,
   74 Fed. Reg. 48,808 (Sep. 24, 2009) ...........................................................11

Jacobs, Jennifer et al., *Trump to Back $200 Billion China Tariffs as Early as Next
   Week, Sources Say*, BLOOMBERG, Aug. 31, 2018 ..................................17

*Modification of Action Under Section 301(b); Out-of-Cycle Review Under Section
   182; and Request for Public Comment: Intellectual Property Laws and
   Practices of the Government of Ukraine*, 71 Fed. Reg. 5,899 (Feb. 3, 2006) ........................12

*Modification of Determination of Action Pursuant to Section 301 Concerning
   Canadian Exports of Softwood Lumber; Opportunity for Comment*, 57 Fed.
   Reg. 44,609 (Sept. 28, 1992) ...................................................................12

*Results of Out-Of-Cycle Review Under Section 182 and Termination of Action
   Under Section 301(b): Intellectual Property Laws and Practices of the
   Government of Ukraine*, 70 Fed. Reg. 53,410 (Sept. 8, 2005) .................11

*Termination of Action: Protection of Intellectual Property Rights by the
   Government of Honduras*, 63 Fed. Reg. 35,633 (June 30, 1998) ...........12

*Termination of Section 301 Investigation and Action Regarding the People's
   Republic of China's Protection of Intellectual Property and Provision and
   Market Access to Persons Who Rely on Intellectual Property Protection*, 60
   Fed. Reg. 12,582 (Mar. 7, 1995).................................................................11

Trade and International Economic Policy Reform Act of 1987—Veto Message
   from the President of the United States, 134 CONG. REC. H3531 (daily ed.
   May 24, 1998) (statement of President Ronald Reagan) ........................14

## INTRODUCTION

In opposing Plaintiffs' preliminary injunction motion, the Government fails to comprehend the limited, protective nature of the interim relief Plaintiffs seek—that is, to maintain the status quo for still unliquidated entries.  Such relief has regrettably become necessary not because of an intervening change in the law, but rather due to a change in the Government's litigating position. Despite acknowledging "binding precedent" that supports reliquidation if Plaintiffs were to prevail (Opp'n 36), the Government has retreated from its concessions in prior cases (based on the "magnitude" of this one, *id.*) and settled on the following contradictory stance:  (i) liquidation should permanently deprive Plaintiffs of billions of dollars in refunds, even if the Court rules that the List 3 and List 4A tariffs were unlawfully imposed; but (ii) neither the Government nor this Court should do anything to prevent that from happening.  This Court should reject that manifestly inequitable position.

In light of the narrowly tailored relief Plaintiffs seek, the Government's arguments on public interest, balance of hardships, and irreparable harm all fail.  Any public interest the Government asserts in enforcing the Section 301 tariffs (or in maintaining the United States' negotiating position vis-à-vis China) would not be affected *at all* by a preliminary injunction limited to suspension of liquidation.  The tariffs would remain operative and Plaintiffs would continue to pay them (until this Court rules them unlawful).  Although the Government claims "enormous" administrative burdens, it has at its disposal an easy solution:  offering the same stipulation as to reliquidation that it concededly offered as recently as last year in precisely these circumstances.  In other words, the avoidable "burdens" of which the Government complains are entirely of its own making.  On the other side of the ledger, the narrow protective injunction Plaintiffs request requires a commensurately narrow showing of irreparable harm.  And that harm

is evident:  denying such limited relief risks depriving Plaintiffs the right to return of duties paid *even once the tariffs are deemed illegal*, as the Government continues to liquidate entries with each passing day.  Plaintiffs simply seek to prevent any unlawfully collected duties on currently unliquidated entries from becoming irretrievably lost—a quintessential form of irreparable harm well recognized in Federal Circuit precedent, including in the liquidation context specifically.

That leaves "likelihood of success" on the merits.  As this Court and the Federal Circuit have recognized, once Plaintiffs have established irreparable harm—which follows *a fortiori* from the Government's new position that liquidation makes paid duties forever unrefundable— Plaintiffs need show only a "fair chance" of success.  That is doubly true where, as here, the requested preliminary injunctive relief is so narrow.  The Government's litigation tactics— including its recognition of the "significance of the section 301 litigation," Opp'n 36, its insistence on multiple rounds of expanded merits briefing over six months, and its stubborn refusal to enter into a stipulation that becomes relevant only if the Government loses—betray its true views regarding Plaintiffs' likelihood of success.

Regardless, Plaintiffs' main legal theory—as set out in its Amended Complaint and elaborated here in reply to the Government's muddled arguments—establishes not only a "fair chance," but a strong probability of success.  Although the Government tries to characterize Plaintiffs' position as "simply wrong," the Government's extensive reliance on inapt snippets of legislative history discussing different (unenacted) language, rather than on the plain and unambiguous statutory text, speaks volumes.  The Trade Act's text and structure reveal that, in granting certain tariff powers to the United States Trade Representative (USTR), Congress also imposed meaningful limitations.  Yet the Government obliterates Section 307's carefully circumscribed limits on modification in an all-out effort to claim unlimited discretion to expand

tariffs and escalate a trade war in whatever fashion, and for however long, it pleases.  Section 307 does not confer such unbounded authority, and the notices promulgating List 3 and List 4—which lack any showing of increased burden *from the investigated intellectual property practices* ("the subject of [the Section 301] action"), but rather rely on China's imposition of its own retaliatory tariffs (and a smattering of other unrelated grievances)—plainly fail to satisfy the Act's conditions for modification.  The Government's acknowledgment elsewhere that this is the first time in the Trade Act's history that USTR has used its Section 307 modification authority to increase (let alone 10-fold) a Section 301 tariff action confirms that its legal position is as unfounded as it is unprecedented.

## <u>ARGUMENT</u>

### I.     PLAINTIFFS HAVE ESTABLISHED A LIKELIHOOD OF SUCCESS

Although no more than a "fair chance" of success is required at this stage, Plaintiffs can demonstrate a "likelihood of success" under any standard.  Given the limited nature of the interim relief Plaintiffs seek, the obvious threat of irreparable harm, and the detailed statutory and legal narrative provided in Plaintiffs' Amended Complaint (as well as 3,700+ related suits), Plaintiffs continue to believe that the merits should be decided based on full briefing under the schedule the Court entered.  Nevertheless, in light of the Government's response, Plaintiffs elaborate on the merits arguments here.

### A.     Plaintiffs Are Likely To Succeed On Their Claim That The Trade Act Does Not Permit The "Supplemental" List 3 And List 4A Tariff Actions (Count One)

USTR exceeded the authority Congress granted it under the Trade Act of 1974 when it imposed tariffs of 10% to 25% on $500 billion worth of Chinese goods (List 3 and List 4)—an amount ten times greater than the $50 billion action (List 1 and List 2) based on the original Section 301 investigation that USTR had deemed "commensurate with an economic analysis of the harm

caused by China's unreasonable technology transfer policies to the U.S. economy."  Am. Compl. ¶ 24, Court No. 20-177 (Sep. 21, 2020), ECF No. 12 ("Am. Compl.").  Although Section 307 of the Trade Act permits USTR to "modify or terminate" a Section 301(b) action in certain circumstances, those circumstances are absent here.  Accordingly, the List 3 and List 4A tariff actions are *ultra vires* and contrary to law.

   1.   *The Legal Framework Governing Imposition and Modification of Section 301 Trade Actions*

The Constitution grants Congress certain enumerated powers, including the power to "lay and collect Taxes, Duties, Imposts and Excises," as well as to "regulate Commerce with foreign Nations." U.S. CONST. art. I, § 8.  In the Trade Act, Congress delegated to the Executive Branch the power to exercise some of that authority within specified statutory constraints.

The Trade Act defines two types of USTR action:  mandatory action under Section 301(a) and discretionary action under Section 301(b).  This case involves Section 301(b), under which USTR has discretion to act upon a showing that "an act, policy, or practice of a foreign country" is "unreasonable or discriminatory" and "burdens or restricts United States commerce." 19 U.S.C. § 2411(b)(1).  Congress authorized USTR to conduct an investigation to make that showing.  *Id.* § 2412.

