UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE MARK A. BARNETT, CHIEF JUDGE; CLAIRE R. KELLY, JENNIFER CHOE-GROVES, JUDGES

_____
                                                      :
                                                      :
IN RE SECTION 301 CASES          :  Court No. 21-00052-3JP
                                                      :
_____:

## **DEFENDANTS' MOTION TO DISMISS OR, ALTERNATIVELY, MOTION FOR JUDGMENT ON THE AGENCY RECORD**

BRIAN M. BOYNTON
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

L. MISHA PREHEIM
Assistant Director

OF COUNSEL:

MEGAN GRIMBALL
Associate General Counsel
PHILIP BUTLER
Associate General Counsel
EDWARD MARCUS
Assistant General Counsel
Office of General Counsel
Office of the U.S. Trade Representative
600 17th Street N.W.
Washington, D.C. 20508

PAULA SMITH
Assistant Chief Counsel
EDWARD MAURER
Deputy Assistant Chief Counsel
VALERIE SORENSEN-CLARK
Attorney
Office of the Assistant Chief Counsel
International Trade Litigation
U.S. Customs and Border Protection
26 Federal Plaza, Room 258

JUSTIN R. MILLER
Attorney-In-Charge,
International Trade Field Office

JAMIE L. SHOOKMAN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
26 Federal Plaza, Room 346
New York, NY 10278
Tel: 212-264-2107
Fax: 212-264-1916

SOSUN BAE
Senior Trial Counsel
ANN C. MOTTO
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station

New York, NY 10278                    Washington, D.C. 20044

June 1, 2021                          *Attorneys for Defendants*

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................. 1

STATEMENT OF FACTS .................................................................................... 3

    I.   Relevant Statutory Framework ................................................................. 3

    II.  Factual And Procedural Background ........................................................ 8

          A.  The Section 301 Investigation ........................................................ 8

          B.  The Section 301 Determination And Subsequent Tariffs .................... 9

               1.  List 3 ................................................................................. 11

               2.  Lists 4A-4B ........................................................................ 15

ARGUMENT ...................................................................................................... 19

    I.      Standard Of Review ................................................................................. 19

    II.     The Actions Complained Of Are Not Reviewable ................................... 21

          A.  Presidential Action Is Not Reviewable Under Section 1581(i) .......... 21

          B.  The President's Discretionary Action Is Non-Reviewable ................. 25

    III.    The President And The USTR Possess Authority Under Section 307 Of The
          Trade Act To Modify An Action ............................................................... 30

    IV.   Alternatively, If The Challenged Actions Constitute Agency Action, Plaintiffs'
          Claim That The USTR Failed To Follow The Appropriate Procedures Lacks
          Merit ......................................................................................................... 38

          A.  The Challenged Actions Qualify For The Foreign Affairs Exception ....... 39

          B.  The USTR Provided Interested Parties All Procedure Due Under
              Section 307 ................................................................................. 44

    V.     Alternatively, If The Challenged Actions Constitute Agency Action, And If The
          Foreign Affairs Exception Does Not Apply, The USTR Still Complied With All
          Relevant APA Requirements ..................................................................... 48

          A.  The Substantial Evidence Standard Does Not Apply ........................ 49

B.   The USTR's Actions Were Not Arbitrary And Capricious ............................... 50

   1.   The USTR Provided A Sufficient Opportunity For Comment ............... 50

   2.   The USTR Considered All Relevant Factors ............................................ 56

   3.   The USTR Connected Record Facts To The Choices It Made ............... 57

C.   The USTR Acted In Accordance With Law And Within Its Statutory
    Authority .............................................................................................................. 59

CONCLUSION ............................................................................................................. 60

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Advanced Data Concepts, Inc. v. United States*,
   216 F.3d 1054 (Fed. Cir. 2000) .................................................................... 50

*Aircraft Owners & Pilots Ass'n v. FAA*,
   600 F.2d 965 (D.C. Cir. 1979) ...................................................................... 49

*Almond Bros. Lumber Co. v. United States*,
   721 F.3d 1320 (Fed. Cir. 2013) ........................................................ 24, 28, 29

*Am. Ass'n of Exps. & Imps. v. United States*,
   751 F.2d 1239 (Fed. Cir. 1985) ............................................................ *passim*

*Am. Inst. for Imported Steel, Inc. v. United States*,
   600 F. Supp. 204 (Ct. Int'l Trade 1984) ................................................... 41

*Am. Water Works Ass'n v. EPA*,
   40 F.3d 1266 (D.C. Cir. 1994) ...................................................................... 54

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ........................................................................................ 19

*Armstrong v. Bush*,
   924 F.3d 282 (D.C. Cir. 1991) ...................................................................... 23

*Baker v. Carr*,
   369 U.S. 186 (1962) ................................................................ 2, 25, 27, 29, 30

*Baylor Univ. Med. Ctr. v. Heckler*,
    758 F.2d 1052 (5th Cir. 1985) ................................................................. 44

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .............................................................................. 19

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*,
    419 U.S. 281 (1974) .............................................................................. 50

*Browning v. Clinton*,
    292 F.3d 235 (D.C. Cir. 2002) ............................................................... 19

*Burlington Truck Lines v. United States*,
    371 U.S. 156 (1962) .............................................................................. 50

*Camp v. Pitts*,
    411 U.S. 138 (1973) .............................................................................. 20

*Capital Area Immigrants' Rights Coal. v. Trump*,
    471 F. Supp. 3d 25 (D.D.C. 2020) .......................................... 40, 42, 44

*City of New York v. Permanent Mission of India to United Nations*,
    618 F.3d 172 (2d Cir. 2010) ................................................................. 40

*City of Portland, Or. v. EPA*,
    507 F.3d 706 (D.C. Cir. 2007) ............................................................... 58

*City of Waukesha v. EPA*,
    320 F.3d 228 (D.C. Cir. 2003) ............................................................... 58

*Consolidated Bearings Co. v. United States*,
    412 F.3d 1266 (Fed. Cir. 2005) ............................................................. 20

*Covad Commc'ns v. FCC*,
    450 F.3d 528 (D.C. Cir. 2006) ............................................................... 58

*Dalton v. Specter*,
    511 U.S. 462 (1994) .............................................................................. 23

*Dupuch-Carron v. Sec'y of Health & Hum. Servs.*,
    969 F.3d 1318 (Fed. Cir. 2020) ............................................................. 37

*Duracell, Inc. v. U.S. Int'l Trade Comm'n*,
    778 F.2d 1578 (Fed. Cir. 1985) ............................................................. 41

*Earth Island Inst. v. Christopher,*
   913 F. Supp. 559 (Ct. Int'l Trade 1995) ................................................. 41

*E. Bay Sanctuary Covenant v. Biden,*
   993 F.3d 640 (9th Cir. 2021) ................................................................ 40

*F.C.C. v. Nat'l Citizens Comm. for Broad.,*
   436 U.S. 775 (1978) ............................................................................. 49

*F.C.C. v. Schreiber,*
   381 U.S. 279 (1965) ............................................................................. 46

*Federal-Mogul Corp. v. United States,*
   63 F.3d 1572 (Fed. Cir. 1995) ............................................................. 26

*Fleetwood Enters., Inc. v. U.S. Dep't of Hous. & Urban Dev.,*
   818 F.2d 1188 (5th Cir. 1987) ............................................................. 45

*Fl. Power & Light Co. v. United States,*
   846 F.2d 765 (D.C. Cir. 1988), *cert. denied*, 490 U.S. 1045 (1988) ....................... 55

*Florsheim Shoe Co. v. United States,*
   880 F. Supp. 848 (Ct. Int'l Trade 1995) ............................................... 20

*Florsheim Shoe Co., Div. of Interco v. United States,*
   744 F.2d 787 (Fed. Cir. 1984) ....................................................... 23, 41

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.,*
   529 U.S. 120 (2000) ............................................................................. 27

*Franklin v. Massachusetts,*
   505 U.S. 788 (1992) ....................................................................... 22, 23

*Gilda Indus., Inc. v. United States,*
   446 F.3d 1271 (Fed. Cir. 2006) ................................................. 24, 26, 34

*Gilda Indus., Inc. v. United States,*
   622 F.3d 1358 (Fed. Cir. 2010) ......................................... 24, 30, 31, 39

*Haggar Co. v. Helvering,*
   308 U.S. 389 (1940) ............................................................................. 37

*Heckler v. Chaney,*
   470 U.S. 821 (1985) ....................................................................... 25, 28

*HCSC-Laundry v. United States,*
    450 U.S. 1 (1981) .................................................................................... 46

*Home Box Office, Inc. v. FCC,*
    567 F.2d 9 (D.C. Cir. 1977) .................................................................... 58

*Humana of S.C., Inc. v. Califano,*
    590 F.2d 1070 (D.C. Cir. 1978) .............................................................. 40

*Indian Harbor Ins. Co. v. United States,*
    704 F.3d 949 (Fed. Cir. 2013) .................................................................. 5

*In re Gartside,*
    203 F.3d 1305 (Fed. Cir. 2000) ............................................................... 49

*Invenergy Renewables LLC v. United States,*
    422 F. Supp. 3d 1255 (Ct. Int'l Trade 2019), *modified*, 476 F. Supp. 1323 (Ct. Int'l Trade
    2020) ............................................................................................... 39, 40

*Japan Line, Ltd. v. County of Los Angeles,*
    441 U.S. 434 (1979) ................................................................................ 29

*Kellogg Brown & Root Servs., Inc. v. United States,*
    728 F.3d 1348 (Fed. Cir. 2013) ............................................................... 19

*Kent v. Principi,*
    389 F.3d 1380 (Fed. Cir. 2004) ............................................................... 20

*Kwo Lee, Inc. v. United States,*
    70 F. Supp. 3d 1369 (Ct. Int'l Trade 2015) ............................................ 56

*Li v. Dep't of Justice,*
    947 F.3d 804 (Fed. Cir. 2020) ................................................................. 50

*Made in the USA Found. v. United States,*
    242 F.3d 1300 (11th Cir. 2001), *cert. denied sub nom, Steelworkers of Am. of AFL-CIO CLC
    v. United States*, 534 U.S. 1039 (2001) ................................................... 25

*Maple Leaf Fish Co. v. United States,*
    762 F.2d 86 (Fed. Cir. 1985) ............................................................ *passim*

*Mast Indus., Inc. v. Regan,*
    596 F. Supp. 1567 (Ct. Int'l Trade 1984) ........................................... 40, 41

*Mazzari v. Rogan,*
    323 F.3d 1000 (Fed. Cir. 2003) ............................................................... 20

*Michelin Tire Corp. v. Wages*,
  423 U.S. 276 (1976)............................................................................................ 29, 30

*Mid Continent Nail Corp. v. United States*,
  846 F.3d 1364 (Fed. Cir. 2017)............................................................................... 54

*Milavetz, Gallop & Milavetz, P.A. v. United States*,
  559 U.S. 229 (2010)................................................................................................ 37

*Miley v. Lew*,
  42 F. Supp. 3d 165 (D.D.C. 2014)........................................................................... 49

*Mohamad v. Palestinian Auth.*,
  566 U.S. 449 (2012) ................................................................................................. 5

*Motions Sys. Corp. v. Bush*,
  437 F.3d 1356 (Fed. Cir. 2006)............................................................................... 23

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983).................................................................................................. 50

*Nat. Classification Comm. v. United States*,
  765 F.2d 1146 (D.C. Cir. 1985).............................................................................. 54

*Nat. Credit Union Admin. v. First Nat. Bank & Trust Co.*,
  522 U.S. 479 (1998)................................................................................................ 35

*Nat. Res. Def. Council v. Jackson*,
  650 F.3d 662 (7th Cir. 2011) .................................................................................. 54

*New Lifecare Hosps. Of Chester Cty. LLC v. Azar*,
  417 F. Supp. 3d 31 (D.D.C. 2019).......................................................................... 49

*Norsk Hydro Canada, Inc. v. United States*,
  472 F.3d 1347 (Fed. Cir. 2006)............................................................................... 24

*Omnipoint Corp. v. F.C.C.*,
  78 F.3d 620 (D.C. Cir. 1996).............................................................................. 54, 55

*Perez v. Mortg. Bankers Ass'n*,
  575 U.S. 92 (2015).................................................................................................. 58

*Pub. Citizen, Inc. v. FAA*,
  988 F.2d 186 (D.C. Cir. 1993)................................................................................. 51

*Rural Cellular Ass'n v. FCC*,
   588 F.3d 1095 (D.C. Cir. 2009) ........................................................ 51

*Samish Indian Nation v. United States*,
   419 F.3d 1355 (Fed. Cir. 2005) ................................................... 25, 26

*SAS Inst., Inc. v. Iancu*,
   138 S. Ct. 1348, 200 L. Ed. 2d 695 (2018) ...................................... 20

*Secured Mail Sols. LLC v. Universal Wilde, Inc.*,
   873 F.3d 905 (Fed. Cir. 2017) ........................................................... 19

*Select Specialty Hosp. Akron, LLC v. Sebelius*,
   820 F. Supp. 2d 13 (D.D.C. 2011) ................................................... 49

*Sherley v. Sebelius*,
   689 F.3d 776 (D.C. Cir. 2012) ......................................................... 58

*Silfab Solar, Inc. v. United States*,
   892 F.3d 1340 (Fed. Cir. 2018) ................................................... 21, 23

*S. Puerto Rico Sugar Co. Trading Corp. v. United States*,
   334 F.2d 622 (Ct. Cl. 1964) ............................................... 23, 26, 34

*Trump v. Hawaii*,
   138 S. Ct. 2392, 201 L. Ed. 2d 775 (2018) .............................. 23, 27

*United Pac. Ins. Co. v. United States*,
   464 F.3d 1325 (Fed. Cir. 2006) ........................................................ 19

*United States v. Fla. E. Coast Ry. Co.*,
   410 U.S. 224 (1973) ......................................................................... 44

*United States v. Martinez*,
   904 F.2d 601 (11th Cir. 1990) ......................................................... 29

*United States v. Thompson/Center Arms Co.*,
   504 U.S. 505 (1992) ......................................................................... 35

*Vt. Yankee Nuclear Power Corp. v. NRDC*,
   435 U.S. 519 (1978) ............................................................. 46, 51, 54

*Webster v. Doe*,
   486 U.S. 592 (1988) ......................................................................... 27

*Yanko v. United States*,
   869 F.3d 1328 (Fed. Cir. 2017) ........................................................................ 20

*Yassini v. Crosland*,
   618 F.2d 1356 (9th Cir. 1980) ......................................................................... 42

*Zhang v. Slattery*,
   55 F.3d 732 (2d Cir. 1995) .............................................................................. 40

**<u>Statutes, Regulations, and Rules</u>**

5 U.S.C. § 553 ...................................................................................................... 41

5 U.S.C. § 553(a) ................................................................................................. 39

5 U.S.C. § 553(a)(1) ............................................................................................ 39

5 U.S.C. § 553(b) ................................................................................. 39, 40, 48, 51

5 U.S.C. § 553(c) ................................................................................. 39, 48, 51, 53

5 U.S.C. § 556 ...................................................................................................... 39, 49

5 U.S.C. § 556(d) ................................................................................................. 53

5 U.S.C. § 557 ...................................................................................................... 39, 49

5 U.S.C. § 559 ...................................................................................................... 44, 45

5 U.S.C. § 706 ...................................................................................................... 20

5 U.S.C. § 706(2)(A) ........................................................................................... 20, 48

5 U.S.C. § 706(2)(B) ........................................................................................... 48

5 U.S.C. § 706(2)(C) ........................................................................................... 20, 48

5 U.S.C. § 706(2)(D) ........................................................................................... 48

5 U.S.C. § 706(2)(E) ........................................................................................... 20, 48, 29

19 U.S.C. § 2171(a) ............................................................................................. 30

19 U.S.C. § 2171(c)(1)(A) ................................................................................... 3

19 U.S.C. § 2171(c)(1)(C) ................................................................................... 3

19 U.S.C. § 2171(c)(1)(D) ................................................................................................. 3

19 U.S.C. § 2411(b) ..................................................................................................... 5, 27

19 U.S.C. § 2411(b)(1) ...................................................................................................... 4

19 U.S.C. § 2411(b)(2) ............................................................................................... *passim*

19 U.S.C. § 2411(c)(1)(B) ..................................................................................... 4, 27, 34

19 U.S.C. § 2411(c)(1)(D)(iii) ........................................................................................ 34

19 U.S.C. § 2411(c)(1)(D)(iii)(I) .................................................................................... 28

19 U.S.C. § 2411(c)(1)(D)(iii)(II) ................................................................................... 28

