## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:     THE HONORABLE MARK A. BARNETT, CHIEF JUDGE
            THE HONORABLE CLAIRE R. KELLY, JUDGE
            THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

_____
                                                        :
                                                        :
*In Re* Section 301 Cases                               :          Court No. 21-00052
                                                        :
_____:

## PLAINTIFFS' CROSS-MOTION FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to U.S. Court of International Trade Rule 56.1, Plaintiffs hereby move for judgment on the agency record with regard to *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 47,974 (Sept. 21, 2018) (List 3) and *Notice of Modification of Section 301 Action:  China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 43,304 (Aug. 20, 2019) (List 4A).

For the reasons stated in the accompanying Memorandum in Support of Plaintiffs' Cross-Motion for Judgment on the Agency Record, Plaintiffs are entitled to the requested relief.

Respectfully submitted,

 /s/ Matthew R. Nicely     
Matthew R. Nicely
Pratik A. Shah
James E. Tysse
Devin S. Sikes
Daniel M. Witkowski
Sarah B. W. Kirwin

Dated: August 2, 2021

AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street, NW
Washington, D.C. 20006

*Counsel to Plaintiffs HMTX Industries LLC, Halstead New England Corporation, Metroflor Corporation, and Jasco Products Company LLC*

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:      THE HONORABLE MARK A. BARNETT, CHIEF JUDGE
             THE HONORABLE CLAIRE R. KELLY, JUDGE
             THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

_____
                                                :
                                                :
*In Re* Section 301 Cases                       :        Court No. 21-00052
                                                :
_____:

## <u>ORDER</u>

Upon consideration of the respective motions filed by Plaintiffs and Defendants; their respective responses; and all other pertinent papers, it is hereby

**ORDERED** that Plaintiff's Cross-Motion for Judgment on the Agency Record is **GRANTED**;

**ORDERED** that Defendants unlawfully promulgated *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 47,974 (Sept. 21, 2018) ("List 3") and *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 43,304 (Aug. 20, 2019) ("List 4A") in contravention of the Trade Act of 1974 and the Administrative Procedure Act;

**ORDERED** that List 3 and List 4A are **VACATED**;

**ORDERED** that Defendants must refund, with interest, any duties paid by Plaintiffs pursuant to List 3 and List 4A;

**ORDERED** that Defendants are permanently enjoined from applying List 3 and List 4A against Plaintiffs and collecting any duties from Plaintiffs pursuant to List 3 and List 4A; and

**ORDERED** that this Order shall remain in full force and effect until further order of this

Court.


Dated: _____
      New York, NY

                                                            _____
                                                                Judge


                                                                _____
                                                                Judge


                                                                _____
                                                                Judge

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:     THE HONORABLE MARK A. BARNETT, CHIEF JUDGE
            THE HONORABLE CLAIRE R. KELLY, JUDGE
            THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

_____
                                                :
                                                :
*In Re* Section 301 Cases                       :        Court No. 21-00052
                                                :
_____:

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR JUDGMENT ON THE AGENCY RECORD AND RESPONSE TO DEFENDANTS' MOTION TO DISMISS/MOTION FOR JUDGMENT ON THE AGENCY RECORD

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

ADMINISTRATIVE DETERMINATIONS UNDER REVIEW ....................................................4

ISSUES PRESENTED............................................................................................................4

JURISDICTION ...................................................................................................................4

BACKGROUND ..................................................................................................................5

I.      LEGAL FRAMEWORK.............................................................................................5

II.     FACTUAL BACKGROUND .......................................................................................6

    A.      Section 301 Investigation.............................................................................6

    B.      Lists 1 And 2 Tariff Action..........................................................................8

    C.      List 3 Tariff Action....................................................................................10

        1. Proposed List 3 Tariffs ...........................................................................10

        2. Final Adoption of List 3 ..........................................................................15

        3. The Delayed Increase to 25% ..................................................................17

    D.      List 4 Tariff Action....................................................................................19

        1. Proposed List 4 .......................................................................................19

        2. List 4 Final Notice ..................................................................................21

SUMMARY OF THE ARGUMENT ........................................................................................24

LEGAL STANDARD ..........................................................................................................27

ARGUMENT .....................................................................................................................28

I.      THE TRADE ACT DOES NOT PERMIT THE "SUPPLEMENTAL" LIST 3 AND
    LIST 4A TARIFF ACTIONS ....................................................................................28

    A.      Section 301(b) Does Not Authorize USTR To Increase The Original Tariff
        Action After One Year.................................................................................28

    B.      Section 307 Does Not Authorize USTR To Increase The Original Tariff
        Action In The Circumstances Present Here ..........................................................30

        1.      Section 307(a)(1)(B) does not authorize List 3 and List 4A Tariffs ..........30

        2.      Section 307(a)(1)(C) does not authorize List 3 and List 4A Tariffs ..........33

        3.      Uniform prior practice bolsters a limited construction of USTR's
            modification authority................................................................................37

    C.      The Government's Reliance On Atextual Considerations Defies The
        Statute's Plain Terms And Structure. .............................................................39

II.     PLAINTIFFS' CLAIMS ARE REVIEWABLE...............................................................46

A.      Plaintiffs' Claims Are Reviewable Under Section 1581(i) ..................................47

B.      Plaintiffs' Claims Are Otherwise Justiciable ..........................................................50

III.   USTR    VIOLATED    THE    APA    AND    RELATED    PROCEDURAL
REQUIREMENTS.........................................................................................................53

A.      USTR Acted Contrary To Law And In Excess Of Its Authority ..........................53

B.      USTR Violated The Procedural Requirements Of The APA ................................54

    1.      *USTR Was Required To Follow Notice-And-Comment Procedures
            When Promulgating Lists 3 and 4A Tariffs* ................................................54

    2.      *USTR Failed to Provide Notice Regarding the Legal Basis of List 3* ........55

    3.      *USTR Failed to Provide a Meaningful Opportunity to Comment on
            List 3 and List 4A* .........................................................................................56

    4.      *USTR Failed to Respond to Comments in a Reasoned Manner* ...............59

    5.      *USTR Failed to Rely on the Relevant Factors in its Notice-and-
            Comment Process*...........................................................................................60

C.      The Foreign Affairs Exception Does Not Apply.....................................................61

CONCLUSION...........................................................................................................................65

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Almond Bros. Lumber Co. v. United States*,
   721 F.3d 1320 (Fed. Cir. 2013)..................................................................48, 51, 52

*Am. Ass'n of Exps. & Imps. v. United States*,
   751 F.2d 1239 (Fed. Cir. 1985)........................................................................62, 64

*Am. Inst. for Imported Steel, Inc. v. United States*,
   600 F. Supp. 204 (Ct. Int'l Trade 1984) ...............................................................62

*Asiana Airlines v. FAA*,
   134 F.3d 393 (D.C. Cir. 1998)...................................................................56, 57, 59

*Australian Meat & Live-Stock Corp. v. Block*,
   590 F. Supp. 1230 (Ct. Int'l Trade 1984) .............................................................62

*Aviation & Gen. Ins. Co. v. United States*,
   882 F.3d 1088 (Fed. Cir. 2018)........................................................................51, 53

*Canadian Solar, Inc. v. United States*,
   918 F.3d 909 (Fed. Cir. 2019)..............................................................................58

*Capital Area Immigrants' Rights Coal. v. Trump*,
   471 F. Supp. 3d 25 (D.D.C. 2020) ..................................................................63, 64

*Chamber of Commerce of U.S. v. Reich*,
   74 F.3d 1322 (D.C. Cir. 1996)..............................................................................48

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
   467 U.S. 837 (1984)................................................................39, 40, 41, 42

*City of Kansas City, Mo. v. Dep't of Hous. & Urb. Dev.*,
   923 F.2d 188 (D.C. Cir. 1991) .............................................................................41

*City of Portland v. EPA*,
   507 F.3d 706 (D.C. Cir. 2007) .............................................................................60

*City of Waukesha v. EPA*,
   320 F.3d 228 (D.C. Cir. 2003)..............................................................................60

*Dai Glob. v. Admin. of the U.S. Agency for Int'l Dev.*,
   945 F.3d 1196 (Fed. Cir. 2019).............................................................................45

*Davis v. Mich. Dep't of Treasury*,
    489 U.S. 803 (1989)..................................................................................34

*Deacero S.A.P.I. de C.V. v. United States*,
    996 F.3d 1283 (Fed. Cir. 2021)...............................................................40

*Del. Dep't of Natural Res. & Envtl. Control v. EPA*,
    785 F.3d 1 (D.C. Cir. 2015)....................................................................59

*Diamond Sawblades Mfrs.' Coal. v. United States*,
    986 F.3d 1351 (Fed. Cir. 2021)...............................................................29

*Dunn v. Commodity Futures Trading Comm'n*,
    519 U.S. 465 (1997)................................................................................40

*El-Shifa Pharm. Indus. Co. v. United States*,
    378 F.3d 1346 (Fed. Cir. 2004)...............................................................50

*Epic Sys. Corp. v. Lewis*,
    138 S. Ct. 1612 (2018)............................................................................45

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 122 (2000)................................................................................40

*Gilda Indus., Inc. v. United States*,
    446 F.3d 1271 (Fed. Cir. 2006)........................................................51, 52

*Gilda Indus., Inc. v. United States*,
    622 F.3d 1358 (Fed. Cir. 2010).............................27, 28, 39, 40, 47, 49, 51, 52, 53

*Gilead Scis., Inc. v. Lee*,
    778 F.3d 1341 (Fed. Cir. 2015)...............................................................45

*Gonzalez v. United States*,
    553 U.S. 242 (2008)................................................................................36

*GPX Int'l Tire Corp. v. United States*,
    780 F.3d 1136 (Fed. Cir. 2015)...............................................................27

*Gundy v. United States*,
    139 S. Ct. 2116 (2019)............................................................................36

*Gutierrez–Brizuela v. Lynch*,
    834 F.3d 1142 (10th Cir. 2016) ..............................................................42

*Haggar Co. v. Helvering*,
    308 U.S. 389 (1940)................................................................................46

*Hamer v. Neighborhood Hous. Servs. of Chi.*,
138 S. Ct. 13 (2017)........................................................................................45

*Int'l Bhd. of Teamsters v. Pena*,
17 F.3d 1478 (D.C. Cir. 1994).........................................................................63

*Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*,
407 F.3d 1250 (D.C. Cir. 2005).......................................................................55

*Invenergy Renewables LLC v. United States*,
422 F. Supp. 3d 1255 (Ct. Int'l Trade 2019) ............................................48, 62

*Invenergy Renewables LLC v. United States*,
476 F. Supp. 3d 1323 (Ct. Int'l Trade 2020) ..................................................59

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*,
478 U.S. 221 (1986)....................................................................................51, 53

*King v. Burwell*,
576 U.S. 473 (2015).........................................................................................41

*Kingdomware Techs., Inc. v. United States*,
136 S. Ct. 1969 (2016).....................................................................................40

*Kisor v. Wilkie*,
139 S. Ct. 2400 (2019).....................................................................................40

*Lilliputian Sys., Inc. v. Pipeline & Hazardous Materials Safety Admin.*,
741 F.3d 1309 (D.C. Cir. 2014).......................................................................61

*Maple Leaf Fish Co. v. United States*,
762 F.2d 86 (Fed. Cir. 1985)...........................................................................50

*Mast Indus., Inc. v. Regan*,
596 F. Supp. 1567 (Ct. Int'l Trade 1984) ........................................................62

*Mid Continent Nail Corp. v. United States*,
846 F.3d 1364 (Fed. Cir. 2017)...........................................................56, 58, 59, 62

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)...........................................................................................59

*Mueller Comercial de Mexico, S. de R.L. de C.V. v. United States*,
753 F.3d 1227 (Fed. Cir. 2014).......................................................................60

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*,
138 S. Ct. 617 (2018).......................................................................................33

*Norsk Hydro Canada, Inc. v. United States*,
      472 F.3d 1347 (Fed. Cir. 2006)................................................................48

*O.A. v. Trump*,
      404 F. Supp. 3d 109 (D.D.C. 2019) .........................................................48

*Panama Ref. Co. v. Ryan*,
      293 U.S. 388 (1935)..................................................................................36

*Pereira v. Sessions*,
      138 S. Ct. 2105 (2018).............................................................................42

*PrimeSource Bldg. Prods., Inc. v. United States*,
      505 F. Supp. 3d 1352 (Ct. Int'l Trade 2021) ..........................................49

*Pub. Citizen v. Barshefsky*,
      939 F. Supp. 31 (D.D.C. 1996) ................................................................41

*Public Citizen v. U.S. Trade Representative*,
      5 F.3d 549 (D.C. Cir. 1993) .....................................................................49

*Russello v. United States*,
      464 U.S. 16 (1983)....................................................................................33

*SEC v. Chenery Corp.*,
      332 U.S. 194 (1947)...........................................................................29, 60

*In re Section 301 Cases*,
      No. 21-00052, 2021 WL 2799979 (Ct. Int'l Trade July 6, 2021)..............4, 36, 47

*Severstal Exp. GMBH v. United States*,
      No. 18-00057, 2018 WL 1705298 (Ct. Int'l Trade Apr. 5, 2018) ..........50

*Shakeproof Indus. Prods. Div. of Ill. Tool Works Inc. v. United States*,
      104 F.3d 1309 (Fed. Cir. 1997).................................................................27

*Shea v. Clinton*,
      850 F. Supp. 2d 153 (D.D.C. 2012) .........................................................41

*Silfab Solar, Inc. v. United States*,
      892 F.3d 1340 (Fed. Cir. 2018).................................................................49

*Sosa v. Alvarez-Machain*,
      542 U.S. 692 (2004)..................................................................................37

*Timex V.I., Inc. v. United States*,
      157 F.3d 879 (Fed. Cir. 1998)............................................................40, 41

*Totes-Isotoner Corp. v. United States*,
   594 F.3d 1346 (Fed. Cir. 2010)................................................................53

*Transpacific Steel LLC v. United States*,
   No. 2020-2157, 2021 WL 2932512 (Fed. Cir. July 13, 2021)...............27, 30, 37, 39

*United States v. Gulla*,
   833 F. Supp. 274 (S.D.N.Y. 1993) .........................................................36

*Util. Air Regulatory Grp. v. EPA*,
   573 U.S. 302 (2014)............................................................................41

*Webster v. Doe*,
   486 U.S. 592 (1988)............................................................................36

*Whitman v. Am. Trucking Ass'ns*,
   531 U.S. 457 (2001)............................................................................39

**Statutes**

5 U.S.C.
   § 553(a)(1) .......................................................................................61
   § 553(b)-(c) ..................................................................................54, 61
   § 704................................................................................................47
   § 706...........................................................................................27, 54

19 U.S.C.
   § 2411..........................................................................................*passim*
   § 2411(a)(1) ......................................................................................48
   § 2411(b).......................................................................................*passim*
   § 2411(b)(1) .......................................................................................5
   § 2411(b)(2) ...................................................................................5, 48
   § 2414(a)(2)(B) ..........................................................................5, 29, 43
   § 2416..............................................................................................32
   § 2416(b)(2) ......................................................................................33
   § 2416(b)(2)(B) ..................................................................................43
   § 2417..........................................................................................*passim*
   § 2417(a)(1) ..................................................6, 18, 34, 35, 48, 53, 54, 63
   § 2417(a)(1)(A) .............................................................................34, 45
   § 2417(a)(1)(B) ......................................22, 30, 31, 32, 42, 45, 51, 55, 61
   § 2417(a)(1)(C) ...............................................................................*passim*
   § 2417(a)(2) ..............................................................................6, 55, 63

28 U.S.C.
   § 1581(i)...............................................................27, 47, 48, 49, 50
   § 1581(i)(1)(B)....................................................................................4
   § 2631(i)...........................................................................................49
   § 2640(e)..........................................................................................47

**Federal Register Notices**

*Addressing China's Laws, Policies, Practices, and Actions Related to Intellectual Property, Innovation, and Technology*, 82 Fed. Reg. 39,007 (Aug. 14, 2017) ........................6

*Extension of Public Comment Period Concerning Proposed Modification of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 38,760 (Aug. 7, 2018) ("*Supplemental List 3 NPRM*")...................13, 56, 57, 58

*Implementation of the U.S.-EC Beef Hormones Memorandum of Understanding*, 74 Fed. Reg. 48,808 (Sep. 24, 2009) ...................................................................................38

*Initiation of Section 301 Investigation; Hearing; and Request for Public Comments: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 82 Fed. Reg. 40,213 (Aug. 24, 2017) ("*Initiation Notice*")...........................................................................7, 29

*Modification of Action Under Section 301(b); Out-of-Cycle Review Under Section 182; and Request for Public Comment: Intellectual Property Laws and Practices of the Government of Ukraine*, 70 Fed. Reg. 53,410 (Sept. 8, 2005) .....................38

*Modification of Determination of Action Pursuant to Section 301 Concerning Canadian Exports of Softwood Lumber; Opportunity for Comment*, 57 Fed. Reg. 44,609 (Sept. 28, 1992) .....................................................................39

*Notice of Action and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 28,710 (June 20, 2018) ("*List 2 NPRM*")............................8, 57, 58

*Notice of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 40,823 (Aug. 16, 2018).......................................................................9

*Notice of Determination and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 14,906 (Apr. 6, 2018) ("*List 1 NPRM*")..................................7, 8, 57

*Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 47,974 (Sept. 21, 2018) ("*List 3 Final Rule*") ............4, 15, 16, 29, 30, 47, 55, 59

*Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 65,198 (Dec. 19, 2018)..................................................................18

*Notice of Modification of Section 301 Action: China's Acts, Policies, and
    Practices Related to Technology Transfer, Intellectual Property, and
    Innovation*, 84 Fed. Reg. 7966 (Mar. 5, 2019) .......................................................................18

*Notice of Modification of Section 301 Action: China's Acts, Policies, and
    Practices Related to Technology Transfer, Intellectual Property, and
    Innovation*, 84 Fed. Reg. 20,459 (May 9, 2019) .....................................................................19

*Notice of Modification of Section 301 Action: China's Acts, Policies, and
    Practices Related to Technology Transfer, Intellectual Property, and
    Innovation*,
    84 Fed. Reg. 43,304 (Aug. 20, 2019) ("*List 4A Final Rule*")....4, 21, 22, 29, 30, 31, 33, 47, 59

*Notice of Modification of Section 301 Action: China's Acts, Policies, and
    Practices Related to Technology Transfer, Intellectual Property, and
    Innovation*,
    84 Fed. Reg. 45,821 (Aug. 30, 2019).....................................................................................22

*Notice of Modification of Section 301 Action:  China's Acts, Policies, and
    Practices Related to Technology Transfer, Intellectual Property, and
    Innovation*, 84 Fed. Reg. 69,447 (Dec. 18, 2019)..............................................................22, 23

*Notice of Modification of Section 301 Action:  China's Acts, Policies, and
    Practices Related to Technology Transfer, Intellectual Property, and
    Innovation*, 85 Fed. Reg. 3741 (Jan. 22, 2020)......................................................................23

*Request for Comments Concerning Proposed Modification of Action Pursuant to
    Section 301:  China's Acts, Policies, and Practices Related to Technology
    Transfer, Intellectual Property, and Innovation*,
    83 Fed. Reg. 33,608 (July 17, 2018) ("*List 3 NPRM*")................................................11, 30, 55

*Request for Comments Concerning Proposed Modification of Action Pursuant to
    Section 301: China's Acts, Policies, and Practices Related to Technology
    Transfer, Intellectual Property, and Innovation*,
    84 Fed. Reg. 22,564 (May 17, 2019) ("*List 4 NPRM*") ......................19, 20, 21, 30, 31, 56, 57

*Results of Out-Of-Cycle Review Under Section 182 and Termination of Action
    Under Section 301(b): Intellectual Property Laws and Practices of the
    Government of Ukraine*, 71 Fed. Reg. 5899 (Feb. 3, 2006) ....................................................38

*Termination of Action: Protection of Intellectual Property Rights by the
    Government of Honduras*, 63 Fed. Reg. 35,633 (June 30, 1998) ...........................................38

*Termination of Section 301 Investigation and Action Regarding the People's
    Republic of China's Protection of Intellectual Property and Provision and
    Market Access to Persons Who Rely on Intellectual Property Protection*,
    60 Fed. Reg. 12,582 (Mar. 7, 1995) .......................................................................................38

**Other Authorities**

H.R. 3, 100th Cong. (1988) ................................................................................45

H. R. REP. NO. 69-1980 (1946) ..........................................................................62

H. R. REP. NO. 100-576 (1988) ..........................................................................47

OFFICE OF THE U.S. TRADE REPRESENTATIVE, FINDINGS OF THE INVESTIGATION
INTO CHINA'S ACTS, POLICIES, AND PRACTICES RELATED TO TECHNOLOGY
TRANSFER, INTELLECTUAL PROPERTY, AND INNOVATION UNDER SECTION 301
OF THE TRADE ACT OF 1974 (Mar. 22, 2018) ...........................................7

OFFICE OF THE U.S. TRADE REPRESENTATIVE, SECTION 301 FACT SHEET
(Mar.  2018) ..............................................................................................7

OFFICE OF THE U.S. TRADE REPRESENTATIVE, STATEMENT BY U.S. TRADE
REPRESENTATIVE ROBERT LIGHTHIZER ON SECTION 301 ACTION (July 10,
2018) ......................................................................................................12

OFFICE OF THE U.S. TRADE REPRESENTATIVE, STATEMENT BY U.S. TRADE
REPRESENTATIVE ROBERT LIGHTHIZER ON SECTION 301 ACTION (Aug. 1,
2018) ..................................................................................................12, 13

OFFICE OF THE U.S. TRADE REPRESENTATIVE, UNDER SECTION 301 ACTION, USTR
RELEASES PROPOSED TARIFF LIST ON CHINESE PRODUCTS (Apr. 3, 2018) ...................8, 28, 29

OFFICE OF THE U.S. TRADE REPRESENTATIVE, UNITED STATES AND CHINA REACH
PHASE ONE TRADE AGREEMENT (Dec. 13, 2019) ....................................23

Trade and International Economic Policy Reform Act of 1987—Veto Message
from the President of the United States, 134 CONG. REC. H3531 (daily ed.
May 24, 1998) (statement of President Ronald Reagan) ........................43

U.S. CONST. art. I, § 8 ........................................................................................5

THE WHITE HOUSE, STATEMENT FROM THE PRESIDENT (Sept. 17, 2018) .....................15

THE WHITE HOUSE, STATEMENT FROM THE PRESIDENT REGARDING TRADE WITH
CHINA (June 18, 2018) ............................................................................11

THE WHITE HOUSE, STATEMENT FROM THE PRESS SECRETARY REGARDING THE
PRESIDENT'S WORKING DINNER WITH CHINA (Dec. 1, 2018) ..................17

## INTRODUCTION

This case presents a critical question:  whether there are enforceable limits on the Executive Branch's ability to expand a tariff action under Section 301 *et seq.* of the Trade Act of 1974 ("Trade Act") for however long, by whatever amount, and by whatever means it chooses.  After imposing tariffs on $50 billion of imports from China following an investigation—an amount it deemed "commensurate" to the investigated harms—the United States Trade Representative ("USTR") announced "supplemental" tariffs as purported "modifications" to cover another roughly $500 billion of imports from China, *i.e.*, virtually the entirety of U.S. annual imports from China.  That radical escalation of tariffs transgressed the statutory limits carefully delineated by Congress when delegating the exercise of its constitutional foreign-trade powers to the Executive Branch.

