# UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:    THE HONORABLE MARK A. BARNETT, CHIEF JUDGE
                THE HONORABLE CLAIRE R. KELLY, JUDGE
                THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

_____ :
                                                   :
IN RE SECTION 301 CASES                   : Court No. 21-00052-3JP
                                                   :
_____:

## JOINT STATUS REPORT

Plaintiffs and defendants respectfully submit this Joint Status Report pursuant to the Court's order of August 2, 2021, which ordered the parties to update "the court on the issues identified by the court at the August 2, 2021 Status Conference as needing further clarification." ECF No. 357. Given that the Court addressed many of its questions at the August 2 Status Conference to defendants, we first set forth defendants' position below, followed by plaintiffs' response. Defendants were unable to review plaintiffs' response in time to respond before the Court's deadline for filing this status report.

## DEFENDANTS' POSITION

We provide below a detailed and updated account of the system created to comply with the preliminary injunction, including modifications we have made in response to plaintiffs' suggestions and concerns. We also address the issues raised by the Panel during the status conference on August 2, 2021.

We first wish to clarify the broad outline of the process we are currently creating to implement the preliminary injunction, including the establishment of a Repository. There are two steps. The first step is the preparation and submission of a list of the unliquidated Subject Entries for each plaintiff importer requesting suspension of the liquidation of their entries. The

second step is for U.S. Customs and Border Protection (CBP) to effectuate suspensions of liquidation for those entries. Completion of the first step requires the submission of a list to the Automated Commercial Environment (ACE) Document Imaging System (DIS), and to the appropriate CBP Center of Excellence and Expertise (Center), but it does not by itself automatically accomplish the suspension of liquidation for any entry. ACE, which was created for and serves very different purposes than those required by the preliminary injunction, does not have the capability to automatically transform the submission of a list of entries through DIS into suspensions of liquidation of those entries. Rather, completing the first step with the submission to DIS and the Center merely deposits into the Repository the request to suspend the liquidation of the specified Subject Entries.

The actual suspension of liquidation can be effectuated only by CBP personnel, by performing the tasks involved in the second step. In other words, once plaintiffs have provided CBP with the necessary information, the second step — effectuating the suspensions — is performed by defendants. Specifically, in order to suspend the liquidation of a list of entries, a CBP user with appropriate access must manually upload into ACE an Excel spreadsheet and use the ACE mass update functionality to change the liquidation status and other appropriate notations for up to 5,000 entries at a time. Because the ACE mass update functionality can currently process no more than 5,000 entries at a time, the spreadsheet of entry numbers cannot exceed 5,000 entries. The system then processes the mass update, which can take more or less time depending on the number of entries and the number of other users also performing updates. In light of the lag time for processing, the CBP user may need to log in at a later time or date to confirm whether the update was successful (if not successful, ACE provides the CBP user with a

list of the entries and associated error codes for those entries for which the update was not successful).

All importers, not just plaintiffs in these actions, are assigned to one of CBP's ten Centers or the Port of San Juan, Puerto Rico, and within each Center, an importer is assigned to a team. These team assignments are rarely changed. The process CBP is establishing for the Repository will enable CBP to distribute the workload involved with the second step among the Centers. Distributing this task to the Centers will enable the workload associated with the preliminary injunction to be spread out as evenly as possible, and importantly, will, to the greatest extent possible, ensure that suspensions are effectuated by the teams to which the importers are already assigned, and with which they may have regular contact. It is anticipated that the majority of the issues that may arise with the processing of the suspensions will be resolved informally, *e.g.*, by e-mail, between the team and the transmitter or point of contact identified in the transmissions to CBP.

## I.     Modifications to Previously-Filed Draft Repository Instructions

The Government has agreed to make the following changes to its draft Repository instructions:

(a)  The sentence stating that "[e]ach importer will provide CBP with its list(s) of Subject Entries on the third Monday of every month," will be revised to request that each importer provide its list of Subject Entries monthly. This is to avoid having plaintiffs submit lists to CBP on a more frequent basis, thus increasing the number of requests to process, yet providing an orderly flow of requests into the Repository that are not too burdensome. The Center import specialists who will be processing the suspensions must do so while balancing their myriad other responsibilities. If plaintiffs submit their requests less frequently than once a month, then the

number of entries that need to be processed per request may be too large to process before the entries liquidate. Conversely, if plaintiffs submit their requests more frequently than once a month, then the number of requests may be overwhelming. Therefore, to facilitate efficiency and minimize the potential for error, plaintiffs will be requested to submit their lists of subject entries to the Repository once a month. Failure to submit reports on this requested timeline, however, will not automatically result in rejected requests for suspension.

