## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:    THE HONORABLE MARK A. BARNETT, CHIEF JUDGE
                THE HONORABLE CLAIRE R. KELLY, JUDGE
                THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

_____
                                           :
                                           :
*In Re* Section 301 Cases                      :             Court No. 21-00052
                                           :
_____:

### PROPOSED BRIEF OF AMICI CURIAE RETAIL LITIGATION CENTER, INC., NATIONAL RETAIL FEDERATION, AMERICAN APPAREL & FOOTWEAR ASSOCIATION, CONSUMER TECHNOLOGY ASSOCIATION, FOOTWEAR DISTRIBUTORS AND RETAILERS OF AMERICA, JUVENILE PRODUCTS ASSOCIATION, AND TOY ASSOCIATION

**TABLE OF CONTENTS**

TABLE OF CONTENTS...................................................................................................... i

TABLE OF AUTHORITES ............................................................................................... ii

INTERESTS OF AMICI.................................................................................................... 1

INTRODUCTION ............................................................................................................. 1

STATUTORY BACKGROUND........................................................................................ 2

FACTUAL AND PROCEDURAL HISTORY .................................................................. 3

    1.   USTR investigates China's technology- and IP-related trade practices ...................... 3

    2.   USTR imposes tariffs in Lists 1 and 2 ....................................................................... 4

    4.   USTR imposes and expands List 4 tariffs to include virtually all
        Chinese goods ............................................................................................................ 7

    5.   U.S. businesses file suit .............................................................................................. 9

ARGUMENT ..................................................................................................................... 9

A.   USTR IMPOSED LISTS 3 AND 4 WITHOUT ADEQUATE PROCESS
     REQUIRED BY LAW................................................................................................ 9

    1.   USTR did not provide meaningful opportunity for comment ................................... 10

    2.   USTR Failed To Consider Substantial Objections To Lists 3 And 4 ......................... 12

B.   SUBSTANTIAL HARM PREDICTED BY RETAILERS AND SUPPLY
     CHAIN PARTNERS WAS REALIZED ................................................................... 14

    1.   The record documented a variety of negative consequences that would
        flow from the tariffs................................................................................................... 14

    2.   The predicted harms materialized .............................................................................. 16

CONCLUSION................................................................................................................. 18

CERTIFICATE OF COMPLIANCE................................................................................ 19

## TABLE OF AUTHORITES

**Page(s)**

**Cases**

*Connecticut Light & Power Co. v. Nuclear Regul. Comm'n*,
    673 F.2d 525 (D.C. Cir. 1982)................................................................11

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
    140 S. Ct. 1891 (2020)......................................................................14

*Gilda Indus., Inc. v. United States*,
    622 F.3d 1358 (Fed. Cir. 2010)........................................................10

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)............................................................................13

*N. Carolina Growers' Ass'n, Inc. v. United Farm Workers*,
    702 F.3d 755 (4th Cir. 2012) ...........................................................12

*Perez v. Mortg. Bankers Ass'n*,
    575 U.S. 92 (2015)............................................................................13

*W. Coal Traffic League v. United States*,
    677 F.2d 915 (D.C. Cir. 1982) .........................................................13

**Statutes, Regulations, Admistrative Proceedings**

5 U.S.C. § 553(c) ......................................................................................3, 9

5 U.S.C. § 706(2) .........................................................................................10

19 U.S.C. § 2411(b)(1) ..................................................................................2

19 U.S.C. § 2411(c)(1)(B) .............................................................................2

19 U.S.C. § 2417(a) .........................................................................2, 3, 5, 9, 14

28 U.S.C. § 2640(e) ......................................................................................10

*Actions by the United States Related to the Section 301 Investigation of China's
    Laws, Policies, Practices, or Actions Related to Technology Transfer,
    Intellectual Property, and Innovation*, 83 Fed. Reg. 13099 (Mar. 27, 2018) ............4

*Extension of Public Comment Period Concerning Proposed Modification of
    Action Pursuant to Section 301*, 83 Fed. Reg. 38760-02 (Aug. 7, 2018) ................6

*Initiation of Section 301 Investigation*, 82 Fed. Reg. 40213-01 (Aug. 24, 2017)..............3

*Notice of Action and Request for Public Comment Concerning Proposed
    Determination of Action Pursuant to Section 301*, 83 Fed. Reg. 28710-01
    (June 20, 2018)..............................................................................4, 5

*Notice of Action Pursuant to Section 301*, 83 Fed. Reg. 40823-01
    (August 16, 2018) ................................................................................5

*Notice of Determination and Request for Public Comment Concerning Proposed
    Determination of Action Pursuant to Section 301: China's Acts, Policies, and
    Practices Related to Technology Transfer, Intellectual Property, and
    Innovation*, 83 Fed. Reg. 14906-02 (Apr. 6, 2018)...........................................4

*Notice of Modification of Section 301 Action*, 83 Fed. Reg. 47974-01
    (Sept. 21, 2018)..........................................................................7, 13

*Notice of Modification of Section 301 Action*, 84 Fed. Reg. 20459-01
(May 9, 2019)..................................................................................................7

*Notice of Modification of Section 301 Action*, 84 Fed. Reg. 43304 (Aug. 20, 2019)...............8, 13

*Notice of Modification of Section 301 Action*, 84 Fed. Reg. 45821-01
(Aug. 30, 2019).........................................................................................8, 9

