## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE MARK A. BARNETT, CHIEF JUDGE; CLAIRE R. KELLY, JENNIFER CHOE-GROVES, JUDGES

|  |  |
|---|---|
| | : |
| | : |
| IN RE SECTION 301 CASES | : Court No. 21-00052-3JP |
| | : |
| | : |

## DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS, RESPONSE TO PLAINTIFFS' CROSS-MOTION FOR JUDGMENT ON THE AGENCY RECORD, <u>AND RESPONSE TO *AMICUS CURIAE* SUPPORTING BRIEFS</u>

BRIAN M. BOYNTON
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

L. MISHA PREHEIM
Assistant Director

OF COUNSEL:

JUSTIN R. MILLER
Attorney-In-Charge,
International Trade Field Office

MEGAN GRIMBALL
Associate General Counsel
PHILIP BUTLER
Associate General Counsel
EDWARD MARCUS
Assistant General Counsel
Office of General Counsel
Office of the U.S. Trade Representative
600 17th Street N.W.
Washington, D.C. 20508

ELIZABETH A. SPECK
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel: 202-307-0369
Email: Elizabeth.Speck@usdoj.gov

PAULA SMITH
Assistant Chief Counsel
EDWARD MAURER
Deputy Assistant Chief Counsel
VALERIE SORENSEN-CLARK
Attorney
Office of the Assistant Chief Counsel
International Trade Litigation
U.S. Customs and Border Protection
26 Federal Plaza, Room 258
New York, NY 10278

SOSUN BAE
Senior Trial Counsel
ANN C. MOTTO
JAMIE L. SHOOKMAN
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044

October 1, 2021

*Attorneys for Defendants*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... iii

INTRODUCTION ............................................................................................... 1

ARGUMENT ...................................................................................................... 3

I.    Plaintiffs' Claims Regarding The Challenged Tariff Actions Are Not Justiciable ............ 3

      A.    The Challenged Tariff Actions Constitute Unreviewable Presidential
            Action ................................................................................................ 4

      B.    The Challenged Tariff Actions Are Unreviewable Because This Case
            Presents A Nonjusticiable Political Question ........................................... 8

II.   Plaintiffs' Arguments Regarding The Scope Of The Executive Branch's
      Authority Under Section 307 Lack Merit .......................................................... 11

      A.    Plaintiffs Advocate For An Incorrect Standard Of Review That
            Disregards Controlling Federal Circuit Precedent .................................... 11

      B.    Section 307(a)(1)(B) Authorized Lists 3 And 4A .................................... 14

      C.    Section 307(a)(1)(C) Authorized Lists 3 And 4A .................................... 18

            1.    Section 307(a)(1)(C) Is Neither Linked To, Nor Limited By,
                  Section 307(a)(1)(A) ................................................................ 19

            2.    Section 307(a)(1)(B) And Section 307(a)(1)(C) Both Contemplate
                  Escalation Of A Tariff Action .................................................... 21

            3.    The USTR's Past Practice Does Not Support Reading A New
                  Limitation Into The Plain Text Of Section 307(a)(1)(C) ................. 25

            4.    The Issuance Of Lists 3 And 4A Does Not Implicate Principles
                  Of Constitutional Avoidance ...................................................... 27

            5.    Plaintiffs Misunderstand Section 307's Operative Legislative
                  History .................................................................................... 30

III.  If The Challenged Actions Constitute Agency Action, And If The APA Applies,
      USTR's Actions Fall Within The Foreign Affairs Exception, And The USTR
      Complied With All Relevant APA Requirements ............................................... 33

      A.    The Challenged Actions Qualify For The Foreign Affairs Exception ......... 33

B.      The USTR's Actions Were Not Arbitrary And Capricious Or In Excess Of
        Statutory Authority, And Were In Accordance With Law ....................................35

        1.      The Notice Announcing List 3 Complied With The APA.......................35

        2.      The USTR Provided A Meaningful Opportunity To Comment ...............37

        3.      The USTR Considered All Relevant Factors And Responded
                To Public Comments In Accordance With The APA...............................40

IV.     The Court Should Dismiss The Claims Raised By Interested Party Plaintiffs .................42

        A.      Non-Importers Lack Standing To Seek Refunds Of Section 301 Tariffs  ............42

                1.      The Interested Party Plaintiffs Lack Article III Standing .........................44

                2.      The Interested Party Plaintiffs Lack Statutory Standing...........................49

        B.      Should Plaintiffs Prevail, Relief May Be Afforded Only To Importers Of
                Record That Are Directly Responsible For Paying Section 301 Duties...............51

CONCLUSION...................................................................................................................52

## **TABLE OF AUTHORITIES**

### **Cases**

*Agro Dutch Indus. Ltd. v. United States*,
  508 F.3d 1024 (Fed. Cir. 2007)......................................................................... 23

*Air Transp. Ass'n of Am. v. Civ. Aeronautics Bd.*,
  732 F.2d 219 (D.C. Cir. 1984)........................................................................... 40

*Almond Bros. Lumber Co. v. United States*,
  721 F.3d 1320  (Fed. Cir. 2013)................................................................... 10, 29

*Am. Ass'n of Exps. & Imps. v. United States*,
  751 F.2d 1239 (Fed. Cir. 1985)......................................................................... 34

*Am. Inst. for Int'l Steel, Inc. v. United States*,
  376 F. Supp. 3d 1335 (Ct. Int'l Trade 2019), *aff'd*, 806 F. App'x 982 (Fed. Cir.),
  *cert. denied*, 141 S. Ct. 133 (2020) ................................................................... 27

*Arjay Assocs., Inc. v. Reagan*,
  707 F. Supp. 1346 (Ct. Int'l Trade), *aff'd sub nom. Arjay Assocs., Inc. v. Bush*,
  891 F.2d 894 (Fed. Cir. 1989)........................................................................... 48

*Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*,
  397 U.S. 150 (1970)........................................................................................... 49

*Baker v. Carr*,
  369 U.S. 186 (1962)..................................................................................... passim

*Bank of Am. Corp. v. City of Miami*,
  137 S. Ct. 1296 (2017)...................................................................................... 49

*Block v. Cmty. Nutrition Inst.*,
  467 U.S. 340 (1984)........................................................................................... 50

*Bowen v. Massachusetts*,
  487 U.S. 879 (1988)........................................................................................... 51

*Briscoe v. Bell*,
  432 U.S. 404 (1977)........................................................................................... 10

*Canadian Lumber Trade All. v. United States*,
  517 F.3d 1319 (Fed. Cir. 2008).................................................................... 47, 51

*Chevron v. Nat. Res. Def. Council,*
  467 U.S. 837 (1984) ................................................................................. 11, 12, 13

*City of New York v. Permanent Mission of India of United Nations,*
  618 F.3d 172 (2d Cir. 2010) ................................................................................. 34

*Clark v. Martinez,*
  543 U.S. 371 (2005) ................................................................................. 27

*Clinton v. City of New York,*
  524 U.S. 417 (1998) ................................................................................. 47

*Corus Grp. PLC v. Int'l Ttade Comm'n,*
  352 F.3d 1351 (Fed. Cir. 2003) ................................................................................. 4, 6

*Dep't of Transp. v. Pub. Citizen,*
  541 U.S. 752 (2004) ................................................................................. 5

*Dickson v. Sec'y of Def.,*
  68 F.3d 1396 (D.C. Cir. 1995) ................................................................................. 10

*FCC v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009) ................................................................................. 27

*Fed. Energy Admin. v. Algonquin SNG, Inc.,*
  426 U.S. 548 (1976) ................................................................................. 28

*Fedmet Res. Corp. v. United States,*
  755 F.3d 912 (Fed. Cir. 2014) ................................................................................. 13

*Florsheim Shoe Co. v. United States,*
  744 F.2d 787 (Fed. Cir. 1984) ................................................................................. 4

*Fund Democracy, LLC v. SEC,*
  278 F.3d 21 (D.C. Cir. 2002) ................................................................................. 47

*Fund for Animals v. Norton,*
  295 F. Supp. 2d 1 (D.D.C. 2003) ................................................................................. 48

*Gen. Elec. Co. v. United Techs. Corp.,*
  928 F.3d 1349 (Fed. Cir. 2019), *cert. denied sub nom.*
  *Gen. Elec. Co. v. Raytheon Techs. Corp.,* 140 S. Ct. 2820 (2020) ................................ 46

*Gettman v. DEA,*
  290 F.3d 430 (D.C. Cir. 2002) ................................................................................. 47, 48

*Gilda Indus., Inc. v. United States*,
446 F.3d 1271 (Fed. Cir. 2006) ............................................................... 51

*Gilda Indus., Inc. v. United States*,
622 F.3d 1358 (Fed. Cir. 2010) ...................................................... passim

*Heckler v. Chaney*,
470 U.S. 821 (1985) ................................................................................ 10

*Int'l Lab. Rts. Fund v. United States*,
391 F. Supp. 2d 1370 (Ct. Int'l Trade 2005) ......................................... 48

*Invenergy Renewables LLC v. United States*,
422 F. Supp. 3d 1255 (Ct. Int'l Trade 2019) ................................... 7, 45

*J.W. Hampton, Jr., & Co. v. United States*,
276 U.S. 394 (1928) ................................................................................ 27

*Leaf Tobacco Exps. Ass'n, Inc. v. Block*,
749 F.2d 1106 (4th Cir. 1984) ............................................................... 50

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014) ................................................................................ 50

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .......................................................................... 44, 48

*Maple Leaf Fish Co. v. United States*,
762 F.2d 86 (Fed. Cir. 1985) ....................................................... 11, 12, 13

*Mast Indus., Inc. v. Regan*,
596 F. Supp. 1567 (Ct. Int'l Trade 1984) .............................................. 33

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
567 U.S. 209 (2012) ................................................................................ 49

*McKinney v. U.S. Dep't of Treasury*,
799 F.2d 1544 (Fed. Cir. 1986) ....................................................... 45, 50

*McMorris v. Carlos Lopez & Assocs., LLC*,
995 F.3d 295 (2d Cir. 2021) ................................................................... 43

*Michael Simon Design, Inc. v. United States*,
609 F.3d 1335 (Fed. Cir. 2010) ............................................................... 4

*Mid Continent Nail Corp. v. United States*,
    846 F.3d 1364 (Fed. Cir. 2017) ........................................................ 35, 36

*Mistretta v. United States*,
    488 U.S. 361 (1989) .............................................................................. 27

*Mobarez v. Kerry*,
    187 F. Supp. 3d 85 (D.D.C. 2016) ........................................................ 10

*Motions Sys. Corp. v. Bush*,
    437 F.3d 1356 (Fed. Cir. 2006) .............................................................. 4

*Nat'l Treasury Emps. Union v. United States*,
    101 F.3d 1423 (D.C. Cir. 1996) ............................................................ 46

*Nat'l Broad. Co. v. United States*,
    319 U.S. 190 (1943) .............................................................................. 28

*O.A. v. Trump*,
    404 F. Supp. 3d 109 (D.D.C. 2019) ........................................................ 8

*Omnipoint Corp. v. FCC*,
    78 F.3d 620 (D.C. Cir. 1996) ................................................................ 40

*Opp Cotton Mills, Inc. v. Adm'r, Wage & Hour Div. of Dep't of Lab.*,
    312 U.S. 126 (1941) .............................................................................. 27

*Perry Chem. Corp. v. United States*,
    375 F. Supp. 3d 1324 (Ct. Int'l Trade 2019), *reconsideration denied*,
    415 F. Supp. 3d 1260 (Ct. Int'l Trade 2019) ................................... 44, 45

*PrimeSource Bldg. Prod., Inc. v. United States*,
    505 F. Supp. 3d 1352 (Ct. Int'l Trade 2021), *appeal docketed*, No. 21-94
    (Fed. Cir. Aug, 2, 2021) .......................................................................... 7

*Richard L. Jones Calexico, Inc. v. United States*,
    30 CIT 1030 (2006) .............................................................................. 51

*Severstal Exp. GMBH v. United States*,
    No. 18-00057, 2018 WL 1705298 (Ct. Int'l Trade Apr. 5, 2018) ............. 7

*Shanxi Hairui Trade Co. v. United States*,
    503 F. Supp. 3d 1307 (Ct. Int'l Trade 2021), *appeal docketed*, No. 21-2067
    (Fed. Cir. June 17, 2021) ...................................................................... 23

*Sherley v. Sebelius,*
    610 F.3d 69 (D.C. Cir. 2010) ................................................................ 47

*Silfab Solar Inc. v. United States,*
    296 F. Supp. 3d 1295 (Ct. Int'l Trade 2018) ...................................... 6, 7

*Silfab Solar Inc. v. United States,*
    892 F.3d 1340 (Fed. Cir. 2018) ................................................... 6, 11, 12

*Simon v. E. Ky. Welfare Rts. Org.,*
    426 U.S. 26 (1976) .................................................................................. 44

*Spokeo, Inc. v. Robins,*
    136 S. Ct. 1540 (2016) ...................................................................... 45, 47

*Transpacific Steel LLC v. United States,*
    466 F. Supp. 3d 1246 (Ct. Int'l Trade 2020) ........................................ 13

*Transpacific Steel LLC v. United States,*
    4 F.4th 1306, 1318 (Fed. Cir. 2021) ............................................... passim

*United States v. Williams,*
    514 U.S. 527 (1995) ................................................................................ 51

*Warth v. Seldin,*
    422 U.S. 490 (1975) ................................................................................ 48

*Watervale Marine Co. v. U.S. Dep't of Homeland Sec.,*
    807 F.3d 325 (D.C. Cir. 2015) .............................................................. 11

*Whitman v. Am. Trucking Ass'ns,*
    531 U.S. 457 (2001) ................................................................................ 27

## **Statutes**

5 U.S.C. § 553(b)(3) ...................................................................... 35, 36

5 U.S.C. § 556 ...................................................................................... 39

5 U.S.C. § 557 ...................................................................................... 39

15 U.S.C. § 1125(a)(1) (2014) ............................................................ 50

19 U.S.C. § 1307 .................................................................................. 48

19 U.S.C. § 1862 .................................................................................. 26

19 U.S.C. § 2411 ................................................................................................... passim

19 U.S.C. § 2416(b)(2) ................................................................................... 16, 17

19 U.S.C. § 2417 ................................................................................................... passim

19 U.S.C. § 2481(6) .......................................................................................... 23

19 U.S.C. § 3512(d) .......................................................................................... 16

28 U.S.C. § 1581(i) ........................................................................................... 51

Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, 102 Stat. 1107 .......... 30

Uruguay Round Agreements Act (URAA), Pub. L. No. 103-465, 108 Stat. 4809 (1994) .......... 16

