## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:    THE HONORABLE MARK A. BARNETT, CHIEF JUDGE
              THE HONORABLE CLAIRE R. KELLY, JUDGE
              THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

_____
                                 :
                                 :
*In Re* Section 301 Cases                  :       Court No. 21-00052
                                 :
_____:

## PLAINTIFFS' REPLY IN SUPPORT OF THEIR CROSS-MOTION FOR JUDGMENT ON THE AGENCY RECORD

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ...................................................................................................................1

ARGUMENT .........................................................................................................................3

I.     THE TRADE ACT DOES NOT PERMIT THE "SUPPLEMENTAL" LIST 3 AND
LIST 4A TARIFF ACTIONS .........................................................................................3

     A.     The Court Should Not Defer To Defendants' Statutory Construction ....................3

     B.     Section 307(a)(1)(B) Does Not Authorize USTR To Increase The Original
Tariff Action In The Circumstances Present Here .....................................................7

     C.     Traditional Tools Of Statutory Construction Demonstrate That Section
307(a)(1)(C) Cannot Authorize The Challenged Actions .....................................11

             1.     *The Text and Structure of Section 307 Compel Plaintiffs' Reading.* ..........11

             2.     *The Purpose of Section 307 Supports Plaintiffs' Reading.* .......................16

             3.     *To the Extent Relevant, the Legislative History Supports Plaintiffs'
Reading.* ...................................................................................................18

             4.     *Defendants Concede that Their Use of Section 307(a)(1)(C) to
Increase a Tariff Action Is Unprecedented.* ..............................................20

             5.     *Defendants' Claim of Unreviewable Authority Compels Application
of the Constitutional-Avoidance Canon.* ..................................................21

II.    USTR'S PREORDAINED DECISION TO PROMULGATE LIST 3 AND LIST 4A
VIOLATED THE APA AND SECTION 307 ...................................................................23

     A.     USTR Violated The Substantive Provisions Of The APA ....................................23

     B.     USTR Violated The APA And Related Procedural Requirements .......................24

             1.     *The Notice Announcing List 3 Was Inadequate.* .......................................24

             2.     *USTR Failed to Engage Meaningfully with Public Comments.* .................25

             3.     *USTR Failed to Comply with Basic Procedural Norms.* ..........................27

     C.     USTR's Actions Do Not Meet The Foreign Affairs Exception ............................28

CONCLUSION ....................................................................................................................31

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Am. Ass'n of Exps. & Imps. v. United States*,
   751 F.2d 1239 (Fed. Cir. 1985)..................................................................................29

*Am. Inst. for Int'l Steel, Inc. v. United States*,
   376 F. Supp. 3d 1335 (Ct. Int'l Trade 2019) ...........................................................22

*Am. Water Works Ass'n v. EPA*,
   40 F.3d 1266 (D.C. Cir. 1994).................................................................................25

*Amerijet Int'l, Inc. v. Pistole*,
   753 F.3d 1343 (D.C. Cir. 2014)..............................................................................7, 8

*Burlington Truck Lines, Inc. v. United States*,
   371 U.S. 156 (1962).................................................................................................10

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
   467 U.S. 837 (1984)...................................................................................................3

*Chrysler Corp. v. Brown*,
   441 U.S. 281 (1979).................................................................................................10

*City of Kansas City v. Dep't of Hous. & Urb. Dev.*,
   923 F.2d 188 (D.C. Cir. 1991).................................................................................28

*Clark v. Suarez Martinez*,
   543 U.S. 371 (2005).................................................................................................22

*Conn. Light & Power Co. v. Nuclear Regul. Comm'n*,
   673 F.2d 525 (D.C. Cir. 1982).................................................................................25

*Crowell v. Benson*,
   285 U.S. 22 (1932)...................................................................................................22

*Dai Glob. v. Adm'r of the U.S. Agency for Int'l Dev.*,
   945 F.3d 1196 (Fed. Cir. 2019)...............................................................................18

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
   140 S. Ct. 1891 (2020).............................................................................................30

*East Bay Sanctuary Covenant v. Biden*,
   993 F.3d 640 (9th Cir. 2021) ...................................................................................29

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*,
   485 U.S. 568 (1988).................................................................................................23

*Fed.-Mogul Corp. v. United States*,
63 F.3d 1572 (Fed. Cir. 1995).................................................................................5

*Fed. Energy Admin. v. Algonquin SNG, Inc.*,
426 U.S. 548 (1976)...............................................................................................22

*Fedmet Res. Corp. v. United States*,
755 F.3d 912 (Fed. Cir. 2014).................................................................................4

*Gilda Indus., Inc. v. United States*,
32 C.I.T. 425, 556 F. Supp. 2d 1366 (2008).........................................................20
446 F.3d 1271 (Fed. Cir. 2006)................................................................................6
622 F.3d 1358 (Fed. Cir. 2010)........................................................................3, 4, 6

*Gilead Scis., Inc. v. Lee*,
778 F.3d 1341 (Fed. Cir. 2015)...............................................................................18

*GPX Int'l Tire Corp. v. United States*,
780 F.3d 1136 (Fed. Cir. 2015)...........................................................................4, 5

*Invenergy Renewables LLC v. United States*,
422 F. Supp. 3d 1255 (Ct. Int'l Trade 2019) .........................................................29
476 F. Supp. 3d 1323 (Ct. Int'l Trade 2020) .....................................................5, 28

*Jean v. Nelson*,
711 F.2d 1455 (11th Cir. 1983) ..............................................................................29

*Kooritzky v. Reich*,
17 F.3d 1509 (D.C. Cir. 1994).................................................................................24

*Maple Leaf Fish Co. v. United States*,
762 F.2d 86 (Fed. Cir. 1985).....................................................................................3

*Merit Mgt. Grp., LP v. FTI Consulting, Inc.*,
138 S. Ct. 883 (2018)..............................................................................................11

*Mid Continent Nail Corp. v. United States*,
846 F.3d 1364 (Fed. Cir. 2017).................................................................24, 28, 30

*Milner v. Dep't of Navy*,
562 U.S. 562 (2011)................................................................................................18

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)....................................................................................................7

*Murata Mach. USA v. Daifuku Co.*,
830 F.3d 1357 (Fed. Cir. 2016)...............................................................................15

*Nat'l Ass'n of Home Builders v. EPA,*
  682 F.3d 1032 (D.C. Cir. 2012) ...................................................27

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
  567 U.S. 519 (2012) .....................................................................23

*NLRB v. Noel Canning,*
  573 U.S. 513 (2014) .....................................................................20

*NLRB v. SW Gen., Inc.,*
  137 S. Ct. 929 (2017) ...................................................................19

*Pavelic & LeFlore v. Marvel Ent. Grp.,*
  493 U.S. 120 (1989) .......................................................................9

*Perez v. Mortg. Bankers Ass'n,*
  575 U.S. 92 (2015) .......................................................................26

*Sherley v. Sebelius,*
  689 F.3d 776 (D.C. Cir. 2012) ...................................................26

*Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs,*
  531 U.S. 159 (2001) .....................................................................23

*Transpacific Steel LLC v. United States,*
  4 F.4th 1306 (Fed. Cir. 2021) .................................................4, 5, 12, 20

*Trump v. Hawaii,*
  138 S. Ct. 2392 (2018) .................................................................20

*Tyler v. Cain,*
  533 U.S. 656 (2001) .....................................................................11

*United States v. Schmidt Pritchard & Co,*
  47 C.C.P.A. 152 (1960) ...............................................................10

*United States v. Yoshida Int'l, Inc.,*
  526 F.2d 560 (C.C.P.A. 1975) .......................................................6

**CONSTITUTION AND STATUTES**

U.S. CONST. art. I, § 8, cl. 1, 3 .........................................................6

5 U.S.C.
  § 553(b) ........................................................................................24
  § 553(c) ........................................................................................24
  § 706(2)(A) ...................................................................................24
  § 706(2)(C) ...................................................................................24

19 U.S.C.
    § 1337(j)(2) ................................................................................................17
    § 2411(b)(2) ..............................................................................................15
    § 2412 ........................................................................................................16
    § 2413 ........................................................................................................16
    § 2414 ........................................................................................................16
    § 2414(a)(2)(B) ...................................................................................16, 18
    § 2416(b)(2) ..............................................................................................10
    § 2417(a)(1)(B) .................................................................................. *passim*
    § 2417(a)(1)(C) .................................................................................. *passim*
    § 2417(a)(2) ...............................................................................................24