After an investigation, USTR must determine whether "action by the United States is appropriate." 19 U.S.C. § 2411(b)(2).  If USTR so determines, USTR may "take all appropriate and feasible action authorized [in Section 301(c)] . . . , subject to the specific direction, if any, of the President regarding any such action, and all other appropriate and feasible action within the power of the President that the President may direct the Trade Representative to take under this subsection, to obtain elimination of that act, policy, or practice." *Id.*  Among other responses, Section 301 authorizes USTR to "impose duties or other import restrictions on the goods of" the

foreign country "for such time as the Trade Representative determines appropriate." *Id.* § 2411(c)(1)(B). Although Defendants repeatedly refer to this action merely as USTR's "initial" action (*e.g.*, Opp'n 2, 4, 5, 7, 9, 11, 13, 21, 22, 23, 24, 25), Section 301 never uses that term. Instead, the determination of what action, if any, to take must be made within 12 months from the initiation of the investigation. *Id.* § 2414(a)(2)(B).

Once a Section 301 action has been implemented, the Trade Act allows USTR to "modify or terminate" the action only in specified circumstances. 19 U.S.C. § 2417. Specifically, under Section 307(a)(1),

> The Trade Representative may modify or terminate any action, subject to the specific direction, if any, of the President with respect to such action, that is being taken under [Section 301] of this title if—
>
> > (A) any of the conditions described in [Section 301(a)(2)] exist,
> >
> > (B) the burden or restriction on United States commerce of the denial rights, or of the acts, policies, and practices, that are the subject of such action has increased or decreased, or
> >
> > (C) such action is being taken under [Section 301(b)] and is no longer appropriate.

*Id.* § 2417(a)(1). Before modifying or terminating a Section 301 action, USTR is obligated to consult with representatives of the domestic industry concerned, and to provide an opportunity for other affected parties to present their views "concerning the effects of the modification or termination and whether any modification or termination of the action is appropriate." *Id.* § 2417(a)(2).

> 2. *Section 307 Does Not Authorize USTR To Increase The Original Tariff Action In The Circumstances Present Here*

Because USTR implemented List 3 and List 4A beyond "12 months after the date on which the [Section 301] investigation [was] initiated," Defendants must locate statutory authorization in

5

Section 307, the "modification" provision. Defendants' response relies on the two subsections of Section 307 interchangeably, but USTR did not do so in promulgating List 3 and List 4A. Specifically, in *proposing* List 3, USTR relied solely on Section 307(a)(1)(C), which allows USTR to "modify or terminate any action, subject to the specific direction, if any, of the President with respect to such action, . . . if . . . such action is being taken under [S]ection 301(b) of this title and is no longer appropriate." 83 Fed. Reg. 33,608, 33,609 (July 17, 2018) (second ellipsis in original) (quoting 19 U.S.C. § 2417(a)(1)(C)); *see* Am. Compl. ¶ 34. Tellingly, upon *finalizing* List 3, USTR for the first time cited Section 307(a)(1)(B), which permits modification where "the burden or restriction on United States commerce . . . of the acts, policies, and practices, that are the subject of such action has increased or decreased." 83 Fed. Reg. 47,974, 47,974 (Sept. 21, 2018) (quoting 19 U.S.C. § 2417(a)(1)(B)); *see* Am. Compl. ¶ 45. As USTR's evolving rationale would suggest, neither provision supports the List 3 or List 4A tariff actions.

      a.      <u>Section 307(a)(1)(B) does not authorize List 3 and List 4A</u>

In promulgating List 3 and List 4A, USTR claimed that "China's unfair acts, policies, and practices include not just its specific technology transfer and IP polices referenced in the notice of initiation in the investigation, but *also China's subsequent defensive actions taken to maintain those policies*"—mainly, China's "deci[sion] to impose approximately $50 billion in tariffs on U.S. goods" and various setbacks in trade negotiations. *See* 83 Fed. Reg. at 47,974 (emphasis added); 84 Fed. Reg. 43,304, 43,304 (Aug. 20, 2019) (same); 84 Fed. Reg. 22,564, 22,564 (May 17, 2019) (citing "China['s] retreat[] from specific commitments made in previous rounds [and] . . . further retaliatory action against U.S. commerce"). Defendants contend that Section 307(a)(1)(B) empowers USTR to ratchet up tariffs without limitation where "the burden or restriction on United States commerce" has increased not from the practices that spurred the investigation and remedial

action under Section 301, but as a result of China's *retaliatory response* to that action—and, potentially, even other issues that USTR never investigated.  *See*, *e.g.*, Opp'n 2 (citing China's "further action to maintain those acts, policies, and practices through the imposition of tariffs on U.S. goods"); *id.* at 15 (citing not only China's retaliation, but also its "decision to devalue its currency"); *see also* Am. Compl. ¶¶ 31, 37, 55-58 (citing, *inter alia*, fentanyl imports, failure to make agricultural purchases, trade imbalance, and currency manipulation).

The text of Section 307(a)(1)(B) proves otherwise.  That provision states that a Section 301 action may be modified only where the burden on U.S. commerce "of the acts, policies, or practices *that are the subject of*" the Section 301 action has increased or decreased.  19 U.S.C. § 2417(a)(1)(B) (emphasis added).  Neither China's retaliatory tariffs, nor its refusal to honor commitments made in subsequent rounds of negotiations, could have been "the subject of" the Section 301 action because they did not exist when the investigation was initiated or when USTR determined that remedial action was "appropriate."  The same goes for the various other reasons the Government has advanced formally and informally to justify List 3 and List 4A.  Even though China's response to the tariffs may cause "increased harm to the U.S. economy," Opp'n 15 (quoting 84 Fed. Reg. at 43,304), that is not the harm with which the investigation, and hence Section 307(a)(1)(B), is concerned.  Had Congress intended to confer on USTR sweeping authority to prosecute a limitless trade war no matter how discrete the original Section 301(b) investigation and action, it presumably would have said so—and not through the narrowly tailored language of Section 307(a)(1)(B).  USTR's effort to piggyback on China's countermeasures and other unrelated measures flouts the plain text of the Act.

To the extent Defendants imply that USTR found the burden of the investigated practices "continues to increase" *apart from China's retaliatory measures and other actions*, they are wrong.

*See* Opp'n 13 (quoting 83 Fed. Reg. at 47,974); *see* 84 Fed. Reg. at 43,304.  As just discussed, the Federal Register notices—and Defendants' opposition—demonstrate that USTR's assertion was premised solely on the separate and distinct burdens from China's *response* to the Section 301 action, and other disparate Chinese acts and policies—actions that are not "acts, policies, and practices that are the subject of the Section 301 action."  *See, e.g.*, Opp'n 1-2 (arguing that modification appropriate based on "China's refusal to cease its unlawful practices" and its adoption of retaliatory measures); *id.* at 11 (List 3 proposed "[i]n light of China's response to the $50 billion action") (alteration in original); *id.* at 14 (List 4 proposed "[i]n response to China's retreat from its prior commitments and announcement that it intended to take further retaliatory action").

> b.      Section 307(a)(1)(C) does not authorize List 3 and List 4A

Defendants' reliance on Section 307(a)(1)(C) also misses the mark.  As discussed, Section 301(b) authorizes USTR to take discretionary action only if:  (1) a foreign country's acts, policies, or practices are unreasonable or discriminatory and burden or restrict U.S. commerce; and (2) responsive action by the United States is "*appropriate*."  19 U.S.C. § 2411(b) (emphasis added). Section 307(a)(1)(C) permits subsequent modification of that action only after concluding that the action once deemed appropriate under Section 301(b) is "*no longer appropriate*."  19 U.S.C. § 2417(a)(1)(C) (emphasis added).  Reading Section 307(a)(1)(C) in conjunction with Section 301(b) (as one must) demonstrates that Section 307(a)(1)(C) provides authority only to reduce or terminate an existing action after changed circumstances undermine the original finding that certain responsive action was "appropriate."  *See Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.").