19 U.S.C. § 2411(c)(3)(B) ............................................................................................... 34

19 U.S.C. § 2411(c)(4) .................................................................................................... 34

19 U.S.C. § 2412(b) ........................................................................................................... 4

19 U.S.C. § 2414(a)(2)(B) ................................................................................................. 4

19 U.S.C. § 2414(b) ......................................................................................................... 45

19 U.S.C. § 2416 ........................................................................................................ 24, 32

19 U.S.C. § 2416(b)(2)(C) ............................................................................................... 26

19 U.S.C. § 2417 .............................................................................................................. 39

19 U.S.C. § 2417(a) ........................................................................................................... 5

19 U.S.C. § 2417(a)(1) ........................................................................................... 22, 24, 33

19 U.S.C. § 2417(a)(1)(B) ......................................................................................... *passim*

19 U.S.C. § 2417(a)(1)(C) ......................................................................................... *passim*

19 U.S.C. § 2417(a)(2) ............................................................................................... 45, 51

10 U.S.C. § 2417(c) ......................................................................................................... 32

28 U.S.C. 1581(i) ................................................................................... 20, 21, 22, 30

28 U.S.C. § 2631(i) ............................................................................................... 22

28 U.S.C. § 2640(e) ....................................................................................... 20, 30

Omnibus Foreign Trade and Competitiveness Act of 1988,
   Pub. L No. 100-418, 102 Stat. 1107 ........................................................ 6, 7, 37

Trade Agreements Act of 1979,
   Pub. L. No. 96-39, 93 Stat. 144 ...................................................................... 5

Trade and Tariff Act of 1984,
   Pub. L. No. 98-573, 98 Stat. 2948 .................................................................. 5

USCIT Rule 12(b)(6) ............................................................................... 1, 19, 20

**<u>Other Authorities</u>**

S. REP. NO. 69-752 (1945) ................................................................................ 40

H.R. REP. NO. 69-1980 (1946) .......................................................................... 40

S. REP. NO. 93-1298 (1974), *reprinted in* 1974 U.S.C.C.A.N. 7186 ................................. 5

*Reorganization Plan No. 3 of 1979,*
   44 Fed. Reg. 69,273 (President of the United States Dec. 3, 1979), *codified in* 5 U.S.C.A.
   § APP. 1 REORG. PLAN 3 1979 (West) ...................................................... 3, 30

H.R. REP. NO. 96-1235 (1980), reprinted in 1980 U.S.C.C.A.N. 3729 ...................................... 21

H.R. REP. NO. 99-581, pt. 1 (1986) .................................................................. 7

H.R. 4750, 99th Cong. (1986) ........................................................................ 7

*Trade Reform Legislation: Hearing Before the H. Subcomm. on Trade of the Comm. on Ways and Means,*
   99th Cong. 99-78 (1986) ............................................................................ 7

H.R. REP. NO. 100-40, pt. 1 (1987) ........................................................... *passim*

S. REP. NO. 100-71 (1987) ....................................................................... *passim*

133 CONG. REC. (1987) ..................................................................... 5, 37, 38

*Conference on H.R. 3, To Enhance the Competitiveness of American Industry: Hearing Before the Comm. of Ways and Means,*
   100th Cong. (1987) .............................................................................. 6, 37

H.R. Conf. Rep. 100-576 (1988) ............................................................................. 7, 28, 36, 37

*Addressing China's Laws, Policies, Practices, and Actions Related to Intellectual Property, Innovation, and Technology,*
    82 Fed. Reg. 39,007 (President of the United States Aug. 17, 2017) ......................................... 8

*Initiation of Section 301 Investigation; Hearing; and Request for Public Comments: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation,*
    82 Fed. Reg. 40,213 (U.S. Trade Rep. Aug. 24, 2017) .......................................................... 8, 9

*Findings of the Investigation into China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation Under Section 301 of the Trade Act of 1974,*
    (U.S. Trade Rep. Mar. 22, 2018) ....................................................................... 8, 9, 10, 43, 57

*Actions by the United States Related to the Section 301 Investigation of China's Laws, Policies, Practices, or Actions Related to Technology Transfer, Intellectual Property, and Innovation,*
    83 Fed. Reg. 13,099 (President of the United States March 22, 2018) ............................. 10, 22

*Notice of Determination and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation,*
    83 Fed. Reg. 14,906 (U.S. Trade Rep. Apr. 6, 2018) ......................................................... 9, 10

White House, *Statement on Steps to Protect Domestic Technology and Intellectual Property from China's Dicriminatory and Burdensome Trade Practices,*
    (May 29, 2018) ......................................................................................................................... 10

President of the United States, *Statement from the President Regarding Trade with China,*
    (June 18, 2018) ............................................................................................................... 11, 22, 15

*Notice of Action and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation,*
    83 Fed. Reg. 28,710 (U.S. Trade Rep. June 20, 2018) ............................................................ 10

*Request for Comments Concerning Proposed Modification of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation,*
    83 Fed. Reg. 33,608 (U.S. Trade Rep. July 17, 2018) ..................................................... *passim*

*Extension of Public Comment Period Concerning Proposed Modification of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation,*
    83 Fed. Reg. 38,760 (U.S. Trade Rep. Aug. 7, 2018) ............................................. 12, 47, 51, 52

*Notice of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*,
    83 Fed. Reg. 40,823 (U.S. Trade Rep. Aug. 16, 2018) ............................................................ 11

President of the United States, *Statement from the President*,
    (Sept. 17, 2018) .................................................................................... 12, 13, 22, 43, 55

*Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*,
    83 Fed. Reg. 47,974 (U.S. Trade Rep. Sept. 21, 2018) .................................................... *passim*

White House, *Statement from the Press Secretary Regarding the President's Working Dinner with China*,
    (Dec. 1, 2018) ............................................................................................................. 14

*Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*,
    83 Fed. Reg. 65,198 (U.S. Trade Rep. Dec. 19, 2018) .......................................... 14, 22, 42, 58

*Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*,
    84 Fed. Reg. 7,966 (U.S. Trade Rep. Mar. 5, 2019) ............................................. 15, 22, 42, 58

*Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*,
    84 Fed. Reg. 20,459 (U.S. Trade Rep. May 9, 2019) ........................................................ 15, 22

*Request for Comments Concerning Proposed Modification of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*,
    84 Fed. Reg. 22,564 (U.S. Trade Rep. May 17, 2019) .................................................... *passim*

*Procedures for Requests to Exclude Particular Products from the September 2018 Action Pursuant to Section 301:  China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*,
    84 Fed. Reg. 29,576 (U.S. Trade Rep. June 24, 2019) ...................................................... 15, 59

U.S. Dep't of the Treasury, *Treasury Designates China as a Currency Manipulator*,
    (Aug. 5, 2019) ............................................................................................................. 17

*Notice of Modification of Section 301 Action:  China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*,
    84 Fed. Reg. 43,304 (U.S. Trade Rep. Aug. 20, 2019) .................................................... *passim*

*Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*,
    84 Fed. Reg. 45,821 (U.S. Trade Rep. Aug. 30, 2019)................................................. 17, 18, 22

*Procedures for Requests to Exclude Particular Products from the August 2019 Action Pursuant to Section 301:  China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*,
    84 Fed. Reg. 57,144 (U.S. Trade Rep. Oct. 24, 2019)......................................................... 17, 59

*Notice of Modification of Section 301 Action:  China's Acts, Polices, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*,
    84 Fed. Reg. 69,447 (U.S. Trade Rep. Dec. 18, 2019) ..................................................... *passim*

*Notice of Modification of Section 301 Action:  China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*,
    85 Fed. Reg. 3,741 (U.S. Trade Rep. Jan. 22, 2020) ............................................. 18, 22, 29, 36

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE MARK A. BARNETT, CHIEF JUDGE; CLAIRE R. KELLY, JENNIFER CHOE-GROVES, JUDGES

_____
:
:
IN RE SECTION 301 CASES                    :  Court No. 21-00052-3JP
:
_____:

## DEFENDANTS' MOTION TO DISMISS OR, ALTERNATIVELY, MOTION FOR JUDGMENT ON THE AGENCY RECORD

### INTRODUCTION

Pursuant to Rule 12(b)(6) of the Rules of the United States Court of International Trade, defendants, the United States *et al*., respectfully request that the Court dismiss the amended complaint filed by plaintiffs HMTX Industries LLC, Halstead New England Corporation, Metroflor Corporation, and Jasco Products Corporation (collectively, "plaintiffs") for failure to state a claim upon which relief may be granted.  *HMTX Industries LLC et al. v. United States*, Ct. Int'l Trade No. 20-00177 (Docket Entry No. 12, Pls.' Am. Compl. at ¶ 55) (hereinafter "Am. Compl.").  Alternatively, we respectfully request that the Court grant judgment in favor of the Government on the agency record.

Plaintiffs' allegations that defendants violated the Administrative Procedure Act (APA) fail because the USTR was acting at the direction of the President, who is not subject to the APA.  Regardless, the USTR's determination and implementation of an "appropriate" response under section 301 of the Trade Act of 1974 (Trade Act), as amended, (and subsequent modifications to that action under section 307) to China's increasingly aggressive and discriminatory trade practices is wholly discretionary and thus non-justiciable because the statute

contains no "judicially discoverable and manageable standard."  19 U.S.C. §§ 2411(b)(2), 2417(a)(1)(C); *Baker v. Carr*, 369 U.S. 186, 217 (1962).

Further, plaintiffs' claims fail as a matter of law because they misconstrue the text and congressional intent of sections 301 and 307 of the Trade Act.  The USTR's promulgation of Lists 3 and 4A, at the President's direction, was made under section 307's authority to modify an action, which does not impose a one-year time limit.  Nor does the statutory text support plaintiffs' contention that, in enacting section 307(a), Congress intended to prevent the USTR (acting either on its own, or at the direction of the President) from effectively implementing and defending its actions.  China's refusal to cease its unlawful practices and, instead, its adoption of measures intended to pressure the United States to drop its section 301 trade action, revealed that the initial action was insufficient.  Thus, modification of the action under section 301(a) was appropriate and authorized.

Plaintiffs' other argument, that section 307(a)(1) grants the USTR (acting on its own, or at the President's direction) the discretion only to "delay, taper or terminate such actions," (rather than to take increased measures, for example) is simply wrong.  Am. Comp. at ¶ 69.  The provision explicitly applies in situations where the burden of the unfair practices has *increased*. As the U.S. House of Representatives Committee on Ways and Means report accompanying H.R. 3 emphasized:  "Any modification may be ***either an increase*** or a reduction in the level or the form of action, ***as appropriate***" and "[m]odifications could ***either*** be reduction or elimination of the action, if it has achieved the desired objective or continuation is not in the U.S. economic

interest, ***or additional or increased measures if further leverage or offsetting action is deemed necessary and appropriate***." H.R. REP. NO. 100-40, pt. 1, at 75-76 (1987) (emphasis added).[1]

Even if the substance of the actions is reviewable, plaintiffs cannot establish that the USTR's actions in modifying the section 301 action constitute an APA violation, as they were not arbitrary and capricious or in excess of statutory authority.

## STATEMENT OF FACTS

### I.    Relevant Statutory Framework

The President, through the USTR, has responsibility for developing and coordinating United States trade policy.  19 U.S.C. § 2171(c)(1)(A).  In matters of international trade, the USTR is the chief representative of the United States responsible for negotiations and policy guidance.  19 U.S.C. § 2171(c)(1)(C), (D).  The USTR is established within the Executive Office of the President, and all decisions made by the USTR are made subject to the direction of the President.  19 U.S.C. § 2171(a); *see also Reorganization Plan No. 3 of 1979*, 44 Fed. Reg. 69,273 (President of the United States Dec. 3, 1979) at 69,274, *codified in* 5 U.S.C.A. § APP. 1 REORG. PLAN 3 1979 (West) (*Reorganization Plan No. 3 of 1979*).  The section 307 modification authority at issue here is explicitly subject to the direction of the President, and the President provided that direction with respect to the specific modifications at issue.

This litigation concerns the President's authority, and the USTR's authority, "subject to the specific direction, if any, of the President," under sections 301, 304 and 307 of the Trade Act. Under section 301, the USTR possesses the discretionary authority to initiate an investigation to

---

[1]  This House Report accompanied H.R. 3, a bill introduced by the House.  The conference outcome of H.R. 3 was materially similar to the version of the bill introduced by the House, and it was adopted by vote by both chambers.  After presidential veto, H.R. 3 was reintroduced with modifications that are not at issue in the section 301 cases as H.R. 4848, the bill that was ultimately signed into law.

determine whether (1) a foreign country is engaging in "an act, policy, or practice . . . [that is] unreasonable or discriminatory and burdens or restricts United States commerce"; and (2) "action by the United States is appropriate."  19 U.S.C. §§ 2411(b)(1)-(2); *see also* 19 U.S.C. § 2412(b) (authorizing an investigation by means other than a petition from the domestic industry).

If, as here, the President or the USTR determines that it is "appropriate" to take initial action in response to an investigation conducted by the USTR, the President (or the USTR acting at the President's direction) is granted broad discretion to take action in order to obtain the elimination of the act, policy, or practice.  Specifically, section 301(b)(2) provides that:

> [T]he Trade Representative shall take all appropriate and feasible action authorized under subsection (c) of this section, subject to the specific direction, if any, of the President regarding any such action, and all other appropriate and feasible action within the power of the President that the President may direct the Trade Representative to take under this subsection, to obtain the elimination of that act, policy, or practice.

19 U.S.C. § 2411(b)(2).  The USTR must determine an initial action within "12 months after the date on which the investigation is initiated."  19 U.S.C. § 2414(a)(2)(B).

Section 301(c) identifies specific types of action the USTR, subject to the direction of the President, may take to obtain the elimination of the acts, policies, or practices under investigation.  For example, under section 301(c)(1)(B), the USTR possesses the discretion to

> impose duties or other import restrictions on the goods of, and notwithstanding any other provision of law, fees or restrictions on the services of, such foreign country for such time as the Trade Representative determines appropriate.

19 U.S.C. § 2411(c)(1)(B).

If the USTR takes initial action, the President and the USTR retain the discretion to determine whether to "modify or terminate any action."  19 U.S.C. § 2417(a).  Section 307(a) states:

> (1)   The Trade Representative may modify or terminate any action, subject to the specific direction, if any, of the President with respect to such action, that is being taken under section 2411 of this title if –
>
> …
>
> (B) the burden or restriction on United States commerce of the denial rights, or of the acts, policies, and practices, that are the subject of such action has increased or decreased, or
>
> (C) such action is being taken under section 2411(b) of this title and is no longer appropriate.

Section 301 is best described as a "negotiating tool to ensure that foreign countries adhere to their trade agreement obligations benefitting the United States and to obtain the elimination of other unjustifiable, unreasonable, or discriminatory foreign practices."  S. REP. NO. 100-71, at 73 (1987); *see also* 133 CONG. REC. 20486 (1987) (statement of Sen. Lautenberg).  In enacting section 301, Congress stated its expectation that "these [section 301] powers be exercised vigorously to insure fair and equitable conditions for U.S. commerce."  S. REP. NO. 93-1298 (1974), *reprinted in* 1974 U.S.C.C.A.N. 7186, 7302.[2]

Section 301 was amended in 1979, 1984, and 1988.  *See* Trade Agreements Act of 1979, Pub. L. No. 96-39, 93 Stat. 144; Trade and Tariff Act of 1984, Pub. L. No. 98-573, 98 Stat. 2948;

---

[2] While courts need not consult legislative history when a statute's text is unambiguous, they may nevertheless confirm that their interpretation of a statutory provision is consistent with the legislative history.  *See*, *e.g.*, *Mohamad v. Palestinian Auth.*, 566 U.S. 449, 459 (2012) ("although we need not rely on legislative history given the text's clarity, we note that the history only supports our interpretation of [statutory term]"); *see also Indian Harbor Ins. Co. v. United States*, 704 F.3d 949, 956 (Fed. Cir. 2013) ("we find no ambiguity in the statute necessitating reliance on anything other than the plain language of Section 330. We note, however, that our interpretation is fully consistent with the legislative history . . .").

Omnibus Foreign Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, 102 Stat. 1107 (Trade Act of 1988). Each subsequent amendment strengthened the section 301 provision. By the late 1980s — when Congress enacted section 307 — Congress was frustrated with Presidential inaction, stating "[t]oo often U.S. Presidents have opted to do nothing in the face of provocative foreign trade barriers and trade-distorting practices." S. Rep. No. 100-71 (1987), at 73-74. Concerned that the President "ha[d] the option to do nothing," Congress "substantially strengthen[ed] section 301 of the 1974 Act, the provision which authorizes the President to address unjustifiable, unreasonable and discriminatory foreign actions." *Id*. at 6, 74; *see also Conference on H.R. 3, To Enhance the Competitiveness of American Industry: Hearing Before the Comm. of Ways and Means*, 100th Cong. 4 (1987) (statement of Sen. Bentsen) ("For too many years, we have seen trade in this country used as a handmaiden for other foreign policy objectives for our country.").