Subject to specific conditions, Section 301 of the Trade Act permits USTR to take specific action if an investigation reveals that a foreign country is engaging in specific unfair or discriminatory trade practices.  But the Trade Act does not give USTR unbridled discretion to launch and prosecute a "trade war" with no discernible limits.  If the Government's interpretation of the Executive Branch's authority is correct, all the limitations Congress placed on modifications of Section 301 actions are superfluous:  Once USTR finds a Section 301 action no longer "appropriate," USTR is free to impose *any* additional tariffs without limit (or even judicial review).

That is precisely what happened here.  Following a seven-month investigation under Section 301, USTR determined that certain of China's acts, policies, and practices related to intellectual property and technology transfer were unreasonable, discriminatory, and burdened U.S. commerce.  USTR imposed an *ad valorem* duty on goods from China across two actions (Lists 1 and 2) covering $50 billion worth of imports.  Although the $50 billion sum amounted to

one of the largest tariff actions in the history of the United States, that action was arguably within the authority Congress delegated to the Executive Branch under Section 301.

What USTR did after that, however, plainly was not. China, claiming that the United States' unilateral actions violated World Trade Organization rules, reacted with countermeasures of its own on $50 billion worth of U.S. goods imported into China. USTR retaliated in extreme fashion: It first imposed 10% duties on an additional $200 billion in Chinese imports ("List 3"). A few months later, USTR more than doubled those duties to 25%. In total, the List 3 tariff action *quintupled* the action USTR had determined was an "appropriate" response after its investigation one year earlier.

But USTR did not stop there. Shortly after it finalized List 3 (and even before its implementation), USTR proposed imposing additional duties on virtually all remaining imports from China. In finalizing that further action—covering almost another $300 billion worth of goods—USTR split it into two lists: List 4A and List 4B. Duties on List 4B products are currently suspended, but duties on approximately $120 billion worth of List 4A products remain in effect today (alongside the List 1, 2, and 3 duties).

The List 3 and List 4A tariff actions are breathtaking in scope: collectively, they constitute a nearly $75 billion annual tax on American purchasers without Congressional action or imprimatur. Although dubbed "supplemental," the List 3 and 4A actions multiply by several times the Section 301 tariff response originally deemed "appropriate" to the discrete set of Chinese intellectual property practices USTR investigated. And USTR embarked on that path despite receiving over 9,000 comments in opposition (within a highly truncated period) from concerned American businesses and groups—comments that USTR never addressed in its rush to action. It

is no exaggeration to say that no regulatory action in modern history has elicited such universal condemnation from virtually all sectors of the U.S. economy.

USTR's tariff modification actions trample on the Trade Act's clear limits. The prior Administration made little secret of the reasons for USTR's extraordinary "supplemental" tariff actions. Those actions do not reflect any corresponding increase in the $50 billion burden on the U.S. economy from the investigated unfair practices, *i.e.*, the only statutorily permitted basis to raise tariffs without a new investigation. Rather, Lists 3 and 4A were predicated on a variety of other justifications: China's imposition of tariffs on U.S. exports, "winning" an escalating trade war, ending a "trade imbalance" between the United States and China, forcing China to open its markets and end its currency manipulation, deterring military activities in the South China Sea, and limiting Chinese fentanyl exports, to name a few claimed objectives. Yet nothing in the Trade Act allows USTR to increase its original actions in retaliation for China's tit-for-tat response to USTR's initial Section 301 determination, or to advance any of the Administration's sundry goals pertaining to China's other unrelated economic and political practices. The tailored "modification" provisions on which USTR has relied do not permit the Administration unilaterally to expand its investigation-specific findings into an open-ended trade war.

Making matters worse, both the List 3 and 4A actions were promulgated in a procedurally suspect and arbitrary and capricious manner that violated the Administrative Procedure Act. Instead of engaging in proper notice and comment, USTR established a sham process that made it impossible for USTR to review, let alone give reasoned consideration to, the thousands of comments objecting to the action (whose outcome was long preordained).

In delegating a portion of its exclusive constitutional authority to regulate international trade to the Executive Branch, Congress imposed clear statutory limits in the Trade Act. When

USTR asserts unfettered discretion to exceed those limits, the courts must step in.  This Court should deny Defendants' motion to dismiss, grant Plaintiffs' cross-motion for judgment on the agency record, halt the detrimental consequences flowing from the ongoing duties on List 3 and 4A products, and order refunds of all unlawfully collected duties.

## ADMINISTRATIVE DETERMINATIONS UNDER REVIEW

Plaintiffs challenge USTR's promulgation of List 3 and List 4A.  *See Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 47,974 (Sept. 21, 2018) ("*List 3 Final Rule*"); *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 43,304 (Aug. 20, 2019) ("*List 4A Final Rule*").

## ISSUES PRESENTED

1.      Whether the List 3 and List 4A tariff actions exceeded Defendants' authority under the Trade Act.

2.      Whether the List 3 and List 4A tariff actions violated the Administrative Procedure Act.

## JURISDICTION

The Court has jurisdiction under 28 U.S.C. § 1581(i)(1)(B), which grants the Court "exclusive jurisdiction of any civil action commenced against the United States *** that arises out of any law of the United States providing for *** tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue."  *In re Section 301 Cases*, No. 21-00052, 2021 WL 2799979, at *4 (Ct. Int'l Trade July 6, 2021).

**BACKGROUND**

I.     **LEGAL FRAMEWORK**

The Constitution grants Congress certain enumerated powers, including the power to "lay and collect Taxes, Duties, Imposts and Excises," as well as to "regulate Commerce with foreign Nations." U.S. CONST. art. I, § 8.  In the Trade Act, Congress delegated to the Executive Branch the power to exercise some of that authority within specified statutory constraints.

The Trade Act defines two types of USTR action:  mandatory action under Section 301(a) and discretionary action under Section 301(b).  This case involves Section 301(b), under which USTR has discretion to act upon a showing that "an act, policy, or practice of a foreign country" is "unreasonable or discriminatory" and "burdens or restricts United States commerce."  19 U.S.C. § 2411(b)(1).  Congress authorized USTR to conduct an investigation to make that showing, *see id.* § 2412, and required USTR to request mandatory consultations with the investigated foreign country, *see id.* § 2413.

After an investigation, USTR must determine whether "action by the United States is appropriate."  19 U.S.C. § 2411(b)(2).  If USTR so determines, USTR may "take all appropriate and feasible action authorized under [Section 301(c)], subject to the specific direction, if any, of the President regarding any such action, and all other appropriate and feasible action within the power of the President that the President may direct the Trade Representative to take under this subsection, to obtain elimination of that act, policy, or practice."  *Id*.  Among other responses, Section 301(c) authorizes USTR to "impose duties or other import restrictions on the goods of" the foreign country "for such time as the Trade Representative determines appropriate."  *Id.* § 2411(c)(1)(B).  Although Defendants repeatedly refer to this action merely as USTR's "initial" action (*e.g.*, Mot. 2, 3, 4, 5, 7, 12, 32, 38, 45, 57), Section 301 never uses that term.  Instead, the

determination of what action, if any, to take must be made within 12 months from the initiation of the investigation. 19 U.S.C. § 2414(a)(2)(B).

Once a Section 301 action has been implemented, the Trade Act allows USTR to "modify or terminate" the action only in specified circumstances. 19 U.S.C. § 2417. Specifically, under Section 307(a)(1):

> The Trade Representative may modify or terminate any action, subject to the specific direction, if any, of the President with respect to such action, that is being taken under [Section 301] of this title if—
>
> (A) any of the conditions described in [Section 301(a)(2)] exist,
>
> (B) the burden or restriction on United States commerce of the denial rights, or of the acts, policies, and practices, that are the subject of such action has increased or decreased, or
>
> (C) such action is being taken under [Section 301(b)] and is no longer appropriate.

*Id.* § 2417(a)(1). "The term 'modification,' as applied to any duty or other import restriction, includes the elimination of any duty or other import restriction." *Id.* § 2481(6). Before modifying or terminating a Section 301 action, USTR is obligated to consult with representatives of the domestic industry concerned, and to provide an opportunity for other affected parties to present their views "concerning the effects of the modification or termination and whether any modification or termination of the action is appropriate." *Id.* § 2417(a)(2).

## II.     FACTUAL BACKGROUND

### A.     Section 301 Investigation

On August 14, 2017, President Trump directed USTR to initiate a Section 301 investigation into China's intellectual property, innovation, and technology development practices that "may be unreasonable or discriminatory and that may be harming American intellectual property rights, innovation, or technology development." *Addressing China's Laws, Policies, Practices, and*

*Actions Related to Intellectual Property, Innovation, and Technology*, 82 Fed. Reg. 39,007, 39,007 (Aug. 14, 2017).  Ten days later, USTR announced that it had formally initiated an investigation into "whether actionable conduct exists under Section 301(b)," the discretionary action provision. *Initiation of Section 301 Investigation; Hearing; and Request for Public Comments: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 82 Fed. Reg. 40,213, 40,214 (Aug. 24, 2017) ("*Initiation Notice*").  Contemporaneous reports suggested that the eventual imposition of tariffs was preordained, with the President himself proclaiming (before any investigation at all) "I want tariffs."  Jonathan Swan, *Exclusive: Trump vents in Oval Office, "I want tariffs. Bring me some tariffs!"* AXIOS (Aug. 27, 2017).[1]

On March 22, 2018, USTR announced the findings of its investigation.  *See* OFFICE OF THE U.S. TRADE REPRESENTATIVE, FINDINGS OF THE INVESTIGATION INTO CHINA'S ACTS, POLICIES, AND PRACTICES RELATED TO TECHNOLOGY TRANSFER, INTELLECTUAL PROPERTY, AND INNOVATION UNDER SECTION 301 OF THE TRADE ACT OF 1974 (Mar. 22, 2018).[2]  USTR concluded that certain "acts, policies, and practices by the Chinese government [related to technology transfer, intellectual property, and innovation] are unreasonable and discriminatory and burden or restrict U.S. commerce."  *Id.* at 17.  USTR simultaneously published a "Fact Sheet" estimating the annual harm to the U.S. economy from those practices to be $50 billion.  OFFICE OF THE U.S. TRADE REPRESENTATIVE, SECTION 301 FACT SHEET (Mar.  2018).[3]

---

[1] https://www.axios.com/exclusive-trump-vents-in-oval-office-i-want-tariffs-bring-me-some-tariffs-1513305111-5cba21a2-6438-429a-9377-30f6c4cf2e9e.html.

[2] https://ustr.gov/sites/default/files/Section%20301%20FINAL.PDF.

[3] https://ustr.gov/about-us/policy-offices/press-office/fact-sheets/2018/march/Section-301-fact-sheet.

### B.    Lists 1 And 2 Tariff Action

On April 6, 2018, USTR published notice of its intent to impose a "duty of 25 percent on a list of products of Chinese origin." *Notice of Determination and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 14,906, 14,907 (Apr. 6, 2018) ("*List 1 NPRM*").  The products on the proposed list spanned 1,333 subheadings under the Harmonized Tariff Schedule of the United States ("HTSUS") with a total value of "approximately $50 billion in terms of estimated annual trade value for calendar year 2018." *Id*.  USTR explained that it chose $50 billion because that amount was "commensurate with an economic analysis of the harm caused by China's unreasonable technology transfer policies to the U.S. economy, as covered by USTR's Section 301 investigation." OFFICE OF THE U.S. TRADE REPRESENTATIVE, UNDER SECTION 301 ACTION, USTR RELEASES PROPOSED TARIFF LIST ON CHINESE PRODUCTS (Apr. 3, 2018) ("USTR April 3, 2018 Release").[4]  USTR invited the public to submit comments on the proposed list and to make requests to appear at a public hearing. *List 1 NPRM*, 83 Fed. Reg. at 14,908.

Less than a month after submission of rebuttal comments, USTR published notice of its final "List 1" HTSUS items after "narrow[ing] the proposed list in the April 6, 2018 notice to 818 tariff subheadings, with an approximate annual trade value of $34 billion." *Notice of Action and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 28,710, 28,711 (June 20, 2018) ("*List 2 NPRM*")*.*  At the same time,

---

[4] https://ustr.gov/about-us/policy-offices/press-office/press-releases/2018/april/under-Section-301-action-ustr.

USTR announced that it intended to impose a 25% *ad valorem* duty on a proposed "List 2" of Chinese products in order to "maintain the effectiveness of [the] $50 billion trade action" grounded in its Section 301 investigation. *Id.* at 28,712. Again, just two weeks after receiving final comments, USTR published notice of final List 2, imposing tariffs on goods with an annual trade value of $16 billion. *Notice of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 40,823, 40,823 (Aug. 16, 2018).

**Figure 1: Original Section 301 Action Relative to Total U.S.-China Trade (Lists 1 and 2)**



Plaintiffs do not challenge the imposition of duties on Lists 1 and 2 products in this action.

### C.      List 3 Tariff Action

#### 1. Proposed List 3 Tariffs

As tensions grew between China and the United States after Lists 1 and 2 were announced, the Administration laid out its sprawling concerns about the trade relationship more generally between the United States and China.  For example, President Trump complained about the "one sided" nature of prior trade deals with China.  Donald J. Trump (@realDonaldTrump), TWITTER (May 13, 2018, 3:22 PM EST) ("China and the United States are working well together on trade, but past negotiations have been so one sided in favor of China, for so many years, that it is hard for them to make a deal that benefits both countries. But be cool, it will all work out!").[5]  He further stated his goal of implementing "reciprocal" tariffs to eliminate a perceived trade imbalance with China.  Donald J. Trump (@realDonaldTrump), TWITTER (Apr. 7, 2018, 2:03 PM EST) ("The United States hasn't had a Trade Surplus with China in 40 years.  They must end unfair trade, take down barriers and charge only Reciprocal Tariffs.  The U.S. is losing $500 Billion a year, and has been losing Billions of Dollars for decades.  Cannot continue!").[6]

In response to Lists 1 and 2, China threatened, and later imposed, 25% retaliatory duties on $50 billion worth of imports from the United States effective on the same dates the United States began collecting its new tariffs.  On June 18, 2018, some three weeks before List 1 took effect and nearly two months before USTR finalized List 2, President Trump directed USTR to consider whether the United States should impose additional duties on products from China with

---

[5] https://media-cdn.factba.se/realdonaldtrump-twitter/995746011321597953.jpg.   Twitter permanently suspended the @realDonaldTrump account on January 8, 2021, causing all past Tweets under that account to be removed from the site.  All references herein are linked to a third-party site on which those Tweets have been archived.  For clarity, Plaintiffs have identified the time of each Tweet in Eastern Standard Time.

[6] https://media-cdn.factba.se/realdonaldtrump-twitter/982680387116781568.jpg.

an estimated trade value of $200 billion—an amount that, when combined with the tariffs imposed pursuant to List 1 and List 2, encompasses roughly half of all U.S. trade with China.  President Trump acknowledged that China's retaliatory tariffs, as well as the overall trade imbalance—not China's acts and policies related to "technology transfer, intellectual property, and innovation"— motivated his request:  "This latest action by China clearly indicates its determination to keep the United States at a permanent and unfair disadvantage, which is reflected in our massive $376 billion trade imbalance in goods.  This is unacceptable."  THE WHITE HOUSE, STATEMENT FROM THE PRESIDENT REGARDING TRADE WITH CHINA (June 18, 2018);[7] *see also* Donald J. Trump (@realDonaldTrump), TWITTER (June 10, 2018, 9:17 PM EST) ("Why should I, as President of the United States, allow countries to continue to make Massive Trade Surpluses, as they have for decades, while our Farmers, Workers & Taxpayers have such a big and unfair price to pay?  Not fair to the PEOPLE of America!  $800 Billion Trade Deficit.").[8]

One month later, USTR published notice of its proposal to "modify the action in this investigation *** by taking a further, supplemental action"—specifically, "an additional 10 percent *ad valorem* duty on products [from] China *** [with] an annual trade value of approximately $200 billion" spanning 6,031 HTSUS tariff subheadings.  *Request for Comments Concerning Proposed Modification of Action Pursuant to Section 301:  China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 33,608, 33,609 (July 17, 2018) ("*List 3 NPRM*").  As authority for its action, USTR invoked only Section 307(a)(1)(C), under which "[t]he Trade Representative may modify or terminate any action, subject to the specific direction, if any, of the President with respect to such action, *** if *** such action is

---

[7] https://trumpwhitehouse.archives.gov/briefings-statements/statement-president-regarding-trade-china-2/.

[8] https://media-cdn.factba.se/realdonaldtrump-twitter/1005982266496094209.jpg.

being taken under section 301(b) of this title and is no longer appropriate." *Id.* (quoting 19 U.S.C. § 2417(a)(1)(C)) (second ellipsis in original).

USTR relied on China's imposition of "retaliatory duties" as a justification for its action. *List 3 NPRM*, 83 Fed. Reg. at 33,609 (asserting "China's response to the $50 billion action announced in the investigation and its refusal to change its acts, policies, and practices"). USTR explicitly tied the $200 billion in its proposed "supplemental" action to the level of retaliatory duties imposed by China on U.S. imports, noting that "action at this level is appropriate in light of the level of China's announced retaliatory action ($50 billion) and the level of Chinese goods imported into the United States ($505 billion in 2017)." *Id.* USTR did not identify any increased burdens or restrictions arising from the intellectual property/technology-related acts, policies, or practices that were the subject of the initial Section 301 investigation. The Administration's press statements confirmed what was apparent from the USTR notice: List 3 was proposed principally "[a]s a result of China's retaliation." Office of the U.S. Trade Representative, Statement by U.S. Trade Representative Robert Lighthizer on Section 301 Action (July 10, 2018).[9]

Not surprisingly, after the announcement of proposed List 3, trade tensions between the United States and China continued to escalate. For example, President Trump reiterated his displeasure over China's retaliatory tariffs and the trade imbalance between the two nations. Donald J. Trump (@realDonaldTrump), Twitter (July 25, 2018, 7:20 AM EST) ("China is targeting our farmers, who they know I love & respect, as a way of getting me to continue allowing them to take advantage of the U.S. They are being vicious in what will be their failed attempt. We were being nice - until now! China made $517 Billion on us last year.").[10]

---

[9] https://ustr.gov/about-us/policy-offices/press-office/press-releases/2018/july/statement-us-trade-representative.