(b) The sentence stating that "[t]his transmission must be made a minimum of 30 days in advance of the scheduled liquidation date for the Subject Entries" will be followed by the clause "if known." CBP understands that in certain circumstances a scheduled liquidation date may not be known, such as antidumping or countervailing duty (AD/CVD) entries that have been suspended awaiting liquidation instructions from the Department of Commerce. Nonetheless, in this circumstance, plaintiffs are expected to know when the suspension of liquidation of their entries for AD/CVD purposes has been lifted and to anticipate when CBP may liquidate them, and to request that CBP suspend them pursuant to the order in this litigation as soon as possible. Similarly, CBP may liquidate an entry in advance of the typical 314-day cycle where the importer has submitted a Post Summary Correction (PSC), but the importer will be aware that a PSC has been submitted and should plan accordingly. CBP requests that plaintiffs transmit their requests at least 30 days in advance of liquidation in order to provide the agency with sufficient time to process the requests and potentially identify any errors. Should CBP receive a request immediately prior to liquidation, it likely will not have sufficient time to process the plaintiff's request and suspend liquidation. However, should a plaintiff submit a request less than 30 days in advance of liquidation, CBP will endeavor to process the request if it is able to do so before the entries liquidate. To minimize the risk of error, plaintiffs should submit their requests as soon

as possible, prioritizing the entries with earlier entry dates and those with pending PSCs.  Finally, in the event that a plaintiff makes a request for suspension at least 30 days prior to an entry's scheduled liquidation date, but the entry inadvertently liquidates prior to that date, our proposed modifications to the Court's preliminary injunction would ensure that this entry can be reliquidated at the conclusion of the litigation.

(c)  The instructions will be revised to request that the email subject line include a "sequential" batch number rather than a "cumulative" one.  CBP's goal is to ensure that each submission be given a sequential number so that it may be distinguished from other submissions made by the same plaintiff.  Thus, the first spreadsheet that a plaintiff (or its agent) submits to the Repository will be batch 1, the second spreadsheet submitted by or on behalf of that same plaintiff will be batch 2, and so on.

## II.      Reporting Functionality in the Automated Commercial Environment (ACE)

All plaintiffs with an ACE account can run ACE reports to pull ACE data relevant to their imports.  Plaintiffs can also add additional "users" to their ACE account, such as their attorney or broker, and these users have the same access as the importer.  Importers can add as many additional users as they would like.  Brokers can also use their own ACE accounts to run reports and access the ACE data for any entries for which the broker is the filer.  Many of plaintiffs' counsel in this litigation have their own ACE accounts and can easily access data for their clients.  Establishing an ACE user account is free of charge, and instructions to help members of the trading community set up their accounts are available on CBP.gov (https://www.cbp.gov/

trade/automated).  Instructions for running ACE reports once the account is set up, including training videos, are also available on CBP.gov.[1]

To facilitate users' report requests for some of the most common queries, CBP has provided several categories of ACE reports with pre-set parameters, which users can run to obtain specific information, such as a list of their entries subject to AD/CVD orders, or a list of their entries subject to Section 301 duties.  For example, the "TR-005" ACE report will provide entry summary line level data specific to the Harmonized Tariff Schedule (HTS) codes for Section 301 duties.  Users can also specify their own parameters for the data search.  For example, a plaintiff can run a report to see all of its entries that are currently unliquidated.  The plaintiff can export the output of its ACE report directly into an Excel spreadsheet.

Therefore, the functionality already exists for plaintiffs (or their counsel or brokers) to use ACE reports to pull the necessary data from ACE, export it to the Excel spreadsheet format that is required for CBP import specialists to process the suspension of liquidation, and transmit the spreadsheets to the Repository within DIS and to the Center for manual upload to ACE to process the suspension of liquidation.

To further facilitate this process for plaintiffs (and/or their attorneys and brokers), and pursuant to the Court's suggestions, CBP is also developing a new ACE report, which will include the specific parameters that are required for submitting suspension requests to the Repository, to the extent that such data is available in ACE (for example, the importer-specific court number and summons date is not information that is available in ACE, so this information cannot be included in the ACE report).  Specifically, plaintiffs (or their attorneys or brokers, or

---

[1] ACE is the unified automated system through which the trading community reports importations and the Government determines admissibility, and all importers are encouraged to set up their free ACE accounts and have access to the ACE data concerning their importations.

any additional users to whom the importers may wish to grant access) would only need to input their importer of record (IOR) number and specify a date range, and the ACE report would produce a list of all of their entries made during that date range for which the following conditions are met: (1) there is at least one entry summary line with an HTS code subject to Section 301 List 3 or 4A; and (2) the liquidation status is either unliquidated or suspended. Because some unliquidated Subject Entries may already be suspended pursuant to AD/CVD orders, or injunctions in other cases, the report will pull all of the plaintiff's Subject Entries for which the liquidation status is either "unliquidated" or "suspended." In the case of entries that are already suspended, CBP will update these entries to add another suspension flag, such that if the suspension pursuant to the other order is lifted before the conclusion of this litigation, then liquidation will still be suspended pursuant to the Repository request in this case.

In addition to the entry numbers, the report will also include the relevant Center and team assigned to each entry, the date of entry, the liquidation status (unliquidated or suspended), and if suspended, the suspension code (AD/CVD or other), all of which plaintiffs or their brokers/counsel (agents) can export into the Excel spreadsheet that is required for submission of suspension requests to the Repository. To complete the spreadsheet for submission to the Repository, plaintiffs (or their agents) will only need to add two columns to specify the importer specific court number and litigation filing date. In addition, to conform to the 5,000-entry limit for the current mass update functionality in ACE, the spreadsheet will need to be separated into individual spreadsheets of no more than 5,000 entries, if the output of the report for the entered date range includes more than 5,000 entries. The reporting functionality in ACE does not permit limitation of output by number of entries; so if the number of subject entries returned for the specified date range exceeds 5,000, plaintiffs can either re-run the report with a shorter date

range, or split up the resulting spreadsheet into individual spreadsheets not exceeding 5,000 entries each.