*Notice of Modification of Section 301 Action*, 84 Fed. Reg. 69447 (Dec. 18, 2019) ....................9

*Notice of Modification of Section 301 Action*, 85 Fed. Reg. 3741 (Jan. 22, 2020)........................9

*Request for Comments Concerning Proposed Modification of Action Pursuant to
Section 301*, 83 Fed. Reg. 33608-01 (July 17, 2018)............................................6, 10

*Request for Comments Concerning Proposed Modification of Action Pursuant to
Section 301*, 84 Fed. Reg. 22564 (May 17, 2019) ..............................................8, 11

**Other Authorities**

Editorial Board, *The 2019 Growth Slowdown*, Wall Street Journal (Jan. 31,
2020), https://www.wsj.com/articles/the-growth-cost-of-tariffs-11580430490 .....................16

Yen Nee Lee, *U.S. companies are bearing the brunt of Trump's China tariffs,
says Moody's*, CNBC (May 18, 2021), https://www.cnbc.com/2021/05/18/us-
companies-bearing-the-brunt-of-trumps-china-tariffs-says-moodys.html............................16

National Retail Federation Comment Letter on Section 301, USTR-2018-0026-
5650 (Sept. 6, 2018).....................................................................................15

National Retail Federation Comment Letter on Section 301, USTR-2019-0004-
2358 (June 17, 2019)................................................................................15, 16

Alan Rappeport and Keith Bradsher, *Yellen Says China Trade Deal Has 'Hurt
American Consumers'*, N.Y. Times (July 16, 2021),
https://www.nytimes.com/2021/07/16/us/politics/yellen-us-china-trade.html .....................17

Retail Industry Leaders Association Comment Letter on Proposed Modification of
Action Pursuant to Section 301, USTR-2018-0026-5887 (Sept. 6, 2018).................14, 15, 16

Retail Industry Leaders Association Comment Letter on Proposed Modification of
Action Pursuant to Section 301 (List 4), USTR-2019-0004-2058 (June 17,
2019) .................................................................................................14, 15

Howard Schneider, *Americans, not Chinese, pay Trump tariffs: NY Fed study*,
Reuters (Nov. 25, 2019), https://www.reuters.com/article/us-usa-fed-
tariffs/americans-not-chinese-pay-trump-tariffs-ny-fed-study-
idUSKBN1XZ2A4.......................................................................................16

*Section 301 Fact Sheet* (Mar. 22, 2018), https://ustr.gov/about-us/policy-
offices/press-office/fact-sheets/2018/march/Section-301-fact-sheet ...................................4

Andrea Shalal, *Trump's tariffs cost U.S. companies $46 billion to date, data
shows*, Reuters (Jan. 9, 2020), https://www.reuters.com/article/us-usa-trade-
economy/trumps-tariffs-cost-u-s-companies-46-billion-to-date-data-shows-
idUSKBN1Z8222 ......................................................................................16

U.S. Trade Representative, *Findings of the Investigation Into China's Acts,
Policies, And Practices Related to Technology Transfer, Intellectual Property,
and Innovation Under Section 301 of The Trade Act of 1974* (Mar. 22, 2018),
https://ustr.gov/sites/default/files/Section%20301%20FINAL.PDF ....................................3, 4

## INTERESTS OF AMICI

Amici, the Retail Litigation Center, Inc. ("RLC"), the National Retail Federation ("NRF"), the American Apparel & Footwear Association ("AAFA"), the Consumer Technology Association ("CTA"), the Footwear Distributors and Retailers of America ("FDRA"), the Juvenile Products Manufacturers Association ("JPMA"), and the Toy Association ("TA") are trade associations whose members have been negatively affected by the China 301 tariffs and have a strong interest in trade policy.  RLC's affiliate, the Retail Industry Leaders Association ("RILA") (many of whose members are also RLC members), NRF, CTA, JPMA, TA, AAFA, FDRA and the associations' individual members submitted comments to USTR in the List 3 and 4 proceedings at issue here.  Additional information about amici can be found in the Appendix to this brief.

## INTRODUCTION

During two brief periods in the summers of 2018 and 2019, the Office of the U.S. Trade Representative ("USTR") proposed and finalized massive tariffs on virtually all imports from China.  Plaintiffs' brief demonstrates that USTR clearly exceeded its authority under the Trade Act of 1974 ("Trade Act") when it imposed those tariffs without connecting them to the underlying investigation of China's trade practices.  Plaintiffs also persuasively argue that USTR violated the Administrative Procedure Act ("APA") by failing to give adequate opportunity for, or consideration of, public comments.  Amici agree, and file this brief to further illuminate USTR's willful procedural failures and to explain their negative consequences across the supply chain.

With hundreds of billions of dollars at stake and the country's economic wellbeing in the balance, thousands of stakeholders attempted to engage with the USTR in 2018 and 2019 to explain how its proposed actions would negatively affect American businesses and consumers.  Amici, their members, and other stakeholders filed close to 10,000 comments and pieces of testimony.

To do so, stakeholders had to navigate USTR's compressed public-comment deadlines that left inadequate time, often just a few days, to analyze and explain the proposed tariffs' far-reaching consequences. Despite the large volume of stakeholder input, the overwhelming majority of which opposed the tariffs, USTR refused to respond to *any* of the identified concerns. These stark defects violated USTR's statutory obligations to provide opportunity for meaningful public comment and engage in reasoned decision-making.