Trade and Development Act of 2000, Pub. L. No. 106-200, 114 Stat. 251 ........................... 16, 17

## **Regulations**

19 C.F.R. § 24.36 ............................................................................................... 48

19 C.F.R. § 141.1(b) .......................................................................................... 43

## **Other Authorities**

S. 490, 100th Cong. (1987) ................................................................................ 30

S. 1420, 100th Cong. (1987) .............................................................................. 30

H.R. 3, 100th Cong (1987) ................................................................................ 30, 31

H.R. Rep. No. 100-40, pt. 1 (1987) ................................................................ passim

S. Rep. No. 100-71 (1987) ................................................................................18, 24, 49

133 Cong. Rec. (1987) ...................................................................................... 18, 30

H.R. 4848 100th Cong. (1988) ......................................................................... 31

H.R. Rep. No. 100-567 (1988) ......................................................................... 5, 31

H.R. Rep. No. 100-576 (1988) ......................................................................... 30, 32

134 Cong. Rec. (1988) ...................................................................................... 30, 31

*Modification of Determination of Action Pursuant to Section 301 Concerning Canadian Exports of Softwood Lumber; Opportunity for Comment*,
57 Fed. Reg. 44,609 (U.S. Trade Rep. Sept. 28, 1992) .......................................................... 25

*Statement of Administrative Action,* H.R. DOC. NO. 103–316 (1994),
*reprinted in* 1994 U.S.C.C.A.N. 4040 .................................................................................... 16

*Termination of Section 301 Investigation and Action Regarding the People's Republic of China's Protection of Intellectual Property and Provision and Market Access to Persons Who Rely on Intellectual Property Protection*,
60 Fed. Reg. 12,582, 12,583 (U.S. Trade Rep. Mar. 7, 1995) ................................................. 25

*Termination of Action: Protection of Intellectual Property Rights by the Government of Honduras*, 63 Fed. Reg. 35,633 (U.S. Trade Rep. June 30, 1998) ......................................... 25

*Modification of Action Under Section 301(b); Out-of-Cycle Review Under Section 182; and Request for Public Comment: Intellectual Property Laws and Practices of the Government of Ukraine*,
70 Fed. Reg. 53,410, 53,411 (U.S. Trade Rep. Sept. 8, 2005) ................................................. 25

*Results of Out-Of-Cycle Review Under Section 182 and Termination of Action Under Section 301(b): Intellectual Property Laws and Practices of the Government of Ukraine*,
71 Fed. Reg. 5899 (U.S. Trade Rep. Feb. 3, 2006) .................................................................. 25

*Notice of Determination and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*,
83 Fed. Reg. 14,906 (U.S. Trade Rep. Apr. 6, 2018) ............................................................... 39

*Notice of Action and Request for Public Comments Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*,
83 Fed. Reg. 28,710 (U.S. Trade Rep. June 20, 2018) ....................................................... 39, 46

*Request for Comments Concerning Modification of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*,
83 Fed. Reg. 33,608 (U.S. Trade Rep. July 17, 2018) .............................................................. 36

*Extension of Public Comment Period Concerning Proposed Modification of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*,
83 Fed. Reg. 38,760, 38,761 (U.S. Trade Rep. Aug. 7, 2018) ......................................... 38, 397

*Notice of Action Pursuant to Section 301:  China's Acts, Policies, and Practices*
  *Related to Technology Transfer, Intellectual Property, and Innovation*,
  83 Fed. Reg. 40,823 (U.S. Trade Rep. Aug. 16, 2018)........................................... 44, 46

*Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices*
  *Related to Technology Transfer, Intellectual Property, and Innovation*,
  83 Fed. Reg. 47,974 (U.S. Trade Rep. Sept. 21, 2018) .................................. 4, 14, 15

THE WHITE HOUSE, STATEMENT FROM THE PRESS SECRETARY REGARDING THE
  PRESIDENT'S WORKING DINNER WITH CHINA (Dec. 1, 2018).................................. 34

*Notice of Modification to Section 301 Action: China's Acts, Policies, and Practices*
  *Related to Technology Transfer, Intellectual Property, and Innovation*,
  84 Fed. Reg. 43,304 (U.S. Trade Rep. Aug. 20, 2019).................................... 4, 14, 15

*Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices*
  *Related to Technology Transfer, Intellectual Property, and Innovation*,
  84 Fed. Reg. 69,447 (U.S. Trade Rep. Dec. 18, 2019)....................................... 17, 28

*Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices*
  *Related to Technology Transfer, Intellectual Property, and Innovation*,
  85 Fed. Reg. 3,741 (U.S. Trade Rep. Jan. 22, 2020) ........................................ 17, 28

Judith Hippler Bello & Alan F. Holmer, *The Heart of the 1988 Trade Act:  A*
  *Legislative History of the Amendments to Section 301*, 25 STAN. J. INT'L L. 1 (1988)........... 30

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE MARK A. BARNETT, CHIEF JUDGE; CLAIRE R. KELLY, JENNIFER CHOE-GROVES, JUDGES

_____
                                                   :
                                                   :
IN RE SECTION 301 CASES                            :  Court No. 21-00052-3JP
                                                   :
_____:

## DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS, RESPONSE TO PLAINTIFFS' CROSS-MOTION FOR JUDGMENT ON THE AGENCY RECORD, AND RESPONSE TO *AMICUS CURIAE* SUPPORTING BRIEFS

Pursuant to Rule 12(b)(6) of the Rules of the United States Court of International Trade, defendants, the United States *et al*., respectfully submit this reply in support of our motion to dismiss (Def. Mot.), and response to plaintiffs' HMTX Industries LLC, Halstead New England Corporation, Metroflor Corporation, and Jasco Products Corporation (collectively, "plaintiffs") cross-motion for judgment on the agency record (Pl. Cross-Mot.), ECF No. 358.  We also respond to the three briefs filed by *amicus curiae* on August 9, 2021.  *See* ECF No. 362 (Amicus Curiae Brief of Interested Parties or Am. Br.); ECF No. 373-2 (Amicus Curiae Brief of Retail Litigation Center, Inc. *et. al.* or RLC Br.); ECF No. 374 (Amicus Curiae Brief of Ecolab Inc. *et. al.* or Ecolab Br.).  Where the amicus briefs overlap with the arguments raised by plaintiffs, we address the arguments together; we address the non-overlapping arguments that were raised by the Interested Party Plaintiffs (IPPS) separately in Section IV of the Argument section of this brief.

## INTRODUCTION

Plaintiffs challenge two actions taken by the Office of the United States Trade Representative (USTR), at the direction of the President, to address China's policies regarding forced technology transfer and to allow U.S. entities fairly to conduct business with China.

Plaintiffs allege that these actions, the imposition of special duties on imports from China, were unauthorized under sections 301 and 307 of the Trade Act of 1974 (Trade Act) and violated the Administrative Procedure Act (APA).  Plaintiffs do not contest the initial primary action taken against China under section 301.  Indeed, they concede, as they must, that the first two tranches of duties were validly imposed.  However, plaintiffs find fault with the third and fourth sets of duties (List 3 and List 4A), which were imposed after China not only refused to cease its adverse practices, but also caused additional harm to U.S. commerce.

As our opening motion demonstrated, plaintiffs' claims fail because they challenge unreviewable presidential action that is not subject to the APA.  The tariff actions are wholly discretionary, nonjusticiable determinations made pursuant to a statute with no "judicially discoverable and manageable standard[.]"  *Baker v. Carr*, 369 U.S. 186, 217 (1962).  Even if reviewable, the tariff actions were authorized by section 307 of the Trade Act, which grants the Executive Branch broad discretion to modify an action when the burden on U.S. commerce from a foreign nation's unfair trade practices has increased or decreased, or the prior section 301 action is "no longer appropriate."  19 U.S.C. §§ 2411(b)(2), 2417(a)(1)(C).

Plaintiffs' cross-motion for judgment only confirms that the challenged actions were unreviewable, highly-discretionary determinations by the Executive Branch.  While plaintiffs liken this case to other trade actions reviewed by this Court, none of those actions was taken at the direction of the President, pursuant to a statute explicitly granting him authority to direct agency action, as with the issuance of Lists 3 and 4A under section 307.  Further, although plaintiffs try to characterize this case as a "pure question[] of statutory interpretation," Pl. Cross-Mot. at 39, they repeatedly ignore section 307's broad grant of discretion to determine an "appropriate" action, which presents an unreviewable, political question.

Plaintiffs misinterpret section 307 in other ways as well. Although they spend much of their brief identifying what they claim to be the "impermissible considerations" that gave rise to Lists 3 and 4A, Pl. Cross-Mot. at 60, they fail to demonstrate that any of these considerations were improper under section 307. Also, plaintiffs urge the Court to interpret section 307(a)(1)(C) only to allow eliminations or reductions — but not increases — in trade actions, even though such a limitation would contravene the plain text of the statute, its legislative history, and the overall purpose of section 301. In any event, the challenged actions are independently authorized by section 307(a)(1)(B). Plaintiffs' reading is also contrary to a recent decision in which the Federal Circuit rejected a statutory interpretation that also would have "disable[d] the President from acting" and disregarded Trade Act amendments intended to "produc[e] more action, not less." *Transpacific Steel LLC v. United States*, 4 F.4th 1306, 1329, 1331 (Fed. Cir. 2021).

Finally, plaintiffs raise myriad arguments alleging that the issuance of Lists 3 and 4A violated the APA. However, the APA does not require the procedures they claim were required, including public hearings with trial-like proceedings, specific timetables to prepare rebuttal comments, and copious responses from the USTR to thousands of public comments. The USTR followed the necessary procedural guarantees of notice and a meaningful opportunity to be heard before issuing Lists 3 and 4A. Nothing further was required to implement additional, critical actions designed to protect U.S. trade interests.

## ARGUMENT

### I.   Plaintiffs' Claims Regarding The Challenged Tariff Actions Are Not Justiciable

As we explained in our opening motion, the issuance of Lists 3 and 4A constitutes unreviewable presidential action and presents a nonjusticiable political question. Def. Mot. at 21-30. Plaintiffs raise a number of arguments in response, none of which has merit.

A.    <u>The Challenged Tariff Actions Constitute Unreviewable Presidential Action</u>

In our opening motion, we established that it was the President's decision to issue Lists 3 and 4A in response to China's aggressive response to the initial 301 action and that longstanding precedent confirms that the substance of presidential action is unreviewable.  Def. Mot at 21-25; *see also Florsheim Shoe Co. v. United States*, 744 F.2d 787, 797 (Fed. Cir. 1984) ("The President's findings . . . and the motivations for his actions are not subject to review"); *Michael Simon Design, Inc. v. United States*, 609 F.3d 1335, 1338 (Fed. Cir. 2010) (finding the President's actions unreviewable under the APA); *Corus Grp. PLC v. Int'l Trade Comm'n*, 352 F.3d 1351, 1359 (Fed. Cir. 2003) (recognizing that the APA does not authorize action against the President); *Motions Sys. Corp. v. Bush*, 437 F.3d 1356, 1360 (Fed. Cir. 2006) (declining to exercise judicial review where there was no "colorable claim" the President exceeded his statutory authority).

Plaintiffs claim that they "plainly challenge final agency action taken by USTR" and subject to the APA.  Pl. Cross-Mot. at 47.  As support for their position, they extract language from the *Federal Register* notices announcing Lists 3 and 4, which state that the "*Trade Representative[]* has determined to modify the prior action in this investigation by imposing additional duties on products of China."  *Id.*  Yet plaintiffs omit additional language repeated throughout both notices stating that the USTR was acting "[i]n accordance with the *specific direction of the President*."[1]  Thus, it is untrue that "there is no dispute that USTR actually took

---

[1] *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 47,974, 47,974-75 (U.S. Trade Rep. Sept. 21, 2018) (*Notice Imposing List 3*) (emphasis added); *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 43,304, 43,304-05 (U.S. Trade Rep. Aug. 20, 2019) (*Notice Imposing List 4*) (emphasis added).

the final agency actions promulgating List 3 and List 4." Pl. Cross-Mot. at 47. Instead, it is evident that these were presidential actions.

Plaintiffs also note that "the 1988 amendments to the statute specifically transferred authority under the section 301 statute from the President to USTR." *Id.* (citing H.R. REP. NO. 100-567 at 551 (1988)). But as the plain text of section 307 makes clear, Congress did not transfer all authority under the statute to the USTR. The USTR is still subject to "the specific direction, if any, of the President" when it modifies or terminates an action pursuant to section 307(a)(1). 19 U.S.C. § 2417(a)(1). Consequently, plaintiffs' assertion that this language would transform *all* agency action into presidential action, or "permanently insulat[e] from judicial review" all actions taken by the USTR, is incorrect. Pl. Cross-Mot. at 48. Rather, section 307(a)(1) expressly authorizes the President to exercise his discretion to direct action under this provision, and when he does, the action constitutes presidential action.

Here, the President provided ample direction to the USTR. Def. Mot. at 22-23. Citing the President's statements throughout their brief, plaintiffs acknowledge that the President played a significant role in the actions at issue. Pl. Cross-Mot. at 7, 10, 11, 12, 15, 16, 17, 19, 21 (citing the President's statements throughout the "Factual Background" section); *see also id* at 17 (referring to a meeting between the Presidents of the United States and China concerning List 3); *cf. Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 766-69 (2004) (recognizing that presidential action was not subject to the provisions of the National Environmental Policy Act of 1969 (NEPA), and that NEPA did not apply to the agency's compliance with the President's directions). Yet, plaintiffs now ask this Court to ignore the President's involvement in the challenged actions.

It is also irrelevant that the Court reviewed actions of the USTR in a case involving a different provision of section 307 and different facts and circumstances.  Pl. Cross-Mot. at 47-48 (discussing *Gilda Indus., Inc. v. United States*, 622 F.3d 1358 (Fed. Cir. 2010) (*Gilda II*)). Contrary to plaintiffs' assertion that *Gilda II* involved the same Trade Act authority that is at issue in this case, Pl. Cross-Mot. at 47, the specific question in *Gilda II* implicated a provision of section 307 that is not at issue here.  Unlike sections 307(a)(1)(B) and (C), the relevant statutory provision at issue in *Gilda II* does not subject the USTR's authority to "the specific direction, if any, of the President."  *Compare* 19 U.S.C. § 2417(c)(1)(A) *with* 19 U.S.C. § 2417(a)(1)(B), (C). Moreover, the disputed retaliation list at issue in *Gilda II* did not involve the President, whereas again, as plaintiffs acknowledge, the President directed the issuance of Lists 3 and 4A.  Pl. Cross-Mot. at 47.