## FEDERAL REGISTER NOTICES

*Initiation of Section 301 Investigation; Hearing; and Request for Public*
    *Comments: China's Acts, Policies, and Practices Related to Technology*
    *Transfer, Intellectual Property, and Innovation*, 82 Fed. Reg. 40,213 (Aug.
    24, 2017) ......................................................................................................9

*Notice of Action Pursuant to Section 301: China's Acts, Policies, and Practices*
    *Related to Technology Transfer, Intellectual Property, and Innovation*, 83
    Fed. Reg. 40,823 (Aug. 16, 2018) ..............................................................9

*Notice of Determination and Request for Public Comment Concerning Proposed*
    *Determination of Action Pursuant to Section 301: China's Acts, Policies, and*
    *Practices Related to Technology Transfer, Intellectual Property, and*
    *Innovation*, 83 Fed. Reg. 14,906 (Apr. 6, 2018) .......................................9

*Notice of Modification of Section 301 Action: China's Acts, Policies, and*
    *Practices Related to Technology Transfer, Intellectual Property, and*
    *Innovation*, 83 Fed. Reg. 47,974 (Sept. 21, 2018) ....................7, 8, 26, 27

*Notice of Modification of Section 301 Action: China's Acts, Policies, and*
    *Practices Related to Technology Transfer, Intellectual Property, and*
    *Innovation*, 84 Fed. Reg. 43,304 (Aug. 20, 2019) ................................26

*Termination of Action: Protection of Intellectual Property Rights by the*
    *Government of Honduras*, 63 Fed. Reg. 35,633 (June 30, 1998) .......15, 20

## OTHER AUTHORITIES

1 C.F.R. § 18.12 .............................................................................................24

48 C.F.R. § 25.202 .........................................................................................17

H.R. REP. NO. 100-576, *as reprinted in* 1988 U.S.C.C.A.N. 1547 (Conf. Rep.) .........................19

**INTRODUCTION**

USTR's massive List 3 and List 4A trade actions, which rely exclusively on its section 307 "modification" authority, are the largest in this Nation's history (by several orders of magnitude). In the more than three decades since Congress enacted section 307, the United States Trade Representative (USTR) had never invoked it to increase a trade action by a single penny, let alone up to a half-trillion dollars.   One would expect such an unprecedented action—involving Defendants' breathtaking claim of unlimited, unreviewable Executive Branch authority—to rest on a clear and explicit congressional delegation and a well-supported factual basis.

Yet from the first sentence of their response brief, Defendants offer a hodge-podge of justifications for the challenged modifications—*e.g.*, "to allow U.S. entities fairly to conduct business with China," Gov't Resp. 1, or because China's retaliatory actions "caused additional harm to U.S. commerce," *id.* at 2, or due to the burden from China's "unfair trade practices" more broadly, *id.*—that overlook the statutory standard.   The statutory scheme is clear:   USTR can increase tariffs pursuant to its section 307 modification authority only when the burden on U.S. commerce has increased *from the investigated practices that were the subject of the section 301 action*.   Defendants have made no showing—and, indeed, claim no need to show—that the burden from China's technology transfer and other investigated practices increased at all, never mind in a manner warranting a seven-fold explosion in the tariff burden on U.S. businesses and consumers.

Defendants argue that once USTR undertakes a section 301 action after a targeted investigation, section 307 authorizes USTR to ratchet up those tariffs to any level to address any conduct of a foreign government at any time.   Neither prong of section 307 permits such unconstrained discretion.   The plain terms of section 307(a)(1)(B) authorize an increase in the original section 301 action only upon a finding that the burdens have increased from "the acts,

1

policies, and practices, *that are the subject of such action*," not just any trade-related (or other) act, policy, or practice with which USTR disagrees. Nor can Defendants fall back on the "no longer appropriate" prong of section 307(a)(1)(C). Statutory structure, context, and practice, as well as the canon of constitutional avoidance, demonstrate that section 307(a)(1)(C), just like parallel section 307(a)(1)(A), serves as a tapering tool—not, as Defendants would have it, a blank check to wage a trade war. Otherwise USTR would *never* rely on section 307(a)(1)(B) in a discretionary action case: why bother making the requisite factual findings under subsection (B) if USTR can ramp up tariffs as it sees fit, free from judicial review, under subsection (C)?

As to the Administrative Procedure Act (APA) claims, Defendants' notion of what is proper—including the various shortcuts it took to reach its preordained conclusion—makes a mockery of notice-and-comment rulemaking. USTR's rushed approach telegraphed that it had no intention of giving meaningful consideration to public input as to the legality, wisdom, or even workability of the tariffs—as indicated by the fact that it provided zero response to the nearly 10,000 comments that (as Defendants admit) "overwhelmingly *agreed* . . . that the tariffs should not go into effect." Gov't Resp. 38. The primary defense Defendants now raise—that the opportunity for public participation was extended purely by the grace of the Executive Branch such that any deficiencies cannot be held against USTR—underscores the dismissiveness with which USTR approached its procedural obligations.

Because the List 3 and List 4A actions violate the Trade Act and the APA, they should be set aside and the unlawfully collected tariffs should be refunded to Plaintiffs.

<u>ARGUMENT[1]</u>

I.    **THE TRADE ACT DOES NOT PERMIT THE "SUPPLEMENTAL" LIST 3 AND LIST 4A TARIFF ACTIONS**

A.    **The Court Should Not Defer To Defendants' Statutory Construction**

Defendants cannot hide behind deference.  The parties agree that "*Chevron* does not apply." Gov't Resp. 11.  Defendants nevertheless insist that this Court must apply a "heightened standard of review" to the pure questions of statutory construction presented here.  *Id.*  It should not.

Defendants' primary authority, *Gilda Industries, Inc. v. United States*, 622 F.3d 1358 (Fed. Cir. 2010) ("*Gilda II*"), does not stand for the proposition that this Court must give "heightened" deference to USTR's statutory interpretations.  Defendants acknowledge that *Gilda II* is the only case it relies on that actually "involved questions of statutory authority."  Gov't Resp. 12-13.  But the Federal Circuit there *rejected* USTR's interpretation of section 307.  Although the Federal Circuit acknowledged that it "affords substantial deference to decisions of the Trade Representative implicating the discretionary authority of the President in matters of foreign relations," *Gilda II*, 622 F.3d at 1363 (citing *Maple Leaf Fish Co. v. United States*, 762 F.2d 86, 89 (Fed. Cir. 1985)), in the very next sentence it confirmed that "[t]he judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent," *id.* (alteration in original) (quoting *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984)).  The court then proceeded to find "the intent of

---

[1] Plaintiffs have already addressed the flaws in Defendants' non-justiciability arguments in our prior brief (Cross-Mot. 47-53) and do not address them again in this reply, which is limited to arguments in support of Plaintiffs' Cross-Motion for Judgment on the Agency Record.  Plaintiffs likewise do not address Defendants' response to *amici curiae* Interested Parties (Gov't Resp. 42-52).  Plaintiffs respectfully submit that remedial issues with respect to the subset of plaintiffs that are not importers of record (unlike the sample-case Plaintiffs) should be resolved in separate remedial proceedings involving *amici curiae*.

Congress is expressed clearly" after reviewing the language *without* deference to USTR's proffered interpretation. *See, e.g., id.* at 1363-64 ("We cannot agree" with USTR's interpretation.); *id.* (Congress left no "interpretive gap to be filled by the Trade Representative, and even if it" did, Government's construction "would not be reasonable or permissible."); *id.* at 1366 (Government's arguments "cannot override the clear language of the statute or the other interests that the text suggests are intended to be considered.").