Section 307 does not permit USTR to increase trade restrictions years later as part of an open-ended trade war.

The neighboring prongs of Section 307(a)(1) reinforce the conclusion that Section 307(a)(1)(C) is a tool to taper, not expand, an existing remedial action. Section 307(a)(1)(A) permits USTR to modify or terminate an action taken under Section 301(a) when "any of the conditions described in section [301(a)(2)] exist." 19 U.S.C. § 2417(a)(1)(A). Those "conditions" are the exceptions to mandatory action under Section 301(a), and include circumstances in which the foreign country is taking steps to remediate its offensive practices, or when a U.S. response to a foreign trade violation would "serious[ly] harm . . . the national security" or "adverse[ly] impact . . . the United States economy." *Id.* § 2411(a)(2)(B)(i)-(v). By authorizing USTR to modify or terminate an action when those *exceptions* to mandatory action are present, Congress did not authorize USTR to *increase* tariffs thereunder. On the contrary, Congress permitted USTR only to withdraw an action previously taken when later-developed conditions render that action undesirable.

Importantly, Section 307(a)(1)(A) mirrors Section 307(a)(1)(C). Whereas the former applies to mandatory action under Section 301*(a)*, the latter applies to discretionary action under Section 301*(b)*. *See* 19 U.S.C. § 2417(a)(1)(A), (C). Just as Section 307(a)(1)(A) allows USTR to terminate or ratchet down a *mandatory* action when that action no longer makes sense in light of changed circumstances, Section 307(a)(1)(C) likewise authorizes USTR to terminate or ratchet down a *discretionary* action when it "is no longer appropriate." 19 U.S.C. § 2417(a)(1)(C). Neither provision authorizes an escalation of a tariff action in response to changed circumstances.

In fact, if the modification authority under Section 307(a)(1)(C) were broad enough to permit USTR to escalate a tariff action on a whim, USTR would always rely on subsection (C)

over (B)—and thus avoid making the factual determinations required by subsection (B) in every discretionary action case.  (USTR did just that in its notice of proposed List 3 action.)  Indeed, subsection (B) is the only sub-provision under Section 307(a)(1) explicitly to reference a possible escalation of action.  The existence of subsection (B) thus explains why Congress chose the broader phrase "*modify* or terminate" rather than "*reduce* or terminate" in the prefatory clause of Section 307(a)(1).  Although "reduce" or "terminate" are the only sensible options under subsections (A) and (C), subsection (B) explicitly contemplates a potential increase in remedial action.  So Congress's choice to use the term "modify" in an introductory clause covering all three subsections does not mean that "modify" permits an upward adjustment in subsection (C).  *See* 19 U.S.C. § 2417.

If any doubt remains, principles of constitutional avoidance should eliminate it.  *See*, *e.g.*, *Gonzalez v. United States*, 553 U.S. 242, 251 (2008) ("[W]hen 'a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided,'" the court's "'duty is to adopt the latter.'").  If Section 307 delegated to USTR the authority to use a single investigation targeting a narrow set of unfair intellectual property and forced technology transfer policies (which warranted a "commensurate" $50 billion action) to justify an unbounded trade war against the entire volume of trade with China, simply because it found the original action "no longer appropriate," that would present a serious problem under the non-delegation doctrine.  *See Panama Refining Co. v. Ryan*, 293 U.S. 388, 421 (1935); *see also Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) ("The constitutional question is whether Congress has supplied an intelligible principle to guide the delegee's use of discretion.");  *United States v. Gulla*, 833 F. Supp. 274, 282 (S.D.N.Y. 1993) ("If Executive action . . . need not be supported by factual findings . . . and cannot be questioned because the governing

standard is 'drawn in such broad terms that in a given case there is no law to apply . . . ' then the question of delegation of taxing power by Congress would come into sharp focus, particularly absent an emergency situation.") (quoting *Webster v. Doe*, 486 U.S. 592, 592 (1988)) (second ellipsis in original). If "no longer appropriate" means USTR can ratchet up tariffs to whatever level it sees fit, then that standard provides no "intelligible principle" at all.

c.    <u>Unbroken prior practice bolsters USTR's limited modification authority</u>

In promulgating List 3, USTR admitted in internal deliberations that its action was unprecedented: "we are not aware of prior investigations where a Trade Representative was called upon to use Section 307 modification authority to increase the level of trade action in order to achieve the statutory goal of obtaining the elimination of harmful policies covered by the investigation." PR-01 (Add. 11). Given the statute's clear language, that is no surprise.

Prior to this investigation, USTR has invoked Section 307(a)(1)(B) just once—to *terminate* duties—when, in 2009, USTR found that the European Communities had decreased the burden or restriction on U.S. commerce by establishing a new tariff quota for beef. *See Implementation of the U.S.-EC Beef Hormones Memorandum of Understanding*, 74 Fed. Reg. 48,808 (Sep. 24, 2009).

USTR has invoked Section 307(a)(1)(C) on five occasions in the 30 years since its enactment (not including this investigation). In three of those instances, including in a prior action against China, USTR terminated the action completely. *See, e.g., Termination of Section 301 Investigation and Action Regarding the People's Republic of China's Protection of Intellectual Property and Provision and Market Access to Persons Who Rely on Intellectual Property Protection*, 60 Fed. Reg. 12,582, 12,583 (Mar. 7, 1995) ("Section 307(a)(1)(C) of the Trade Act authorizes the USTR to terminate any action . . . if, inter alia, the USTR determines that the action being taken under section 301(b) of the Trade Act is no longer appropriate."); *see also Results of*

11

*Out-Of-Cycle Review Under Section 182 and Termination of Action Under Section 301(b): Intellectual Property Laws and Practices of the Government of Ukraine*, 71 Fed. Reg. 5,899 (Feb. 3, 2006); *Termination of Action: Protection of Intellectual Property Rights by the Government of Honduras*, 63 Fed. Reg. 35,633 (June 30, 1998).  On another occasion, USTR decided to terminate in part a Section 301 action after "the Government of Ukraine . . . addressed one of the two issues . . . that were the basis of . . . the Trade Representative's finding that Ukraine's inadequate IPR protections were actionable under Section 301(b)." *Modification of Action Under Section 301(b); Out-of-Cycle Review Under Section 182; and Request for Public Comment: Intellectual Property Laws and Practices of the Government of Ukraine*, 70 Fed. Reg. 53,410, 53,411 (Sept. 8, 2005). In the last example, USTR delayed implementation of a Section 301(b) action to allow for completion of review under a trade agreement.  *See Modification of Determination of Action Pursuant to Section 301 Concerning Canadian Exports of Softwood Lumber; Opportunity for Comment*, 57 Fed. Reg. 44,609 (Sept. 28, 1992).

What USTR has never done is rely on Section 307(a)(1)(B) or (C) to *expand* a tariff action—never mind by such a mind-boggling magnitude.  The Government's unbroken past practice is further confirmation that neither "mousehole" provides the "elephant"-size authorization for the $500 billion List 3 and List 4 tariff actions.  *See Whitman v. American Trucking Ass'n*, 531 U.S. 457, 468 (2001) ("Congress . . . does not . . . hide elephants in mouseholes.").

          3.   *The Government Reliance On Legislative History, Policy, And The Absurdity Canon Defies The Statute's Plain Text.*

None of the Government's contrary arguments defeats Plaintiffs' showing of a likelihood of success.

*First*, Defendants' textual argument badly conflates and commingles the two distinct and limited modification provisions under subsections 307(a)(1)(B) and (C).  As noted above, those subsections play distinct roles, which is why Congress divided them accordingly:  subsection (B) allows USTR to ratchet up tariffs when the investigated practice has worsened, *i.e.*, when "the burden on United States commerce of the practices that are subject of [the 301] action has increased," while subsection (C) allows USTR to ratchet down the tariffs when the 301 action "is no longer appropriate."  So, contrary to Government's repeated assertion (and consistent with Plaintiffs' plain-text reading), the statutory scheme does permit USTR to ratchet up tariffs—but only when USTR makes a proper finding that the investigated practices *themselves* have worsened. Under the Government's view, by contrast, the only limit on USTR's tariff-boosting authority is its own imagination.