For example, to compel action against foreign unfair trade practices, the 1988 Trade Act granted the authority to decide whether and what type of action is appropriate to the USTR, "subject to the specific direction, if any, from the President." Trade Act of 1988, § 1301(a), 102 Stat. at 1164; *see also* H.R. Rep. No. 100-40, pt. 1 (1987) at 59. For investigations under section 301(b), which cover a broader range of unreasonable practices (such as those involved in the section 301 investigation here), the 1988 Trade Act provides the USTR with discretionary authority "subject to the specific direction, if any, of the President" to take "all appropriate and feasible action," as authorized by section 301(c). Trade Act of 1988 § 1301(a), 102 Stat. at 1164-1165; H.R. Rep. No. 100-40, pt. 1 (1987) at 60-62; Sen. Rep. No. 100-71 (1987) at 13-15.

Finally, and most importantly for purposes of this litigation, the 1988 Trade Act gave the USTR, "subject to the specific direction, if any, of the President," the express authority to

"modify or terminate a section 301 action" at any time if certain conditions were met.  H.R. Rep. 100-40, pt. 1 (1987) at 75-76; Trade Act of 1988 § 1301(a), 102 Stat. at 1174.  Those conditions include situations where the burden on U.S. commerce has *increased* since the time the initial action was taken.  19 U.S.C. 2417(a)(1)(B).  Consistent with the plain text, H.R. 3 (the House Report for a bill that was materially similar to the one ultimately signed into law) explained that "***[a]ny modification may be either an increase or a reduction in the level or the form of action, as appropriate.***"  H.R. REP. NO. 100-40, pt. 1, at 75 (1987) (emphasis added).  Put differently, "[m]odification could either be reduction or elimination of the action if it has achieved the desired objective or continuation is not in the U.S. economic interest, ***or additional or increased measures if further leverage or offsetting action is deemed necessary and appropriate.***"  *Id.* at 76 (emphasis added); *see also* Sen. REP. NO. 100-71 (1987) at 84; H.R. CONF. REP. 100-576 (1988) at 564-65.[3]  Thus, the action by the USTR that the plaintiffs challenge — additional and increased measures — is action squarely authorized by statute and expressly contemplated by Congress.

---

[3]  This was not the first time the U.S. House of Representatives had sought to add the authority to impose "increased measures."  A prior bill, H.R. 4750, 99th Cong. (1986), also sought to add the authority to "modify or terminate" an action under section 301, and the accompanying House Report contained language identical to H.R. Rep. No. 100-40.  *See* H.R. REP. NO. 99-581, pt. 1 (1986) at 43 ("The amendments will provide the USTR specific authority to modify or terminate section 301 actions if . . . the action is ineffective.  Modifications could either be reduction or elimination of the action . . . ***or additional or increased measures if further leverage or offsetting action is deemed necessary and appropriate***.") (emphasis added).

In 1986, the USTR actually opposed amendments to add modification authority as unnecessary, stating, "[w]e . . . already have authority to modify actions taken under Section 301."  *Trade Reform Legislation: Hearing Before the H. Subcomm. on Trade of the Comm. on Ways and Means*, 99th Cong. 99-78 (1986) at 348 (statement of Ambassador Clayton Yeutter).

II.   **Factual And Procedural Background**

A.   **The Section 301 Investigation**

On August 14, 2017, the President notified the USTR that China engages in certain actions related to intellectual property, innovation, and technology that may negatively impact United States industries.  *Findings of the Investigation into China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation Under Section 301 of the Trade Act of 1974* (U.S. Trade Rep. Mar. 22, 2018) (*Section 301 Findings*) at 4, *available at* https://ustr.gov/sites/default/files/Section%20301%20FINAL.PDF; *see also Addressing China's Laws, Policies, Practices, and Actions Related to Intellectual Property, Innovation, and Technology*, 82 Fed. Reg. 39,007, 39,007 (President of the United States, Aug. 17, 2017).  The President directed the USTR to determine whether to investigate under section 301 China's law, policies, practices, or actions that may be harming American interests.  *Id.*

On August 18, 2017, the USTR initiated a section 301 investigation into a wide range of allegedly unfair practices by the Chinese government.  *Section 301 Findings* at 5; *Initiation of Section 301 Investigation; Hearing; and Request for Public Comments: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 82 Fed. Reg. 40,213, 40,213 (U.S. Trade Rep. Aug. 24, 2017) (*Initiation of Section 301 Investigation*). The initiation notice outlined the major areas of focus of the investigation, including the Chinese government's:  (1) use of tools, such as its "opaque and discretionary administrative approval processes," to "regulate or intervene in U.S. companies' operations in China, in order to require or pressure the transfer of technologies and intellectual property to Chinese companies"; (2) acts, policies, and practices that "deprive U.S. companies of the ability to set market-based terms in licensing and other technology-related negotiations with Chinese companies and undermine U.S.

companies' control over their technology in China"; (3) direction and unfair facilitation of the "systematic investment in, and/or acquisition of, U.S. companies and assets by Chinese companies" to obtain cutting-edge technologies and intellectual property; and (4) purported unauthorized intrusions into U.S. commercial networks and other theft of intellectual property. *Initiation of Section 301 Investigation*, 82 Fed. Reg. at 40,213-14.

**B.** **The Section 301 Determination And Subsequent Tariffs**

Based on the information gathered, the USTR examined the four categories of acts, policies, and practices identified in the initiation notice and made specific findings as to each one. *Notice of Determination and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 14,906 (U.S. Trade Rep. Apr. 6, 2018) (*Notice of Section 301 Determination*). The USTR determined that China's technology transfer policies — including systemic pressures to transfer U.S. technology to Chinese firms, as well as outright cyber-theft — were inconsistent with United States and international norms and caused billions of dollars in estimated harm to the United States economy every year. *Id.* at 14,907; *see also Section 301 Findings* at 17-18. Specifically, the USTR determined:

> 1. China uses foreign ownership restrictions, such as joint venture requirements and foreign equity limitations, and various administrative review and licensing processes, to require or pressure technology transfer from U.S. companies.
>
> 2. China's regime of technology regulations forces U.S. companies seeking to license technologies to Chinese entities to do so on non-market-based terms that favor Chinese recipients.
>
> 3. China directs and unfairly facilitates the systematic investment in, and acquisition of, U.S. companies and assets by Chinese

> companies to obtain cutting-edge technologies and intellectual
> property and generate the transfer of technology to Chinese
> companies.
>
> 4.  China conducts and supports unauthorized intrusions into, and
>     theft from, the computer networks of U.S. companies to access
>     their sensitive commercial information and trade secrets.

*Id.*

After making the initial section 301 determination, the USTR, at the direction of the

President, determined it would be appropriate to impose an additional 25 percent *ad valorem*

duty on products of China, with an annual trade value of approximately $50 billion.  *Notice of*

*Section 301 Determination*, 83 Fed. Reg. at 14,907; *see also Actions by the United States Related*

*to the Section 301 Investigation of China's Laws, Policies, Practices, or Actions Related to*

*Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 13,099, 13,100

(President of the United States March 22, 2018) (*March 2018 Presidential Directive*); White

House, *Statement on Steps to Protect Domestic Technology and Intellectual Property from*

*China's Discriminatory and Burdensome Trade Practices* (May 29, 2018), *available at*

https://china.usembassy-china.org.cn/statement-on-steps-to-protect-domestic-technology-and-

intellectual-property-from-chinas-discriminatory-and-burdensome-trade-practices/; *Notice of*

*Action and Request for Public Comments Concerning Proposed Determination of Action*

*Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer,*

*Intellectual Property, and Innovation*, 83 Fed. Reg. 28,710, 28,711 (U.S. Trade Rep. June 20,

2018) (*June 2018 Notice of Action*).

The additional duties were applied in two tranches or "Lists."  List 1 covered 818 tariff

subheadings, with an approximate annual trade value of $34 billion.  *June 2018 Notice of Action*,

83 Fed. Reg. at 28,711.  List 2 covered 279 tariff subheadings, with an approximate annual trade

value of $16 billion.  *Notice of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 40,823, 40,823-24 (U.S. Trade Rep. Aug. 16, 2018).

1.    <u>List 3</u>

Unfortunately, Lists 1 and 2 did not have their desired effect of persuading China to eliminate its unfair practices.  Instead, in June 2018, China announced its intent to raise tariffs on $50 billion worth of United States exports.  *See* President of the United States, *Statement from the President Regarding Trade with China* (June 18, 2018) (*June 2018 Presidential Directive*), *available at* https://china.usembassy-china.org.cn/statement-from-the-president-regarding-trade-with-china/.  In response, the President explained that China had "no intention of changing its unfair practices related to the acquisition of American intellectual property and technology" and that, "[r]ather than altering those practices, it is now threatening United States companies, workers, and farmers who have done nothing wrong."  *Id.*  Thus, the President "directed the United States Trade Representative to identify $200 billion worth of Chinese goods for additional tariffs at a rate of 10 percent."  *Id*.  China subsequently retaliated by imposing 25 percent *ad valorem* tariffs on $50 billion in United States goods implemented in two stages of $34 billion and $16 billion at the same time the United States implemented Lists 1 and 2.  *Request for Comments Concerning Proposed Modification of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 33,608, 33,608-09 (U.S. Trade Rep. July 17, 2018) (*Request for Comments for List 3*).

As a result of China's failure to eliminate — and efforts to maintain — its unfair trade practices, and at the express direction of the President, on July 17, 2018, the USTR proposed to

modify its action under section 301 by imposing an additional 10 percent *ad valorem* duty on products from China with an annual trade value of approximately $200 billion. *Id* at 33,609. In announcing this modification, the USTR explained that further supplemental action was required because, "[i]n light of China's response to the $50 billion action . . . it has become apparent that U.S. action at this level is not sufficient to obtain the elimination of China's acts, policies, and practices covered in the investigation." *Id*. The USTR further explained that such action was "appropriate in light of the statutory goal of obtaining the elimination of the acts, policies, and practices covered in the investigation," because China's response had shown that the initial action was inadequate to promote the desired response. *Id.* As part of this process, the USTR announced that it was seeking public comment and would hold a public hearing regarding the proposed modification. *Id.*

Subsequently, and at the direction of the President, the USTR announced that it was considering increasing the duties from 10 percent to 25 percent *ad valorem*. *Extension of Public Comment Period Concerning Proposed Modification of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 38,760, 38,760 (U.S. Trade Rep. Aug. 7, 2018) (*Extension of List 3 Comment Period*). The USTR also announced that it may extend the previously announced hearing dates (which were subsequently extended from four to six days), and that it was extending the time for the submission of written comments, filing requests to appear at the hearing, and the submission of post-hearing rebuttal comments. *Id.* at 38,761.

On September 17, 2018, the President released a statement that "[t]oday, following seven weeks of public notice, hearings, and extensive opportunities for comment, I directed [the USTR] to proceed with placing additional tariffs on roughly $200 billion of imports from

12

China."  President of the United States, *Statement from the President* (Sept. 17, 2018)

(*September 2018 Presidential Directive*), *available at* https://trumpwhitehouse.archives.gov/

briefings-statements/statement-from-the-president-4/.  The President further directed that "[t]he

tariffs will take effect on September 24, 2018, and be set at a level of 10 percent until the end of

the year."  *Id.*  On January 1, [2019], the tariffs will rise to 25 percent."  *Id.*  The President also

stated that the United States had given China multiple opportunities to change its trade practices

and had "given China every opportunity to treat us more fairly" but that, "so far, China has been

unwilling to change its practices" and had "recently imposed new tariffs in an effort to hurt the

United States economy."  *Id.*

  In accordance with the Presidential directive, on September 21, 2018, the USTR

announced it was imposing List 3 and implementing the two-phase implementation of duties

described in the President's September directive.  *Notice of Modification of Section 301 Action:*

*China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and*

*Innovation*, 83 Fed. Reg. 47,974, 47,974-75 (U.S. Trade Rep. Sept. 21, 2018) (*Notice Imposing*

*List 3*).  In the Federal Register notice announcing List 3, the USTR explained that, at the

direction of the President, it was modifying the section 301 action pursuant to sections

307(a)(1)(B)-(C) (19 U.S.C. § 2417(a)(1)(B)-(C)).  *Id.* at 47,974.  Specifically, and in accordance

with section 307(a)(1)(B), the USTR explained that the "burden or restriction on United States

commerce" of the actions that were the subject of the section 301 investigation "continues to

increase, including following the one-year investigation period."  *Id.*  The USTR further stated

that China's actions included not only the initial practices that were the subject of the section 301

investigation, but also "subsequent defensive actions taken to maintain those policies," including

"impos[ing] approximately $50 billion in tariffs on U.S. goods."  *Id.*; *see also* PR-01 at 4-6.

The USTR further explained that it was also acting pursuant to section 307(a)(1)(C), which permits the USTR, subject to the direction of the President, to modify the section 301 action when the action taken pursuant to section 301(b) is "no longer appropriate."  *Id*.  In doing so, the USTR explained that:

> China's response . . . has shown that the current action no longer is appropriate.  China has made clear – both in public statements and in government-to-government communications – that it will not change its policies in response to the current Section 301 action . . . .  The United States has raised U.S. concerns repeatedly with China, including in Ministerial level discussions, but China has been unwilling to offer meaningful modifications to its unfair practices.  Furthermore, China openly has responded to the current action by choosing to cause further harm to the U.S. economy, by increasing duties on U.S. exports to China.

*Notice Imposing List 3*, 83 Fed. Reg. at 47,975; *see also* PR-01 at 6.  The announcement also indicated that, in response to the public comments and witness testimony received at the six-day hearing, the USTR had "determined not to include certain tariff subheadings."  *Notice Imposing List 3*, 83 Fed. Reg. at 47,975.

Following the imposition of List 3, the USTR and China engaged in several rounds of negotiations, and, as a result of perceived progress in those negotiations, and taking into account comments received from both interested parties and the advisory committees, the USTR, in accordance with direction from the President, delayed the imposition of the List 3 duties by twice postponing the date they would take effect.  *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 65,198, 65,198-99 (U.S. Trade Rep. Dec. 19, 2018) (*Notice of December 2018 Delay*); White House, *Statement from the Press Secretary Regarding the President's Working Dinner with China* (Dec. 1, 2018) (*December 2018 White House Statement*), *available at* https://trumpwhitehouse. archives.gov/briefings-statements/statement-

press-secretary-regarding-presidents-working-dinner-china/; *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 7,966, 7,966-67 (U.S. Trade Rep. Mar. 5, 2019) (*Notice of March 2019 Delay*); *see also* PR-06 at 2; PR-07 at 2.

On May 9, 2019, the USTR announced that the 25 percent duties would take effect on May 10, 2019, and that the increase was required because, in the most recent round of negotiations with China, "China has chosen to retreat from specific commitments agreed to in earlier rounds." *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 20,459, 20,459-60 (U.S. Trade Rep. May 9, 2019) (*May 2019 Notice Modifying List 3*). The announcement also stated that, after considering the submitted comments and the hearing testimony, the USTR would be developing an exclusion process whereby interested parties could request to be excluded from the duties. *Id.* at 20,460; *see also Procedures for Requests to Exclude Particular Products from the September 2018 Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 29,576, 29,576-77 (U.S. Trade Rep. June 24, 2019) (*List 3 Exclusion Procedures*); *see also* PR-08 at 2.

## 2.   Lists 4A-4B

Following the imposition of List 3, China still failed to eliminate — and took additional measures to maintain — its unfair trade practices. In response to China's retreat from its prior commitments and its announcement that it intended to take further retaliatory action, and in accordance with direction from the President, the USTR again announced its intent to modify the section 301 action pursuant to section 307(a). On May 17, 2019, the USTR proposed imposing

an additional *ad valorem* duty of up to 25 percent on products of China, with an approximate annual trade value of $300 billion (List 4).  *Request for Comments Concerning Proposed Modification of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 22,564, 22,564 (U.S. Trade Rep. May 17, 2019) (*Request for Comments for List 4*).  Specifically, the USTR explained that the modification was necessary "[i]n light of China's failure to meaningfully address the acts, policies, and practices that are subject to this investigation and its response to the current action being taken."  *Id.*  The USTR also announced that it was accepting comments on duties up to 25 percent and that a hearing would be held on June 17, 2019.  *Id.* at 22,565.