[10] https://media-cdn.factba.se/realdonaldtrump-twitter/1022079127799701504.jpg.

Within weeks of these statements, USTR announced that, in light of China's retaliatory duties, USTR would propose to increase the additional duty on List 3 from 10% to 25% *ad valorem*. Again, rather than addressing the original conduct investigated pursuant to Section 301, USTR premised the further increase in tariffs on China's "illegal[] retaliat[ion] against U.S. workers, farmers, ranchers and businesses." OFFICE OF THE U.S. TRADE REPRESENTATIVE, STATEMENT BY U.S. TRADE REPRESENTATIVE ROBERT LIGHTHIZER ON SECTION 301 ACTION (Aug. 1, 2018).[11]

Shortly thereafter, USTR formally proposed "raising the level of the additional duty in the proposed supplemental action from 10 percent to 25 percent." *Extension of Public Comment Period Concerning Proposed Modification of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 38,760, 38,760 (Aug. 7, 2018) ("*Supplemental List 3 NPRM*"). USTR set dates for a public hearing over a mere six-day period (August 20-24, 2018 and August 27, 2018), and for the first time ever in a Section 301 proceeding, set the same date—September 6, 2018—as the deadline for both the *initial and rebuttal* comments from the public. *Id.* at 38,760-61. This change in commenting procedures not only deviated from past practice, but also denied both USTR and the public the ability to consider initial written comments in time for the hearing. And it left no opportunity for interested parties to review and respond to the thousands of initial comments filed by other parties. The hearing itself became largely a pointless exercise because USTR had no ability to ask informed questions given the lack of the written comments; indeed, each hearing

---

[11] https://ustr.gov/about-us/policy-offices/press-office/press-releases/2018/august/ statement-us-trade-representative.

participant was limited to five minutes and was typically asked just one question (*i.e.*, whether the product could be sourced from elsewhere).

Despite the obvious problems with this new procedure, approximately 350 witnesses representing a broad array of businesses, trade associations, consumer, and public interest groups appeared at the hearings, and over 6,000 comments were submitted.  *See* Section 301 Docket.[12] The overwhelming majority of the testimonies and comments (~98%) revealed deep and widespread concern over the potentially devastating impact of the $200 billion tariffs on U.S. businesses and consumers.  For example:

- The National Retail Federation ("NRF") noted that List 3 "includes many consumer goods" that are "purchased by nearly every American household" and "account for relatively large shares of total household spending of lower-income households."  NRF Comments at 2 (Sept. 6, 2018).[13]  NRF observed that the proposed tariffs had "started a scramble among importers to find alternative sources of supply" and harmed businesses and consumers by "bidding up prices for these goods already from all possible alternative manufacturers."  *Id.*  NRF further stressed that the tariffs "would jeopardize U.S. jobs" and "would cost retailers, or their customers, inordinate price increases."  *Id.* at 3.

- The American Chemistry Council ("ACC"), observing that nearly every major segment of the U.S. economy relies on chemical inputs, stated that proposed List 3 tariffs "would have a profound and negative ripple effect throughout the U.S. economy, increasing costs and causing deep and lasting harm to domestic manufacturers, farmers, workers, and consumers."  ACC Comments at 1 (Sept. 6, 2018).[14]  ACC noted that the List 3 tariffs would "threaten the viability of the $202 billion in announced chemical industry projects and the ability of the U.S. chemicals industry to increase our exports to the rest of the world."  *Id.* at 2.

- SEMI, the trade association representing the semiconductor manufacturing industry, said that the List 3 tariffs would "put thousands of high-paying and high skill jobs at risk."  SEMI Comments at 1 (Sept. 6, 2018).[15]  SEMI further observed that the tariffs would impact U.S. competitiveness because "costs for

---

[12] https://www.regulations.gov/docket?D=USTR-2018-0026.

[13] https://www.regulations.gov/comment/USTR-2018-0026-5650.

[14] https://www.regulations.gov/comment/USTR-2018-0026-5181.

[15] https://www.regulations.gov/comment/USTR-2018-0026-1470.

U.S. semiconductor equipment companies will increase, while costs for non-U.S. competitors will remain the same *** [such] that non-U.S. firms receive an advantage" from the tariffs. *Id*. at 7.

Although the volume of the comments submitted and the importance of the issues raised gave USTR an enormous amount of information to process, the Administration suggested—even before the comment period ended—that USTR was ready to impose tariffs immediately. *See* Jennifer Jacobs, Shawn Donnan, Andrew Mayeda, & Saleha Mohsin, *Trump to Back $200 Billion China Tariffs as Early as Next Week, Sources Say,* Bloomberg (Aug. 31, 2018).[16]  Indeed, less than 24 hours after the comment deadlines, President Trump added that more tariffs on an additional $267 billion in Chinese goods were "ready to go *** if I want."  Shannon Pettypiece, *Trump Threatens Tariffs on Another $267 Billion of Chinese Imports*, Bloomberg (Sept. 7, 2018).[17]

### 2. *Final Adoption of List 3*

Just eleven days after USTR received written initial and rebuttal comments from the public, President Trump announced that USTR would "proceed with placing additional tariffs on roughly $200 billion of imports from China."  The White House, Statement from the President (Sept. 17, 2018).[18]  Once again, the President made clear the additional tariffs were in relation to China's retaliation to the $50 billion tariff action, as he promised to proceed with yet more tariffs "if China takes retaliatory action against our farmers or other industries."  *Id.*  Peter Navarro, Director of the White House National Trade Council, was equally transparent:  "China retaliated.  And so in

---

[16] https://www.bloomberg.com/news/articles/2018-08-30/trump-said-to-back-200-billion-china-tariffs-early-as-next-week.

[17] https://www.bloomberg.com/news/articles/2018-09-07/trump-threatens-tariffs-another-267-billion-of-chinese-imports.

[18] https://trumpwhitehouse.archives.gov/briefings-statements/statement-from-the-president-4/.

response to that, the president directed USTR to go through the process meticulously of preparing the additional tariffs." *White House Adviser Navarro On Why U.S. Hit China With More Tariffs*, NPR MORNING EDITION (Sept. 18, 2018).[19]

Just twelve days after comments were due, USTR published notice of final List 3. *List 3 Final Rule*, 83 Fed. Reg. 47,974. Despite purporting to "have carefully reviewed the public comments" and testimony, *id.* at 47,975, USTR did not explain how it had time to consider the over 6,000 List 3 written comments and tens of thousands of pages of public testimony in just twelve days, let alone respond to any of those comments. USTR announced that the additional 10% *ad valorem* duty would apply to all listed products that entered the United States from China on or after September 24, 2018, and would rise automatically to 25% *ad valorem* on January 1, 2019. *Id.*

As to legal authority, USTR this time relied on a provision not previously cited (in addition to the one it cited to initiate consideration of the List 3 additional duties): Section 307(a)(1)(B). *See List 3 Final Rule*, 83 Fed. Reg. at 47,974. Parroting the language of that statute, USTR stated, in conclusory fashion, that the relevant burden "continues to increase, including following the one-year investigation period." *Id.* "Furthermore," USTR added, "China's unfair acts, policies, and practices include not just its specific technology transfer and IP polices referenced in the notice of initiation in the investigation, but also China's subsequent defensive actions taken to maintain those policies." *Id.* USTR also repeated its citation of Section 307(a)(1)(C), arguing that China's response to the $50 billion tariff action "has shown that the current action no longer is appropriate"

---

[19] https://www.npr.org/2018/09/18/649089105/white-house-adviser-navarro-on-why-hit-china-with-more-tariffs.

because "China openly has responded to the current action by choosing to cause further harm to the U.S. economy, by increasing duties on U.S. exports to China." *Id.* at 47,975.

**Figure 2: Section 301/307 Actions Relative to Total U.S.-China Trade (List 3)**



**+ $200,000,000,000**
Addition of List 3
Tariffs now imposed on 46% of U.S. goods imports from China.

List 3

Lists 1 & 2

**$50,000,000,000**
Sum of List 1 and List 2
Amount found by USTR to be commensurate with the harm caused by China's acts, policies, and practices

**U.S. Section 301 Tariffs**

**Totality of U.S. Goods Imports from China, 2018**
Source: Census.gov

$539,000,000,000

$250,000,000,000

$50,000,000,000

*3.  The Delayed Increase to 25%*

On December 3, 2018, the Administration announced its decision to delay the scheduled January 1 increase in rate from 10% to 25% for List 3 products.  The catalyst was apparently a "highly successful meeting" between President Trump and President Xi.  THE WHITE HOUSE, STATEMENT FROM THE PRESS SECRETARY REGARDING THE PRESIDENT'S WORKING DINNER WITH CHINA (Dec. 1, 2018).[20]  The Administration cited progress "made with respect to North Korea" and announced that "China will agree to purchase a not yet agreed upon, but very substantial,

---

[20] https://trumpwhitehouse.archives.gov/briefings-statements/statement-press-secretary-regarding-presidents-working-dinner-china/.

amount of agricultural, energy, industrial, and other product from the United States to reduce the trade imbalance between [the United States and China]." *Id.*

Relying on Section 307(a)(1) of the Trade Act, USTR explained in the implementing Federal Register notice that, "[i]n light of the outcome of the December 1 meeting, and at the direction of the President, the Trade Representative has determined that it no longer is appropriate for the rate of duty under the September 2018 action to increase to 25 percent on January 1, 2019, and that the rate of duty under the September 2018 action instead should increase to 25 percent on March 2, 2019 (which is the day following the end of the 90-day period mentioned in the December 1 Statement)." *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 65,198, 65,199 (Dec. 19, 2018).

On February 24, 2019, the Administration delayed the increase again as a result of "very productive talks." Ana Swanson & Allan Rappeport, *Trump Delays a Tariff Deadline, Citing Progress in China Trade Talks*, N.Y. TIMES (Feb. 24, 2019).[21]   In the implementing Federal Register notice, USTR again invoked Section 307(a)(1) generally: "In light of progress of the additional rounds of negotiations since December 2018, and at the direction of the President, the Trade Representative has determined that it is no longer appropriate for the rate of duty under the September 2018 action to increase to 25 percent on March 2, 2019, and that the rate of duty under the September 2018 action will remain at 10 percent until further notice." *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 7966, 7967 (Mar. 5, 2019).

---

[21] https://www.nytimes.com/2019/02/24/us/politics/us-china-trade-truce.html.

Negotiations between the United States and China, which had little to do with the subject of the Section 301 investigation, fell apart a few months later.  On May 5, 2019, the eve of the final round of negotiations between the United States and China, President Trump immediately announced that tariffs on List 3 goods would increase to 25% "shortly" because talks were proceeding "too slowly, as [China] attempt[ed] to renegotiate."    Donald J. Trump (@realDonaldTrump), TWITTER (May 5, 2019, 12:08 PM EST).[22]

On May 9, 2019, USTR issued a Federal Register notice officially announcing its intent to raise tariffs on List 3 goods to 25%.  *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 20,459 (May 9, 2019).  The notice again cited China's decision to "retreat from specific commitments made in earlier rounds" of negotiations as the sole basis for the increase in duties.  *Id.* at 20,459.  "In light of the lack of progress in the additional rounds of negotiations since March 2019," the Notice read, "the Trade Representative has determined that it is appropriate for the rate of additional duty under the September 2018 action to increase to 25 percent [for goods leaving China] on May 10, 2019."  *Id.* at 20,460.  USTR made no finding of any increased burden from China's investigated trade practices.  And USTR sought no additional comments on its action.

### D.    List 4 Tariff Action

#### 1.  *Proposed List 4*

Just eight days after announcing the increase in the List 3 duty rate to 25%, USTR announced its intent to proceed with List 4, which would subject an additional $300 billion worth of products imported from China to up to 25% *ad valorem* tariffs.  *Request for Comments Concerning Proposed Modification of Action Pursuant to Section 301: China's Acts, Policies, and*

---

[22] https://media-cdn.factba.se/realdonaldtrump-twitter/1125069836088950784.jpg.

*Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 22,564 (May 17, 2019) ("*List 4 NPRM*").  USTR once again was clear about the reason for its "proposed modification of action" against China, and that reason once again was unrelated to any increased burdens on U.S. commerce from the acts and practices at issue in the original Section 301 investigation:  "Shortly in advance of the last scheduled round [of negotiations], China retreated from specific commitments made in previous rounds *** [and] announced further retaliatory action against U.S. commerce."  *Id.* at 22,564.  "In light of China's failure to meaningfully address the acts, policies, and practices that are subject to this investigation and its response to the current action being taken in this investigation," USTR "propose[d] to modify the [Section 301] action" by increasing the value of products subject to tariffs *ten-fold* above the initial action.  *Id.*

The public submitted nearly 3,000 comments outlining the expansive harms American businesses and consumers would suffer from List 4 tariffs.  For example:

- The U.S. Chamber of Commerce noted that imposing tariffs on products covered by List 4 "will dramatically expand the harm already done to American consumers, workers, businesses, and the economy," especially considering that "U.S. tariffs on imports from China are already costing American households $106 billion a year."[23]  U.S. Chamber Comments at 4 (footnote omitted).  It also stressed that "American farmers have become some of the most severely affected targets of retaliation," with "[s]oybean exports to China, once among the most prominent exports for the United States, dropp[ing] by nearly half in 2018—their lowest level in 16 years."  *Id.* at 9.

- The Consumer Technology Association ("CTA") pointed out the unlawful nature of the List 4 tariffs.  CTA Comments (June 17, 2019) at 4.[24]  It also noted that the tariffs will "stifle *** growth and market share, diminish U.S. product adoption, and undermine [CTA's members'] ability to invest in continued innovation to drive the U.S. industry and its global market share forward."  *Id.*

---

[23] https://www.regulations.gov/document?D=USTR-2019-0004-2667.

[24] https://www.regulations.gov/document/USTR-2019-0004-1833.

- The National Association of Manufacturers ("NAM") warned that the List 4 tariffs, by sharply increasing the cost of "raw materials, intermediate goods or capital equipment from China," will actually harm *domestic* manufacturing, by "mak[ing] it more expensive and less competitive to manufacture in the United States, undermining production, capital and R&D investment and jobs here at home while also forcing manufacturers to cede ground to their competitors overseas." NAM Comments at 3.[25]  It also noted that "[n]umerous [companies] have shared examples of planned or announced investments in new manufacturing plants and decisions to hire more manufacturing workers that have been cancelled, delayed or put at risk because of tariff costs." *Id.* at 7.

Similar to List 3, the List 4 hearings attracted over 300 witnesses who testified about the negative impact of the tariffs.[26]  And like the List 3 process, the timeline for the hearings and written comments left little opportunity for effective presentation. *List 4 NPRM*, 84 Fed. Reg. at 22,565.  The written comments were due the same day as the hearing, which again denied any informed interaction between the Administration and the witnesses at the hearing. *Id.*  Once again, witnesses were granted only five minutes, and most were asked only one question (the same product-sourcing question as in the List 3 hearings). *Id.*  USTR set the deadline for rebuttal comments seven days after the conclusion of the public hearing, leaving interested parties little opportunity to respond to comments submitted by others. *Id.*

### 2. List 4 Final Notice

On August 1, 2019, citing China's failure to follow through on agricultural purchases and to reduce exports of fentanyl flowing into the United States, President Trump announced on Twitter that the List 4 tariffs would become effective September 1 at a rate of 10%.  Donald J. Trump (@realDonaldTrump), TWITTER (Aug. 1, 2019, 1:26 PM EST) (describing it as a "small additional Tariff").[27]

---

[25] https://www.regulations.gov/document?D=USTR-2019-0004-1340.

[26] https://ustr.gov/sites/default/files/enforcement/301Investigations/Section%20301%20Hearing%20Schedule%20June%2017-June%2025%202019.pdf.

[27] https://media-cdn.factba.se/realdonaldtrump-twitter/1156979446877962243.jpg.

Later that month, USTR issued a final notice adopting List 4 in two tranches. *List 4A Final Rule*, 84 Fed. Reg. 43,304. List 4A would impose a 10% *ad valorem* duty on goods worth approximately $120 billion, effective September 1, 2019. *Id.* at 43,304. List 4B would impose a 10% *ad valorem* duty on the remaining goods (with limited exclusions "based on health, safety, national security, and other factors"), effective December 15, 2019. *Id.* at 43,305. Once again, USTR did not address any of the nearly 3,000 comments submitted or any of the testimony provided by witnesses, other than to claim that its determination "takes account of the public comments and the testimony." *Id.*

As legal support for its action, USTR cited both Section 307(a)(1)(B) and (C) of the Trade Act, stating that it may modify its prior action taken pursuant to Section 301 of the Trade Act if (1) "[t]he burden or restriction on United States commerce" imposed by the investigated foreign country practice "has increased or decreased," or (2) "the action *** is no longer appropriate." *Id.* at 43,304. But instead of finding any increased burden on U.S. commerce from the practices that were the subject of USTR's investigation, USTR pointed to "China's subsequent defensive actions taken to maintain those unfair acts, policies, and practices as determined in that investigation," including retaliatory tariffs on U.S. imports, retreating from commitments during negotiations, and devaluing its currency. *Id.* at 43,304-05.

Just ten days later, USTR published notice of its decision to increase the tariff rate applicable to goods covered by List 4A and List 4B from 10% to 15%. *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 45,821 (Aug. 30, 2019). USTR explained that it increased the tariff rate because, shortly after it finalized Lists 4A and 4B, "China responded by

announcing further tariffs on U.S. goods." *Id.* at 45,822.  USTR once again cited China's retreat from its negotiation commitments and devaluation of its currency as grounds for its action.  *Id.*

On December 18, 2019, citing a recently negotiated limited trade deal with China, USTR published notice that it would "suspend indefinitely the imposition of additional duties of 15 percent on products of China covered by" List 4B.  *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 69,447, 69,447 (Dec. 18, 2019).  USTR also stated its intent to reduce the tariff rate applicable to products covered by List 4A, *id.*, an action that ultimately became effective on February 14, 2020, when USTR halved the applicable duty rate, *Notice of Modification of Section 301 Action:  China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 85 Fed. Reg. 3741 (Jan. 22, 2020).

In the months that followed, the United States and China implemented the limited trade deal that they negotiated near the end of 2019.  OFFICE OF THE U.S. TRADE REPRESENTATIVE, UNITED STATES AND CHINA REACH PHASE ONE TRADE AGREEMENT (Dec. 13, 2019).[28]  During that time, Defendants declined to impose additional duties on imports covered by List 4B, presumably because China had agreed to unrelated obligations under the limited trade deal.  The 7.5% duties imposed on products covered by List 4A remain in effect.

With the promulgation of List 4, the four lists collectively cover essentially all Chinese imports to the United States:

---

[28] https://ustr.gov/about-us/policy-offices/press-office/press-releases/2019/december/united-states-and-china-reach.

**Figure 3: Section 301/307 Actions Relative to Total U.S.-China Trade (List 4)**



**SUMMARY OF THE ARGUMENT**

**I.** Defendants' "supplemental" List 3 and List 4A tariff actions on hundreds of billions of dollars of imported Chinese goods are *ultra vires* and contrary to law. Absent a new investigation, the Trade Act does not permit USTR to increase (let alone by orders of magnitude) the penalties imposed following a targeted Section 301 investigation in response to a foreign country's decision to apply reciprocal tariffs to U.S. goods. Nor does the Trade Act permit USTR to increase tariffs to redress the grab-bag of grievances offered by the prior Administration: setbacks in trade negotiations, a broader trade imbalance, fentanyl exports, currency manipulation, broken promises to purchase U.S. agriculture products, lack of market access in areas unrelated to the original Section 301 investigation, or non-trade related military disagreements, to name a few.

24

As relevant here, Section 307 of the Act authorizes USTR to "modify or terminate" an action in two circumstances—neither of which is present here.  First, Section 307(a)(1)(B) allows USTR to modify an existing action where the burden on U.S. commerce "of the acts, policies, and practices[] that are the subject of" the Section 301 action has increased or decreased.  Applied here, only an increase in the burden on U.S. commerce *from the investigated intellectual property practices themselves (i.e., "the subject of" the Section 301 action)* could justify an increase in the existing action.  But the grounds USTR gave—China's retaliatory tariffs and other policy disagreements—postdated or otherwise fell outside the Section 301 investigation, and therefore could not be considered "the subject of" the resulting action.

Second, Section 307(a)(1)(C) permits USTR to modify an action if the action USTR originally deemed "appropriate" under Section 301 is "no longer appropriate."  The statutory structure demonstrates that this provision allows USTR to reduce or terminate an existing action after changed circumstances undermine the original finding that certain responsive action was "appropriate."  Just as its counterpart section (Section 307(a)(1)(A)) allows USTR to terminate or ratchet down a *mandatory* action in light of changed circumstances, Section 307(a)(1)(C) authorizes USTR to terminate or ratchet down a *discretionary* action when it "is no longer appropriate."