CBP is diligently working on developing this new ACE report template, and anticipates that it can be made available to ACE users on August 26, 2021, which is the next available date for regularly scheduled deployments for new ACE reports. In the meantime, for importers wishing to submit suspension requests to the Repository between August 20 and August 26, plaintiffs may use existing ACE reports, or data from their own records (which importers are required to keep for at least five years after importation, *see* 19 U.S.C. § 1508; 19 C.F.R. § 163.4), to compile the required Excel spreadsheet for submission to the Repository and transmission to the Center.

It is important to reiterate that although any ACE user, including CBP, can run ACE reports, it would be immensely burdensome for CBP to generate the reports described above for all of the plaintiffs wishing to suspend their Subject Entries, in addition to all of the other unprecedented resource demands placed upon CBP by the preliminary injunction. Once again, the output of each report would still need to be broken down into spreadsheets of no more than 5,000 entries, which import specialists would then still need to upload, one at a time, in order to use the ACE mass processing functionality to suspend liquidation for 5,000 entries at a time. Based on the latest available quarterly data for all unliquidated entries subject to duties imposed under Section 301 List 3 and 4A (for all importers), CBP estimates that the total volume of entries for which the 6,500 plaintiffs in this litigation are likely to request suspension of liquidation through the Repository is currently in the millions. And, since existing ACE mass processing functionality requires an appropriate CBP user to upload a spreadsheet limited to no more than 5,000 entries at a time, the suspension of liquidation for millions of Subject Entries

will likely require the uploading of thousands of individual spreadsheets, which CBP does not have the manpower to generate.  Accordingly, while CBP is working on developing a new ACE report that plaintiffs or their agents can use to generate the required spreadsheets, this report is only intended to aid the plaintiffs in compiling the necessary information and providing it to CBP in the format required to process the requests for the suspension of liquidation.  CBP simply does not have the resources to perform this initial step plaintiffs, who should bear the burden of providing their own information in support of their claims.  Indeed, even without compiling the plaintiffs' own information for them, whether CBP will be able to successfully divert the resources necessary to comply with the unprecedented scope of the preliminary injunction without compromising its vast other statutory and regulatory responsibilities remains to be seen.

III.    **Technical Requirements for Requesting Suspension of Subject Entries**

The Repository that defendants are establishing requires that the plaintiffs (or their agents) submit their respective lists of Subject Entries for which they are requesting that liquidation be suspended to both DIS and to the appropriate Center.  DIS is an existing system for storing documentation submitted by importers or their brokers in connection with the importation of merchandise.  Importantly, DIS is also a system of record with sufficient data storage capability to store the massive volume of data that CBP is expected to receive once the 6,500 plaintiffs begin submitting their respective lists of entries.  Thus, DIS is the Repository that will store the submissions that will be made by thousands of plaintiffs on a monthly basis throughout the remainder of this litigation.  However, submission to DIS does not result in any notification to any Center or team that a repository document has been submitted, nor is the system equipped with the functionality to perform any function with respect to the data received other than to store it and send an auto-generated confirmation email to the submitter.  Further, as

explained above, submission to the Repository alone will not accomplish the suspension of liquidation of any entry. Suspensions must be processed manually by CBP personnel at the Center teams. Accordingly, to ensure appropriate notification to the Centers when submissions are made to the Repository, and to ensure efficient distribution of the workload of processing the suspension requests, CBP requires that a plaintiff concurrently submit its list to the DIS Repository and to the appropriate Center. Thus, the copy to the Center acts both as a notification to the Center and as a working copy of the list for the actual processing of the suspension request.

If an importer knows the Center and Control Team to which it is currently assigned, it does not need to check whether earlier entries for which it is seeking suspension show a different Center or Control Team. Since Center and team assignments are infrequently changed, we anticipate that there should be no burden on plaintiffs to regularly look up their team assignment going forward.

If a plaintiff does not know its Center or Control Team, that information is readily available in the Entry Summary "header" information in ACE for any of its recent entries. If the plaintiff does not have an ACE account, its broker or counsel will be able to look up this information. Moreover, this information will only need to be identified once, for the reasons explained above. CBP has provided a comprehensive Center directory on its website at https://www.cbp.gov/trade/centers-excellence-and-expertise-information/cee-directory.

If a plaintiff submits its request to the wrong Center, the error may delay processing of its request, but will not be fatal to the submission. It is anticipated that the receiving Center will discover the error when the personnel who receive the request assign it to one of the Center's teams. It is further anticipated that the receiving Center will then forward the submission to the

correct Center, and notify the person submitting the request or the person identified as the point of contact of the correct Center and team for purposes of future submissions.

If a plaintiff submits its request to the correct Center, but identifies the wrong team or a non-existent team, the error may delay processing of its request but will not be fatal to the submission. It is anticipated that the teams at each Center will discover the error and resolve the issue internally, and, as appropriate, the Center will notify the person submitting the request or the person identified as the point of contact for purposes of future submissions.