If USTR had satisfied its obligation to allow for meaningful comments from amici and others and had actually considered them, it would have recognized the considerable harm its actions would inflict. The tariffs are a hidden tax on U.S. consumers, hurting domestic producers, retailers, and customers alike. And, as predicted, they have had a significant adverse impact on the U.S. economy.

## STATUTORY BACKGROUND

Section 301(b) of the Trade Act authorizes the USTR to impose tariffs upon a showing that "an act, policy, or practice of a foreign country" is "unreasonable or discriminatory" and "burdens or restricts United States commerce." 19 U.S.C. § 2411(b)(1). Following an investigation, USTR must determine whether "action by the United States is appropriate." 19 U.S.C. § 2411(b)(2). If so, USTR may "take all appropriate and feasible action authorized" by the statute, including "impos[ing] duties or other import restrictions on the goods of" another country "for such time as the Trade Representative determines appropriate." 19 U.S.C. §§ 2411(b)(2), (c)(1)(B).

Once a Section 301 action has been implemented, USTR may "modify or terminate" the action only in specified circumstances. 19 U.S.C. § 2417(a)(1). Modification or termination is permissible if the trade rights of the United States are no longer being denied, the burden on U.S. commerce has increased or decreased, or the USTR action is "no longer appropriate." 19 U.S.C. § 2417(a)(1).

2

"Before taking any action . . . to modify or terminate" a trade action, USTR "shall consult . . . with representatives of the domestic industry concerned" and "provide opportunity for the presentation of views by other interested persons affected by the proposed modification or termination concerning the effects of the modification or termination and whether any modification or termination of the action is appropriate." 19 U.S.C. § 2417(a)(2). That Trade Act-specific consultation requirement reinforces USTR's duties under the APA to provide notice of its actions, allow the public a meaningful opportunity to comment, and engage in reasoned decision making. *See* 5 U.S.C. § 553(b)-(c).

## FACTUAL AND PROCEDURAL HISTORY

Between August 2017 and September 2019, USTR imposed an escalating series of tariffs that ultimately covered virtually all imports from China. The detailed chronology of USTR's actions below is important because it illustrates how USTR deprived stakeholders of a meaningful opportunity to participate in these hugely consequential decisions.

### 1.    *USTR investigates China's technology- and IP-related trade practices*

In August 2017, USTR initiated a Section 301 inquiry "to determine whether acts, policies, and practices of the Government of China related to technology transfer, intellectual property, and innovation are actionable under the Trade Act." *Initiation of Section 301 Investigation*, 82 Fed. Reg. 40213-01, 40213 (Aug. 24, 2017).

After a seven-month investigation, USTR concluded that China's technology and intellectual property ("IP") practices were "unreasonable or discriminatory." USTR, *Findings of the Investigation Into China's Acts, Policies, And Practices Related to Technology Transfer, Intellectual Property, and Innovation Under Section 301 of The Trade Act of 1974* 153 (Mar. 22,

2018).[1]  The agency's report focused on four practices: (1) China's efforts to pressure technology transfers from U.S. companies to Chinese entities, *id*. at 19; (2) IP licensing that favored Chinese companies, *id*. at 48; (3) systematic investment in, or acquisition of, U.S. companies, *id*. at 62; and (4) intrusions into U.S. commercial computer networks to access business information, *id*. at 153.

USTR estimated that those practices burdened the U.S. economy by approximately $50 billion annually and announced its intent to propose tariffs "on certain products of China, with an annual trade value commensurate with the harm caused to the U.S. economy resulting from China's unfair policies." *Section 301 Fact Sheet* (Mar. 22, 2018);[2] *see Actions by the United States Related to the Section 301 Investigation of China's Laws, Policies, Practices, or Actions Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 13099 (Mar. 27, 2018).

### 2.    *USTR imposes tariffs in Lists 1 and 2*

In April 2018, USTR proposed tariffs on approximately $50 billion in products from China. *Notice of Determination and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 14906-02, 14907 (Apr. 6, 2018).

After receiving public comment and holding hearings, USTR narrowed its final list of tariffs to $34 billion in goods (List 1).  *Notice of Action and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301*, 83 Fed. Reg. 28710-01, 28711 (June 20, 2018) ("*List 1 Notice*").  USTR also proposed additional tariffs on approximately

---

[1] https://ustr.gov/sites/default/files/Section%20301%20FINAL.PDF.

[2] https://ustr.gov/about-us/policy-offices/press-office/fact-sheets/2018/march/Section-301-fact-sheet.

$16 billion in products (List 2) to "maintain the effectiveness of a $50 billion trade action." *Id*. at 28712. List 1 went into effect in July 2018, and, after another round of comments and hearings, List 2 tariffs went into effect the following month. *Notice of Action Pursuant to Section 301*, 83 Fed. Reg. 40823-01, 48024 (Aug. 16, 2018) ("*List 2 Notice*"). In contrast to the subsequent Lists 3 and 4 at issue here, Lists 1 and 2 covered "products containing industrially significant technology, including technologies and products related to the 'Made in China 2025 program.'" *List 1 Notice*, 83 Fed. Reg. at 28711; *List 2 Notice*, 83 Fed. Reg. at 40823.