Nor is plaintiffs' assertion correct that this Court has reviewed cases involving "more direct Presidential action than at issue in this case."  Pl. Cross-Mot. at 49.  Plaintiffs cite, for example, *Silfab Solar Inc. v. United States*, 296 F. Supp. 3d 1295, 1302 (Ct. Int'l Trade), *aff'd* 892 F.3d 1340 (Fed. Cir. 2018), *see* Pl. Cross-Mot. at 49.  But as this Court explained in that case, there is a difference between claims that involve "the [agency's] failure to reach agreement [on,], and report to the President," which are "judicially reviewable," *see id*. at 1302, and claims "reduced to a challenge to a decision Congress committed to the President's discretion," which are not reviewable.  *Id.* at 1302-03.  Plaintiffs also cite to *Corus Group PLC v. International Trade Commission*, 352 F.3d 1351, 1359-60 (Fed. Cir. 2003) for support, but the importers in *Corus* did not challenge the President's exercise of discretion itself; rather, they challenged whether there was a tie vote among commissioners at the International Trade Commission,

6

which was required for the President to exercise his authority under 19 U.S.C. § 1330(d) (2000). *Corus*, 352 F.3d at 1356, 1358.

Plaintiffs cite other cases involving reviewable actions that involved the President, but these simply demonstrate that courts do not review the substance of the President's actions and apply a heightened standard of review when evaluating whether "statutory language . . . limits the President," such as when his authority depends on a non-discretionary prerequisite such as a specific finding from an agency, *see Severstal Exp. GMBH v. United States*, No. 18-00057, 2018 WL 1705298, at *7 (Ct. Int'l Trade Apr. 5, 2018) (internal citations omitted), or a time limit. *See PrimeSource Bldg. Prod., Inc. v. United States*, 505 F. Supp. 3d 1352, 1357 (Ct. Int'l Trade 2021), *appeal docketed*, No. 21-94 (Fed. Cir. Aug. 2, 2021). Pl. Cross-Mot. at 49. [2] Here, conversely, no such statutory limit exists because section 307 grants the President broad discretion to modify a section 301 action. *See*, *e.g.*, *Silfab Solar*, 296 F. Supp. 3d at 1318 ("[t]he exercise of the President's judgment . . . is not subject to review by the court.") (internal quotations omitted).

The remaining cases that plaintiffs cite are also easily distinguishable; none involved circumstances in which the President exercised discretion committed to him (rather than a federal agency) by statute. Pl. Cross-Mot. at 47-48. For example, *Almond Bros. Lumber Co. v. United States*, 721 F.3d 1320, 1326 (Fed. Cir. 2013), involved a challenge to an agreement negotiated by the USTR under section 301(c), which grants discretion to the USTR — and only the USTR — to determine what actions are "appropriate." And *Invenergy Renewables LLC v. United States*, 422 F. Supp. 3d 1255 (Ct. Int'l Trade 2019), concerned the USTR's decision to

---

[2] *See infra* Section II.A of the Argument section of this brief for a discussion of this heightened standard of review; *see also* Def. Mot. at 23, 30-31 (discussing the standard).

exclude certain products from safeguard duties, not presidential action with respect to the duties themselves.  Also, *O.A. v. Trump*, 404 F. Supp. 3d 109 (D.D.C. 2019), challenged a rule by the Department of Homeland Security issuing new asylum criteria, not presidential action.

Finally, plaintiffs note that "*all* Executive Branch agencies act at presidential 'direction' (whether explicitly or implicitly)."  Pl. Cross-Mot. at 50.  But that is overly simplistic and misses the point.  Congress may and frequently does authorize specific officers to make recommendations and decisions in implementing particular statutes, and in such instances that official must make the decision, even though he or she reports to the President.  Here, however, Congress delegated only some authority to the USTR while reserving to the President the power to direct certain actions.  Thus, the challenged actions here do not constitute presidential action merely because the USTR is part of the Executive Branch.  Rather, the issuance of Lists 3 and 4A qualifies as presidential action because the USTR acted, as Congress intended, pursuant to the "specific direction, if any, of the President."  19 U.S.C. § 2417(a)(1).[3]

## B.    The Challenged Tariff Actions Are Unreviewable Because This Case Presents A Nonjusticiable Political Question

In our opening motion, we also demonstrated that the challenged actions are not justiciable and are thus unreviewable because determining what is an "appropriate" response to subsequent unfair actions taken by China involves issues that are committed to another branch of government, and the statute contains language that does not lend itself to judicial review.  Def. Mot at 25-30 (citing, *e.g.*, *Baker*, 369 U.S. at 217).  Plaintiffs respond that they "do not challenge any purely discretionary determinations by USTR (or by the President)," and seek only application of "the traditional rules of statutory construction."  Pl. Cross-Mot. at 26, 34, 50-52.

---

[3] The USTR selected the specific products for the lists, but plaintiffs are not contesting the contents of the lists; rather, they are contesting the decision to issue the lists at all — a decision made by the President.

As explained in detail below and in our opening motion, *see* Def. Mot. at 35-37, the plain text of section 307(a)(1)(C) grants the Executive Branch broad discretion to modify a section 301 action without limiting its authority only to reduce or terminate an action.  Pl. Cross-Mot. at 34. Thus, there is no need to go further than what the statute says on its face because the statute clearly allows the President (or the USTR) to decide what is "appropriate," and commits that determination to the Executive Branch's discretion.

Plaintiffs cite *Gilda II* to argue "[a] potential for the Court's decision to have some sort of impact on U.S. trading relations [does] not render the claims nonjusticiable."  Pl. Cross-Mot. at 52-53.  Our position is not, however, that plaintiffs' claims are unreviewable simply because they may impact U.S. trading relations with China.  Challenges that may impact U.S. trading relations may be reviewable, provided that they arise under a statute with a "judicially discoverable and manageable standard[.]"  *Baker*, 369 U.S. at 217.  *Gilda II* is one such example, because whether a lack of notice under 19 U.S.C. § 2417(c)(2) precludes the automatic termination of the retaliatory duties under 19 U.S.C. § 2417(c)(1) presents a judicially manageable standard.  *Gilda II*, 622 F.3d at 1362-67.  Here, once again, the issuance of Lists 3 and 4A is unreviewable because the highly discretionary determination of what constitutes "appropriate" action is plainly an issue that is reserved to the Executive Branch.

It is also irrelevant that plaintiffs do not ask the Court to "create trade policy" or "review complex and on-going negotiations regarding trade agreements."  Pl. Cross-Mot. at 52 (citing Def. Mot. at 30).  The challenged tariff actions concern a significant trade program that, if set aside, would have repercussions for the United States' national interests, national economy, and credibility with foreign nations.  Indeed, the so-called "prudential considerations" outlined in our opening motion underlie the very reason for the political question doctrine in the first place.  Pl.

Cross-Mot. at 52 (citing Def. Mot. at 29-30) (areas of foreign affairs "uniquely demand [a] single-voiced statement of the Government's views").

The statute's lack of a judicially manageable standard further demonstrates that issues of whether an initial action is "no longer appropriate" under section 307(a)(1)(C) is committed to the Executive Branch to resolve. *Baker*, 369 U.S. at 210; *Heckler v. Chaney*, 470 U.S. 821, 831 (1985) (lack of a judicially manageable standard makes an action unreviewable under the APA). Similar to the facts presented in *Almond Brothers*, in which the determination of a "satisfactory" action under section 301(c)(1)(D)(iii)(I) was found to be unreviewable, Def. Mot. at 28, here too, the equally discretionary determination of an "appropriate" action under section 307 is also "beyond judicial review." *Almond Bros.*, 721 F.3d at 1327; *see also* 19 U.S.C. §§ 2411(b)(2); 2417(a)(1)(C).

Moreover, the fact that the APA may present "judicially manageable standards," assuming the action in this case is subject to the APA, does not make an unreviewable claim somehow reviewable. Pl. Cross-Mot. at 51. If a case presents an unreviewable political question, then no review of those claims is available under the APA. *Heckler v. Chaney*, 470 U.S. at 828; *see also Mobarez v. Kerry*, 187 F. Supp. 3d 85, 97 (D.D.C. 2016) ("the question that Plaintiffs' APA claim poses . . . would necessarily require the court to answer a nonjusticiable political question."). Only the "specific statutory provisions involved" — here, sections 301 and 307 of the Trade Act — determine whether a claim is justiciable. *Briscoe v. Bell*, 432 U.S. 404, 414 (1977); *see also Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1404 (D.C. Cir. 1995); *Watervale Marine Co. v. U.S. Dep't of Homeland Sec.,* 807 F.3d 325 (D.C. Cir. 2015). Holding otherwise would allow the APA to swallow the political question doctrine.

II.     **Plaintiffs' Arguments Regarding The Scope Of The Executive Branch's**
        **Authority Under Section 307 Lack Merit**

Plaintiffs spend much time purporting to present a "plain-text reading" of section 307.

Pl. Cross-Mot. at 42.  In reality, they set forth a complicated interpretation based on conjecture

and language outside of the relevant statutory provisions.  Plaintiffs also argue that China's

actions giving rise to Lists 3 and 4A did not justify the Executive Branch's exercise of its

modification authority under section 307.  *Id*. at 25.  None of these arguments are persuasive.

Importantly, for the reasons discussed above, the substance of the actions in this case are

not reviewable.  Even if some form of review were available, however, plaintiffs are incorrect

that under *Chevron v. Natural Resources Defense Council*, 467 U.S. 837 (1984), "no deference

to the Government is appropriate."  Pl. Cross-Mot. at 41.  As we explained in our opening

motion, and as we explain below, to the extent the President's (or the USTR's) actions are

reviewable, *Chevron* does not apply.  Instead, the Court applies a heightened standard of review,

which limits the proper legal standard of review to determining whether there was a "clear

misconstruction of the governing statute" or "action outside delegated authority."  Def. Mot. at

23, 30-31 (citing, *e.g.*, *Maple Leaf Fish Co. v. United States*, 762 F.2d 86, 89 (Fed. Cir. 1985);

*Silfab Solar, Inc. v. United States*, 892 F.3d at 1346); *see also Gilda II*, 622 F.3d at 1363

(applying the same heightened standard of review when reviewing the USTR's conclusion that a

retaliation list had not terminated under section 307(c)).  But even under the *Chevron*, Lists 3 and

4A were authorized under section 307.

A.      **Plaintiffs Advocate For An Incorrect Standard Of Review That**
        **Disregards Controlling Federal Circuit Precedent**

As explained in our opening motion, in cases involving either the President or "decisions

of the Trade Representative implicating the discretionary authority of the President in matters of

foreign relations," the Federal Circuit reviews the challenged decision, if at all, to determine

11

whether there is a "clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority." *Gilda II*, 622 F.3d at 1363 (quoting *Maple Leaf*, 762 F.2d at 89); *see also* Def. Mot. at 3-4 (explaining the relationship of the USTR to the President).

Here, the relevant statutory provisions are clear and support upholding the President's (and the USTR's) decisions in promulgating Lists 3 and 4A. *See* Def. Mot. at 30-37; *see also* 19 U.S.C. § 2417(a)(1)(B), (C). Specifically, sections 307(a)(1)(B) and (C) provide the President (and the USTR) with the discretion to modify an action initially taken under section 301(b) when the offending country refuses to cease its unlawful practices and, adopts new measures intended to pressure the United States to drop its 301 action, or otherwise increases the burden of the unlawful practices on U.S. commerce. Def. Mot. at 2, 30-37. Thus, there is no "clear misconstruction of the governing statute," *Maple Leaf*, 762 F.2d at 89. And, to the extent *Chevron* is relevant, the Court should "give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43. Or, if the Court concludes that the statute is ambiguous, with respect to the questions of statutory interpretation at issue, judgment must still be entered in our favor.

It is also inaccurate to characterize this case as involving only "pure questions of statutory interpretation." Pl. Cross-Mot. at 39. This case involves actions taken by the Executive Branch pursuant to a statute that affords the President (and the USTR) broad discretion. But even if this case did involve pure questions of statutory interpretation, the Court should still apply a heightened standard of review. *Silfab Solar*, 892 F.3d at 1346 (citing *Maple Leaf's* "clear misconstruction" standard with approval). In fact, the *Gilda II* decision that articulated the same standard of review articulated in *Maple Leaf* in the section 301 context

involved questions of statutory interpretation.  *See Gilda II*, 622 F.3d at 1363 (quoting *Chevron*, 467 U.S. at 843 n.9).  Thus, although the judiciary "is the final authority on issues of statutory construction," *see Gilda II* 622 F.3d at 1363 (quoting *Chevron*, 467 U.S. at 843 n.9), the Court still must apply a higher standard of review here.

Plaintiffs cite *Transpacific Steel LLC v. United States* as an example of a court "resolving [a] statutory construction question *de novo*, without reference to 'clear misconstruction' standard or deference to Executive Branch interpretation."  Pl. Cross-Mot. at 39 (citing *Transpacific*, 4 F.4th at 1318).  But the *de novo* standard of review that plaintiffs cite in *Transpacific* referenced the appellate court's standard for reviewing the lower court's decision, *not* the level of deference afforded to questions of statutory interpretation.  When the Federal Circuit reviews an issue *de novo*, it "appl[ies] anew the same standard of review used by the Trade Court." *Fedmet Res. Corp. v. United States*, 755 F.3d 912, 918 (Fed. Cir. 2014).  And in reviewing issues *de novo* in *Transpacific*, the Federal Circuit applied the same deferential standard that the trial court applied to the Executive Branch decisions at issue.  *See Transpacific Steel LLC v. United States*, 466 F. Supp. 3d 1246, 1251 (Ct. Int'l Trade 2020) (reviewing actions for a "clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority") (citing *Maple Leaf*, 762 F.2d at 89), *rev'd and remanded*, 4 F.4th 1306 (Fed. Cir. 2021).

Plaintiffs also argue that the Court should grant no deference to the Government's interpretation of the relevant statutory provisions because "USTR failed to develop or explain its expansive interpretation of its own authority during notice-and-comment rulemaking."  Pl. Cross-Mot. at 41.  This is untrue.  The USTR explained the basis for its authority at length in the decision memoranda accompanying both Lists 3 and 4A, both of which are part of the

administrative record.  *See* PR-1 at 4-7 (explaining that section 307(a)(1)(B) "explicitly refers to

an *increase* in the level of trade harm," that section 307(a)(1)(C) "links back" to the USTR's

discretionary authority under section 301(b) to take all "appropriate" action, and that section

301(a)(1)'s reference to "modify" encompasses "not only decreases, but increases, of the

underlying trade action"); *see also* PR-09 at 3-5 (same).