The Federal Circuit's recent decision in *Transpacific Steel LLC v. United States*, 4 F.4th 1306 (Fed. Cir. 2021), confirms the judiciary's primacy with respect to statutory interpretation—even in matters indisputably implicating foreign affairs.  That case involved a lawsuit that *directly* challenged the President's trade actions and statutory authority under section 232 (another statute that, like section 301, involves a delegation of a portion of Congress's constitutional foreign commerce and duty-collection powers).  But the court of appeals did not mention, let alone rely on, a heightened deference standard.  Instead, it explicitly recognized that the "legal issues" on appeal—*i.e.*, issues of statutory construction—were ones that "we decide de novo."  *Id.* at 1318.  For that proposition, the Federal Circuit cited a case confirming the same:  that the court "review[s] questions of constitutional or statutory interpretation de novo."  *GPX Int'l Tire Corp. v. United States*, 780 F.3d 1136, 1140 (Fed. Cir. 2015).  Although Defendants contend that the court was referring merely to its de novo "standard for reviewing the lower court's decision," Gov't Resp. 13, the court explicitly differentiated (in distinct sentences) its review of (i) the lower court's decision, which it reviewed "without deference," *Transpacific*, 4 F.4th at 1318 (citing *Fedmet Res.*

*Corp. v. United States*, 755 F.3d 912, 918 (Fed. Cir. 2014)), and (ii) the "legal issues" on appeal, "which we decide de novo," *id.* (citing *GPX Int'l Tire*, 780 F.3d at 1140).[2]

Nor are Defendants entitled to deference for legal interpretations that were neither made public nor "adequate[ly] expl[ained]" in a way that "allow[ed] interested parties to review and scrutinize" them. *Invenergy Renewables LLC v. United States*, 476 F. Supp. 3d 1323, 1346-47 (Ct. Int'l Trade 2020). Defendants deny as "untrue" Plaintiffs' point that "USTR failed to develop or explain its expansive" legal interpretation during the rulemaking process. Gov't Resp. 13-14. But tellingly, Defendants do not cite the Federal Register notices for that assertion; instead, they cite only internal decision memoranda. *See id.* (citing PR-1 at 4-7 & PR09 at 3-5). Such "[a]n explanation that is never made available to the parties or to the public at large is not one that can be considered transparent or of use to those who participated outside the agency," *Invenergy*, 476 F. Supp. 3d at 1346-47 (footnote omitted), and is undeserving of heightened deference.

To be sure, Defendants are correct that courts generally defer to the Executive Branch's policy choices when a lawsuit challenges a genuinely discretionary foreign affairs judgment. *See, e.g., Fed.-Mogul Corp. v. United States*, 63 F.3d 1572, 1581 (Fed. Cir. 1995) ("Trade policy is an increasingly important aspect of foreign policy, an area in which the executive branch is

---

[2] Defendants also try to distinguish *Transpacific* on the ground that section 232 does not include a provision like section 307 "that specifically addressed the President's authority to modify an action." Gov't Resp. 26. Although Plaintiffs agree that *Transpacific* is ultimately distinguishable as to its result, that statutory difference (among others) cuts in favor of Plaintiffs, not Defendants. In *Transpacific*, based on the text, structure, and history of section 232, the court held that Congress did not intend to change the settled meaning of the word "action" as referring to a continuous course of conduct when it amended section 232 of the Trade Expansion Act of 1962. Here, in contrast, Defendants make no similar argument under USTR's section 301(b) authority (nor could they, *see* Cross-Mot. at 28-29); instead, Defendants rely solely on USTR's specific authority under Trade Act sections 307(a)(1)(B) and (C), which have no analogue in section 232. Accordingly, USTR's modification authority is bound by the "text, structure, and history" of those distinct provisions, including the specific limitations Congress imposed.

traditionally accorded considerable deference.").  But this lawsuit does not actually challenge a policy judgment (*i.e.*, how much to raise or lower tariffs *if* section 307's modification criteria are met).  Rather, it challenges whether USTR possessed the statutory authority to act at all (*i.e.*, whether section 307's modification criteria were met in the first place).  *See Gilda Indus., Inc. v. United States*, 446 F.3d 1271, 1282 (Fed. Cir. 2006) ("We agree that the Trade Representative's determinations under the carousel provision are entitled to substantial deference.  But that does not preclude review of whether the Trade Representative has actually made a determination required by the statute, or whether, instead, the Trade Representative has wholly ignored the statute's commands.").  Accordingly, no authority requires this Court to dilute its constitutional role merely because a policy question *not* raised in this case might implicate the Executive Branch's foreign policy prerogatives.  That is particularly true in a case like this one, which implicates the proper interpretation of a congressional delegation of constitutional authority to the Executive Branch— not the Executive Branch's exercise of inherent powers.  *See United States v. Yoshida Int'l, Inc.*, 526 F.2d 560, 572 (C.C.P.A. 1975) ("It is nonetheless clear that no undelegated power to regulate commerce, or to set tariffs, inheres in the Presidency."); *see also* U.S. Const. art. I, § 8, cl. 1, 3 (granting Congress power to "regulate Commerce with foreign Nations" and to "lay and collect Taxes, Duties, Imports and Excises").

Even if (contrary to *Transpacific*) Defendants' statutory interpretations were entitled to some deference, that deference is hardly insurmountable.  As noted, in Defendants' primary authority, the Federal Circuit ruled *against* the Government's interpretation of a different part of section 307.  *See Gilda II*, 622 F.3d at 1366 (finding that the interpretation "cannot override the clear language of" 19 U.S.C. § 2417(c)).  No degree of deference could allow USTR to override

the clear limits on its modification authority that Congress enumerated in section 307(a)(1):  the

List 3 and 4A actions are *ultra vires* under any standard.

### B.    Section 307(a)(1)(B) Does Not Authorize USTR To Increase The Original Tariff Action In The Circumstances Present Here

Turning to the merits, Defendants spend only a few pages defending the validity of USTR's

finding that the "burden or restriction on United States commerce of . . . the acts, policies, and

practices, *that are the subject of such action* has increased or decreased."  19 U.S.C.

§ 2417(a)(1)(B) (emphasis added).  Their limited attention to the issue is understandable:

Defendants' heavy reliance on China's "subsequent defensive actions" (Gov't Resp. 14)—which,

by definition, took place "subsequent" to the investigated practices "that are the subject of such

action"—confirms that section 307(a)(1)(B) cannot support Lists 3 and 4A.

At the outset, Defendants assert in passing that Lists 3 and 4A were not issued "solely"

because of China's "defensive measures."  Gov't Resp. 15.  But the meager support they offer for

supposed factual findings as to increased burdens on U.S. commerce from the investigated

practices are (i) its conclusory statements that the burden on U.S. commerce "continues to

increase," *see Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices

Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 47,974, 47,974

(Sept. 21, 2018) & PR-09 at 3, and (ii) an internal decision memorandum referring to unspecified

"news reports" regarding "China's unfair actions in acquiring hybrid vehicle technology from

Toyota," Cross-Mot. Add. 15 (PR-01 at 6)—a *Japanese* car manufacturer never mentioned in

USTR's original section 301 report.  Such "conclusory statements will not do."  *Amerijet Int'l,

Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014); *see Motor Vehicle Mfrs. Ass'n of U.S., Inc.

v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (reasoned decision making requires

agency to show connection between "facts found" and the "choice made," and to "articulate a

satisfactory explanation for its action"). Defendants provided no analysis (then or now) regarding how those purported burdens related to the practices investigated in the section 301 report, no quantification of the "increase" in burdens, and no reasons why the increase (if it existed) justified a modification of any size. The agency thus failed the "fundamental requirement of administrative law" to adequately "set forth its reasons for decision." *Amerijet Int'l*, 753 F.3d at 1350.

Defendants' true argument is *not* that the investigated practices themselves worsened, but rather that "China's defensive actions were not distinct from its investigated unfair trade practices" because they had the goal of "perpetuating" those practices. Gov't Resp. 15. But that argument conflates two practices that are, in fact, quite "distinct": (a) China's retaliatory responses to U.S. tariffs imposed following a section 301 investigation; and (b) the four discrete categories of intellectual property and technology transfer conduct that USTR actually investigated. The magnitude of the responsive List 3 and 4A actions—*seven times* the original $50 billion tariff action that USTR deemed "commensurate" to the harms from the four categories of investigated practices themselves—underscores their distinct nature. Congress chose to restrict USTR's authority to situations where the burden or restriction on U.S. commerce of the "acts, policies, and practices, *that are the subject of such action* has increased or decreased." 19 U.S.C. § 2417(a)(1)(B) (emphasis added). China's retaliatory actions may have burdened U.S. commerce, but that is not the burden with which section 307(a)(1)(B) is concerned. USTR's finding that China "will not *change* its policies in response to the current Section 301 action," 83 Fed. Reg. at 47,975 (emphasis added), is not tantamount to a finding that the burden of the policies "that are the subject of" the section 301 action *increased*, as the text requires.