The Government never grapples with the implications of its statutory reading.  Defendants do not (and cannot) deny that, if subsection 307(a)(1)(C) also allows increases in tariff actions, USTR would *always* rely on subsection (C)—which imposes no fact-finding requirements—for modifying any Section 301(b) action.  Nor can Defendants deny that, unlike other Trade Act provisions that permit "retaliation" only in defined circumstances, *e.g.*, 19 U.S.C. § 2416(b)(2)(B), Section 307 conspicuously lacks any "retaliation" provision—let alone the open-ended one the Government claims.  And Defendants cannot deny that their reading would trample the carefully calibrated limitations on Executive Branch action embedded throughout the statute, including mandatory investigation requirements (§ 302), consultation requirements (§ 303), mandatory factual findings (§ 304), and even the twelve-month deadline for choosing "appropriate" action (*id.*).  If the Government is correct, once USTR takes "initial" action under Section 301, she is

forever empowered to take *any* subsequent trade action she deems "appropriate" against that country, for any reason, and without any limitation or meaningful judicial review.

*Second*, the Government relies heavily on legislative history to bolster its atextual reading. But as the Government admits (in a footnote), the history it relies on concerns an unenacted—in fact, vetoed[1]—bill. *See* Opp'n 2 n.1. The Government implies (misleadingly) that the bill was subsequently enacted only with modifications "that are not at issue in the Section 301 cases." *Id.* But as the Government later admits (in a different footnote), its legislative history quotations discuss language that differs materially from the enacted text—*i.e.*, whenever USTR deems the original action "not effective." *See id.* at 24 n.4 (noting that original "not effective" language from House bill was excised in conference process).

This Court should decline the Government's invitation to "replace the actual text with speculation as to Congress' intent." *Hamer v. Neighborhood Hous. Servs. of Chi.*, 138 S. Ct. 13, 20 (2017) (internal quotations omitted); *see Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1814 (2019) ("[L]egislative history is not the law."). That rule has special force where, as here, the Government's proffered speculation regards language Congress *specifically declined to enact*. *See Dai Glob. v. Administrator of the United States Agency for Int'l Dev.*, 945 F.3d 1196, 1199 (Fed. Cir. 2019) ("It is axiomatic that a statute should not be read to implicitly include language specifically rejected by Congress."). Because "[t]he authoritative statement is the statutory text, not the legislative history or any other extrinsic material," *Gilead Scis., Inc. v. Lee*, 778 F.3d 1341,

---

[1] Trade and International Economic Policy Reform Act of 1987—Veto Message from the President of the United States, 134 CONG. REC. H3531 (daily ed. May 24, 1998) (statement of President Ronald Reagan), *available at* https://www.senate.gov/legislative/vetoes/messages/ReaganR/HR3-Hdoc-100-200.pdf.

1348 (Fed. Cir. 2015), the Court should interpret the words Congress actually chose, *see id.* (rejecting reliance on "two House committee reports for bills that were not enacted").

*Third*, the Government makes a naked policy appeal, asking the Court: "What kind of negotiator would the President (or the USTR) be if he could only 'delay, taper, or terminate' the initial section 301 action if he subsequently concluded the initial action was ineffective?" Opp'n 24. That relies on a false premise: as explained above, USTR *can* increase the action under subsection (B), so long as USTR (unlike here) complies with the Act's limitations. And, if the circumstances do not exist to permit reliance on subsection (B), then USTR can commence a new Section 301 investigation to address the new unfair trade practices. In all events, the fact that the Government has never exercised the breathtaking authority it now claims was "abundantly clear" all along, Opp'n 23, belies its protest that Plaintiffs' reading would "deny the President and the USTR the flexibility to respond to a trading partner's refusal to eliminate its unfair trade practices," *id.* at 22.

*Finally*, the Government relies on the absurdity canon, under which the "literal reading" of a statute is avoided if it "would lead to absurd results." *Haggar Co. v. Helvering*, 308 U.S. 389, 394 (1940). Although Plaintiffs certainly agree that their construction of the statute is the "literal" one, there is nothing "absurd" about requiring the President to obey the terms Congress imposed. Congress delegated to the Executive Branch ample negotiating leverage and discretion regarding foreign trade, but simultaneously imposed certain guardrails—including a one-year time limit in determining an "appropriate" action, the ability to increase that action later if specific factual prerequisites are met, and the power to initiate a new Section 301 investigation in response to tit-for-tat retaliation when such retaliation was never previously investigated. Unlike Defendants'

audacious claim of unlimited Executive Branch discretion, only Plaintiffs' statutory reading takes account of the meaningful limitations in the enacted text.

**B.     Plaintiffs Are Also Likely To Succeed On Their Claim That Defendants Violated The APA (Count Two)**

Plaintiffs have also shown a "likelihood of success" on their procedural claim under the APA (Count Two), because Defendants neither provided a meaningful opportunity for comment nor considered the public's comments in a meaningful way.  Combined with the initial $50 billion tariff action imposed through List 1 and List 2, USTR's $500 billion List 3 and List 4 tariff actions cover virtually *all* imports from China.  Despite the unprecedented scope of USTR's action, USTR provided less than a month for the public to submit both initial and rebuttal comments on List 3, and little more than that for List 4.  Even worse, initial and rebuttal List 3 comments were due simultaneously, while List 4 rebuttal comments were due just days after the hearing (with over 300 witnesses) concluded.  Interested parties thus had little or no time to review the thousands of initial comments filed by other parties before developing their rebuttal comments.  That is no "meaningful" comment opportunity.  *See Asiana Airlines v. FAA*, 134 F.3d 393, 396 (D.C. Cir. 1998) ("[R]ule-making proceedings must provide both notice and meaningful opportunity to comment.").

USTR's cavalier approach to the comment process—including imposing new truncated procedures and its decision to announce the imposition of List 3 duties mere days after the comment period ended—underscores the fact that the agency never intended to consider the views of thousands of American businesses and trade associations that described the wide-ranging detrimental impacts these additional tariffs would have on global supply chains, U.S. jobs, and U.S. consumer prices.  USTR could not possibly have carefully reviewed the six days of hearing testimony and all 6,000+ comments submitted for List 3 in that short window.

16

It is hardly surprising, then, that USTR in its final notices addressed exactly none of those 6,000+ List 3 comments or the nearly 3,000 List 4 comments.  USTR was obligated to "respon[d] to public comments [in a way that] at least 'enable[s] [the Court] to see what major issues of policy were ventilated . . . and why the agency reacted to them as it did."  *American Coll. of Emergency Physicians v. Price*, 264 F. Supp. 3d 89, 94 (D.D.C. 2017) (fourth alteration and ellipsis in original) (quoting *Auto. Parts & Accessories Ass'n v. Boyd*, 407 F.2d 330, 338 (D.C. Cir. 1968).  Far from meeting that standard, USTR merely mentioned the number of comments it had received and stated that, based on its "careful[] review[,] . . . the Trade Representative, at the direction of the President, has determined not to include certain tariff subheadings" in List 3.  83 Fed. Reg. at 47,975; *see also* 84 Fed. Reg. at 43,305 (stating, in single conclusory sentence, that the final List 4 determination "takes account of the public comments and the testimony").  USTR offered no explanation of which comments, and what concerns raised in those comments, caused it to withdraw certain tariff headings and products but not others.  Although an agency "need not address every comment, . . . it must respond in a reasoned manner to those that raise significant problems."  *City of Waukesha v. EPA*, 320 F.3d 228, 257 (D.C. Cir. 2003); *see, e.g.*, *City of Portland v. EPA*, 507 F.3d 706, 715 (D.C. Cir. 2007) ("Significant comments are those which, if true, raise points relevant to the agency's decision and which, if adopted, would require a change in an agency's proposed rule.") (internal quotation marks and emphasis omitted).  USTR did not come close to fulfilling that obligation here.