On August 1, 2019, the President announced that he was directing the USTR to impose List 4 tariffs that would become effective on September 1, 2019, at a rate of 10 percent *ad valorem*.  Am. Compl. at ¶ 55.  Accordingly, the USTR again modified the section 301 action by announcing the imposition of tariffs on List 4, imposing tariffs immediately on List 4A, and delaying the additional tariffs on List 4B.  *Notice of Modification to Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 43,304, 43,304-05 (U.S. Trade Rep. Aug. 20, 2019) (*Notice Imposing List 4*).  The announcement also indicated that the USTR had considered public comments and witness testimony at a seven-day public hearing.  *Id.* at 43,305.

In promulgating Lists 4A-B, the USTR again explained that, "[i]n accordance with the specific direction of the President," it was taking these actions pursuant to sections 307(a)(1)(B)-(C), because the burden on United States commerce continued to increase as a result of both China's unfair trade practices, as well as its "subsequent defensive actions taken to maintain those unfair acts, policies, and practices . . ."  *Id.* at 43,304.  The USTR noted that China had

"impose[d] tariffs on approximately $110 billion worth of U.S. goods" in order to pressure the United States, and that its actions resulted in "increased harm to the U.S. economy." *Id.* Thus, the USTR explained that "the current action no longer is appropriate," particularly in light of China's unwillingness to address its trade practices, its retreat from prior commitments, and its decision to devalue its currency. *Id.* at 43,304-5 (citing U.S. Dep't of the Treasury, *Treasury Designates China as a Currency Manipulator* (Aug. 5, 2019), *available at* https://home.treasury. gov/news/press-releases/sm751); *see also* PR-09 at 3-4.

The *Notice Imposing List 4* stated that List 4A would be subject to an additional duty of 10 percent *ad valorem*, effective September 1, 2019. The merchandise on List 4B would be subject to the same duty, but because that list "includes products where China's share of U.S. imports from the world is 75 percent or greater," the USTR announced that it was delaying the tariffs until December 15, 2019 "[t]o provide for a longer adjustment period." *Id.* at 43,305. The notice also announced an exclusion process. *Id.* at 43,305; *see also Procedures for Requests to Exclude Particular Products from the August 2019 Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 57,144, 57,145-46 (U.S. Trade Rep. Oct. 24, 2019) (*List 4A Exclusion Procedures*).

Subsequently, and at the express direction of the President, the USTR determined to increase the additional duties on Lists 4A-B to 15 percent. *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 45,821, 45,821 (U.S. Trade Rep. Aug. 30, 2019) (*Notice Increasing List 4*). Again, the USTR stated that it was modifying the action pursuant to section 307(a)(1)(B)-(C), and that China's unfair trade practices and subsequent defensive actions,

including the imposition of further retaliatory tariffs, continued to harm United States commerce and rendered the prior action no longer appropriate.  *Id.* at 45,822; *see also* PR-09 at 3-4.

In December 2019, "following months of negotiations, the United States and China reached a historic and enforceable agreement on a Phase One trade deal that requires structural reforms and other changes to China's economic and trade regime, including with respect to certain issues covered in this Section 301 investigation."  *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 69,447, 69,447 (U.S. Trade Rep. Dec. 18, 2019) (*Notice Suspending List 4B*).  Consequently, at the direction of the President, the USTR suspended the additional 15 percent in duties covered by List 4B on December 18, 2019, because, given the progress in the negotiations to eliminate China's unfair practices, the President concluded that the additional tariffs were "no longer appropriate."  *Id.*

On January 22, 2020, the USTR announced that, at the direction of the President, he was reducing the duties of List 4A to 7.5 percent based on continued progress in trade negotiations with China.  *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 85 Fed. Reg. 3,741, 3,471 (U.S. Trade Rep. Jan. 22, 2020) (*Notice Reducing List 4A*).  In particular, the USTR explained that the agreement was scheduled to enter into force on February 14, 2020, and that the reduction in the additional tariff rate on List 4A would take effect on that date.  *Id.*

The trade agreement entered into force as scheduled.  China has committed in the Agreement to addressing some — though not all — of the issues covered in the section 301 investigation.  This includes commitments by China to stop its ongoing policy of using informal pressures to coerce technology transfer.  The Administration is currently engaged in the process

of enforcing the Agreement, which involves constant monitoring and, when appropriate, raising compliance issues with the Government of China.  Further U.S.-China negotiations will address additional concerns identified in the section 301 investigation.  The current Administration is conducting a review of the U.S.-China policy, including with respect to the section 301 tariffs.  While this review is being undertaken, the tariffs on Lists 3 and 4A remain in effect.

## ARGUMENT

### I.    Standard Of Review

Plaintiffs have not pled a justiciable claim and their claims should be dismissed.  A motion to dismiss for failure to state a claim is appropriate when a plaintiff's allegations do not entitle it to a remedy.  *See United Pac. Ins. Co. v. United States*, 464 F.3d 1325, 1327 (Fed. Cir. 2006).  The motion "tests the legal sufficiency of a complaint," *see Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002), which must be dismissed if it fails to present a legally cognizable right of action.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Dismissal is required when a complaint fails to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "In deciding a motion to dismiss, the court must accept well-pleaded factual allegations as true and must draw all reasonable inferences in favor of the claimant," *see Kellogg Brown & Root Servs., Inc. v. United States*, 728 F.3d 1348, 1365 (Fed. Cir. 2013) (citation omitted), but need not accept legal conclusions contained in the same allegations.  *See Twombly*, 550 U.S. at 555.  Nor is this Court bound to "accept as true allegations that contradict matters properly subject to judicial notice or by exhibit" in ruling on a 12(b)(6) motion.  *Secured Mail Sols. LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 913 (Fed. Cir. 2017) (internal quotations and citations omitted).

Interpretations of governing legal authorities, such as statutes, regulations, and presidential proclamations, involve questions of law. *See Kent v. Principi*, 389 F.3d 1380, 1384 (Fed. Cir. 2004) (interpretation of a statute or regulation is a question of law) (citation omitted); *see also Yanko v. United States*, 869 F.3d 1328, 1331 (Fed. Cir. 2017) (treating as a "pure legal issue of statutory interpretation" claim based on interpretation of statutory provision and related executive order); *Florsheim Shoe Co. v. United States*, 880 F. Supp. 848, 850 (Ct. Int'l Trade 1995) ("The issue in dispute, therefore, is a question of law: what is the scope of the [Presidential] Proclamation."). Such issues are appropriately resolved under Rule 12(b)(6). *See, e.g.*, *Yanko*, 869 F.3d at 1331 (citation omitted).

Alternatively, should the Court decline to dismiss plaintiffs' claims, judgment on the agency record should be entered for the Government. The scope of judicial review for actions commenced under 28 U.S.C. § 1581(i) is found in 28 U.S.C. § 2640(e), which directs the Court to 5 U.S.C. § 706. Pursuant to these standards, the Court will "hold unlawful and set aside agency action, findings, and conclusions found to be – (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . (C) in excess of statutory . . . authority . . . or (E) unsupported by substantial evidence . . ." 5 U.S.C. §§ 706(2)(A), (C), (E); *see also Consolidated Bearings Co. v. United States*, 412 F.3d 1266, 1269 (Fed. Cir. 2005); *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1359, 200 L. Ed. 2d 695 (2018); *Mazzari v. Rogan*, 323 F.3d 1000, 1005 (Fed. Cir. 2003). The scope of the Court's review in section 1581(i) actions is limited to the administrative record developed before the agency. *See Camp v. Pitts*, 411 U.S. 138, 142 (1973).

Below, we first demonstrate why the promulgation of List 3 and List 4 does not constitute reviewable agency action. We also demonstrate that the President and the USTR had authority

to modify the original section 301 action in response to China's refusal to eliminate its unfair trade practices.  Finally, we show that the promulgation of List 3 and List 4 was exempt from the APA's notice-and-comment requirements, and, in any case, complied with all relevant requirements of both the APA and the Trade Act.

## II.     The Actions Complained Of Are Not Reviewable

Plaintiffs challenge the discretionary decision to impose additional tariffs.  However, judicial review is unavailable because the actions that plaintiffs challenge — the promulgation of Lists 3 and 4A — were made pursuant to Presidential directives and are committed to discretion by law.  And, even to the extent any limited review is available, plaintiffs have failed to demonstrate that the President's actions were a "clear misconstruction of the governing statute," resulted in a "significant procedural violation," or were "outside [of his] delegated authority." *Maple Leaf Fish Co. v. United States*, 762 F.2d 86, 89 (Fed. Cir. 1985); *see also Silfab Solar, Inc. v. United States*, 892 F.3d 1340, 1346 (Fed. Cir. 2018).

### A.     Presidential Action Is Not Reviewable Under Section 1581(i)

Plaintiffs attempt to challenge the President's discretionary directives to the USTR pursuant to the APA.  Am. Compl. ¶¶ 71-75.  Section 1581(i) provides this Court with exclusive jurisdiction to consider certain types of customs and trade claims against the "United States, its agencies, or its officers," but not against the President.  28 U.S.C. § 1581(i).  In enacting section 1581(i), Congress specifically considered and rejected the idea of extending jurisdiction to include discretionary trade decisions by the President.  *See* H.R. REP. NO. 96-1235 at 32 (1980), *reprinted in* 1980 U.S.C.C.A.N. 3729, 3743-44 ("Congress, in enacting various tariff and trade bills, has made it clear that those Presidential decisions are not subject to judicial review but will

be reviewed in the course of Congress' consideration of subsequent international trade legislation.").

Congress has constrained this Court's section 1581(i) jurisdiction through the corresponding standing statute, 28 U.S.C. § 2631(i).  That statute provides that only those who have been "adversely affected or aggrieved by agency action within the meaning of section 702" of the APA have standing to bring a challenge pursuant to 28 U.S.C. § 1581(i).  Plaintiffs do not challenge *agency* action; rather, they challenge the action of the President in *directing* the USTR.  *See* Am. Compl. at ¶¶ 29, 31, 32, 39, 43, 55.  As we explained above, the USTR acted at "the specific direction . . . of the President," *see* 19 U.S.C. § 2417(a)(1), rather than exercising independent discretion, in determining to impose duties on Lists 3 and 4A, and in suspending, increasing, or reducing the tariff rates on those lists.  *See*, *e.g.*, *March 2018 Presidential Directive*, 83 Fed. Reg. at 13,100-01; *Notice Imposing List 3*, 83 Fed. Reg. at 47,974-75; *December 2018 White House Statement*; *Notice Imposing List 4*, 84 Fed. Reg. at 43,304-05; *June 2018 Presidential Directive*; *September 2018 Presidential Directive*; Am. Compl. at ¶ 55 (discussing the President's directive regarding Lists 4A-B); *see also* PR-01 at 2, 4-8; PR-09 at 1, 5-6.[4]  Thus, the APA is unavailable to challenge these Presidential actions because the President is not an "agency" within the meaning of the APA.  *Franklin v. Massachusetts*, 505 U.S. 788,

---

[4]  *See also Notice of December 2018 Delay*, 83 Fed. Reg. at 65,198 (decision to suspend tariff increase on List 3 was postponed "[i]n accordance with the direction of the President"); *Notice of March 2019 Delay*, 84 Fed. Reg. at 7,966 (postponing tariff increases "[i]n accordance with the direction of the President"); *May 2019 Notice Modifying List 3*, 84 Fed. Reg. at 20,459 (announcing List 3 tariff increases "[i]n accordance with the direction of the President"); *Request for Comments for List 4*, 84 Fed. Reg. at 22,564 (proposing Lists 4A-B "[i]n accordance with the direction of the President"); *Notice Increasing List 4*, 84 Fed. Reg. at 45,821 (notice of increasing tariffs "[i]n accordance with the specific direction of the President"); *Notice Suspending List 4B*, 84 Fed. Reg. at 69,447 (notice of suspension "[i]n accordance with the direction of the President"); *Notice Reducing List 4A*, 85 Fed. Reg. at 3,741 (reducing tariffs "[i]n accordance with the direction of the President").

800-01 (1992); *see also Armstrong v. Bush*, 924 F.2d 282, 289 (D.C. Cir. 1991) ("[W]e refuse to hold that the President is an 'agency' within the meaning of the APA").

Further, the case law is clear that any review of the substance of the President's decision is inappropriate.  *See Maple Leaf*, 762 F.2d at 89-90 (in case involving President's grant of import relief pursuant to section 201-03 of the Trade Act, "'[t]he President's findings of fact and the motivations for his action [were] not subject to review,'" and the Court did not "look[] to see if substantial evidence support[ed] the agency's findings") (quoting *Florsheim Shoe Co., Div. of Interco v. United States*, 744 F.2d 787, 795 (Fed. Cir. 1984)); *see also Silfab Solar*, 892 F.3d at 1349 (in case involving President issuing safeguard action pursuant to section 201 of the Trade Act, the Court "ha[d] no authority to review the President's factual determinations"); *Trump v. Hawaii*, 138 S. Ct. 2392, 2409, 201 L. Ed. 2d 775 (2018) (stating that when a statute confers discretion on the President it is "questionable" whether the President is required to "explain [his] finding[s] with sufficient detail to enable judicial review");  *Dalton v. Specter*, 511 U.S. 462, 474 (1994) ("We may assume for the sake of argument that some claims that the President has violated a statutory mandate are reviewable outside the framework of the APA . . . . But longstanding authority holds that such review is not available when the statute in question commits the decision to the discretion of the President.") (citation omitted); *S. Puerto Rico Sugar Co. Trading Corp. v. United States*, 334 F.2d 622, 632 (Ct. Cl. 1964) ("In a statute dealing with foreign affairs, a grant to the President which is expansive to the reader's eye should not be hemmed in or 'cabined, cribbed, confined' by anxious judicial blinders"); *Motions Sys. Corp. v. Bush*, 437 F.3d 1356, 1360 (Fed. Cir. 2006) (declining to exercise judicial review when there was no "colorable claim" the President exceeded his statutory authority).

Plaintiffs cannot overcome this hurdle by captioning their challenge to the President's actions as an action against the USTR, or CBP, because the "true nature" of this action is a challenge to Presidential action. *Norsk Hydro Canada, Inc. v. United States*, 472 F.3d 1347, 1355 (Fed. Cir. 2006) (citation omitted). As discussed above, the modifications to the section 301 action were made pursuant to the authority conferred in section 307, which commits the decision to the "specific direction" of the President when he issues such direction. 19 U.S.C. § 2417(a)(1). And the allegations in plaintiffs' amended complaint confirm that plaintiffs also understand that Lists 3 and 4A were promulgated (and subsequently modified) in accordance with explicit Presidential directives. *See* Am. Compl. at ¶¶ 29, 31, 32, 39, 43, 55.

Other cases involving section 301 actions that were subject to review by the courts are distinguishable from the present section 301 cases, because none involved the USTR making a determination that was committed to the discretion of the President when the President chooses to exercise that authority, under either section 301 or 307. In *Gilda Industries, Inc. v. United States*, 446 F.3d 1271, 1278-83 (Fed. Cir. 2006) (*Gilda I*), the Court of Appeals for the Federal Circuit (Federal Circuit) reviewed plaintiff's claims under the APA that the USTR had failed to comply with the "carousel provision" of section 306(b)(2)(B) (19 U.S.C. § 2416), which required the USTR periodically to review and revise a list of goods that are subject to retaliatory duties. Similarly, in *Gilda Industries, Inc. v. United States*, 622 F.3d 1358, 1362-67 (Fed. Cir. 2010) (*Gilda II*), the Federal Circuit reviewed under the APA whether a retaliation list had terminated because the USTR had failed to consult with the domestic industry regarding the impending termination. By contrast, in *Almond Bros. Lumber Co. v. United States*, 721 F.3d 1320, 1326 (Fed. Cir. 2013), the Court held that a challenge to an agreement negotiated by the USTR pursuant to section 301(c) was immune from judicial review under the APA because the

24

challenged statutory provision contained no judicially manageable standard and was left to the discretion of the USTR.

### B.     The President's Discretionary Action Is Non-Reviewable

Review is also unavailable because the President's decision whether to impose additional tariffs in response to China's refusal to eliminate its acts, policies, and practices, and the USTR's implementation of that decision, is entirely discretionary and would require the Court to move beyond the areas of judicial expertise.  Plaintiffs' challenge, therefore, presents a non-justiciable political question.  *See Heckler v. Chaney*, 470 U.S. 821, 831 (1985).