Beyond the statutory text and context, the purpose of these provisions dictates that Section 307 circumscribe USTR's modification authority rather than confer unfettered discretion on the Executive Branch.  Uniform past practice confirms that conclusion.  And because Defendants' open-ended reading of the Executive Branch's Section 307 modification authority would amount to an unconstitutional delegation of Congress's authority to levy duties and regulate foreign commerce, the canon of constitutional avoidance forecloses it.

**II.** The Government's justiciability arguments are meritless.  This case challenges a final agency action taken by USTR, not by the President.  The Government cites no support for the proposition that an agency acting pursuant to Presidential direction is permanently shielded from judicial review.  On the contrary, this Court (and many others) have repeatedly reviewed final agency actions taken at the direction of the President, including in situations where USTR acted pursuant to the same statutory provisions at issue here.

The Government is also wrong to argue that this case presents a "political question."  The central question presented is one of statutory interpretation, *i.e.*, whether the Trade Act authorized USTR to promulgate List 3 and List 4A.  Plaintiffs do not challenge any purely discretionary determinations by USTR (or by the President).  As precedent demonstrates, nothing bars this Court from fulfilling its core constitutional duty of ensuring the Executive Branch acts only in accordance with the governing statute and the authority delegated by Congress.

**III.** Defendants violated the Administrative Procedure Act ("APA") in two distinct ways.  First, for all the reasons USTR acted *ultra vires*, Defendants violated the APA's prohibition on agency action in excess of statutory authority or otherwise contrary to law.

Second, pursuant to the APA, agencies must afford the public adequate notice and opportunity to comment on proposed rules, meaningfully consider the comments they receive, and avoid acting in an arbitrary and capricious manner.  Here, USTR for the first time asserted a statutory basis—Section 307(a)(1)(B)—in its final rule announcing the $200 billion List 3 action, without providing notice or an adequate opportunity for interested parties to comment on that new justification.  In addition, participants in the List 3 rulemaking process were required to submit initial and rebuttal comments on the same day, after the hearing, making it impossible for parties to respond to the comments submitted by others or to use those comments to prepare for the

hearing.  And in issuing its final List 3 determination just eleven days after the close of the comment period, USTR gave short shrift to the thousands of comments explaining the detrimental and wide-ranging impacts the tariffs would have on U.S. companies and consumers—exempting some products but not others similarly situated.  List 4 suffered from similar procedural infirmities.  The Government's last-ditch attempt to shield its procedural errors from judicial review under the "foreign affairs function" finds no support in the law and contradicts Circuit precedent.

## **LEGAL STANDARD**

Because this case arises under 28 U.S.C. § 1581(i), the "Administrative Procedure Act standard of review applies."  *Shakeproof Indus. Prods. Div. of Ill. Tool Works Inc. v. United States*, 104 F.3d 1309, 1313 (Fed. Cir. 1997); *see* Mot. 30.  Under the APA standard, this Court must "hold unlawful and set aside agency action, findings, and conclusions found to be *** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706.  This Court may grant judgment on the agency record if, after reviewing the issues of law in conjunction with the record, the Court concludes that the Government violated the APA standard.  *See* CIT R. 56.1.

Ordinarily, "legal issues"—such as issues of statutory construction—are decided without deference.  *Transpacific Steel LLC v. United States*, No. 2020-2157, 2021 WL 2932512, at *9 (Fed. Cir. July 13, 2021) ("This appeal involves only legal issues, which we decide de novo."); *GPX Int'l Tire Corp. v. United States*, 780 F.3d 1136, 1140 (Fed. Cir. 2015) ("We review questions of constitutional or statutory interpretation de novo.").  That is because the judiciary, not USTR or the President, "is the final authority on issues of statutory construction[.]"  *Gilda Indus., Inc. v. United States*, 622 F.3d 1358, 1363 (Fed. Cir. 2010) ("*Gilda II*") (citation omitted).  Although a court sometimes affords "substantial deference to decisions of the Trade Representative

implicating the discretionary authority of the President in matters of foreign relations," it affords

no similar deference to USTR's interpretation of clear statutory mandates.  *Id.*

## ARGUMENT

**I.     THE TRADE ACT DOES NOT PERMIT THE "SUPPLEMENTAL" LIST 3 AND LIST 4A TARIFF ACTIONS**

USTR exceeded the authority Congress granted it under the Trade Act of 1974 when it

imposed tariffs of 7.5% to 25% on Chinese goods worth hundreds of billions of dollars (List 3 and

List 4A)—an amount magnitudes greater than the original $50 billion action (List 1 and List 2)

that USTR, based on its Section 301 investigation, had deemed "commensurate with an economic

analysis of the harm caused by China's unreasonable technology transfer policies to the U.S.

economy."  USTR April 3, 2018 Release, *supra*.  Although Section 307 of the Trade Act permits

USTR to "modify or terminate" a Section 301(b) action in certain circumstances, those

circumstances are absent here.  Accordingly, the List 3 and List 4A tariff actions are *ultra vires*

and contrary to law.

### A.     Section 301(b) Does Not Authorize USTR To Increase The Original Tariff Action After One Year

USTR did not rely on Section 301(b) (19 U.S.C. § 2411(b)) as authority for its increase in

the tariff action, and Defendants do not rely on that section either.  For good reason:  Section

301(b) could not authorize the "supplemental" tariff actions, at least in the absence of a new

Section 301 investigation, for at least two independent reasons.

First, Section 301(b) permits USTR to take action, predicated on an investigation, only

upon a finding that the investigated "act, policy, or practice of a foreign country is unreasonable

or discriminatory and burdens or restricts United States commerce, and *** action by the United

States is appropriate."  19 U.S.C. § 2411(b).  Following a targeted Section 301 investigation

focused on intellectual property and technology transfer, USTR elected to impose tariffs in an

amount "commensurate with an economic analysis of the harm caused by China's unreasonable technology transfer policies." USTR April 3, 2018 Release, *supra*. USTR's later determination to impose the List 3 and List 4A tariffs, however, was not predicated on the harm caused by the investigated practices (as Section 301(b) requires), but rather on China's decision to impose "retaliatory duties" on U.S. goods, setbacks in negotiations, the U.S.-China trade deficit, and other unrelated concerns. *List 3 Final Rule*, 83 Fed. Reg. 47,974; *List 4A Final Rule*, 84 Fed. Reg. 43,304; *see* pp. 15-16, 21-22, *supra* (setting forth Administration's justifications for Lists 3 and 4).

Second, the List 3 and 4A actions were beyond the one-year deadline for determining an action to take in response to a Section 301 investigation. *See* 19 U.S.C. § 2414(a)(2)(B); *Initiation Notice*, 82 Fed. Reg. at 40,214. Because USTR's investigation began on August 24, 2017, USTR's determination to impose the $200 billion List 3 tariffs on September 17, 2018, and to impose the $120 billion List 4A tariffs on September 1, 2019, fell outside the requisite 12-month window. Indeed, Defendants concede that there is a "one-year time limit" applicable to actions taken on the basis of a Section 301 investigation. Mot. 31.[29]

For these reasons, USTR could not have invoked—and in fact did not invoke—Section 301(b) as authority for its combined $500 billion tariff action in Lists 3 and 4 (unlike for Lists 1 and 2). Defendants may not do so now. *See Diamond Sawblades Mfrs.' Coal. v. United States*, 986 F.3d 1351, 1366 (Fed. Cir. 2021) (courts assess agency's decision "on the basis [agency] gave for that decision") (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

---

[29] Contrary to Defendants' red herring, Plaintiffs have never contended that Section 307 should be "construed as having the same one-year time limit as is applicable to actions taken on the basis of the investigation as provided for in sections 304(a)(1) and 305(a)." Mot. 31. Instead, Plaintiffs argue only that, in light of the "one-year time limit," Section 307 provides the exclusive basis for modifying actions outside that one-year window.

**B.      Section 307 Does Not Authorize USTR To Increase The Original Tariff Action In The Circumstances Present Here**

Instead of relying on Section 301, USTR claimed statutory authorization for Lists 3 and 4A in Section 307, the "modification" provision.  Defendants now rely on the two subsections of Section 307 interchangeably, but USTR did not do so in promulgating List 3.  Specifically, in *proposing* List 3, USTR relied solely on Section 307(a)(1)(C), which allows USTR to "modify or terminate any action, subject to the specific direction, if any, of the President with respect to such action, *** if *** such action is being taken under [S]ection 301(b) of this title and is no longer appropriate." *List 3 NPRM*, 83 Fed. Reg. at 33,609 (second ellipsis in original) (quoting 19 U.S.C. § 2417(a)(1)(C)).  Tellingly, upon *finalizing* List 3, USTR for the first time cited Section 307(a)(1)(B), which permits modification where "the burden or restriction on United States commerce *** of the acts, policies, and practices, that are the subject of such action has increased or decreased." *List 3 Final Rule*, 83 Fed. Reg. at 47,974 (quoting 19 U.S.C. § 2417(a)(1)(B)).

As USTR's evolving rationale would suggest, neither provision supports the List 3 or List 4A tariff actions.  As detailed below, Section 307's "text and context, including purpose and history," *Transpacific*, 2021 WL 2932512, at *9, reveal that Section 307 could not have authorized the challenged actions.

*1.  Section 307(a)(1)(B) does not authorize List 3 and List 4A Tariffs*

In promulgating Lists 3 and 4A, USTR claimed that "China's unfair acts, policies, and practices include not just its specific technology transfer and IP policies referenced in the notice of initiation in the investigation, but *also China's subsequent defensive actions* taken to maintain those policies"—*e.g.*, China's "deci[sion] to impose approximately $50 billion in tariffs on U.S. goods" as well as other subsequent conduct. *List 3 Final Rule*, 83 Fed. Reg. at 47,974 (emphasis added); *see List 4A Final Rule*, 84 Fed. Reg. at 43,304-05 (citing as reasons for USTR's

30

modification China's retreat from "specific commitments" during prior negotiations and its "concrete steps to devalue its currency").  Defendants contend that Section 307(a)(1)(B) empowers USTR to ratchet up tariffs without limitation where "the burden or restriction on United States commerce" has increased not from the practices that spurred the investigation and remedial action under Section 301, but as a result of China's *retaliatory response* to that remedial action, along with other actions by China that USTR never investigated.  *See id.*; *see also supra* pp. 10-12, 17-22 (citing, *inter alia*, fentanyl imports, failure to make agricultural purchases, trade imbalance, and currency manipulation).

The text of Section 307(a)(1)(B) proves otherwise.  That provision states that a Section 301 action may be modified only where the burden on U.S. commerce "of the acts, policies, and practices, *that are the subject of*" the Section 301 action has increased or decreased.  19 U.S.C. § 2417(a)(1)(B) (emphasis added).  Neither China's retaliatory tariffs, nor its refusal to honor commitments made in subsequent rounds of broader trade negotiations, could have been "the subject of" the Section 301 action because those actions had not yet transpired when the investigation was initiated or when USTR determined that remedial action was "appropriate."

The same goes for the various other reasons the Government has advanced formally and informally to justify List 3 and List 4A.  For example, Defendants acknowledge USTR's reliance on China's "decision to devalue its currency"—which obviously has nothing to do with the investigated practices—as yet another basis for its modification actions.  Mot. 17 (citing *List 4A Final Rule*, 84 Fed. Reg. at 43,304-05).  Even though China's responses to the tariffs may have caused "increased harm to the U.S. economy," Mot. 17 (quoting *List 4A Final Rule*, 84 Fed. Reg. at 43,304), that is not the harm with which the investigation, and hence Section 307(a)(1)(B), is concerned.  Had Congress intended to confer on USTR sweeping authority to prosecute a limitless

trade war for any reason, no matter how discrete the original Section 301(b) investigation and action, it presumably would have said so—and not through the tailored language of Section 307(a)(1)(B). USTR's effort to piggyback off the narrowly focused Section 301 investigation on China's intellectual property practices to penalize China for its countermeasures and other unrelated measures flouts the plain text of the Act.

The Government does not seriously argue that China's retaliatory or other measures increased the burden of "the acts, policies, and practices, *that are the subject of*" the Section 301 action, as the text requires. 19 U.S.C. § 2417(a)(1)(B) (emphasis added). In fact, it ultimately contends that "the USTR was not required to find *any* increased burden on U.S. commerce in order to modify the section 301 action." Mot. 56 (emphasis added). The Government instead argues that China's retaliatory actions "were not separate and distinct" from the investigated practices. Mot. 32. But the statutory language is clear: the increased burden must come from the practices that are "the subject of" the action *themselves*, 19 U.S.C. § 2417(a)(1)(B)—*i.e.*, the practices that were actually subject to investigation and consultation, *id.* § 2414. The increased burden cannot come from other subsequent "defensive" actions.

The Government also argues that the statute must give the Executive Branch "flexibility to respond to a trading partner's refusal to eliminate its unfair trade practices," Mot. 33, and suggests that "Congress envisioned that the USTR would continue monitoring section 301 investigations and react if the initial action was ineffective at resolving the unfair or discriminatory trade practice," *id.* at 32 (citing, *inter alia*, 19 U.S.C. § 2416). But that proves Plaintiffs' point: When Congress delegates authority to USTR, it does so explicitly and within circumscribed limits. In fact, Section 306—unlike neighboring Section 307—gives USTR *explicit* "retaliation" authority. Specifically, Section 306 authorizes USTR to take retaliatory action due to "the failure of" a

foreign country "to implement the recommendation made pursuant to a dispute settlement proceeding under the World Trade Organization."  19 U.S.C. § 2416(b)(2).  Section 307 includes no similar language, further demonstrating that Section 307's "modification" authority cannot encompass distinct "retaliation" authority, as "[c]ourts are required to give effect to Congress' express inclusions and exclusions[.]"  *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 631 (2018); *see Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion[.]" (internal quotation marks and brackets omitted)).

To the extent Defendants imply that USTR found that the burden of the investigated practices "continues to increase" *apart from China's retaliatory measures and other actions*, they are wrong.  *See* Mot. 56-57 (quoting *List 4A Final Rule*, 83 Fed. Reg. at 43,304).  As just discussed, the Federal Register notices (and Defendants' Motion) demonstrate that USTR's assertion was premised solely on the distinct burdens from China's *response* to the Section 301 remedial action as well as other disparate Chinese acts and policies.  Those separate actions, which do not involve any escalation of the investigated practices themselves, are not "acts, policies, and practices that are the subject of the Section 301 action."  Defendants do not and cannot contend otherwise.[30]

### 2.  *Section 307(a)(1)(C) does not authorize List 3 and List 4A Tariffs*

Defendants' reliance on Section 307(a)(1)(C) also misses the mark.  As discussed, Section 301(b) authorizes USTR to take discretionary action within one year if:  (1) a foreign country's acts, policies, or practices are unreasonable or discriminatory and burden or restrict U.S.

---

[30] Even had USTR tried to rely on any *actual* increased burdens of the investigated trade practices under Section 307(a)(1)(B), that would fail for an additional reason:  it would come too late in the rulemaking process.  *See* Section III.B, *infra*.

commerce; and (2) responsive action by the United States is "*appropriate*." 19 U.S.C. § 2411(b) (emphasis added). Section 307(a)(1)(C), in turn, permits subsequent modification of that action only after concluding that the action once deemed appropriate under Section 301(b) is "*no longer appropriate*." *Id.* § 2417(a)(1)(C) (emphasis added).

Both sides agree that Section 307(a)(1)(C) must be read harmoniously with Section 301(b). *See*, *e.g.*, Mot. 27-28 ("Notably, the language in Section 307(a)(1)(C) mirrors the language in section 301(b)(2).") Reading Section 307(a)(1)(C) in conjunction with Section 301(b) (as one must) demonstrates that Section 307(a)(1)(C) provides authority only to reduce or terminate an existing action after changed circumstances undermine the original finding that certain responsive action was "appropriate." *See Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."). Section 307 does not permit USTR to increase trade restrictions days, months, or years later as part of an open-ended trade war.

The neighboring prongs of Section 307(a)(1) reinforce the conclusion that Section 307(a)(1)(C) is a tool to taper, not expand, an existing remedial action. Section 307(a)(1)(A) permits USTR to modify or terminate an action taken under Section 301(a) when "any of the conditions described in section [301(a)(2)] exist." 19 U.S.C. § 2417(a)(1)(A). Those "conditions" are the exceptions to mandatory action under Section 301(a), and reflect circumstances in which the foreign country is taking steps to remediate its offensive practices or when a U.S. response to a foreign trade violation would "serious[ly] harm *** the national security" or "adverse[ly] impact *** the United States economy." *Id.* § 2411(a)(2)(B)(i)-(v). By authorizing USTR to modify or terminate an action when those *exceptions* to mandatory action are present, Congress did not

34

authorize USTR to *increase* tariffs thereunder.  On the contrary, Congress permitted USTR only to withdraw or curtail a mandatory action previously taken when later-developed conditions render that action undesirable.

Importantly, Section 307(a)(1)(A) is linked to Section 307(a)(1)(C).  Whereas the former applies to mandatory action under Section 301*(a)*, the latter applies to discretionary action under Section 301*(b)*.  *See* 19 U.S.C. § 2417(a)(1)(A), (C).  Just as Section 307(a)(1)(A) allows USTR to terminate or ratchet down a *mandatory* action when that action no longer makes sense in light of changed circumstances, Section 307(a)(1)(C) likewise authorizes USTR to terminate or ratchet down a *discretionary* action when USTR finds that it "is no longer appropriate."  *Id.* § 2417(a)(1)(C).  Neither provision authorizes an escalation of a tariff action in response to changed circumstances.

If the modification authority under Section 307(a)(1)(C) were broad enough to permit USTR to escalate a tariff action at its discretion, USTR would *always* rely on subsection (C) over (B)—and thus avoid making the factual determinations required by subsection (B) in every discretionary action case.  (Indeed, USTR did just that in its notice of proposed List 3 action.)  Indeed, subsection (B) is the only sub-provision under Section 307(a)(1) explicitly to reference a possible escalation of action.  The existence of subsection (B) thus explains why Congress chose the broader phrase "*modify* or terminate" rather than "*reduce* or terminate" in the prefatory clause of Section 307(a)(1).  So Congress's choice to use the term "modify" in an introductory clause covering all three subsections does not mean that "modify" permits an upward adjustment in subsection (C).  Particularly given the "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme," and the fact "that neither party has cited any case in which the Government has increased

an action under Section 301(b) under the claimed authority of Section 307(a)(1)(C)," Plaintiffs' "substantial and serious" reading should compel the conclusion that this provision does not give USTR freewheeling discretion to increase tariffs under Section 307(a)(1)(C). *Section 301 Cases*, 2021 WL 2799979, at *9 (internal quotation marks and citation omitted).

If any doubt remains, principles of constitutional avoidance should eliminate it. *See*, *e.g.*, *Gonzalez v. United States*, 553 U.S. 242, 251 (2008) ("[W]hen 'a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided,'" the court's "'duty is to adopt the latter.'") (citations omitted). If Section 307 delegated to USTR the authority to use a single investigation targeting a narrow set of unfair intellectual property and forced technology transfer policies (which warranted a "commensurate" $50 billion action) to justify an unbounded trade war against the entire volume of trade with China, simply because it found the original action "no longer appropriate," that would present a serious problem under the non-delegation doctrine. *See Panama Ref. Co. v. Ryan*, 293 U.S. 388, 429-30 (1935) (legislative delegations permissible only if Congress "lay[s] down by legislative act an intelligible principle to which the person or body *** is directed to conform") (internal quotation marks and citation omitted); *see also Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) ("The constitutional question is whether Congress has supplied an intelligible principle to guide the delegee's use of discretion."); *United States v. Gulla*, 833 F. Supp. 274, 282 (S.D.N.Y. 1993) ("If Executive action *** need not be supported by factual findings *** and cannot be questioned because the governing standard is 'drawn in such broad terms that in a given case there is no law to apply,'" "then the question of delegation of taxing power by Congress would come into sharp focus, particularly absent an emergency situation.") (quoting *Webster v. Doe*, 486 U.S. 592, 599 (1988)).

The Government admits the premise of that non-delegation doctrine problem in making the startling argument that "whether maintaining a prior action is 'no longer appropriate' *** presents a judicially unmanageable standard."  Mot. 29.  If accepted, that argument means that the Executive Branch has unfettered discretion not only to determine whether and when to take a modification action, but also to modify Section 301 tariffs in whatever way it deems appropriate— with no judicial review.  If "no longer appropriate" means USTR can ratchet up tariffs whenever and however USTR sees fit, then that standard provides no "intelligible principle" at all.  Of course, a more sensible (and constitutional) conclusion exists:  Congress, consistent with the terms and structure of Section 307 as a whole, designed Section 307(a)(1)(C) to permit *reducing or terminating* a Section 301 action when that action is "no longer appropriate."