## IV. Consequences of Failing to Comply with Repository Instructions

The Repository instructions require that a plaintiff seeking suspension of liquidation transmit an Excel spreadsheet to DIS, in one of two ways, and to the Center via email. The consequences of failing to comply with these aspects of the Repository are as follows:

DIS Submission: The Repository instructions require that plaintiffs transmit an Excel spreadsheet to DIS either through a system-to-system transmission, or via email. (In either instance, the DIS submission must be accompanied by an email to the Center.) With respect to transmitting to DIS via email, we understand that concerns were raised about the syntax required to transmit an email to DIS. CBP has provided detailed instructions about the specific syntax required, and it has provided a sample email that plaintiffs can copy, substituting only their specific information. Submitting documents into DIS by the trade community is commonplace, with approximately six million documents uploaded annually, and the syntax required for successful submission to DIS for purposes of the Repository in this case is materially identical to the syntax that is generally required for any submission to DIS by email. *See* CBP's ACE DIS Implementation Guide, *available at* https://www.cbp.gov/document/ guidance/ace-dis-implementation-guide, at APPENDIX B: General Guidelines for Documents Submitted to DIS

via Email. Moreover, as long as a plaintiff includes the required syntax in its email to DIS, the inclusion of other incorrect importer-specific information (*i.e.*, incorrect transmitter name, point of contact, etc.) may delay the processing of a suspension request, but it will not result in a rejection. If, on the other hand, a plaintiff includes incorrect syntax, it will receive an auto-generated rejection email from DIS. However, the rejection of a plaintiff's email to DIS will not in any way affect the transmission of its email to the Center. Thus, should a plaintiff receive repetitive auto-generated rejections from DIS but is unable to fix the errors in its syntax, that plaintiff can follow up on the email sent to the Center and await further guidance.

Excel Spreadsheet: CBP has set forth the precise information required on the Excel spreadsheet to be transmitted to DIS and attached to the email to the Center, and it will provide a sample Excel spreadsheet for plaintiffs' use. Moreover, as indicated above, CBP will create a report in ACE that the plaintiffs may use to extract data from ACE in the format CBP requires. All of these measures will greatly reduce the frequency of errors on the spreadsheet. Nonetheless, errors will occur, and the consequence of those errors depends on the nature of the error.

Should the spreadsheet list the incorrect court number or filing date, Center ID, Control Team Number or Entry Date, CBP will nevertheless be able to process the request and suspend the liquidation of the entries listed on the spreadsheet. On the other hand, should the plaintiff provide an incorrect IOR number, ACE will not be able to process any of the entries on the spreadsheet. If the plaintiff provides an incorrect entry number, ACE will not process or suspend the liquidation of any incorrect entry numbers listed on the spreadsheet, although correctly listed entries on the same spreadsheet will be processed and suspended.

For any entries listed on a spreadsheet that was successfully transmitted to DIS and the Center, but for which the suspension of liquidation in ACE was unsuccessful, the Center will respond to the transmitter or other person identified as a point of contact for that Repository transmission to alert that person of the list of entries for which suspension was unsuccessful and the associated ACE error code(s). Plaintiffs may then review the information provided for these entries and resubmit once the deficiencies are corrected.

Once again, importers have the best chance of successfully suspending the liquidation of their entries by making their requests with the most lead-time possible, and liquidation may occur if there is insufficient time for CBP to resolve errors made in the submission process. Importers may protest the liquidation of any entries that they believe were liquidated incorrectly, which CBP will assess on a case-by-case basis.

Center Email: The Center must either be included on the email to DIS, should the importer choose to file its DIS submission in that manner, or, if the importer elects to make its DIS submission via the system-to-system method, a separate email must be sent to the Center. The email to the Center must be sent because it notifies CBP personnel that a request has been made, and, in particular, it prompts the relevant Center personnel to suspend the liquidation of the entries included on the spreadsheet. Without this email, CBP personnel would not be notified that a submission into DIS had been made. Therefore, failure to send the Center an email will result in the request not being processed and liquidation not being suspended.

V. **Drawback and Reconciliation Related Implications of Suspending Subject Entries**

If any of the Subject Entries that are suspended pursuant to the Court's preliminary injunction are covered by drawback or reconciliation entries, such drawback or reconciliation entries will not be liquidated until the underlying Subject Entries are liquidated at the conclusion

of the litigation (including appeals).  Keeping the drawback and reconciliation entries open until the underlying consumption entries covered by this litigation are liquidated ensures, respectively, that drawback is not refunded twice and that the correct duty rates are applied at reconciliation.

## VI.  Confirmation of Successful Suspension of Subject Entries

The Court and plaintiffs expressed concern regarding how plaintiffs can confirm that their suspension requests have been approved and their listed entries suspended.  First, plaintiffs or their agents can monitor the liquidation status of a plaintiff's entries using CBP's Official Notice of Extension, Suspension and Liquidation on CBP.gov (https://aceservices.cbp.dhs. gov/LBNotice).  The Official Notice of Extension, Suspension and Liquidation provides public notice of liquidation actions for entry summaries filed with CBP.  The information contained in the Official Notice of Extension, Suspension and Liquidation is updated daily and is available full-time, less scheduled maintenance windows, and is provided free of charge.  This notice is in accordance with 19 C.F.R. § 159 and in compliance with the disclosures required per CBP Form 4333.

Second, plaintiffs or their agents can run the existing Trade ACE Report ES-001, which includes current liquidation status as a data element, to obtain a list of all of their suspended entries, which can be exported to an Excel spreadsheet.