### 3.    *The trade war escalates, and USTR imposes List 3 tariffs*

**<u>Timeline of 2018 List 3 Proceedings (proposed $200 billion in tariffs)</u>**



In July 2018, China retaliated by announcing duties in an equivalent amount: tariffs on U.S. goods valued at roughly $50 billion. Almost immediately, USTR invoked its authority under 19 U.S.C. § 2417(a)(1)(c) to "modify or terminate" a Section 301 action and proposed 10% duties on a set of $200 billion in products designed to "cover a substantial percentage of Chinese imports"

(List 3).  *Request for Comments Concerning Proposed Modification of Action Pursuant to Section 301*, 83 Fed. Reg. 33608-01, 33609 (July 17, 2018).  List 3 was announced before List 2 was finalized and implemented and well before USTR could evaluate China's response.  USTR did not suggest that the proposed List 3 tariffs had any direct relationship with China's IP or tech practices at issue in the agency's investigation.  Instead, "supplemental" List 3 was based solely on "China's announcement that it was imposing retaliatory tariffs on U.S. goods."  *Id*.  Notwithstanding the vast scope of List 3, covering a significant percentage of all goods imported from China, USTR also proposed a tight public comment timeline, initially setting a 30-day deadline for comments by August 17, 2018, followed by a hearing three days later on August 20, and rebuttal submissions a mere ten days later on August 30.  *Id*.

On August 7, 2018, just ten days before the deadline for written comments on List 3, USTR proposed more than doubling the size of the List 3 tariffs from 10% to 25%.  *Extension of Public Comment Period Concerning Proposed Modification of Action Pursuant to Section 301*, 83 Fed. Reg. 38760-02, 38760 (Aug. 7, 2018).  Instead of extending the comment deadlines to allow stakeholders adequate time to comment on the more than doubled tariffs, USTR did the opposite. It further compressed the public comment period without moving the already-scheduled August 20 hearing—requiring proposed testimony by August 13 (only six days from USTR's announcement of the expansion of duties to 25%) and combining the deadlines for initial written comments and rebuttal comments on the same day, September 6.  *Id*. at 38761.  As a result, amici and other stakeholders had less than a month from USTR's announcement of the 25% tariffs to assess their impact on supply chains, businesses operations, and customers and to formulate thoughtful comments.

Despite testimony from 350 witnesses and more than 6,000 comments, USTR finalized the List 3 tariffs just two weeks later on September 21, 2018. *Notice of Modification of Section 301 Action*, 83 Fed. Reg. 47974-01, 47974 (Sept. 21, 2018). In doing so, the agency did not respond to any of the thousands of public comments it had received, which overwhelmingly opposed extension of List 3 tariffs to product categories outside the scope of the underlying U.S.-China trade dispute. List 3 went into effect three days later on September 24, 2018, imposing 10% duties on covered products, with an automatic increase to 25% scheduled less than three months later. *Id*. The 25% increase was delayed by trade negotiations and went into effect in May 2019. *See Notice of Modification of Section 301 Action*, 84 Fed. Reg. 20459-01, 20459-60 (May 9, 2019). From start to finish, USTR took only two months to impose tariffs on U.S. imports from China valued at more than $200 billion—already quadruple the value of the underlying harm.

**4.    *USTR imposes and expands List 4 tariffs to include virtually all Chinese goods***

<u>**Timeline of 2019 List 4 Proceedings (proposed $300 billion in tariffs)**</u>



In May 2019, eight days after the tariff on List 3 products was increased to 25% and without attempting to assess their impact on the trade dispute or the American economy, USTR proposed new 25% tariffs on an additional $300 billion in Chinese products (List 4).  *Request for Comments Concerning Proposed Modification of Action Pursuant to Section 301*, 84 Fed. Reg. 22564, 22564 (May 17, 2019).  List 4 was sweeping—it covered "essentially *all* products [imported from China] not currently covered by action in this investigation."  *Id.* (emphasis added). USTR followed the path forged by List 3:  it did not purport to tailor List 4 tariffs to findings in the Section 301 investigation, and it set accelerated deadlines for public comments.  Written comments were due on June 17, 2019—31 days after USTR's announcement and the same day that public hearings were scheduled to begin.  *Id.* at 22565.  Rebuttal comments were due seven days after the last day of hearings.  *Id.*

USTR finalized the List 4 tariff action a month later.  *Notice of Modification of Section 301 Action*, 84 Fed. Reg. 43304, 43304 (Aug. 20, 2019).  The List 4 tariffs would be implemented in two stages:  List 4A would impose a 10% duty on $120 billion in goods almost immediately, while List 4B would impose a 10% duty on all other goods (with narrow exceptions) on December 15. *Id.*  Like List 3, USTR did not respond to a single public comment or piece of testimony despite the effort of 3,000 commenters to share information and objections and the testimony of more than 300 witnesses.  The agency's single nod to the huge volume of public opposition was its bald assertion that its "determination takes account of the public comments."  *Id.* at 43305.

For a third time, USTR did not wait to gauge the effectiveness of its proposed action in changing China's practices.  Ten days after finalizing List 4, and just two days before List 4A went into effect, USTR announced it was increasing the tariff rate on List 4A and 4B from 10% to 15%. *Notice of Modification of Section 301 Action*, 84 Fed. Reg. 45821-01, 45821 (Aug. 30, 2019).