As we explain below, and in our opening motion, *see* Def. Mot. at 30-38, either section

307(a)(1)(B) or 307(a)(1)(C) was sufficient to justify the decision of the USTR (acting at the

President's direction) to issue Lists 3 and 4A.  Those provisions support the challenged actions

and at a minimum satisfy the substantial deference analysis articulated in *Maple Leaf*.  Indeed,

Lists 3 and 4A pass muster even under plaintiffs' proposed standard of review.

**B.**      **Section 307(a)(1)(B) Authorized Lists 3 And 4A**

The President (and the USTR) had clear authority to issue Lists 3 and 4A under section

307(a)(1)(B), which authorizes an action under section 301 to be modified if "the burden or

restriction on United States commerce of . . . the acts policies, and practices, that are the subject

of such action has increased or decreased."  In issuing both lists, the USTR, acting at the

President's direction, made the required finding that the burden on U.S. commerce had increased

as a result of China's unfair trade practices, and its "subsequent defensive actions taken to

maintain" those practices.  Def. Mot. at 13, 16; *see also Notice Imposing List 3*, 83 Fed. Reg. at

47,974; *Notice Imposing List 4*, 84 Fed. Reg. at 43,304.  Plaintiffs' and Ecolab's claim that the

President or the USTR could not rely on section 307(a)(1)(B) because China's subsequent

defensive actions were not "'*the subject of*' the section 301 action [that] has increased or

decreased," is misplaced.  Pl. Cross-Mot. at 31 (emphasis in original); Ecolab Br. at 5, 11-12.

14

Contrary to plaintiffs' and Ecolab's assertions, Lists 3 and 4A were not issued solely because of China's subsequent defensive measures.  Pl. Cross-Mot. at 33 (alleging that there was no "escalation of the investigated practices themselves."); Ecolab Br. at 11-12.  Rather, the USTR *did* find that China's investigated unfair trade practices had worsened, and that they *were* causing increased harm to United States commerce.  *Notice Imposing List 3*, 83 Fed. Reg. at 47,974; *Notice Imposing List 4*, 84 Fed. Reg. at 43,304; *see also* PR-01 at 6 ("the burden or restriction on United States commerce. . . continues to increase," including from "China's unfair actions in acquiring hybrid vehicle technology from Toyota"); PR-09 at 3 ("the burden or restriction on United States commerce of the acts, policies, and practices that are the subject of the Section 301 action continues to increase.").

Moreover, China's defensive actions were not distinct from its investigated unfair trade practices.  As the notices accompanying Lists 3 and 4 explained, China sought to pressure the President and the USTR to drop the section 301 action by adopting additional tariffs and other measures, such as the devaluation of its currency.  *Notice Imposing List 3*, 83 Fed. Reg. at 47,974-75; *Notice Imposing List 4*, 84 Fed. Reg. at 43,304-05.  Thus, the subsequent defensive measures by China that gave rise to Lists 3 and 4A were directly related to the section 301 investigation, as their ultimate goal was perpetuating China's investigated unfair trade practices.

Plaintiffs' attempt to characterize the section 301 investigation as "narrowly focused" (*see* Pl. Cross-Mot. at 32) is unfounded.  The investigated unfair trade practices encompass China's massive "top-down national strategy," unfairly to acquire U.S. technology, "in which implementation requires the mobilization and participation of *all sectors of society* and the

integration of civil and military resources."[4]  These practices "work collectively as part of a multi-faceted strategy to advance China's industrial policy objectives . . . and are implemented through a diverse set of state and state-backed actors, including state-owned enterprises."  *Id.* at 17.  The Court should reject plaintiffs' attempt to mischaracterize the section 301 investigation as involving a limited and discrete set of practices.

Plaintiffs also contend that Section 307's "modification" authority cannot encompass actions designed to respond to retaliatory acts because – according to plaintiffs – section 306 of the Trade Act, explicitly grants "explicit 'retaliation' authority."  Pl. Cross-Mot. at 32-33 (discussing section 306(b)(2)).  Section 306(b)(2), however, does not actually use the phrase "retaliation authority."  Regardless, section 306 is irrelevant here.

Section 306(b)(2) is implicated when a foreign nation fails to implement a recommendation of the World Trade Organization (WTO) and has no applicability to discretionary modifications of actions under section 301(b) involving unfair trade acts. 19 U.S.C. § 2416(b)(2).  Section 306 was amended in 1994 to include what is now section 306(b)(2)(A), as part of the Uruguay Round Agreements Act (URAA), Pub. L. No. 103-465 § 314, 108 Stat. 4809 (1994); however, the precise quotation cited on page 33 of plaintiffs' brief is from revisions made as a result of the Trade and Development Act of 2000, Pub. L. No. 106-200, 114 Stat. 251.  The Statement of Administrative Action (SAA), which accompanied the United States' adoption of the URAA, explains Congress' intent in adopting the URAA. Statement of Administrative Action, H.R. Doc. No. 103–316, at 912-13 (1994), *reprinted in*

---

[4] *Findings of the Investigation into China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation Under Section 301 of the Trade Act of 1974* (U.S. Trade Rep. Mar. 22, 2018) (*Section 301 Findings*) at 11, *available at* https://ustr.gov/sites/default/files/Section%20301%20FINAL.PDF (emphasis added).

1994 U.S.C.C.A.N. 4040; 19 U.S.C. § 3512(d).  The SAA also does not use the words

"retaliation" or "authority" when discussing the amendments to section 306.  1994 U.S.C.C.A.N.

at 4316.  And in describing the WTO dispute resolution process, the SAA sets forth a process

whereby the USTR would retaliate after "seek[ing] authority from the [WTO Dispute Settlement

Body]."  *Id.* at 4320.

In fact, the only portions of section 306 that specifically include the word "retaliation,"

address it in the context of revising "retaliation lists," and were added in 2000, five years after

the WTO entered into force.  Trade and Development Act of 2000, Pub. L. No. 106-200, 114

Stat. 251; 19 U.S.C. §§ 2416(b)(2)(B), (E), (F).  These provisions were added to require the

USTR to modify WTO authorized "retaliation lists" on a periodic basis.  *Id.*  For Congress to

require a rotation of WTO-authorized retaliation is not relevant to the discretionary modifications

of actions explicitly provided for in investigations under section 301(b) involving unfair trade

acts.  Importantly, the challenged section 301 actions are not "retaliation;" rather, the sole

purpose of the challenged trade actions in this case was to pressure China to remedy its unfair

trade practices.  Indeed, the USTR reduced the level of the trade action, as appropriate, when the

circumstances indicated that less pressure was required —— for example, by reducing certain

measures and suspending others once China began remedying its unfair trade practices.[5]

Finally, plaintiffs and Ecolab suggest that, instead of invoking section 307(a)(1)(B), the

USTR should have commenced a new section 301 investigation.  Pl. Cross-Mot. at 46; Ecolab

Br. at 11-12.  But not only is there no statutory requirement to initiate a new section 301

---

[5] *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 85 Fed. Reg. 3,741 (U.S. Trade Rep. Jan. 22, 2020) (*Notice Reducing List 4A*); *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 69,447 (U.S. Trade Rep. Dec. 18, 2019) (*Notice Suspending List 4B*).

investigation when the initial action needs to be modified, there is no need to do so because Congress created a specific mechanism to modify an initial action under section 307, which was used here.  Plaintiffs' (and Ecolab's) policy preferences should not be converted into a hidden statutory requirement that would bind the hands of the President and the USTR.  If the President and the USTR could counter China's escalating unfair trade practices only by initiating a new investigation, it would undermine the very reason Congress amended the Trade Act in 1988 to add section 307, which was intended to allow section 301 "to pack [a] punch against unfair trading practices," and not let "the game deteriorate[]" if a foreign nation responds to a section 301 action with aggression.  133 CONG. REC. 40,486 (1987) (statement of Sen. Lautenberg); *see also* 133 CONG. REC. 40,486 (1987) (statement of Sen. Levin)[6]; Def. Mot at 5-7 (explaining the background of the 1988 amendments).  The 1998 amendments to the Trade Act were meant to produce *more* action, not less.  S. REP. NO. 100-71 (1987), at 73-74; *see also Transpacific*, 4 F.4th at 1329, 1331 (overturning an interpretation of a provision that would "disable the President from acting," noting that amendments to the Trade Act had the "purpose of producing more action, not less — and of counteracting a perceived problem of inaction").

C.    <u>Section 307(a)(1)(C) Authorized Lists 3 And 4A</u>

The President (and the USTR) also had clear authority to issue Lists 3 and 4A under section 307(a)(1)(C), which authorizes an action under section 301 to be modified if the action "is no longer appropriate."  Plaintiffs claim that the provision provides authority only "to reduce or terminate an existing action after changed circumstances undermine the original finding that certain responsive action was 'appropriate.'"  Pl. Cross-Mot. at 34.  Plaintiffs point to the text of subsection (C) and its neighboring provisions, the USTR's allegedly "uniform" prior practice,

---

[6] Pages 5 and 38 of our opening brief contains incorrect citations to these quotations from Senator Lautenberg and Senator Levin.  The correct citation is 133 CONG. REC. 40,486 (1987).

the doctrine of constitutional avoidance, and legislative history to support their interpretation.

Plaintiffs' arguments in support of their unduly narrow construction of this provision lack merit.

### 1. Section 307(a)(1)(C) Is Neither Linked To, Nor Limited By, Section 307(a)(1)(A)

Plaintiffs first argue that section 307(a)(1)(A) supports their interpretation of section

307(a)(1)(C). Specifically, they claim that section 307(a)(1)(A) is "linked" to section

307(a)(1)(C), with subsection (A) only authorizing the USTR to terminate or ratchet down a

*mandatory* action, and subsection (C) only authorizing the USTR to terminate or ratchet down a

*discretionary* action. Pl. Cross-Mot. at 34-35. This interpretation, however, is unsupported by

the statute.

Section 307(a)(1)(A), authorizes action when "any of the conditions described in [section

301(a)(2)] of this title exist." Section 301(a)(2) is part of section 301(a), which involves

mandatory action based upon violations of trade agreements or other international legal rights of

the United States. *See also* 19 U.S.C. § 2411(d)(4)(A) (defining "unjustifiable" acts in the

context of whether the "act, policy, or practice is "in violation of, or inconsistent with, the

international legal rights of the United States"). But the China investigation is under section

301(b), which concerns discretionary action based upon unreasonable or discriminatory acts,

regardless of any international legal rights. *See also* 19 U.S.C. § 2411(d)(3)(A) (defining

"unreasonable" acts as those "not necessarily in violation of, or inconsistent with, the

international legal rights of the United States . ."). Thus, section 307(a)(1)(A) has nothing to do

with authorities relevant to the current investigation.

Even aside from this threshold problem with plaintiffs' argument, plaintiffs' reliance on

section 307(a)(1)(A) fails on its own terms. As noted above, section 301(a) investigations –

unlike section 301(b) investigations – require ***mandatory*** action – meaning the USTR ***must*** take

19

trade action unless the exceptions identified in section 301(a)(2) are met.  Those exceptions include when a foreign nation is taking steps to remediate its unfair trade practices, or action that would have "an adverse impact on the United States economy."  19 U.S.C. § 2411(a)(2)(B) (i)-(v).  Given the nature of the listed exceptions, plaintiffs argue that it logically follows that any action under 307(a)(1)(A) would be to reduce, not increase, a tariff action.

From this reading of section 307(a)(1)(A), plaintiffs make an extraordinary leap and claim that an entirely different provision – section 307(a)(1)(C) – also can be invoked only to terminate or ratchet down a tariff action.  But this interpretation is belied by the very provisions themselves.  Section 307(a)(1)(A) provides for modification when an exception to mandatory action exists, *i.e.*, instances when the President or the USTR can chose *not to take action*, either because the action would significantly harm the United States or the complained of conduct is being remedied.  In contrast, no analogous language providing permission *not* to take trade action was needed with respect to section 301(b) investigations – because any such action is discretionary.  And section 307(a)(1)(C) provides for modification of certain discretionary actions, *i.e.*, instances where the President or the USTR chose to take action.  Given this critical difference, plaintiffs have no basis for asserting any alleged "link" between subsections (A) and (C) exists, *see* Pl. Cross-Mot. at 35, or for characterizing the two provisions as "counterpart section[s]."  *Id.* at 25.  If anything, the existence of section 307(a)(1)(A) supports that Congress included other provisions — 307(a)(1)(B) and (C) — to address situations where the President may need to increase measures.[7]

_____

[7] Indeed, the fact that subsections 307(a)(1)(A) and (C) both exist demonstrates that they were intended to accomplish different purposes; if they had been meant to achieve the same result, Congress would not have enacted two separate subsections.

###### 2. Section 307(a)(1)(B) And Section 307(a)(1)(C) Both Contemplate Escalation Of A Tariff Action

Plaintiffs also claim, incorrectly, that our "textual argument conflates and commingles the two distinct and limited modification provisions under subsections 307(a)(1)(B) and (C)," urging the Court to find that only subsection (B) authorizes the USTR to "ratchet up tariffs."  Pl. Cross-Mot. at 42.  Our interpretation of these provisions, however, is specifically based on the interpretations in the administrative record, is reasonable, and is consistent with the distinct roles of these subsections, as reflected in the statute's plain text.

Section 307(a)(1)(B) can be invoked with respect to the entire range of section 301 actions whenever "the burden or restriction on United States commerce . . . that are the subject of such action has increased or decreased."  19 U.S.C. § 2417(a)(1)(B).  Thus, this provision can apply to *any* type of section 301 action, including mandatory actions taken in response to trade agreement violations.  Subsection (C), on the other hand, applies only to actions taken under one type of investigation.  The President or the USTR may rely on this provision when actions being taken under section 301(b) — *i.e.*, discretionary actions — are "no longer appropriate."

This distinction underlies the different roles played by subsections (B) and (C).  As we explained in our opening motion, the language in section 307(a)(1)(C) mirrors the language in section 301(b)(2), with the latter setting forth the requirements for taking discretionary action in response to a section 301 investigation.  Def. Mot. at 27.  Under section 301(b)(2), the President or the USTR can take discretionary action, which consists of "all appropriate and feasible action . . . to obtain the elimination of that act policy or practice" only if he first determines that "action by the United States is *appropriate*."  19 U.S.C. § 2411(b)(2) (emphasis added).  Likewise, a discretionary action can be modified under section 307(a)(1)(C) only if the USTR determines that it is "no longer *appropriate*."  19 U.S.C. § 2417(a)(1)(C) (emphasis added).  In the case of

mandatory action, on the other hand, section 301(a)(1) instructs that the USTR "shall take action," unless an exception exists under section 301(a)(2).