As a temporal and logical matter, the "subject of" the section 301 action does not encompass all "subsequent defensive measures" China might take in retaliation for U.S. tariffs.

Gov't Resp. 14-15, 40.  Defendants seek to revise section 307(a)(1)(B) to justify a modification whenever, in their preferred wording, "the burden or restriction on United States commerce of . . . the acts, policies, and practices, that are the subject of such action *or of any subsequent defensive* *measures taken in response to such action* has increased or decreased."   However much Defendants prefer that revision, a court's task is "to apply the text, not to improve upon it."  *Pavelic & LeFlore v. Marvel Ent. Grp.*, 493 U.S. 120, 126 (1989).

Tellingly, Defendants now try to paint USTR's investigation with a broad brush, arguing that Plaintiffs "mischaracterize the section 301 investigation as involving a limited and discrete set of practices," when actually it "encompass[ed] China's massive 'top-down national strategy[.]'" Gov't Resp. 15-16.  But until now, USTR sang a different tune:  its investigation was limited to four "specific types of conduct"—namely, (1) foreign ownership restrictions; (2) technology regulations; (3) investment in U.S. companies; and (4) intellectual property theft.  *Initiation of Section 301 Investigation; Hearing; and Request for Public Comments: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 82 Fed. Reg. 40,213, 40,213 (Aug. 24, 2017); *see, e.g., Notice of Determination and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 14,906, 14,906 (Apr. 6, 2018) ("On August 18, 2017, . . . USTR initiated an investigation into certain acts, policies, and practices of the Government of China related to technology transfer, intellectual property, and innovation" and asked for comments on "four categories" of conduct.); *Notice of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 40,823, 40,823 (Aug. 16, 2018) (similar); Cross-Mot. Add. 11 (internal decision memorandum discussing how

9

"investigation covered four categories of acts, policies, and practices").   Needless to say, the section 301 report's passing reference to China's long-term, "top-down" goals—several pages *after* it describes the four specific types of investigated practices noted above—cannot retroactively expand the scope of the original investigation to cover any and all "retaliatory actions" taken by China that burden U.S. commerce.   Gov't Resp. 40; *see Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962) ("[C]ourts may not accept appellate counsel's *post hoc* rationalizations for agency action[.]").[3]

Left only with policy arguments and legislative history, Defendants finally contend that, even where the increased burden on U.S. commerce comes from something other than the investigated acts, policies, and practices "that are the subject of such action," it should not have to "initiat[e] a new [section 301] investigation" because doing so might "bind the hands of the President and the USTR" in a way that Defendants deem too limiting.   Gov't Resp. 18.   But imposing limitations is the reason Congress qualifies its delegations of constitutional authority.   *See United States v. Schmidt Pritchard & Co*, 47 C.C.P.A. 152, 162 (1960) ("It requires no elaborate argument to support the proposition that Congress in so delegating its powers may prescribe whatever procedures and limitations it sees fit to enact for limiting the exercise by its agents of such delegated powers.").   Contrary to Defendants' invocation of unbridled authority, the Executive Branch may exercise authority delegated from Congress only "subject to limitations which that body imposes."   *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 (1979).   And under section

---

[3] Defendants also argue (at 16-17) that section 306—which authorizes "retaliation" against another country due to "the failure of such country or countries to implement" recommendations made pursuant to World Trade Organization dispute resolution proceedings, 19 U.S.C. § 2416(b)(2)—does not limit USTR's authority here.   But Plaintiffs' point is not that section 306 controls in this context; rather, it is that section 306 shows that Congress understood how to authorize "retaliation" explicitly against another country's response to trade proceedings or actions where it wanted to.   And Congress did not do so in section 307.   *See* Cross-Mot. 32-33.

307(a)(1)(B), Congress explicitly predicated any increase in tariffs on an increase in burdens from the practices that were the subject of the original section 301 investigation, not new post-investigation practices.

### C.   Traditional Tools Of Statutory Construction Demonstrate That Section 307(a)(1)(C) Cannot Authorize The Challenged Actions

The only other potential statutory basis for Lists 3 and 4A is section 307(a)(1)(C).  All of the tools of statutory construction—text, structure, purpose, history, past practice, and the canon of constitutional avoidance—demonstrate that section 307(a)(1)(C) cannot support USTR's "supplemental" List 3 and 4A tariff actions.

#### 1.   The Text and Structure of Section 307 Compel Plaintiffs' Reading.

Defendants' tactic on section 307(a)(1)(C) is to ask the Court to ignore the surrounding statute and instead interpret the word "appropriate" in isolation.  But courts do not "construe the meaning of statutory terms in a vacuum"; rather, they analyze statutory terms "in their context and with a view to their place in the overall statutory scheme."  *Tyler v. Cain*, 533 U.S. 656, 662 (2001); *see Merit Mgt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 892-93 (2018) (examining "[t]he language of" the statute, "the specific context in which that language is used, and the broader statutory structure").  When accounting for the statutory context and structure—including (i) the parallel modification authority set forth in sections 307(a)(1)(A) and (C), (ii) the relationship between sections 307(a)(1)(B) and (C), and (iii) the authorization for taking discretionary action only if "appropriate" in section 301(b)(2)—Plaintiffs' interpretation is plain and Defendants' is untenable.

***Relationship between sections 307(a)(1)(A) and (C).***  Defendants argue that section 307(a)(1)(A) "has nothing to do with authorities relevant to the current investigation," because it authorizes modifications related to *mandatory* action, whereas this case involves *discretionary*

action.  Gov't Resp. 19.  But that is Plaintiffs' point:  Congress set up *parallel* authority designed to allow termination (or tapering) of either mandatory action (in subsection (A)) or discretionary action (in subsection (C))—with subsection (B) authorizing increases or decreases to both mandatory *and* discretionary actions based on a specific condition.  In other words, section 307(a)(1)(A) is "relevant" to this action because it sheds light on the meaning of the statute Congress enacted.  *See, e.g.*, *Transpacific*, 4 F.4th at 1319 (discerning "best reading of the statutory text" based on, *inter alia*, how it is "understood in context").

Defendants acknowledge that section 307(a)(1)(A) operates as a tapering tool only, allowing USTR to terminate or decrease mandatory actions.  *See, e.g.*, Gov't Resp. 20 (arguing that "the existence of section 307(a)(1)(A) supports that Congress included other provisions — 307(a)(1)(B) and (C) — to address situations where the President may need to increase measures").  Defendants nonetheless suggest it is an "extraordinary leap" (*id.* at 20) to believe that Congress intended section 307(a)(1)(C) to provide for equivalent tapering authority for *discretionary* actions.  But it is hardly "extraordinary" for Congress to have granted parallel authority for each type of section 301 action in the lone statutory section granting USTR modification authority.

Defendants argue that subsections (A) and (C) must have been intended to "accomplish different purposes," or else Congress "would not have enacted two separate subsections."  Gov't Resp. 20 n.7.  But everyone agrees they "accomplish different purposes":  As Defendants elsewhere point out, *id.* at 19-20 & n.7, subsection (A) is tied to specific statutory criteria identified in section 301(a) for *mandatory* actions—criteria which do not exist for *discretionary* actions taken under section 301(b).  That explains why Congress enacted separate but parallel subsections— with the former defining "instances when the President or the USTR can [choose] not to take

*[mandatory]* action," *id.* at 20 (emphasis omitted), and the latter authorizing USTR not to take (or to ratchet down) *discretionary* action.

Defendants' theory would also paradoxically confer on USTR *less* authority to counteract retaliation in the context of international trade violations giving rise to *mandatory* actions. Specifically, section 307(a)(1)(A) permits modifications to actions involving "unjustifiable" acts of foreign countries (such as "violations of trade agreements") that Congress has deemed so serious that the requisite finding triggers a mandatory response. Gov't Resp. 19-20 ("[S]ection 301(a) investigations — unlike section 301(b) investigations — require *mandatory* action — meaning the USTR *must* take trade action unless the exceptions identified in section 301(a)(2) are met."). But given that both sides agree Congress gave USTR no power under subsection (A) to increase a mandatory action, it makes little sense that Congress in subsection (C) would have granted USTR *more* authority to counteract retaliation in the context of *less serious* trade violations.