USTR's inscrutable and rushed decision-making reinforces the notion the outcome of the public comment process was preordained.  Indeed, before the comment period for List 3 had even closed, President Trump already had indicated his intent to move ahead with the tariffs.  *See* Jennifer Jacobs et al., *Trump to Back $200 Billion China Tariffs as Early as Next Week, Sources*

*Say*, BLOOMBERG, Aug. 31, 2018.  Such statements, the hasty and flawed process, and USTR's failure to address the comments submitted all "demonstrate[] that the agency's decision was not based on a consideration of the relevant factors," and thus was in violation of the APA.  *Lilliputian Sys., Inc. v. Pipeline & Hazardous Materials Safety Admin.*, 741 F.3d 1309, 1312 (D.C. Cir. 2014) (internal quotation marks omitted).

### C.    The Government's Meritless "Anticipated Defenses" Have Been Consistently Rejected By This And Other Courts

The Government chides Plaintiffs for failing to address its anticipated defenses—particularly that the challenged final agency action is a political question, and otherwise unreviewable under the APA, because USTR acted at the direction of the President when it promulgated List 3 and List 4A.  But Plaintiffs did not address those defenses because they are meritless; in fact, they have been consistently rejected by the courts that have considered them in analogous contexts.  If anything, the Government's assertion of those defenses underscores the feebleness of its merits position.  Because the Trade Act places explicit limits on USTR's authority to act regardless of any Presidential directive, they should be rejected out of hand here as well.

That the President himself is not subject to the APA is beside the point:  Plaintiffs challenge final agency actions taken by USTR, an administrative agency subject to judicial review under APA standards.  *See* 5 U.S.C. § 704 ("final agency action" subject to judicial review); 28 U.S.C. § 2640(e) ("In any civil action not [otherwise] specified . . . , the Court of International Trade shall review the matter as provided in" the APA.).  On multiple occasions, the Federal Circuit has reviewed final agency actions taken by USTR under its Section 301 authority, including specifically whether USTR complied with explicit and enforceable statutory limits in modifying an action under Section 307.  *See, e.g.*, *Gilda Indus., Inc. v. United States*, 622 F.3d 1358, 1363 (Fed. Cir. 2010) (affirming grant of summary judgment under APA to plaintiff regarding § 1581(i)

18

challenge to USTR action under Section 307); *Almond Bros. Lumber Co. v. United States*, 721 F.3d 1320, 1326 (Fed. Cir. 2013) (reviewing challenge to USTR action under Section 301).

It makes no difference whether USTR acted (as agencies often do) pursuant to the direction of the President. That fact "hardly seems to insulate [agency actions] from judicial review under the APA, even if the validity of the [President's directive] were thereby drawn into question." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1326-1327 (D.C. Cir. 1996). As this Court recently held, USTR's "final agency action" remains reviewable under the APA, regardless whether USTR was acting at Presidential direction. *Invenergy Renewables LLC v. United States*, 422 F. Supp. 3d 1255, 1282-1283, 1294 (Ct. Int'l Trade 2019), *modified*, 476 F. Supp. 3d 1323 (Ct. Int'l Trade 2020) (finding USTR's actions relating to exclusions reviewable even though they were taken after "[t]he President directed USTR to adopt [the] exclusion process" via Proclamation); *see also, e.g.*, *O.A. v. Trump*, 404 F. Supp. 3d 109, 147 (D.D.C. 2019) ("The Court, moreover, need not pause over the fact that presidential actions are not themselves subject to APA review because it is the [agency's] Rule, and not the Proclamation, that has operative effect[.]") (internal citation omitted).

For similar reasons, the Government is wrong to argue that its actions "are beyond the review of this Court" because they present non-justiciable "political" questions. The question presented by this case is whether USTR complied with Section 307's terms and limits. As indicated by the Federal Circuit's resolution of similar questions in the past, *see Gilda* and *Almond Brothers*, *supra*, USTR's compliance with the Trade Act's statutory scheme plainly presents a "judicially discoverable and manageable standard" for resolving Plaintiffs' claims. Opp'n 27.

Finally, the Government contends that USTR's action falls within the "foreign affairs" exception to the APA's rulemaking requirements. Even if the Government were correct, that would

only excuse USTR from complying with Section 553's *rulemaking* requirements. *See* 5 U.S.C. § 553(a) ("Rule making") ("This section applies" except where, *inter alia*, a "foreign affairs" function is exercised). But Section 307 imposes its own public consultation requirements. *See* 19 U.S.C. § 2417(a)(2) (requiring the "opportunity for the presentation of views by other interested persons affected by the proposed modification"). Having decided to hold hearings and consider public comments, USTR should not be heard to argue that it was free to do so in an arbitrary, capricious, or illegal manner. *See* 5 U.S.C. § 706; *see, e.g.*, *Morton v. Ruiz*, 415 U.S. 199, 235-236 (1974) (noting that agencies must comply with their own internal procedures). No one disputes that USTR's actions are otherwise reviewable for "a clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority." Opp'n 20 (quoting *Silfab Solar, Inc. v. United States*, 892 F.3d 1340, 1346 (Fed. Cir. 2018)). As explained above, USTR's actions in promulgating List 3 and List 4A violated both the Trade Act and basic principles of administrative law.

## II. DEFENDANTS CANNOT DODGE THE INEVITABLE RISK OF IRREPARABLE HARM ABSENT INTERIM RELIEF

Plaintiffs demonstrated in their Motion that they risk suffering irreparable harm absent interim relief that suspends the liquidation of unliquidated entries subject to List 3 and List 4A duties. Pls.' Mot. 6-12. In response, Defendants concede that their (new) position regarding the unavailability of reliquidation, if successful, would permanently deprive Plaintiffs of all duties liquidated between now and the end of this litigation (totaling at least hundreds of millions of dollars and probably billions). *See* Opp'n 35-42; *see also Zenith Radio Corp. v. United States*, 710 F.2d 806, 809 (Fed. Cir. 1983) (holding that "a viable threat of serious harm which cannot be undone authorizes exercise of a court's equitable power to enjoin before the merits are fully

determined" (emphasis omitted)).  Nothing more is necessary to find that Plaintiffs likely will suffer irreparable harm absent interim relief.

In fact, Defendants' response makes Plaintiffs' irreparable harm even clearer.  Defendants essentially acknowledge that they are seeking to overturn settled law regarding this Court's reliquidation authority via appeal—and, in the meantime, will try to run out the clock on Plaintiffs' recovery.  Defendants concede that "this Court, and the litigants, are bound by *Shinyei Corp. of Am. v. United States*"—"binding precedent" that confirms the availability of reliquidation in actions initiated pursuant to 28 U.S.C. § 1581(i).  Opp'n 35, 36; *see Shinyei*, 355 F.3d 1297, 1311-1312 (Fed. Cir. 2004).  Defendants also admit "[i]t is now clear that the Court possesses authority to order reliquidation if necessary to enforce and protect the integrity of its own judgments or orders."  Opp'n 40-41.  And they admit that, until now, they have "relied on [*Shinyei*'s] holding in defending against certain requests to suspend the liquidation of entries."  *Id.* at 36.  Given that they have previously opposed preliminary injunctions suspending liquidation in reliance on *Shinyei*, their newfound opposition to such relief logically suggests they should *support* an injunction—or, better yet, a voluntary suspension of liquidation—here.  Indeed, Defendants' fail to reconcile their newfound claim of "uncertainty surrounding [*Shinyei*'s] application" with two decisions in which the Federal Circuit granted preliminary injunctions suspending liquidation based on the very same "uncertainty."  Pls.' Mot. 10-11 (discussing *American Signature, Inc. v. United States*, 598 F.3d 816, 829 (Fed. Cir. 2010); *Ugine & Alz Belgium v. United States*, 452 F.3d 1289, 1297 (Fed. Cir. 2006)).