The political question doctrine encompasses subject matter deemed inappropriate for judicial review, despite otherwise meeting jurisdictional requirements.  *Baker*, 369 U.S. at 210 ("[I]t is the relationship between the judiciary and the coordinate branches of the Federal Government . . . which gives rise to the 'political question.'").  Courts review the existence of a non-justiciable political question by evaluating six factors identified in *Baker*:

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id.* at 217; *see also Made in the USA Found. v. United States*, 242 F.3d 1300, 1312-14 (11th Cir. 2001), *cert. denied sub nom*, *Steelworkers of Am. of AFL-CIO, CLC v. United States*, 534 U.S. 1039 (2001) (analyzing the *Baker* criteria in context of the significance of the powers of the President and Congress in the areas of foreign policy and foreign commerce).  Satisfying any one

25

factor is both "necessary and sufficient."  *Samish Indian Nation v. United States*, 419 F.3d 1355, 1372 (Fed. Cir. 2005).

Non-justiciable political questions can arise when consideration of trade issues would require the Court to second guess decisions made by the President, the USTR, or Congress that appear to be rooted in policy.  For example, in *Gilda I*, 446 F.3d at 1283, the Federal Circuit noted that, out of "deference accorded by the court to the Executive Branch's exercise of discretion in the area of trade negotiations," it would not be able to review whether the USTR should have removed toasted breads from a list of products subject to higher retaliatory tariffs pursuant to section 306(b)(2)(C).  *Id.* (citing 19 U.S.C. § 2416(b)(2)(C), *Am. Ass'n of Exps. & Imps. v. United States*, 751 F.2d 1239, 1247 (Fed. Cir. 1985) and *Maple Leaf*, 762 F.2d at 89).  Further, it is well-established that "[i]n the external sector of the national life, Congress does not ordinarily bind the President's hands so tightly that he cannot respond promptly to changing conditions or the fluctuating demands of foreign policy."  *S. Puerto Rico Sugar Co.*, 334 F.2d at 632.  And "[t]rade policy is an increasingly important aspect of foreign policy, an area in which the executive branch is traditionally accorded considerable deference."  *Federal-Mogul Corp. v. United States*, 63 F.3d 1572, 1581 (Fed. Cir. 1995); *see also id.* at 1582 ("For the Court of International Trade to read a GATT violation into the statute, over Commerce's objection, may commingle powers best kept separate.").

Here, plaintiffs ask the Court to evaluate the President's conclusion that the United States' initial response to China's unfair and discriminatory trade practices was "no longer appropriate," and whether the new tariffs were "appropriate" to "obtain the elimination of that act, policy, or practice."  19 U.S.C. §§ 2417(a)(1)(C), 2411(b)(2).  They also question the determination under section 307(a)(1)(B) that subsequent unfair actions taken by China

following the one-year period of investigation, including retaliatory measures, increased the burden on the United States economy, requiring further modification of the action. 19 U.S.C. § 2417(a)(1)(B). Given the highly discretionary nature of what is "appropriate" to obtain the elimination of the practice, the statute lacks a "judicially discoverable and manageable standard[] for resolving it." *Baker*, 369 U.S. at 217; *Trump*, 138 S. Ct. at 2409 (casting doubt on the notion that a statute that commits an issue to presidential discretion requires the President to "explain that finding with sufficient detail to enable judicial review") (citing *Webster v. Doe*, 486 U.S. 592, 600 (1988)).

Notably, the language in section 307(a)(1)(C) mirrors the language in section 301(b)(2), which provides that when the USTR, subject to the direction of the President, concludes that action by the United States is "appropriate" under section 301(b), the President (or the USTR) can impose "duties or other import restrictions" on goods of a foreign country it has determined engages in an act, policy, or practice that the USTR determines is "unreasonable or discriminatory and burdens or restricts United States commerce." 19 U.S.C. §§ 2417(a)(1)(C), 2411(b), (c)(1)(B). The fact that section 307(a)(1)(C) harkens back to the statutory language in section 301(b), pursuant to which the President (or the USTR acting at the President's direction) must "take all appropriate and feasible action under [section 301(c)] . . . to obtain the elimination of [the] act, policy, or practice," demonstrates that Congress also wanted to confer discretion on the President (or the USTR) when determining what action is appropriate to "modify" an action. 19 U.S.C. §§ 2411(b), 2417(a)(1)(C); *see also Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("It is a fundamental cannon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme. A court must therefore interpret the statute as a symmetrical and

coherent regulatory scheme, and fit, if possible, all parts into a harmonious whole.") (internal quotations and citations omitted).[5]

Further, what constitutes an "appropriate" action to eliminate the unfair trade practice necessarily involves the balancing of multiple and complex factors that does not lend itself to judicial review. *See Almond Bros.*, 721 F.3d at 1326 (citing *Heckler*, 470 U.S. at 831). Significantly, the Federal Circuit has found a lack of judicially manageable standards when analyzing other provisions of section 301 that contain similarly discretionary language. For example, in *Almond Brothers*, 721 F.3d at 1327, the court examined section 301(c)(1)(D)(iii)(I), which, in defining the scope of the USTR's authority to take "appropriate and feasible action" to "obtain the elimination of the act, policy, or practice" under section 301, permits the USTR to enter into binding agreements with a foreign country to "provide the United States with compensatory trade benefits that:  (I) are satisfactory to the Trade Representative, and (II) meet the requirements of [section 301(c)(4)]." 19 U.S.C. §§ 2411(c)(1)(D)(iii)(I)-(II).  After reviewing these provisions, the court concluded that what constitutes a "satisfactory" resolution of the dispute "is a question that is committed to the discretion of the USTR and therefore beyond judicial review."  *Almond Bros.*, 721 F.3d at 1327.  The court also held that, under the standards in that statutory subsection, "the USTR has discretion to craft whatever relief it deems necessary to resolve the dispute."  *Id.* at 1326.

---

[5]  That Congress in enacting section 307 intended to mirror the language in section 301 is supported by the legislative history.  The initial legislation introduced by the U.S. House of Representatives on January 6, 1987 stated that the USTR could "modify or terminate a section 301 action at any time if:  [ . . . ] (1) the foreign act, policy, or practice is being eliminated or phased out satisfactorily; or (2) the action is not effective or its continuation is not in the national economic interest."  H.R. CONF. REP. 100-576 (1988) at 564.  The final language, as currently codified, states that "such action is being taken under section 2411(b) of this title and is no longer appropriate," which directly mirrors the statutory language in the cited section.  19 U.S.C. § 2417(a)(1)(C).

If it is a non-reviewable political question whether an agreement is "satisfactory to the

U.S. Trade Representative" to obtain the elimination of the act, policy, or practice under section

301(c)(1)(D), then logically it follows that determining (1) whether maintaining a prior action is

"no longer appropriate," or (2) that further "appropriate" action is necessary to address the

increased burden on United States commerce, also presents a judicially unmanageable standard.

19 U.S.C. §§ 2411(b)(2); 2417(a)(1)(C); *Almond Bros.*, 721 F.3d at 1327.

Further, prudential considerations weigh against reviewing the President's actions

because plaintiffs invite "the potentiality of embarrassment from multifarious pronouncements

by various departments on one question." *Baker*, 369 U.S. at 217.  Here, plaintiffs invite

competing policies and statements regarding United States trade policy from the Judicial Branch,

potentially disrupting the conduct of United States foreign relations.  Negotiations with China

have been proceeding for over two years without formal complaint from the plaintiffs (and with

considerable Congressional support), and disruption of those negotiations could have significant

international repercussions.  *See Notice Suspending List 4B*, 84 Fed. Reg. at 69,447 (suspending

List 4B because the "United States and China reached a historic and enforceable agreement on a

Phase One trade deal that requires structural reforms and other changes to China's economic and

trade regime, including with respect to certain issues covered in this Section 301 investigation.");

*Notice Reducing List 4A*, 85 Fed. Reg. at 3,741 (reducing List 4A based on success in

negotiations with China).

Areas of foreign affairs "uniquely demand [a] single-voiced statement of the

Government's views." *Baker*, 369 U.S. at 211; *see also United States v. Martinez*, 904 F.2d 601,

602 (11th Cir. 1990).  In foreign commerce, "federal uniformity is essential." *Japan Line, Ltd. v.*

*County of Los Angeles*, 441 U.S. 434, 448 (1979); *see also Michelin Tire Corp. v. Wages*, 423

U.S. 276, 285 (1976) ("the Federal Government must speak with one voice when regulating commercial relations with foreign governments").  Courts are ill-equipped to review complex and on-going negotiations regarding trade agreements.  If the Court were to undermine the President's authority, there could be significant repercussions for our national interests, national economy, and credibility with foreign nations.  Thus, it is not for the Judiciary to insert itself into this highly political process of negotiating and resolving the trade dispute with China and to limit the Executive Branch's international negotiating flexibility.  *Baker*, 369 U.S. at 211.

Accordingly, the USTR's actions, as specifically directed by the President, are beyond this Court's review.

### III.   The President And The USTR Possess Authority Under Section 307 Of The Trade Act To Modify An Action

Even if the challenged actions in the section 301 cases could be considered those of the USTR and not the President, only a very narrow level of review is applied.  As explained above, the USTR is a member of the Executive Office of the President, and conducts "[a]ll functions . . . under the direction of the President."  19 U.S.C. § 2171(a); *see also Reorganization Plan No. 3 of 1979*, 44 Fed. Reg. at 69,274.  Thus, although pursuant to 28 U.S.C. § 2640(e), the standard of review under the APA generally applies to claims brought under 28 U.S.C. § 1581(i), precedent from the Federal Circuit makes clear that that it "affords substantial deference to decisions of the Trade Representative implicating the discretionary authority of the President in matters of foreign relations."  *Gilda II*, 622 F.3d at 1363.

In *Gilda II*, which concerned whether a retaliation list had terminated under section 307(c)(2), the Federal Circuit applied the standard of review articulated in *Maple Leaf Fish Co. v. United States*, 762 F.2d at 89, pursuant to which the Court stated that "[f]or a court to interpose, there has to be a clear misconstruction of the governing statute, a significant

procedural violation, or action outside delegated authority." *Gilda II*, 622 F.3d at 1363 (quoting *Maple Leaf*, 762 F.2d at 89).  Thus, to the extent the Court concludes that the modification decisions are those of the Trade Representative and not the President, the Court must "afford[ ] substantial deference to decisions of the Trade Representative" and limit its review to the standard articulated in *Maple Leaf* and *Gilda II*.

Whether presidential or agency action, plaintiffs have failed to establish *any* violation of the statute, much less a "clear misconstruction."  *Maple Leaf*, 762 F.2d at 89.  Instead, plaintiffs incorrectly allege that the USTR, at the direction of the President, was precluded from taking action because more than a year had passed since the section 301 investigation was initiated. Section 307(a), however, does not contain a one-year time limit — or any time limit at all.  To the contrary, within the statutory structure, section 307(a) serves the necessary role of allowing for supplemental action to address the issues under investigation, either through modification or termination of the trade action.  If section 307(a) were somehow construed as having the same one-year time limit as is applicable to actions taken on the basis of the investigation as provided for in sections 304(a)(1) and 305(a), the statute would provide no mechanism for terminating a trade action, for example, upon a successful resolution.  In fact, section 307(c) provides that a section 301 action will not otherwise terminate for — at the earliest — four years.

Notably, in addition to authorizing the termination of an action, section 307(a) also provides that the USTR may "modify" an action if the "burden or restriction on United States commerce of the denial rights, or of the acts, policies, and practices, that are the subject of such action has increased or decreased."  19 U.S.C. § 2417(a)(1)(B).  That the USTR is authorized to take action if the burden on United States commerce subsequently *increases* supports that the level of the action itself could also increase.  In fact, plaintiffs concede that section 307(a)(1)(B)

31

"explicitly [references] a possible escalation of action."  Plaintiffs' Proposed Rely in Support of

Motion for Preliminary Injunction (Pl. Proposed Reply) at 10.  Moreover, the fact that the USTR

could escalate action pursuant to this statutory provision demonstrates that Congress envisioned

that the USTR would continue monitoring section 301 investigations and react if the initial

action was ineffective at resolving the unfair or discriminatory trade practice.  *See also* 19 U.S.C.

§ 2416 (providing for ongoing monitoring of certain types of section 301 actions); 19 U.S.C. §

2417(c) (calling for a four-year review of section 301 actions, including a consideration of "other

actions that could be taken").

Plaintiffs' other grounds for challenging the USTR's authority fare no better.  As

explained in the *Notice Imposing List 3*, 83 Fed. Reg. at 47,974-75, and in the *Notice Imposing*

*List 4*, 84 Fed. Reg. at 43,304-05, the increase in the tariffs was necessary to further encourage

China to eliminate the unfair polices identified in the USTR's investigation (that List 1 and List 2

had demonstrably failed to do), and thus to further support the effectiveness of the initial section

301 action.  Indeed, these notices stated that China sought to pressure the President and the

USTR to drop the section 301 action — through China's adoption of tariffs successively on $50

billion and $110 billion of United States goods, as well as other measures such as the devaluation

of its currency — and that if China were successful, this would only allow it to perpetuate its

discriminatory and harmful practices.  *Id.*  Thus, China's actions necessitating List 3 and List 4A

were not separate and distinct from their unfair trade practices investigated under section 301.

Rather, China's subsequent actions were directly related to the section 301 investigation, in that

their ultimate goal was perpetuating the investigated unfair trade practices that were burdening

United States commerce.

These actions fall squarely within the President and the USTR's authority to "modify . . . any action . . . if . . . the burden . . . on United States commerce . . . of the acts, policies, and practices, that are the subject of such action *has increased*," *see* 19 U.S.C. § 2417(a)(1)(B) (emphasis added), or if the action being taken is "no longer appropriate." 19 U.S.C. § 2417(a)(1)(C). The President's and the USTR's construction of these statutory terms is not "a clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority." *Maple Leaf*, 762 F.2d at 89. Plaintiffs' misreading of the statute — which would deny the President and the USTR the flexibility to respond to a trading partner's refusal to eliminate its unfair trade practices and, instead, to retaliate in hope of pressuring the United States to withdraw its section 301 action — is fundamentally inconsistent with the purpose of taking action under section 301 in the first place, which is taking all "appropriate and feasible action" within the power of the President to obtain the elimination of the unfair "act, policy, or practice." 19 U.S.C. § 2411(b)(2); *see also* H.R. REP. NO. 100-40, pt. 1, at 76 (1987) (modification under section 307 may constitute "additional or increased measures if further leverage or offsetting action is deemed necessary and appropriate").

Nor can the statute be read to require the President and the USTR, in modifying an action under section 307, to direct tariffs to specific categories of goods, particularly if they determine other action is more "appropriate" to eliminate the unfair act, policy, or practice. 19 U.S.C. §§ 2417(a)(1); 2411(b)(2). Notably, in imposing the initial tariffs following the section 301 investigation, the President and the USTR were not restricted to imposing tariffs on certain categories of goods from a particular economic sector. Instead, they possess the discretion to "impose duties or other import restrictions on the goods of, and, notwithstanding any other

33

provision of law, fees or restrictions on the services of, such foreign country for such time as the Trade Representative determines appropriate."  19 U.S.C. § 2411(c)(1)(B).

Furthermore, the statute specifically provides that "[t]he actions the Trade Representative is authorized to take under subsection (a) or (b) may be taken against any goods or economic sector … (B) without regard to whether or not such goods or economic sector were involved in the act, policy, or practice that is the subject of such action."  19 U.S.C. § 2411(c)(3)(B).  Alternatively, the parties could enter into an agreement to provide other types of "compensatory trade benefits" if the USTR concludes that is more "satisfactory."  *Id.* at §§ 2411(c)(1)(D)(iii); 2411(c)(4).  If the President and the USTR possess this kind of flexibility at the outset, there is no reason why they would not possess similar flexibility in determining whether to modify an action.  *See S. Puerto Rico Sugar*, 334 F.2d at 632 ("In the external sector of the national life, Congress does not ordinarily bind the President's hands so tightly that he cannot respond promptly to changing conditions or the fluctuating demands of foreign policy.").  Indeed, the Federal Circuit in *Gilda I* recognized that in imposing retaliatory duties under section 306 for noncompliance with a World Trade Organization dispute settlement agreement, a retaliation list could include "non-reciprocal goods" — that is, goods that were not in the economic sector that was the subject of the initial dispute — so that the foreign nation would not thwart the intended effect of a retaliation list by "subsidizing products that were included on the list."  *Gilda I*, 446 F.3d at 1277.