### 3. Uniform prior practice bolsters a limited construction of USTR's modification authority

In addition to text and context, "[p]ractice under" the modification provision over the past three decades since modification authority was added in 1988 "provide[s] strong confirmation [as to] the proper meaning of the language at issue here."  *Transpacific*, 2021 WL 2932512, at *16; *see Sosa v. Alvarez-Machain*, 542 U.S. 692, 714 (2004) (relying on "history and practice" in interpreting statute).

In promulgating List 3, USTR admitted in internal deliberations that its action was unprecedented:  "[W]e are not aware of prior investigations where a Trade Representative was called upon to use Section 307 modification authority to increase the level of trade action in order to achieve the statutory goal of obtaining the elimination of harmful policies covered by the investigation."  PR-01 at 5 (Addendum at 14).[31]  Defendants, moreover, concede that USTR has

---

[31] "PR-" refers to documents listed in the administrative record index filed by Defendants. Plaintiffs append the cited document to this memorandum.

only "previously invoked section 307(a)(1)(C) to reduce, terminate or delay section 301 actions." Mot. 36 n.6.  Given the statute's clear language, that is no surprise.

Prior to this investigation, USTR has invoked Section 307(a)(1)(B) just once—to *terminate* duties—when, in 2009, USTR found that the European Communities had decreased the burden or restriction on U.S. commerce by establishing a new tariff quota for beef.  *See Implementation of the U.S.-EC Beef Hormones Memorandum of Understanding*, 74 Fed. Reg. 48,808 (Sep. 24, 2009).

USTR has invoked Section 307(a)(1)(C) on five occasions in the thirty years since its enactment (not including this investigation).  In three of those instances, including in a prior action against China, USTR terminated the action completely.  *See, e.g., Termination of Section 301 Investigation and Action Regarding the People's Republic of China's Protection of Intellectual Property and Provision and Market Access to Persons Who Rely on Intellectual Property Protection*, 60 Fed. Reg. 12,582, 12,583 (Mar. 7, 1995) ("Section 307(a)(1)(C) of the Trade Act authorizes the USTR to terminate any action *** if, inter alia, the USTR determines that the action being taken under section 301(b) of the Trade Act is no longer appropriate."); *see also Results of Out-Of-Cycle Review Under Section 182 and Termination of Action Under Section 301(b): Intellectual Property Laws and Practices of the Government of Ukraine*, 71 Fed. Reg. 5899 (Feb. 3, 2006); *Termination of Action: Protection of Intellectual Property Rights by the Government of Honduras*, 63 Fed. Reg. 35,633 (June 30, 1998).  On another occasion, USTR decided to terminate in part a Section 301 action after "the Government of Ukraine *** addressed one of the two issues *** that were the basis of *** the Trade Representative's finding that Ukraine's inadequate IPR protections were actionable under Section 301(b)."  *Modification of Action Under Section 301(b); Out-of-Cycle Review Under Section 182; and Request for Public Comment: Intellectual Property Laws and Practices of the Government of Ukraine*, 70 Fed. Reg. 53,410, 53,411 (Sept. 8, 2005).

In the last instance, USTR delayed implementation of a Section 301(b) action to allow for completion of review under a trade agreement. *See Modification of Determination of Action Pursuant to Section 301 Concerning Canadian Exports of Softwood Lumber; Opportunity for Comment*, 57 Fed. Reg. 44,609 (Sept. 28, 1992).

What USTR has never done is rely on Section 307(a)(1)(B) or (C) to *expand* a tariff action—never mind by such a mind-boggling magnitude. The Government's unbroken past practice is further confirmation that neither "mousehole" provides the "elephant"-size authorization for the List 3 and 4A tariff actions. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress *** does not *** hide elephants in mouseholes.").

### C.   The Government's Reliance On Atextual Considerations Defies The Statute's Plain Terms And Structure

None of the Government's contrary arguments (Mot. 30-38), which fail to grapple with the textual, structural, and contextual arguments set forth above, carries the day.

*First*, the Government asks this Court to put a heavy thumb on the scale in its favor on the ground that "only a very narrow standard of review applies." Mot. 30. Although the Court defers to the Executive Branch's factfinding, no equivalent deference is afforded to pure questions of statutory interpretation—even where, unlike here, the Court reviews Presidential (rather than agency) action. *See, e.g.*, *Transpacific*, 2021 WL 2932512, at *9 (resolving statutory construction question *de novo*, without reference to "clear misconstruction" standard or deference to Executive Branch interpretation).

That is because the judiciary—not USTR—"is the final authority on issues of statutory construction." *Gilda II*, 622 F.3d at 1363 (quoting *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 n. 9 (1984)). Under the *Chevron* framework, a court must first look to whether Congress has directly spoken on the issue. "If the intent of Congress is clear, that

is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43.  A court will defer to the agency's interpretation only if it finds the statute to be silent or ambiguous.  *See id.*; *see, e.g., Gilda II*, 622 F.3d at 1363 (finding "intent of Congress [was] expressed clearly in" statutory text).  A court does "not fulfill [its] duty to say what the law is *** by merely agreeing to [an agency's] interpretation of the statutory provision at issue if it is 'reasonable,' regardless of whether [the court] think[s] it correct."  *Timex V.I., Inc. v. United States*, 157 F.3d 879, 881 (Fed. Cir. 1998) (citing *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803)).

The Supreme Court recently emphasized, moreover, that deference requires "genuine ambiguity."  *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) (discussing interpretation of regulations, but noting that Court applies the "same approach" under *Chevron*); *see Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1979 (2016) (declining to apply *Chevron* deference when statute is unambiguous).  Thus, before determining whether a statute is ambiguous, courts "employ traditional tools of statutory construction and examine the statute's text, structure, and legislative history, and apply the relevant canons of interpretation."  *Deacero S.A.P.I. de C.V. v. United States*, 996 F.3d 1283, 1294–95 (Fed. Cir. 2021) (internal citations omitted); *see FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 122, 132-133 (2000) ("Ambiguity is a creature not of definitional possibilities but of statutory context[.]") (internal citations omitted).  Even where "the statute's text does not explicitly address the precise question," courts "do not at that point simply defer to the agency."  *Timex*, 157 F.3d at 882; *see, e.g., Dunn v. Commodity Futures Trading Comm'n*, 519 U.S. 465, 470-80 (1997) (considering various tools of statutory construction to conclude statute unambiguous, even when more than one reading of the literal text of the statute was possible).

Thus, before a court "can allow an agency to say what the law is, [it] must thoroughly investigate whether Congress had an intent on the matter." *Timex*, 157 F.3d at 882. Only if after investigation the Court remains "at a loss as to what Congress intended" may it "grant *Chevron* deference." *Id.* And even where ambiguity or silence remains under *Chevron* step one, the agency's interpretation must still be reasonable in light of the statute as a whole under *Chevron* step two. *See, e.g.*, *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 321 (2014) (rejecting agency's statutory interpretation under *Chevron* step two and explaining that a "reasonable statutory interpretation" under *Chevron* step two "must account for both the specific context in which language is used and the broader context of the statute as a whole" (internal quotation marks, ellipses, and citation omitted)); *see also Pub. Citizen v. Barshefsky*, 939 F. Supp. 31, 36 (D.D.C. 1996) (despite finding ambiguity, "declin[ing] to defer to the USTR's interpretation of" Trade Act of 1974 as "inconsistent with the purpose" of statute, and instead "conclud[ing] that the USTR's" action "violates the Trade Act" under *Chevron* step two).

Here, no deference to the Government is appropriate. USTR failed to develop or explain its expansive interpretation of its own authority during notice-and-comment rulemaking, and "the law is clear that agencies are not entitled to deference for interpretations offered by their counsel in legal briefs." *Shea v. Clinton*, 850 F. Supp. 2d 153, 161 (D.D.C. 2012); *see, e.g.*, *City of Kansas City, Mo. v. Dep't of Hous. & Urb. Dev.*, 923 F.2d 188, 192 (D.C. Cir. 1991) ("In whatever context we defer to agencies, we do so with the understanding that the object of our deference is the result of agency decisionmaking, and not some *post hoc* rationale developed as part of a litigation strategy."). Beyond that, Congress could not have intended to allow USTR to aggrandize its own Section 307 authority in the manner it did given the "deep 'economic and political significance'" of the issues "central to this statutory scheme." *King v. Burwell*, 576 U.S. 473, 486 (2015) ("[H]ad

Congress wished to assign that question to an agency, it surely would have done so expressly."). In any event, the Government does not even contend that the relevant statutory authority is ambiguous; for all the reasons explained above, it is not.  *Cf.* Mot. 5 n.2 (arguing that "courts need not consult legislative history when a statute's text is unambiguous").  The Court should thus decline the invitation to cede its role in interpreting statutory text to the Executive Branch.[32]

*Second*, Defendants' textual argument conflates and commingles the two distinct and limited modification provisions under subsections 307(a)(1)(B) and (C).  As noted above, those subsections play distinct roles, which is why Congress divided them accordingly:  subsection (B) allows USTR to ratchet up tariffs when the investigated practice has worsened, *i.e.*, when "the burden on United States commerce of the practices that are subject of [the 301] action has increased," while subsection (C) allows USTR to ratchet down the tariffs when the 301 action "is no longer appropriate."   19 U.S.C. § 2417(a)(1)(B), (C).   So, contrary to the Government's repeated assertion (and consistent with Plaintiffs' plain-text reading), the statutory scheme does permit USTR to ratchet up tariffs—but only when USTR makes a proper finding under section 307(a)(1)(B) that the burden from the investigated practices themselves has worsened.  Under the Government's view, by contrast, the only limit on USTR's tariff-boosting authority is its own imagination.

---

[32] That is especially true in light of recent statements from Supreme Court justices casting doubt on the underpinnings of the *Chevron* doctrine.  *See Pereira v. Sessions,* 138 S. Ct. 2105, 2121 (2018) (Kennedy, J., concurring) ("It seems necessary and appropriate to reconsider, in an appropriate case, the premises that underlie *Chevron* and how courts have implemented that decision."); *see also Gutierrez–Brizuela v. Lynch*, 834 F.3d 1142, 1149 (10th Cir. 2016) (Gorsuch, J., concurring) ("[T]he fact is *Chevron* *** permit[s] executive bureaucracies to swallow huge amounts of core judicial and legislative power and concentrate federal power in a way that seems more than a little difficult to square with the Constitution of the framers' design. Maybe the time has come to face the behemoth.").  Plaintiffs reserve the right to challenge the continuing vitality of *Chevron* as invoked here should this Court conclude that Defendants prevail based on such deference.

The Government never grapples with the implications of its statutory reading. Defendants do not (and cannot) deny that, if subsection 307(a)(1)(C) also allows increases in tariff actions, USTR would *always* rely on subsection (C)—which imposes no fact-finding requirements—for modifying any Section 301(b) action. Nor can they deny that, unlike other Trade Act provisions that permit "retaliation" only in defined circumstances, *e.g.*, 19 U.S.C. § 2416(b)(2)(B), Section 307 conspicuously lacks any "retaliation" provision—let alone the open-ended one the Government claims. And Defendants cannot deny that their reading would trample the carefully calibrated limitations on Executive Branch action embedded throughout the statute, including mandatory investigation requirements (*id.* § 2412), mandatory consultation requirements (*id.* § 2413), mandatory factual findings (*id.* § 2414), and even the twelve-month deadline for choosing "appropriate" action (*id.* § 2414(a)(2)(B)). If the Government is correct, once USTR takes "initial" action under Section 301, USTR is forever empowered to take *any* subsequent trade action against that country, for any reason, and without any limitation or meaningful judicial review.

*Third*, the Government relies heavily on a single snippet of legislative history to bolster its atextual reading. But as the Government admits (in a footnote), the history it relies on concerns an unenacted (and vetoed)[33] bill. *See* Mot. 3 n.1. The Government implies (misleadingly) that the bill was subsequently enacted only with modifications "that are not at issue in the Section 301 cases." *Id.* But as the Government later admits (in a different footnote), its legislative history quotations discuss language that differs materially from the enacted text—*i.e.*, the scope of USTR's authority after it deems an action "not effective." *See id.* at 28 n.5 (acknowledging that

---

[33] Trade and International Economic Policy Reform Act of 1987—Veto Message from the President of the United States, 134 Cong. Rec. H3531 (daily ed. May 24, 1998) (statement of President Ronald Reagan), https://www.senate.gov/legislative/vetoes/messages/ReaganR/HR3-Hdoc-100-200.pdf.

original "not effective" language from House bill was excised in conference process); *see also id.*

at 37 n.7.  A comparison of the two versions makes that clear:

| Unenacted House Bill (H.R. 3) | Enacted Version (19 U.S.C. § 2417) |
| --- | --- |
| (a) IN GENERAL.—The Trade Representative may modify or terminate an action taken by him under section 301 if—<br><br>(1) the Contracting Parties to the GATT have determined, or a panel of experts has reported to the Contracting Parties, that—<br><br>(A) the action violates, or is inconsistent with, the international obligations of the United States, or<br><br>(B) the foreign act, policy, or practice to which the action responds—<br><br>(i) is not a violation of a trade agreement, or<br><br>(ii) is not inconsistent with the provisions of, or otherwise does not otherwise deny, nullify, or impair benefits to the United States under, any trade agreement; or<br><br>(2) the Trade Representative determines that—<br><br>(A) the foreign act, policy, or practice has been eliminated or is being phased out in a manner satisfactory to him, or<br><br>(B) the action is not effective or its continuation is not in the national economic interest. | (a) IN GENERAL<br><br>(1)The Trade Representative may modify or terminate any action, subject to the specific direction, if any, of the President with respect to such action, that is being taken under section 2411 of this title if—<br><br>(A) any of the conditions described in section 2411(a)(2) of this title exist,<br><br>(B) the burden or restriction on United States commerce of the denial rights, or of the acts, policies, and practices, that are the subject of such action has increased or decreased, or<br><br>(C) such action is being taken under section 2411(b) of this title and is no longer appropriate. |

Contrary to the Government's argument, the enacted language is not "materially similar" to the language described in the cited legislative history.  *Id.* at 3 n.1.  The unenacted bill permits USTR to "modify or terminate an action" under circumstances not present in the enacted bill, such

as when USTR's remedial action is found to be "inconsistent with[] the international obligations of the United States," or when it "is not effective or its continuation is not in the national economic interest."  H.R. 3, 100th Cong. (1988).  By contrast, the enacted language (as described above) permits modification in three different circumstances:  one for terminating or reducing mandatory actions (19 U.S.C. § 2417(a)(1)(A)), one for terminating or reducing discretionary actions (*id.* § 2417(a)(1)(C)), and a third for increasing or decreasing action where the burden of the investigated practices themselves has increased or decreased (*id.* § 2417(a)(1)(B)).  That is a "material" change in both language and function.

Regardless, both parties agree that no resort to legislative history is necessary (or even appropriate).  *See* Mot. 5 n.2 (arguing that "courts need not consult legislative history when a statute's text is unambiguous").  This Court should decline the Government's invitation to "replace the actual text with speculation as to Congress' intent."  *Hamer v. Neighborhood Hous. Servs. of Chi.*, 138 S. Ct. 13, 20 (2017) (internal quotation marks and citations omitted); *see Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1631 (2018) ("[L]egislative history is not the law.").  That rule has special force where, as here, the Government's proffered speculation regards language Congress *specifically declined* to enact.  *See Dai Glob. v. Admin. of the U.S. Agency for Int'l Dev.*, 945 F.3d 1196, 1199 (Fed. Cir. 2019) ("It is axiomatic that a statute should not be read to implicitly include language specifically rejected by Congress.").  Because "[t]he authoritative statement is the statutory text, not the legislative history or any other extrinsic material," *Gilead Scis., Inc. v. Lee*, 778 F.3d 1341, 1348 (Fed. Cir. 2015), the Court should interpret the words Congress actually chose, *see id.* (rejecting reliance on "two House committee reports for bills that were not enacted").

*Fourth*, the Government makes a naked policy appeal, asking the Court:  "What kind of negotiator would the President (or the USTR) be if he could only 'delay, taper, or terminate' the

initial section 301 action if he subsequently concluded the initial action was ineffective?"  Mot. 36-37.  That argument relies on a false premise:  As explained above, USTR *can* increase the action under subsection (B), so long as USTR (unlike here) complies with the Act's limitations.  If the circumstances do not exist to permit reliance on subsection (B), then USTR can commence a new Section 301 investigation to address the new unfair trade practices.  In all events, the Government's protest that Plaintiffs' reading would "deny the President and the USTR the flexibility to respond to a trading partner's refusal to eliminate its unfair trade practices" rings hollow:  the Government has never (until now) exercised the boundless authority it now claims was "abundantly clear" all along.  *Id.* at 33, 35.

*Finally*, the Government relies on the absurdity canon, under which the "literal reading" of a statute is avoided if it "would lead to absurd results."  *Haggar Co. v. Helvering*, 308 U.S. 389, 394 (1940).  Although Plaintiffs certainly agree that their construction of the statute is the "literal" one, there is nothing "absurd" about requiring the President to obey the terms Congress imposed.  Congress delegated to the Executive Branch ample negotiating leverage and discretion regarding foreign trade, but simultaneously imposed certain guardrails—including a one-year time limit in determining an "appropriate" action, the ability to modify that action outside the one-year period only if specific factual prerequisites are met, and the ability to initiate a new Section 301 investigation in response to tit-for-tat retaliatory action when such action was not previously investigated.  Unlike Defendants' audacious claim of unlimited Executive Branch discretion, Plaintiffs' statutory reading takes account of the meaningful limitations in the enacted text.

## II.   PLAINTIFFS' CLAIMS ARE REVIEWABLE

Defendants argue (Mot. 21-30) that the actions complained of are not reviewable by this Court for two reasons:  (i) Plaintiffs challenge Presidential action, rather than agency action; and (ii) this case presents a non-justiciable political question.  This Court preliminarily determined that

neither defense "is so clear cut as to defeat the fair chance that Plaintiffs may prevail." *Section 301 Cases*, 2021 WL 2799979, at 24 n.15.  Both arguments lack merit.

### A.   Plaintiffs' Claims Are Reviewable Under Section 1581(i)

Defendants argue that the Court lacks jurisdiction over Plaintiffs' claims because jurisdiction under 28 U.S.C. § 1581(i) is limited to challenges to agency action, yet Plaintiffs are supposedly challenging Presidential action rather than agency action.  Defendants are wrong.

Plaintiffs plainly challenge final agency actions taken by USTR, an administrative agency subject to judicial review under APA standards.  *See* 5 U.S.C. § 704 ("final agency action" subject to judicial review); 28 U.S.C. § 2640(e) ("In any civil action not [otherwise] specified *** , the Court of International Trade shall review the matter as provided in" the APA.).  USTR is the agency authorized to take action under the statute.  19 U.S.C. §§ 2411(b) ("If the Trade Representative determines" that action is unreasonable or discriminatory and "action by the United States is appropriate, the Trade Representative shall take all appropriate and feasible action[.]"), 2417 ("The Trade Representative may modify or terminate any action[.]").  In fact, the 1988 amendments to the statute specifically transferred authority under the Section 301 statute from the President to USTR.  H. R. Rep. No. 100-576 at 551 (1988).  And there is no dispute that USTR actually took the final agency actions promulgating List 3 and List 4.  *List 3 Final Rule*, 83 Fed. Reg. at 47,974 (the "*Trade Representative*[] has determined to modify the prior action in this investigation by imposing additional duties on products of China") (emphasis added); *List 4A Final Rule*, 84 Fed. Reg. at 43,304 (similar).

On multiple occasions, the Federal Circuit has reviewed final actions taken by USTR under the same Trade Act authority, including specifically whether USTR complied with explicit and enforceable statutory limits in modifying an action under Section 307.  *See, e.g.*, *Gilda II*, 622 F.3d at 1363 (affirming grant of summary judgment under APA to plaintiff regarding § 1581(i)

challenge to USTR action under Section 307); *Almond Bros. Lumber Co. v. United States*, 721 F.3d 1320, 1326 (Fed. Cir. 2013) (reviewing challenge to USTR action under Section 301).