Third, as discussed in Section II above, CBP is developing a new ACE report that plaintiffs or their agents can run, that will be specific to the entries for which requests for suspension may be submitted to the Repository, and which will also include the entries' current liquidation status.  Accordingly, a plaintiff or its agent will be able to run the new ACE report both to generate the initial spreadsheet for a particular date range of subject entries for submission to the Repository, and also to check (after the passage of, for example, 30 days) that

all of the entries within that date range, for which a request was submitted to the Repository, have been suspended.  As noted above, CBP is diligently working on developing this new ACE report template, and anticipates that it can be made available to ACE users on August 26, 2021.

These options will provide plaintiffs with lists they can easily compare against their submissions, and CBP is not contemplating preparing and sending any e-mail confirmations of suspensions.

## VII.    Resources Available for Assisting Plaintiffs

There are various resources available to a plaintiff, depending on the issue and point in the process.  Should a plaintiff or its agent have general questions, CBP has provided a general email address in the instructions.  Many other questions can be addressed to the Center, using the email addresses provided in the instructions (see above for additional information on identifying the Center.)  However, CBP will not have a dedicated Help Desk, and it will not assist plaintiffs in identifying their entries or preparing their spreadsheets.  As in any litigation, plaintiffs must bear the burden of identifying the basic information underlying their claims.  And, as noted above, importers have an obligation to maintain records regarding their import transactions, irrespective of whether they have access to ACE (*see* 19 U.S.C. § 1508(a); 19 C.F.R. § 163.2-163.5).

The Repository instructions do not require that a plaintiff have access to ACE, as the DIS submission may be transmitted by email along with the email to the Center, and the Excel spreadsheet does not need to be developed from ACE data, but from any accurate record the plaintiff may keep of its imports.  However, brokers will have access to ACE, and they are also required to maintain entry records.  *Id*.  Finally, although the Repository instructions do not require an importer to have an ACE account, ACE access is free, and CBP encourages importers

to obtain an ACE account and take advantage of the training and resources available on its website. (See https://www.cbp.gov/trade/automated.)

## **PLAINTIFFS' POSITION**

Defendants shared their proposed submission at 4 pm on Friday, August 6, leaving only the weekend for Plaintiffs to consult with the Steering Committee to provide these comments—and no opportunity for further dialogue with the Government in advance of this "joint" submission.

### I.      Plaintiffs Acknowledge Defendants' Incremental Progress

Plaintiffs are gratified to see that Defendants are taking some steps to assist Plaintiffs to provide the information Defendants state is required from Plaintiffs for Defendants to effectuate the suspension of liquidation. Despite those modest yet positive steps, Plaintiffs continue to have serious concerns about Defendants' approach to implementing the Court's injunction.

Among the positive developments are:

- Removing the requirement that spreadsheets be uploaded on the third Monday of every month. This change allows Plaintiffs to better manage their workflow while still providing the requested information in a timely manner. Defendants' Position, *supra*, 3.
- Recognizing that scheduled liquidation dates are not always known and modifying the submission requires to state it is expected to be filed a minimum of 30 days before the scheduled liquidation date "if known." *Id.* at 4.
- Clarifying that the batch number for each submission is "sequential." *Id.* at 5.

- Developing a new ACE report to generate the information CBP requires to suspend entries including the relevant Center and Team designations, leaving Plaintiffs to append only the Court Number and filing date. *Id.* at 7.

- Clarifying that the email submission to DIS can be copied to the Center rather than requiring two separate emails. *Id.* at 10.

- Confirming special procedures for drawback and reconciliation entries. *Id.* at 13-14.

- Creating resources to assist Plaintiffs. *Id.* at 15-16.

## II. Plaintiffs' Continuing Concerns Are Well Justified

Although Plaintiffs welcome Defendants' recognition that the prior proposals were unnecessarily onerous and its proposals intended to streamline the reporting and flagging requirements (which would benefit both Plaintiffs and CBP), the current proposal: (1) leaves CBP out of compliance with the Court's Injunction; (2) results in Plaintiffs potentially losing lawfully due refunds (if the underlying suit is successful), including due to inevitable mistakes; and (3) risks this Court losing subject-matter jurisdiction over potentially a large number of entries—the very result that the injunction was intended to prevent. As such, Plaintiffs believe that further work is needed to ensure that the goals of the injunction are met.

### a. CBP Has Not Yet Taken Reasonable Steps to Implement the Injunction

Defendants have explained that once CBP receives the entry information from Plaintiffs, CBP can effectuate the injunction against liquidation only manually and only in batches of 5,000 entries. This means that, regardless of who generates the properly formatted lists of 5,000 entries, the work to effectuate the injunction will be the same. Moreover, the fact that CBP has agreed to create an ACE query to generate the properly formatted reports confirms, once again, that CBP already has the data that is required to implement the Court's injunction.

CBP maintains that it does not have the necessary resources and budget to run the queries that will produce the report for all Plaintiffs and their Importer of Record Numbers. *See, e.g.,* Defendants' Position, *supra*, 9. First, the Court should note that the Section 301 duties have also created an unprecedented burden on Plaintiffs and on importers generally. According to CBP statistics, the United States has collected $99,185,698,888 in Section 301 duties on products from China since the duties were imposed on July 6, 2018.[2] Much of that would have been collected on List 3 and List 4A products imported by Plaintiffs.