Because the agency had already "invited public comments on duties of up to 25 percent on the products covered by the proposed $300 billion action," it said it did not need to solicit additional comments or hold any further proceedings. *Id*. USTR eventually suspended the List 4B duties as part of a trade deal with China, *Notice of Modification of Section 301 Action*, 84 Fed. Reg. 69447 (Dec. 18, 2019), and reduced the applicable duty rate for List 4A products to 7.5%, *Notice of Modification of Section 301 Action*, 85 Fed. Reg. 3741 (Jan. 22, 2020). The broad scope of List 4A remained unchanged.

Combined, Lists 1-4A tariffs continue to be in place on goods valued at more than $350 billion annually—seven times the value of harm identified by USTR in the underlying Section 301 investigation.

### 5.    *U.S. businesses file suit*

In September 2020, plaintiffs filed this suit challenging the List 3 and List 4A tariffs as unlawful under the Trade Act and APA. More than 6,500 businesses soon filed similar actions. The Court named this suit the sample case, and the government moved to dismiss or, alternatively, for judgment on the administrative record.

## ARGUMENT

### A.    USTR Imposed Lists 3 and 4 Without Adequate Process Required By Law

The Trade Act requires USTR to "consult . . . with representatives of the domestic industry concerned, and [to] provide opportunity for the presentation of views by other interested persons affected by the proposed modification or termination concerning the effects of the modification or termination and whether any modification or termination of the action is appropriate." 19 U.S.C. § 2417(a)(2). In addition, the Administrative Procedure Act requires all agencies to give the public a meaningful opportunity to submit data and written analysis about a proposed rulemaking. 5 U.S.C. § 553(c). This Court evaluates USTR tariff decisions using the APA's procedural

requirements. *See* 28 U.S.C. § 2640(e); *Gilda Indus., Inc. v. United States*, 622 F.3d 1358, 1363 (Fed. Cir. 2010).[3]  Under the APA standard, the Court must set aside any agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).  As detailed below, USTR violated its basic procedural obligations under the Trade Act and APA by promulgating Lists 3 and 4 without meaningful opportunity for public comment and by failing to consider and respond to any of the nearly 10,000 objections it received.

### 1.    *USTR did not provide meaningful opportunity for comment*

China is one of the United States' top three trading partners and supplied $539 billion in imported goods in 2018 alone.  U.S. Census Bureau, *Trade in Goods with China*.[4]  Every part of the U.S. economy—producers, manufacturers, retailers and consumers—is affected by this important trading relationship.  So, proposing the extension of tariffs to virtually all products imported from China was momentous and called for a measured and thoughtful effort to solicit meaningful comments and consider likely consequences.  Instead, USTR did the opposite and imposed unreasonably short deadlines for public comment relative to the magnitude of its proposals, severely limiting stakeholders' ability to participate meaningfully.

Over the course of just two months in 2018, while it was still finalizing List 2 tariffs, USTR proposed, expanded, and finalized 25% duties on $200 billion worth of List 3 products reflecting "a substantial percentage of Chinese imports."  *Request for Comments Concerning Proposed Modification of Action Pursuant to Section 301*, 83 Fed. Reg. at 33609.  The tariffs applied to

---

[3] For the reasons given by Plaintiffs, Cross-Motion and Response at 47-50 & 62, Defendants are mistaken that the APA is inapplicable because of the President's involvement or because of the foreign affairs exception.  Motion to Dismiss at 22, 29.

[4] https://www.census.gov/foreign-trade/balance/c5700.html.

millions of List 3 products covering a dizzying array of products, from frozen shrimp to frozen strawberries, handbags to wallets, doormats to bathmats, air conditioners to tower heaters. Despite the staggering scale and far-reaching effects of that action, USTR required interested parties to propose testimony *less than a week* after announcing its expanded action (from August 7 to August 13). And it incomprehensibly required parties to submit initial comments *and* rebuttal comments *on the very same day* (September 6), rendering actual rebuttal impossible. From start to finish, List 3 was finalized 66 days after it was first proposed, and just 45 days after USTR proposed dramatically expanding the tariff rate to 25%.

Despite its larger scale, the timeframe and process for List 4 tariffs in 2019 was similarly defective. In a few months, USTR proposed, finalized, and expanded tariffs on $300 billion in goods representing "essentially all products" from China that were not already covered by prior actions. 84 Fed. Reg. at 22564. Like List 3, the number and variety of products covered by List 4 were breathtaking, including clothes, shoes, jewelry, yard equipment, and televisions (among thousands of other products). Initial public comments were due on the same day that hearings began and interested parties had only seven days to submit rebuttals. Making matters worse, USTR did not even bother to solicit comments when, on the eve of List 4A's effective date, it expanded the tariff rate from 10% to 15%.

"[T]he opportunity for interested parties to participate in a meaningful way in the discussion and final formulation of rules" is a "particularly important component" of an agency's decision-making process. *Connecticut Light & Power Co. v. Nuclear Regul. Comm'n,* 673 F.2d 525, 528 (D.C. Cir. 1982). While neither the APA nor the Trade Act sets a specific number of days an agency must allow for comments, courts have recognized that agencies do not provide "a meaningful opportunity" for public input where a comment period is "exceedingly short," the

public has demonstrated substantial interest in commenting, and the agency has not demonstrated "exigent circumstances in which agency action was required" in a short timeframe. *N. Carolina Growers' Ass'n, Inc. v. United Farm Workers*, 702 F.3d 755, 770 (4th Cir. 2012) (ten-day comment period with 800 comments submitted did not offer meaningful opportunity).