Thus, while plaintiffs correctly recognize that subsections 307(a)(1)(B) and (C) play distinct roles, plaintiffs have no basis for asserting that Congress divided them to allow the President or the USTR to ratchet up tariffs under subsection (B) and ratchet down tariffs under subsection (C).  Pl. Cross-Mot. at 42.  Rather, *both* subsections contemplate a possible escalation (or de-escalation) of action, but subsection (C) harkens back to the language of section 301(b) because Congress wanted to delegate to the Executive Branch the same discretion to determine what discretionary actions are appropriate to "modify" as it has to determine what actions are appropriate in the first place.  Moreover, it makes no sense that Congress would grant broad authority to increase or decrease a tariff action under subsection (B), but strictly limit authority to "ratchet[ing] down" a tariff action under subsection (C), *see* Pl. Cross-Mot. at 42, without stating this limitation in the plain text of the statute itself.

Plaintiffs also inexplicably claim that the word "modify" in the introductory clause of section 307(a)(1) allows an increase in measures for some, but not all subsequent subparts. Specifically, plaintiffs claim that the introductory clause includes the phrase "*modify* or terminate" rather than "*reduce* or terminate" because subsection (B) of this provision — and only subsection (B) — explicitly contemplates an escalation of action.  However, nothing in the text of section 307(a)(1) suggests that the term "modify" in the introductory paragraph applies only to subsection (B), or that the term has a different meaning when applied to different subsequent

subparts.[8]  *See* 19 U.S.C. § 2417(a)(1); *see also Agro Dutch Indus. Ltd. v. United States*, 508

F.3d 1024, 1032 (Fed. Cir. 2007) (noting the "normal rule of statutory construction that identical

words used in different parts of the same act are intended to have the same meaning"); *see also*

*Shanxi Hairui Trade Co. v. United States*, 503 F. Supp. 3d 1307, 1318 (Ct. Int'l Trade 2021)

(denying plaintiffs' "proposed statutory interpretation [that] would have the court ignore [the

statute's] introductory clause"), *appeal docketed*, No. 21-2067 (Fed. Cir. June 17, 2021).  Indeed,

if Congress wanted "modify" to apply only to subsection (B), it would have included the word

"modify" only in this subsection, not in the introductory clause that applies to all subsections.

Nor does anything in the neighboring provisions support reading such a consequential limitation

into subsection (C)'s plain text.

    Plaintiffs also allege that if our interpretation of section 307(a)(1)(C) is correct, the

Government would always rely on this provision to modify section 301(b) actions, as it "imposes

no fact-finding requirements."  Pl. Cross-Mot. at 43.  But plaintiffs ignore that, in this case, the

USTR (at the President's direction) relied on *both* subsections 307(a)(1)(B) and (C).  Also, the

USTR in the administrative record cites facts in support of invoking *both* provisions.

Specifically, the USTR notices state the factual basis for finding that the action being taken was

no longer appropriate, and why a higher level of trade action was appropriate.  Regardless,

plaintiffs' speculative claim about how these provisions may be invoked in the future does not

change that section 307(a)(1)(C) grants the Executive Branch discretion to determine when

---

[8] Plaintiffs note that "[t]he term 'modification,' as applied to any duty or other import restriction, includes the elimination of any duty or other import restriction."  Pl. Cross-Mot. at 6 (citing 19 U.S.C. § 2481(6)).  As explained above, the legislative history of section 307 clarifies that a "modification" may involve a reduction, elimination, *or* an increase in measures.  *See* H.R. REP. NO. 100-40, pt. 1, at 75-76 (1987); *see also* Def. Mot. at 7 n.3 (citing similar language in H.R. REP. NO. 99-581, pt. 1 (1986), at 43).

actions under section 301(b) are "no longer appropriate," and to modify those actions through a reduction, elimination, or increase in measures. Plaintiffs also fail to recognize that the President and the USTR did explain here why the action was "appropriate." Nor do they explain why Congress would have permitted the President to reduce but not increase tariffs under subsection C without fact-finding. Indeed, that view is at odds with the very purpose of the amendments to the Trade Act.

Finally, plaintiffs claim that our interpretation of section 307(a)(1)(C) would "trample" other limitations in the Trade Act. But the fact that statutory provisions that are not at issue contain investigatory or fact-finding requirements does not mean that the Court may limit section 307(a)(1)(C) in contravention of its plain language. Congress, had it wanted to, could have added those same limitations to section 307(a)(1). It did not.

Ultimately, there is good reason to conclude that Congress did not intend to limit the President's or the USTR's modification authority under section 307(a)(1)(C) as plaintiffs urge the Court to do. As we explained in our opening motion, if the Executive Branch could take vigorous action in response to a section 301 investigation but not increase that action when appropriate, it would leave the United States with *no leverage* in trade negotiations, and thus powerless to respond to a foreign country's worsening trade practices. Def. Mot. at 38. Such a limitation would contradict the statute's plain language, as well as Congress's intent to use section 301 as a "*negotiating* tool to ensure that foreign countries adhere to their trade agreement obligations . . ." S. REP. NO. 100-71 at 73 (emphasis added).

In sum, our interpretation of section 307(1)(a)(C) comports with the statute's plain text and overall scheme. Plaintiffs' alleged "plain-text" reading of this provision, on the other hand,

requires pages of explanation, a rewriting of the statute, and multiple inferences that defy logic and congressional intent.  Pl. Cross-Mot. at 34-37.

### 3.    The USTR's Past Practice Does Not Support Reading A New Limitation Into The Plain Text Of Section 307(a)(1)(C)

Next, plaintiffs allege that "[u]niform prior practice bolsters a limited construction of USTR's modification authority."  Pl. Cross-Mot. at 37.  Plaintiffs point to the handful of times that the USTR has invoked section 307(a)(1)(C), as well as a single case.  *Id.* (citing *Transpacific*, 4 F.4th at 1326).  The USTR's prior use of section 307(a)(1)(C), however, does not establish a "uniform prior practice," nor does *Transpacific* support plaintiffs' "limited construction" of this provision.

China's response to the initial 301 action is unprecedented.  None of the prior instances in which the USTR invoked 301 involved a foreign government that refused to cease its unlawful practices and instead, adopted measures intended to pressure the United States to drop its section 301 trade action, like China did here.  Indeed, in all of the prior instances involving use of this provision, the foreign government took steps to remedy some or all of the investigated unfair trade practices,[9] or it requested review of its trade agreement with the United States.[10]  Thus,

---

[9] *See Termination of Section 301 Investigation and Action Regarding the People's Republic of China's Protection of Intellectual Property and Provision and Market Access to Persons Who Rely on Intellectual Property Protection*, 60 Fed. Reg. 12,582, 12,583 (U.S. Trade Rep. Mar. 7, 1995); *see also Results of Out-Of-Cycle Review Under Section 182 and Termination of Action Under Section 301(b): Intellectual Property Laws and Practices of the Government of Ukraine*, 71 Fed. Reg. 5899 (U.S. Trade Rep. Feb. 3, 2006); *Termination of Action: Protection of Intellectual Property Rights by the Government of Honduras*, 63 Fed. Reg. 35,633 (U.S. Trade Rep. June 30, 1998); *Modification of Action Under Section 301(b); Out-of-Cycle Review Under Section 182; and Request for Public Comment: Intellectual Property Laws and Practices of the Government of Ukraine*, 70 Fed. Reg. 53,410, 53,411 (U.S. Trade Rep. Sept. 8, 2005).

[10] *See Modification of Determination of Action Pursuant to Section 301 Concerning Canadian Exports of Softwood Lumber; Opportunity for Comment*, 57 Fed. Reg. 44,609 (U.S. Trade Rep. Sept. 28, 1992).

prior instances involving section 307(a)(1)(C), neither reflect a "uniform" or "unbroken" past practice, Pl. Cross-Mot. at 37, 39, nor are they applicable to the instant matter.

While plaintiffs cite the USTR's internal deliberations regarding Lists 3 and 4A to claim that its reliance on section 307(a)(1)(C) was somehow improper, their cherry-picked language proves no such thing. Specifically, plaintiffs cite language in which the USTR recognizes that action with respect to List 3 was unprecedented, *see* Pl. Cross-Mot. at 37 (citing PR-01 at 5), without citing the sentence immediately preceding this language, in which the USTR states: "We are not aware of any prior investigation where a U.S. trading partner has responded to a section 301 action by refusing to consider a change to its policies, and instead has openly adopted its own retaliatory measures." PR-01 at 5. Plaintiffs' selective quotation therefore omits that in instances of U.S. trading partners responding to a section 301 action with aggressive retaliation, no "uniform prior practice" — or *any* prior practice — exists.

Finally, plaintiffs' reliance on *Transpacific* is misplaced. Pl. Cross-Mot. at 37. *Transpacific* involved a different statute, 19 U.S.C. § 1862, and the relevant statutory provisions did not contain a provision similar to section 307 that specifically addressed the President's authority to modify an action. 4 F.4th at 1319. Nor did the legislative history of the 1988 amendments to the statute at issue in *Transpacific* contain language similar to that in, for example, H.R. REP. NO. 100-40, pt. 1 at 75-76, which reflects clear congressional intent to authorize "increased measures if further leverage or offsetting action is deemed necessary and appropriate." Nevertheless, the Federal Circuit concluded that the statute was not designed to "disable" the President from taking additional actions if such action was necessary. *Transpacific*, 4 F.4th at 1331. The Court should similarly avoid adopting a construction that would hamstring the President's ability to conduct foreign affairs, particularly since the statutory

scheme's intent to authorize the President to modify prior action is at least as clear here as it was in *Transpacific*.

4.    **The Issuance Of Lists 3 And 4A Does Not Implicate Principles Of Constitutional Avoidance**

Plaintiffs also claim that "principles of constitutional avoidance" support their interpretation of section 307(a)(1)(C).  Pl. Cross-Mot. at 36.  "The so-called cannon of constitutional avoidance is an interpretive tool, counseling that ambiguous statutory language be construed to avoid serious constitutional doubts."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009).  Plaintiffs allege that our reading of section 307(a)(1)(C) would implicate this canon because it would violate the non-delegation doctrine.  They are wrong.

As an initial matter, the canon of constitutional avoidance "comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction."  *Clark v. Martinez*, 543 U.S. 371, 385 (2005).  But section 307(a)(1)(C) is unambiguous.  As explained above, the statutory text allows the President or the USTR to "modify" a tariff action by *increasing* that action.

Even if susceptible to multiple constructions, our reading of section 307(a)(1)(C) does not violate the non-delegation doctrine.  Although this doctrine is rooted in the principle of separation of powers, the Supreme Court has long recognized that "Congress simply cannot do its job absent an ability to delegate power under broad general directives."  *Mistretta v. United States*, 488 U.S. 361, 372 (1989) (citing *Opp Cotton Mills, Inc. v. Adm'r, Wage & Hour Div. of Dep't of Lab.*, 312 U.S. 126, 145 (1941)).  Thus, enactments which leave discretion to the Executive Branch are permissible as long as they offer some "intelligible principle" to guide that discretion.  *Whitman v. Am. Trucking Ass'ns,* 531 U.S. 457, 472-76 (2001) (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)).

The "intelligible principle" standard is not demanding.  As this Court recently recognized, "[s]ince 1935 no act has been struck down as lacking an intelligible principle."  *Am. Inst. for Int'l Steel, Inc. v. United States*, 376 F. Supp. 3d 1335, 1339 (Ct. Int'l Trade 2019), *aff'd*, 806 F. App'x 982 (Fed. Cir.), *cert. denied*, 141 S. Ct. 133 (2020).  For example, a statute regulating broadcast licensing as "public interest, convenience, or necessity" was held to be sufficient.  *Id.* at 1339-40 (quoting *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 225–26 (1943)).  Notably, in *Federal Energy Administration. v. Algonquin SNG, Inc*., 426 U.S. 548, 559 (1976), the Supreme Court found that section 232(b) of the Trade Expansion Act of 1962 "easily" satisfied the "intelligible principle" test, in that it contains "clear preconditions" to presidential action and "specific factors" to be considered.  The Court also explained that "the leeway that the statute gives the President" is "far from unbounded," in that the President "can act only to the extent 'he deems necessary to adjust the imports of such article and its derivatives so that such imports will not threaten to impair the national security.'"  *Id.*

Here too, section 307(a)(1)(C) easily satisfies the "intelligible principle" test, in that it provides the President and the USTR clear guidance on how to exercise their discretion. Specifically, a modification (including an increase in measures) is authorized only when a section 301 action is "no longer appropriate."  19 U.S.C. § 2417(a)(1)(C).  Just as in *Algonquin*, the leeway that section 307(a)(1)(C) provides is "far from unbounded."  Absent a determination that the action being taken under section 301(b) is "no longer appropriate," the USTR cannot invoke section 307(a)(1)(C), and it is therefore constrained by the facts and circumstances of a particular case.  When the facts and circumstances changed in the present case, for example, the USTR (at the direction of the President) responded by invoking section 307(a)(1)(C) to reduce

List 4A and suspend List 4B.  *Notice Reducing List 4A*, 85 Fed. Reg. at 3,741; *Notice Suspending List 4B*, 84 Fed. Reg. at 69,447.

Plaintiffs claim that we "admit [] the premise of th[e] non-delegation doctrine" in arguing that section 307 contains no "judicially discoverable and manageable standard."  Pl. Cross-Mot. at 37, 51.  Not so.  A statute that lacks a "judicially discoverable and manageable standard" can still contain an "intelligible principle" for guiding the President or an agency in exercising its discretion.  *Almond Bros. Lumber Co. v. United States*, 721 F.3d 1320 (Fed. Cir. 2013), is one such example.  As we explained in our opening motion, *Almond Bros.* involved a statute that authorizes the USTR to provide any trade benefits that it deems "satisfactory."  *Id.* at 1326-27.  The Federal Circuit found that "[w]hether those benefits were satisfactory is a question that is committed to the discretion of the USTR and therefore beyond judicial review."  *Id.* at 1327.

In *Almond Brothers*, just as in the present case, the fact that the USTR's exercise of discretion was beyond judicial review did not mean that the statute in question constituted an unconstitutional delegation of authority.  Pl. Cross-Mot. at 37.  Nor does the fact that Congress provided leeway under section 307(a)(1)(C) equate to a grant of "unfettered" or "unlimited Executive Branch discretion," *see* Pl. Cross-Mot. at 37, 46, or authority to "take *any* subsequent trade action . . . without any limitation."  Pl. Cross-Mot. at 37 (emphasis in original).  Instead, Congress provided an "intelligible principle" for the Executive Branch to exercise its discretion under this provision, such that it is limited by the facts and circumstances of each case.  And, once again, the USTR (acting at the President's direction) exercised that discretion in the present case both to increase measures by issuing Lists 3 and 4, and also to decrease measures by reducing additional duties for List 4A and suspending List 4B once China began addressing its unfair trade practices.