***Relationship between sections 307(a)(1)(B) and (C).*** Subsection 307(a)(1)(B), unlike subsection (a)(1)(C), explicitly contemplates an increase in a trade action—but, sensibly, it must be predicated upon a factual finding of an increased burden associated with the very practices that were "the subject of" the original mandatory or discretionary action. Subsection (C), in contrast, does not explicitly or implicitly authorize an increase. If it did, Defendants would *never* have occasion to rely on subsection (B) to increase tariffs in a discretionary action case. Such a scheme defies logic.

Resisting that conclusion, Defendants offer the undisputed point that subsection (B) can be invoked for both mandatory and discretionary actions, whereas subsection (C) applies solely to discretionary actions. *See* Gov't Resp. 21 (describing "the different roles played by subsections (B) and (C)"). But once again, Defendants draw the wrong lesson: under their theory, subsection

13

(B) is rendered wholly superfluous in discretionary-action cases like this one. Defendants do not (and cannot) deny that, if they enjoy freewheeling authority to increase actions under subsection (C), no rational USTR will bother to gather evidence of an increased "burden or restriction on United States commerce" of the investigated "acts, policies, and practices." 19 U.S.C. § 2417(a)(1)(B). This is a case in point: Despite pointing out that it (belatedly) relied on subsection (B) *and* subsection (C), Defendants ultimately admit that, under their theory, USTR's unprecedented and massive "modification" action did "not require any finding with respect" to burden whatsoever. *See* Gov't Resp. 41 (contending that "section 307(a)(1)(C) provided an independent basis for [USTR's] action, and section 307(a)(1)(C) does not require any finding with respect to the burden on United States commerce" (emphasis omitted)).[4]

Defendants also misunderstand Plaintiffs' argument about the meaning of the introductory "modify or terminate" clause in subsection 307(a)(1). Contrary to Defendants' argument, "modify" does not have a "different meaning" in different subsections; Congress simply chose that encompassing antecedent clause because it applies not only to the subsections that permit decreases (*i.e.*, subsections (A) and (C)), but also to the lone subsection that additionally allows increases (subsection (B)). Proving the point, both sides agree that subsection (A) does not permit USTR to increase an existing mandatory action; yet that subsection is preceded by the same "modify or terminate" clause. In other words, everyone agrees that "the word 'modify' in the

---

[4] Defendants also suggest that "plaintiffs ignore that, in this case, the USTR (at the President's direction) relied on both subsections 307(a)(1)(B) and (C)." Gov't Resp. 23 (emphasis omitted). Plaintiffs did not "ignore" that fact; on the contrary, Plaintiffs pointed out that USTR only belatedly relied on subsection (B) in finalizing List 3, after omitting it in the notice of agency action. *See* Cross-Mot. 30. That sequence of events not only betrays Defendants' own doubts regarding whether subsection (C) supported its unprecedented action, but also proves Plaintiffs' point: If permitted to do so, USTR will *always* turn first to subsection (C), which requires no actual "finding with respect to the burden on United States commerce." Gov't Resp. 41.

introductory clause of section 307(a)(1) allows an increase in measures for some, but not all subsequent subparts."  Gov't Resp. 22.  The parties' lone disagreement is whether it allows an increase under any subsection *besides* subsection (B).

   ***Relationship between sections 301(b)(2) and 307(a)(1)(C).***  Both sides agree that "the language in section 307(a)(1)(C) mirrors the language in section 301(b)(2)" (Gov't Resp. 21): USTR may take discretionary action under section 301(b)(2) only if it determines that "action by the United States is appropriate," 19 U.S.C. § 2411(b)(2), and USTR may modify that action under section 307(a)(1)(C) only if it determines that action is "no longer appropriate," 19 U.S.C. § 2417(a)(1)(C).  But Defendants learn exactly the wrong lesson from that relationship.  If (as Defendants acknowledge) a finding that an action is "appropriate" is a "requirement[] for taking discretionary action in response to a section 301 investigation," Gov't Resp. 21, that must mean that discretionary action can no longer be maintained once it is "*no longer* appropriate."  *See* Cross-Mot. 33-34.  Because the terms "appropriate" and "no longer appropriate" are opposites, through the latter provision Congress necessarily was authorizing USTR only to turn "off" (or at most turn down) the discretionary action it previously turned "on"—not to increase it.  *See Termination of Action: Protection of Intellectual Property Rights by the Government of Honduras*, 63 Fed. Reg. 35,633, 35,633 (June 30, 1998) ("Section 307(a)(1)(C) of the Trade Act authorizes the USTR to *terminate* any action, subject to the specific direction, if any, of the President, if such action is being taken under Section 301(b) and is *no longer appropriate*."  (emphasis added))*; see also, e.g.*, *Murata Mach. USA v. Daifuku Co.*, 830 F.3d 1357, 1361 (Fed. Cir. 2016) ("A court may lift a stay if the circumstances supporting the stay have changed such that the stay is *no longer appropriate*." (emphasis added)).

2.      *The Purpose of Section 307 Supports Plaintiffs' Reading.*

The purpose of section 307 flows from the Trade Act's text and structure:  Congress intended to empower USTR to modify section 301 actions—including to increase actions in the specific circumstance where the investigated practices themselves worsened—but under the terms it specified.  After restricting USTR from imposing section 301 tariffs unless and until it has investigated specific conduct, Congress would not have granted USTR limitless authority under section 307(a)(1)(C) to increase those tariffs for any post-investigation reason.

Defendants respond that "Congress wanted to delegate to the Executive Branch the same discretion to determine what discretionary actions are appropriate to 'modify' as it has to determine what actions are appropriate in the first place."  Gov't Resp. 22.  But discretionary actions can be taken under section 301(b) only after USTR jumps through a series of congressionally imposed hoops:  mandatory investigation requirements (19 U.S.C. § 2412), mandatory consultation requirements (*id.* § 2413), mandatory factual findings (*id.* § 2414), and a twelve-month deadline to choose "appropriate" action (*id.* § 2414(a)(2)(B)).  *See* Cross-Mot. 43.  Only after those prerequisites are satisfied may USTR take action; yet, if Defendants are correct, USTR's discretion to *modify* actions is subject to no limitations whatsoever.  Far from giving the Executive Branch the "same discretion," through section 307 (in Defendants' view) Congress gave *far greater* discretion to ratchet up section 301 actions than it did to act in the first place.  The "supplemental" actions challenged here—a seven-fold escalation of the original section 301 action—proves the point.

Defendants have no response to Plaintiffs' argument that Congress would not have placed various procedural and substantive obstacles in the way of the Executive Branch's authority to take action under section 301(b), only to give USTR unfettered authority under section 307 to

increase those actions exponentially once taken.  Take a hypothetical scenario under Defendants' view of subsection (a)(1)(C):  USTR could decide that imposing a $1 *million* tariff action is "appropriate" based on a thorough investigation targeting one discrete product, and then "modify" that action as "no longer appropriate" to a $1 *trillion* action covering the entire trade portfolio— just because the targeted nation responded with its own $1 million tariff or for virtually any other policy reason.  That hypothetical differs from this case only in the order of magnitude of USTR's "modification."

Congress would not have designed such a loophole around the Trade Act's carefully circumscribed limits.  Instead, the only coherent reading is that, in light of the foreign policy concerns at stake, Congress left to the Executive Branch's discretion actions to terminate or reduce an action (section 307(a)(1)(C)), but ensured that any *increases* in existing actions would need to be justified by an increased burden on U.S. commerce from the investigated practices themselves (section 307(a)(1)(B))—or, failing that, a new investigation.  That distinction follows from the statutory requirement that section 301 tariffs be imposed only after an investigation.  It also makes perfect sense:  relieving trade penalties should be easier than imposing trade penalties—a concept widely reflected in other trade statutes and regulations as well, *see, e.g.*, 19 U.S.C. § 1337(j)(2) (public-interest exception to section 337 action); 48 C.F.R. § 25.202 (public-interest exception to Buy-American restrictions).  Indeed, the parity between establishing the initial action under section 301 and increasing such action under section 307(a)(1)(B) is obvious:  USTR must find facts regarding the investigated practices to impose new penalties on a trade partner.