Defendants barely attempt to justify their grossly inequitable litigation strategy that, if successful, would guarantee that *even currently unliquidated* entries will become permanently

unrecoverable once liquidated.[2]  Instead, they try to change the subject.  Defendants contend that Plaintiffs' "claim of irreparable harm is undercut by the fact that [P]laintiffs waited over two years to challenge the List 3 and List 4 tariffs" and "waited seven months from the filing of their [C]omplaint to raise issues regarding relief before the Court."  Opp'n 33.  Beyond the fact that Plaintiffs' injunction seeks only *prospective* relief regarding *unliquidated* entries, and that Plaintiffs filed well within the statute of limitations, the Government is wrong on the facts. Plaintiffs Halstead New England Corp. and Metroflor Corporation—the plaintiffs who initiated this entire litigation—filed suit less than one month after their Section 301 exclusion expired and their harm began to accrue.  *See* Court No. 20-177, ECF. No. 1 (initiating action on September 10, 2020); Am. Compl. at ¶ 49 (explaining that the applicable exclusion expired on August 7, 2020). And once Defendants finally took a position on the refund issue in April 2021—seven months after Plaintiffs first raised the issue, *see* Pls.' Mot. 3-5—Plaintiffs promptly filed their motion for interim relief just eleven days later.

Defendants' "delay" argument is particularly galling because the only reason Plaintiffs are in this position is that *Defendants* dragged their feet for seven months.  Despite persistent calls from both Plaintiffs and the Court for Defendants to come to terms on remedies, Pls.' Mot. 3-5, Plaintiffs waited to seek preliminary injunctive relief in good-faith reliance on the Government's requests for additional time for internal deliberation.  But no good deed goes unpunished: Plaintiffs' reward is the Government's baseless accusation of delay.  And to be clear, that accusation of "delay" follows on the heels of the Government's concession that Plaintiffs' position

---

[2] To make matters worse, some Section 301 Plaintiffs have reported that U.S. Customs & Border Protection (CBP) is declining to extend the period for liquidation through an otherwise routine regulatory request in light of this litigation.

on the Court's refund authority is *correct under existing precedent*. *See* Opp'n 35-36 (acknowledging concessions made in prior appeals based on *Shinyei*).

Defendants also make the irrelevant point that Plaintiffs failed to "support their irreparable harm arguments with affidavits purporting to show that, without an order suspending liquidation, their very existence is threatened." Opp'n 34-35. That misconstrues the nature of relief Plaintiffs seek and conflates the sort of harm showing that might be necessary were Plaintiffs seeking a much broader preliminary injunction enjoining operation and collection of the Section 301 tariffs altogether. If liquidation bars the recovery of refunds (as Defendants contend), then it follows ineluctably that Plaintiffs will permanently lose unrecoverable sums as each entry liquidates. In light of the narrow protective injunction Plaintiffs seek, that fact alone establishes irreparable harm; Plaintiffs need not also prove that they will go bankrupt. *See J. Conrad Ltd. v. United States*, 457 F. Supp. 3d 1365, 1377 (Ct. Int'l Trade 2020) (stating that "a viable threat of serious harm which cannot be undone can constitute irreparable injury") (internal quotation marks and citation omitted); *see, e.g., Ohio Oil Co. v. Conway*, 279 U.S. 813, 814 (1929) (per curiam) ("[I]n view of the entire absence under the local law of any remedy enforceable by the plaintiff, if the tax be paid and afterwards held invalid by the final decree, we are of opinion that the application for an interlocutory injunction should have been granted."); *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) ("[H]arm is irreparable here because the states will not be able to recover monetary damages."); *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003) ("An irreparable harm requirement is met if a plaintiff demonstrates a *significant risk* that he or she will experience harm that cannot be compensated after the fact by monetary damages.") (internal quotation marks omitted); *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484-485 (3d Cir. 2000) (same); *Enterprise Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 473

(5th Cir. 1985) ("The absence of an available remedy by which the movant can later recover monetary damages, however, may also be sufficient to show irreparable injury.").

## III.   DEFENDANTS FAIL TO REFUTE THAT THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST WEIGH IN PLAINTIFFS' FAVOR

Plaintiffs showed in their Motion that, for several reasons, the balance of the equities and public interest weigh in their favor.  Pls.' Mot. 14-15.  As noted, the main reason is that Plaintiffs seek only narrow relief—to enjoin the suspension of liquidation, not the collection of the List 3 and List 4A tariffs altogether—to maintain the status quo and limit disruption to the Government while the Court takes the time to consider the parties' full merits presentation.  *Id.* at 14.

The Government's argument in response is mystifying.  Defendants contend that injunctive relief would somehow interfere with the ongoing operation of the List 3 and List 4A tariffs and discourage China from "end[ing] the unfair trade practices" that gave rise to the underlying Section 301 investigation.  Opp'n 29-30.  But the entire point of Plaintiffs' narrow request for relief is to avoid such disruption while this litigation plays out.  The Government's suggestion that CBP's internal administrative treatment of entries to prevent them from liquidating pending litigation would have some broader effect on geopolitical negotiations is both unsupported and unintelligible.

Defendants also argue that "a suspension of liquidation [would] adversely affect the public interest" and "impose an unprecedented and enormous burden on the Government."  *Id.* at 30; *see id.* at 30-31 (discussing Overacker Decl.).  But that supposed administrative burden in suspending liquidation on millions of entries (as calculated by the Government) is entirely self-imposed.  Defendants can avoid any burden by just stipulating, as they have done in prior cases, that refunds are available for all covered entries should Plaintiffs prevail.  To be sure, if Defendants wish to flout their prior concessions and challenge the "binding precedent" established by *Shinyei* (*id.* at

24

36), that is their right.  But they enjoy no similar right to inflict irreparable harm on Plaintiffs during that misguided quest.[3]

Defendants finally assert that the balance of hardships weighs in their favor because millions of entries affected by List 3 and List 4A have already liquidated.  *Id.* at 32.  But the fact that millions of entries have already liquidated does not increase the Government's burden of complying with Plaintiffs' request to suspend liquidation on a *prospective basis only*.  If anything, the fact that millions of entries already liquidated—and thus, if the Government succeeds in overturning *Shinyei* on appeal, have *already* become permanently unrecoverable—simply underscores the critical need for limited preliminary injunctive relief to avoid the risk of further harm.

## CONCLUSION

For these reasons and those stated in the Motion, Plaintiffs respectfully request that the Court grant their Motion for Preliminary Injunction Limited to Suspension of Liquidation and enter Plaintiffs' proposed order.[4]

---

[3] In any event, the Government overstates the complexity of implementing a preliminary injunction against liquidation.  CBP can run a query in its Automated Commercial Environment that identifies all entries corresponding to each importer of record number and that contain HTSUS Chapter 99 subheadings that impose Section 301 duties on products of China under List 3 and List 4A.  By its own admission (*see* Overacker Decl. ¶¶ 7b, 7d), CBP indicates it can unset liquidation via scripts and a dedicated team at CBP HQ.  While taking these steps for each of the 6,500+ plaintiffs may take time, none is exceptionally difficult.

[4] Defendants' alternative proposed order is unworkable.  *First*, although Plaintiffs agree that all plaintiffs subject to these cases should provide to the government the information necessary to suspend their entries—*i.e.*, their importer of record numbers, the filing date of their complaint, and the CBP Center and team assignment (if available)—the Steering Committee should not be required to collect that information from all plaintiffs (thousands of whom are not even clients of the Steering Committee members).  It is not the Steering Committee's job to play that role while Defendants seek to overturn binding precedent (which is the only reason suspension of liquidation is necessary in the first place).  *Second*, Defendants should be given no more than 30 days in which

Respectfully submitted,

Matthew R. Nicely
Pratik A. Shah
James E. Tysse
Devin S. Sikes
Daniel M. Witkowski
Sarah B. W. Kirwin

Dated:  May 20, 2021

AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street, NW
Washington, D.C. 20006

*Counsel to Plaintiffs HMTX Industries LLC, Halstead New England Corporation, Metroflor Corporation, and Jasco Products Company LLC*

---

to comply with the Court's order.  Allowing 90 days to pass, during which (according to the government's calculations, *see* Overacker Decl. ¶¶ 10-11) potentially hundreds of thousands of additional entries could be liquidated, would require Plaintiffs risking millions of dollars of additional refunds due to the Government's delay.  *Third*, and relatedly, Defendants do not offer to reset as unliquidated any entries that liquidate following the Court's issuance of a preliminary injunction; such action is necessary to maintain the status quo.  *Fourth*, Plaintiffs object to the Government's proposal to prevent plaintiffs from filing Post Summary Corrections on entries for which CBP has wrongly collected List 3 or List 4A duties despite a previously granted exclusion. Such a plaintiff must not be punished for being a party to this litigation; it should be able to seek correction like any other party.