Moreover, we note that section 307(a)(1)(C) closely mirrors the language in section 301(b)(2) (*i.e.*, 19 U.S.C. § 2411(b)(2)), which authorizes the President and the USTR to take all "appropriate and feasible action" to resolve the unfair trade practice.  Given the discretion that is afforded the President (or the USTR) in selecting an "appropriate" action under that section of

the statute — which is not limited to imposing tariffs on a particular economic sector — it would make no sense to impose a more restrictive reading on the term "appropriate" in section 307.  *See Am. Ass'n of Exps. & Imps.*, 751 F.2d at 1247 (when a statute gives a "broad grant of authority to the President in the international field," those "delegations are normally given a broad construction"); *see also United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 512 n.5 (1992) ("Our normal canons of construction caution us to read the statute as a whole, and, unless there is a good reason, to adopt a consistent interpretation of a term used in more than one place within a statute"); *Nat. Credit Union Admin. v. First Nat. Bank & Trust Co.*, 522 U.S. 479, 501 (1998) (it is an "established canon of construction that similar language contained within the same section of a statute must be accorded a consistent meaning.") (citation omitted).

Plaintiffs are also wrong that section 307(a)(1)(C) limits Presidential authority so that the President, or the USTR at his direction, can only "delay, taper, or terminate" a section 301 action.  Am Compl. at ¶¶ 2, 69.  The only possible way to reach this incorrect conclusion is to find that the word "modify" in section 307(a)(1)'s introductory clause somehow does not apply to subpart (C) (since the word "modify" simply does not mean "delay" or "taper").  However, this interpretation is unfounded, because the entire introductory clause — including the word "modify" — applies to all subparts, (A) through (C), based on a plain reading of the text. Plaintiffs' interpretation is also at odds with the plain text of the provision because it includes modifications which, as noted, may address situations in which the burden on U.S. commerce has *increased*.  Furthermore, the legislative history makes abundantly clear that Congress did not intend the word "modify" to restrict the President's and the USTR's discretion.  As mentioned above, the House Committee on Ways and Means directly addressed this issue, indicating that it was adding section 307, and stated the following:

> Any modification may be either an ***increase*** or a reduction in the
> level or the form of action, ***as appropriate***.
> . . .
>
> Modifications could either be reduction or elimination of the action
> if it has achieved the desired objective or continuation is not in the
> U.S. economic interest, ***or additional or increased measures if
> further leverage or offsetting action is deemed necessary and
> appropriate.***

H. REP. NO. 100-40 (1987) at 75-76 (emphasis added).  The Senate Report further confirms this

position, as does the Conference Report.  *See* S. REP. NO. 100-71 (1987) at 84; H.R. CONF. REP.

NO. 100-576 (1988) at 564.[6]

Moreover, plaintiffs' interpretation begs the question:  What kind of negotiator would the

President (or the USTR) be if he or she could only "delay, taper, or terminate" the initial section

---

[6] Even if the USTR could not modify the section 301 action at issue in the present cases pursuant
to 19 U.S.C. § 2417(a)(1)(C), it could have modified the section 301 action based solely upon a
finding that the burden on U.S. commerce "of the acts, policies, and practices that are the subject
of [a section 301] action has increased" pursuant to 19 U.S.C. § 2417(a)(1)(B).  While the USTR
promulgated List 3 and List 4 based on both statutory provisions, each provision provides an
independent basis for action.

In addition, the fact that the USTR has previously invoked section 307(a)(1)(C) to reduce,
terminate or delay section 301 actions fails to demonstrate that this statutory provision may not
also be used to increase actions.  Indeed, the USTR previously invoked this provision after
foreign governments took steps to remedy some or all of their investigated unfair trade practices,
or requested review of its trade agreement with the United States.  None involved a foreign
government that refused to cease its unreasonable and harmful practices and, instead, adopted
measures intended to pressure the United States to drop its section 301 action, like China did
here.  The fact that the USTR invoked section 307(a)(1)(C) for a different purpose in markedly
different circumstances has no bearing on the present cases.  As the USTR noted in promulgating
List 3, "[w]e are not aware of any prior investigation where a U.S. trading partner has responded
to a Section 301 action by refusing to consider a change to its policies, and instead has openly
adopted its own retaliatory measures."  PR-01 at 5.  Moreover, once China committed to
addressing its unfair trade practices, the USTR, at the direction of the President, invoked its
modification authority under section 307 to reduce List 4A and suspend List 4B.  *Notice
Reducing List 4A*, 85 Fed. Reg. at 3,741; *Notice Suspending List 4B*, 84 Fed. Reg. at 69,447.

301 action if he subsequently concluded the action was ineffective?[7]  This interpretation would require the President (or the USTR) to take the most aggressive action imaginable at the outset, risking diplomatic turmoil, rather than proceeding cautiously and only taking the minimum action necessary to eliminate the foreign unfair trade practices.  In enacting section 307, Congress did not cabin the President's (or the USTR's) discretion in this way.

Plaintiffs' statutory construction also fails because it would produce "absurd results inconsistent with the statute's context."  *Dupuch-Carron v. Sec'y of Health & Hum. Servs.*, 969 F.3d 1318, 1330 (Fed. Cir. 2020); *see also Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 252 (2010) (declining to "adopt a view of the statute that . . . would produce an absurd result"); *Haggar Co. v. Helvering*, 308 U.S. 389, 394 (1940) (explaining that a reading of a statute that "would lead to absurd results is to be avoided when [it] can be given a reasonable application consistent with [its] words and with the legislative purpose.").  Indeed, Congress enacted the Trade Act of 1988 and strengthened section 301 because it wanted the United States to "vigorously pursue appropriate action whenever necessary . . . to respond to . . . unfair foreign acts, policies, or practices determined by the USTR to be actionable under section 301."  S. Rep. No. 100-71 (1987) at 80.  In discussing the amendments to section 301 as part of H.R. 3, Senator Lautenberg aptly stated:

> But if section 301 is to pack any punch against unfair trading practices, we must do more than launch investigations.  We must be ready to retaliate.  Because if a referee blows his whistle and never walks off the yardage, pretty soon the game deteriorates.  That is what's happening now in trade.

---

[7]  The Conference Report on H.R. 3 shows that the original language was "the action is not effective or its continuation is not in the national economic interest."  H.R. CONF. REP. 100-576 (1988) at 564.  The Senate's amendment added the language that is now codified at 19 U.S.C. § 2417(a)(1)(B).

133 CONG. REC. 40,486 (1987) (statement of Sen. Lautenberg); *see also* 123 Cong. Rec. 20,486 (1987) (statement of Sen. Levin) ("By passing the trade bill today, the Senate will be sending a message to our competitors in the international marketplace — the United States is discarding a 'hands off' approach to trade. . . . This trade bill begins this process of recognizing the tough reality of international trade.  It toughens up our trade laws in many respects, making it more likely that we will retaliate against those countries that put up barriers to our products.").

It would make no sense for Congress to give the President (or the USTR acting at the President's direction) expansive authority initially for "vigorous[ ]" action, only to let "the game deteriorate" if the foreign country refused to eliminate the unfair trade practices or retaliated.  S. REP. NO. 100-71 (1987) at 80; 133 CONG. REC. 40,486 (1987).  If plaintiffs' reading of the statute were correct, it would mean that Congress intended the United States to have *no leverage* in conducting trade negotiations.  Countries with unfair trade practices would know that the President and the USTR would have only one opportunity to determine what action would be "appropriate" to eliminate an unfair trade policy or practice and could not revisit that decision if the initial action did not have the desired effect, or the foreign country's trade practices actually worsened.  That interpretation would only incentivize other countries to refuse to negotiate and take wide-ranging retaliatory measures knowing that the President and the USTR would be powerless to respond without conducting an entirely new investigation.  This would leave the United States *worse off* for attempting to eliminate the unfair and discriminatory practices than if it had never taken action in the first place.  Such a result is plainly not what Congress intended.

## IV.   Alternatively, If The Challenged Actions Constitute Agency Action, Plaintiffs' Claim That The USTR Failed To Follow The Appropriate Procedures Lacks Merit

As discussed above, the USTR acted pursuant to Presidential directives, which are non-reviewable, and whether an action is "appropriate" presents a non-justiciable political question.

Moreover, the substance of the USTR's decision is otherwise not reviewable outside of the narrow standard articulated in *Maple Leaf*.  *See Maple Leaf*, 762 F.2d at 89; *see also Gilda II*, 622 F.3d at 1363.  But even if the Court rejects these arguments, the challenged actions are exempt from the APA's informal notice-and-comment requirements because they fall within the "foreign affairs function" exception.  As a result, the USTR was only required to comply with the procedural requirements mandated by its enabling statute, all of which it followed with respect to the challenged actions in this case.

A.    <u>**The Challenged Actions Qualify For The Foreign Affairs Exception**</u>

In certain circumstances, agency action is exempt from the APA's notice-and-comment requirements.  *See* 5 U.S.C. § 553(a).  One such circumstance is when agency action constitutes a foreign affairs function.  *See* 5 U.S.C. § 553(a)(1) (exempting rules from notice-and-comment procedures "to the extent that there is involved ... a military or foreign affairs function of the United States.").

The foreign affairs exception applies to informal rulemaking.  Informal rulemaking, or "notice-and-comment" rulemaking, can be distinguished from formal rulemaking, which occurs when an agency takes action pursuant to an enabling statue that requires a hearing on the record. 5 U.S.C. §§ 553(c), 556, 557.  Here the List 3 and 4 trade actions were implemented pursuant to 19 U.S.C. § 2417 ("Modification and termination of actions"), which does not require any type of hearing.  As a result, if the Court concludes that the promulgation of List 3 and List 4 pursuant to section 307(a)(1) involves agency action, it constitutes informal rulemaking, or "notice and comment" rulemaking, subject to the requirements of 5 U.S.C. § 553(b)-(c).

Turning next to the requirements of the foreign affairs function exception itself, this exception applies "'only to the extent that the excepted subject matter is clearly and directly

39

involved in a foreign affairs function.'"  *Invenergy Renewables LLC v. United States*, 422 F. Supp. 3d 1255, 1289 (Ct. Int'l Trade 2019) (quoting *Mast Indus., Inc. v. Regan*, 596 F. Supp. 1567, 1582 (Ct. Int'l Trade 1984)); *see also Capital Area Immigrants' Rights Coal. v. Trump*, 471 F. Supp. 3d 25, 52 (D.D.C. 2020) (the first part of the phrase "to the extent there is involved," has been interpreted to mean "*clearly and directly*" involved (discussing *Humana of S.C., Inc. v. Califano*, 590 F.2d 1070, 1082 (D.C. Cir. 1978)) (emphasis in original)).[8]

---

[8]  Some circuits have held that a foreign affairs function must have "definitely undesirable international consequences" if rulemaking were required to qualify for this exception.  *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 676 (9th Cir. 2021) (not applying the foreign affairs exception where government failed to establish that "adhering to notice and comment and a thirty-day grace period will 'provoke definitely undesirable international consequences'").  This approach is based on legislative history stating that "foreign affairs functions" are those affairs that "so affect relations with other Governments that, for example, public rule-making provisions would provoke *definitely undesirable international consequences*."  *Am. Ass'n of Exps. & Imps.*, 751 F.2d at 1249 (quoting H. Rep. No. 69-1980 (1946) and citing S. Rep. No. 69-752 (1945)) (emphasis added).  Other circuits have held that "undesirable international consequences" was meant to be an illustration, not the definition of "foreign affairs function."  *See, e.g.*, *City of New York v. Permanent Mission of India to United Nations*, 618 F.3d 172, 202 (2d Cir. 2010).  The Federal Circuit has not explicitly addressed this issue.  In *Am. Ass'n of Exporters & Importers*, 751 F.2d at 1249, the Federal Circuit found that the rule in question qualified for the foreign affairs function exception because its prior disclosure would "provoke definitely undesirable international consequences."  The Court, however, did not hold that a foreign affairs function must necessarily provoke "undesirable international consequences" in order to qualify for the exception.  Notably, this Court concurred with the Second Circuit's approach in *Mast Industries Inc. v. Regan*, 596 F. Supp. at 1581 (holding that "the phrase 'clearly provoke definitely undesirable international consequences' appears illustrative," and that "a requirement of such a finding would render the 'military or foreign affairs function' superfluous since the 'good cause' exception, § 553(b)(B), would apply.").  While this Court has more recently stated that the foreign affairs exception only applies when public rulemaking provisions would "provoke definitely undesirable international consequences," *see Invenergy*, 422 F. Supp. at 1289 (Ct. Int'l Trade 2019) (quoting *Zhang v. Slattery*, 55 F.3d 732, 744 (2d Cir. 1995)), the case cited for this proposition predates *City of New York*, in which the Second Circuit held that "definitely undesirable international consequences" was only illustrative, and may only be necessary in "areas of law like immigration that only indirectly implicate international relations."  *City of New York*, 618 F.3d at 202.

Numerous types of agency action fall within the foreign affairs function exception, including the negotiation and/or implementation of international agreements.  For example, this Court has held that "[w]hen the President defines, modifies or even violates the terms of an international agreement, or directs his subordinates to do so, that action is 'clearly and directly' involved within the 'foreign affairs function.'"  *Mast Indus.,* 596 F. Supp. at 1582; *see also Am. Ass'n of Exps. and Imps.,* 751 F.2d at 1249 (regulations implementing the Arrangement Regarding International Trade in Textiles qualified for the foreign affairs exception); *Earth Island Inst. v. Christopher*, 913 F. Supp. 559, 574 (Ct. Int'l Trade 1995) (guidelines promulgated to implement statutory provisions for the international protection of sea turtles were subject to the foreign affairs exception); *Am. Inst. for Imported Steel, Inc. v. United States*, 600 F. Supp. 204, 211 (Ct. Int'l Trade 1984) (foreign affairs function exception applied to the embargo of pipe and tube steel from the European communities, as it "clearly and directly goes to the purpose of an international agreement: limiting imports").  The Federal Circuit has also stated the following:

> At least as early as 1967, the then pertinent executive agencies (Departments of Commerce and Labor) informed Congress that in their view, *the international negotiation and administration of international agreements . . .*  fell within the present foreign affairs exemption in Section 4 of the APA, 5 U.S.C. § 553.

*Ass'n of Exps. & Imps.*, 751 F.2d at 1249 n.16 (emphasis added).  More broadly, the Federal Circuit has found that the area of international trade is "intimately involved in foreign affairs." *Id.* at 1248 (quoting *Florsheim Shoe,* 744 F.2d at 793); *Duracell, Inc. v. U.S. Int'l Trade Comm'n*, 778 F.2d 1578, 1582 (Fed. Cir. 1985) (same).  It follows that negotiating an international agreement "clearly and directly" involves a foreign affairs function.

Actions related to the President's political negotiations with another country also fall within the foreign affairs function exception.  In *Ass'n of Exporters & Importers*, for example, the Federal Circuit held that an agency's imposition of import restrictions was subject to the

exception, explaining that the agency's authority "derive[d] in part from the President's foreign affairs power," which the President may use "as a part of his overall foreign policy."  751 F.2d at 1249.  Therefore, the timing of the action in question could be "linked intimately with the Government's overall political agenda concerning relations with another country," and were the Court to require the agency to comply with notice-and-comment requirements, "the President's power to conduct foreign policy would plainly be hampered."  *Id.*

Stated differently by another court interpreting the *Ass'n of Exporters & Importers* decision, "the court appears to have weighed that the rule at issue involved authority Congress delegated to the President (that he then delegated to the agency) to negotiate export agreements with foreign countries and issue relevant regulations."  *Capital Area Immigrants' Rights*, 471 F. Supp. 3d at 56 n.23; *see also Yassini v. Crosland*, 618 F.2d 1356, 1361 (9th Cir. 1980) (directive "designed to further the policy expressed in the Presidential directive" was exempt from notice-and-comment requirements of the APA).

Should the Court find that the challenged actions in this case constitute agency action, it should also find that they qualify for the foreign affairs function exception.  First, the challenged actions were part of the negotiation of an international trade agreement.  Indeed, upon issuing List 3, the USTR and China engaged in several rounds of trade negotiations.  *Notice of December 2018 Delay*, 83 Fed. Reg. at 65,199; *December 2018 White House Statement*; *Notice of March 2019 Delay*, 84. Fed. Reg. at 7,966.  Then, after the USTR issued List 4A, the United States and China reached a trade deal.  In announcing that deal, the USTR specifically referenced the section 301 investigation, making clear that the investigation and related trade actions — including the List 3 and List 4A trade actions at issue in this case — were critical to the negotiation of the trade deal.  *Notice Suspending List 4B*, 84 Fed. Reg. at 69,447 (stating that the

deal "requires structural reforms and other changes . . . including with respect to certain issues covered in this Section 301 investigation.").  Moreover, the fact that the USTR reduced tariffs on List 4A and suspended List 4B based on the progress of negotiations with China further demonstrates that the List 3 and List 4A trade actions were essential bargaining chips used in the negotiation of an international agreement.  Such action is consistent with the nature of section 301 as a "negotiating tool to ensure that foreign countries adhere to their trade agreement obligations . . . ," *see* S. REP. NO. 100-71 at 73 (1987), and it therefore triggers the foreign affairs function exception.