Defendants nevertheless argue that, because Sections 301 and 307 authorize USTR to act "subject to the specific direction, if any, of the President with respect to such action," 19 U.S.C. §§ 2411(a)(1), (b)(2) & 2417(a)(1), those agency actions are transformed into Presidential actions—and thus permanently insulated from judicial review. Defendants fail to cite a single case adopting their sweeping theory. Although the statute gives the President a role, it still authorizes only *USTR* officially to take, modify, or terminate the action. The fact that the President plays a statutory role "hardly seems to insulate [agency actions] from judicial review under the APA, even if the validity of the [President's directives] were thereby drawn into question." *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1326-27 (D.C. Cir. 1996).[34]

This Court recently held that USTR's "final agency action" remains reviewable under the APA, regardless whether USTR was acting at Presidential direction. *See Invenergy Renewables LLC v. United States*, 422 F. Supp. 3d 1255, 1282-83, 1294 (Ct. Int'l Trade 2019) ("*Invenergy I*") (finding USTR's actions relating to exclusions reviewable even though they were taken after "[t]he President directed USTR to adopt [the] exclusion process" via proclamation); *see also O.A. v. Trump*, 404 F. Supp. 3d 109, 147 (D.D.C. 2019) ("The Court, moreover, need not pause over the fact that presidential actions are not themselves subject to APA review because it is the [agency's] Rule, and not the Proclamation, that has operative effect[.]") (internal citation omitted). And as

---

[34] Defendants mistakenly rely on *Norsk Hydro Canada, Inc. v. United States*, 472 F.3d 1347 (Fed. Cir. 2006), which did not involve Section 301 or 307, let alone the question of whether the "true nature" of the action was a challenge to an agency or Presidential action. Instead, it was an "artful pleading" case in which the plaintiff tried to "substitute one specific grant of jurisdiction, namely § 1581(c), for another specific jurisdictional grant no longer available, namely § 1581(a)." *Id.* at 1355-56.

noted, the Federal Circuit in *Gilda II* reviewed actions taken by USTR under the same statutory provisions at issue in this case.  *See Gilda II*, 622 F.3d at 1363.[35]

Defendants likewise cite no authority for the incorrect proposition that suits implicating Presidential decision-making fall outside Section 1581(i).  That interpretation would run counter to the numerous cases before the Federal Circuit and this Court that have reviewed under section 1581(i) more direct Presidential action than at issue in this case.  For example, in *Corus Group PLC v. International Trade Commissionn*, the Federal Circuit explicitly held that the President himself could not be named as a defendant, but unanimously concluded that the court still had jurisdiction to review the legality of the President's safeguard proclamation regarding steel.  352 F.3d 1351, 1359-60 (Fed. Cir. 2003); *see also Pub. Citizen v. U.S. Trade Representative*, 5 F.3d 549, 552 (D.C. Cir. 1993) (limitation on judicial review of Presidential action under the APA "is limited to those cases in which the President has final constitutional or statutory responsibility for the final step necessary for the agency action directly to affect the parties").  More recently, the Federal Circuit held that "[t]he CIT had jurisdiction pursuant to 28 U.S.C. § 1581(i)" in a case challenging the President's safeguard proclamation regarding solar products.  *Silfab Solar, Inc. v. United States*, 892 F.3d 1340, 1345 (Fed. Cir. 2018); *see also, e.g.*, *PrimeSource Bldg. Prods., Inc. v. United States*, 505 F. Supp. 3d 1352 (Ct. Int'l Trade 2021) (reviewing presidential action under § 1581(i)).  And this Court has stated that the reference to "agency action" in the standing requirements set forth in 28 U.S.C. § 2631(i) does not bar parties from challenging Presidential action in this Court under 28 U.S.C. § 1581(i).  *Severstal Exp. GMBH v. United States*, No. 18-

---

[35] Although Defendants attempt to distinguish *Gilda II* on the ground that it supposedly did not "involve[] the USTR making a determination that was committed to the discretion of the President when the President chooses to exercise that authority," Mot. 24, that argument conflicts with the Federal Circuit's description of that case as involving a "decision[] of the Trade Representative implicating the discretionary authority of the President," *Gilda II*, 622 F.3d at 1363.

00057, 2018 WL 1705298, at *3 & n.3 (Ct. Int'l Trade Apr. 5, 2018).  Defendants' argument regarding the scope of this Court's jurisdiction is thus contrary to well-established jurisprudence entertaining challenges under section 1581(i) that implicate Presidential action far more directly than the challenge to USTR's action in this case.

Defendants also assert (Mot. 23) that review of the substance of the President's discretionary decision is inappropriate.  As explained, Plaintiffs do not challenge any exercise of Presidential discretion but rather action taken by USTR in excess of its statutory authority.  Such actions have long been permissible in this Court and the Federal Circuit.  *See, e.g., Maple Leaf Fish Co. v. United States*, 762 F.2d 86, 89 (Fed. Cir. 1985).

In short, the involvement of the President at some point in the decisional process prior to final implementation by the agency does not somehow transmogrify agency action into (unreviewable) Presidential action, or strip this Court of jurisdiction.  If Defendants' broad argument were correct, it would cast doubt on the APA itself, given that *all* Executive Branch agencies act at Presidential "direction" (whether explicitly or implicitly).  If such direction somehow insulated the agency from judicial review, the APA would be largely a dead letter.  As Defendants' lack of authority shows, that is not the law.

### B.     Plaintiffs' Claims Are Otherwise Justiciable

Defendants alternatively argue (Mot. 25-30) that review is unavailable because Plaintiffs' claims present a non-justiciable political question.  But the "decision that a question is nonjusticiable is not one courts should make lightly."  *El-Shifa Pharm. Indus. Co. v. United States*, 378 F.3d 1346, 1362 (Fed. Cir. 2004).  The question presented by this case is whether USTR complied with Section 307's terms and limits.  As indicated by the Federal Circuit's resolution of similar questions in the past, *see, e.g., Gilda II* and *Almond Bros.*, *supra*, the Trade Act's statutory

scheme plainly presents a "judicially discoverable and manageable standard" for resolving Plaintiffs' claims challenging USTR's compliance with that scheme.  Mot. 25.

As detailed above, Plaintiffs' arguments with respect to both Section 307(a)(1)(B) and (C) present a question of statutory interpretation.  "[I]t goes without saying that interpreting congressional legislation is a recurring and accepted task for the federal courts."  *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986).  Plaintiffs' claims merely seek application of "the traditional rules of statutory construction" and raise no political question.  *Id.*; *see Aviation & Gen. Ins. Co. v. United States*, 882 F.3d 1088, 1095 (Fed. Cir. 2018) (no political question when arguments present "legal question for which [court had] judicially discoverable and manageable standards for resolution").

Review of whether USTR complied with the APA and related procedural requirements (discussed below) likewise presents judicially manageable standards—*i.e.*, the application of long-established principles of administrative law to the facts of this case, which is something that courts do routinely.  Indeed, Defendants do not even reference these separate claims in their argument that the case lacks judicially manageable standards.  *See* Mot. 26-28.

The Government's attempt to analogize this case to *Gilda Industries, Inc. v. United States*, 446 F.3d 1271 (Fed. Cir. 2006) ("*Gilda I*") and *Almond Bros.* is unavailing.  *See* Mot. 26, 28. Unlike in those cases, Plaintiffs do not challenge discretionary determinations committed to the Executive Branch, such as "whether the USTR should have removed toasted breads from a list of products subject to higher retaliatory tariffs," *id.* at 26, or what constitutes a "'satisfactory' resolution" of a trade dispute, *id.* at 28.  Plaintiffs' arguments do not turn on any subjective determination of what is "appropriate" (or any other discretionary determination), but rather the Government's compliance with the statute, *e.g.*, whether Section 307's "no longer appropriate"

provision confers on USTR limitless statutory authority to expand a prior tariff action.  Indeed, that is precisely the distinction drawn in *Almond Bros.*, which declined to second-guess USTR's determination of what it considered "satisfactory," but still considered the plaintiff's arguments as to the proper statutory construction of that provision.  721 F.3d at 1326-27.

Defendants also argue that prudential considerations weigh in favor of permanently insulating the agency's actions from judicial review.  In particular, they allege that "plaintiffs invite competing policies and statements regarding United States trade policy from the Judicial Branch," and that "Courts are ill-equipped to review complex and on-going negotiations regarding trade agreements."  Mot. 29-30.  That misunderstands Plaintiffs' claims.  Plaintiffs are not asking the Court to create trade policy or to "review complex and on-going negotiations regarding trade agreements," *id.* at 30; rather, Plaintiffs ask the Court to ensure that USTR abides by the statutory limits that Congress placed on the Executive Branch.

Multiple decisions of this Court, moreover, foreclose Defendants' argument.  This Court has regularly reviewed the merits of claims within the specific context of Section 301 regardless of the potential collateral impact on the United States' ability to resolve trade disputes.   In particular, both *Gilda* cases involved USTR's maintenance of a retaliation list, which were designed to pressure U.S. trading partners into complying with their WTO obligations following a successful dispute settlement challenge of a foreign measure at the WTO.   *See Gilda II*, 622 F.3d at 1360-62 (describing factual background for both *Gilda I* and *Gilda II*).  Despite the potential leverage of the retaliation list for purposes of resolving trade disputes with other WTO members, this Court and the Federal Circuit entertained the plaintiffs' claims, and they ultimately held that the retaliation list at issue had terminated under the law.  *Id.* at 1360.  A potential for the Court's decision to have some sort of impact on U.S. trading relations did not render the claims non-

justiciable.  *Id.*; *see, e.g.*, *Japan Whaling Ass'n,* 478 U.S. at 230 (explaining that, "under the Constitution, one of the Judiciary's characteristic roles is to interpret statutes, and we cannot shirk this responsibility merely because our decision may have significant political overtones"); *Totes-Isotoner Corp. v. United States*, 594 F.3d 1346, 1352-53 (Fed. Cir. 2010) (rejecting an argument by the Government that "[t]he changes in the tariff rates that Totes requests the courts to impose would intrude upon the foreign affairs powers of the political branches by undermining both the specific bargain the President struck and the grounds upon which Congress approved the overall [trade] agreement"); *Aviation & Gen. Ins.*, 882 F.3d at 1095-96 (distinguishing between a challenge to the President's decision to exclude plaintiffs from settlement proceeds under the Libya Claims Settlement Agreement, which presented a political question, and the question of whether the termination of their lawsuits by the reinstatement of Libya's sovereign immunity pursuant to the Agreement constituted a taking under the Fifth Amendment, which was a legal claim).

Indeed, every Section 301 action, by definition, relates to a trade dispute with another country, and the point of the action is to enforce U.S. rights or eliminate the offending foreign act, policy, or practice.  *See* 19 U.S.C. § 2411.  If accepted, Defendants' sweeping argument that judicial review would interfere with the Executive's ability to resolve trade disputes could be used to prevent judicial review of practically any action taken with respect to Section 301.

## III.   USTR VIOLATED THE APA AND RELATED PROCEDURAL REQUIREMENTS

### A.   USTR Acted Contrary To Law And In Excess Of Its Authority

For the reasons explained above, USTR exceeded its authority, and acted contrary to law, when it promulgated List 3 and List 4A duties.  *See supra* Section I.  In issuing List 3 and List 4A pursuant to Section 307(a)(1), USTR also arbitrarily and capriciously failed to offer *any* evidence regarding the asserted "increased burden" from China's intellectual property policies and practices that were the subject of USTR's investigation.  *See id.*  These failures provide a sufficient basis for

the Court to conclude that USTR not only violated the Trade Act, *see id.*, but the APA as well.  *See* 5 U.S.C. § 706(2)(A), (C) (authorizing the Court to hold unlawful and set aside agency action that is "arbitrary, capricious," "not in accordance with law," and "in excess of statutory *** authority").

### B.    USTR Violated The Procedural Requirements Of The APA

Apart from those substantive errors, USTR acted arbitrarily and capriciously in violating various procedural requirements under the APA and Section 307 itself:  it failed to provide sufficient notice or opportunity for comment, failed to respond to comments, and failed to consider relevant factors when making its decisions.  These procedural failures provide an independent basis for the Court to conclude that USTR violated the APA in promulgating List 3 and 4A duties.

#### 1.    USTR Was Required To Follow Notice-And-Comment Procedures When Promulgating Lists 3 and 4A Tariffs

Under the APA, USTR was required to follow various procedural requirements in promulgating List 3 and List 4A, including the requirement to provide notice of its action as well as to allow the public a meaningful opportunity to comment.  5 U.S.C. § 553(b)-(c); *see id.* § 551(4) (defining "rule"), (5) (defining "rulemaking"); *see also* Mot. 39 (conceding that "if the Court concludes that the promulgation of List 3 and List 4 pursuant to section 307(a)(1) involves agency action, it constitutes informal rulemaking, or 'notice and comment' rulemaking, subject to the requirements of 5 U.S.C. § 553(b)-(c)").

Beyond the APA's default requirements, Section 307 independently requires USTR to provide notice and comment.  5 U.S.C. § 559 (stating that the APA "do[es] not limit or repeal additional requirements imposed by statute or otherwise recognized by law").  Specifically, Section 307(a)(2) requires that, before USTR may modify an initial action taken under Section 301, USTR must

> consult with *** representatives of the domestic industry concerned[] and shall
> provide opportunity for the presentation of views by other interested persons

affected by the proposed modification *** concerning the effects of the modification *** and whether any modification  *** of the action is appropriate.

19 U.S.C. § 2417(a)(2).

Defendants spill much ink arguing that, as a formal matter, they were not required to provide notice of an opportunity to comment under the APA because the agency's action falls under the "foreign affairs exception."  They are wrong about that.  *See* Section III.C, *infra*.  But either way, USTR was required to provide meaningful notice-and-comment procedures.  As explained below, it failed to do that regardless of the source of the obligation.

### 2.   *USTR Failed to Provide Notice Regarding the Legal Basis of List 3*

As an initial matter, USTR failed to provide adequate notice of the legal basis for its action that later resulted in List 3 tariffs.  When USTR initially proposed List 3, it relied exclusively on Section 307(a)(1)(C), which authorizes USTR to modify a Section 301(b) action that "is no longer appropriate."  19 U.S.C. § 2417(a)(1)(C); *see List 3 NPRM*, 83 Fed. Reg. at 33,609 (invoking only Section 307(a)(1)(C) as the basis for the proposed action).  When USTR issued List 3, the public thus could not have anticipated that USTR would rely on a different basis—that "the burden or restriction on United States commerce of the denial rights, or of the acts, policies, and practices, that are the subject of [the Section 301 investigation] ha[d] increased or decreased."  19 U.S.C. § 2417(a)(1)(B); *see also List 3 Final Rule*, 83 Fed. Reg. at 47,974.  Consequently, "interested parties would have had to 'divine [USTR's] unspoken thoughts'" to know to submit comments on this critical, fact-dependent issue.  *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin*., 407 F.3d 1250, 1259–60 (D.C. Cir. 2005) (citation omitted).

Defendants' only response is that USTR published a notice of proposed List 3 in the *Federal Register*.  Mot. 51.  But the mere publication of a notice does not, by itself, "fairly apprise interested parties of the issues involved."  *Mid Continent Nail Corp. v. United States*, 846 F.3d

1364, 1373 (Fed. Cir. 2017).  Instead, adequate notice means that interested parties "should have anticipated that [a specific] change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period." *Id*. (citation omitted).  By citing only Section 307(a)(1)(C) in its proposed notice, USTR failed to provide an opportunity to comment on the legal and factual predicate underlying its reliance on Section 307(a)(1)(B) in the final notice.  USTR's defective notice thus left a record vacuum as to whether the burden from the underlying acts, policies, and practices had increased or decreased.  That critical omission violated the notice requirements of both the APA and Section 307.

> ### 3.   *USTR Failed to Provide a Meaningful Opportunity to Comment on List 3 and List 4A*

When an agency provides an opportunity to comment, that opportunity must be "meaningful."  *Asiana Airlines v. FAA*, 134 F.3d 393, 396 (D.C. Cir. 1998) (citation omitted). USTR flunked that obligation for both List 3 and List 4A.

Combined with the initial $50 billion tariff action imposed through Lists 1 and 2, USTR's List 3 and List 4 rulemakings cover virtually all imports from China.  Despite the unprecedented scope of USTR's action, USTR gave the public a month to submit both initial and rebuttal comments on List 3 and limited testimony at the public hearing to five minutes per participant. *See Supplemental List 3 NPRM*, 83 Fed. Reg. at 38,761 (setting deadline of September 6, 2019 for "written comments" and "post-hearing rebuttal comments" after announcing it would consider imposing a 25% tariff on goods covered by proposed List 3).  USTR provided little more time than that for comments on proposed List 4 and the same five minutes for witnesses appearing at the public hearing.  *See List 4 NPRM*, 84 Fed. Reg. at 22,564-65 (setting deadline of June 17, 2019 for "written comments" and seven days after the last hearing day for "post-hearing" rebuttal comments).  Even worse, USTR imposed (nonsensically) the same deadline for initial *and* rebuttal

comments on List 3, while List 4 rebuttal comments were due just days after the hearing (with over 300 witnesses) concluded. *Supplemental List 3 NPRM*, 83 Fed. Reg. at 38,761; *List 4 NPRM*, 84 Fed. Reg. at 22,564. Interested parties thus had little or no time to review the thousands of written comments filed by other parties before developing and submitting their rebuttal comments. That is no "meaningful" comment opportunity. *See Asiana Airlines*, 134 F.3d at 396.

USTR's half-baked approach to the comment process reveals that its actions were arbitrary and capricious in another way. Thousands of American businesses and trade associations submitted comments and gave testimony describing the wide-ranging detrimental impacts that these additional tariffs would have on global supply chains, U.S. jobs, and U.S. consumer prices. *See supra* pp. 13-14, 20. USTR could not possibly have carefully reviewed the six days of hearing testimony and the over 6,000 comments submitted for List 3 in the eleven days between the submission of final comments and the announcement of List 3.

None of Defendants' hodgepodge of excuses salvages their procedural violations. *First*, Defendants point out that "the Federal Register notices provided due dates for 'written' comments (not 'initial' comments) and 'post-hearing rebuttal comments.'" Mot. 52. Defendants offer a distinction without a difference. "Rebuttal comments," by definition, must address comments that came before them. By making both "written" and "post-hearing rebuttal comments" on proposed List 3 due on the same date, USTR rendered hollow a critical component of the comment process.

*Second*, Defendants argue that USTR properly limited rebuttal comments for List 4 to "rebutting or supplementing testimony at the hearing." *Id.* at 53 (quoting *List 4 NPRM*, 84 Fed. Reg. at 22,565). But Defendants did not limit rebuttal comments in this way when promulgating List 1, List 2, or List 3. *See List 1 NPRM*, 83 Fed. Reg. at 14,906-09; *List 2 NPRM*, 83 Fed. Reg. at 28,710-12; *Supplemental List 3 NPRM*, 83 Fed. Reg. at 38,761. Its decision to do so in the List

4 comment process resulted in an arbitrary and capricious departure from its practice.  *See Canadian Solar, Inc. v. United States*, 918 F.3d 909, 917 (Fed. Cir. 2019) (explaining that an agency must provide a "reasoned explanation" when it "deviates from a previous policy or practice" (citations omitted)).  Defendants offer no reason for its disparate approach.  *See* Mot. 53.

 *Third*, Defendants contend that USTR properly shortchanged the opportunity to comment because of the "urgent need for action with regard to the [S]ection 301 investigation and related trade actions."  *Id.* at 55.  Defendants, however, cite no legal authority for the proposition that USTR can belatedly excuse itself from procedural requirements based on a *post hoc* "exigency" rationale.  Besides, USTR's decision to promulgate List 4A two years after the underlying Section 301 investigation belie Defendants' claims of urgency.

 *Fourth*, Defendants argue that Plaintiffs "fail[] to mention that[,] with respect to List 3[,] the simultaneous submission deadline resulted" from USTR providing interested parties additional time to file comments.  *Id.* at 52.  But USTR was forced to provide extra time only because its initial notice regarding List 3 failed to propose the higher 25% tariff rate contained in USTR's subsequent notice.  *See Supplemental List 3 NPRM*, 83 Fed. Reg. at 38,760; *see also Mid Continent Nail*, 846 F.3d at 1373 (requiring a notice to "fairly apprise" the public of its scope and impact).  Regardless, no additional amount of time could overcome the arbitrary and capricious decision by USTR to require the submission of written and rebuttal comments on the same day.

 *Finally*, Defendants contend that the APA "does not require rebuttal or reply comments," Mot. 53, and contains no "requirement for a public hearing," *id.* at 52.  But USTR elected to hold a hearing, and USTR elected to provide an opportunity for rebuttal comments.  Having done so, it was not free to short-circuit that process.  Providing each witness a mere five minutes to present, and mandating rebuttal and initial comments on the same day, strongly implies that the outcome

of the process was preordained—hardly a "meaningful" comment opportunity. *Asiana Airlines*, 134 F.3d at 396.

### 4. USTR Failed to Respond to Comments in a Reasoned Manner

"[I]nextricably intertwined with" the requirement of a meaningful opportunity to comment "is [USTR's] need to respond, in a reasoned manner, to any comments" it receives "that raise significant issues with respect to a proposed rule." *Mid Continent Nail*, 846 F.3d at 1379 n.11 (internal quotation marks, ellipses, and citation omitted). To provide the requisite "adequate and reasoned explanations for its decisions," *Invenergy Renewables LLC v. United States*, 476 F. Supp. 3d 1323, 1344 (Ct. Int'l Trade 2020), USTR "must offer a rational connection between the facts found and the choice made," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983) (internal quotation marks and citation omitted).