Defendants were apparently unconcerned about their resource and budget constraints when they decided to challenge this Court's ability to remedy the illegal collection of duties. Defendants similarly ignored resource and budget constraints when they chose to oppose Plaintiffs' motion for a preliminary injunction, which was the natural and foreseeable consequence of Defendants' position. Even after losing on their opposition to the preliminary injunction, Defendants could have entirely avoided the expenditure of resources and budget about which it is now expressing concern by stipulating to the availability of a refund just for entries liquidated after the July 6, 2021 injunction, as the Court itself had proposed as an alternative. That alternative would have fully preserved the legal remedy issue for appeal with no financial impact on the Treasury, *i.e.*, leaving Defendants in the exact same position it will be after full compliance with the Court's preliminary injunction order.

Second, with respect to human resources, it is relevant to note that the Government can and does act with alacrity when taking steps that it perceives as intended to protect domestic industries. Entries of merchandise subject to antidumping and countervailing duty affirmative determinations

---

[2] https://www.cbp.gov/newsroom/stats/trade?_ga=2.203159250.2119041155.1628460472-970730355.1628366891<Last visited, Aug. 7, 2021>

are routinely suspended pursuant to instructions from the Department of Commerce and to statutory injunctions from this Court. Defendants' decision to challenge existing law on the availability of refunds precipitated the need for preliminary injunction proceedings, and Defendants lost in opposing that injunction. The Court having issued an order to prevent further liquidations, Defendants cannot now repeat the mantra of limited budget and resources to avoid the burdens associated with the need to suspend liquidations, for which they are solely responsible.

As further evidence of the speed with which the Government can act, the Office of the USTR announced the imposition of the Section 301 List 3 duties in a Federal Register Notice on September 21, 2018. *See*, 83 Fed. Reg. 47974. On **the same day**, CBP issued an administrative message to the trade identifying the subject products and stating that the duties would become effective for merchandise entered on or after 12:01 AM on September 24, 2018, a mere three days later. See, CSMS# 18-000554.[3] In that message, CBP noted the Government had created two new tariff items to identify these goods. By October 10, 2018, CBP issued a second administrative message, CSMS# 18-000624, indicating how to report in ACE the HTSUS items relevant to the collection of the Section 301 duties (and other trade remedies).[4]

Plaintiffs' counsel recognize that we do not have visibility into the management of ACE programming and how the List 3 and List 4A duties were implemented. Nevertheless, it is telling

---

[3]
https://content.govdelivery.com/accounts/USDHSCBP/bulletins/20eee50?utm_source=search.usa.gov&utm_medium=search.usa.gov&utm_term=undefined&utm_content=undefined&utm_campaign=(not%20set)&gclid=undefined&dclid=undefined&GAID=1265690522.1619645146 <Last visited Aug. 8, 2021>.

[4]
https://content.govdelivery.com/accounts/USDHSCBP/bulletins/20eee50?utm_source=search.usa.gov&utm_medium=search.usa.gov&utm_term=undefined&utm_content=undefined&utm_campaign=(not%20set)&gclid=undefined&dclid=undefined&GAID=1265690522.1619645146 <Last visited Aug. 8, 2021>.

that the Government acted quickly to allow for the collection of these duties. And yet, in the face of a Temporary Restraining Order and Preliminary Injunction ordering Defendants to refrain from liquidating entries more than one month ago, CBP has to this date not found a way to come into compliance with that mandate. Moreover, the Government now tells the Court in this status report that it will not even implement the new ACE report until August 26, 2021, "the next available date for regularly scheduled deployments for new ACE reports." Defendants do not indicate why Plaintiffs must wait for the next regularly scheduled update. And Defendants continue to remain non-committal about their obligations. *See* Defendants' Position, *supra*, 9 ("[E]ven without compiling the plaintiffs' own information for them, whether CBP will be able to successfully divert the resources necessary to comply with the unprecedented scope of the preliminary injunction without compromising its vast other statutory and regulatory responsibilities remains to be seen.").

Finally, in almost every meeting with the Plaintiffs' Steering Committee and in the status conferences with this Court, the Government has made representations that it is working on better long-term solutions. This is consistent with the Overacker Declaration, ECF No. 304-1, attached to Defendants' Response to Motion for Preliminary Injunction, which states (emphasis added):

> Creating new programming within ACE to automate some of the processes described above is not a feasible alternative for implementation **in the short term**. Planning, developing, and testing such programming would take significant time and could not be completed within the time frame for implementing an injunction.

This statement indicates that CBP has the capability to program ACE to automate at least "some of the processes" necessary to effectuate the Court's order.

More than a month after the injunction issued, Defendants have continued to propose an inefficient process that requires data to be taken from ACE, manipulated, and sent back to ACE. Each step risks the introduction of errors and omissions in the data. Also during that time, Defendants have never made an ACE programmer available to Plaintiffs to discuss this process,

nor have they included an ACE programmer in a status conference with the Court. The Court, therefore, has been unable to fully evaluate whether CBP can implement a more efficient and less error-prone system to comply with the Court's order. Plaintiffs believe that is a necessary step to ensure that the Court and the Plaintiffs are fully informed of the possible better solutions and the reasonable time in which they can be implemented.

With that in mind, Plaintiffs provide the following specific comments on the Defendants' Position.