USTR provided no "meaningful opportunity" for public input on the Lists 3 and 4 tariffs. *Id.* Those proposed tariffs implicated hundreds of billions of dollars of imports and affected almost every facet of the U.S. economy. Many stakeholders, including amici's members, must plan out their international supply chains and delivery schedules months in advance. Not surprisingly, these businesses needed time to review the hundreds of thousands of products they manufacture, transport, and sell to evaluate the availability and feasibility of alternative non-Chinese sources and to assess impacts on supply chains and retail operations. They also needed time to respond to other parties' comments—something that was impossible on List 3 with its simultaneous deadline for initial and rebuttal comments.

In sum, USTR's arbitrary deadlines and truncated process deprived thousands of interested parties, including amici and their members, of the opportunity to fully and meaningfully engage with USTR on a host of important issues. USTR provided no rationale or justification for the truncated process and short deadlines and never explained why they were necessary. For these reasons, USTR's abbreviated process for soliciting comments on Lists 3 and 4 violated both the APA's and Trade Act's meaningful comment requirements.

### 2.   *USTR Failed To Consider Substantial Objections To Lists 3 And 4*

Given USTR's short timeframes for public feedback on Lists 3 and 4, it is no surprise that the outcome was preordained. Tariffs were implemented almost immediately without any indication that USTR actually considered the huge number of comments and pieces of testimony it received (i.e., more than 6,000 written comments on List 3, *Notice of Modification of Section*

*301 Action*, 83 Fed. Reg. at 47974, and nearly 3,000 comments on List 4, *Notice of Modification of Section 301 Action*, 84 Fed. Reg. at 43304, and more than 600 total witnesses testified at the Lists 3 and 4 hearings. *Id*.; *Notice of Modification of Section 301 Action*, 83 Fed. Reg. at 47974). As explained below, these comments and pieces of testimony raised serious concerns about the far-reaching consequences of imposing steep tariffs on essentially every product from the largest exporter to the United States. *See infra* Part B. But USTR failed to respond to *any* of the issues raised by stakeholders. Nor did it give itself adequate time to do so. Instead, USTR finalized tariff actions under both Lists 3 and 4 within a few weeks of receiving final submissions. Indeed, in the two weeks USTR gave itself for list 3, it would have been physically impossible to actually consider the massive volume of stakeholder input.

These fundamental procedural defects cannot be reconciled with USTR's obligation under both the APA and the Trade Act to engage in reasoned decision-making. An agency is not required to respond to every comment it receives, but it "must consider and respond to significant comments received during the period for public comment." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). The requirement for agencies to provide adequate notice and opportunity for public comment is not some empty formality. It is core to an agency's reasoned decision-making process, ensuring that it does not "entirely fail[] to consider an important aspect of the problem" before it, or "offer[] an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Indeed, "an agency decision may not be reasoned if the agency ignores vital comments regarding relevant factors, rather than providing an adequate rebuttal." *W. Coal Traffic League v. United States*, 677 F.2d 915, 927 (D.C. Cir. 1982). This is particularly true in the context of modifications to Section 301 trade actions, where Congress expressly directed USTR to consider public industry

concerns in the course of determining "the effects of the modification . . . and whether any modification . . . of the action is appropriate."  19 U.S.C. § 2417(a)(2).

As noted previously, amici agree with Plaintiffs that USTR exceeded its statutory authority when imposing the List 3 and 4 tariffs. But even assuming that USTR had statutory authority to do so, it was not free to act without providing stakeholders an opportunity for meaningful comment and a reasoned explanation for its action.  USTR's compressed deadlines and rapid implementation of Lists 3 and 4 tariffs left the agency no time to meaningfully engage with stakeholders or consider the significant problems raised in the 10,000 comments and pieces of testimony.  And the agency did not even purport to do so.  Its "fail[ure] to consider the conspicuous issues" before it was arbitrary and capricious, and must be set aside.  *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1916 (2020).

**B.     Substantial Harm Predicted by Retailers And Supply Chain Partners Was Realized**

Not surprisingly, USTR's failure to follow mandated procedures produced bad public policy.  Comments by amici, their members and others identified the immense harm the proposed tariffs would cause to the U.S. economy.   USTR ignored those comments, stayed on its predetermined course, and the predicted harms ensued.

> *1.     The record documented a variety of negative consequences that would flow from the tariffs*

As amici tried to explain to USTR, imposing tariffs on virtually all imports from China acts as a hidden tax for consumers on everyday products.  RILA Comment Letter on Proposed Modification of Action Pursuant to Section 301 at 1-2, USTR-2018-0026-5887 (Sept. 6, 2018) ("RILA List 3 Comment Letter"); RILA Comment Letter on Proposed Modification of Action Pursuant to Section 301 (List 4) at 2, USTR-2019-0004-2058 (June 17, 2019) ("RILA List 4 Comment Letter").  This hidden tax hits low- and middle-income consumers the hardest, raising

the price of everything from lightbulbs to baby cribs.  RILA List 3 Comment Letter at 3.  Indeed, the full range of affected products are "purchased by nearly every American household," National Retail Federation Comment Letter on Section 301 at 2, USTR-2018-0026-5650 (Sept. 6, 2018) ("NRF List 3 Comment Letter"), and amici advised that proposed tariffs could cause the average American family to pay $2,300 more each year for goods and services, RILA List 4 Comment Letter at 2.  Tariffs on furniture alone could cost Americans more than $4 billion annually.  NRF List 3 Comment Letter, Appendix E.  The bottom line:  USTR levied two of the largest tax increases on American consumers in history—with minimal input and insufficient analysis of consequences.