5.       **Plaintiffs Misunderstand Section 307's Operative Legislative History**

In our opening motion we also demonstrated that the legislative history underlying the 1988 amendments to the Trade Act demonstrated that Congress intended for the President (or the USTR) to be able to increase tariffs under 307(a)(1)(C).  Def. Mot. at 20, 28 n.5, 35-38.  And, as we demonstrate below, plaintiffs' assertion that the legislative history cited in our opening motion should be disregarded has no merit.  Pl. Cross-Mot. at 45.

First, plaintiffs contend that the version of the bill that was debated and adopted in both chambers of Congress was "unenacted (and vetoed)."  Pl. Cross-Mot. at 43.  This argument is misleading.  The Federal Circuit has already recognized the relevance of the legislative history of the prior bill in *Transpacific*.  4 F.4th at 1331 n.8.  To the extent further explanation is helpful, section 307 was added as part of the Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, 102 Stat. 1107 (Trade Act of 1988), which has a lengthy legislative history.  In 1987, the principle bill in the House of Representatives was H.R. 3, 100th Cong. (1987), which, as amended, is the bill that accompanied H.R. REP. NO. 100-40, pt. 1, at 75-76, and was discussed extensively in our opening motion.  Def. Mot. at 3, 6, 35-36; Judith Hippler Bello & Alan F. Holmer, *The Heart of the 1988 Trade Act:  A Legislative History of the Amendments to Section 301*, 25 STAN. J. INT'L L. 1, 3-9 (1988) (detailing the legislative history); 133 CONG. REC. 10,671, 10,812 (1987) (passing H.R. 3, as amended).  The principal bill in the Senate was S. 490, 100th Cong. (1987), which was combined with several other bills to create S. 1420, 100th Cong. (1987), the omnibus bill.  Bello & Holmer, 25 STAN. J. INT'L L., at 7 n.32 and accompanying footnotes; 133 CONG. REC. 20,476, 20,495 (1987) (passing the bill).  Eventually, a conference was convened to resolve the differences between the bills and Congress adopted the H.R. 3 conference outcome.  *See* H.R. REP. NO. 100-576 (1988); 134 CONG. REC. H2278, H2284,

H2375 (daily ed. Apr. 21, 1988) (House adopts conference report), 134 CONG. REC. 8880, 8978

(1988) (Senate adopts conference report).

On May 24, 1988, the President vetoed the bill.  134 CONG. REC. H3531 (daily ed. June

16, 1988).  H.R. 3 was reintroduced in the House one week later, as H.R. 4848, 100th Cong.

(1988), with only two modifications that are not relevant here.  134 CONG. REC. S7385 (daily ed.

July 13, 1988).  The Senate then passed H.R. 4848 on August 3, 1988.  134 CONG. REC. 20,026,

20,104 (1988); 134 CONG. REC. 20,023 (1988) (statement of Sen. Stanford) ("I think it is too bad

we had to go through the political exercise of having this bill vetoed thereby delaying the

effectiveness of it.  The fact that the plant-closing provisions have now become law and that the

same trade bill is once again before the Senate shows how uselessly political the veto was.  The

President's veto has unfortunately caused us hours and hours of additional work and the

expenditure of a great deal of time for a political maneuver that did not work.").  The President

signed H.R. 4848 into law on Aug. 23, 1988.  Trade Act of 1988, 102 Stat. at 1107.  Thus, as

Congress's statements when it passed the bill that was ultimately enacted into law confirm, the

legislative history from the vetoed bill *is the relevant legislative history*.  Also, plaintiffs cannot

seriously claim that legislative history becomes irrelevant just because a bill is subsequently

enacted following a presidential veto *when they rely on the very same legislative history in a

different part of their brief*.  *See* Pl. Cross-Mot. at 43 (discussing H.R. REP. NO. 100-567 at 551

(1988)).

Nor is there any merit to plaintiffs' claim that the history we cite "discuss[es] language

that differs materially from the enacted text."  Pl. Cross-Mot. at 43-44.  Plaintiffs note that the

original bill authorized the USTR to modify a section 301 action that was "not effective,"

whereas the enacted bill authorizes the USTR to modify a section 301 action when the burden on

United States commerce has increased or decreased, or when the action is "no longer appropriate."  *Compare* H.R. 3, as amended in May 1987, *with* 19 U.S.C. § 2417.  Regardless of the precise language ultimately used, however, the enacted bill, like the original version, contemplates modifying a tariff action through a decrease *or increase* of measures, which plaintiffs even admit.  *See* Pl. Cross-Mot. at 42 (section 307(a)(1)(B) "allows USTR to ratchet up tariffs when the investigated practice has worsened").  It is therefore untrue that we are trying to "replace the actual text with speculation as to Congress' intent."  Pl. Cross-Mot. at 45 (citations and quotations omitted).  This is also the only report from either chamber of Congress that we could locate that sheds any light on what Congress intended when it enacted section 307(a)(1)(C).  *See also* Def. Mot. at 7 n.3 (citing a similar provision from a House bill from 1986 discussed in H.R. REP. NO. 99-581, pt. 1, at 43).  The Senate's bill, S. 1420 at 154, did not contain similar language, and the conference report H.R. REP. NO. 100-576, at 564-65, supports that the Senate "reced[ed]" to the House position.

Further, the fact that Congress changed the words "not effective" in the original House version of the bill makes sense, given that section 307(a)(1)(C) now contains the words "no longer appropriate," thereby mirroring section 301(b)(2).  Once again, as explained above, the enacted bill authorizes the Executive Branch to take discretionary action that it deems "*appropriate*" under section 301(b)(2), and to modify that action under section 307(a)(1)(C) if it deems it "no longer *appropriate*."  *See* 19 U.S.C. § 2411(b)(2) (emphasis added); *see also* 19 U.S.C. § 2417(a)(1)(C) (emphasis added).  Thus, the change in language between the original and the enacted bills can be explained by Congress's intent to grant the Executive Branch the same broad discretion to determine what discretionary actions are appropriate to modify as it has to determine what discretionary actions are appropriate initially.

Regardless, nothing suggests, as plaintiffs claim, that the change in language reflects a change in "the scope of USTR's authority" under section 307(a)(1)(C), *see* Pl. Cross-Mot.at 43, or Congress's intent to impose a sweeping limitation on the Executive Branch's authority that was absent in the original text. *See id.* at 43. If Congress intended to so drastically limit the Executive Branch's authority under section 307, one would expect some discussion in the legislative history, given its clear intent to authorize modification through *increased* measures. *See* H.R. REP. No. 100-40, pt. 1, at 75-76 (modifications could be "additional or increased measures"). Given this clear intent, the lack of any discussion to the contrary, and, most important, the plain language of the enacted text, the Court should find that section 307(a)(1)(C) authorizes the President and the USTR to increase a tariff action.

III.   **If The Challenged Actions Constitute Agency Action, And If The APA Applies, USTR's Actions Fall Within The Foreign Affairs Exception, And The USTR Complied With All Relevant APA Requirements**

Even if the Court concludes that the issuance of Lists 3 and 4A constituted agency action, it qualifies for the "foreign affairs function" exception, and the APA's notice-and-comment requirements do not apply. Def. Mot. at 39-44. In any case, the challenged actions were not arbitrary and capricious, in excess of statutory authority, or otherwise not in accordance with the law, *see id.* at 50-60, and the USTR fully complied with all requirements mandated by section 307. *Id.* at 44-48.

A.   **The Challenged Actions Qualify For The Foreign Affairs Exception**

Plaintiffs first claim that Lists 3 and 4A were not "foreign affairs functions" since public rulemaking would not provoke "definitely undesirable international consequences." Pl. Cross-Mot. at 62. However, "definitely undesirable international consequences" is only an example of a foreign affairs function in the APA's legislative history. Def. Mot. at 40, n.8; *see also Mast Indus., Inc. v. Regan*, 596 F. Supp. 1567, 1581 (Ct. Int'l Trade 1984) ("the phrase 'clearly

provoke definitely undesirable international consequences' appears illustrative").  Not every circuit that has considered this matter requires a foreign affairs function to have "definitely undesirable international consequences," an analysis that would raise nonjusticiable political questions, and the Federal Circuit has not decided the issue.  Def. Mot. at 40 n.8 (citing, *e.g.*, *City of New York v. Permanent Mission of India of United Nations*, 618 F.3d 172, 202 (2d Cir. 2010)).  Instead, the Court should find that the exception applies here because Lists 3 and 4A clearly relate to a foreign affairs function.

Plaintiffs also claim that this exception is typically invoked for agency action "implementing international agreements," whereas Lists 3 and 4A were issued "pursuant to a domestic statute . . . not an international treaty that the Government had already negotiated."  Pl. Cross-Mot. at 62-63.  However, as the Federal Circuit has noted, the "*negotiation . . . of international agreements*" falls within the foreign affairs function exception.  *Am. Ass'n of Exps. & Imps. v. United States*, 751 F.2d 1239, 1249 n.16 (Fed. Cir. 1985).  And, as plaintiffs readily admit, Lists 3 and 4 undoubtedly relate to the *negotiation* of an international trade deal with China.  *See*, *e.g.*, Pl. Cross-Mot. at 19 (increase in List 3 duty rate based on failed "negotiations" with China); *id.* at 23 (suspension of List 4B duties and reduction of List 4A duties followed a "recently negotiated limited trade deal with China").

Plaintiffs also argue that an agency's rule does not constitute a foreign affairs function simply because it relates to the President's overall "political agenda" or had "some entanglement with foreign affairs more generally."  Pl. Cross-Mot. at 64.  In the case of Lists 3 and 4A, however, the related political agenda had more than a mere "indirect" or "downstream effect[]" on foreign affairs, as plaintiffs claim.  *Id.* at 63.  The President personally discussed List 3 with President Xi of China, *see id.* at 17 (citing THE WHITE HOUSE, STATEMENT FROM THE PRESS

SECRETARY REGARDING THE PRESIDENT'S WORKING DINNER WITH CHINA (Dec. 1, 2018)), which among other things, demonstrates that the challenged tariff actions were "clearly and directly involved in a foreign affairs function."  Def. Mot. at 39-40.

Finally, we do not invoke the foreign affairs function exception to "duck" any statutory obligations under section 307.  Pl. Cross-Mot. at 61.  As explained in our opening motion, the USTR provided interested parties all the procedures required under its enabling statute.  Def. Mot. at 44-48.  Rather, by qualifying for the foreign affairs function exception, *see id*. at 42-44, the challenged actions in this case are exempt from the additional notice-and-comment requirements of the APA.

### B.     The USTR's Actions Were Not Arbitrary And Capricious Or In Excess Of Statutory Authority, And Were In Accordance With Law

Even if the Court finds that the APA applies, the USTR provided interested parties all required procedures.  Thus, there is no merit to the assertions raised by plaintiffs and RLC that the Government failed to provide a meaningful opportunity to submit comments regarding Lists 3 and 4A.  Pl. Cross-Mot. at 54-61; RLC Br. at 10-13, 15.

### 1.     The Notice Announcing List 3 Complied With The APA

Plaintiffs first allege that the USTR violated the APA's notice requirements because it relied on section 307(a)(1)(B) in issuing — but not in requesting comments regarding — List 3. Pl. Cross-Mot. at 55-56.  As a result, plaintiffs claim, the USTR "failed to provide an opportunity to comment on the legal and factual predicate underlying its reliance on Section 307(a)(1)(B) in the final notice."  Pl. Cross-Mot. at 56.  This claim is unfounded.

An agency does not need to include its "legal and factual predicate" in the notice of a proposed rule.  Rather, the APA requires only that an agency provide "either the terms or substance of the proposed rule or a description of the subjects and issues involved."  5 U.S.C.

§ 553(b)(3); *see Mid Continent Nail Corp. v. United States*, 846 F.3d 1364, 1373 (Fed. Cir. 2017) (a notice only needs to "fairly apprise interested parties of the issues involved.") (internal citations omitted).  Here, the USTR provided the entire proposed List 3 in a 118-page Annex accompanying its request for comments, thereby providing the "terms or substance" of the proposed rule and plainly satisfying 5 U.S.C. § 553(b)(3).[11]

If any doubt remains, "[t]he dispositive question in assessing the adequacy of notice under the APA is whether an agency's final rule is a 'logical outgrowth' of an earlier request for comment."  *Mid Continent*, 846 F.3d at 1373 (internal quotations and citations omitted).  The logical outgrowth test requires an interested party to be able to anticipate the final rule itself — not the final rule's "legal and factual predicate," *see* Pl. Cross-Mot at 56 — based on the agency's request for comment.  Here, List 3 was undoubtedly a "logical outgrowth" of the 118-page Annex accompanying the USTR's request for comment.  In fact, plaintiffs' objection to List 3 is that it did not change *enough* from the proposed rule.  Pl. Cross-Mot. at 59-60.  The fact that the USTR did not cite section 307(a)(1)(B) as a legal authority in its request for comments has no bearing on whether List 3 was a logical outgrowth of the proposed rule.

In any case, plaintiffs fail to articulate how not citing section 307(a)(1)(B) in the request for comment deprived any interested party of a meaningful opportunity to comment on List 3. Pl. Cross-Mot. at 14.  Plaintiffs cite no comment that would have differed if the USTR had cited section 307(a)(1)(B) in the request for comment.  Although the public comments reflect the trading community's significant interest in List 3, which the USTR considered before issuing a

---

[11] *Request for Comments Concerning Modification of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 33,608, 33,610-728 (U.S. Trade Rep. July 17, 2018) (*Request for Comments for List 3*).

final rule, they do not demonstrate that the precise legal basis for the USTR's authority was "critical" to interested parties, *see id.* at 55, or that List 3's request for comments in any way deprived them of an opportunity to comment on the applicable legal basis.

### 2.      The USTR Provided A Meaningful Opportunity To Comment

Plaintiffs and RLC also allege that they had no "meaningful opportunity" to comment on the challenged tariff actions due to the timing of affirmative and rebuttal comments, the time allotted for witnesses to testify at public hearings, and the total amount of time allotted to public comment.  Pl. Cross-Mot. at 56-59; RLC Br. at 10-11, 13, 15.  None of these arguments have merit.