Defendants' only response is that Plaintiffs' reading "would leave the United States with *no leverage* in trade negotiations[.]"  Gov't Resp. 24.  But far from leaving the United States "powerless to respond to a foreign country's worsening trade practices," *id.*, Congress empowered

USTR, in explicit terms, to take section 301 action within twelve months of the investigation's initiation, 19 U.S.C. § 2414(a)(2)(B), and, outside that twelve-month window, to increase the section 301 action when the burden on U.S. commerce from the acts "that are the subject of such action has increased," *id*. § 2417(a)(1)(B).   What Congress plainly did not do, however, is authorize USTR to exploit a single targeted investigation to wage an open-ended trade war, without procedural or substantive limit, whenever the Executive Branch so chooses.

### 3.   To the Extent Relevant, the Legislative History Supports Plaintiffs' Reading.

Courts do not "allow[] ambiguous legislative history to muddy clear statutory language." *Milner v. Dep't of Navy*, 562 U.S. 562, 572 (2011).   Defendants nevertheless spend multiple pages attempting to rehabilitate their strained reading of a snippet of legislative history—a snippet that, they eventually concede, was discussing language that differed from the language in the "enacted bill" leading to section 307(a)(1)(C).   Gov't Resp. 32.   Defendants resort to the startling assertion that the Court should rely on their proffered legislative history "*[r]egardless of the precise language ultimately used*" by Congress.   *Id.*   (emphasis added).

Even when courts resort to legislative history, however, that history must shed light on the meaning of *enacted* text—not language that was discarded in conference.   *See Gilead Scis., Inc. v. Lee*, 778 F.3d 1341, 1348 (Fed. Cir. 2015) (rejecting reliance on "two House committee reports for bills that were not enacted"); *see also Dai Glob. v. Adm'r of the U.S. Agency for Int'l Dev.*, 945 F.3d 1196, 1199 (Fed. Cir. 2019) ("It is axiomatic that a statute should not be read to implicitly include language specifically rejected by Congress.").   And contrary to Defendants' assertion, that discarded language was materially different:   permitting modification when an action is "not effective" (a basis to *increase* the action) is not the same as permitting modification when an action is "no longer appropriate" (a basis to *taper* the "appropriate" action).   Congress ultimately adopted

18

the latter, not the former (among other structural changes to the modification provision as a whole). *See* Cross-Mot. 43-45.

Defendants also misread that inapt legislative history. The House Report explains that the Senate bill, unlike the House version, did not include the power to modify a *discretionary* action. *See* H.R. REP. NO. 100-576, at 564, *as reprinted in* 1988 U.S.C.C.A.N. 1547, 1597 (Conf. Rep.). During conference, "[t]he Senate recede[d], with amendments" to, *inter alia*, "substitute the same applicable criteria under the conference agreement for exceptions to cases involving mandatory action and, in other cases, the criteria for discretionary action, or if the burden or restriction on U.S. commerce increases or decreases." *Id.* at 1598. In other words, this Report supports Plaintiffs' reading because it explains that the House and Senate conference negotiators adopted a parallel structure for mandatory and discretionary actions—and distinguished that structure from the authority to modify in cases of increased burdens on U.S. commerce enacted as section 307(a)(1)(B).

Given that the above report is "the only report from either chamber of Congress . . . that sheds any light on what Congress intended when it enacted" section 307, Gov't Resp. 32, Defendants essentially admit that the rest of the cited legislative history—including various floor statements by individual legislators—is unilluminating as to the meaning of subsections (a)(1)(B) and (C) specifically. *See NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 943 (2017) ("[F]loor statements by individual legislators rank among the least illuminating forms of legislative history."). Regardless, the legislative history applicable to section 301 more generally makes clear that Congress intended for USTR's authority to impose "retaliatory measures" to be "balanced by an acute concern that, because retaliation often backfired, any retaliatory action must be implemented with the utmost care, and without causing undue harm to broader national economic interests."

*Gilda Indus., Inc. v. United States*, 32 C.I.T. 425, 431, 556 F. Supp. 2d 1366, 1372 (2008) (reviewing section 301's legislative history).   In short, to the extent the legislative history is relevant at all, it favors Plaintiffs.

> 4.      *Defendants Concede that Their Use of Section 307(a)(1)(C) to Increase a Tariff Action Is Unprecedented.*

Defendants do not—and cannot—dispute that, in the more than three decades since Congress granted USTR modification authority under section 307, USTR has never invoked section 307(a)(1)(C) to increase a tariff action taken under section 301.   As *Transpacific* recognized, such consistent past practice provides "strong confirmation" as to the meaning of disputed statutory language.   *Transpacific*, 4 F.4th at 1326; *see also NLRB v. Noel Canning*, 573 U.S. 513, 525 (2014) ("[T]he longstanding practice of the government can inform our determination of what the law is."  (internal quotation marks and citations omitted)); *Trump v. Hawaii*, 138 S. Ct. 2392, 2415 (2018) (looking at "historical practice" for statutory interpretation).

Defendants dispute that USTR's prior practice has been "uniform" or "unbroken," countering that USTR simply never had occasion to invoke section 307 in this manner since its enactment in 1988.   But that is a concession that adopting the construction readily indicated by the statute's text, structure, purpose, and history would hardly "hamstring the President's ability to conduct foreign affairs."   Gov't Resp. 26.   The fact remains that Defendants cannot cite a single instance where USTR has ever exercised the authority it now claims is so critical for Congress to have delegated.   Indeed, USTR has never even asserted (let alone exercised) such authority until this case; to the contrary, it has always read section 307(a)(1)(C) as authorizing *termination* of a section 301(b) action when "no longer appropriate."   *E.g.*, 63 Fed. Reg. at 35,633.   That is no surprise:   after all, Defendants continue to recognize that section 307 denies USTR authority to ratchet up trade actions even with respect to the more serious mandatory trade actions taken under

section 301(a), except in the limited instance when the burden on U.S. commerce from the originally investigated trade practices has increased (*see* pp. 12-15, *supra*).

5.    *Defendants' Claim of Unreviewable Authority Compels Application of the Constitutional-Avoidance Canon.*

Plaintiffs' reading of section 307(a)(1)(C) provides an "intelligible principle" that comports with constitutional delegation principles:  USTR can taper a discretionary action when the statutory prerequisite for taking discretionary action is "no longer" met, *i.e.*, when it is "no longer appropriate."  Defendants' interpretation, in contrast, has no such limiting principle:  USTR can taper an action, or it can increase it by 10-fold (or 100-fold or 1,000-fold), with no procedural or substantive limitation.

In the face of the obvious non-delegation concerns posed by such a capacious view of its subsection (C) authority (*see* Cross-Mot. 36-37), Defendants argue that determining whether a section 301 action is "no longer appropriate" qualifies as an "intelligible principle" limiting USTR's discretion.  Gov't Resp. 27-28.  Earlier in their brief, however, Defendants claimed "unreviewable" authority due to "[t]he statute's lack of a judicially manageable standard," purportedly because "whether an initial action is 'no longer appropriate' under section 307(a)(1)(C) is committed to the Executive Branch to resolve."  Gov't Resp. 10; *see id.* at 2 (describing List 3 and 4A tariff actions as "wholly discretionary").  Defendants cannot have it both ways:  they cannot claim *unlimited* authority to shield their actions from review, and *limited* authority to save their proffered statutory construction from an unconstitutional delegation.

Defendants cite *Almond Brothers* as an "example" of a case involving a statute that both lacks a "judicially discoverable and manageable standard" (so as to render the challenge non-justiciable) yet still contains an "intelligible principle" (so as to avoid an unconstitutional delegation from Congress).  Gov't Resp. 29.  But *Almond Brothers* did not address (or otherwise

21

involve) constitutional avoidance, the non-delegation doctrine, or the phrase "intelligible principle." It thus says exactly nothing of interest about whether Defendants can claim unlimited, unreviewable discretion to ratchet up tariffs without running afoul of the non-delegation doctrine.