# ADDENDUM

# ADDENDUM

# TABLE OF CONTENTS

19 U.S.C. § 2411(a)-(b)......................................................................Add. 1

19 U.S.C. § 2414.............................................................................Add. 4

19 U.S.C. § 2417.............................................................................Add. 8

PR-1 – Excerpts from "Modification of Action in Section 301 Investigation of China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation," Office of the United States Trade Representative (Sept. 17, 2018)[1]..................................................Add. 10

---

[1] This document is included in the Non-Confidential Administrative Record Index filed by Defendants on April 30, 2021.  *See* ECF No. 297 (Apr. 30, 2021).

**United States Code**

**Title 19. Customs Duties**

**Chapter 18.  Trade Act of 1974**

**Subchapter III. Enforcement of United States Rights Under Trade Agreements and Response to Certain Foreign Trade Practices**

**§ 2411.  Actions by United States Trade Representative**

(a) Mandatory action

(1) If the United States Trade Representative determines under section 2414(a)(1) of this title that--

(A) the rights of the United States under any trade agreement are being denied; or

(B) an act, policy, or practice of a foreign country--

(i) violates, or is inconsistent with, the provisions of, or otherwise denies benefits to the United States under, any trade agreement, or

(ii) is unjustifiable and burdens or restricts United States commerce;

the Trade Representative shall take action authorized in subsection (c), subject to the specific direction, if any, of the President regarding any such action, and shall take all other appropriate and feasible action within the power of the President that the President may direct the Trade Representative to take under this subsection, to enforce such rights or to obtain the elimination of such act, policy, or practice. Actions may be taken that are within the power of the President with respect to trade in any goods or services, or with respect to any other area of pertinent relations with the foreign country.

(2) The Trade Representative is not required to take action under paragraph (1) in any case in which--

(A) the Dispute Settlement Body (as defined in section 3531(5) of this title) has adopted a report, or a ruling issued under the formal dispute settlement proceeding provided under any other trade agreement finds, that--

Add. 1

(i) the rights of the United States under a trade agreement are not being denied, or

(ii) the act, policy, or practice--

(I) is not a violation of, or inconsistent with, the rights of the United States, or

(II) does not deny, nullify, or impair benefits to the United States under any trade agreement; or

(B) the Trade Representative finds that--

(i) the foreign country is taking satisfactory measures to grant the rights of the United States under a trade agreement,

(ii) the foreign country has--

(I) agreed to eliminate or phase out the act, policy, or practice, or

(II) agreed to an imminent solution to the burden or restriction on United States commerce that is satisfactory to the Trade Representative,

(iii) it is impossible for the foreign country to achieve the results described in clause (i) or (ii), as appropriate, but the foreign country agrees to provide to the United States compensatory trade benefits that are satisfactory to the Trade Representative,

(iv) in extraordinary cases, where the taking of action under this subsection would have an adverse impact on the United States economy substantially out of proportion to the benefits of such action, taking into account the impact of not taking such action on the credibility of the provisions of this subchapter, or

(v) the taking of action under this subsection would cause serious harm to the national security of the United States.

(3) Any action taken under paragraph (1) to eliminate an act, policy, or practice shall be devised so as to affect goods or services of the foreign country in an amount that is equivalent in value to the burden or restriction being imposed by that country on United States commerce.

(b) Discretionary action

If the Trade Representative determines under section 2414(a)(1) of this title that--

> (1) an act, policy, or practice of a foreign country is unreasonable or discriminatory and burdens or restricts United States commerce, and

> (2) action by the United States is appropriate, the Trade Representative shall take all appropriate and feasible action authorized under subsection (c), subject to the specific direction, if any, of the President regarding any such action, and all other appropriate and feasible action within the power of the President that the President may direct the Trade Representative to take under this subsection, to obtain the elimination of that act, policy, or practice. Actions may be taken that are within the power of the President with respect to trade in any goods or services, or with respect to any other area of pertinent relations with the foreign country.

* * * * *

Add. 3

**United States Code**

**Title 19. Customs Duties**

**Chapter 18.  Trade Act of 1974**

**Subchapter III. Enforcement of United States Rights Under Trade Agreements and Response to Certain Foreign Trade Practices**

**§ 2414. Determinations by Trade Representative**

(a) In general

(1) On the basis of the investigation initiated under section 2412 of this title and the consultations (and the proceedings, if applicable) under section 2413 of this title, the Trade Representative shall--

(A) determine whether--

(i) the rights to which the United States is entitled under any trade agreement are being denied, or

(ii) any act, policy, or practice described in subsection (a)(1)(B) or (b)(1) of section 2411 of this title exists, and

(B) if the determination made under subparagraph (A) is affirmative, determine what action, if any, the Trade Representative should take under subsection (a) or (b) of section 2411 of this title.

(2) The Trade Representative shall make the determinations required under paragraph (1) on or before--

(A) in the case of an investigation involving a trade agreement, except an investigation initiated pursuant to section 2412(b)(2)(A) of this title involving rights under the Agreement on Trade-Related Aspects of Intellectual Property Rights (referred to in section 3511(d)(15) of this title) or the GATT 1994 (as defined in section 3501(1)(B) of this title) relating to products subject to intellectual property protection, the earlier of--

(i) the date that is 30 days after the date on which the dispute settlement procedure is concluded, or

Add. 4

(ii) the date that is 18 months after the date on which the investigation is initiated, or

(B) in all cases not described in subparagraph (A) or paragraph (3), the date that is 12 months after the date on which the investigation is initiated.

(3)(A) If an investigation is initiated under this subchapter by reason of section 2412(b)(2) of this title and--

(i) the Trade Representative considers that rights under the Agreement on Trade-Related Aspects of Intellectual Property Rights or the GATT 1994 relating to products subject to intellectual property protection are involved, the Trade Representative shall make the determination required under paragraph (1) not later than 30 days after the date on which the dispute settlement procedure is concluded; or

(ii) the Trade Representative does not consider that a trade agreement, including the Agreement on Trade-Related Aspects of Intellectual Property Rights, is involved or does not make a determination described in subparagraph (B) with respect to such investigation, the Trade Representative shall make the determinations required under paragraph (1) with respect to such investigation not later than the date that is 6 months after the date on which such investigation is initiated.

(B) If the Trade Representative determines with respect to an investigation initiated by reason of section 2412(b)(2) of this title (other than an investigation involving a trade agreement) that--

(i) complex or complicated issues are involved in the investigation that require additional time,

(ii) the foreign country involved in the investigation is making substantial progress in drafting or implementing legislative or administrative measures that will provide adequate and effective protection of intellectual property rights, or

(iii) such foreign country is undertaking enforcement measures to provide adequate and effective protection of intellectual property rights,

Add. 5

the Trade Representative shall publish in the Federal Register notice of such determination and shall make the determinations required under paragraph (1) with respect to such investigation by no later than the date that is 9 months after the date on which such investigation is initiated.

(4) In any case in which a dispute is not resolved before the close of the minimum dispute settlement period provided for in a trade agreement, the Trade Representative, within 15 days after the close of such dispute settlement period, shall submit a report to Congress setting forth the reasons why the dispute was not resolved within the minimum dispute settlement period, the status of the case at the close of the period, and the prospects for resolution. For purposes of this paragraph, the minimum dispute settlement period provided for under any such trade agreement is the total period of time that results if all stages of the formal dispute settlement procedures are carried out within the time limitations specified in the agreement, but computed without regard to any extension authorized under the agreement at any stage.