In addition, the challenged actions in this case relate to the President's "overall political agenda concerning relations with another country."  *Ass'n of Exps. & Imps.*, 751 F.2d at 1249. Indeed, the Memorandum from the President directing the USTR to determine whether to initiate a section 301 investigation specifically outlined the relevant parts of the President's political agenda with China.  *See Section 301 Findings* at 4 (seeking to investigate "laws, policies, practices, and actions [that] may inhibit United States exports, deprive United States citizens of fair remuneration for their innovations, divert American jobs to workers in China, contribute to our trade deficit with China, and otherwise undermine American manufacturing, services, and innovation.").  This political agenda was the result of longstanding concerns with the Chinese government "related to technology transfer, intellectual property, and innovation."  *Id.*

In fact, List 3 and List 4A were issued for the very purpose of achieving the goals set forth in the President's Memorandum to the USTR.  Specifically, in directing the USTR to issue List 3, the President stated that supplemental action was required to counter the "unfair policies and practices relating to United States technology and intellectual property" identified in the 301 investigation.  *September 2018 Presidential Directive.*  Likewise, the President directed the

USTR to issue List 4 as a result of actions taken by China to maintain the unfair practices

identified in the section 301 investigation.  *Notice Imposing List 4*, 84 Fed. Reg. at 43,304-05.

Just as in *Ass'n of Exporters & Importers*, if the Court finds that the USTR — not the

President — made the decisions that resulted in List 3 and List 4A, the USTR did so based on

authority delegated by Congress to the President (that the President then delegated to the

agency), and that authority derived "from the President's foreign affairs power."  *Ass'n of Exps.*

*& Imps.*, 751 F.2d at 1249.  Unlike situations in which agency action only indirectly implicates

foreign affairs, *see*, *e.g.*, *Capital Area Immigrants' Rights Coal.*, 471 F. Supp. 3d at 56, the List 3

and List 4A trade actions were "linked intimately with the Government's overall political agenda

concerning relations with another country."  *Ass'n of Exps. & Imps.*, 751 F.2d at 1249.  These

actions fall squarely within the foreign affairs function exception to the APA's rulemaking

requirements, as plaintiffs appear to concede.  *See* Pl. Proposed Reply at 19-20 ("Even if the

Government were correct [that the challenged actions fall within the foreign affairs function

exception]," it only exempts these actions from the APA's rulemaking requirements).

### B.        The USTR Provided Interested Parties All Procedure Due Under Section 307

Because the APA does not apply to the President's actions (or the USTR acting at the

President's direction), the USTR was only required to comply with the procedural requirements

mandated by its enabling statute.  *See, e.g., Baylor Univ. Med. Ctr. v. Heckler*, 758 F.2d 1052,

1061-62 (5th Cir. 1985) (proceeding to determine whether agency complied with substantive

requirements of enabling statute after concluding that agency action fell within the benefits

exemption of the APA); *see also United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224, 238

(1973) (in addition to the APA, an agency must comply with the requirements in its enabling

statute); 5 U.S.C. § 559 (The APA "do[es] not limit or repeal additional requirements imposed

by statute or otherwise recognized by law.").  Here, the USTR complied with all of the statutory requirements.

As explained above, section 307 provides the procedures required when the USTR modifies or terminates initial action.  Specifically, section 307(a)(2) provides that before modifying an action, the USTR must: (1) "consult . . . with representatives of the domestic industry concerned," and (2) "provide opportunity for the presentation of views by other interested persons affected by the proposed modification or termination concerning the effects of the modification or termination and whether any modification or termination of the action is appropriate."  19 U.S.C. § 2417(a)(2).  The statute does not define "presentation of views," but it is necessarily a flexible phrase.[9]  In addition, given that another section of the same statute requires a public hearing if requested, *see* section 304(b), the Court can reasonably infer that the absence of any express reference to a "public hearing" in section 307(a)(2) means that that no such hearing is required for the USTR to satisfy its mandate to "consult" with the domestic industry and "provide an opportunity for the presentation of views[.]"  *Compare* 19 U.S.C. § 2414(b), *with* 19 U.S.C. § 2417(a)(2).[10]

---

[9] In *Fleetwood Enterprises, Inc. v. U.S. Department of Housing and Urban Development*, 818 F.2d 1188 (5th Cir. 1987), for example, the Court of Appeals for the Fifth Circuit was tasked with deciding what kind of proceeding was required under the National Manufactured Housing Construction and Safety Standards Act of 1974, which obligated the Secretary of Housing and Urban Development to provide the manufacturer "an opportunity to present his views and evidence in support thereof . . ."  *Fleetwood Enterprises*, 818 F.2d at 1190.  The Court held that the Secretary's interpretation — that the Act leaves the form of the proceeding to the Secretary's discretion — was reasonable and, thus, the Act allowed "for either formal or informal administrative proceedings depending upon the circumstances of the particular case[.]"  *Id.* at 1194.  The plain language of section 307 similarly affords the USTR flexibility to determine what form of proceedings are appropriate in terms of providing interested parties the opportunity for the "presentation of views."

[10] Had Congress intended for section 304(b)'s "public hearing" requirement to apply when, as here, the USTR modifies or terminates a section 301 action pursuant to section 307, Congress

In addition, the Court may not impose additional requirements on the agency beyond those prescribed in section 307. "Absent constitutional constraints or extremely compelling circumstances the 'administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties.'" *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 543 (1978) (quoting *F.C.C. v. Schreiber*, 381 U.S. 279, 290 (1965)). As long as the USTR "employed at least the statutory *minima*," then its action must be sustained. *Id.* at 548.

Here, the USTR employed more than the statutory *minima* under section 307. Even if section 307 required a public hearing (which it does not), the USTR provided interested persons the ability to present their views concerning the proposed modification through both written comments and oral testimony. First, the USTR requested public comments for both List 3 and List 4, *see Request for Comments for List 3*, 83 Fed. Reg. at 33,608-09; *Request for Comments for List 4*, 84 Fed. Reg. at 22,564-65, with respect to the specific tariff subheadings to be subject to increased duties, the level of the increase, the rate of duty, and the appropriate aggregate level of trade to be covered by additional duties. *Id.* The USTR also encouraged parties to address whether imposing increased duties on a particular product would be "practicable or effective to obtain the elimination of China's acts, policies, and practices, and whether imposing additional duties on a particular product would cause disproportionate economic harm to U.S. interests[.]"

---

would not have prescribed separate, specific procedures under section 307(a)(2). *See, e.g.*, *HCSC-Laundry v. United States*, 450 U.S. 1, 6 (1981) ("it is a basic principle of statutory construction that a specific [provision of a] statute . . . controls over a general provision . . . particularly when the two are interrelated and closely positioned, both in fact being parts of" the same statute and relating to the same topic).

*Request for Comments for List 3*, 83 Fed. Reg. at 33,609; *Request for Comments for List 4*, 84 Fed. Reg. at 22,565.

Second, in response to the President directing the USTR to consider increasing the proposed level of the modification from 10 percent to 25 percent, the USTR extended the public comment period for List 3.  *See Extension of List 3 Comment Period*, 83 Fed. Reg. at 38,760-61. The USTR also requested post-hearing rebuttal comments for both List 3 and List 4.  *Id.* at 38,761; *see also Request for Comments for List 4*, 84 Fed. Reg. at 22,565.  In addition, although it was not required to do so, the USTR held a six-day public hearing with respect to the proposed List 3, *see Request for Comments for List 3*, 83 Fed. Reg. at 33,608; *Notice Imposing List 3*, 83 Fed. Reg. at 47,974, and a seven-day hearing with respect to the proposed List 4.  *Request for Comments for List 4*, 84 Fed. Reg. at 22,564; *Notice Imposing List 4*, 84 Fed. Reg. at 43,305.

Finally, the USTR explained in promulgating both lists that it had considered all of the views presented.  In issuing List 3, the USTR explained that it had "carefully reviewed the public comments and the testimony from the six-day public hearing," and based on comments and testimony received, determined not to include certain tariff subheadings that had been proposed in the Annex to its notice requesting comments.  *Notice Imposing List 3*, 83 Fed. Reg. at 47,975. Likewise, the USTR explained in promulgating List 4 that it had "take[n] account of the public comments and the testimony from the seven-day public hearing."  *Notice Imposing List 4*, 84 Fed. Reg. at 43,305.  The USTR also explained in this notice that List 4 would be separated into two lists with different effective dates.  The second list, List 4B, was to be delayed until December 15, 2019 "[t]o provide a longer adjustment period for U.S. interested persons[.]"  *Id.* at 43,305.

In short, the USTR more than satisfied its obligations under section 307 by permitting interested parties to present their views in multiple rounds of written comments, as well as at a six-day public hearing for List 3, and at a seven-day public hearing for List 4.

## VI.   Alternatively, If The Challenged Actions Constitute Agency Action, And If The Foreign Affairs Exception Does Not Apply, The USTR Still Complied With All Relevant APA Requirements

Even if the Court finds that the challenged actions are subject to the APA's notice-and-comment provisions, the USTR still complied with all relevant requirements.  *See* 5 U.S.C. § 553(b)-(c).

The APA authorizes the Court to hold unlawful and set aside agency action that is: "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law; [or] (E) unsupported by substantial evidence[.]"  5 U.S.C. § 706(2)(A)-(E).

Plaintiffs appear to assert claims under the following subparts of this statute:  Subpart (A), *see* Am. Compl. at ¶ 75 ("Defendants also promulgated List 3 and List 4A in an arbitrary and capricious manner . . .") and ¶ 73 ("Defendants exceeded their authority under the Trade Act in promulgating List 3 and List 4A and therefore acted 'not in accordance with the law'"); Subpart (C), *see id.* at ¶ 73 ("Defendants exceeded their authority under the Trade Act in promulgating List 3 and List 4A and therefore acted . . . 'in excess of statutory authority'"); and Subpart (E).  *See id.* at ¶ 74 ("Defendants failed to offer any evidence for any asserted 'increased burden' from China's intellectual property policies and practices that were the subject of USTR's Section 301 investigation.").  For the following reasons, none of these claims has merit.

48

### A.    The Substantial Evidence Standard Does Not Apply

Subpart (E) of 5 U.S.C. § 706(2) allows courts to set aside agency action that is "unsupported by substantial evidence." However, the "substantial evidence" standard only applies when reviewing formal agency action.[11] *See New Lifecare Hosps. of Chester Cty. LLC v. Azar*, 417 F. Supp. 3d 31, 48 n.5 (D.D.C. 2019) (quoting *Select Specialty Hosp. Akron, LLC v. Sebelius*, 820 F. Supp. 2d 13, 27 (D.D.C. 2011)); *see also F.C.C. v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775, 802-03 (1978) ("informal rulemaking . . . not subject to review under the 'substantial evidence' test of the APA"). Thus, when an agency acts through "informal rulemaking, and its organic act does not subject its findings to substantial evidence review, the APA authorizes judicial review of the agency's findings of fact under the arbitrary and capricious test." *Miley v. Lew*, 42 F. Supp. 3d 165, 170 n.2 (D.D.C. 2014) (internal quotations and citation omitted); *see also In re Gartside*, 203 F.3d 1305, 1313 (Fed. Cir. 2000) ("the 'arbitrary, capricious' standard applies when the 'substantial evidence' test of section 706(2)(E) is deemed inapplicable") (quoting *Aircraft Owners & Pilots Ass'n v. FAA,* 600 F.2d 965, 969 (D.C. Cir.1979)).

Here, section 307 did not require a hearing on the record, and the List 3 and List 4A trade actions therefore constituted informal rulemaking. As a result, if the Court finds it necessary to review the USTR's actions under the APA, it should reject any claim regarding the alleged lack of substantial evidence in support of List 3 and List 4A. If the Court reviews the USTR's actions under the APA, it should instead apply the arbitrary and capricious standard.

---

[11]  Indeed, pursuant to the APA, the substantial evidence standard applies only "in a case subject to sections 556 and 557 of [the APA] or otherwise reviewed on the record of an agency hearing provided by statute" *see* 5 U.S.C. § 706(2)(E), and sections 556 and 557 of the APA govern agency hearings at which evidence is taken. *See* 5 U.S.C. §§ 556, 557. In the case of informal rulemaking, on the other hand, no such hearing is required. *See supra* at 39-40.

**B.**     <u>The USTR'S Actions Were Not Arbitrary And Capricious</u>

The Supreme Court has articulated the "arbitrary and capricious" standard as follows:

> The scope of review under the 'arbitrary and capricious' standard
> is narrow and a court is not to substitute its judgment for that of the
> agency.  Nevertheless, the agency must examine the relevant data
> and articulate a satisfactory explanation for its action including a
> 'rational connection between the facts found and the choice made.'

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)

(quoting *Burlington Truck Lines v. United States,* 371 U.S. 156, 168 (1962)).  The arbitrary and

capricious standard is therefore "highly deferential," requiring a reviewing court "to sustain an

agency action evincing rational reasoning and consideration of relevant factors."  *Advanced Data*

*Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (citing *Bowman Transp.,*

*Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974)); *see also Li v. Dep't of*

*Justice*, 947 F.3d 804, 808-09 (Fed. Cir. 2020) (same).

Plaintiffs identify three actions that purportedly demonstrate that the USTR acted in an

arbitrary and capricious manner:  The USTR "(1) failed to provide sufficient opportunity for

comment, e.g., requiring interested parties to submit affirmative *and* rebuttal comments on

proposed List 3 *on the same day*; (2) failed to consider relevant factors when making its decision,

e.g., undertaking no analysis of the supposed 'increased burden' imposed on U.S. commerce

from the unfair policies and practices that it originally investigated; and (3) failed to connect the

record facts to the choices it made."  Am. Compl. at ¶¶ 3, 75 (emphasis in original).  We address

each allegation below.

**1.**     <u>The USTR Provided A Sufficient Opportunity For Comment</u>

The first of the USTR's allegedly "arbitrary and capricious" actions involves the

sufficiency of plaintiffs' opportunity to comment on the proposed List 3 and List 4.  The

requirements for "notice-and-comment" rulemaking, including the opportunity for comment, are

set forth in 5 U.S.C. § 553(b)-(c).  These provisions require agencies to place notice of proposed

rulemaking in the Federal Register, solicit comments on a rulemaking docket, and then respond

to significant comments along with the final rule containing a concise general statement of the

basis and purpose of the rule in the Federal Register.  5 U.S.C. § 553(b)-(c); *Rural Cellular Ass'n*

*v. FCC*, 588 F.3d 1095, 1101 (D.C. Cir. 2009).  Notice-and-comment procedures were meant to

be relatively straightforward and not particularly demanding.  *See Pub. Citizen, Inc. v.*

*FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993).  Moreover, courts should be deferential to the

agency's choice of procedures absent statutory constraints.  *See Vt. Yankee Nuclear Power*, 435

U.S. at 543-44.

The USTR followed all of the APA's notice-and-comment requirements.  First, the

USTR provided sufficient notice of the proposed rulemaking.  In accordance with 5 U.S.C.

§ 553(b), the USTR published notices in the *Federal Register* of the proposed List 3 and List 4

trade actions.  Second, the USTR solicited comments on a public rulemaking docket.  *See*

*Request for Comments for List 3*, 83 Fed. Reg. at 33,609 (announcing the opportunity for

comments, rebuttal comments, and participation in a public hearing for List 3); *see also*

*Extension of List 3 Comment Period*, 83 Fed. Reg. at 38,761 (extending the comment period

based upon the announcement that the USTR was considering List 3 tariffs up to 25 percent);

*Request for Comments for List 4*, 84 Fed. Reg. at 22,565 (announcing the opportunity for

comments, rebuttal comments, and participation in a public hearing for List 4).

Third, the USTR held a public hearing, even though, as noted, none is required when

modifying an action pursuant to section 307(a)(2).  19 U.S.C. § 2417(a)(2).  While plaintiffs

appear to take issue with the USTR "limit[ing] each hearing participant to five minutes," *see*

Am. Compl. at ¶ 40; *see also id.* at ¶ 53, in the absence of any requirement for a public hearing, the length of the witness testimony does not violate the APA.