Given the rushed process and procedural errors above, it is hardly surprising that USTR in its final notices addressed exactly none of the over 6,000 List 3 comments or the nearly 3,000 List 4 comments it received. Yet USTR was obligated to "respond sufficiently" to public comments "to enable [the Court] to see what major issues of policy were ventilated and why the agency reacted to them as it did." *Del. Dep't of Natural Res. & Envtl. Control v. EPA*, 785 F.3d 1, 15 (D.C. Cir. 2015) (internal quotation marks, ellipses, and citation omitted).

Far from meeting that standard, USTR merely mentioned the number of comments it had received and stated that, based on its "careful[] review[,] *** the Trade Representative, at the direction of the President, has determined not to include certain tariff subheadings" in List 3. *List 3 Final Rule*, 83 Fed. Reg. at 47,974; *see List 4A Final Rule*, 84 Fed. Reg. at 43,305 (stating, in single conclusory sentence, that List 4A and 4B "takes account of the public comments and the testimony"). Defendants correctly observe that USTR determined not to include certain tariff subheadings in List 3 and List 4A, Mot. 58-59, but ignore that USTR offered no explanation of

which comments, and what concerns raised in those comments, caused it to withdraw certain tariff headings and products but not others.

Although an agency "need not address every comment, *** it must respond in a reasoned manner to those that raise significant problems." *City of Waukesha v. EPA*, 320 F.3d 228, 257 (D.C. Cir. 2003) (citation omitted); *see, e.g., City of Portland v. EPA*, 507 F.3d 706, 715 (D.C. Cir. 2007) ("Significant comments are those which, if true, raise points relevant to the agency's decision and which, if adopted, would require a change in an agency's proposed rule." (citation and internal quotation marks omitted)).  USTR did not come close to fulfilling that obligation here.

### 5. *USTR Failed to Rely on the Relevant Factors in its Notice-and-Comment Process*

USTR's cavalier approach to the comment process—including imposing new truncated procedures and finalizing List 3 duties mere days after the comments period ended—underscores the fact that USTR never intended to consider the legally relevant factors before launching a trade war with China.  As discussed above (pp. 10-12, 16-22, *supra*), USTR based its List 3 and List 4A actions on a wide variety of impermissible considerations, including China's "defensive actions," trade imbalances, currency manipulation and monetary policy, as well as China's failure to follow through on agricultural purchases and to reduce exports of fentanyl.  Because Defendants acknowledge (or do not dispute) that USTR based its decisions at least in part on these factors, List 3 and List 4A "cannot stand." *Mueller Comercial de Mexico, S. de R.L. de C.V. v. United States*, 753 F.3d 1227, 1232 (Fed. Cir. 2014) (holding that when an agency "relied on [] two rationales in combination, not on either one as an independent ground," the agency's ruling "cannot stand" if "one [rationale] fails") (citing *Chenery*, 332 U.S. at 196-97).

Defendants also argue that "USTR was not required to find any increased burden on U.S. commerce in order to modify the section 301 action," in part because it "had already determined

that China's unfair trade actions burden U.S. commerce as part of its section 301 investigation." Mot. 57. But Section 307(a)(1)(B) allows USTR to modify an action if the burden on U.S. commerce associated with the acts, policies, and practices that were the subject of the original investigation "has increased" *beyond* what USTR originally found. 19 U.S.C. § 2417(a)(1)(B); *see* Section I.B.1, *supra*. The original "burden" finding obviously cannot support both the original action and its modification. That argument further "demonstrates that the agency's decision was not based on a consideration of the relevant factors," and thus was in violation of the APA. *Lilliputian Sys., Inc. v. Pipeline & Hazardous Materials Safety Admin.*, 741 F.3d 1309, 1312 (D.C. Cir. 2014) (citation and internal quotation marks omitted).

### C.    The Foreign Affairs Exception Does Not Apply

Despite acknowledging that USTR's promulgation of Lists 3 and 4A "constitutes informal rulemaking, or 'notice and comment' rulemaking, subject to the requirements of 5 U.S.C. § 553(b)-(c)," Mot. 39, Defendants argue that the APA's "foreign affairs function" exception excused USTR's compliance with those requirements. *Id.* at 39-44. That argument fails on multiple levels.

For starters, Defendants concede that USTR was required to comply with Section 307(a)(2)—including its requirement that USTR "provide opportunity for the presentation of views by other interested persons affected by the proposed modification"—regardless of whether the foreign affairs exception applies. *See id.* at 44-48. So, exception or not, USTR cannot duck its statutory obligation to conduct meaningful notice-and-comment.

In any event, the exception, which excuses notice-and-comment rulemaking when USTR's action involves a "foreign affairs function of the United States," 5 U.S.C. § 553(a)(1), is inapplicable here. That exception is "narrowly construed and only reluctantly countenanced." *Mid Continent Nail*, 846 F.3d at 1380 (internal quotation marks and citation omitted); *accord Invenergy I*, 422 F. Supp. 3d at 1289 (discussing foreign affairs function exception). The foreign affairs

exception does not apply "merely because [the challenged actions] have impact beyond the borders of the United States." *Mast Indus., Inc. v. Regan*, 596 F. Supp. 1567, 1581 (Ct. Int'l Trade 1984). Nor does it apply in challenges to a "routine change to the tariff rates imposed on imported goods by the United States" or to agency action taken "pursuant to U.S. statutory authority." *Invenergy I*, 422 F. Supp. 3d at 1289-90. And it does not apply to disputes over whether an agency possessed "legal[] authori[ty]" to act. *Austl. Meat & Live-Stock Corp. v. Block*, 590 F. Supp. 1230, 1235 (Ct. Int'l Trade 1984). Instead, "[f]or the exception to apply, the public rulemaking provisions should provoke definitively undesirable international consequences." *Invenergy I*, 422 F. Supp. 3d at 1289 (citation omitted).

Defendants do not contend that public rulemaking over Lists 3 and 4A would "provoke definitively undesirable international consequences." *Id.* Nor could they, considering that Defendants actually provided notice and an opportunity to comment.

Typically, the exception is invoked for agency action implementing international agreements. *See Am. Ass'n of Exps. & Imps. v. United States*, 751 F.2d 1239, 1249 (Fed. Cir. 1985) (quoting H. R. REP. NO. 69-1980 (1946)); *see also, e.g.*, *Invenergy I*, 422 F. Supp. 3d at 1290 (stating that "agency action [taken] pursuant to treaty obligations" would involve the foreign affairs function exception); *Am. Inst. for Imported Steel, Inc. v. United States*, 600 F. Supp. 204, 211 (Ct. Int'l Trade 1984) (invoking foreign affairs function exception because "the action challenged here clearly and directly goes to the purpose of an international agreement" negotiated by the United States and the European Communities). The D.C. Circuit likewise has applied the exception to a dispute over an agency's implementation of an agreement between the United States and Mexico. *See Int'l Bhd. of Teamsters v. Pena*, 17 F.3d 1478, 1481-86 (D.C. Cir. 1994); *see also*

*Capital Area Immigrants' Rights Coal. v. Trump*, 471 F. Supp. 3d 25, 54 (D.D.C. 2020) (discussing same).

By contrast, USTR promulgated Lists 3 and 4A pursuant to a domestic statute (Section 307(a)(1)), not an international treaty that the Government had already negotiated.  Defendants have cited no cases in which a USTR action taken under Section 301 fell within the foreign affairs function.  Indeed, such a conclusion would be hard to square with Section 307(a)(2), which requires USTR to "consult with *** representatives of the domestic industry concerned" and to afford an "opportunity for the presentation of views by other interested persons affected by the proposed modification."  19 U.S.C. § 2417(a)(2).

Neither of Defendants' contrary arguments has merit.  First, Defendants contend that Lists 3 and 4A "were part of the negotiation of an international trade agreement" signed in February 2020 (the so-called Phase One deal).  Mot. 42.  Defendants observe that, "upon issuing List 3, USTR and China engaged in several rounds of trade negotiations" and that USTR and China signed an agreement after List 4A issued.  *Id.*  Defendants also emphasize that the decision to reduce the tariff rate on goods covered by List 4A and to suspend List 4B show that "List 3 and List 4A *** were essential bargaining chips used in the negotiation of an international agreement."  *Id.* at 43. But the *issuance* of Lists 3 and 4A obviously could not have resulted from trade negotiations if (as Defendants acknowledge) negotiations did not commence until *after Lists 3 and 4A issued*.  In any event, "indirect" or "downstream effects" on future "negotiations with other countries," such as those that resulted in the Phase One deal, "do not clear the high bar necessary to dispense with notice-and-comment rulemaking under the foreign affairs function exception."  *Capital Area Immigrants' Rights*, 471 F. Supp. 3d at 55.

Second, Defendants make the sweeping claim that the Court cannot review USTR's actions that "relate to the President's 'overall political agenda concerning relations with another country.'" Mot. 43 (quoting *Am. Ass'n of Exps. & Imps.*, 751 F.2d at 1249).  But Congress did not hinge the application of the foreign affairs function exception on the President's political agenda or on some entanglement with foreign affairs more generally:

> Nowhere does the statutory text suggest that being "linked *** with the [President]'s overall political agenda concerning relations with another country" meets the exception.  And *** Congress could have—but did not—exempt rulemakings that merely affect or implicate foreign affairs.  *** [E]ven the case from which Defendants pluck this language[, *Am. Ass'n of Exps. & Imps.*,] does not hold it out as a test for the exception; it is dicta.  In fact, in that case[,] the Federal Circuit held that the exception applied because notice and comment "would provoke definitely undesirable international consequences," specifically, trade dumping.

*Capital Area Immigrants' Rights*, 471 F. Supp. 3d at 56 n.23 (citation omitted).  The Court should reject Defendants' arguments here for the same reason.

64

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their cross-motion for judgment on the agency record and deny the Government's motion to dismiss.  The Court should order refunds to Plaintiffs for all tariffs unlawfully collected under List 3 and List 4A and permanently enjoin any future collections of such tariffs.

Respectfully submitted,

_____

Matthew R. Nicely
Pratik A. Shah
James E. Tysse
Devin S. Sikes
Daniel M. Witkowski
Sarah B. W. Kirwin

Dated:  August 2, 2021

AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street, NW
Washington, D.C. 20006

*Counsel to Plaintiffs HMTX Industries LLC, Halstead New England Corporation, Metroflor Corporation, and Jasco Products Company LLC*

## **CERTIFICATE OF COMPLIANCE**

Undersigned hereby certifies that the Memorandum in Support of Plaintiffs' Cross-Motion for Judgment on the Agency Record and Response to Defendants' Motion to Dismiss/Motion for Judgment on the Agency Record complies with the 20,000 word-count limitation set forth in the Court's April 13, 2021 Scheduling Order.  The Memorandum contains 19,584 words according to the word-count function of the word-processing software used to prepare the Memorandum.

Dated: August 2, 2021                /s/ Matthew R. Nicely
                                         Matthew R. Nicely
                                         AKIN GUMP STRAUSS HAUER & FELD LLP

# ADDENDUM

# ADDENDUM

# TABLE OF CONTENTS

19 U.S.C. § 2411(a)-(b)......................................................................Add. 1

19 U.S.C. § 2414...............................................................................Add. 4

19 U.S.C. § 2417...............................................................................Add. 8

PR-1 – Excerpts from "Modification of Action in Section 301 Investigation of China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation," Office of the United States Trade Representative (Sept. 17, 2018)[1] .................................................Add. 10

---

[1] This document is included in the Non-Confidential Administrative Record Index filed by Defendants on April 30, 2021.  *See* ECF No. 297 (Apr. 30, 2021).

**United States Code**

**Title 19. Customs Duties**

**Chapter 18.  Trade Act of 1974**

**Subchapter III. Enforcement of United States Rights Under Trade Agreements and Response to Certain Foreign Trade Practices**

**§ 2411.  Actions by United States Trade Representative**

(a) Mandatory action

(1) If the United States Trade Representative determines under section 2414(a)(1) of this title that--

(A) the rights of the United States under any trade agreement are being denied; or

(B) an act, policy, or practice of a foreign country--

(i) violates, or is inconsistent with, the provisions of, or otherwise denies benefits to the United States under, any trade agreement, or

(ii) is unjustifiable and burdens or restricts United States commerce;

the Trade Representative shall take action authorized in subsection (c), subject to the specific direction, if any, of the President regarding any such action, and shall take all other appropriate and feasible action within the power of the President that the President may direct the Trade Representative to take under this subsection, to enforce such rights or to obtain the elimination of such act, policy, or practice. Actions may be taken that are within the power of the President with respect to trade in any goods or services, or with respect to any other area of pertinent relations with the foreign country.

(2) The Trade Representative is not required to take action under paragraph (1) in any case in which--

(A) the Dispute Settlement Body (as defined in section 3531(5) of this title) has adopted a report, or a ruling issued under the formal dispute settlement proceeding provided under any other trade agreement finds, that--

(i) the rights of the United States under a trade agreement are not being denied, or

(ii) the act, policy, or practice--

(I) is not a violation of, or inconsistent with, the rights of the United States, or

(II) does not deny, nullify, or impair benefits to the United States under any trade agreement; or

(B) the Trade Representative finds that--

(i) the foreign country is taking satisfactory measures to grant the rights of the United States under a trade agreement,

(ii) the foreign country has--

(I) agreed to eliminate or phase out the act, policy, or practice, or

(II) agreed to an imminent solution to the burden or restriction on United States commerce that is satisfactory to the Trade Representative,

(iii) it is impossible for the foreign country to achieve the results described in clause (i) or (ii), as appropriate, but the foreign country agrees to provide to the United States compensatory trade benefits that are satisfactory to the Trade Representative,

(iv) in extraordinary cases, where the taking of action under this subsection would have an adverse impact on the United States economy substantially out of proportion to the benefits of such action, taking into account the impact of not taking such action on the credibility of the provisions of this subchapter, or

(v) the taking of action under this subsection would cause serious harm to the national security of the United States.

(3) Any action taken under paragraph (1) to eliminate an act, policy, or practice shall be devised so as to affect goods or services of the foreign country in an amount that is equivalent in value to the burden or restriction being imposed by that country on United States commerce.

Add. 2

(b) Discretionary action

If the Trade Representative determines under section 2414(a)(1) of this title that--

(1) an act, policy, or practice of a foreign country is unreasonable or discriminatory and burdens or restricts United States commerce, and

(2) action by the United States is appropriate, the Trade Representative shall take all appropriate and feasible action authorized under subsection (c), subject to the specific direction, if any, of the President regarding any such action, and all other appropriate and feasible action within the power of the President that the President may direct the Trade Representative to take under this subsection, to obtain the elimination of that act, policy, or practice. Actions may be taken that are within the power of the President with respect to trade in any goods or services, or with respect to any other area of pertinent relations with the foreign country.

\* \* \* \* \*

**United States Code**

**Title 19. Customs Duties**

**Chapter 18.  Trade Act of 1974**

**Subchapter III. Enforcement of United States Rights Under Trade Agreements and Response to Certain Foreign Trade Practices**

**§ 2414. Determinations by Trade Representative**

(a) In general

(1) On the basis of the investigation initiated under section 2412 of this title and the consultations (and the proceedings, if applicable) under section 2413 of this title, the Trade Representative shall--

(A) determine whether--

(i) the rights to which the United States is entitled under any trade agreement are being denied, or

(ii) any act, policy, or practice described in subsection (a)(1)(B) or (b)(1) of section 2411 of this title exists, and

(B) if the determination made under subparagraph (A) is affirmative, determine what action, if any, the Trade Representative should take under subsection (a) or (b) of section 2411 of this title.

(2) The Trade Representative shall make the determinations required under paragraph (1) on or before--

(A) in the case of an investigation involving a trade agreement, except an investigation initiated pursuant to section 2412(b)(2)(A) of this title involving rights under the Agreement on Trade-Related Aspects of Intellectual Property Rights (referred to in section 3511(d)(15) of this title) or the GATT 1994 (as defined in section 3501(1)(B) of this title) relating to products subject to intellectual property protection, the earlier of--

(i) the date that is 30 days after the date on which the dispute settlement procedure is concluded, or

(ii) the date that is 18 months after the date on which the investigation is initiated, or

(B) in all cases not described in subparagraph (A) or paragraph (3), the date that is 12 months after the date on which the investigation is initiated.

(3)(A) If an investigation is initiated under this subchapter by reason of section 2412(b)(2) of this title and--

(i) the Trade Representative considers that rights under the Agreement on Trade-Related Aspects of Intellectual Property Rights or the GATT 1994 relating to products subject to intellectual property protection are involved, the Trade Representative shall make the determination required under paragraph (1) not later than 30 days after the date on which the dispute settlement procedure is concluded; or

(ii) the Trade Representative does not consider that a trade agreement, including the Agreement on Trade-Related Aspects of Intellectual Property Rights, is involved or does not make a determination described in subparagraph (B) with respect to such investigation, the Trade Representative shall make the determinations required under paragraph (1) with respect to such investigation not later than the date that is 6 months after the date on which such investigation is initiated.

(B) If the Trade Representative determines with respect to an investigation initiated by reason of section 2412(b)(2) of this title (other than an investigation involving a trade agreement) that--

(i) complex or complicated issues are involved in the investigation that require additional time,

(ii) the foreign country involved in the investigation is making substantial progress in drafting or implementing legislative or administrative measures that will provide adequate and effective protection of intellectual property rights, or

(iii) such foreign country is undertaking enforcement measures to provide adequate and effective protection of intellectual property rights,

Add. 5

the Trade Representative shall publish in the Federal Register notice of such determination and shall make the determinations required under paragraph (1) with respect to such investigation by no later than the date that is 9 months after the date on which such investigation is initiated.

(4) In any case in which a dispute is not resolved before the close of the minimum dispute settlement period provided for in a trade agreement, the Trade Representative, within 15 days after the close of such dispute settlement period, shall submit a report to Congress setting forth the reasons why the dispute was not resolved within the minimum dispute settlement period, the status of the case at the close of the period, and the prospects for resolution. For purposes of this paragraph, the minimum dispute settlement period provided for under any such trade agreement is the total period of time that results if all stages of the formal dispute settlement procedures are carried out within the time limitations specified in the agreement, but computed without regard to any extension authorized under the agreement at any stage.

(b) Consultation before determinations

(1) Before making the determinations required under subsection (a)(1), the Trade Representative, unless expeditious action is required--

(A) shall provide an opportunity (after giving not less than 30 days notice thereof) for the presentation of views by interested persons, including a public hearing if requested by any interested person,

(B) shall obtain advice from the appropriate committees established pursuant to section 2155 of this title, and

(C) may request the views of the United States International Trade Commission regarding the probable impact on the economy of the United States of the taking of action with respect to any goods or service.

(2) If the Trade Representative does not comply with the requirements of subparagraphs (A) and (B) of paragraph (1) because expeditious action is required, the Trade Representative shall, after making the determinations under subsection (a)(1), comply with such subparagraphs.

(c) Publication

The Trade Representative shall publish in the Federal Register any determination made under subsection (a)(1), together with a description of the facts on which such determination is based.

**United States Code**

**Title 19. Customs Duties**

**Chapter 18.  Trade Act of 1974**

**Subchapter III. Enforcement of United States Rights Under Trade Agreements and Response to Certain Foreign Trade Practices**

**§ 2417.  Modification and termination of actions**

(a) In general

>   (1) The Trade Representative may modify or terminate any action, subject to the specific direction, if any, of the President with respect to such action, that is being taken under section 2411 of this title if--

>>   (A) any of the conditions described in section 2411(a)(2) of this title exist,

>>   (B) the burden or restriction on United States commerce of the denial rights, or of the acts, policies, and practices, that are the subject of such action has increased or decreased, or

>>   (C) such action is being taken under section 2411(b) of this title and is no longer appropriate.

>   (2) Before taking any action under paragraph (1) to modify or terminate any action taken under section 2411 of this title, the Trade Representative shall consult with the petitioner, if any, and with representatives of the domestic industry concerned, and shall provide opportunity for the presentation of views by other interested persons affected by the proposed modification or termination concerning the effects of the modification or termination and whether any modification or termination of the action is appropriate.

(b) Notice; report to Congress

The Trade Representative shall promptly publish in the Federal Register notice of, and report in writing to the Congress with respect to, any modification or termination of any action taken under section 2411 of this title and the reasons therefor.

(c) Review of necessity

>   (1) If--

Add. 8

(A) a particular action has been taken under section 2411 of this title during any 4-year period, and

(B) neither the petitioner nor any representative of the domestic industry which benefits from such action has submitted to the Trade Representative during the last 60 days of such 4-year period a written request for the continuation of such action,

such action shall terminate at the close of such 4-year period.