**b. The Proposed System Does Not Provide Sufficient Opportunity for Error Correction**

Throughout Defendants' Position in this Status Report, Defendants discuss how errors and omissions in Plaintiffs' submissions will be addressed. For example, at page 4, Defendants state, "Failure to submit reports on this requested timeline, however, will not automatically result in rejected requests for suspension." This sentence should not include the word "automatically," which indicates that there are cases in which a "late" request, according to Defendants' manufactured yet unclear deadline, will result in the entry not being suspended and appears to leave that determination to CBP.

Later, on the same page, Defendants state that if a plaintiff submits a request less than 30 days in advance of liquidation "CBP will endeavor to process the request if it is able to do so before the entries liquidate." The Report does not state that those entries, if liquidated, will be treated as "inadvertently liquidated" and subject to reliquidation or refund. Indeed, confusingly, on page 13 of their Report, Defendants say that "liquidation may occur if there is insufficient time for CBP to resolve errors made in the submission process. **Importers may protest the liquidation of any entries that they believe were liquidated incorrectly, which CBP will assess on a case-by-case basis**." (Emphasis added.) This is not a proper solution and will lead to even more work for both

plaintiffs and CBP. It is also likely to result in additional and avoidable litigation when CBP denies any of those protests. Instead, those entries should be treated as "inadvertently liquidated" and subject reliquidation and refund, like any unliquidated entries that are prematurely liquidated now while CBP is out of compliance with the court's order.[5]

Defendants further state on page 13 that a "failure to send the Center an email will result in the request not being processed and liquidation not being suspended." Presumably, in this scenario, the plaintiff has submitted the list of entries to CBP via DIS, meaning that the relevant plaintiff has sent CBP the information necessary to comply with the Court's order. While we understand the two-step process CBP has devised to effectuate the order requires the email to the Center, an inadvertent failure to copy the Center should not result in the loss of the potential refund. That is not consistent with the Injunction, which requires that Center and Team be provided "if known." This scenario should be treated as "inadvertent liquidations," provided the Plaintiff can make a showing of inadvertence.

Finally, with respect to submitting information through DIS, Defendants state that the use of DIS is "commonplace." Defendants' Position, *supra*, 11. It is not at all clear what portion of the DIS submissions Defendants are referencing originate with brokers as opposed to importers or law firms. It is, therefore, not self-evident that DIS submissions are common among the plaintiffs or their counsel. DIS is typically used to submit documents in support of a protest or in response to a Request for Information and for other communications with CBP. When, in the ordinary course of conducting trade, an importer makes an error in a DIS submission, the consequences are typically known or subject to regulations (*e.g.*, a protest denied due to lack of support) and to judicial review.

---

[5] Plaintiffs note that with respect to entries submitted to CBP "at least 30 days prior to an entry's scheduled liquidation date," but which are nevertheless liquidated, CBP will treat those as "inadvertent liquidations." Defendants' Position, *supra*, 5.

That contrasts with the current situation in which the Defendants are dictating how and when information is to be submitted to implement an injunction that bars it from further liquidations of subject entries. Defendants do not state with specificity that liquidations that result from unresolved problems with a DIS submission will be treated as "inadvertent" and subject to reliquidation or refund. That should be included in the process to ensure compliance with the injunction.

Plaintiffs' concern relating to the correction of errors and omissions is the direct result of Defendants' newly stated theory that this Court lacks the authority to order refunds of duties imposed on liquidated entries in violation of the Administrative Procedure Act and Section 301. By maintaining this position, Defendants create the risk of Plaintiffs losing access to lawful refunds due to clerical errors and inadvertencies. Moreover, the Defendants' theory may result in this Court losing subject-matter jurisdiction over a potentially large number of claims through clerical errors and inadvertencies. This result is inconsistent with the purpose of the Court's order, which is explicitly to preserve these claims. To the extent Defendants' instructions and suspension methodology has that result, the Government will remain out of compliance with the Order.

### c. Defendants Overestimate the Usage of ACE in the Trade and in Law Firms

Relevant to the proper allocation of burden, while the promised addition of a new ACE report will help individual plaintiff importers gather the necessary information to request suspension, that will not help all plaintiffs. It is true that importers can set up ACE accounts to help manage and monitor their imports. There is, however, no guaranty that all plaintiffs will have done so and there is no legal requirement for importers to do so, even if it is convenient for Defendants. Once an ACE account is established, an importer who is new to ACE does not necessarily have employees who are familiar with the complex system and can generate the necessary data.

In reality, many plaintiffs and, in particular, smaller plaintiffs will rely on their brokers to manage this data collection task. Many importers have multiple brokers for different trade flows including, sea, air, and land. Because products subject to the Section 301 duties may be shipped to the U.S. from any location, it is likely that all these modes are relevant. Thus, some plaintiffs will need to engage with multiple brokers, potentially at significant expense, to complete these required monthly submissions.

Finally, not all law firms, including those engaged only in customs and trade matters, have ACE expertise. It is common for law firms to work with their clients' brokers or corporate managers to gather entry information. Importantly, contrary to the assertion in the Defendants' Position, *supra*, at p. 5, a law firm that has an ACE account does not have visibility to an importer's entry data unless the importer grants user status to an individual at the law firm. Moreover, many law firms will simply not have the resources or the expertise to undertake the requested reporting for the numerous plaintiffs in this matter. This is in stark contrast to, for example, a protest process in which plaintiffs and their counsel have 180 days **after liquidation** to submit the entry information and argument in support of the protest. 19 U.S.C. § 1514(c)(3).