Among the consequences USTR chose to ignore was the disruptive impact on the supply chains of U.S. retailers, manufacturers, and producers.  For many of the Lists 3 and 4 products, China is the sole or primary source.  NRF List 3 Comment Letter at 3.  For example, China supplied 93 percent of the 15.7 million bikes imported in 2017, 85 percent of toys sold in the United States, 84 percent of travel goods, and 72 percent of all footwear.  RILA List 3 Comment Letter at 2-3; RILA List 4 Comment Letter at 2-4.  Even where there are sourcing alternatives, many countries lack the manufacturing capacity or expertise necessary to meet the quality and product volume requirements for the U.S. market.  Moreover, shifting production to another country can take years, *id.* at 4. Forcing precipitous changes "poses a major risk to supply chains," RILA List 3 Comment Letter at 3, because many U.S. companies, including amici's members, rely on carefully calibrated delivery schedules set up to 12 months in advance.  RILA List 3 Comment Letter at 3-4; NRF List 3 Comment Letter at 4. Companies cannot swap suppliers overnight, especially given the complex set of logistical factors informing such decisions: trade laws, responsible sourcing, raw materials, taxes, shipping routes, and workforce education to name just a few.  Small retailers and businesses

would be especially hard hit, because they lack the market power to negotiate with suppliers.  NRF Comment Letter on Section 301 at 5, USTR-2019-0004-2358 (June 17, 2019).

Amici warned that the negative effects of List 3 and 4 tariffs would be widespread, and "[t]he ripple effect of these tariffs will be felt in every sector of the American economy."  RILA List 3 Comment Letter at 2.  Tariffs would hurt domestic manufacturers because component parts are subject to tariffs.  *Id*.  Even domestic producers of raw goods (e.g., cotton farmers and commercial fishers) would be hurt because they supply materials to Chinese companies that reprocess the materials and export the finished products for sale to U.S. consumers.  *Id*. at 4-5.

### 2.    *The predicted harms materialized*

Amici's comments in 2018 and 2019 proved prescient.  The U.S. economy grew only 2.3 percent in 2019—weak annual GDP growth that the *Wall Street Journal* attributed to "trade friction" with China.  Editorial Board, *The 2019 Growth Slowdown*, WALL STREET JOURNAL (Jan. 31, 2020).[5]  The tariffs cost U.S. companies some $46 billion in 2018 and 2019 alone. Andrea Shalal, *Trump's tariffs cost U.S. companies $46 billion to date, data shows*, REUTERS (Jan. 9, 2020).[6]  Recent independent studies confirmed that American consumers, not Chinese firms, paid the price for List 3 and 4 tariffs.  Howard Schneider, *Americans, not Chinese, pay Trump tariffs: NY Fed study*, REUTERS (Nov. 25, 2019);[7] Yen Nee Lee, *U.S. companies are bearing the brunt of*

---

[5] https://www.wsj.com/articles/the-growth-cost-of-tariffs-11580430490.

[6] https://www.reuters.com/article/us-usa-trade-economy/trumps-tariffs-cost-u-s-companies-46-billion-to-date-data-shows-idUSKBN1Z8222.

[7] https://www.reuters.com/article/us-usa-fed-tariffs/americans-not-chinese-pay-trump-tariffs-ny-fed-study-idUSKBN1XZ2A4.

*Trump's China tariffs, says Moody's*, CNBC (May 18, 2021).[8]  Even current federal officials acknowledge the significant harm caused by these tariffs. Recently, Treasury Secretary Janet Yellen said that the China tariffs were "taxes on consumers" that "hurt American consumers" and were not implemented "in a way that was very thoughtful with respect to where there are problems and what is the U.S. interest."  Alan Rappeport and Keith Bradsher, *Yellen Says China Trade Deal Has 'Hurt American Consumers'*, N.Y. TIMES (July 16, 2021).[9]

It is precisely those harms, caused by USTR's flawed process and rush to judgment, that support plaintiffs' claims in this case. The Trade Act and APA required USTR to establish a reasonable process for soliciting public comment and to meaningfully address them.  The agency's failure to satisfy these basic requirements of reasoned decision-making requires that its decisions be set aside.

---

[8] https://www.cnbc.com/2021/05/18/us-companies-bearing-the-brunt-of-trumps-china-tariffs-says-moodys.html.

[9] https://www.nytimes.com/2021/07/16/us/politics/yellen-us-china-trade.html.

## **CONCLUSION**

The Court should deny defendants' motion to dismiss and grant judgment for plaintiffs on the administrative record.