First, RLC contends that there was no "meaningful opportunity" to comment because of the scope of the tariffs, which did not take into account that delivery schedules and supply chains are set up "months in advance," RLC Br. at 12, but cites nothing that would require the USTR to provide a comparable notice-and-comment period of 12 months or even years, in response to these concerns.  As explained in our opening motion and further below, the USTR more than provided a meaningful opportunity for interested parties to comment on proposed Lists 3 and 4A, including providing sufficient time for both affirmative and post-hearing rebuttal comments (even though post-hearing rebuttal comments were not required).  Def. Mot. at 50-55.

Turning to plaintiffs' and RLC's objections regarding the timing of post-hearing rebuttal comments, as we explained in our motion, the APA does not require the USTR to provide post-hearing rebuttal comments or a public hearing.  Def. Mot. at 51-55.  Plaintiffs essentially concede this point, arguing instead that, if the USTR decides to provide for such additional procedures, then it is "not free to short-circuit that process."  Pl. Cross-Mot. at 58; *see also* RLC Br. at 11 (objecting to the submission of initial and rebuttal comment on the same day).  But none of the procedures that the USTR provided were "short-circuited."

With respect to the post-hearing rebuttal comments, plaintiffs and RLC misconstrue the purpose of those comments, which was to allow parties to respond to arguments *raised at the hearing* and not to rebut initial written comments.  Def. Mot. at 53.  Also, plaintiffs cite nothing in support of their position that "'rebuttal comments' by definition must address comments that came before them," and could not be limited to rebutting positions expressed at the hearing.  Pl. Cross-Mot at 57.

Plaintiffs' objection to not having extensive time to "review the thousands of written comments filed by other parties before developing and submitting their rebuttal comments" is also unpersuasive.  Pl. Cross-Mot. at 57; *see also* RLC Br. at 10-11.  Nowhere in their lengthy brief do plaintiffs explain *why* they would need to rebut any of the initial written comments (or, for that matter anything discussed at the hearing), when, as the administrative record demonstrates, the written commenters and hearing participants overwhelmingly *agreed* with the plaintiffs' position, that the tariffs should not go into effect.

Nor is there any merit to plaintiffs' contention that the USTR allotted more time only after proposing a higher duty rate for List 3.  Pl. Cross-Mot. at 58.  As explained in our opening motion, regardless of the reason, the three extra weeks provided for affirmative comments, and one extra week provided for post-hearing rebuttal comments, clearly resulted in a meaningful opportunity for comment.[12]

Plaintiffs also incorrectly claim that it was arbitrary and capricious for the USTR to limit List 4 rebuttal comments to "rebutting or supplementing testimony at the hearing," when it did

---

[12] *Extension of Public Comment Period Concerning Proposed Modification of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 38,760, 38,761 (U.S. Trade Rep. Aug. 7, 2018) (*Extension of List 3 Comment Period*).

not similarly limit rebuttal comments for the List 1, 2 or 3 tariff actions.  Pl. Cross-Mot. at 57.

Contrary to plaintiffs' assertions, the *Federal Register* notices announcing Lists 1-3 all referred

to "post-hearing rebuttal comments."[13]  The fact that the USTR more explicitly stated in the

*Federal Register* notice for List 4 that the purpose of post-hearing rebuttal comments was to

respond or supplement statements made at the hearing does not establish that the USTR changed

its practices when issuing List 4.

Plaintiffs' complaints about the details of the public hearing — *i.e.*, the time allotted for

each witness to testify, *see* Pl. Cross-Mot. at 13, 56, the number of questions asked of each

witness, *see id.* at 13-14, the timing of written submissions with respect to the hearings, *see id.* at

13, 21, and the total length of the hearings, *id.* at 13, 26 — fare no better.  There is no basis for

finding that the public hearings for Lists 3 and 4 were deficient when they involved multiple

days, hundreds of witnesses, and the opportunity to later rebut or supplement witness testimony,

particularly when the APA requires *no* public hearings in the first place.  5 U.S.C. §§ 556, 557.

Plaintiffs also contest our assertion that Lists 3 and 4A were issued in response to an

urgent need for action, *see* Def. Mot. at 55, dismissing this as a "*post hoc* 'exigency' rationale.'"

Pl. Cross-Mot. at 55.  However, the rationale for urgently issuing Lists 3 and 4A cannot be *post

hoc* when it is based on contemporaneous, presidential directives.  Def. Mot. at 55.  Nor does the

fact that List 4A was issued two years after the underlying section 301 investigation "belie [our]

---

[13] *E.g.*, *Notice of Determination and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 14,906 (U.S. Trade Rep. Apr. 6, 2018) (List 1); *Notice of Action and Request for Public Comments Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 28,710 (U.S. Trade Rep. June 20, 2018) (*June 2018 Notice of Action*) (List 2); *Extension of List 3 Comment Period*, 83 Fed. Reg. at 38,761.

claims of urgency." Pl. Cross-Mot. at 58.  Indeed, the entire reason for responding to China's

unfair trade practices in tranches, or "lists" of additional duties was to determine the appropriate

action at each point in time, as negotiations with China progressed.  Regardless, as we explained

in our opening motion, the overall time provided by the USTR for public comment — seven

weeks for List 3, and six weeks for List 4A — demonstrates that plaintiffs had more than ample

opportunity for comment.  Def. Mot. at 55.

        Finally, plaintiffs and RLC have "failed to identify any substantive challenges [they]

would have made had [they] been given additional time."  *Omnipoint Corp. v. FCC*, 78 F.3d 620,

630 (D.C. Cir. 1996) (internal citation omitted); *see also Air Transp, Ass'n of Am, v. Civ.

Aeronautics Bd.,* 732 F.2d 219, 224 n.11 (D.C. Cir. 1984) (finding harmless error where

petitioner "[did] not explain what it would have said had it been given" an opportunity to

respond).

        **3.    The USTR Considered All Relevant Factors And Responded
                To Public Comments In Accordance With The APA**

        Our opening motion explained that the USTR considered the comments submitted by

interested parties and based its decisions on the relevant factors set forth in sections 307(a)(1)(B)

and (C).  Def. Mot. at 56-59.  We also explained that either provision could serve as an

independent basis for action.  *Id.*  In response, plaintiffs allege that because the USTR based its

decisions on "impermissible considerations," namely, on China's retaliatory actions, Lists 3 and

4A "cannot stand."  Pl. Cross-Mot. at 60.  RLC also erroneously contends that the USTR failed

meaningfully to consider comments raised by interested parties.  RLC Br. at 12-15.  As we

explain below, there is no merit to either claim.

        First, plaintiffs cite a statement in our opening motion — that the "USTR was not

required to find any increased burden on U.S. commerce in order to modify the section 301

action," *see* Pl. Cross-Mot. at 60 — which they take out of context to argue that the "original 'burden' finding" in the section 301 investigation cannot support modifying an action under section 307(a)(1)(B).  Pl. Cross-Mot. at 61.  We never made this argument.  Instead, our motion explained that a burden finding was not required for Lists 3 and 4A because *section 307(a)(1)(C) provided an independent basis for action*, and section 307(a)(1)(C) does not require any finding with respect to the burden on United States commerce.  Def. Mot. at 36 n.6, 57.

Also, plaintiffs concede that the USTR made changes to Lists 3 and 4A in response to public comment, but still claim that the agency's response was insufficient.  Pl. Cross-Mot. at 59-60 (noting that the USTR determined not to include certain tariff subheadings); RLC Br. at 15 (contending that the USTR failed to consider "substantial objections").  Plaintiffs cite no authority that requires the USTR to identify specifically "which comments, and what concerns raised" caused it to withdraw "certain tariff headings and products but not others."  *Id.*  Also, plaintiffs and RLC ignore that the USTR twice delayed increasing List 3 tariffs from 10 percent to 25 percent duties, and established exclusion processes for both lists, all in an effort to ease the burden on the domestic industry.  Def. Mot. at 58.  Thus, there is no merit to plaintiffs' contention that the USTR failed to respond to public comments in a "reasoned manner."  Pl. Cross-Mot. at 59.

Although RLC identifies specific concerns about the tariffs that were raised during the public comment process, RLC Br. at 15, those concerns about the merits of the tariffs do not change the fact that the process for issuing Lists 3 and 4A complied with all relevant APA requirements.  Likewise, RLC alleges that Lists 3 and 4A act as "a hidden tax for consumers on everyday products," affecting products from lightbulbs to baby cribs, *see* RLC Br. at 14-15, and that the challenged tariff actions will have a "disruptive impact on the supply chains of U.S.

retailers, manufacturers, and producers." *Id.* at 15.  None of these purported policy critiques for issuing the lists provides a legal basis for overturning the tariffs.  Once again, the USTR considered all public comments, including those submitted by RLC, and it responded in a reasoned manner in compliance with the APA.

Finally, RLC cites a number of articles to try and demonstrate that the harm they warned against did in fact materialize.  RLC Br. at 15-16.  These articles are not part of the administrative record and should not be considered by the Court.  In any event, the proffered evidence regarding the *effects* of Lists 3 and 4A does not demonstrate that the notice-and-comment procedures followed in the *issuance* of Lists 3 and 4A were deficient.

In sum, if the Court finds that this case involves agency action subject to the APA, then it should also find that the challenged actions complied with the APA's notice-and-comment requirements.

## IV.   **The Court Should Dismiss The Claims Raised By Interested Party Plaintiffs**

Finally as explained below, the Court should dismiss the claims raised in the Amicus Curiae Brief of Interested Parties (Am. Br.), because those parties do not possess either Constitutional or statutory standing.  Moreover, relief may generally be provided to importers of record who paid the challenged duties.

### A.   **Non-Importers Lack Standing To Seek Refunds Of Section 301 Tariffs**

The Amicus Curiae Brief of Interested Parties is submitted on behalf of "certain plaintiffs, who are interested parties that bear or bore the cost of the List 3 and/or List 4A tariffs, irrespective of importer of record status."  Am. Br. at 1.  The Interested Party Plaintiffs (IPPs) claim to have "incurred significant costs . . . either as the importer of record directly responsible for such duties or as an ultimate consignee or purchaser required to pay them as a part of the

transaction for the imported goods." *Id.* at 4.  They request that any relief be "not limited to an importer of record," but rather, "available to those who bear or have borne the cost of the tariffs pursuant to List 3 or List 4A, and who have filed a complaint." *Id*. at 1.

As an initial matter, the IPPs appear to represent members of the United States' vast supply chain network, including consignees, purchasers, and importers, and the relief they request — that refunds be "available to those who have borne the cost of tariffs" — potentially encompasses numerous additional parties, such as manufacturers, producers, and other consumers.  The IPPs, however, have provided virtually no information about the parties they seek to represent, and their broad request that monetary relief be "available" to any company that potentially "bore the cost" of section 301 tariffs should be summarily rejected.  *See McMorris v. Carlos Lopez & Assocs*., *LLC*, 995 F.3d 295, 302 (2d Cir. 2021) ("determining standing is an inherently fact-specific inquiry that requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted.") (citation and internal  quotation omitted).

Even if the IPPs *had* provided more information about who they purport to represent, non-importers of record lack standing to challenge the Lists 3 and 4A tariff actions, and the Court therefore lacks jurisdiction to entertain their request for relief.  As explained below, any potential relief in this case is limited to specifically-identified importers of record because importers of record — not consignees, purchasers, or other "interested parties" — paid the challenged tariffs.  *See* 19 C.F.R. § 141.1(b) ("[t]he liability for duties, both regular and additional, attaching on importation, constitutes a personal debt due from the importer to the United States …").  Consumers who may pay increased costs as part of a downstream transaction fall far outside the zone of interests protected by sections 301 and 307, the purpose of which is to

eliminate acts, policies, or practices of foreign governments that are unreasonable,

discriminatory, or burden or restrict United States commerce.

### 1.    The Interested Party Plaintiffs Lack Article III Standing

To establish constitutional standing, a party seeking to invoke federal jurisdiction must

satisfy three requirements.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  First, the party

must show that it has suffered an "injury in fact" that is both concrete and particularized, and

actual or imminent (as opposed to conjectural or hypothetical).  *Id.* at 560.  "Second, there must

be a causal connection between the injury and the conduct complained of—the injury has to be

'fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the

independent action of some third party not before the court.'"  *Id.* at 560 (quoting *Simon v. E. Ky.*

*Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976)).  Third, the party must show that it is likely, rather

than merely speculative, that a favorable judicial decision will redress the injury.  *Id.* at 561.

The IPPs claim to have incurred economic harm "as an ultimate consignee or purchaser

required to pay [the duties] as a part of the transaction for the imported goods."  Am. Br. at 4.

But consignees and purchasers are not directly responsible for paying section 301 duties.  The

IPPs concede as much.  Am. Br. at 3-4 (noting that importers of record are "directly responsible

for" duties).  In *Perry Chemical Corp. v. United States*, 375 F. Supp. 3d 1324, 1332 (Ct. Int'l

Trade), *reconsideration denied*, 415 F. Supp. 3d 1260 (Ct. Int'l Trade 2019), this Court

dismissed for lack of standing a claim brought by a non-importer seeking to compel the

Department of Commerce to issue modified liquidation instructions to Customs and Border

Patrol (CBP).  The Court held that, "with respect to entries for which Perry was not the importer

and did not pay the cash deposits, Perry suffered no 'injury in fact,' as Perry paid nothing on

these entries and was not impacted by their liquidation."  *Perry Chem. Corp.*, 375 F. Supp. 3d at

1332.  The Court emphasized that Perry did not have a particularized injury related to the relief it

sought — reliquidation of all entries — because it did not pay cash deposits for all entries.  *Id.* at

1333.

The reasoning in *Perry* governs here.  The IPPs request the Court to confirm that "relief

is available to those who bear or have borne the cost of the tariffs[.]"  Am. Br. at 1.  But Lists 3

and 4A imposed duties on products from China that consignees, purchasers, and other

downstream consumers *did not pay.*  Thus, like the plaintiff in *Perry*, the IPPs do not have an

injury in fact tied to the relief they seek.

While some economic injuries can be established through indirect "economic logic," *see*

Am. Br. at 3, the IPPs have made no such showing.  They vaguely assert that the "costs" of the

section 301 duties were passed on to them "as a part of the transaction for the imported goods."

Am. Br. at 4.  But these allegations establish no "particularized" injury that affects the IPPs in a

"personal and individual way."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016), *as revised*

(May 24, 2016).  Moreover, injury "shared in substantially equal measure by all or a large part of

the populace" does not suffice.  *McKinney v. U.S. Dep't of Treasury*, 799 F.2d 1544, 1551 (Fed.

Cir. 1986).  The injury that the IPPs claim — increased costs to downstream consumers — is

exactly the type of "shared," non-particularized injury that cannot establish constitutional

standing.  Am. Br. at 7.