All of the other cases Defendants cite involve more specific and precise delegations than the one at issue here. *See, e.g.*, *Am. Inst. for Int'l Steel, Inc. v. United States*, 376 F. Supp. 3d 1335, 1339-40 (Ct. Int'l Trade 2019) ("public interest, convenience, or necessity"). The contrast with *Federal Energy Administration v. Algonquin SNG, Inc.*, 426 U.S. 548, 559 (1976), is particularly stark. The Court in that case emphasized that the Act "establishes clear preconditions to Presidential action," including "[a] finding by the Secretary of the Treasury that an 'article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security.'" *Id.* Moreover, the Court found the President's actions far from "unbounded," given that they were limited to actions taken so that imports "will not threaten to impair the national security," based on a list of specific factors. *Id.* Here, in contrast, the Executive Branch claims unbounded power to increase a trade action based on its apparently unreviewable determination that an existing action is "no longer appropriate"—perhaps due to economic, policy, ideological, political, or even idiosyncratic personal reasons.

Importantly, this Court need not actually hold this delegation unconstitutional to employ the canon of constitutional avoidance. "[E]ven if a *serious doubt* of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Crowell v. Benson*, 285 U.S. 22, 62 (1932). Because the canon is premised on the idea "that Congress did not intend" a construction of a statute that "raises serious constitutional doubts," "[t]he canon is thus a means of giving effect to congressional intent, not of subverting it." *Clark v. Suarez Martinez*, 543 U.S. 371, 381-82 (2005).

And for that reason, a court must employ constitutional avoidance *before* deferring to the Executive Branch's interpretation (even assuming any deference were otherwise appropriate). *See Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172-73 (2001) (Deference would not be appropriate "[w]here an administrative interpretation of a statute invokes the outer limits of Congress' power" without "a clear indication that Congress intended that result. This requirement stems from our prudential desire not to needlessly reach constitutional issues and our assumption that Congress does not casually authorize administrative agencies to interpret a statute to push the limits of congressional authority."  (citation omitted)); *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 574-78, 588 (1988) (applying constitutional-avoidance canon to strike down agency interpretation of statute and refusing to give *Chevron* deference).

In other words, the question here is whether Congress intended to delegate unlimited, unreviewable authority to USTR to increase a section 301 action.  Plaintiffs' contrary statutory interpretation avoids the constitutional concerns created by such a delegation.  Because Plaintiffs' interpretation is at least "plausible"—in fact, it is unambiguously correct—this court's "plain duty" is to adopt it.  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 562 (2012) ("[I]t is well established that if a statute has two possible meanings, one of which violates the Constitution, courts should adopt the meaning that does not do so.").

## II.    USTR'S PREORDAINED DECISION TO PROMULGATE LIST 3 AND LIST 4A VIOLATED THE APA AND SECTION 307

### A.    USTR Violated The Substantive Provisions Of The APA

For the reasons provided above and in Plaintiffs' Cross-Motion, in promulgating Lists 3 and 4A, USTR exceeded its authority, acted contrary to law, and arbitrarily and capriciously failed to offer any evidence regarding an "increased burden" from China's intellectual property and

technology transfer practices that were the subject of USTR's investigation.  *See* Cross-Mot. 28-46; *see also supra* Part I.  If the Court agrees, Lists 3 and 4A must be set aside under the APA as agency action that is "arbitrary [and] capricious," "not in accordance with law," and "in excess of statutory . . . authority."  5 U.S.C. § 706(2)(A), (C).

**B.     USTR Violated The APA And Related Procedural Requirements**

The APA and the Trade Act also impose certain procedural requirements on USTR, including to provide proper notice of its action, to allow the public a meaningful opportunity to comment, and to engage on significant comments.  5 U.S.C. § 553(b)-(c); 19 U.S.C. § 2417(a)(2); *see* Cross-Mot. 54-55.  USTR failed to meet those obligations in promulgating Lists 3 and 4A.

*1.   The Notice Announcing List 3 Was Inadequate.*

As an initial matter, Defendants contend that USTR did not need to identify section 307(a)(1)(B) as a possible legal basis for its action when it first proposed List 3, even though it relied on section 307(a)(1)(B) when it later issued List 3.  Gov't Resp. 35-36.  Defendants claim that USTR provided adequate notice when it attached "a 118-page Annex" covering thousands of HTSUS subheadings to its notice of proposed rulemaking, because "List 3 was undoubtedly a 'logical outgrowth' of the 118-page Annex accompanying the USTR's request for comment."  *Id*. at 36.

That argument is a *non sequitur*.  The Annex accompanying proposed List 3 may have sufficiently informed interested parties of the thousands of different categories of imports that would face additional duties, but it did not "fairly apprise" the public regarding one of the two statutory bases for USTR's action.  *Mid Continent Nail Corp. v. United States*, 846 F.3d 1364, 1373 (Fed. Cir. 2017); *see* 1 C.F.R. § 18.12 (agency must "prepare a preamble" that "inform[ed] the reader, who is not an expert in the subject area, of the basis and purpose for the . . . proposal"); *accord Kooritzky v. Reich*, 17 F.3d 1509, 1513 (D.C. Cir. 1994).  Even if an agency need not always

24

disclose the basis of its proposed action, section 307(a)(1)(B) required USTR to make a critical factual finding: namely, whether "the burden or restriction on United States commerce of the denial rights, or of the acts, policies, and practices, that are the subject of [the section 301 investigation] ha[d] increased or decreased." 19 U.S.C. § 2417(a)(1)(B). By failing to identify section 307(a)(1)(B) as a potential legal basis for List 3, USTR left the public without cause to comment on that decisive, fact-dependent question.

Defendants counter that "Plaintiffs cite no comment that would have differed if the USTR had cited section 307(a)(1)(B) in the request for comment." Gov't Resp. 36. Had USTR actually proposed to rely on section 307(a)(1)(B) anywhere in its notice of proposed rulemaking, however, there is no doubt that at least some of the thousands of interested parties would have offered comments regarding any change (or lack thereof) in burden from the investigated practices— something they otherwise had no reason to address. When, as here, "a new round of notice and comment would provide the first opportunity for interested parties to offer comments that could persuade [USTR] to modify its rule," the rule does not satisfy the "logical outgrowth" standard. *Am. Water Works Ass'n v. EPA*, 40 F.3d 1266, 1274 (D.C. Cir. 1994).

### 2. *USTR Failed to Engage Meaningfully with Public Comments.*

"[T]he opportunity for interested parties to participate in a meaningful way in the discussion and final formulation of rules" is a "particularly important component" of an agency's decision making process. *Conn. Light & Power Co. v. Nuclear Regul. Comm'n*, 673 F.2d 525, 528 (D.C. Cir. 1982). But USTR's rushed, preordained rulemaking—in which it provided a compressed "comment" process that ignored the thousands of comments it received—was anything but "meaningful."

To recap, USTR finalized List 3 and imposed additional duties on $200 billion in imports barely two months after List 3 was first proposed. Cross-Mot. 11-16. The timeframe and process

for List 4, which subjected $300 billion in imports to additional duties, was similarly compressed. *Id.* at 19-22. USTR still received nearly 10,000 comments from interested parties operating in nearly every corner of the U.S. economy. *Id.* at 14-15, 20-21; *see* RLC Amicus Br. 5-8 (describing industry involvement, including "testimony from 350 witnesses and more than 6,000 comments" on List 3, and "the effort of 3,000 commenters to share information and objections and the testimony of more than 300 witnesses" on List 4). Defendants admit, moreover, that the comments were in "overwhelming[]" opposition to its proposed actions. Gov't Resp. 38. Yet USTR offered no response at all to any of the comments it received. All USTR provided was a blanket statement that it had "carefully reviewed" them. 83 Fed. Reg. at 47,975; *see Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 43,304, 43,305 (Aug. 20, 2019) (asserting that its "determination takes account of the public comments"); *see also* RLC Amicus at 2 ("Despite the large volume of stakeholder input, the overwhelming majority of which opposed the tariffs, USTR refused to respond to *any* of the identified concerns.").

That striking silence violates the APA. After all, "the opportunity to comment is meaningless unless the agency responds to significant points raised by the public." *Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012) (citation omitted); *accord Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015) (confirming that an agency "must consider and respond to significant comments received during the period for public comment"). It is not enough that USTR purportedly "made changes to Lists 3 and 4A in response to public comment," including through establishment of an exclusion process. Gov't Resp. 41. Plaintiffs' claim is not about the wisdom of specific exclusions, or whose ox was gored, but rather about USTR's lack of any engagement

with the avalanche of public comments condemning the imposition of List 3 and 4A duties altogether.