(b) Consultation before determinations

(1) Before making the determinations required under subsection (a)(1), the Trade Representative, unless expeditious action is required--

(A) shall provide an opportunity (after giving not less than 30 days notice thereof) for the presentation of views by interested persons, including a public hearing if requested by any interested person,

(B) shall obtain advice from the appropriate committees established pursuant to section 2155 of this title, and

(C) may request the views of the United States International Trade Commission regarding the probable impact on the economy of the United States of the taking of action with respect to any goods or service.

(2) If the Trade Representative does not comply with the requirements of subparagraphs (A) and (B) of paragraph (1) because expeditious action is required, the Trade Representative shall, after making the determinations under subsection (a)(1), comply with such subparagraphs.

(c) Publication

The Trade Representative shall publish in the Federal Register any determination made under subsection (a)(1), together with a description of the facts on which such determination is based.

**United States Code**

**Title 19. Customs Duties**

**Chapter 18.  Trade Act of 1974**

**Subchapter III. Enforcement of United States Rights Under Trade Agreements and Response to Certain Foreign Trade Practices**

**§ 2417.  Modification and termination of actions**

(a) In general

> (1) The Trade Representative may modify or terminate any action, subject to the specific direction, if any, of the President with respect to such action, that is being taken under section 2411 of this title if--

>> (A) any of the conditions described in section 2411(a)(2) of this title exist,

>> (B) the burden or restriction on United States commerce of the denial rights, or of the acts, policies, and practices, that are the subject of such action has increased or decreased, or

>> (C) such action is being taken under section 2411(b) of this title and is no longer appropriate.

> (2) Before taking any action under paragraph (1) to modify or terminate any action taken under section 2411 of this title, the Trade Representative shall consult with the petitioner, if any, and with representatives of the domestic industry concerned, and shall provide opportunity for the presentation of views by other interested persons affected by the proposed modification or termination concerning the effects of the modification or termination and whether any modification or termination of the action is appropriate.

(b) Notice; report to Congress

The Trade Representative shall promptly publish in the Federal Register notice of, and report in writing to the Congress with respect to, any modification or termination of any action taken under section 2411 of this title and the reasons therefor.

(c) Review of necessity

> (1) If--

Add. 8

(A) a particular action has been taken under section 2411 of this title during any 4-year period, and

(B) neither the petitioner nor any representative of the domestic industry which benefits from such action has submitted to the Trade Representative during the last 60 days of such 4-year period a written request for the continuation of such action,

such action shall terminate at the close of such 4-year period.

(2) The Trade Representative shall notify by mail the petitioner and representatives of the domestic industry described in paragraph (1)(B) of any termination of action by reason of paragraph (1) at least 60 days before the date of such termination.

(3) If a request is submitted to the Trade Representative under paragraph (1)(B) to continue taking a particular action under section 2411 of this title, or if a request is submitted to the Trade Representative under section 2416(c)(2) of this title to reinstate action, the Trade Representative shall conduct a review of--

(A) the effectiveness in achieving the objectives of section 2411 of this title of--

(i) such action, and

(ii) other actions that could be taken (including actions against other products or services), and

(B) the effects of such actions on the United States economy, including consumers.

Add. 9

## MODIFICATION OF ACTION IN SECTION 301 INVESTIGATION OF CHINA'S ACTS, POLICIES, AND PRACTICES RELATED TO TECHNOLOGY TRANSFER, INTELLECTUAL PROPERTY, AND INNOVATION

| | |
|---|---|
| **TO:** | **USTR ROBERT LIGHTHIZER** |
| **FROM:** | **GENERAL COUNSEL STEPHEN VAUGHN** |
| **DATE:** | **September 17, 2018** |

**ISSUE**

On August 18, 2017, you initiated an investigation under Section 301(b) of the Trade Act of 1974, as amended,[1] of China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation.[2]  The statute provides that determinations in the investigation are to be made within one year of initiation.[3]  During the investigation, you determined:  (1) that the acts, policies, and practices of China under investigation are unreasonable or discriminatory and burden or restrict U.S. commerce, and are thus actionable under Section 301(b);[4] and (2) to take the action of imposing an additional 25 percent duty on products of China with an annual trade value of approximately $50 billion.  The additional duties were applied in two tranches:  tranche 1 covered 818 tariff subheadings, with an approximate annual trade value of $34 billion;[5] and tranche 2 covered 279 tariff subheadings, with an approximate annual trade value of $16 billion.[6]

Section 301(b) provides that the "Trade Representative shall take all appropriate and feasible action authorized under subsection (c) [which includes increased tariffs], subject to the specific direction, if any, of the President regarding any such action . . . to obtain the elimination of that act, policy, or practice."  During the closing weeks of the investigation, China's statements and conduct indicated that a trade action at a $50 billion level would not obtain the statutory goal of obtaining the elimination of China's unfair and harmful policies.

To address the possibility that trade action at a $50 billion level would not be sufficient to encourage China to change its policies, you decided to seek public comment on modifying the action taken in the investigation by adopting a supplemental action to impose an additional 10 percent duty on products from China classified in 6,031 tariff lines, with an annual trade value of approximately $200 billion.[7]  In a notice published on August 7, 2018, you announced that you would consider applying an additional duty of 25 percent, and you extended the public comment periods.[8]

---

[1]  Hereinafter referred to as 1974 Trade Act.  The term 'Section 301' is commonly used as shorthand for Sections 301-309 of the 1974 Trade Act, codified at 19 U.S.C. 2411-2419.
[2]  82 FR 40213 (August 24, 2017).
[3]  Section 304(a)(2)(B).
[4]  83 FR 14906 (April 6, 2018).
[5]  83 FR 28710 (June 20, 2018).
[6]  83 FR 40823 (August 16, 2018).
[7]  83 FR 33608 (July 17, 2018).
[8]  83 FR 38760 (August 7, 2018).

1

In those discussions, China has been unwilling to offer modifications to its unfair practices. Furthermore, China has openly responded to the current trade action by choosing to cause *further* harm to the U.S. economy. In particular, China is imposing increased duties on U.S. exports to China, at approximately the same annual trade value as the Section 301 action (currently, approximately $50 billion). In essence, China's response to the findings and action in the 301 investigation is to try to cause enough additional economic damage to the U.S. economy so as to force the United States to drop its Section 301 action, leaving China's harmful policies unchanged.

In these circumstances, use of your modification authority under Section 307(a)(1) is warranted. In relevant part, this provision states:

> "The Trade Representative may modify or terminate any action, subject to the specific direction, if any, of the President with respect to such action, that is being taken under [Section 301] if:
>
> . . .
>
> (B) the burden or restriction on United States commerce of the denial [of] rights, or of the acts, policies, and practices, that are the subject of such action has increased or decreased, or
>
> (C) such action is being taken under section [301(b)] of this title and is no longer appropriate."

The President has exercised his authority under Section 307 to direct you to proceed with modifying the prior action in the investigation by adopting this supplemental action. A statement from the President, which has been issued today and references this direction, is attached to this memorandum.

We are not aware of any prior investigation where a U.S. trading partner has responded to a Section 301 action by refusing to consider a change to its policies, and instead has openly adopted its own retaliatory measures. Accordingly, we are not aware of prior investigations where a Trade Representative was called upon to use Section 307 modification authority to increase the level of trade action in order to achieve the statutory goal of obtaining the elimination of harmful policies covered by the investigation. Given that paragraph (B) explicitly refers to an *increase* in the level of trade harm from the investigated acts, policies, and practices, it is clear that where warranted, a modification may include an increase in the overall level of trade action. This conclusion is also supported by Section 307(a)(1)'s reference to "modify", which encompasses not only decreases, but increases, of the underlying trade action.

In the current situation, a determination to increase the level of the trade action is critical to meeting your statutory mandate, which (as noted) provides that upon a finding that trade action is appropriate, "the Trade Representative *shall* take all appropriate and feasible action authorized

Add. 11