Plaintiffs also take issue with the fact that the USTR required that "initial" and "rebuttal" comments be submitted on the same day.  Am. Compl. at ¶ 40.  However, the Federal Register notices provided due dates for "written" comments (not "initial" comments) and "post-hearing rebuttal comments."  *Request for Comments for List 3*, 83 Fed. Reg. at 33,608; *Request for Comments for List 4*, 84 Fed. Reg. at 22,564.  In addition, plaintiffs' complaint fails to mention that with respect to List 3, the simultaneous submission deadline resulted from the USTR providing interested parties an extension of time for *both* written and post-hearing rebuttal comments.  Indeed, the USTR originally set August 17, 2018 as the due date for written comments, August 20-23, 2018 as the dates for a public hearing, and August 30, 2018 as the due date for post-hearing rebuttal comments.  *Request for Comments for List 3*, 83 Fed. Reg. at 33,608.  The USTR subsequently extended the period for both rounds of comments, providing almost three extra weeks for the submission of written comments, *see Extension of List 3 Comment Period*, 83 Fed. Reg. at 38,761 (extending the deadline for written comments from August 17 to September 6, 2018), and an extra week for the submission of post-hearing rebuttal comments.  *See id.* (extending the deadline for post-hearing rebuttal comments from August 30 to September 6, 2018).  The hearing dates, then scheduled for August 20-23, 2018, were unchanged.[12]  Thus, the *Extension of List 3 Comment Period* allowed interested parties more

---

[12]  The public hearing started on August 20, 2018, as originally scheduled, but it ultimately took place over six days instead of four, therefore ending on August 27 instead of August 23, 2018.  *See Notice Imposing List 3*, 83 Fed. Reg. at 47,974.  Extending the length of the public hearing was consistent with the *Extension of List 3 Comment Period* Federal Register notice, which stated: "The Section 301 Committee may extend the length of the hearing depending on the number of additional interested persons who request to appear."  *Extension of List 3 Comment Period*, 83 Fed. Reg. at 38,761.

time for written comments, and more time to submit post hearing rebuttal comments following the public hearing.

Plaintiffs claim that the USTR's extension of time "deviat[ed] from its past practices, prevent[ing] both USTR and the public from considering initial comments at the hearing, and le[aving] insufficient time for interested parties to review and respond to the initial comments filed by other parties." Am. Compl. at ¶ 40. But the purpose of the post-hearing rebuttal comments was to provide interested parties the opportunity to respond to testimony elicited at the hearing, as the name suggests, not to respond to written comments. *See Request for Comments for List 4*, 84 Fed. Reg. at 22,565 ("Post-hearing rebuttal comments . . . should be limited to rebutting or supplementing testimony at the hearing"). The opportunity to respond to hearing testimony was not diminished by the fact that written comments were due on the same day.

In addition to misreading the Federal Register notice regarding the extension of the List 3 comment period, plaintiffs assert that the public was prevented from "considering initial comments at the hearing," and from "review[ing] and respond[ing] to the initial comments filed by other parties." Am. Compl. at ¶ 40. The APA, however, does not require rebuttal or reply comments as part of "notice-and-comment" procedures (or, as discussed above, a hearing). Rather, 5 U.S.C. § 553(c) states only that "[a]fter notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation."[13]

---

[13] This differs from formal proceedings, which require that an interested party have an opportunity "to present his case or defense by oral or documentary evidence, *to submit rebuttal evidence*, and to conduct such cross-examination as may be required for a full and true disclosure of the facts." 5 U.S.C. § 556(d) (emphasis added).

Courts have confirmed that informal rulemaking need not include an opportunity for rebuttal or reply comments. In *National Classification Committee v. United States*, 765 F.2d 1146, 1149-50 (D.C. Cir. 1985), the Court of Appeals for the District of Columbia held that the Interstate Commerce Commission did not violate the APA by soliciting comments to a proposed rule without providing for "cross-service of comments by the parties . . . [or] the filing of reply comments." The court noted that the APA's informal rulemaking provisions do not "require cross-service of comments or the filing of replies[.]" *Id.* at 1149. The court also explained that it had "no authority to supplement the procedural guarantees of section 553 unless Congress has indicated that courts should do so," because "[s]uch supplementation threatens to destroy all the 'inherent advantages of informal rulemaking,' while imposing excessive costs from delay and procedural obfuscation." *Id.* at 1151 (citing *Vt. Yankee Nuclear Power*, 435 U.S. at 547); *see also Omnipoint Corp. v. F.C.C.*, 78 F.3d 620, 637 (D.C. Cir. 1996) (agency did not violate the APA's notice-and-comment requirements "by dispensing with reply comments in the rulemaking process.").[14]

In short, even if the promulgation of List 3 and List 4A is subject to the APA's notice-and-comment requirements, the USTR was not required to provide an opportunity for rebuttal comments. However, just as it did by providing a public hearing, the USTR provided interested

---

[14] In fact, "[i]n deciding whether a second round of comment is required, [a court] looks to see 'whether the final rule promulgated by the agency is a "logical outgrowth" of the proposed rule.'" *Omnipoint*, 78 F.3d at 631 (quoting *Am. Water Works Ass'n. v. EPA,* 40 F.3d 1266, 1274 (D.C. Cir. 1994)). A final rule is "a logical outgrowth of a proposed rule only if interested parties should have anticipated that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period." *Mid Continent Nail Corp. v. United States*, 846 F.3d 1364, 1373 (Fed. Cir. 2017) (internal quotations and citation omitted). When an agency "did not make any material change" to a proposed rule, there is "no need for another round of comments." *Nat. Res. Def. Council v. Jackson*, 650 F.3d 662, 666 (7th Cir. 2011).

parties the opportunity to submit "post-hearing rebuttal comments" in addition to the requirements of the APA.  The USTR could not have violated the APA by requiring the submission of "post-hearing rebuttal comments" on the same day as written comments, when no rebuttal comments were even required (and when, once again, the USTR provided extensions for *both* sets of comments).

As a final matter, the overall time provided by the USTR for public comment demonstrates that plaintiffs had more than sufficient opportunity for comment.  The USTR provided over seven weeks for public comment for List 3, and over six weeks for public comment for List 4.  Not surprisingly, courts have found much shorter comment periods to be sufficient when circumstances so require.  *See, e.g.*, *Omnipoint*, 78 F.3d at 627, 629 (two-week comment period sufficient when congressional mandate created an "urgent necessity for rapid administrative action") (quotations and citations omitted); *see also Fl. Power & Light Co. v. United States,* 846 F.2d 765, 772 (D.C. Cir. 1988), *cert. denied,* 490 U.S. 1045 (1988) (fifteen-day comment period sufficient given congressional deadline imposed on agency).

Here, the USTR proposed and promulgated List 3 and List 4A pursuant to Presidential directives.  These directives warned of the threat to "United States companies, workers, and farmers," and to "the long-term health and prosperity of the United States economy," if China's unfair trade practices did not abate.  *June 2018 Presidential Directive*; *September 2018 Presidential Directive.*  Like the congressional mandates at issue in the cases cited above, these Presidential directives articulated an urgent need for action with regard to the section 301 investigation and related trade actions, including List 3 and List 4A.  For all of these reasons, the USTR provided sufficient opportunity for comment.

## 2.   The USTR Considered All Relevant Factors

Plaintiffs allege that the USTR "failed to consider relevant factors when making its decision, e.g., undertaking no analysis of the supposed 'increased burden' imposed on U.S. commerce from the unfair policies and practices that it originally investigated."  Am. Compl. at ¶ 3.  This claim is unfounded.

The "relevant factors" in a particular case will depend on the nature of the challenged agency action.  *See*, *e.g.*, *Am. Paper Inst., Inc. v. Am. Elec. Power Serv. Corp.*, 461 U.S. 402, 417 (1983) (Federal Energy Regulatory Commission's decision was not arbitrary and capricious because it considered all of the relevant statutory factors); *see also Kwo Lee, Inc. v. United States*, 70 F. Supp. 3d 1369, 1378 (Ct. Int'l Trade 2015) ("relevant factors" for CBP's bond sufficiency determination were "the discrepancies and omissions in [importer's] documentation and the absence of any other evidence to adequately fill those gaps").  Here, the USTR modified the section 301 trade action pursuant to section 307(a)(1)(B)-(C).  These statutory provisions include the "relevant factors" for a modification, which are whether "the burden or restriction on United States commerce of the denial rights, or of the acts, policies, and practices, that are the subject of such action has increased or decreased," *see* 19 U.S.C. § 2417(a)(1)(B), or whether the initial section 301 action "is no longer appropriate."  19 U.S.C. § 2417(a)(1)(C).  As demonstrated in section III of the arguments section, above, the USTR considered all of these factors in promulgating List 3 and List 4A.

Plaintiffs claim that "instead of finding any increased burden on U.S. commerce from the practices that were the subject of USTR's investigation, USTR merely pointed to 'China's subsequent defensive actions taken to maintain those unfair acts, policies, and practices . . .'" Am. Compl. at ¶ 57 (quoting *Notice Imposing List 4*, 84 Fed. Reg. at 43,304).  This is untrue. The notice plaintiffs cite states that "[t]he burden or restriction on United States commerce of the

acts, policies, and practices that are the subject of the Section 301 action continues to increase." *Notice Imposing List 4*, 84 Fed. Reg. at 43,304. In addition, the "defensive actions" to which plaintiffs refer include increased tariffs, as well as threatened additional retaliation, that the USTR expressly concluded was being taken to "further protect the unreasonable acts, policies, and practices identified in the investigation, resulting in increased harm to the U.S. economy." *Id*; *see also* PR-09 at 3-4; PR-01 at 6 ("the current trade action has resulted in a situation where the U.S. economy is suffering further harm from China as a result of China's increased tariffs.").

More broadly, however, the USTR was not required to find any increased burden on U.S. commerce in order to modify the section 301 action. Indeed, the USTR had already determined that China's unfair trade actions burden U.S. commerce as part of its section 301 investigation, *see Section 301 Findings* at 45-47, which resulted in the original section 301 action. The purpose of a modification, on the other hand, was to supplement the section 301 action if necessary. Specifically, the USTR could modify a section 301 action upon finding *either* that the burden on U.S. commerce of "of the acts, policies, and practices that are the subject of [a section 301] action has increased," *or* that the initial action was "no longer appropriate." 19 U.S.C. § 2417(a)(1)(B)-(C). The USTR could have modified the section 301 action based on either of these "relevant factors." Instead, it considered both. As a result, the USTR did not act in an arbitrary and capricious manner.

### 3.   The USTR Connected Record Facts To The Choices It Made

Plaintiffs also allege that the USTR's actions were arbitrary and capricious because it "failed to connect the record facts to the choices it made." Am. Compl. at ¶ 3. Specifically, plaintiffs claim that the USTR did not respond to the written comments or testimony elicited at the public hearings. *Id.* at ¶¶ 3, 44, 56. Not so.

It is well established that an "agency need not address every comment" it receives. *City of Waukesha v. EPA,* 320 F.3d 228, 257 (D.C. Cir. 2003) (internal citations and quotations omitted). Rather, an agency only needs to respond to "significant comments." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). "Significant comments are those 'which, if true, raise points relevant to the agency's decision *and which, if adopted, would require a change in an agency's proposed rule.*" *City of Portland, Or. v. EPA*, 507 F.3d 706, 715 (D.C. Cir. 2007) (quoting *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35 n.58 (D.C. Cir. 1977) (emphasis in original). "Put simply, '[t]he failure to respond to comments is significant only insofar as it demonstrates that the agency's decision was not based on a consideration of the relevant factors.'" *Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012) (quoting *Covad Commc'ns v. FCC,* 450 F.3d 528, 550 (D.C. Cir. 2006)).

As explained above, the USTR considered all "relevant factors" in promulgating List 3 and List 4. Moreover, the Federal Register notices announcing both trade actions clearly demonstrate that the USTR considered the views expressed in written comments and at the public hearings. Indeed, upon imposing List 3, the USTR stated that it had "carefully reviewed the public comments and the testimony from the six-day public hearing." *Notice Imposing List 3*, 83 Fed. Reg. at 47,975; *see also* PR-01 at 7-9. Based on this review process, the USTR "determined not to include certain tariff subheadings," previously proposed to be included in List 3 in the final tariff action. *Notice Imposing List 3*, 83 Fed. Reg. at 47,975; *see also* PR-01 at 7-9. In addition, the USTR twice delayed the increase from 10 percent to 25 percent duties for List 3 to ease the burden on the domestic industry, once again, after "tak[ing] into account the extensive public comments and testimony previously provided[.]" *Notice of December 2018 Delay*, 83 Fed. Reg. at 65,199; *Notice of March 2019 Delay*, 84 Fed. Reg. at 7,967; *see also* PR-

06 at 2.  The USTR also established a time-consuming and extensive exclusion process for List 3.  *See List 3 Exclusion Procedures*, 84 Fed. Reg. at 29,576-77 (announcing exclusion procedures for List 3); *see also* PR-08 at 2.

As with List 3, the USTR "[took] account of the public comments and the testimony from the seven-day public hearing" in promulgating List 4.  *Notice Imposing List 4*, 84 Fed. Reg. at 43,305; *see also* PR-09 at 1, 5-6.  The USTR removed from the final list certain tariff subheadings previously proposed to be included in the List 4 final tariff action "based on health, safety, national security, and other factors."  *Notice Imposing List 4*, 84 Fed. Reg. at 43,305; *see also* PR-09 at 6.  The USTR also separated List 4 into two lists with different effective dates, List 4A and List 4B.  *Id.*  The latter, List 4B, was delayed "[t]o provide a longer adjustment period for U.S. interested persons."  *Id.*  Finally, just as with List 3, the USTR established an exclusion process for List 4A.  *Notice Imposing List 4*, 84 Fed. Reg. at 43,305; *List 4A Exclusion Procedures,* 84 Fed. Reg. at 57,145-46.

In sum, there is no merit to plaintiffs' contention that the USTR failed to respond to written comments or to connect record facts to the choices it made.

### C.   The USTR Acted In Accordance With Law And Within Its Statutory Authority

Plaintiffs' final APA challenge is that defendants' actions were "not in accordance with the law" and "in excess of statutory authority" for "the reasons set forth in Count One."  Am. Compl. at ¶ 73.  Count one of plaintiffs' complaint, in turn, seeks a declaration that the actions resulting in the List 3 and List 4A tariffs were *ultra vires* and contrary to the Trade Act of 1974. *Id.* at ¶¶ 63-70.  But neither the USTR nor the President acted contrary to the Trade Act of 1974. As demonstrated above, the List 3 and List 4A trade actions were necessary to encourage China to eliminate its unfair acts, policies, and practices, and to counter China's increasingly aggressive

retaliation, and both lists were promulgated in accordance with the modification authority set forth in section 307.

## **CONCLUSION**

For these reasons, we respectfully request that this Court dismiss plaintiffs' amended complaint for failure to state a claim or, alternatively, grant judgment for defendants upon the administrative record.

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

/s/ Jeanne E. Davidson
JEANNE E. DAVIDSON
Director

/s/ L. Misha Preheim
L. MISHA PREHEIM
Assistant Director

OF COUNSEL:

MEGAN GRIMBALL
Associate General Counsel
PHILIP BUTLER
Associate General Counsel
EDWARD MARCUS
Assistant General Counsel
Office of General Counsel
Office of the U.S. Trade Representative
600 17th Street N.W.
Washington, D.C. 20508


PAULA SMITH
Assistant Chief Counsel
EDWARD MAURER
Deputy Assistant Chief Counsel
VALERIE SORENSEN-CLARK
Attorney
Office of the Assistant Chief Counsel
International Trade Litigation
U.S. Customs and Border Protection

/s/ Justin R. Miller
JUSTIN R. MILLER
Attorney-In-Charge,
International Trade Field Office

/s/ Jamie L. Shookman
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
26 Federal Plaza, Room 346
New York, NY 10278
Tel: 212-264-2107
Fax: 212-264-1916

SOSUN BAE
Senior Trial Counsel
ANN C. MOTTO
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice

60

26 Federal Plaza, Room 258                    P.O. Box 480
New York, NY 10278                            Ben Franklin Station
                                              Washington, D.C. 20044


June 1, 2021                                  *Attorneys for Defendants*

## **CERTIFICATE OF COMPLIANCE**

I, Jamie L. Shookman, an attorney in the Office of the Assistant Attorney General, Civil Division, Commercial Litigation Brach, International Trade Field Office, who is responsible for the Government's motion to dismiss or, alternatively, motion for judgment on the agency record, dated June 1, 2021, relying upon the word count feature of the word processing program used to prepare the memorandum, certify that this memorandum complies with the word count limitation ordered in the Scheduling Order of April 13, 2021 and contains 19,497 words.

/s/ Jamie L. Shookman