(2) The Trade Representative shall notify by mail the petitioner and representatives of the domestic industry described in paragraph (1)(B) of any termination of action by reason of paragraph (1) at least 60 days before the date of such termination.

(3) If a request is submitted to the Trade Representative under paragraph (1)(B) to continue taking a particular action under section 2411 of this title, or if a request is submitted to the Trade Representative under section 2416(c)(2) of this title to reinstate action, the Trade Representative shall conduct a review of--

(A) the effectiveness in achieving the objectives of section 2411 of this title of--

(i) such action, and

(ii) other actions that could be taken (including actions against other products or services), and

(B) the effects of such actions on the United States economy, including consumers.

# MODIFICATION OF ACTION IN SECTION 301 INVESTIGATION OF CHINA'S ACTS, POLICIES, AND PRACTICES RELATED TO TECHNOLOGY TRANSFER, INTELLECTUAL PROPERTY, AND INNOVATION

TO:      **USTR ROBERT LIGHTHIZER**
FROM:    **GENERAL COUNSEL STEPHEN VAUGHN**
DATE:     **September 17, 2018**

## ISSUE

On August 18, 2017, you initiated an investigation under Section 301(b) of the Trade Act of 1974, as amended,[1] of China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation.[2]  The statute provides that determinations in the investigation are to be made within one year of initiation.[3]  During the investigation, you determined:  (1) that the acts, policies, and practices of China under investigation are unreasonable or discriminatory and burden or restrict U.S. commerce, and are thus actionable under Section 301(b);[4] and (2) to take the action of imposing an additional 25 percent duty on products of China with an annual trade value of approximately $50 billion.  The additional duties were applied in two tranches:  tranche 1 covered 818 tariff subheadings, with an approximate annual trade value of $34 billion;[5] and tranche 2 covered 279 tariff subheadings, with an approximate annual trade value of $16 billion.[6]

Section 301(b) provides that the "Trade Representative shall take all appropriate and feasible action authorized under subsection (c) [which includes increased tariffs], subject to the specific direction, if any, of the President regarding any such action . . . to obtain the elimination of that act, policy, or practice."  During the closing weeks of the investigation, China's statements and conduct indicated that a trade action at a $50 billion level would not obtain the statutory goal of obtaining the elimination of China's unfair and harmful policies.

To address the possibility that trade action at a $50 billion level would not be sufficient to encourage China to change its policies, you decided to seek public comment on modifying the action taken in the investigation by adopting a supplemental action to impose an additional 10 percent duty on products from China classified in 6,031 tariff lines, with an annual trade value of approximately $200 billion.[7]  In a notice published on August 7, 2018, you announced that you would consider applying an additional duty of 25 percent, and you extended the public comment periods.[8]

---

[1]  Hereinafter referred to as 1974 Trade Act.  The term 'Section 301' is commonly used as shorthand for Sections 301-309 of the 1974 Trade Act, codified at 19 U.S.C. 2411-2419.
[2]  82 FR 40213 (August 24, 2017).
[3]  Section 304(a)(2)(B).
[4]  83 FR 14906 (April 6, 2018).
[5]  83 FR 28710 (June 20, 2018).
[6]  83 FR 40823 (August 16, 2018).
[7]  83 FR 33608 (July 17, 2018).
[8]  83 FR 38760 (August 7, 2018).

1

In response to the notice of additional proposed action, interested persons filed over 6,000 written submissions. USTR and the Section 301 Committee held a 6-day public hearing from August 20–27, 2018, during which time approximately 350 witnesses provided testimony and responded to questions.

## DECISION

Based on the specific direction of the President, and taking into account a review of public comments, public testimony, confidential ITAC advice, and interagency advice, we recommend that you determine to modify the action in the investigation by adopting a supplemental action in the form of an additional duty on products of China classified in the attached list of 5,745 full and partial tariff subheadings, with an annual trade value of approximately $200 billion. The additional duties will be effective September 24, 2018, and initially the additional duty will be 10 percent. Starting January 1, 2019, the rate of additional duty will increase to 25 percent. A formal Determination is attached for your signature.

## DISCUSSION

**Findings on Actionability**

On August 18, 2017, you initiated an investigation into the Government of China's acts, policies, and practices related to technology transfer, intellectual property, and innovation. *See* 82 FR 40213.

The investigation involved a public notice and comment period in which interested persons filed approximately 70 submissions. The Section 301 Committee also convened a public hearing on October 10, 2017 during which witnesses provided testimony and responded to questions. USTR also sought confidential advice from the advisory committees under Section 304(b).

The findings in the investigation are reflected in an extensive 200-page report, which USTR published on its website on March 22, 2018. These findings, along with advice from the Section 301 Committee and advisory committees, supported a determination that China's acts, policies, and practices were actionable under Section 301(b). The investigation covered four categories of acts, policies, and practices: (1) foreign ownership restrictions, such as joint venture requirements and foreign equity limitations, and various administrative review and licensing processes, that require or pressure technology transfer from U.S. companies; (2) China's regime of technology regulations that force U.S. companies seeking to license technologies to Chinese entities to do so on non-market-based terms that favor Chinese recipients; (3) China's direction and unfair facilitation of the systematic investment in and acquisition of U.S. companies and assets by Chinese companies to obtain cutting-edge technologies and intellectual property and to generate the transfer of technology to Chinese companies, and; (4) China's conduct and support

involving unauthorized intrusions into, and theft from, the computer networks of U.S. companies to access their sensitive commercial information and trade secrets.

On April 3, 2018, you determined that China's acts, policies, and practices covered in the Section 301 investigation of China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation are unreasonable or discriminatory and burden or restrict U.S. commerce, and are thus actionable under Section 301(b).[9]

You decided that U.S. concerns with the second category of acts, policies, and practices (involving discriminatory technology regulations) could be appropriately addressed through recourse to WTO dispute settlement.  Accordingly, USTR initiated a WTO dispute by requesting consultations with the Government of China regarding certain specific aspects of China's technology regulations.[10]  We have been working closely with the EU and Japan in an effort to have them join the dispute.  Both the EU and Japan participated in the consultations. Furthermore, on June 1, 2018, the EU filed its own complaint, meaning that the EU is likely to be a full co-complainant throughout the dispute.[11]

Because you have decided to address the technology licensing issues through recourse to WTO dispute settlement, neither the prior actions, nor the supplemental action, relate to (or take into account harm caused by) this category of acts, policies, and practices of China.

**Prior Actions in the Investigation**

In a notice published on April 6, 2018 (83 FR 14906), you invited public comment on a proposed action in the investigation, in the form of an additional 25 percent *ad valorem* duty on products from China classified in a list of 1,333 tariff subheadings, with an annual trade value of approximately $50 billion.

The public comment process included two opportunities for the submission of written comments, and the opportunity to participate in a public hearing.  USTR received thousands of submissions, and held a 3-day public hearing with more than 100 witnesses.

USTR and the interagency Section 301 Committee carefully reviewed the public comments and the testimony from the public hearing.  USTR and the Section 301 Committee also carefully reviewed the extent to which the tariff subheadings in the April 6, 2018 notice included products containing industrially significant technology, including technologies and products related to China's "Made in China 2025" industrial policy program.

Based on this review process, you determined to take the action in the investigation in two tranches.  For the first tranche, you narrowed the proposed list in the April 6 notice to 818 tariff

---

[9] 83 FR 14906 (April 6, 2018)
[10] *China—Certain Measures Concerning the Protection of Intellectual Property Rights* (DS542).
[11] *China — Certain Measures on the Transfer of Technology* (DS549).

subheadings, with an approximate annual trade value of $34 billion. This initial action became effective July 6, 2018.

The June 20 notice invited public comment on a second tranche of products, consisting of products covered in 284 tariff subheadings, with an annual trade value of approximately $16 billion.

In response to the notice, interested persons filed 741 written submissions. USTR and the interagency Section 301 Committee held a two-day public hearing from July 24-25, 2018, during which 84 witnesses provided testimony and responded to questions.

Based on this review process, you determined to narrow the proposed list in the August 16 notice to 279 tariff subheadings, with an approximate annual trade value of $16 billion. This second tranche became effective August 23, 2018. The combined level of the trade action taken during the investigation was approximately $50 billion.

**Supplemental Action**

*Modification authority*

Section 301(b) provides that upon a finding of actionability under Section 301(b), and if the Trade Representative determines that action by the United States is appropriate, "the Trade Representative shall take all appropriate and feasible action authorized under [section 301(c)], subject to the specific direction, if any, of the President regarding any such action, and all other appropriate and feasible action within the power of the President that the President may direct the Trade Representative to take under [section 301(b)], to obtain the elimination of that act, policy, or practice."[12]

The action taken during the investigation, with a combined aggregate trade value of approximately $50 billion, was intended to obtain the elimination of China's unfair and harmful policies involving tech transfer, intellectual property, and innovation.[13] During the closing weeks of the investigation, China's statements and conduct indicated that a trade action at an aggregate level of $50 billion would not obtain the statutory goal of obtaining the elimination of China's unfair and harmful policies. And, as of the time of this recommended determination, trade action at an aggregate $50 billion has not been—and apparently will not be—sufficient to achieve the statutory goal of obtaining the elimination of China's acts, policies, and practices.

China has openly stated that it will not change its policies in response to the current trade action; indeed, China denies that it has any problems with respect to its policies involving technology transfer and IP. Furthermore, the United States has raised our concerns in government-to-government discussions, including at a Ministerial level, held both in Beijing and Washington.

---

[12] 19 U.S.C. 2411(b)(2).
[13] As noted above, because you have decided to pursue the prong 2 issues (technology licensing) by way of a WTO dispute, the trade action does not relate to this set of Chinese policies.

4

Add. 13

In those discussions, China has been unwilling to offer modifications to its unfair practices. Furthermore, China has openly responded to the current trade action by choosing to cause *further* harm to the U.S. economy. In particular, China is imposing increased duties on U.S. exports to China, at approximately the same annual trade value as the Section 301 action (currently, approximately $50 billion). In essence, China's response to the findings and action in the 301 investigation is to try to cause enough additional economic damage to the U.S. economy so as to force the United States to drop its Section 301 action, leaving China's harmful policies unchanged.

In these circumstances, use of your modification authority under Section 307(a)(1) is warranted. In relevant part, this provision states:

> "The Trade Representative may modify or terminate any action, subject to the specific direction, if any, of the President with respect to such action, that is being taken under [Section 301] if:
>
> . . .
>
> (B) the burden or restriction on United States commerce of the denial [of] rights, or of the acts, policies, and practices, that are the subject of such action has increased or decreased, or
>
> (C) such action is being taken under section [301(b)] of this title and is no longer appropriate."

The President has exercised his authority under Section 307 to direct you to proceed with modifying the prior action in the investigation by adopting this supplemental action. A statement from the President, which has been issued today and references this direction, is attached to this memorandum.

We are not aware of any prior investigation where a U.S. trading partner has responded to a Section 301 action by refusing to consider a change to its policies, and instead has openly adopted its own retaliatory measures. Accordingly, we are not aware of prior investigations where a Trade Representative was called upon to use Section 307 modification authority to increase the level of trade action in order to achieve the statutory goal of obtaining the elimination of harmful policies covered by the investigation. Given that paragraph (B) explicitly refers to an *increase* in the level of trade harm from the investigated acts, policies, and practices, it is clear that where warranted, a modification may include an increase in the overall level of trade action. This conclusion is also supported by Section 307(a)(1)'s reference to "modify", which encompasses not only decreases, but increases, of the underlying trade action.

In the current situation, a determination to increase the level of the trade action is critical to meeting your statutory mandate, which (as noted) provides that upon a finding that trade action is appropriate, "the Trade Representative *shall* take all appropriate and feasible action authorized

5

Add. 14

under [section 301(c)] . . . to obtain the elimination of that act, policy, or practice."[14]  Indeed, if you would determine to leave the current level of trade action unchanged, it may not only be ineffective in achieving the statutory goal, but would also leave the U.S. economy vulnerable to further economic harm due to China's retaliatory trade action.  Under these circumstances, the statute cannot be read to require you to leave unchanged a trade action taken during the investigation.

Both paragraphs (B) and (C) of the modification provision apply to the current situation.

Under paragraph (B), the burden or restriction on United States commerce of the acts, policies, and practices that are the subject of the trade action continues to increase, including following the one-year investigation period.  For example, news reports just this week highlight China's unfair actions in acquiring hybrid vehicle technology from Toyota -- a corporation that produces hybrids in the United States, Japan, and other markets.  Moreover, China's unfair acts, policies, and practices include not just its specific technology transfer and IP polices, but also defensive actions taken to maintain those policies.  As noted, China has decided to impose approximately $50 billion in tariffs on U.S. goods, with the goal of encouraging the United States to drop its efforts to obtain the elimination of China's unfair policies.  Thus, instead of addressing the underlying problems, China has increased tariffs to further protect the unreasonable acts, policies, and practices identified in the investigation, resulting in increased harm to the U.S. economy.

Under Paragraph (C), "action is being taken under section [301(b)] of this title and is no longer appropriate."  In this provision, the term "appropriate" links back to the primary language in Section 301(b), which as noted, requires the Trade Representative to "take all appropriate and feasible action authorized under [section 301(c)] to obtain the elimination of [the] act, policy, or practice."  No mathematical formula exists that can perfectly predict what particular action will encourage a foreign government to eliminate a harmful trade policy.  Rather, this is a matter of predictive judgment, to be exercised by the Trade Representative, subject to any specific direction of the President.

Here, the President directed you to take the initial trade actions in the investigation, and you proceeded to do so.  This reflects the judgment that, based on then-available information, a $50 billion trade action would be effective in obtaining the elimination of China's policies.  Thus, the trade actions taken during the one-year period of the investigation were appropriate at the time these actions were taken.  China's response, however, has shown that the current trade action "is no longer" appropriate.  As noted, the current trade action has not caused China to consider the elimination of its policies, and is thus no longer appropriate in the sense of being sufficient to obtain the elimination of the unfair practice.  Moreover, the current trade action has resulted in a situation where the U.S. economy is suffering further harm from China as a result of China's increased tariffs.  In these circumstances, the current trade action must be modified to a level more likely to result in the elimination of the relevant Chinese practices subject to the investigation.

---

[14] Section 301(b) of the 1974 Trade Act (emphasis added).

6

Add. 15

Following the initial $50 billion trade action, China was able to match retaliatory tariffs on a dollar-for-dollar level, which in China's view, apparently is a preferable course of action compared to engaging with the United States to address the problems identified in the investigation. In contrast, China cannot adopt a similar response with respect to the recommended supplemental action, at least in the area of tariffs on U.S. imports. Total U.S. exports to China are only about $130 billion, while Chinese exports to the United States are approximately $500 billion. China thus has only $80 billion of U.S. exports to cover by a retaliatory response, and some of these exports are already subject to Chinese tariffs in response to the 232 action. In these circumstances, it is far more likely that a combination of the initial action and the supplemental action, as opposed to the initial action alone, will be effective in obtaining the elimination of China's unfair policies.

*Procedures for Modification Authority*

Section 307(a)(2) provides that "before taking any action under paragraph (1) to modify or terminate any action taken under section [301], the Trade Representative shall consult with the petitioner, if any, and with representatives of the domestic industry concerned, and shall provide opportunity for the presentation of views by other interested persons affected by the proposed modification or termination concerning the effects of the modification or termination and whether any modification or termination of the action is appropriate." We have provided these opportunities for public comment, and more. In particular, although the modification statute does not require a public hearing, we proceeded to hold one. The hearing lasted six days, and approximately 350 witnesses appeared.

Because this investigation was self-initiated, the investigation does not involve a petitioner. Accordingly, we have consulted with the "domestic industry concerned." Given the scope of China's unfair technology transfer and IP policies, every U.S. industry that relies on innovation should be concerned with the outcome of this investigation. We consulted with this broad range of industries by seeking the confidential advice of all the private sector advisory committees, including ITACs 13 - Intellectual Property Rights. We have also sought public comments from all concerned industries, and have held the public hearing, at which a number of industry associations testified.

*Specifics of the Recommended Modification*

*(i) Aggregate Level:*

As noted, the President has directed you to proceed with this tariff action, including by covering approximately $200 billion in annual trade from China.

A $200 billion aggregate level for the supplemental action appropriately represents the amount of tariffs needed to obtain the elimination of China's acts, policies, and practices identified in the Section 301 investigation. The existing $50 billion level, covering less than 10 percent of China's exports to the United States, has proven to be ineffective. Indeed, as noted above, China was able to match U.S. trade action on a dollar-for-dollar basis with tariffs on U.S. goods. In contrast, the supplemental action plus the existing $50 billion action, would cover roughly half of

Add. 16

China's exports to the United States. Given the level of U.S. goods exports to China, China does not have the option of imposing dollar-for-dollar retaliatory tariffs. Accordingly, based on currently available information, a modification which involves the recommended supplemental action is far more likely—but not greater than necessary—to obtain the elimination of China's harmful acts, policies, and practices.

*(ii) Level of Duty Increase*:

As noted, the President has directed you to proceed with this tariff action, including by initially imposing an additional duty of 10 percent, and by increasing the level of the additional duty to 25 percent on January 1, 2019.

As for the prior actions, a 25 percent duty is likely to be effective because elasticity data indicates that, over time, a 25 percent duty is likely to cause purchasers to switch to other sources.

The initial rate of 10 percent will mitigate negative effects on U.S. purchasers, as it will allow purchasers approximately three months to transition to other sources prior to the imposition of the higher, 25 percent rate.

*(iii) Specific Products Covered by the Action*:

As noted, the President has directed you to proceed with this tariff action, including by imposing additional duties on the list of products covered in the attached notice.

The selection of products on the suggested final list set out in the attached *Federal Register* notice takes account of adverse effects on U.S. stakeholders, including consumers, as reflected in the public comments and testimony, interagency advice, and internal analysis.[15]

Specifically, the suggested final list removed 2970 HTS lines or partial lines from the proposed initial list of 6,031 HTS lines. (286 full 8-digit lines and 11 partial 8-digit lines). The 297 HTS lines removed included: a partial exclusion of a basket electronics line to remove consumer products; products that were subject to U.S. WTO cases on rare earths/critical materials; basic chemical lines where China accounts for more than 90% of U.S. imports; inputs for pesticide and other agricultural chemicals; U.S.-caught fish processed in China and shipped back to the United States; certain health and safety products[16]; textile-related inputs; certain agriculture products identified by stakeholders; child safety furniture (e.g., high-chairs, car seats, playpens); and certain other products identified by stakeholders as critical inputs.

---

[15] In the context of a four-year review of a trade action, the statute provides that the Trade Representative should take account of "the effects of such actions on the United States economy, including consumers." Section 307(c)(3)(B).
[16] Health and safety equipment recommended for removal include bicycle and all other safety helmets; bicycle safety lights; rubber and plastic gloves; sanitary/hospital paper sheeting; hairnets; and certain precursor chemicals used to manufacture pharmaceuticals.

8

Add. 17

The trade value of the remaining 5,741 HTS lines remains at approximately $200 billion, based on estimated 2018 trade values.

**Advisory Committee Views**

As noted above, USTR sought confidential advice from the private-sector advisory committees. That confidential advice, which is summarized in Attachment 3, generally supports the Administration's effort to address unfair Chinese trade practices, but expresses concern about negative effects the tariff action would have on certain U.S. industries, and about the overall effectiveness of increased tariffs in terms of achieving the goals of the investigation. None of the advice, however, proposes any viable alternatives to increased tariffs as a tool for obtaining the elimination of China's unfair policies.

**Interagency Views**

Throughout the public notice and comment process on the proposed tariff action, USTR staff worked closely with the interagency Section 301 Committee. Staff from other agencies, including Commerce, USDA, and FDA, provided input on the development of the final list of products.

Both the Section 301 Committee, and the Trade Policy Staff Committee, concur in imposing a 10 percent tariff on the attached list of products. We will continue to consult with other agencies with regard to the actions taken in the investigation, and on China's response.

**Congressional Views**

USTR received correspondence from over 60 members of Congress on the proposed supplemental tariff action. All correspondence acknowledged the importance of addressing China's unfair trade practices and promoting the interests of U.S. commerce, but requested certain products be removed from the list. Specific product categories that members of Congress requested to be removed include: bicycle safety accessories (10 members), chemicals (10 members), textiles (8 members), cement articles (4 members), gift supplies (4 members), seating parts (4 members), log splitting components (4 members), vacuum cleaners (4 members), demonstrational apparatus (3 members), seafood (3 members), zeolite (2 members), vinyl flooring tiles (2 members), container chassis and chassis parts (2 members), broadband and telecommunication infrastructure (1 member), hydraulic fluid pumps (1 member), crude vat dyes (1 member), transporter cranes (1 member), and power equipment (1 member).

**ATTACHMENTS**

1.  Determination
2.  List of covered full and partial tariff subheadings.
3.  Confidential Summary of Confidential Advisory Committee advice
4.  Presidential Statement