## III.   Specific Suggestions to Effectuate Suspension

1.  The Government should be required to demonstrate on a periodic basis the progress it is making toward implementing a long-term solution that is based on its own use of ACE or other data. Even if Plaintiffs are required to generate and submit data in the near-term, Plaintiffs suggest that part of the design of a long-term solution should include the identification of entries to be suspended at the time of entry, thereby eliminating the need for ongoing reporting and the risk of entries inadvertently liquidating. This could, we believe be implemented through several of the data

elements contained in an entry. For example, CBP could implement a new "entry type" to identify "Subject Entries," just as CBP has entry type 03 to indicate that the goods are subject to an antidumping duty order. In fact, creating a Section 301 entry type for use by Plaintiffs would, going forward, allow Customs to identify the entries to be suspended and eliminate any requirement to have monthly submissions after the date at which such a change to the 7501 Entry Summary Form is implemented. Another option is a new "Special Program Indicator" or "SPI" similar to the "S" indicator used to identify entries containing claims for USMCA status or the "A" SPI for GSP claims. Moreover, CBP already has the unique HTSUS codes applicable to List 3 and List 4A, which it could use to identify entries for suspension. In all these cases, CBP would only need the Plaintiffs' IOR Numbers, Court Number, and summons date to implement suspension at the time of entry.

2. In the meantime, and to avoid periodic reporting with respect to future entries, Defendants should adjust the reporting from every month to every quarter. There is no good reason to force both Plaintiffs and CBP to undertake this task every 30 days; furthermore, if a 90-day reporting period were implemented, Plaintiffs hope that within the first 90 days CBP could adopt a new upon-entry coding system, as discussed above, which would eliminate the need for periodic reporting entirely.

3. In the event periodic reporting remains necessary, the requirement that requests be submitted 30 days prior to scheduled liquidation date should be treated as aspirational rather than a requirement. Any entry that liquidates following a request from a Plaintiff should be treated as an "inadvertent liquidation" and reliquidated or otherwise refunded following a final judgment for Plaintiffs.

4. The instructions issued to the Plaintiffs should make it clear that a liquidation that results from inadvertence on the part of the plaintiff will not result in the loss of the claim. Where a plaintiff can show an effort to submit the required information to request suspension, CBP should be required to treat that entry as "inadvertently liquidated" and reliquidate or refund the duties following a final judgment for Plaintiffs.

5. In recognition that, at least at the beginning of this process, some plaintiffs may not know the Center and Team relevant to their entries, CBP should create a general mailbox to send copies of the DIS submissions when the Center and Team are not known. This effectuates the language of the Court's order by allowing CBP to get the necessary information when Center and Team are not known.

6. Finally, separate from this Status Report itself, Plaintiffs believe that the period of Temporary Restraint, which currently expires on September 2, 2021, should be extended by at least two weeks to allow counsel to communicate the final instructions to our clients and for Plaintiffs to generate and submit the required data.

## IV. Plaintiffs' Conclusion

The preliminary injunction the Court entered had one overarching goal: to protect this Court's jurisdiction to order refunds over all Subject Entries if Plaintiffs prevail on the merits. To effectuate that goal, the Court required Defendants (unless they agreed to a limited stipulation for Subject Entries) to produce an administrable system to suspend Subject Entries while minimizing the burdens on all parties. Yet Defendants' current proposal is unnecessarily complicated and resource-intensive for plaintiffs, does not absolutely preserve the remedy for all Subject Entries, and risks the loss of this Court's subject-matter jurisdiction over claims due to plaintiffs' inadvertent mistakes or inability to meet the Governments' onerous instructions. Despite these

concerns and a pointed request from the Court that it make someone available who is an expert in ACE programming, CBP has yet to do so, leaving the Court with an incomplete picture of the capabilities of ACE and the professionals who manage it. As Plaintiffs have continuously suggested, including in this Status Report, there are multiple available solutions, to mitigate the burdens that Defendants have foisted on Plaintiffs and that allow CBP to suspend Subject Entries efficiently. This Court should order Defendants to adopt them.

Respectfully submitted,

/s/ Matthew R. Nicely
Matthew R. Nicely
Pratik A. Shah
James E. Tysse
Devin S. Sikes
Daniel M. Witkowski
Sarah B. W. Kirwin

AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street, NW
Washington, D.C. 20006

*Counsel to Plaintiffs HMTX Industries LLC, Halstead New England Corporation, Metroflor Corporation, and Jasco Products Company LLC*

BRIAN M. BOYNTON
Acting Assistant Attorney General

/s/ Jeanne E. Davidson
JEANNE E. DAVIDSON
Director

/s/ L. Misha Preheim
L. MISHA PREHEIM
Assistant Director

/s/ Justin R. Miller
JUSTIN R. MILLER
Attorney-In-Charge,
International Trade Field Office

/s/ Jamie L. Shookman
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
26 Federal Plaza, Room 346
New York, NY 10278
Tel: 212-264-2107
Fax: 212-264-1916

SOSUN BAE
Senior Trial Counsel
ANN C. MOTTO
Trial Attorney
Commercial Litigation Branch
Civil Division

Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044

*Attorneys for Defendants*

Date: August 9, 2021