Dated: August 9, 2021                    Respectfully submitted,

                                         /s/ Joseph R. Palmore
                                         JOSEPH R. PALMORE
                                         ADAM L. SORENSEN
                                         MORRISON & FOERSTER LLP
                                         2100 L Street, NW, Ste. 900
                                         Washington, DC 20037
                                         (202) 887-1500
                                         JPalmore@mofo.com


                                         *Counsel for Retail Litigation Center,*
                                         *National Retail Federation, American*
                                         *Apparel & Footwear Association, Consumer*
                                         *Technology Association, Footwear*
                                         *Distributors and Retailers of America,*
                                         *Juvenile Products Association, and Toy*
                                         *Association*

## CERTIFICATE OF COMPLIANCE

I, Joseph R. Palmore, an attorney with Morrison & Foerster LLP who is responsible for this amicus brief, dated August 9, 2021, relying upon the word count feature of the word processing program used to prepare the brief, certify that this brief complies with the word count limitation set out in the Court's April 13, 2021 Scheduling Order and contains 4.885 words.

/s/ Joseph R. Palmore

## APPENDIX

The Retail Litigation Center, Inc. ("RLC") is the only trade organization dedicated to representing the retail industry in the courts. The RLC's members include many of the country's largest and most innovative retailers. Collectively, they employ millions of workers throughout the United States, provide goods and services to tens of millions of consumers, and account for tens of billions of dollars in annual sales. The RLC seeks to provide courts with retail-industry perspectives on important legal issues affecting its members, and to highlight the potential industry-wide consequences of significant pending cases. Since its founding in 2010, the RLC has participated as an *amicus* in more than 150 judicial proceedings of importance to retailers. RLC's affiliate, the Retail Industry Leaders Association ("RILA"), and RILA's members (many of which are also RLC members) submitted comments to USTR in the List 3 & 4 proceedings at issue here.

The National Retail Federation ("NRF") is the world's largest retail trade association and the voice of retail worldwide. The NRF's membership includes retailers of all sizes, formats and channels of distribution, representing the breadth and diversity of an industry that employs more than 52 million workers and contributes $3.9 trillion annually to GDP. As the industry umbrella group, the NRF regularly submits amicus curiae briefs in cases raising significant legal issues that are important to the retail industry. NRF and its members also submitted comments to USTR in the List 3 & 4 proceedings at issue here.

The American Apparel & Footwear Association ("AAFA") is the national trade association representing apparel, footwear and other sewn products companies, and their suppliers and workers, which compete in the global market. Representing more than 1,000 world famous name brands, AAFA is the trusted public policy and political voice of the apparel and footwear industry, its management and shareholders, its three million U.S. workers, and its contribution of more than $350 billion in annual U.S. retail sales. AAFA and its members submitted comments and testified during the List 3 and List 4 proceedings.

The Consumer Technology Association ("CTA") represents more than 2,200 member companies in the $377 billion U.S. consumer technology industry, which supports more than 15 million U.S. jobs. Member companies come from every facet of the consumer technology industry, including manufacturers, distributors, developers, retailers, and integrators. Over 80% of CTA's members are start-ups, small and mid-sized companies as defined by the Small Business

Administration. CTA's member companies are negatively impacted by the use of tariffs to address the imbalance in the US-China trade relation.

Founded in 1944, the Footwear Distributors & Retailers of America ("FDRA") is governed and directed by footwear executives and is the only trade organization focused solely on the footwear industry. It serves the full footwear supply chain and boosts the bottom lines of its members through innovative products, training and consulting on footwear design and development, sourcing and compliance, trade and customs, advocacy, and consumer and sales trend analysis for retailers selling shoes around the world. FDRA also runs the footwear industry's weekly podcast Shoe-In Show featuring leading footwear executives and experts discussing key business trends.  FDRA members range from small family-owned footwear businesses to multi-national footwear companies. Members include the majority of U.S. footwear manufacturers, brands, retailers and importers. In all, FDRA supports nearly 500 companies and brands worldwide, representing 95% of total U.S. footwear sales, making it by far the largest and most respected American footwear trade and business association.

The Juvenile Products Manufacturers Association ("JPMA") is a national not-for-profit trade organization representing 95% of the prenatal to preschool industry including the producers, importers, or distributors of a broad range of childcare articles that provide protection to infants and assistance to their caregivers. JPMA collaborates with government officials, consumer groups, and industry leaders on programs to educate consumers on the safe selection and use of juvenile products. 90% of our members are small businesses. JPMA and its members also submitted comments to USTR in the List 3 & 4 proceedings at issue here.

The Toy Association™, Inc. ("TA") represents more than 800 businesses—toy manufacturers, importers and retailers, as well as toy inventors, designers and testing labs—all involved in bringing safe, fun, and educational toys and games for children to market. Over 3 billion toys are sold in the U.S. each year, totaling nearly $30 billion at retail, and our members account for approximately 90% of this market. Importantly, over 95% of toy manufacturers, wholesalers, distributors in the United States are small businesses.  With China supplying 85% of all toys sold in the U.S. and with no alternative manufacturing capacity readily available elsewhere, tariffs on toys cause substantial harm to consumers due to higher prices and fewer choices.

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of International Trade by using the CM/ECF system on August 9, 2021.  I certify that all participants in the case are registered CM/ECF users and that service of the brief will be accomplished by the CM/ECF system.

Dated:  August 9, 2021                                  /s/ Joseph R. Palmore