Other than generalized, conclusory statements, the IPPs present no evidence of the

"economic harm" they have or will allegedly suffer.  Unlike the plaintiffs in *Invenergy*

*Renewables LLC v. United States*, 422 F. Supp. 3d at 1273, who alleged harm to "existing and

future projects" if the revocation of an exclusion were not reversed, the IPPs proffer no

allegations or evidence with respect to the price that their suppliers previously charged, or will

charge in the future, for any particular product.  The generalized nature of plaintiffs' claimed

injury is especially palpable under the facts of this case, in which the challenged tariffs applied to

$500 billion worth of imported products from China across more than 1,000 different tariff

subheadings.[14]

      In short, the tenuous allegation that "[p]laintiffs' injuries are related to the payment of

tariffs and impact on prices of imported products" is too conjectural, remote, and abstract to

establish a particularized and concrete injury-in-fact.  Am. Br. at 7; *see also Nat'l Treasury*

*Emps. Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996) (injuries must be "certainly

impending," not conjectural, hypothetical, speculative, abstract, or remote); *see also Gen. Elec.*

*Co. v. United Techs. Corp*., 928 F.3d 1349, 1353 (Fed. Cir. 2019), *cert. denied sub nom. Gen.*

*Elec. Co. v. Raytheon Techs. Corp*., 140 S. Ct. 2820 (2020) ("expend[ing] some unspecified

amount of time and money" too speculative to establish a real or imminent injury).

      Nor does the "competitor standing" doctrine confer standing over the IPPs' claims.  Am.

Br. at 3.  "For the competitor standing doctrine to apply, the government action must change the

competitive landscape by, for example, creating new benefits to competitors."  *Gen. Electric*,

928 F.3d at 1354.  "Put another way, the government action must alter the status quo of the field

of competition."  *Id.*  The IPPs, however, do not allege that they "may lose sales to rivals, or be

forced to lower [their] price or to expend more resources to achieve the same sales, all to the

detriment of [their] bottom line."  *See Sherley v. Sebelius*, 610 F.3d 69, 72 (D.C. Cir. 2010).

Moreover, the facts in this case are materially distinguishable from the facts in *Canadian Lumber*

---

[14] *June 2018 Notice of Action*, 83 Fed. Reg. at 28,711 (818 tariff subheadings); *Notice of Action Pursuant to Section 301:  China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 40,823 (U.S. Trade Rep. Aug. 16, 2018) (279 tariff subheadings).

*Trade Alliance v. United States*, 517 F.3d 1319, 1332 (Fed. Cir. 2008), *see* Am. Br. at 3, in which the Government's action of distributing duties to domestic producers — effectively subsidizing American competitors — caused economic injury to Canadian producers in the form of increased competition.  Unlike the domestic subsidies in *Canadian Lumber*, the section 301 tariffs apply equally to all importers with products subject to the duties."[15]

Further, alleging a procedural violation alone is insufficient to confer standing.  Am. Br. at 4.  "Article III standing requires a concrete injury even in the context of a statutory violation. For that reason, [the IPPs] could not, for example, allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III."  *Spokeo*, 136 S. Ct. at 1549.  To be sure, the IPPs "may be 'interested part[ies]' under the statute, and therefore able to petition the agency, and yet not have Article III standing to bring this action in federal court."  *Gettman v. DEA*, 290 F.3d 430, 433 (D.C. Cir. 2002) (citing *Fund Democracy, LLC v. SEC*, 278 F.3d 21, 27 (D.C. Cir. 2002)) (bracketing by court).  "Participation in agency proceedings is alone insufficient to satisfy judicial standing requirements."  *Id*.

---

[15] *Clinton v. City of New York*, 524 U.S. 417 (1998) is also distinguishable.  Am. Br. at 3.  In that case, the President exercised his authority under the Line Item Veto Act to cancel section 968 of the Taxpayer Relief Act of 1997, which permitted owners of certain food refiners and processors to defer payments of capital gains taxes.  *Clinton*, 524 U.S. at 423.  The Supreme Court held that a farmers' cooperative possessed standing to challenge the President's cancellation of section 968 because: (1) "Congress enacted § 968 for the specific purpose of providing a benefit to a defined category of potential purchasers of a defined category of assets," and the "members of that statutorily defined class received the equivalent of a statutory 'bargaining chip' to use in carrying out the congressional plan to facilitate their purchase of such assets;" (2) "the President selected § 968 as one of only two tax benefits . . . that should be canceled," and (3) the "cooperative was organized for the very purpose of acquiring processing facilities, it had concrete plans to utilize the benefits of § 968, . . . it was engaged in ongoing negotiations with the owner of a processing plant who had expressed an interest in structuring a tax-deferred sale," and "it is actively searching for other processing facilities for possible future purchase if the President's cancellation is reversed[.]"  *Id.* at 432.  Far from helping the IPPs' case, *Clinton* only highlights how generalized, remote, hypothetical, and conjectural their claimed injury is.

Also, the IPPs' injury is not traceable to the Government's actions.  Their injury is based
entirely on the actions of third parties, *i.e.*, the price third-party suppliers decide to charge.
Business decisions made by third-party suppliers and plaintiffs' purported failure to negotiate
more beneficial terms for themselves cannot constitute injury traceable to the Government.
Because the injury alleged is entirely dependent on the future, independent actions of third
parties, there is no causal connection between the injury and the section 301 tariffs.  *See Lujan*,
504 U.S. at 560-61.

Finally, a favorable judicial decision would not redress the claimed injury.  CBP
regulations provide that refunds of excessive duties "shall be certified for payment to the
importer of record," subject to certain limited exceptions that are not present here.  19 C.F.R.
§ 24.36.  Thus, a favorable judicial decision would result in refunds to the importers of record; it
would not redress any past or future "costs" that plaintiffs' allegedly incurred due to independent
third party "transaction[s] for the imported goods."  Am. Br. at 4; *see Warth v. Seldin*, 422 U.S.
490, 505 (1975) (overturning ordinance that precluded third-party developers and builders from
constructing housing at prices affordable to the plaintiffs, because it would not redress claimed
harm); *Arjay Assocs., Inc. v. Reagan*, 707 F. Supp. 1346, 1347-48 (Ct. Int'l Trade), *aff'd sub
nom. Arjay Assocs., Inc. v. Bush*, 891 F.2d 894 (Fed. Cir. 1989) (manufacturers' representatives
lacked standing to contest sanctions that resulted in fewer orders from importer); *Int'l Lab. Rts.
Fund v. United States*, 391 F. Supp. 2d 1370, 1375 (Ct. Int'l Trade 2005) (dismissing 19 U.S.C. §
1307 complaint for lack of redressability due to Court's recognized inability to control the use of
child labor on cocoa farms in the Ivory Coast); *Fund for Animals v. Norton*, 295 F. Supp. 2d 1, 7-
8 (D.D.C. 2003) (alleged injury to public interest group could not be redressed by banning the

48

importation of endangered Mongolian argali sheep trophies, because ban would not affect

Mongolian government's granting of hunting permits, as well as poaching).

### 2.    The Interested Party Plaintiffs Lack Statutory Standing

Even if the IPPs have constitutional standing, they are not within the "zone of interests"

addressed by sections 301 or 307.  In addition to the constitutional requirements of standing

under Article III, the Supreme Court "has also referred to a plaintiff's need to satisfy 'prudential'

or 'statutory' standing requirements."  *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296,

1302 (2017).  "The question is whether the statute grants the plaintiff the cause of action that he

asserts."  *Id.*  Said another way: statutory standing concerns "whether the interest sought to be

protected by the complainant is arguably within the zone of interests to be protected or regulated

by the statute or constitutional guarantee in question."  *Ass'n of Data Processing Serv. Orgs.,*

*Inc. v. Camp*, 397 U.S. 150, 153 (1970) (in the APA context).

The IPPs claim they are within the zone of interests "protected by [s]ection 301" because

"[p]laintiffs are companies who engage in international trade and participate in U.S.

commerce[.]"  Am. Br. at 7.  Section 301's zone of interest, or that of section 307 — the

statutory provision actually invoked in this case — is not so broad.  To the contrary, the IPPs'

interest in paying cheaper prices as a consumer is wholly "inconsistent with the purposes implicit

in," and at best, only "marginally related" to, section 301's broader purpose of protecting United

States commerce.  *See Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,

567 U.S. 209, 225 (2012); *see also* S. REP. NO. 100-71, at 80 (purpose of section 301 is to

"vigorously pursue appropriate action . . . to respond to . . . unfair foreign acts, policies, or

practices."); 19 U.S.C. § 2417(a)(1)(B) (authorizing the modification of action when the "burden

. . . on United States commerce" has increased).  Such an interpretation would allow virtually

any consumer to file suit challenging the President's discretionary decision to take action to eliminate unfair and discriminatory foreign practices.  This is exactly the type of disruption to the statutory scheme that the Supreme Court has cautioned against.  *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 352-53 (1984); *see also Leaf Tobacco Exps. Ass'n, Inc. v. Block*, 749 F.2d 1106, 1108 (4th Cir. 1984) ("the zone test works to prevent groups outside of the class from usurping the legislative entitlement.").

Nor is it dispositive that "Section 301 contemplates the inclusion of a wide range of affected parties in the implementation process[.]"  Am. Br. at 7.  As explained above with respect to Article III standing, "[p]articipation in agency proceedings is alone insufficient to satisfy judicial standing requirements." *Gettman*, 290 F.3d at 433.  Moreover, as the Supreme Court has made clear, not every consumer who alleges harm falls within a statute's zone of interests.  In a case involving claims for false advertising under the Lanham Act, for example, the Court reviewed the statute's broad authorization allowing "suit by 'any person who believes that he or she is likely to be damaged' by a defendant's false advertising." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014) (quoting 15 U.S.C. § 1125(a)(1) (2014)). Despite this broad authorization — which lacks any equivalent under section 301 — the Court determined that "a business misled by a supplier into purchasing an inferior product is, like consumers generally, not under the [Lanham] Act's aegis."  *Lexmark*, 572 U.S. at 132; *see also McKinney*, 799 F.2d at 1552 (trade statute had "[n]o stated or implied intention . . . to protect the consuming public from the importation of goods produced by forced labor," even though it barred imports manufactured using forced labor).  Similar to "consumers generally," *see Lexmark*, 572 U.S. at 132, or the purchaser of any product, non-importers lack standing to ask for refunds or "relief" for Section 301 duties that they did not pay.

Finally, setting aside these standing issues, it is unclear what relief the IPPs can actually obtain.  Money damages are unavailable under the APA.  *See Bowen v. Massachusetts*, 487 U.S. 879 (1988).

**B.      Should Plaintiffs Prevail, Relief May Be Afforded Only To Importers Of Record That Are Directly Responsible For Paying Section 301 Duties**

In the final portion of their brief, the IPPs suggest that the Court should "order refunds irrespective of the status of an importer[.]"  Am. Br. at 9.  In making this argument, the IPPs do not cite a single case commenced under 28 U.S.C. § 1581(i) in which the Court granted monetary relief to non-importers of record, and we are aware of no such case.

Indeed, all of the cases cited by the IPPs are inapposite.  *United States v. Williams*, 514 U.S. 527, 530 (1995), for example, involved the disbursement of sale proceeds directly to the Government (specifically, the Internal Revenue Service), *see* Am. Br. at 10, whereas the IPPs pay no section 301 duties.  The *Gilda* case is also distinguishable, in that plaintiffs were *importers* of toasted breads subject to, and responsible for paying, a 100 percent retaliatory duty. Am. Br. at 10; *Gilda Indus., Inc. v. United States*, 446 F.3d 1271, 1275 (Fed. Cir. 2006). Moreover, plaintiffs in *Canadian Lumber* did not request monetary relief.  *See* Am. Br. at 10 (citing *Canadian Lumber*, 517 F.3d at 1325) (seeking declaratory judgment and injunction). While the Court found that customs brokers had standing in *Richard L. Jones Calexico, Inc. v. United States*, 30 CIT 1030, 1037 (2006), *see* Am. Br. at 11, that holding has no relevance here, as the Court held that the brokers were "*acting as an agent of the importer*."  *Calexio*, 30 CIT at 1037; Am. Br. at 11.  The IPPs cannot, and do not, allege that they are agents of importers of record.  Further, offering monetary relief to non-importers would potentially result in an *overpayment* of duties paid on the same transaction – the importer would be refunded the duties

if plaintiffs prevail, and an additional party to the transaction would receive a monetary judgment

as well, potentially resulting in monetary payments that exceed the amounts paid.

## **CONCLUSION**

For these reasons, we respectfully request that this Court dismiss plaintiffs' amended

complaint for failure to state a claim or, alternatively, grant judgment for defendants upon the

administrative record.

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

/s/ Jeanne E. Davidson
JEANNE E. DAVIDSON
Director

/s/ L. Misha Preheim
L. MISHA PREHEIM
Assistant Director

/s/ Justin R. Miller
JUSTIN R. MILLER
Attorney-In-Charge,
International Trade Field Office

OF COUNSEL:

MEGAN GRIMBALL
Associate General Counsel
PHILIP BUTLER
Associate General Counsel
EDWARD MARCUS
Assistant General Counsel
Office of General Counsel
Office of the U.S. Trade Representative
600 17th Street N.W.
Washington, D.C. 20508

/s/ Elizabeth A. Speck
ELIZABETH A. SPECK
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tel: 202-307-0369
Email: Elizabeth.Speck@usdoj.gov

PAULA SMITH                                  SOSUN BAE
Assistant Chief Counsel                      Senior Trial Counsel
EDWARD MAURER                                ANN C. MOTTO
Deputy Assistant Chief Counsel               JAMIE L. SHOOKMAN
VALERIE SORENSEN-CLARK                        Trial Attorneys
Attorney                                     Commercial Litigation Branch
Office of the Assistant Chief Counsel        Civil Division
International Trade Litigation               Department of Justice
U.S. Customs and Border Protection           P.O. Box 480
26 Federal Plaza, Room 258                   Ben Franklin Station
New York, NY 10278                           Washington, D.C. 20044


October 1, 2021                              *Attorneys for Defendants*

## **CERTIFICATE OF COMPLIANCE**

I, Elizabeth Speck, an attorney in the Office of the Assistant Attorney General, Civil Division, Commercial Litigation Brach, who is responsible for the Government's motion to dismiss or, alternatively, motion for judgment on the agency record, dated October 1, 2021, relying upon the word count feature of the word processing program used to prepare the memorandum, certify that this memorandum complies with the word count limitation ordered in the Scheduling Order of April 13, 2021 and contains 16,618 words.

/s/ Elizabeth A. Speck