### 3.   USTR Failed to Comply with Basic Procedural Norms.

USTR's failure to engage with the public's overwhelming comments was not surprising; instead, Defendants foreshadowed, through a rushed process, that its procedures were not designed to lead to a reasonable and rational outcome.  For example, it would have been impossible for any agency to "carefully review[]" six days of hearing testimony from hundreds of witnesses, and over 6,000 comments from interested parties, in the eleven days between the submission of final comments and the announcement of List 3 duties.  *List 3 Final Rule*, 83 Fed. Reg. at 47,975; *see* RLC Amicus at 10 (highlighting USTR's "unreasonably short deadlines for public comment relative to the magnitude of its proposals").

Defendants respond that USTR had broad license to conduct the List 3 and List 4A rulemakings however it saw fit because "the APA does not require the USTR to provide post-hearing rebuttal comments or a public hearing."  Gov't Resp. 37.  But Defendants do not dispute that the APA barred USTR from arbitrarily and capriciously implementing the "additional procedures" it established.  *Id.*  Nor can they:  just as USTR may not adopt arbitrary and capricious procedures, it may not arbitrarily and capriciously apply the procedures it adopts.  *See Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1039-40 (D.C. Cir. 2012) (explaining that although an agency may "not have a statutory duty" to perform a particular analysis, if the "agency decides to rely on [that] analysis as part of its rulemaking, a serious flaw undermining that analysis can render the rule unreasonable" (citations omitted)).

Defendants' *post hoc* reasons for its truncated rulemaking cannot salvage the procedural deficiencies.   Defendants contend that USTR had an "urgent need for action" "based on contemporaneous, presidential directives."  Gov't Resp. 39.  Yet USTR never identified those

exigencies as a basis for its action in List 3 and List 4A.  Defendants' attempt to do so now is impermissible.  *See Mid Continent Nail*, 846 F.3d at 1382 (reason not articulated in final rule "cannot support a finding of good cause" for exception to APA notice-and-comment rulemaking); *City of Kansas City v. Dep't of Hous. & Urb. Dev.*, 923 F.2d 188, 192 (D.C. Cir. 1991) ("In whatever context we defer to agencies, we do so with the understanding that the object of our deference is the result of agency decisionmaking, and not some *post hoc* rationale developed as part of a litigation strategy.").

In the end, Defendants retreat to arguing that USTR committed at most "harmless error." Gov't Resp. 40.  But its error is not "harmless" at all:  as noted, USTR's procedural failings, including its failure to solicit comments on one of the fact-intensive legal predicates for its action, demonstrates that the procedural failings "prejudice[d] interested parties."  *Invenergy*, 476 F. Supp. 3d at 1346-47; *see id.* at 1347, 1353 (holding that procedural "deficiencies are not harmless errors" in situation where "interested parties cannot understand and thus rebut or correct the rationale behind a rule that applies to them").  In any event, that argument is a revealing admission that no matter what additional compelling evidence and arguments commenters could have developed and presented had they been given proper notice and a meaningful opportunity to comment, nothing was going to affect the inevitable outcome.  That is not how notice-and-comment rulemaking is supposed to work.

### C.    USTR's Actions Do Not Meet The Foreign Affairs Exception

Defendants also rehash their contention that USTR was not required to provide any notice and comment under the foreign affairs exception to the APA's rulemaking requirements.  Gov't Resp. 33-35.  But they still do not and cannot dispute that the similar procedural requirements of section 307(a)(2) govern regardless.  Cross-Mot. 61.  Even putting that practical reality aside, both

Federal Circuit precedent and the all-encompassing nature of Defendants' position doom their invocation of the narrow foreign affairs exception.

Defendants contend that "[n]ot every circuit . . . requires a foreign affairs function to have 'definitely undesirable international consequences.'"  Gov't Resp. 34 (citing Gov't Mot. 40 n.8). But Defendants' artful language aside, the Federal Circuit (along with the majority of circuits that have considered the issue) has looked to that factor as the primary one. *See Am. Ass'n of Exps. & Imps. v. United States*, 751 F.2d 1239, 1249 (Fed. Cir. 1985) ("Prior disclosure of the Government's intention to trigger the agreements' consultation provisions or to impose stricter import restrictions would 'provoke definitely undesirable international consequences.'"); *see also, e.g.*, *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 676 (9th Cir. 2021) ("For the foreign affairs exception to apply, the public rulemaking provisions should provoke definitely undesirable international consequences."  (internal quotations omitted)); *Jean v. Nelson*, 711 F.2d 1455, 1478 (11th Cir. 1983) (observing that "[t]he government at trial offered no evidence of undesirable international consequences that would result if rulemaking were employed").  Thus, regardless of whether "every circuit" applies the test, this Court is bound to do so—and in fact has done so. *See Invenergy Renewables LLC v. United States*, 422 F. Supp. 3d 1255, 1289 (Ct. Int'l Trade 2019) ("For the exception to apply, the public rulemaking provisions should provoke definitely undesirable international consequences."  (citation omitted)).  And there plainly was no "definitely undesirable international consequences" of engaging in notice-and-comment rulemaking here; indeed, USTR (however deficiently) solicited public comments and held hearings with respect to both lists. *See* Cross-Mot. 58-59.

Resisting precedent, Defendants argue that the exception should apply because "Lists 3 and 4 undoubtedly relate to the *negotiation* of an international trade deal with China."  Gov't Resp.

29

34.  But *the issuance* of List 3 obviously did not result from trade negotiations with China, which did not begin until after List 3 was promulgated.  Gov't Mot. 42 (stating that, "*upon issuing List 3*, the USTR and China engaged in several rounds of trade negotiations" and that USTR and China signed an agreement after List 4A issued (emphasis added)).  Defendants also argue that the exception applies because President Trump "personally discussed List 3 with President Xi of China" over dinner in December 2018, an event that supposedly "demonstrates that the challenged tariff actions were 'clearly and directly involved in a foreign affairs function.'"  Gov't Resp. 34-35.  That conversation occurred nearly four months *after* List 3 issued, so USTR cannot rely on it to defend List 3, either.  *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020) ("It is a foundational principle of administrative law that judicial review of agency action is limited to the grounds that the agency invoked when it took the action." (internal quotation marks omitted)).

In any event, Defendants cite no authority for the proposition that the Executive Branch can insulate itself from notice-and-comment requirements merely by pointing out that the rule will impact foreign countries or foreign governments.  Congress plainly did not intend for the Executive Branch to allow the foreign affairs exception to excuse USTR—whose actions will implicate foreign affairs in nearly every case—from APA compliance entirely.  *See Mid Continent Nail*, 846 F.3d at 1380 (stating that "exceptions to notice-and-comment rulemaking under the APA are narrowly construed and only reluctantly countenanced" (internal quotation marks omitted)).

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their cross-motion for judgment on the agency record and deny Defendants' combined motion to dismiss and motion for judgment on the agency record.  The Court should order refunds to Plaintiffs for all tariffs unlawfully collected under List 3 and List 4A (with interest as provided by law), and permanently enjoin any future collections of such tariffs.

Respectfully submitted,

_____
Matthew R. Nicely
Pratik A. Shah
James E. Tysse
Devin S. Sikes
Daniel M. Witkowski
Sarah B. W. Kirwin

Dated:  November 15, 2021

AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street, NW
Washington, D.C. 20006

*Counsel to Plaintiffs HMTX Industries LLC, Halstead New England Corporation, Metroflor Corporation, and Jasco Products Company LLC*

31

## CERTIFICATE OF COMPLIANCE

Undersigned hereby certifies that Plaintiffs' Reply in Support of Their Cross-Motion for Judgment on the Agency Record complies with the 10,000 word-count limitation set forth in the Court's April 13, 2021 Scheduling Order.  Plaintiffs' Reply contains 9,573 words according to the word-count function of the word-processing software used to prepare the Memorandum.

Dated: November 15, 2021                         /s/ Matthew R. Nicely
                                                Matthew R. Nicely
                                                AKIN GUMP STRAUSS HAUER & FELD LLP