

**MATTHEW R. NICELY**
**Partner**
202.887.4046/fax: 202.887.4288
mnicely@akingump.com

January 10, 2022

Mr. Mario Toscano, Clerk of the Court
U.S. Court of International Trade
One Federal Plaza
New York, NY 10278-0001

Re:    *In re Section 301 Cases*, Court No. 21-00052:  Plaintiffs' Notice of Supplemental Authorities Relevant to the Parties' Cross-Motions for Judgment on the Agency Record

Dear Mr. Toscano:

Plaintiffs submit this letter notifying the Court of two pertinent and significant authorities decided after the parties' briefs were filed in the above-captioned case:  *Solar Energy Industries Association v. United States*, No. 20-03941, Slip Op. 21-154 [2021 WL 5320790] (Ct. Int'l Trade Nov. 16, 2021) ("*SEIA*"), and *Invenergy Renewables LLC v. United States*, No. 19-00192, Slip Op. 21-155 [2021 WL 5356036] (Ct. Int'l Trade Nov. 17, 2021) ("*Invenergy*").  Copies of the slip opinions for both decisions are attached to this letter.[*]

In *SEIA*, this Court determined that the President "clearly misconstrue[d]" his authority to "modify" a safeguard action under Section 204(b)(1)(B) of the Trade Act and acted outside of his delegated authority when he relied on that provision to increase trade restrictions.  Slip Op. 21-154 at 26-27.  In asking whether "the word 'modify' in Section 204(b)(1)(B) [could] be read to permit increased restrictions on trade," *id*. at 3, the Court acknowledged that the term in isolation was open to more than one interpretation, but looked to both the text and "'to the broader structure of the [statute] to determine the meaning'" of that term, *id.* at 28-29 (alteration in original) (quoting *King v. Burwell*, 576 U.S. 473, 492 (2015)).  The Court focused on the detailed substantive and procedural limits on the Executive Branch's ability to promulgate safeguard tariffs in the first instance, including "both ongoing review and strict time limitations."  *Id*. at 29.  In light of those limits, the Court concluded that interpreting Section 204(b)(1)(B) to authorize increases in trade restrictions would "undermine the broader statutory scheme" by providing a "loophole" for imposing "harsher safeguards without the standard procedural restrictions."  *Id.* at 30.  Because the statute was clear, moreover, the Court had no need to consult legislative history.  *Id.*

---

[*] In accordance with Federal Rule of Appellate Procedure 28(j) ("Citation of Supplemental Authorities"), this letter, which discusses two supplemental authorities, does not exceed the combined 700-word limit.



Mr. Mario Toscano, Clerk of the Court
January 10, 2022
Page 2

      The Court's analysis in *SEIA* directly supports Plaintiffs' interpretation of Section 307 of the Trade Act of 1974, 19 U.S.C. § 2417.  As in *SEIA*, determining the meaning of the modification provisions requires a review of both the text and "broader structure" of the statute as a whole. *SEIA*, Slip Op. 21-154 at 29; *see* Pls.' Br. 34-35, 40-41.  As in *SEIA*, the fact that the statute places various substantive and procedural limits on the Executive Branch's ability to promulgate tariffs in the first instance demonstrates that interpreting the modification provision to permit increased tariffs in this circumstance would create a "loophole" and "run counter to th[e] detailed statutory scheme."  *SEIA*, Slip Op. 21-154 at 29-30; *see* Pls.' Br. 35, 43.  And as in *SEIA*, because reading the modification provision as a whole confirms that Section 307(a)(1)(C) permits only reductions, not increases, in tariff actions, the Executive Branch's actions in increasing duties here constituted "a clear misconstruction [of] the statute."  *SEIA*, Slip Op. 21-154 at 31; *see* Pls.' Br. 34-35, 42-43.

      This Court's opinion in *Invenergy* likewise supports Plaintiffs' arguments with respect to the Administrative Procedure Act ("APA").  In *Invenergy*, the Court vacated a USTR rule because USTR "provided no more than conclusory statements" in its rule and "did not address significant comments" raised by opponents of the rule USTR adopted.  Slip Op. 21-155 at 25-26.  In vacating USTR's rule, the Court explained that "remand would be ineffective to remedy the arbitrary and capricious nature" of USTR's rule, because USTR would be limited to relying on the reasons it gave at the time of the rule, which "omitted any mention of certain significant issues." *Id.* at 32-33. Vacatur is likewise appropriate here, where USTR violated the APA by failing to respond in any reasoned manner to the thousands of public comments raising significant concerns from a broad array of stakeholders.  *See* Pls.' Br. 53-54, 59-60.

                                          Respectfully submitted,

                                          /s/ Matthew R. Nicely
                                          Matthew R. Nicely
                                          Pratik A. Shah
                                          James E. Tysse
                                          Devin S. Sikes
                                        Daniel M. Witkowski
                                        Sarah B. W. Kirwin

Dated:  January 10, 2022               AKIN GUMP STRAUSS HAUER & FELD LLP
                                          2001 K Street, NW
                                          Washington, D.C. 20006

## CERTIFICATE OF COMPLIANCE

The undersigned counsel at Akin Gump Strauss Hauer & Feld LLP hereby certify that

Plaintiffs' Notice of Supplemental Authority, dated January 10, 2022, complies with the word-

count limitation set forth in 2(B) of the Standard Chambers Procedures of this Court, as amended

on October 3, 2016.  The notice contains 632 words according to the word-count function of the

word-processing software used to prepare the memorandum.

Respectfully submitted,

/s/ Matthew R. Nicely

Matthew R. Nicely

Akin Gump Strauss Hauer & Feld LLP

2001 K Street N.W.

Washington, D.C. 20006

Tel: (202) 887-4046

Fax: (202) 887-4288

Email: mnicely@akingump.com

Dated:  January 10, 2022

***Solar Energy Industries Association v. United States***, No. 20-03941, Slip Op. 21-154
[2021 WL 5320790] (Ct. Int'l Trade Nov. 16, 2021)

Slip Op. 21-154

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **SOLAR ENERGY INDUSTRIES ASSOCIATION, NEXTERA ENERGY, INC., INVENERGY RENEWABLES LLC, and EDF RENEWABLES, INC.,**<br><br>**Plaintiffs,**<br><br>v.<br><br>**UNITED STATES, UNITED STATES CUSTOMS AND BORDER PROTECTION, AND TROY A. MILLER, IN HIS OFFICIAL CAPACITY AS ACTING COMMISSIONER OF UNITED STATES CUSTOMS AND BORDER PROTECTION,**<br><br>**Defendants.** | **Before:  Gary S. Katzmann, Judge**<br>**Court No. 20-03941** |

## <u>OPINION</u>

[The court denies Defendants' motion to dismiss and grants Plaintiffs' motion for summary judgment.]

Date:  <u>November 16, 2021</u>

<u>Matthew R. Nicely</u> and <u>Daniel M. Witkowski</u>, Akin, Gump, Strauss, Hauer & Feld LLP, of Washington, D.C., argued for Plaintiffs Solar Energy Industries Association and NextEra Energy, Inc.  With them on the briefs were <u>James E. Tysse, Devin S. Sikes</u> and <u>Julia K. Eppard</u>.

<u>Amanda Shafer Berman</u>, and <u>John Brew</u>, Crowell & Moring LLP, of Washington, D.C. and New York, N.Y., argued for Plaintiff Invenergy Renewables LLC.  With them on the briefs were <u>Larry F. Eisenstat</u> and <u>Frances Hadfield</u>.

<u>Christine M. Streatfeild</u> and <u>Kevin M. O'Brien</u>, Baker & McKenzie LLP, of Washington, D.C., argued for Plaintiff EDF Renewables, Inc.

<u>Stephen C. Tosini</u>, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S.

Department of Justice, of Washington, D.C., argued for Defendants United States, United States Customs and Border Protection, and Troy A. Miller, in his Official Capacity as Acting Commissioner of United States Customs and Border Protection. With him on the briefs were Brian M. Boynton, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Tara K. Hogan, Assistant Director, and Joshua E. Kurland, Trial Attorney.

Katzmann, Judge:  Solar modules consist of cells that convert sunlight into electricity on both the front and the back of the cells.[1]  The court has on five occasions addressed ongoing litigation involving efforts by the President to withdraw an exclusion from safeguard duties on imported solar modules, duties which the President had imposed by proclamation to protect the domestic industry from serious injury suffered due to increased imports.[2]  Flowing from a new complaint, the case now before the court principally involves the most recent effort by the President in 2020, invoking Section 204 of the Trade Act of 1974 ("Trade Act") -- a separate track not adjudicated in the previous litigation -- to withdraw an exclusion from safeguard duties on imported solar modules.  That section provides that if certain conditions are met, the President is authorized to "reduce, modify, or terminate" previously instituted safeguard measures.  Plaintiffs Solar Energy Industries Association ("SEIA"), NextEra Energy, Inc. ("NextEra"), Invenergy Renewables LLC ("Invenergy"), and EDF Renewables, Inc. ("EDF-R")[3] have initiated this suit to

---

[1]  For purposes of this opinion, the terms "solar modules" and "solar panels" are used interchangeably.

[2]  Prelim. Inj. Order and Op., Invenergy Renewables LLC v. United States, 43 CIT __, 422 F. Supp. 3d 1255 (2019) ("Invenergy I"); Order and Op. Den. Mot. to Show Cause, id., 44 CIT __, 427 F. Supp. 3d 1402 (2020) ("Invenergy II"); Order and Op. Den. Mot. to Dissolve Prelim Inj., Mots. to Dismiss and Granting Mot. to Suppl. Compl., id., 44 CIT __, 450 F. Supp. 3d 1347 (2020) ("Invenergy III"); Order and Op. Den. Mot. to Dissolve Prelim Inj., Mot. to Stay, Granting Mot. to Modify Prelim. Inj., Mot. to Complete Administrative R., and Vacating USTR Decision, id., 44 CIT __, 476 F. Supp. 3d 1323 (2020) ("Invenergy IV"); Order and Op. Den. Mot. to Modify Prelim. Inj., id., 44 CIT __, 482 F. Supp. 3d 1344 (2020) ("Invenergy V").

[3]  Per the complaint, SEIA "is the national trade association for the U.S. solar industry, with hundreds of member companies . . . throughout the solar value chain, including importers, manufacturers, distributors, installers, and project developers[;]" "NextEra is one of the largest

challenge Presidential Proclamation 10101, which withdrew the exclusion of bifacial solar panels

from Section 201 safeguards on imported crystalline silicon photovoltaic ("CSPV") solar panels.

Proclamation 10101: To Further Facilitate Positive Adjustment to Competition from Imports of

Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled into

Other Products), 85 Fed. Reg. 65,639 (Oct. 16, 2020) ("Proclamation 10101"); Complaint at 1,

Dec. 29, 2020, ECF No. 2 ("Compl."). Named as Defendants are the United States, United States

Customs and Border Protection ("CPB"), and Troy A. Miller, in his Official Capacity as Acting

CBP Commissioner (collectively "the Government.")

        This case raises a number of questions regarding the interface of Proclamation 10101 with

Sections 201–204 of the Trade Act.  For example: (1) Do three letters (reflecting a majority of the

domestic industry production) which seek the modification of safeguards constitute a petition as

required by statute?  (2) Is the requirement that a petition be submitted to the President satisfied

by submission to the United States Trade Representative ("USTR")?  (3) Does the Proclamation's

withdrawal of the exclusion for bifacial modules violate the statutory temporal restrictions which

must be met before new presidential action may be taken?  (4) Was Proclamation 10101 issued in

violation of the requirement that the President determine that an action will "provide greater

economic and social benefits than costs"?  (5) Can the word "modify" in Section 204(b)(1)(B) be

read to permit increased restrictions on trade?  The court concludes that with respect to the first

four questions, the answer is "Yes."  With respect to the fifth question, the answer is "No."

---

electric power and energy infrastructure companies in North America and a leader in the renewable
energy industry[;]" Invenergy Renewables, LLC, "is the world's leading independent and
privately-held renewable energy company" [and] "develops, owns and operates large-scale
renewable and other clean energy generation facilities around the world[;]" and EDF Renewables,
Inc. "has more than 30 years of expertise in the renewable energy industry," with a focus on "wind,
solar, energy storage and offshore wind."  Compl., ¶¶ 7-9.

Plaintiffs allege that Proclamation 10101 violates Sections 201, 203 and 204 of the Trade Act and seek both a declaratory judgment that the proclamation is unlawful and the injunction of its enforcement.  Compl. at 16–21.  The Government has moved to dismiss Plaintiffs' complaint; Plaintiffs oppose this motion and have moved separately for summary judgment.  The Government in turn opposes Plaintiffs' motion.  The court concludes that the various procedural challenges posed by Plaintiffs to Proclamation 10101 are unpersuasive.  However, the court also concludes that because Section 204(b)(1)(B) permits only trade-liberalizing modifications to existing safeguard measures, Proclamation 10101's withdrawal of the exclusion of bifacial solar panels and increase of the safeguard duties on CSPV modules constituted both a clear misconstruction of the statute and action outside the President's delegated authority.  The court now grants Plaintiffs' motion for summary judgment and denies the Government's motion to dismiss.

## BACKGROUND

### I.    *Legal & Regulatory Framework*

Section 201 of the Trade Act of 1974 authorizes the executive branch to implement discretionary protective measures ("safeguards") to protect a domestic industry from the harm associated with an increase in imports from foreign competitors, and Sections 202 through 204 lay out the procedures for issuing such safeguards.  19 U.S.C. §§ 2251–54.  Relevant here, Section 202 provides that upon petition from domestic entities or industries, the International Trade Commission ("ITC") may make an affirmative determination that imports have seriously injured, or threaten serious injury to, domestic industry.  19 U.S.C. § 2252.  Once such a determination has been made, Section 203 permits the President to authorize safeguard measures to temporarily

protect domestic industry from the identified harm.  19 U.S.C. § 2253.

For the duration of any safeguard measure, Section 204 provides that the ITC shall monitor "developments with respect to the domestic industry, including the progress and specific efforts made by workers and firms in the domestic industry to make a positive adjustment to import competition." 19 U.S.C § 2254(a)(1).  If a safeguard duty is imposed for longer than three years, the ITC "shall submit a report on the results of the monitoring . . . to the President and to the Congress not later than the date that is the mid-point of the initial period, and of each such extension, during which the action is in effect." 19 U.S.C § 2254(a)(2).

Upon receipt of this report, the President is authorized to reduce, modify, or terminate the safeguard measures according to either 19 U.S.C. § 2254(b)(1)(A) or 19 U.S.C. § 2254(b)(1)(B).  The statute specifically provides that:

(1)  Action taken under [Section 203] may be reduced, modified, or terminated by the President (but not before the President receives the report required under subsection (a)(2)(A)) if the President—

(A)  after taking into account any report or advice submitted by the Commission under subsection (a) and after seeking the advice of the Secretary of Commerce and the Secretary of Labor, determines, on the basis that either—

(i)  the domestic industry has not made adequate efforts to make a positive adjustment to import competition, or

(ii)  the effectiveness of the action taken under [Section 203] of this title has been impaired by changed economic circumstances, that changed circumstances warrant such reduction, or termination;

(B)  determines, after a majority of the representatives of the domestic industry submits to the President a petition requesting such reduction, modification, or termination on such basis, that the domestic industry has made a positive adjustment to import competition.

19 U.S.C. § 2254(b)(1).

Safeguard measures have a maximum duration of four years, unless extended for another maximum of four years based upon a new determination by the ITC.  19 U.S.C. § 2253(e)(1).  In addition, measures resulting in the increase or imposition of duties on an article, the institution of a tariff-rate quota with respect to an article, the imposition or modification of qualitative import restrictions on an article, or limitations on the import of an article subject to international agreements face a two-year "cooling-off period," during which further action is restricted.  19 U.S.C. § 2253(e)(7)(A).  Once terminated, such safeguard measures may not be re-imposed, nor may additional such measures be enacted on the same article, for at least two years following the date of termination.  Id.

## II.     *Factual Background & Procedural History*

On January 23, 2018, President Trump issued Presidential Proclamation 9693, which imposed a safeguard measure under Section 203(a)(3) of the Trade Act on certain CSPV products.  Proclamation 9693: To Facilitate Positive Adjustment to Competition from Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled into Other Products) and for Other Purposes, 83 Fed. Reg. 3,541 (Jan. 23, 2018) ("Proclamation 9693").  Proclamation 9693 imposed a duty on CSPV modules for a four-year period beginning on February 7, 2018.  Id.

On February 14, 2018, USTR published a notice detailing the procedures to request a product exclusion.  Procedures to Consider Additional Requests for Exclusion of Particular Products from the Solar Products Safeguard Measure, 83 Fed. Reg. 6,670 (USTR Feb. 14, 2018).  Pursuant to these procedures, on June 13, 2019, USTR granted a number of requested exclusions from the safeguard measures declared by Proclamation 9693, including an exclusion for bifacial

solar panels.  Exclusion of Particular Products from the Solar Products Safeguard Measure, 84

Fed. Reg. 27,684 (USTR Jun. 13, 2019).

USTR attempted to withdraw the exclusion of bifacial solar panels on October 9, 2019 and

again on April 17, 2020.  Withdrawal of Bifacial Solar Panels Exclusion to the Solar Products

Safeguard Measure, 84 Fed. Reg. 54,244 (USTR Oct. 9, 2019) ("First Withdrawal");

Determination on the Exclusion of Bifacial Solar Panels From the Safeguard Measure on Solar

Products, 85 Fed. Reg. 21,497 (USTR Apr. 17, 2020) ("Second Withdrawal").  Each withdrawal

was issued on the basis that "[s]ince publication of [the exclusion] notice, the U.S. Trade

Representative has evaluated this exclusion further and . . . determined it will undermine the

objectives of the safeguard measure," First Withdrawal, 84 Fed. Reg. at 54,244; with the Second

Withdrawal noting that bifacial solar panel imports are directly substitutable for domestically-

produced monofacial solar panels, and concluding that because "[c]ompetition from low-priced

imports prevented domestic producers from selling significant quantities of solar panels in the

utility segment during the ITC's original investigation period . . . low-priced imports of bifacial

solar panels due to the exclusion are likely to have a similar effect under current market

conditions,"  85 Fed. Reg. at 21,498.

Both attempted withdrawals were challenged before the court in Invenergy Renewables

LLC v. United States, with consumers, purchasers, and importers of utility-grade bifacial solar

panels "argu[ing] that the importation of bifacial solar panels does not harm domestic producers

because domestic producers do not produce utility-scale bifacial solar panels; [and] thus

oppos[ing] safeguard duties that they contend increase the cost of these bifacial solar panels."

Invenergy I, 422 F. Supp. 3d at 1264.  Both withdrawals were ultimately enjoined.  See id. at 1294;

Invenergy IV, 476 F. Supp. 3d at 1356–57.  Following the court's expansion of its preliminary

injunction to include the Second Withdrawal in Invenergy IV, President Trump issued

Proclamation 10101 on October 16, 2020.  Proclamation 10101 again withdrew the exclusion,

thereby re-imposing safeguard duties on bifacial modules, and further increased the safeguard

duties on CSPV modules declared under Proclamation 9693 from 15% to 18%.[4]  85 Fed. Reg. at

65,640–42.

Plaintiffs sought to incorporate Proclamation 10101 into the ongoing Invenergy litigation,

and into the court's previously issued PI enjoining USTR from withdrawing the exclusion.  See

Invenergy V, 482 F. Supp. 3d at 1351.  The court denied both leave to amend and expansion of

the PI, finding that Plaintiffs' Proclamation 10101 claims "involve actions undertaken by the

President, a party not implicated in Plaintiffs' complaints or supplemental complaints [in the

Invenergy litigation] and seek relief against the President not contemplated by Plaintiffs' prior

pleadings" -- in other words, that "the core issues are different."  Id. at 1353.  In the wake of the

court's denial, this action was filed in a separate complaint on December 29, 2020.  Compl.

The Government filed a motion to dismiss the action on March 1, 2021.  Defs.' Mot. to

Dismiss, March 1, 2021, ECF No. 17 ("Defs.' Br.").  Plaintiffs filed a cross-motion for summary

judgment and a response to the Government's motion to dismiss on May 7, 2021.  Pls.' Resp. to

Defs.' Mot. to Dismiss and Cross-Mot. for Summ. J., ECF No. 28 ("Pls.' Resp.").  The Government

filed its reply to Plaintiffs' motion for summary judgment on June 11, 2021.  Defs.' Reply in Supp.

of Mot. to Dismiss and Resp. to Pls.' Mot. for Summ. J., ECF No. 30 ("Defs.' Reply"). On June

25, 2021, Plaintiffs filed their own reply in support of their cross-motion for summary judgment.

Pls.' Reply in Support of Cross-Mot. for Summ. J., ECF No. 32 ("Pls.' Reply").  In response to a

---

[4] The parties agree that this is the first instance of the President employing 19 U.S.C.
§ 2254(b)(1)(B) to withdraw an exclusion. See Oral Argument, July 13, 2021, ECF No. 38; Pls.'
Resp. to Oral Arg. Questions at 7, Jul. 9, 2021, ECF No. 36.

request by the court, the parties filed written responses prior to argument.  Defs.' Resp. to the Ct.'s

Questions, Jul. 9, 2021, ECF No. 35; Pls.' Resp. to Oral Arg. Questions.  Oral argument was held

July 13, 2021 and the parties filed supplemental briefs on the issues discussed at oral argument

thereafter.   Oral Arg., ECF No. 38; Defs.' Suppl. Br., Jul. 20, 2021, ECF No. 39; Defs.'

Transpacific Br., Jul. 20, 2021, ECF No. 40; Pls.' Transpacific Br., Jul. 20, 2021, ECF No. 41;

Pls.' Suppl. Br., Jul. 20, 2021, ECF No. 42.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction over this case pursuant to 28 U.S.C. § 1581(i), which provides

that the court "shall have exclusive jurisdiction of any civil action commenced against the United

States, its agencies, or its officers, that arises out of the law of the United States providing for . . .

[the] administration and enforcement" of tariffs and duties.  The court may review Presidential

action pursuant to Section 201, insofar as it gives rise to a controversy involving international trade

and foreign affairs, for a "clear misconstruction of the governing statute, a significant procedural

violation, or action outside delegated authority."  See Maple Leaf Fish Co. v. United States, 762

F.2d 86, 89 (Fed. Cir. 1985).

## DISCUSSION

Plaintiffs raise four overarching claims.  First, Plaintiffs argue that Proclamation 10101

violates the procedural requirements of Section 204(b)(1)(B) of the Trade Act with respect to the

nature and contents of the petition the President must receive prior to taking action.  Second,

Plaintiffs claim that Proclamation 10101 violates the requirements of Section 203(e)(7) of the

Trade Act by imposing a new safeguard measure on bifacial modules less than two years after the

previous measure -- namely, the duties imposed by Proclamation 9693 -- expired.  Third, Plaintiffs

argue that Proclamation 10101 violates the requirements of Section 201 of the Trade Act because

the President failed to weigh the social and economic costs and benefits of the modifications prior to issuing the proclamation.  Finally, Plaintiffs argue that <u>Proclamation 10101</u> violates the substantive requirements of Section 204(b)(1)(B) of the Trade Act by increasing safeguard measures under the aegis of that provision.

The court addresses each of these arguments in turn and concludes that while the Government prevails on the questions of procedural compliance -- the form, contents, and timing of the petition, as well as the President's assessment of costs and benefits -- <u>Proclamation 10101</u> <u>ultimately</u> fails to comply with the substantive requirements of Section 204(b)(1)(B) of the Trade Act.  Accordingly, the court grants Plaintiffs' motion for summary judgment and denies the Government's motion to dismiss.

I.     ***<u>Proclamation 10101</u> Does Not Violate the Procedural Requirements of § 204(b)(1)(B) of the Trade Act***

Plaintiffs identify five procedural requirements within Section 204(b)(1)(B).  Four of these requirements pertain to features of the petition submitted by the domestic industry: first, "the petition must be submitted by 'a majority of the representatives of the domestic industry'"; second, it must be submitted to the President; third, "by the use of the language '*such* reduction, modification, or termination,' the petition must request the reduction, modification, or termination that the President ultimately adopts" and fourth, "by the use of the language 'on *such* basis,' the petition must request the reduction, modification or termination on the basis that 'the domestic industry has made a positive adjustment to import competition.'"  Pls.' Resp. at 13–14 (quoting 19 U.S.C. § 2254(b)(1)(B)).  The final requirement Plaintiffs identify is that the President must find that the industry "has made a positive adjustment to import competition."  <u>Id.</u>; 19 U.S.C. § 2254(b)(1)(B).

Plaintiffs' arguments that <u>Proclamation 10101</u> significantly violated the procedural requirements of Section 204 are unpersuasive. The court concludes that: (1) the letters submitted to the Trade Representative are, taken collectively, sufficient to constitute a petition to the President; (2) submission to USTR was sufficient to satisfy the requirements of the statute; (3) the petition adequately complied with the statute's requirement that "such reduction, modification, or termination" be requested by the "majority of the representatives of the domestic industry"; (4) the petition in this case did not significantly violate 204(b)(1)(B)'s "on such basis" requirement; and (5) the President's finding that the domestic industry "has begun to make" a positive adjustment to import competition again does not significantly violate the statutory requirement that the President find the domestic industry "has made," a positive adjustment to import competition. 19 U.S.C. § 204(b)(1)(B).

As a preliminary matter, the parties dispute the jurisdiction of the court over the above questions. Plaintiffs contend that they are requesting judicial inquiry into whether the President satisfied the statutory predicates for action under the safeguard statute, and that the challenge to <u>Proclamation 10101</u> is therefore within the authority of the court. Pls.' Resp. at 17–21; <u>see</u> <u>Silfab Solar, Inc. v. United States</u>, 892 F.3d 1340, 1346 (Fed. Cir. 2018) (holding that courts may set aside Presidential action if the President "acts beyond his statutory authority"). The Government, meanwhile, frames the inquiry as a requested review of Presidential fact-finding, which would be outside the scope of judicial review. Defs.' Reply at 10–12; <u>see</u> <u>Florsheim Shoe Co., Div. of Interco, Inc. v. United States</u>, 744 F.2d 787, 796 (Fed. Cir. 1985) ("After it is decided that the President has congressional authority for his action, 'his motives, his reasoning, his finding of facts requiring the action, and his judgment, are immune from judicial scrutiny.'" (quoting <u>United States Cane Sugar Refiners' Ass'n v. Block</u>, 683 F.2d 399, 404 (C.C.P.A. 1982))).

Plaintiffs' view prevails.  It has been established by the Federal Circuit that courts may consider whether "the President has violated an explicit statutory mandate."  Motion Sys. Corp. v. Bush, 437 F.3d 1356, 1361 (Fed. Cir. 2006) (en banc).  Such analysis has been undertaken where the disputed Presidential action constitutes an exercise of delegated authority without complete discretion, including where the President has acted to institute safeguard measures under the Trade Act.  See, e.g., Maple Leaf Fish Co., 762 F.2d at 89; see also, e.g. Corus Group PLC v. Int'l Trade Com'n, 352 F.3d 1351, 1358–59 (Fed. Cir. 2003).  Here as well, the court may consider whether the President's action constituted a "clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority."  Silfab, 892 F.3d at 1346 (citing Maple Leaf Fish Co., 762 F.2d at 89).

Even so, the law is clear that claims alleging violation of the President's statutory mandate face an extraordinarily high bar for success.  The court in Silfab Solar, Inc. v. United States, for example, determined that even where procedural violations are alleged with respect to the agency recommendations underlying Presidential action, the President may nevertheless act to approve those recommendations without judicial intrusion.  Silfab, 892 F.3d at 1347 (rejecting challenge to Presidential action under Section 201 following alleged procedural violations by the ITC under Section 202).  Silfab also made clear that the failure of the President to comply with statutory requirements generally, so long as those requirements are not conditions precedent to the action challenged before the court, provides no basis for overturning the challenged action.  Id.  Similarly, in Maple Leaf Fish Co. v. United States, the court determined that reliance on an allegedly flawed ITC report nevertheless did not invalidate the resultant Presidential action.  These cases illustrate that more is required for a successful challenge to Presidential safeguards than simple noncompliance, and Plaintiffs' challenges must be weighed against that benchmark here.

### A.      The Petition

With respect to the petition, Plaintiffs allege that the three letters which constitute the purported petition do not satisfy the requirements of Section 204(b)(1)(B) because (1) they were not a petition to the President within the meaning of the statute; (2) they only contained requests from three companies for a change in the duty rate and from five companies for the withdrawal of the exclusion, and thus were not a petition by a majority of the representatives of the domestic industry for the same modification instituted by the President; and (3) they failed to allege that the domestic industry has made a positive adjustment to import competition, "much less [to] identify such positive adjustment as the basis for their request to modify the safeguard measure."  Pls.' Resp. at 16.  The Government responds that (1) the statute does not define "petition," and the President therefore "lawfully accepted the domestic industry's communications as 'a petition' under the statute;" (2) the petition constituted a request from the majority of the industry by production volume and collectively requested the relief granted by the President; and (3) the statute does not require petitioners to assert that the industry has made a positive adjustment to import competition.  Defs.' Reply at 8, 14–21.  The court addresses each of these arguments in turn.

### 1.      The Letters Submitted to USTR Constituted a Petition

With respect to the requirement that a petition be submitted to the President, Plaintiffs' overarching argument is that "an amalgamation of three letters submitted to USTR" by Auxin Solar, SolarTech Universal, Mission Solar Energy, LG Electronics USA, Inc., and Hanwha Q CELLS cannot constitute a petition.  Pls.' Resp. at 14.  Plaintiffs object to both the form and timing of the alleged petition.

First, Plaintiffs argue that that the earliest of the three letters, submitted to USTR in July 2019, cannot serve as the basis for Presidential action in any case because it was submitted prior

to the issuance of the ITC's midterm report. Pls.' Resp. at 15. This argument is without merit, as 19 U.S.C. § 2254(b)(1) requires only that the President must receive the ITC report before taking action and does not require any particular timing with respect to industry petitions. The court therefore rejects Plaintiffs' timing argument.

Next, Plaintiffs argue that "multiple documents" do not constitute "'a petition' in the singular," and therefore the three letters comprising the alleged petition fail to satisfy the text of the statute. Pls.' Resp. at 14. However, as the Government notes, the statute provides no requirement for the form a petition must take. Defs.' Reply at 12. Furthermore, the United States Code provides that "[i]n determining the meaning of any Act of Congress, unless the context indicates otherwise -- words importing the singular include and apply to several persons, parties, or things." 1 U.S.C. § 1; Defs.' Reply at 13. There is no indication in the statute that a petition must constitute a single document. The court therefore determines that the letters submitted in this case were reasonably construed as a petition under the meaning of Section 204(b)(1)(B).

### 2.    *Submission of the Letters to USTR was Not a Procedural Violation*

In addition to disputing that the letters in this case constitute a petition, Plaintiffs argue that any petition in fact submitted fails to satisfy Section 204(b)(1)(B) because it was submitted to USTR and not to the President. Pls.' Resp. at 14. The court rejects this argument for two reasons. First, the statute does not require, or even suggest, that the President may not exercise discretion in determining the appropriate method of submission. By contrast, where Congress has intended strict requirements with respect to petitions under the safeguard statute, those requirements have generally been explicit. For example, Section 202 of the Trade Act requires that a petition under that section be "filed with the Commission" and additional documents "submit[ted] to the Commission and the [USTR]" within a set period, and further prescribes specific language that

must be included in the petition.  19 U.S.C. § 2252(a)(1), (3)–(4).  No such detailed requirements are found under Section 204(b)(1)(B).  Accordingly, the court declines to read such inflexibility into the statute.  See Jama v. Immigration and Customs Enf't, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest.").

Furthermore, the petitions were submitted to USTR, and USTR  is the agency which "act[s] as the principal spokesperson of the President on international trade."[5]  19 U.S.C. § 2171(c)(1)(E). With respect to safeguard duties specifically, the statute contemplates the close relationship between the President and USTR; requiring that "the interagency trade organization established under 1872(a)," of which USTR is chair, "make a recommendation to the President as to what action the President should take" prior to the institution of any safeguards.  19 U.S.C. § 2253(a)(1)(C); 19 U.S.C.  § 1872(a)(3)(A).  Given the close relationship of USTR and the President in the context of trade regulation and of safeguards specifically, the court finds that filing the petitions with USTR reasonably satisfied Section 204(b)(1)(B)'s requirement that the petitions be submitted to the President.

### 3.     The Petition Constituted a Request from the Majority of the Representatives of the Domestic Industry for the Relief Granted by the President

Plaintiffs next argue that even if the three letters submitted to USTR constitute a valid petition, the withdrawal was requested by at most six out of twenty of the "representatives of the domestic industry," which is less than a majority and therefore in violation of the statute.  Pls.'

_____

[5] See About Us, Office of the U.S. Trade Representative, https://ustr.gov/about-us (last visited Nov. 9, 2021).

Resp. at 16–17.  The Government counters that it is appropriate to look to production volume to determine if a majority of domestic industry representatives have submitted a petition, and that by this measure a majority of the domestic industry has requested both the withdrawal of the exclusion and the increased duty rate imposed by Proclamation 10101.  Defs.' Reply at 15–18.  Plaintiffs, in turn, respond that this conflates "a majority of the representatives" -- the language of the statute -- with "representatives of the majority."  Pls.' Reply at 7.  The latter language, according to Plaintiffs, might permit measuring the majority by production volume, but "'majority of the representatives' reflects a majority of particular individuals."  Id.

The language of the statute belies Plaintiffs' interpretation.  Section 202(c)(6)(A)(i) defines "domestic industry" with respect to a specific article as "the producers as a whole of the like or directly competitive article or those producers whose collective production of the like or directly competitive article constitutes a major proportion of the total domestic production of such article." 19 U.S.C. § 2252(c)(6)(A)(i).  Clearly, the statute permits definition of domestic industry on the basis of production volume.  Id.  Section 204(b)(1)(B) may accordingly be read to require (prior to any safeguard adjustments) a petition by "a majority of the representatives of" the producers who are responsible for a "major proportion" of domestic production, and a finding by the President that the same producers have positively adjusted to import competition.  19 U.S.C. § 2254(b)(1)(B).  In short, Section 204(b)(1)(B) implicitly contemplates the submission of a petition by those producers responsible for the majority of production volume.  Id.

Nor does context support a reading of 204(b)(1)(B) that focuses on a numerical majority of representatives, rather than a proportional majority of manufacturers.  First, the statute requires that a "majority . . . submits" a petition, not that a majority of the representatives submit a petition. Id.  Second, it is clear from the statute's follow-on requirement that the President determine that

the domestic industry as a whole has positively adjusted to competition that 204(b)(1)(B) is intended to permit changes to a safeguard measure where a specific domestic industry has <u>overall</u> adapted to competition -- not when a certain number of producers have requested modification. <u>Id.</u>   Requiring that a <u>numerical</u> majority of industry representatives petition for modification, regardless of the associated production volume, would therefore not support the ultimate aim of 204(b)(1)(B) as there is no indication that such a numerical majority would reflect industry-wide adaptation.   Accordingly, the court concludes that the statute should not be read to exclusively require petition by a majority of representatives.

Having thus determined that production volume is an appropriate metric for the assessment of a petition, the court concludes that a majority of the domestic industry requested the modifications.   Auxin, Hanwha Q CELLS, and LG requested the modification of the tariff rate in the fourth year of the solar safeguard measure, and according to the confidential filings submitted to the court, these representatives constitute a majority of the domestic industry by production volume.   <u>See</u> ITC Pub. 5021 at III-14 III-15 (Table III-4).   Similarly, Auxin, Hanwha Q CELLS, Heliene, Mission, and Solar Tech requested withdrawal of the bifacial exclusion, and these domestic producers, too, constitute a majority of production during the relevant period.   <u>Id.</u>   Thus, the court finds no basis to conclude that a majority of the domestic industry representatives failed to request the relief granted by the President.

### 4.     <u>*Proclamation 10101* Did Not Clearly Misconstrue the Language of Section 204(b)(1)(B)</u>

Finally, the parties dispute whether the petition submitted by the domestic industry must request relief on the basis that the domestic industry has made a positive adjustment to import competition.   Plaintiffs' argument hinges on the statute's inclusion of "on such basis," which they contend should be read to require that petitioners must request reduction, modification, or

termination of the safeguard measure on the basis that the domestic industry has made a positive adjustment to competition.  Pls.' Resp. at 14–15.  The Government argues that the statute must instead be interpreted to require the President to determine the domestic industry has made a positive adjustment to competition on the basis of either the petition or the ITC midterm review report referenced earlier in Section 204.  Defs.' Suppl. Br. at 7.  As the President in fact relied on the ITC report, the Government contends that the court must defer to his reasonable interpretation of the statute and accept that "on such basis" refers to the ITC report.  Id.

The question before the court is not merely one of statutory interpretation.  Rather, as noted above, the court may only set aside Presidential action where such action constitutes a "clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority."  Maple Leaf Fish Co., 762 F.2d at 89.  Accordingly, the appropriate inquiry is not how the court would interpret the statute, but whether the President's interpretation of the statute was a "clear misconstruction" warranting judicial intervention.

The court concludes that it was not.  As the Government notes, the President's determination of positive adjustment on the basis of the ITC report is at least plausibly supported by the statutes as a whole.  First, "such" is typically read to "refer[] back to something indicated earlier in the text," which disfavors Plaintiffs' view that the basis referred to is the industry's positive adjustment.  Defs.' Reply at 21–22.  Second, a determination made on the basis of the ITC report would reflect "the views of an independent body based on information and argument provided by all market participants," and would therefore align with the Section 204(b)(1)(B)'s overall aim of permitting the adjustment of safeguard measures when the industry as a whole begins to adapt to competition.  Defs.' Suppl. Br. at 7.  The President's reading of the statute is not

the only possible interpretation of "on such basis."  Nevertheless, neither is it so implausible as to amount to a clear misconstruction.

Even in the event that the correct referent of "such basis" under Section 204(b)(1)(B) is, as Plaintiffs contend, "that the domestic industry has made a positive adjustment to import competition," there is likely no basis to set aside Proclamation 10101.  Plaintiffs argue that the correct interpretation of "such basis" requires that the petition submitted to the president include a request for modification on the basis of positive adjustment. Pls.' Resp. at 16.  Failure to satisfy such a requirement would therefore be an interpretive error by the representatives of domestic industry, rather than the President -- and would result in a flawed petition.  As discussed above, the Federal Circuit has previously recognized that, where there is nothing in the statute that "prohibit[s] the President from approving recommendations that are procedurally flawed," procedural inadequacies in recommendations provided to the President do not provide a basis for rejecting the resultant Presidential action.  See Silfab, 892 F.3d at 1347 (quoting Dalton v. Specter, 511 U.S. 462, 476).  Indeed, "a recommendation does not cease to be made 'under' [the relevant] section . . . simply because the recommendation is assertedly contrary to the substantive requirements of that provision."  Id. (quoting Michael Simon Design, Inc. v. United States, 609 F.3d 1335, 1341 (Fed. Cir. 2010)).  Even under Plaintiffs' interpretation of the statute, as in Silfab, there is no requirement in Section 204 precluding the President's acceptance of a flawed petition.  Accordingly, even if the appropriate referent of "on such basis" under Section 204(b)(1)(B) were "the domestic industry has made a positive adjustment to import competition," the failure of petitioners to comply with this requirement would not render Proclamation 10101 unlawful.

### B.       The President's Determination.

Finally, Plaintiffs allege that the President failed to comply with the procedural requirements of Section 204(b)(1)(B) by determining in <u>Proclamation 10101</u> that the domestic industry "has begun to make" a positive adjustment to import competition, rather than "has made" such a positive adjustment.  Pls.' Resp. at 21–23.  The Government rejects Plaintiffs' argument that there is a meaningful distinction between "has made" and "has begun to make" which would invalidate the President's action under Section 204.  Defs.' Reply at 22–24.

The court agrees with the Government.  The phrase "has made a positive adjustment" in the statute is broad enough to include the finding that the domestic industry "has begun to make a positive adjustment" contained in the proclamation.  For their argument to succeed, Plaintiffs must demonstrate a "clear misconstruction of the governing statute," <u>Silfab</u>, 892 F.3d at 1346, and the distinction between "has made" and "has begun to make" is too narrow to rise to the level of a clear misconstruction.  Accordingly, the court rejects Plaintiffs' arguments with respect to the President's procedural compliance with the statute.

### II.      <u>*Proclamation 10101* Does Not Violate Section 203(e)(7) of the Trade Act</u>

Plaintiffs next argue that <u>Proclamation 10101</u> violates the timing provisions of Section 203(e)(7) of the Trade Act.  Section 203(e)(7) prohibits new safeguard duties from being imposed on an article for at least "a period of 2 years beginning on the date on which the previous action terminates" imposed on that article was terminated.  19 U.S.C. § 2253(e)(7)(A)(ii).[6]  Plaintiffs

---

[6] 19 U.S.C. § 2253(e)(7) provides:

   (A)   If an article was the subject of an action under subparagraph (A), (B), (C), or (E) of
         subsection (a)(3), no new action may be taken under any of those subparagraphs with
         respect to such article for—

contend that <u>Proclamation 10101</u> violates this section because (1) bifacial solar panels are "articles" for the purposes of Section 203, and (2) the exclusion granted by USTR constitutes the termination of a safeguard duty such that any re-imposition of duties on bifacial solar panels through withdrawal of that exclusion would violate the prohibition on new safeguard measures. Pls.' Resp. at 35.  The Government argues that CSPV products generally are the "article" at issue in Section 203, and that the exclusion "did not 'terminate' the safeguard measure as to bifacial products'" but rather "modif[ied] the HTS provisions" created by <u>Proclamation 9693</u> to exclude a specific product from the safeguard measure.  Defs.' Resp. to the Court's Questions at 8.

The court concludes that the relevant article for purposes of Section 203's cooling-off period is CSPV products generally, and not bifacial solar panels specifically.  The word "article" in this section refers back to its use in Section 201, which establishes the President's authority to impose safeguard duties "[i]f the [ITC] determines . . . that an article is being imported in the United States in such increased quantities as to be a substantial cause of serious injury." 19 U.S.C. § 2251(a).  Here, the ITC determined that "crystalline silicon photovoltaic cells . . . are being

---

(i)  a period beginning on the date on which the previous action terminates that is equal to the period in which the previous action was in effect, or

(ii)  a period of 2 years beginning on the date on which the previous action terminates, whichever is greater.

(B)  Notwithstanding subparagraph (A), if the previous action under subparagraph (A), (B), (C), or (E) of subsection (a)(3) with respect to an article was in effect for a period of 180 days or less, the President may take a new action under any of those subparagraphs with respect to such article if—

(i)  at least 1 year has elapsed since the previous action went into effect; and

(ii) an action described in any of those subparagraphs has not been taken with respect to such article more than twice in the 5-year period immediately preceding the date on which the new action with respect to such article first becomes effective.

imported into the United States in such increased quantities as to be a substantial cause of injury to the domestic industry producing an article like or directly competitive with the imported article." Crystalline Silicon Photovoltaic Cells (Whether or not Partially or Fully Assembled into Other Products), Investigation No. TA-201-75, USITC Pub. 4739 (Nov. 2017) at 1. It is clear that the ITC considered the imported "article" at issue here to be all CSPV products, and not bifacial products specifically. Accordingly, the court finds that Section 203(c)(7)'s cooling-off period does not apply to bifacial panels specifically, but rather to CSPV products as a whole.[7]

The court further concludes that the exclusion of bifacial solar panels is not a "termination" for the purposes of Section 203(e)(7). The President in Proclamation 9693 authorized USTR to "exclude . . . particular product[s] from the safeguard measure" and to "modify or terminate any such determination." Proclamation 9693, 83 Fed. Reg. at 3,544. The President did not, however, delegate the authority to terminate the safeguard measure, which is the action that would trigger the limitations of Section 203(e)(7). Accordingly, no action that would trigger Section 203(e)(7)'s cooling-off period -- i.e., a termination of a safeguard measure -- was undertaken through the issuance of the exclusion. Furthermore, interpreting the exclusion of bifacial panels as a termination of the safeguard measure with respect to a specific "article" would run counter to

---

[7] Plaintiffs further argue that bifacial solar panels constitute an article for the purposes of 203(e)(7), and that failing to consider bifacial panels (rather than CSPV panels generally) a qualifying article would "allow safeguard duties to be immediately re-imposed on products following the termination of a safeguard measure as long as the domestic industry slightly modifies the definition of the article for which relief is sought." Pls.' Resp. at 35. Such a loophole, Plaintiffs contend, runs counter to the purpose of Section 203. Pls.' Br. at 36. However, as Defendants expressly acknowledge in their responses to the court's questions before oral argument, "imposition of a safeguard measure against any subsequent entry of an overlapping product before the cooling-off period has passed would result [in] a 'new action . . . taken . . . with respect to such article'" and accordingly would be in violation of Section 203. Defs.' Resp. to the Court's Questions at 7–8 (quoting 19 U.S.C. § 2253(e)(7)(A)). As Plaintiffs' basis for deeming bifacial solar panels an article for purposes of the cooling-off period has therefore been mooted, the court declines to further address Plaintiffs' argument here.

Congressional intent.  First, as set out above, bifacial solar panels are not an article for purposes

of Section 203.  Second, as the Government notes, viewing a withdrawn exclusion as a termination

subject to Section 203's two-year limitation on new safeguards would require a separate cooling-

off period with respect to every excluded "article," which would in turn give rise to repeated "mini-

ITC investigations into separate subsets of the original 'article'" as each excluded product became

eligible for the re-imposition of safeguards.  Defs.' Br. at 22.  The Government asserts that

"Congress did not intend such a piecemeal approach to the protections of the safeguard statute,"

and the court agrees.  Id.   For the reasons set forth above, the court therefore concludes that

Proclamation 10101's withdrawal of the exclusion was not in violation of Section 203(7)(e).

### III.   *Proclamation 10101 Does Not Violate Section 201 of the Trade Act*

The parties also dispute whether action taken under Section 201 of the Trade Act requires

the President to weigh the economic and social benefits of the alterations in Proclamation 10101

against the costs.  Section 201(a) imposes a requirement that the President weigh the costs and

benefits of a safeguard measure before imposing it:

> If the United States International Trade Commission (hereinafter referred to in this part as the "Commission") determines under [Section 202(b)] of this title that an article is being imported into the United States in such increased quantities as to be a substantial cause of serious injury, or the threat thereof, to the domestic industry producing an article like or directly competitive with the imported article, the President, in accordance with this part, shall take all appropriate and feasible action within his power which the President determines will facilitate efforts by the domestic industry to make a positive adjustment to import competition and provide greater economic and social benefits than costs.

19 U.S.C. § 2251(a).  The Government argues that the President's initial explicit weighing of the

economic and social costs in Proclamation 9693 is sufficient to comply with the requirements of

the statute,[8] and maintains that the weighing of economic and social costs is only expressly required under Section 201(a) and Section 203(a)(2) -- which govern the initial implementation of safeguard duties -- and not under Section 204, which governs the alterations at issue here.  Defs.' Br. at 22–24.  Therefore, according to the Government, "there is no statutory basis for appending additional requirements onto Section 204 determinations."  Defs.' Reply at 33.

Plaintiffs, however, contend that this determination must be made for Proclamation 10101 as well.  First, Plaintiffs argue that Proclamation 9693 weighed the costs and benefits of a different tariff rate: 15% in the fourth year, rather than 18%.  Pls.' Resp. at 39–42.  Second, Plaintiffs argue that all changes to safeguard duties require the President to weigh social and economic costs and benefits.  Id. at 40.  They maintain that the President acknowledged as much in Proclamation 9693, which read in part that changes could be made "to facilitate efforts by the domestic industry to make a positive adjustment to import competition and to provide greater economic and social benefits than costs."  Id. at 40–41 (quoting Proclamation 9693, 83 Fed. Reg. at 3,542).  Furthermore, Plaintiffs argue that Section 201 of the Trade Act, which contains the requirement to weigh social and economic costs and benefits, provides "the overarching rule for safeguard duties," and therefore "sets the parameters for all actions taken pursuant to the entire safeguard statute," including the amendment of safeguard measures.  Pls.' Reply at 21.  They claim that the Government's interpretation of Section 204 "would create an exception . . . that would swallow the rule," and therefore should be rejected.  Id. (citing Schwegmann Bros. v. Calvert Distillers

---

[8] The relevant portion of the proclamation reads, "I have determined that this safeguard measure will facilitate efforts by the domestic industry to make a positive adjustment to import competition and provide greater economic and social benefits than costs."  Proclamation 9693, 83 Fed. Reg. at 3,542.

Corp., 341 U.S. 384, 389 (1951) (rejecting statutory interpretation under which "the exception swallows the proviso and destroys its practical effectiveness)).

The court concludes that the President was required to weigh the costs and benefits of his alterations to the safeguards imposed by Proclamation 9693, and further concludes that the President met this requirement. On the first issue, the court agrees with Plaintiffs that failing to apply Section 201's requirement to weigh costs and benefits throughout the safeguard statute risks permitting absurd results, wherein "the President could impose a safeguard duty of one percent on certain CSPV products under Section 201 (after concluding that the costs of doing so did not outweigh the benefits), but then use Section 204 to increase the safeguard duty to 50 percent . . . without ever considering whether the benefits of doing so exceed the costs." Pls.' Resp. at 41. Such a scenario would allow any Section 204 exception to swallow the Section 201 rule and would thus "destroy its practical effectiveness." Schwegmann 341 U.S. at 389. Accordingly, it is appropriate to read a baseline requirement to weigh social and economic costs and benefits into the statute as a whole.

With respect to the second issue, the court finds that the President considered, in compliance with the statute, the costs and benefits of his alterations to the safeguards imposed by Proclamation 9693. In Proclamation 10101 the President determined that "that the exclusion of bifacial panels from application of the safeguard tariff has impaired and is likely to continue to impair the effectiveness of the action I proclaimed in Proclamation 9693," and that "the exclusion of bifacial panels from application of the safeguard tariffs has impaired the effectiveness of the 4-year action I proclaimed in Proclamation 9693, and that to achieve the full remedial effect envisaged for that action, it is necessary to adjust the duty rate of the safeguard tariff for the fourth year of the safeguard measure to 18 percent." 85 Fed. Reg. at 65,640. By determining that the

bifacial exclusion "impaired" the action taken under Proclamation 9693, which was itself deemed

necessary to "facilitate efforts by the domestic industry to make a positive adjustment to import

competition and provide greater economic and social benefits than costs," the President weighed

the necessity of Proclamation 10101's alterations.  Id.; see Proclamation 9693, 83 Fed. Reg. at

3,542.  Furthermore, by referring back to the purpose of the safeguards issued by Proclamation

9693 and thus to that proclamation's express consideration of the economic and social costs and

benefits of the safeguard measures, the President evinced his general consideration of the costs

and benefits of the changes.  As there is no requirement in either Section 201(a) or Section

204(b)(1)(B) that the President set forth his analysis in specific detail, the court concludes that the

assessment of costs and benefits apparent here satisfies the statutory requirement.

### IV.      *Proclamation 10101 Violates the Substantive Requirements of § 204(b)(1)(B) of the Trade Act*

Finally, Plaintiffs argue that Proclamation 10101 fails to comply substantively with Section

204(b)(1)(B) because it restricts, rather than liberalizes, trade.  As set out above, Section 204(b)

provides for the "reduction, modification, and termination" of a safeguard action, and specifically

states that:

> (1)   Action taken under [Section 203] may be reduced, modified, or terminated by
>        the President . . . if the President—
>
>                 [ . . . ]
>
> (B)   determines, after a majority of the representatives of the domestic industry
>        submits to the President a petition requesting such reduction, modification, or
>        termination on such basis, that the domestic industry has made a positive
>        adjustment to import competition.

19 U.S.C. § 2254(b)(1).  The court concludes that, by interpreting "modification" to permit the

expansion or upward adjustment of safeguard measures, Proclamation 10101 clearly misconstrues

the meaning of the statute.  Accordingly, Proclamation 10101's withdrawal of the exclusion must

be set aside as a "clear misconstruction of the governing statute," resulting in "action outside

delegated authority." Silfab, 892 F.3d at 1346 (quoting Maple Leaf Fish Co., 762 F.2d at 89).

      Plaintiffs contend that only trade-liberalizing modifications are permitted under

204(b)(1)(B) because "[i]t runs counter to logic and congressional intent to increase trade

restrictions when 'the domestic industry has made a positive adjustment to import competition.'"

Pls.' Resp. at 25 (emphasis in original).  Plaintiffs further contend that in the Uruguay Round

Agreement on Safeguards, Congress sought to implement existing United States law, and the fact

that the resultant agreement only permits trade liberalizing modifications reflects the congressional

intent that Section 204(b)(1)(B) also only permit trade liberalizing modifications. Id. at 27–28.

Plaintiffs note that "[t]he [Statement of Administrative Action] further explains that '[t]he Uruguay

Round Agreement on Safeguards (the Agreement) incorporates many concepts taken directly from

section 201. These include criteria regarding . . . degressivity (progressive liberalization of

safeguard restrictions).'"  Id. (citing H.R. Rep. No. 103-316, 286, as reprinted in 1994

U.S.C.C.A.N. 4040, 4262).  Accordingly, Plaintiffs argue, Proclamation 10101 should be set aside.

      The Government claims that Section 204(b)(1)(B) is not limited to trade liberalizing

measures, and in fact permits the President to increase safeguard duties.  In support of their position

they argue that, because safeguards may be reduced, modified, or terminated by the President

under Section 204, reading modification to permit only "actions that reduce safeguard protections

would make 'modification' coterminous with . . . 'reduction', and therefore render 'modification'

superfluous." Defs.' Br. at 13.  The Government also cites to legislative history in support of their

argument, noting that "an earlier Senate amendment stated that, upon receipt of the 'ITC

monitoring report, the President may reduce, modify (but not increase), or terminate any action . .

. .'" Id. at 14–15.  The Government argues that the omission of the parenthetical "but not increase"

in the final version of the act indicates that Congress intended to permit increases because "[w]here Congress includes limiting language in an earlier version of a bill but deletes it prior to enactment, it may be presumed that the limitation was not intended." Russello v. United States, 464 U.S. 16, 23–24 (1983); see id. Accordingly, the Government argues, Proclamation 10101 is lawful under 204(b)(1)(B).

The question underlying this dispute is the meaning of "modify" as used in 204(b)(1)(B). How that question is resolved is informed by basic principles of statutory interpretation. See generally, Robert A. Katzmann, JUDGING STATUTES (2014). The court begins with the principle that statutory language should be interpreted "in accord with the ordinary public meaning of its terms at the time of its enactment." Bostock v. Clayton County, 140 S. Ct. 1731, 1738 (2020). An appeal to the dictionary is therefore illustrative. In its verb form -- as it is used in 204(b)(1) -- "modify" is defined as "to make less extreme." See "Modify," Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/modify (last visited Nov. 9, 2021) Similarly, in its noun form -- as it is used in the section title, and in 204(b)(1)(B) -- "modification" is defined as "the limiting of a statement." See "Modification," Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/modification (last visited Nov. 9, 2021). Secondarily, "modification" is defined as "the making of a limited change in something." Id. The definition of the verb (as well as the first definition of the noun) favors Plaintiffs' interpretation: that the statute's provision for modification permits only changes that limit or moderate the existing safeguard measures. On the other hand, the second definition of "modification" favors the Government's interpretation: that both trade-liberalizing and trade-restricting changes to existing safeguard duties are authorized by the statute. Defs.' Resp. to the Court's Questions at 3.

Accordingly, the court turns next to the statute as a whole.  Courts may look "to the broader structure of the [statute] to determine the meaning" of specific language.  <u>King v. Burwell</u>, 576 U.S. 473, 492 (2015).  Where, as here, the terminology of the statute is ambiguous, it is all the more important to read disputed provisions "in their context and with a view to their place in the overall statutory scheme."  <u>Utility Air Reg. Grp. v. EPA</u>, 573 U.S. 302, 311 (2014) (quoting <u>FDA v. Brown & Williamson Tobacco Corp.</u>, 529 U.S. 120, 133 (2000)).

Safeguard measures are intended to "facilitate efforts by the domestic industry to make a positive adjustment to import competition" while providing "greater economic and social benefits than costs."  19 U.S.C. § 2251(a).  As Plaintiffs correctly note, "to strike that balance, the statute contains an intricate framework of investigations, consultations, reports, [and] weighing of factors."  Pls.' Resp. at 26.  This framework includes specific instructions for the investigation of alleged harms by the ITC, including the assessment of enumerated factors favoring a finding of serious injury and the holding of public hearings on both the risk of injury and proposed adjustment plans.  19 U.S.C. § 2252(b), (e).  In order to ultimately authorize any safeguard measures, the President must also comply with a variety of interpretive and substantive requirements, as well as specific deadlines for both further investigation and the proclamation of relief.  <u>See generally</u>, 19 U.S.C. § 2253.  The measures implemented go on to face both ongoing review and strict time limitations.  19 U.S.C. § 2253(e)(7); 2253(a).

Interpreting Section 204(b)(1)(B) to permit both trade-restricting and trade-liberalizing modifications would run counter to this detailed statutory scheme.  Under such a view of the statute, the President would be permitted to increase safeguard measures without complying with the statutory requirements necessary to initially impose those safeguards.  Adjustment of safeguard measures under 204(b)(1)(B) requires only that the President consider a midterm report by the ITC

on the "developments with respect to the domestic industry, including the progress and specific efforts . . . to make a positive adjustment to import competition."  U.S.C. § 2254(a)(1)–(3), (b). There is no indication in the statute that Congress intended Section 204 to provide a loophole for the institution of harsher safeguards without the standard procedural restrictions.  Conversely, there is every indication that the section was intended to provide an escape hatch from those safeguards where domestic industry has adequately adapted to import competition.  Section 204(b)(1)(A), for example, contemplates that safeguards might be reduced or terminated where "the domestic industry has not made adequate efforts" to adjust to competition, or where "the effectiveness of the action . . . has been impaired by changed economic circumstances" which "warrant . . . reduction, or termination."  19 U.S.C. § 2254(b)(1)(A)(i)–(ii). The court therefore concludes that 204(b)(1)(B) must be read to authorize only trade-liberalizing modifications to safeguard measures, because interpreting the statute to permit trade-restricting modifications would undermine the broader statutory scheme. See United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 371 (1988) ("A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law.") (citations omitted).

In light of the above, the court need not consider the legislative history arguments advanced by either side.  See Bostock, 140 S. Ct. at 1749 ("Legislative history, for those who take it into account, is meant to clear up ambiguity, not create it.") (quoting Milner v. Department of Navy, 562 U.S. 562, 574 (2011)).  Even in the event, however, that the court did proceed to consideration of the legislative history Plaintiffs still prevail, as that history is not decisive.  For example, it is easy to imagine a scenario where a trade-liberalizing modification would require an "increase" of

sorts (the President might increase a previously instituted quota) and the Government's arguments

to the contrary are not dispositive.[9]

Because Section 204(b)(1)(B) permits only trade-liberalizing modifications to existing

safeguard measures, the court concludes that <u>Proclamation 10101</u>'s withdrawal of the exclusion

of bifacial solar panels and increase of the safeguard duties on CSPV modules constituted both a

clear misconstruction the statute and action outside the President's delegated authority.  85 Fed.

Reg. at 65,640–42; <u>Maple Leaf Fish Co.</u>, 762 F.2d at 89.  This conclusion is rooted in the statutory

---

[9] In support of its legislative history argument, the Government points primarily to the fact that "(but not increase)" was included in an earlier version of the statute in support of their position. Defs.' Reply at 28–29. And indeed, as already noted earlier in this opinion, "[w]here Congress includes limiting language in an earlier version of a bill but deletes it prior to enactment, it may be presumed that the limitation was not intended." <u>Russello</u>, 464 U.S. at 23–24 (citations omitted). This presumption, however, is not irrebuttable, and Plaintiffs offer convincing alternative explanations.

Procedurally, Plaintiffs suggest the "but not increase" language was dropped as "a byproduct of combining different provisions addressing different situations using different language into a single provision." Pls.' Resp. to Oral Arg. Questions at 1–2.  The "but not increase" language did not disappear during deliberations within a single house of Congress, but rather as a result of combining a similar provision from the Senate with one from the House. <u>See</u> H.R. Rep. No. 100-576, 687–88 (1988), <u>as reprinted in</u> 1988 U.S.C.C.A.N. 1547, 1720–21. This indicates that the deleted language may not carry the presumptive meaning argued for by the Government.

Practically, moreover, the "but not increase" language may have been deleted from the final version of the statute in order to give the President flexibility to make trade-liberalizing increases to existing safeguard duties. An increase in a quota, for example, would be a trade-liberalizing modification permitted under the operative language of Section 204(b)(1)(B) that would perhaps have been barred had the "but not increase" language not been deleted.

Furthermore, there is legislative history supporting Plaintiffs' view that "modify" should be read to permit only trade-liberalizing changes. In particular, the Uruguay Round Agreement on Safeguards, a multilateral treaty negotiated in the 1980s which only permits trade liberalizing modifications, was explicitly negotiated to reflect existing United States law. <u>See</u> H.R. Rep. No. 103–316, 286 (1994), <u>as reprinted in</u> 1994 U.S.C.C.A.N. at 4262 ("The Uruguay Round Agreement on Safeguards (the Agreement) incorporates many concepts taken directly from section 201. These include criteria regarding . . . degressivity (progressive liberalization of safeguard restrictions).") As such, the limitations on trade-restricting action incorporated in the Uruguay Round Agreement seem to reflect Congress's intent that the originating statute, including Section 204(b)(1)(B), also only permit trade-liberalizing modifications. Accordingly, even the legislative history supports Plaintiffs' view that "modify" only permits trade-liberalizing changes to safeguard measures.

scheme.  That is not to say that, in another context, in a different statute, "modify" could not be read differently, or indeed as the Government argues.  To be sure, Congress is free to revise the statute now before the court to permit upward modifications.  Nevertheless, in this context, and without such revision of the law, the Government's argument cannot succeed.  Accordingly, the court grants Plaintiffs' motion for summary judgment and finds that the proclamation must be set aside.

## CONCLUSION

Ultimately, while Proclamation 10101 complied with the procedural requirements of the safeguard statute, it nevertheless clearly misconstrued the reach of Section 204(b)(1)(B) of the Trade Act, and thus constituted an action outside the President's delegated authority.  Neither the statute nor the statutory scheme supports interpreting Section 204(b)(1)(B) to permit increased restrictions on trade. Accordingly, the court grants Plaintiff's motion for summary judgment, and sets aside Proclamation 10101 on the basis that trade-restricting modifications are not permitted under the authority granted to the President by Section 204(b)(1)(B).  The Government is enjoined from enforcing Proclamation 10101, including by modifying the Harmonized Tariff Schedule of the United States, and Plaintiff shall be refunded all safeguard duties collected pursuant to Proclamation 10101, with interest.

SO ORDERED.

/s/  Gary S. Katzmann
Gary S. Katzmann, Judge

Dated:  November 16, 2021
New York, New York

*Invenergy Renewables LLC v. United States*, No. 19-00192, Slip Op. 21-155
[2021 WL 5356036] (Ct. Int'l Trade Nov. 17, 2021)

Slip Op. 21-155

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **INVENERGY RENEWABLES LLC,**<br><br>**Plaintiff,**<br><br>**and**<br><br>**SOLAR ENERGY INDUSTRIES ASSOCIATION, CLEARWAY ENERGY GROUP LLC, EDF RENEWABLES, INC. and AES DISTRIBUTED ENERGY, INC.,**<br><br>**Plaintiff-Intervenors,**<br>**v.**<br><br>**UNITED STATES OF AMERICA, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, UNITED STATES TRADE REPRESENTATIVE KATHERINE TAI, U.S. CUSTOMS AND BORDER PROTECTION, and ACTING COMMISSIONER OF U.S. CUSTOMS and BORDER PROTECTION TROY A. MILLER,**<br><br>**Defendants.** | **Before: Judge Gary S. Katzmann**<br>**Court No. 19-00192** |

## OPINION

[The court grants Plaintiffs' motion for judgment on the agency record and vacates the <u>Second Withdrawal</u>.]

Dated:  <u>November 17, 2021</u>

<u>Amanda Shafer Berman</u> and <u>John Brew</u>, Crowell & Moring LLP, of Washington, D.C. and New York, N.Y., argued for Plaintiff Invenergy Renewables LLC and Plaintiff-Intervenors Clearway Energy Group LLC and AES Distributed Energy, Inc.  With them on the joint briefs were <u>Larry Eisenstat</u> and <u>Frances Hadfield</u>.

<u>Matthew R. Nicely</u> and <u>Daniel M. Witkowski</u>, Akin, Gump, Strauss, Hauer & Feld LLP, of Washington, D.C., argued for Plaintiff-Intervenor Solar Energy Industries Association.

<u>Christine M. Streatfeild</u> and <u>Kevin M. O'Brien</u>, Baker & McKenzie LLP, of Washington, D.C.,

argued for Plaintiff-Intervenor EDF Renewables, Inc.

<u>Stephen C. Tosini</u>, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for Defendants United States of America, Office of the United States Trade Representative, United States Trade Representative Katherine Tai, U.S. Customs and Border Protection, and Acting Commissioner of U.S. Customs and Border Protection Troy A. Miller.  With him on the briefs were <u>Bryan M. Boynton</u>, Acting Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, and <u>Tara K. Hogan</u>, Assistant Director.

Katzmann, Judge:  The court returns to a dispute regarding the United States and the Office of the United States Trade Representative's ("USTR") withdrawal of the previously granted exclusion from safeguard duties on imported bifacial solar modules, duties which in 2018 the President imposed by proclamation to protect domestic industry.[1]  See <u>Proclamation 9693: To Facilitate Positive Adjustment to Competition from Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled into Other Products) and for Other Purposes</u>, 83 Fed. Reg. 3,541 (Jan. 23, 2018) ("<u>Proclamation 9693</u>").  After lengthy preliminary disputes, Plaintiff Invenergy Renewables LLC ("Invenergy"), a renewable energy company, joined by Plaintiff-Intervenors Solar Energy Industries Association ("SEIA"), Clearway Energy Group LLP ("Clearway"), EDF Renewables, Inc. ("EDF-R"), and AES Distributed Energy, Inc. ("AES DE") (collectively, "Plaintiffs"), filed a motion for judgment on the agency record challenging the <u>Determination on the Exclusion of Bifacial Solar Panels From the Safeguard Measure on Solar Products</u>, 85 Fed. Reg. 21,497 (USTR Apr. 17, 2020) ("<u>Second Withdrawal</u>"), by Defendants the United States, USTR, U.S. Trade Representative Katherine Tai, U.S. Customs and Border Protection ("CBP"), and CBP Acting Commissioner Troy A. Miller (collectively, "the Government").[2]  Specifically, Plaintiffs contend that the <u>Second Withdrawal</u>

---

[1] For the purposes of this opinion, the terms "solar modules" and "solar panels" are used interchangeably.

[2] Per CIT Rule 25(d), named officials have been substituted to reflect the current officeholders.

should be vacated as a decision issued without statutory authority and without compliance with

the requirements of the Administrative Procedure Act ("APA").   Pls.' Mot. for J. on the

Administrative R., Feb. 5, 2021, ECF No. 302 ("Pls.' Br.").   The Government requests that the

court uphold the Second Withdrawal as in accordance with the Trade Act of 1974, the APA, and

otherwise supported by record evidence.   Defs.' Corr. Resp. to Pls.' Mot. for J. on the

Administrative R., June. 15, 2021, ECF No. 322 ("Defs.' Br.").   The court grants Plaintiffs' motion

and vacates the Second Withdrawal.

## BACKGROUND

The court presumes familiarity with its previous opinions -- (1) Invenergy Renewables

LLC v. United States, 43 CIT __, 422 F. Supp. 3d 1255 (2019) (Invenergy I); (2) id., 44 CIT __,

427 F. Supp. 3d 1402 (2020) (Invenergy II); (3) id., 44 CIT __, 450 F. Supp. 3d 1347 (2020)

(Invenergy III); (4) id., 44 CIT __, 476 F. Supp. 3d 1323 (2020) (Invenergy IV); and (5) id., 44

CIT __, 482 F. Supp. 3d 1344 (2020) (Invenergy V) -- each of which provide additional

information on the factual and legal background of this case.[3]   Information pertinent to this

decision follows.

As the court has noted:

This case emerges from a debate within the American solar industry between
entities that rely on the importation of bifacial solar panels and entities that produce
predominately monofacial solar panels in the United States.   Plaintiffs here, who
include consumers, purchasers, and importers of utility-grade bifacial solar panels,
argue that the importation of bifacial solar panels does not harm domestic producers
because domestic producers do not produce utility-scale bifacial solar panels; they

---

[3] Most recently, the court has also issued a related opinion addressing the issuance of Presidential
Proclamation 10101, Proclamation 10101: To Further Facilitate Positive Adjustment to
Competition from Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not
Partially or Fully Assembled into Other Products), 85 Fed. Reg. 65,639 (Oct. 16, 2020)
("Proclamation 10101"), and that Proclamation's effort to withdraw the exclusion of bifacial solar
panels from safeguards imposed by Proclamation 9693.   See Solar Energy Indus. Ass'n v. United
States, 45 CIT __, Slip Op. 21-154 (Nov. 16, 2021).

thus oppose safeguard duties that they contend increase the cost of these bifacial solar panels. Domestic producers, however, contend that solar project developers can use either monofacial or bifacial solar panels, and thus safeguard duties are necessary to protect domestic production of solar panels. Both sides contend that their position better supports expanding solar as a source of renewable energy in the United States.

Invenergy I, 422 F. Supp. 3d at 1264.

## I.    The Safeguard Statute

Through the Trade Act of 1974, Congress provided a process by which the executive branch could implement temporary safeguard measures to protect a domestic industry from the harm associated with an increase in imports from foreign competitors. Trade Act of 1974 §§ 201–04, 19 U.S.C. §§ 2251–54 ("Safeguard Statute"). Section 202 of that the Safeguard Statute dictates that, upon petitions from domestic entities or industries, the International Trade Commission ("ITC") may make an affirmative determination that serious injury or a threat of serious injury to that industry exists. 19 U.S.C. § 2252. Under Section 203, the President may then authorize discretionary measures, known as "safeguards," to provide a domestic industry temporary relief from serious injury. 19 U.S.C. § 2253. The statute vests the President with decision-making authority based on consideration of ten factors. 19 U.S.C. § 2253(a)(2). Safeguard measures have a maximum duration of four years, unless extended for another maximum of four years based upon a new determination by the ITC. 19 U.S.C. § 2253(e)(1). The statute also outlines certain limits on the President's ability to act under this statute, including to limit new actions after the termination of safeguard measures regarding certain articles. See 19 U.S.C. § 2253(e). Further, the safeguard statute mandates that the President "shall by regulation provide for the efficient and fair administration of all actions taken for the purpose of providing import relief." 19 U.S.C. § 2253(g)(1). Finally, Section 204 outlines the process by which the President may modify safeguard measures. 19 U.S.C. § 2254.

## II.       The President's Safeguard Action and Delegation to USTR

In May 2017, pursuant to 19 U.S.C. § 2252(a), Suniva, Inc. ("Suniva"), a domestic solar

cell producer, filed an amended petition with the ITC alleging that certain solar panel cells "are

being imported into the United States in such increased quantities as to be a substantial cause of

serious injury, or threat thereof, to the domestic industry producing an article like or directly

competitive with the imported article."   Crystalline Silicon Photovoltaic Cells (Whether or Not

Partially or Fully Assembled into Other Products) at 6, Inv. No. TA-201-75, USITC Pub. 4739

(Nov. 2017) ("ITC Report").   The ITC then instituted an investigation pursuant to 19 U.S.C. §

2252.  Id.; Procedures to Consider Additional Requests for Exclusion of Particular Products From

the Solar Products Safeguard Measure, 83 Fed. Reg. 6,670 (USTR Feb. 14, 2018) ("Exclusion

Procedures") (citing 19 U.S.C. § 2252).   The scope of its investigation covered certain crystalline

silicon photovoltaic ("CSPV") cells,

> whether or not partially or fully assembled into other products, of a thickness equal
> to or greater than 20 micrometers, having a p/n junction (or variant thereof) formed
> by any means, whether or not the cell has undergone other processing, including,
> but not limited to cleaning, etching, coating, and addition of materials (including,
> but not limited to metallization and conductor patterns) to collect and forward the
> electricity that is generated by the cell.  The scope of the investigation also included
> photovoltaic cells that contain crystalline silicon in addition to other materials, such
> as passivated emitter rear contact cells, heterojunction with intrinsic thin layer cells,
> and other so-called "hybrid" cells ("certain CSPV cells").

Exclusion Procedures, 83 Fed. Reg. at 6,670.  The ITC reached an affirmative determination that

certain CSPV cells "are being imported into the United States in such increased quantities as to be

a substantial cause of serious injury, or threat of serious injury, to the domestic industry producing

a like or directly competitive article," Proclamation 9693, 83 Fed. Reg. at 3,541, and referred its

findings and recommendations to the President on November 13, 2017.  ITC Report at 1, 7.

Pursuant to Section 203 of the Safeguard Statute, in 2018 President Trump issued a proclamation, imposing temporary safeguard duties of 30% on certain CSPV cells, to decrease by 5% each year until 2022, at which point the safeguard duties end.  See generally, Proclamation 9693.  The safeguard duties applied to the bifacial solar panels used by Invenergy.  Pls.' Br. at 8. The President implemented these duties by modifying Chapter 99 of the Harmonized Tariff Scheduled of the United States ("HTSUS").  Proclamation 9693, 83 Fed. Reg. at Annex I.  The President also instructed USTR to publish within thirty days "procedures for requests for exclusion of a particular product" from the safeguard duties in the Federal Register and authorized USTR to make such exclusions after consultation with the Secretaries of Commerce and Energy and publishing a notice in the Federal Register.  Id. at 3,543−44.  The safeguard duties went into effect on February 7, 2018.  Id. at 3,545−49.

USTR then published procedures for exclusion requests in the Federal Register in February 2018.  Exclusion Procedures, 83 Fed. Reg. at 6,670–73.  The notice summarized the scope of the ITC's investigation, the scope of the products covered by Proclamation 9693, and the procedure to request the exclusion of certain solar products.  Id.  USTR invited "interested persons to submit comments identifying a particular product for exclusion from the safeguard measure and providing reasons why the product should be excluded."  Id. at 6,671.  The notice did not provide a method for withdrawal, or otherwise indicate that the exclusions could be withdrawn during the four-year safeguard period.  Id.

Three solar companies, Pine Gate Renewables, Sunpreme, Inc., and SolarWorld Industries GmBH, submitted requests for USTR to exclude the bifacial solar panels at issue here.  Complete Public Administrative Record at 4 (Pine Gate Renewables exclusion request), 48 (SolarWorld exclusion request), 55 (Sunpreme exclusion request) ("Complete P.R."); see also Complete P.R.

418–19 (July 3, 2018 USTR memo identifying the three bifacial panel exclusion requests).  USTR

received forty-eight product exclusion requests and 213 comments responding to these requests.

Exclusion of Particular Products From the Solar Products Safeguard Measure, 84 Fed. Reg. 27,684

(USTR June 13, 2019) ("Exclusion").  After a sixteen-month notice-and-comment process through

which USTR considered requests for exclusions "[b]ased on an evaluation of the factors set out in

the February 14 notice," USTR decided to exclude bifacial solar panels from safeguard duties.  Id.

The Exclusion did not indicate that it would apply temporarily, would require renewal, or could

be withdrawn.  Id.

Shortly after USTR granted the exclusion request for bifacial solar panels, on June 26,

2019, Suniva, First Solar Inc., and Hanwha Q Cells USA, Inc. ("Q Cells") wrote to USTR to ask

it to reconsider its decision, arguing that the Exclusion would, "in a very short period of time,

undermine the relief afforded by the Section 201 tariffs as imposed by the President on January

23, 2018."  Invenergy's Compl. Ex. H, Oct. 21, 2019, ECF No. 13 (Letter from Suniva, First Solar,

and Q Cells to Ambassador Gerrish, Deputy U.S. Trade Representative (June 26, 2019)).  The

letter referenced a meeting between the parties less than a week prior and included eighteen

attachments for USTR's consideration.  Id.  On October 3, 2019, based on alleged rumors that

USTR was considering rescinding the Exclusion, Invenergy's CEO and thirteen other solar

industry executives wrote to USTR expressing their desire to be heard should USTR plan to take

any additional actions regarding the Exclusion.  Invenergy's Mem. In Supp. of Pls.' Mot. for PI at

5–6, Nov. 1, 2019, ECF No. 57; Defs.' Mot. to Dismiss and Resp. to Invenergy's Mot. for PI at 9,

Nov. 8, 2019, ECF No. 112; Invenergy's Compl. Ex. J (Letter to USTR re: Solar Safeguard Bifacial

Module Exclusion).

Thus, only four months after issuing the <u>Exclusion</u>, USTR published the <u>Withdrawal of Bifacial Solar Panels Exclusion to the Solar Products Safeguard Measure</u>, 84 Fed. Reg. 54,244 (USTR Oct. 9, 2019) ("<u>First Withdrawal</u>"), announcing its decision to withdraw the exclusion for bifacial solar panels, effective October 28, 2019.  The <u>First Withdrawal</u> explained that, "[s]ince publication of [the <u>Exclusion</u>] notice, the U.S. Trade Representative has evaluated this exclusion further and, after consultation with the Secretaries of Commerce and Energy, determined it will undermine the objectives of the safeguard measure."  <u>Id.</u>  Absent intervening court action, the <u>First Withdrawal</u> would have reinstituted safeguard duties on certain bifacial solar panels.

### III.    *Litigation History and Subsequent Developments*

#### A.    *<u>First Withdrawal</u>*

Plaintiff Invenergy initiated this case in response to the <u>First Withdrawal</u>.  Summons, Oct. 21, 2019, ECF No. 1; Invenergy's Compl., Oct. 21, 2019, ECF No. 13.[4]  The Government subsequently moved for, and the court allowed, USTR to delay the effective date of the <u>First Withdrawal</u> to November 8, 2019.  Mot. for Leave to Defer Implementation of Withdrawal of Exclusion From Section 201 Duties Until Nov. 8, 2019, Oct. 25, 2019, ECF No. 23; Order, Oct. 25, 2019, ECF No. 29.  The court issued a temporary restraining order, Nov. 7, 2019, ECF No. 68, and later a preliminary injunction ("PI"), to enjoin USTR from reinstituting safeguard duties on certain bifacial solar panels through implementation of the <u>First Withdrawal</u>, <u>Invenergy I</u>, 422 F. Supp. 3d at 1294.  The court in <u>Invenergy I</u> found that USTR made the decision with only nineteen

---

[4] After the initiation of this litigation, several parties moved to intervene as either Plaintiff-Intervenor or Defendant-Intervenor.  The court granted each of these motions, although some were the subject of opposition.  <u>See</u> <u>Invenergy I</u>, 422 F. Supp. 3d at 1271–80, <u>Invenergy III</u>, 450 F. Supp. 3d at 1356–57.  After the court issued its decision in <u>Invenergy V</u>, Defendant-Intervenors Hanwha Q Cells and Auxin Solar were voluntarily dismissed from this action.  Order of Dismissal, Mar. 15, 2021, ECF No. 309.

days' notice to the public, without an opportunity for affected or interested parties to comment, and without reasoned explanation on a developed public record. Id. at 1286–88. The court enjoined USTR from amending the HTSUS to reflect withdrawal of the Exclusion, "until entry of final judgment as to Plaintiffs' claims against Defendants in this case." Id. at 1295. In so ruling, the court held that the First Withdrawal of the Exclusion by the Government likely violated the APA on two grounds: (1) it was a rulemaking without notice and comment, id. at 1286–87; and (2) it was likely an arbitrary and capricious agency decision, id. at 1287–88.

On January 24, 2020, the Government filed a status report notifying the court and the other parties of USTR's publication of "a notice in the Federal Register, requesting interested party comment regarding whether to withdraw the [June 2019 Exclusion] from the safeguard measure pursuant to section 201 of the Trade Act of 1974, 19 U.S.C. § 2251, et seq., for bifacial solar panels contained in [the June 2019 Exclusion]." Defs.' Status Report at 1, ECF No. 131. USTR published the notice in the Federal Register three days later, thereby initiating the comment period. Procedures to Consider Retention or Withdrawal of the Exclusion of Bifacial Solar Panels From the Safeguard Measure on Solar Products, 85 Fed. Reg. 4,756–58 (USTR Jan. 27, 2020) ("January 2020 Notice"). The January 2020 Notice acknowledged the court's PI "enjoining the U.S. Trade Representative from withdrawing the exclusion on bifacial solar panels from the safeguard measure," and noted that "[i]f the U.S. Trade Representative determines after receipt of comments pursuant to this notice that it would be appropriate to withdraw the bifacial exclusion or take some other action with respect to the exclusion, the U.S. Trade Representative will request that the [c]ourt lift the injunction." Id. at 4,756.

In response, Plaintiffs Invenergy, Clearway, and AES DE filed their Motion to Show Cause as to Why the Court Should Not Enforce the Preliminary Injunction, Jan. 30, 2020, ECF No. 132,

alleging that the Government's publication of the January 2020 Notice violated the PI.   The
Government responded with a motion to dismiss and vacate the First Withdrawal as moot.   Defs.'
Resp. to Invenergy's Mot. to Show Cause and Mot. to Vacate Withdrawal and Dismiss Case as
Moot, Jan. 7, 2020, ECF No. 139.   The court ruled exclusively on the Plaintiffs' motion stating,
"the Government's [January 2020 Notice] did not violate the text of [the PI] because the [January
2020 Notice] does not (1) implement the [First Withdrawal]; (2) modify the HTSUS; or (3) enforce
or make effective the [First Withdrawal] or modifications to the HTSUS related to the [First
Withdrawal]."   Invenergy II, 427 F. Supp. 3d at 1407.   The court made clear that "[it] retain[ed]
exclusive jurisdiction over the implementation, enforcement, or modification of the [First
Withdrawal] until such date as a final judgment is entered in this case."   Id.   The court did not rule
on the Government's motion to dismiss at that time because it required further briefing.   Id.

### B.   *Second Withdrawal*

On April 14, 2020, the Government filed another status report to inform the court of the
issuance of USTR's Second Withdrawal.   Defs.' Status Report, ECF No. 155.   The Second
Withdrawal withdraws the Exclusion of bifacial solar panels from safeguard duties -- the same
conclusion as the First Withdrawal.   In that status report, the Government explained that "[i]n
response to the [c]ourt's preliminary conclusion that repealing the withdrawal of the exclusion
'requires rulemaking subject to . . . APA notice and comment,' USTR 'opened a public docket,'
and received 15 comments regarding the bifacial exclusion and 49 subsequent comments
responding to the initial comments."   Id. at 2 (citations omitted).   Further, the Government
explained that USTR "based the [Second Withdrawal] on the comments and evidence received."
Id.   There, USTR published what it characterized as nine findings in support of its decision to
withdraw the Exclusion:

1. Global capacity to produce bifacial solar panels is likely to increase significantly over the next three years.

2. As bifacial solar panel production currently is low in the United States, and the vast majority of bifacial solar panel capacity is foreign, allowing import of bifacial solar panels free of safeguard tariffs disincentivizes U.S. producers from converting existing monofacial production to bifacial production or opening new bifacial production.

3. Imports of bifacial solar panels were rising even before the bifacial exclusion and continued to increase after the exclusion.

4. Demand both globally and domestically for bifacial solar panels is likely to increase significantly for at least the next three years.

5. The cost of producing bifacial solar panels is not more than 10 percent higher than the cost of producing monofacial panels.

6. Bifacial solar panels and monofacial solar panels are substitutes from the perspective of utilities planning solar generating facilities in locations where both are cost competitive with conventional forms of energy.

7. Bifacial solar panels are expected to offer a 5 to 10 percent improvement in energy output over a same-size monofacial panel, and removing the safeguard tariff will enable their sale for prices below those of monofacial panels, which will depress prices for monofacial panels.

8. The proposed TRQ for bifacial solar panels would allow importation of massive quantities of bifacial solar panels and therefore would duplicate the negative effects of the bifacial exclusion.

9. Competition from low-priced imports prevented domestic producers from selling significant quantities of solar panels in the utility segment during the ITC's original investigation period, and low-priced imports of bifacial solar panels due to the exclusion are likely to have a similar effect under current market conditions.

Second Withdrawal, 85 Fed. Reg. at 21,498.

Based on this new decision by USTR, the Government filed its first motion to dissolve the PI. Defs.' Mot. to Dissolve PI, Apr. 16, 2020, ECF No. 156. The Government argued that the Second Withdrawal "cured the sole reason for which the injunctive relief was granted." Id. at 1. Plaintiffs argued that the Second Withdrawal was an arbitrary and capricious decision and thus did

not cure the second likely APA violation previously identified by the court.  See, e.g., Invenergy,

Clearway, and AES DE's Resp. in Opp'n to Defs.' Mot. to Dissolve Prelim. Inj., May 7, 2020,

ECF No. 163.  Shortly thereafter, Plaintiffs filed motions to supplement their complaints to include

the Second Withdrawal.  Pls.' Mot. for Leave to File Suppl. Compls., May 8, 2020, ECF No. 170.

Prior to holding oral argument on those motions, the court issued questions to the parties

for written answers.  Ct.'s Letter re: Questions for Oral Arg., May 8, 2020, ECF No. 169.  In

responding to these questions, the Government attached two memoranda to its responses to the

court's questions.  Mem. from then-DUSTR Jeffrey D. Gerrish and then-General Counsel Joseph

Barloon to then-USTR Robert Lighthizer, Apr. 13, 2020, Attach. 1 to Defs.' Resp. to Ct.'s

Questions, ECF No. 172-1 ("Lighthizer Decision Memorandum"); Mem. from then-DUSTR

Jeffrey D. Gerrish and then-General Counsel Joseph Barloon to then-USTR Robert Lighthizer,

Apr. 10, 2020, Attach. 2 to Defs.' Resp. to Ct.'s Questions, ECF No. 172-2 ("Gerrish

Memorandum"), (collectively, "USTR Memoranda").  The USTR Memoranda consist of then-

Deputy U.S. Trade Representative Jeffrey D. Gerrish's and U.S. Trade Representative then-

General Counsel Joseph Barloon's analysis of USTR's authority to withdraw an exclusion, their

analysis of comments received pursuant to the January 2020 Notice, and a recommended decision,

initialed by then-U.S. Trade Representative Robert Lighthizer.  Id.  Neither memo was ever

published in the Federal Register or otherwise made available to the interested public.

Furthermore, the Second Withdrawal made no mention or reference to any other decision

documents that would alert the public to the existence of or relevance of the Gerrish Memo to

USTR's final decision in the Second Withdrawal.  The court subsequently issued its decision in

Invenergy III, in which it decided multiple outstanding motions.  450 F. Supp. 3d 1347.  First, the

court denied the Government's motion to dismiss for failure to join an indispensable party.  Id. at

1356–57.  Second, the court granted Plaintiffs' motion to supplement their complaints to include the Second Withdrawal.  Id. at 1357–58.  Third, the court denied the Government's motion to vacate the First Withdrawal and dismiss the case as moot because the Government had not shown that the First Withdrawal was moot nor did the court have the authority to vacate the First Withdrawal without a decision on the merits.  Id. at 1358–60.  Finally, the court denied the Government's first motion to dissolve the PI because the Government had not proved sufficiently changed circumstances.  Id. at 1360–64.  Thus, the litigation continued on the basis of USTR's decisions to withdraw the Exclusion through the First Withdrawal and Second Withdrawal.  The Government appealed the denial of its first motion to dissolve the PI on August 5, 2020.  Invenergy III, appeal docketed No. 2020-2130 (Fed. Cir. Aug. 5, 2020), ECF No. 240.

As the litigation proceeded, on June 5, 2020, the Government filed the administrative record.  Public Administrative Record, ECF No. 196 ("P.R.").  Plaintiffs subsequently moved to complete the agency record.  Pls.' Mot. to Complete A.R., June 19, 2020, ECF No. 201.  Further, in response to Invenergy III, on June 12, 2020, USTR published the Rescission of the First Withdrawal of the Bifacial Solar Panels Exclusion From the Safeguard Measure on Solar Products, in which it "expressly rescind[ed] the [First Withdrawal]." 85 Fed. Reg. 35,975 (USTR June 12, 2020) ("June 2020 Rescission").  That same day, the Government made its second motion to dissolve the PI.  Defs.' Mot. to Dissolve PI, June 12, 2020, ECF No. 198.  Plaintiffs responded and made a cross-motion to modify the PI.  Pls.' Resp. to Defs.' Mot. to Dissolve PI and Cross-Mot. to Modify PI, June 29, 2020, ECF No. 206.  After the court set a date for oral argument on those motions, the Government filed its above-mentioned appeal.

The court decided Invenergy IV on October 15, 2020.  476 F. Supp. 3d 1323.  Noting the Government's June 2020 Rescission and subsequent abandonment of its defense of the First

Withdrawal, the court held that the First Withdrawal was unlawful on the merits and vacated the agency decision accordingly. Id. at 1340. There, the court incorporated its analysis in Invenergy I, decided that each of its preliminary conclusions apply to the merits of the First Withdrawal, and vacated the First Withdrawal pursuant to 5 U.S.C. § 706(2) of the APA as an agency action that is not in accordance with the law. Id. Furthermore, the court modified the PI to incorporate the Second Withdrawal in order to avoid the "very inequity to the Plaintiffs the PI sought to prevent" and to "to give effect to its purpose -- to shield Plaintiffs from the effects of an agency decision that was undertaken in violation of the APA." Id. at 1342. However, the court noted that its conclusion was preliminary, based on a limited record, and reserved judgment of the merits until properly presented to the court. Id. at 1357.

Concurrent to the court's decision in Invenergy IV, President Trump announced his decision to withdraw by proclamation the Exclusion and his decision to increase duties on certain CSPV cells in year four of the safeguard measure from those duties previously announced. Proclamation 10101. In response, Plaintiffs filed motions to again supplement their complaints to include Proclamation 10101 and further filed motions to enjoin its enforcement. Pls.' Mot. for Leave to File Second Suppl. Compls., Oct. 17, 2020, ECF No. 257; Pls.' Emergency Appl./Mot. for Prelim. Inj. Modification or in the Alternative TRO, Oct. 20, 2020, ECF No. 263. The court temporarily restrained Proclamation 10101 from entering into force so that it could decide Plaintiffs' motions. Order Granting Mot. for TRO, Oct. 24, 2020, ECF No. 270; Order Extending TRO, Nov. 6, 2020, ECF No. 283. On November 19, 2020, the court decided Invenergy V, in which it denied both of Plaintiffs' motions. 482 F. Supp. 3d 1344. Rather, the court concluded that Plaintiffs' challenges to Proclamation 10101 did not demonstrate sufficient changed

circumstances to warrant modification of the PI and that Proclamation 10101 was sufficiently distinct so as not to require supplementation of Plaintiffs' complaints. Id. at 1354.[5]

On December 3, 2020, the Government filed the completed administrative record. Complete P.R. Plaintiffs then filed their motion for judgment on the agency record challenging the Second Withdrawal. Pls.' Br. The Government filed its response on March 12, 2021. Defs.' Br. [6] Plaintiffs then replied in support of their motion. Pls.' Reply in Supp. of Mot. for J. on the Administrative R., Apr. 9, 2021, ECF No. 312; see also Pls.' Suppl. Reply in Supp. of Mot. for J. on the Administrative R., June 22, 2021, ECF No. 323. Oral argument on Plaintiffs' motion was held on July 13, 2021. Oral Arg., ECF No. 326. Prior to oral argument, the court issued and the parties responded to questions regarding the case. Ct.'s Letter re: Questions for Oral Arg., June 2, 2021, ECF No. 314; Pls.' Resps. To Ct.'s Questions Regarding Mot. For J. on the Administrative Record, June 11, 2021, ECF No. 319 ("Pls.' OAQ Resps."); Defs.' Resp. to Ct.'s Questions of June 2, 2021, June 11, 2021, ECF No. 318 ("Defs.' OAQ Resps."). As directed by the court, the parties also filed briefs following oral argument. Pls.' Post-Arg. Br. In Supp. of Mot. For J. on the Administrative R., July 20, 2021, ECF No. 330; Defs.' Suppl. Br., July 20, 2021, ECF No. 327.

---

[5] On December 29, 2020, Plaintiffs filed a separate challenge to Proclamation 10101. Compl., SEIA v. United States, No. 20-3941, (CIT Dec. 29, 2020), ECF No. 2. That case was subsequently assigned to this court and is currently under advisement. Order of Assignment, SEIA, No. 20-3941, (CIT Feb. 10, 2021), ECF No. 15.

[6] The Government's response submitted on March 12, 2021 omitted certain portions of that brief. See Defs.' Resp. to Pls.' Mot. for J. on the Administrative R., Mar. 12, 2021, ECF No. 307. On June 9, 2021, the Government moved to file a corrected response brief that included the omitted portions. Mot. for Errata to Corr. Resp. Br., June 9, 2021, ECF No. 316. The court granted that motion and also ordered that Plaintiffs could file a supplemental reply to the corrected brief. Order, June 10, 2021, ECF No. 317. Plaintiffs filed a joint supplemental reply brief on June 22, 2021. Pls.' Suppl. Reply in Supp. of Mot. for J. on the Administrative R., ECF No. 323.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction over this case pursuant to 28 U.S.C. § 1581(i), which provides that the court "shall have exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for . . . tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue" of tariffs and duties.

The APA requires the courts "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  To survive review under the arbitrary and capricious standard, the agency must have "examined 'the relevant data' and articulated 'a satisfactory explanation' for [its] decision, 'including a rational connection between the facts found and the choice made.'" Dep't of Com. v. New York, 139 S. Ct. 2551, 2569 (2019) (quoting Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) ("State Farm")); see also Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402 (1971) (noting that agencies must provide adequate reasons for their decisions).  Because this case involves a delegation of Presidential statutory authority to an agency, the court also considers the President's delegation of authority for a "clear misconstruction of the governing statute, a significant procedural violation, or action outside [statutorily] delegated authority." Maple Leaf Fish Co. v. United States, 762 F.2d 86, 89 (Fed. Cir. 1985).

## DISCUSSION

After five preliminary opinions on Plaintiffs' challenges to withdrawals of the exclusion for imports of bifacial solar cells from the imposition of safeguard duties, the court at last addresses and enters judgment on Plaintiffs' challenges.  The court concludes that (1) USTR has no statutory

authority to withdraw the Exclusion; and (2) that, in any event, the Second Withdrawal was an arbitrary and capricious agency decision.  The court accordingly grants Plaintiffs' motion and vacates the Second Withdrawal.

### I.      USTR Had No Statutory Authority to Withdraw an Exclusion Once Granted.

A threshold requirement to any agency action is statutory or other authority to act. Accordingly, Plaintiffs challenge the Second Withdrawal as outside of USTR's authority. Plaintiffs contend that USTR lack authority to withdraw an exclusion because (1) the statute does not allow exclusions to be withdrawn, Pls.' Br. at 61–64; 72; (2) the President through Proclamation 9693 did not delegate USTR the authority to withdraw exclusions, Pls.' Br. at 69–73; and (3) USTR had no inherent authority to reconsider its decision to grant an exclusion, Pls.' Br. at 73–75.  First, Plaintiffs argue that either USTR's Second Withdrawal was not authorized under Sections 201 and 203 because it exceeded the procedural and substantive limitations on Presidential action under those sections, Pls.' Br. at 62–64, 67–69; or the Second Withdrawal was an unlawful modification of the safeguard measure not in accordance with Section 204, Pls.' Br. at 65–67.  Furthermore, Plaintiffs contend that the President's delegation of authority to USTR in Proclamation 9693 did not include authority to withdraw exclusions, rather the delegation was limited to granting exclusions according to USTR's Exclusion Procedures issued in accordance with the President's directive.  Pls.' Br. at 69–73.  Finally, Plaintiffs argue that USTR had no inherent authority to reconsider its exclusion decisions because the statute does not permit re-imposition of duties or modifications to the safeguard measure outside its modification procedures. Pls.' Br. at 74–75.

The Government contests each of these points and argues that USTR acted within its delegated authority and in accordance with the statute in issuing the Second Withdrawal.  Defs.'

Br. at 53–56.  The Government contends that USTR was not required to comply with the same requirements as the President in acting to withdraw an exclusion.  Defs.' Br. at 54–55.  Further, the Government argues that the <u>Second Withdrawal</u> did not constitute a modification of the safeguard action for purposes of Section 204, but that USTR may nevertheless modify a safeguard action through discrete exclusions and withdrawals of those exclusions.  Defs.' Br. at 54.  The Government also claims that the President granted USTR the authority to modify exclusion decisions and the President's directive to issue the <u>Exclusion Procedures</u> did not reach to modifications of exclusions.[7]  Defs.' Br. at 54, 56.  Finally, the Government relies on the inherent authority of agencies to reconsider their decisions as a basis of authority for the <u>Second Withdrawal</u>.  Defs.' Br. at 55.

In determining the scope of USTR's authority regarding safeguard exclusions, the court first looks to the safeguard statute.  <u>See</u> <u>Merck Sharp & Dohme Corp. v. Albrecht</u>, 139 S. Ct. 1668, 1679 (2019) (observing that an agency only has the authority that has been delegated to it).  The court notes that the trade power is constitutionally lodged with Congress exclusively, and that Congress can delegate that authority, cabined by "intelligible principles" to the President.  <u>See generally</u> <u>Universal Steel Prods. Inc. v. United States,</u> 44 CIT __, __, 495 F. Supp. 3d 1336, 1359 (2021) (Katzmann, J., concurrence) ("If nothing else, precedent affirms that in enacting such statutes, Congress can restrict the actions of the President in the delegation of its power of trade to the Executive; indeed, the constitutionality of that legislation is informed by restraints on that power."); <u>Am. Inst. for Int'l Steel, Inc. v. United States</u>, 43 CIT __, __, 376 F. Supp. 3d 1335,

---

[7] The court notes the Government's claim that "USTR was not obligated to follow the same procedures in issuing the [<u>Second Withdrawal</u>] that it followed in its February 2018 exclusion procedures."  Defs.' Br. at 56.  Because the court previously and conclusively rejected a similar argument in <u>Invenergy I</u>, 422 F. Supp. 3d at 1283–86, it need not revisit this issue here.

1346–53 (2019) (Katzmann, J., dubitante) (reviewing cases involving challenges to trade legislation raising the question of unconstitutional delegation of legislative power).  Thus, the President's own authority to act, and any subsequent delegation of his authority to USTR, is constrained by Congress's directives on the initiation and implementation of safeguard measures. As a whole, these measures are intended to "facilitate efforts by the domestic industry to make a positive adjustment to import competition" while providing "greater economic and social benefits than costs."  19 U.S.C. § 2251(a).

The President issued Proclamation 9693 pursuant to Section 203.  As noted, Section 203 authorizes the President to take safeguard measures when certain prerequisites are met and further prescribes limitations on those safeguard measures.  19 U.S.C. § 2253.  Specifically, Section 203 limits the duration, nature, and extent of the safeguard measure.  19 U.S.C. § 2253(e).  Relevant here, Section 203 requires that, where the safeguard measure taken is to impose or increase duties on an article that "has an effective period of more than 1 year[, the duties] shall be phased down at regular intervals during the period in which the action is in effect."  Id. § 2253(e)(5). Furthermore, Section 203 states that the President may implement regulations to "provide for the efficient and fair administration of all actions taken for the purpose of providing import relief under this part."  Id. § 2253(g)(1); see also id. § 2253(g)(3) ("Regulations prescribed under this subsection shall, to the extent practicable and consistent with efficient and fair administration, insure against inequitable sharing of imports by a relatively small number of larger importers." (emphasis added)).

Importantly, Section 203 requires that the President, in implementing a safeguard measure, must set a bar for duties imposed, gradually phase down those duties from their initial peak, and,

in accordance with those principles, efficiently and fairly implement the safeguard measure.[8]  This

is the relevant authority given to the President by Congress and as such it confines the scope of the

authority that the President could have delegated to USTR in <u>Proclamation 9693</u> issued pursuant

to Section 203.  The court notes that <u>Proclamation 9693</u> is not challenged here or by any other

party to date.  Thus, to the extent that the court examines the President's interpretation of Section

203 as expressed in <u>Proclamation 9693</u>, it is only to discern the scope of the authority delegated to

USTR, as the President can only delegate authority that he already possessed under the safeguard

statute.  For the reasons outlined below, the court concludes that USTR exceeded this statutory

authority in withdrawing the <u>Exclusion</u>.

The Government contends that agencies have inherent authority to reconsider their

decisions, and therefore USTR had inherent authority to withdraw its decision to exclude bifacial

solar panels from the safeguard measure.  Defs.' Br. at 55–56.  The court agrees with the

Government's contention that caselaw supports an agency's inherent authority to reconsider its

decisions.  <u>See, e.g.</u>, <u>Tokyo Kikai Seisakusho, Ltd. v. United States</u>, 529 F.3d 1352, 1361–62 &

n.7 (Fed. Cir. 2008) ("<u>TKS</u>").  However, as the Federal Circuit in the TKS decision explained:

> The power to reconsider is inherent in the power to decide.  For this reason, the
> courts have uniformly concluded that administrative agencies possess inherent
> authority to reconsider their decisions, subject to certain limitations, regardless of
> whether they possess explicit statutory authority to do so. . . .  An agency's inherent
> authority to reconsider its decisions is not without limitation, however.  An agency
> cannot, for example, exercise its inherent authority in a manner that is contrary to
> a statute.  Thus, an agency obviously lacks power to reconsider where a statute
> forbids the exercise of such power.  Similarly, in situations where a statute does

---

[8] Although not essential to the court's analysis where, as here, the text itself is clear, the legislative history further reflects Congress's intent to provide for the gradual reduction of tariffs.  Congress has acknowledged that the safeguard statute contains "criteria regarding . . . degressivity (progressive liberalization of safeguard restrictions)," and has explicitly incorporated the statute's focus on degressivity into international agreements on safeguard measures.  <u>See</u> H.R. Rep. No. 103-316, 286, <u>as reprinted in</u> 1994 U.S.C.C.A.N. 4040, 4262.  The statute's goal of gradually reducing safeguards is thus well-established.

> expressly provide for reconsideration of decisions, the agency is obligated to follow
> the procedures for reconsideration set forth in the statute.  The agency must also
> give notice to the parties of its intent to reconsider, and such reconsideration must
> occur within a reasonable time.  Finally, an agency may not reconsider in a manner
> that would be arbitrary, capricious, or an abuse of discretion.  These limitations on
> the exercise of inherent power are uncontroversial . . . .

Id. at 1360–61 (first citing Trujillo v. Gen. Elec. Co., 621 F.2d 1084, 1086 (10th Cir. 1980); then

citing Macktal v. Chao, 286 F.3d 822, 825 (5th Cir. 2002); then citing Bookman v. United States,

453 F.2d 1263, 1265 (Ct. Cl. 1972); then citing Civil Aeronautics Bd. v. Delta Air Lines, Inc., 367

U.S. 316, 329 (1961); and then citing 5 U.S.C. § 706(2)(a)).

Because the court concludes that Section 203 only allows the President to set safeguard

duties at a high mark that then phases down, the court also concludes that the statute does not

permit USTR to withdraw the grant of an exclusion where that withdrawal would result in the

imposition of higher duties on the affected goods.  A withdrawal of an exclusion is not a phasing

down of the imposition of duties as the statute directs.  19 U.S.C. § 2253(e)(5).  The Government,

by contrast, claims that "[w]ithdrawal of an exclusion is not an increase in the rate of duty for

products subject to the safeguard measure," but rather is "merely a reversion to the rate of duty

mandated by the President in Proclamation 9693."  Defs.' Br. at 54.  However, a reversion to a

higher rate of duty is still an increase in the rate of duty for the sub-set of bifacial products covered

by the Exclusion even if it does not increase duties for the entire range of products covered by the

safeguard measure.  In direct opposition to the mandate of the statute that duties be phased down,

a reversion to a higher duty undoes the drastic phasing down of safeguard duties (to zero)

accomplished by granting the exclusion.  19 U.S.C. § 2253(e)(5).  Thus, the statute does not allow

such yo-yoing of duties within a scheme that is tightly limited by Congress in terms of the

substance and duration of safeguard actions that can be taken by the President.

Furthermore, Section 203 requires that regulations that implement safeguard measures, such as the Exclusion Procedures and resulting Exclusion, be "efficient[ly] and fair[ly] administ[ered]".  19 U.S.C. § 2253(g)(1).  Against the backdrop of a statute that as a whole contemplates a phasing down of safeguard relief and only lasts four year (eight years if extended), importers had no notice that an exclusion once granted would -- or even could -- be subject to being withdrawn.  Pls.' Br. at 71–72.  Plaintiffs note that this absence of notice stands in direct contrast to other exclusions granted by USTR from duties imposed pursuant to Section 301 that were subject to renewal, 19 U.S.C. §§ 2411–2420, for unreasonable or discriminatory trade practices, and temporary exclusions granted by the Department of Commerce from national security duties imposed pursuant to Section 232, 19 U.S.C. § 1862.  Id.; Pls.' Suppl. Reply at 4.  Notice is a fundamental fairness requirement.  Furthermore, notice is a limit identified by the Federal Circuit on an agency's ability to reconsider its decision.  TKS, 529 F.3d at 1361.  Therefore, the Second Withdrawal runs afoul of the fair implementation requirement of the statute and inherent to an agency's ability to reconsider any decision.[9]

In short, the court concludes that in deciding to withdraw the Exclusion for bifacial solar panels, USTR exceeded both the authority granted to the President in Section 203 and the authority delegated by the President to USTR in Proclamation 9693.  Thus, the Second Withdrawal does not comply with the safeguard statute and must be vacated.[10]  Whether Section 203 should be revised is a matter for the Congress and not for the court.

---

[9] The parties spend a considerable part of their briefing arguing whether, in Proclamation 9693, the President intended to delegate to USTR the authority to modify exclusion decisions.  The court need not reach those arguments as it concludes the statute does not provide the President the authority to withdraw exclusions from safeguard measures.

[10] The court has considered and does not find persuasive Plaintiffs' other statutory arguments regarding USTR's authority.  See Pls.' Br. at 65–69.

## II.    The <u>Second Withdrawal</u> was Arbitrary and Capricious in Violation of APA Requirements.

Without regard to the court's determination in Section I, above, there exists a second, independent basis for vacating the <u>Second Withdrawal</u> -- USTR's failure to comply with the requirements set forth in the APA.  In modifying the PI to enjoin the <u>Second Withdrawal</u> in <u>Invenergy IV</u>, the court preliminary concluded that Plaintiffs had "show[n] that the <u>Second Withdrawal</u> was likely arbitrary and capricious."  <u>Invenergy IV</u>, 476 F. Supp. 3d at 1343.  In moving for judgment on the agency record, Plaintiffs similarly challenge the <u>Second Withdrawal</u>'s compliance with several APA requirements.  The court now addresses the merits of these claims after, on multiple occasions, addressing certain of these claims preliminarily.  At the start, the court adopts its previous conclusion that its review of the agency's decision for compliance with the substantive requirements of the APA is limited to the <u>Second Withdrawal</u> as published in the Federal Register, which included no reference to the analysis provided in USTR's internal memoranda.  <u>Id.</u> at 1343–48.[11]  The court adopts and expands (1) its preliminary conclusion that USTR's decision inadequately responded to comments by interested parties; and (2) its

---

[11] As detailed above, <u>supra</u>, and addressed in <u>Invenergy IV</u>, two internal memoranda came to light in the course of this litigation, specifically in response to written questions issued to all parties by the court.  USTR Memoranda.  While the Government has consistently relied upon the USTR Memoranda as USTR's explanation of its decision, <u>see, e.g.</u>, Defs.' Br., the court previously held that, because neither memorandum was published, those documents could not be considered part of USTR's final rulemaking decision.  The court's conclusion rested, in part, upon the Supreme Court's decision in <u>Dep't of Homeland Sec'y v. Regents of the Univ. of Cal.</u>, in which the Court reiterated the APA's requirements that "[a]n agency must defend its actions based on the reasons it gave when it acted," including a contemporaneous and public reasoned explanation.  140 S. Ct. 1891, 1909 (2020) ("<u>Regents</u>"); <u>see also</u> <u>Dep't of Commerce v. New York</u>, 139 S. Ct. 2551, 2575 (2019).  The court also rejected the Government's argument that the error was not prejudicial to interested parties.  <u>Invenergy IV</u>, 476 F. Supp. 3d at 1346–47.  Because nothing has changed with respect to the publication of the USTR Memoranda since the court made this preliminary conclusion and because the Government makes no new arguments that would change the court's opinion, it now adopts that conclusion as part of its analysis of Plaintiffs' dispositive motion.

preliminary conclusion that USTR's decision inadequately explained its policy change.  See Invenergy IV, 476 F. Supp. 3d at 1349–52.

> ### A.      USTR's Statement of Basis and Purpose, Including Response to Significant Comments

As part of its hard look review of agency action under the APA, the court must determine whether an agency adequately "incorporate[d] in the rules adopted a concise general statement of their basis and purpose," 5 U.S.C. § 553(c).  See Invenergy I, 422 F. Supp. 3d  at 1286 ("Because the Exclusion process constituted rulemaking, so too must the Withdrawal"); Invenergy IV, 476 F. Supp. 3d at 1344 & n.5 (citing Catherine Sharkey, Federalism Accountability: "Agency-Forcing" Measures, 58 Duke L.J. 2125, 2181 (2009)).  This statement allows a reviewing court "to see what major issues of policy were ventilated by the informal proceedings and why the agency reacted to them the way it did."  State of S.C. ex rel Tindal v. Block, 717 F.2d 874, 886 (4th Cir. 1983) (quoting Gen. Tel. Co. v. United States, 449 F.3d 846, 862 (5th Cir. 1971)).  Further, "[t]he purpose of requiring a statement of the basis and purpose is to enable courts, which have the duty to exercise review, to be aware of the legal and factual framework underlying the agency's actions."  Am. Standard, Inc. v. United States, 602 F.2d 256, 269 (Ct. Cl. 1979) (citing Sec. Exch. Comm'n v. Chenery Corp., 318 U.S. 80, 94 (1943) ("Chenery"); Nat'l Welfare Rights Org. v. Mathews, supra, 533 F.2d 637, 649 (1976)).  "Inextricably intertwined with the basis and purpose requirement of 5 U.S.C. § 553(c) is the agency's need to respond, in a reasoned manner, to any comments received by the agency that raise significant issues with respect to a proposed rule" Disabled Am. Veterans v. Gober, 234 F.3d 682, 692 (Fed. Cir. 2000) (overruled on other grounds by Nat'l Org. of Veterans Advocs., Inc. v. Sec'y of Veterans Affs., 981 F.3d 1360 (2020)) (citation omitted).  However, "the agency need not respond to each comment, and the detail of the agency's response depends upon the subject matter of the regulation and the comments received."  Id.

"Significant comments are those 'which, if true, raise points relevant to the agency's decision and which, if adopted, would require a change in an agency's proposed rule.'" City of Portland v. E.P.A. 507 F.3d 706, 715 (D.C. Cir 2017) (quoting Home Box Office, Inc. v. F.C.C., 567 F.2d 9, 35 n.58 (1977)).

Plaintiffs identify two problems with the Second Withdrawal in connection with this requirement: first, that USTR provided no basis for its conclusions, Pls.' Br. at 19–23; and second, that USTR did not respond to significant comments from interested parties, Pls.' Br. at 33–46. The Government responds that USTR adequately explained its decision to withdraw the Exclusion, Defs.' Br. at 24–8, 29–30; and that, while USTR did not need to address every comment received, it addressed significant comments raised in both the Second Withdrawal and in the USTR Memoranda, Defs.' Br. at 28–50.

First, the court adopts its previous conclusion that USTR provided no more than conclusory statements in the Second Withdrawal that did not meet the basis and purpose requirement of the APA. Invenergy IV, 476 F. Supp. 3d at 1350. As the court earlier explained, the facts relied upon by USTR in reaching the conclusions of the Second Withdrawal are indiscernible in light of record evidence that appears to contradict those conclusions with respect to the substitutability of bifacial and monofacial solar panels. Id.; see also Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n, 988 F.2d 146, 150 (D.C. Cir. 1993) (rejecting an explanation of an agency decision that lacked an explanation of data relied upon). Furthermore, the court notes that Plaintiffs' repeatedly expressed concerns about USTR's statutory authority to withdraw an exclusion both in this litigation and before USTR. See, e.g., SEIA's Compl.; Invenergy's Mot. for PI; Pls.' Resp. to Mot. to Show Cause. Nevertheless, USTR's perceived statutory basis for the Second Withdrawal is not apparent to the court. Invenergy IV, 476 F. Supp. 3d at 1350. While USTR did cite its authority under

Proclamation 9693, USTR did not explain how it concluded that Proclamation 9693 -- which, as

discussed above, only plainly indicates an authority to grant exclusions -- also allowed USTR to

withdraw exclusions once granted.  See 85 Fed. Reg. at 21,498.[12]  Therefore, the court concludes

that USTR's conclusory statements did not constitute an adequate statement of basis and purpose

so as to allow the court to review the "the legal and factual framework underlying the agency's

action[]," Am. Standard, 602 F.2d at 269; see also In re Sang Su Lee, 277 F.3d 1338, 1344 (Fed.

Cir. 2002) ("Conclusory statements such as those here provided do not fulfill the agency's

obligation" to reach reasoned decisions).

Similarly, the court agrees with Plaintiffs that USTR did not address significant comments

as required by the APA's basis and purpose requirement.[13]  Previously, the court noted that the

Second Withdrawal did not include USTR's response to Plaintiffs' comments on significant issues

or to detracting evidence on the following: (1) USTR's authority to withdraw a previously granted

exclusion; and (2) the substitutability of bifacial solar panels and monofacial solar panels.

Invenergy IV, 476 F. Supp. 3d at 1350–52.  The court incorporates those conclusions here.

Furthermore, Plaintiffs contend that USTR erred by not addressing significant comments

on the economic and other costs of withdrawing the Exclusion, Pls.' Br. at 40.  Plaintiffs cite

several comments submitted to USTR on the issue of costs associated with withdrawing the

---

[12] Plaintiffs also claim that USTR failed to include the required "reference to the legal authority" for its rulemaking pursuant to 5 U.S.C. § 553(b)(2).  However, the APA imposes that requirement in connection with the adequacy of the notice of a proposed rulemaking.  As Plaintiffs concede, their harm stems from the Second Withdrawal and not from any deficiency with the January 2020 Notice.  Pls.' OAQ Resps. at 8–10.  Because the court addresses this issue in the context of USTR's compliance with other APA requirements and in the context of the legal question of USTR's authority, it declines to further address this challenge.

[13] The court addresses only those comments raised by Plaintiffs before USTR and not those comments raised by individuals and entities not before the court in this litigation.  See Pls.' Br. at 40–46; see, e.g., Kowalski v. Tesmer, 543 U.S. 125, 129 (2004).

Exclusion, for example comments concerning job losses, P.R. 67, 1632, 715–16, planned solar projects and the communities where those projects are located, P.R. 64–65, and overall solar industry impacts, P.R. 715–16.  Plaintiffs also contend that USTR "failed to respond to comments regarding the lack of domestic production of bifacial solar modules, which commenters explained necessitates continued access to reasonably-priced bifacial panels manufactured abroad."  Pls.' Br. at 46–47.  Plaintiffs explain that their comments showed in detail the domestic industry's lack of production of or plan to produce utility grade bifacial solar panels.  Pls.' Br. at 47 (citing P.R. 54–56, 696, 703–08, 1611–15, 1918–24, 2477–79).  Thus, they contend that, contrary to USTR's conclusions, there would be no harm to the domestic industry in allowing the continued exclusion of utility grade bifacial solar panels from safeguard tariffs.  See Pls.' Br at 47–48.

In the Second Withdrawal, USTR stated that "[a]s bifacial solar panel production currently is low in the United States, and the vast majority of bifacial solar panel capacity is foreign, allowing import of bifacial solar panels free of safeguard tariffs disincentivizes U.S. producers" from increasing bifacial production. 85 Fed. Reg. at 21,498.  However, USTR did not address the impact that withdrawing the Exclusion would have on the solar energy industry given low domestic production and the resulting need for bifacial solar imports.  Nor did USTR address the economic and social impacts that the added tariff burden would have.  This issue was plainly significant in that the statute itself identifies it as a central consideration to the imposition of safeguard measures. See 19 U.S.C. § 2253 ("the President shall take into account . . . the short- and long-term economic and social costs . . . relative to their short- and long-term economic and social benefits and other considerations relative to the position of the domestic industry in the United States economy"); Catholic Legal Immigr. Network, Inc. v. Exec. Office for Immigr. Rev., 513 F. Supp. 3d 154, 173 (holding an agency decision to be arbitrary and capricious where the agency did not address the

decision's impact on legal service providers of services relevant to the applicable statute). USTR itself recognized the significance of this issue by requesting comment on that issue in its <u>January 2020 Notice</u>. 85 Fed. Reg. at 4,756. Thus, it is clear that USTR failed to respond to comments on this significant issue.

In short, USTR did not provide a reasoned explanation or basis and purpose for its <u>Second Withdrawal</u> so that the court could review its conclusions. It also failed to address significant comments raised by Plaintiffs that if adopted may have changed USTR's decision to withdraw the <u>Exclusion</u>.

### B.   *USTR's Consideration and Explanation of Its Policy Change*

Separate from the court's conclusion that USTR did not adequately respond to significant comments, the second part of the court's hard-look review is the APA's prohibition on "agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706. The court previously preliminarily found fault with USTR's lack of an adequate explanation of "its change in position as set forth in long-established caselaw on what is required of an agency when it changes its position." <u>Invenergy IV</u>, 476 F. Supp. 3d at 1351 (citing <u>F.C.C. v. Fox Television Stations, Inc.</u>, 556 U.S. 502, 517 (2009)). The court noted that "USTR fail[ed] to explain what information it received or what facts changed since the issuance of the <u>June 2019 Exclusion</u> that led it to believe that withdrawal was the more appropriate action, thus its decision was not adequately reasoned in this respect." <u>Id.</u> (citing <u>Encino Motorcars, LLC v. Navarro</u>, 136 S. Ct. 2117, 2125–26 (2016)).

As Plaintiffs summarize, the <u>Second Withdrawal</u> provided no justification for deviation from the facts underlying the <u>Exclusion</u>: "1) that the economic and social benefits outweigh its costs . . . ; 2) that bifacial panels are physically distinct, differentiated and functionally different,

with a higher energy yield that enables special use cases for project feasibility; and 3) that the domestic industry does not have the capacity to supply U.S. demand for bifacial panels, and is not likely to any time in the future."  Pls.' Reply at 13 (citations, alterations, and quotations omitted). Further, the court notes Plaintiffs' contentions that USTR granted the Exclusion based on a record that showed the Department of Energy recommended a bifacial exclusion because of the limited availability of domestically produced bifacial panels that would have a "medium competitive impact."  Pls.' Br. at 30 (quoting Complete P.R. 541–43).  This argument, made based on Plaintiffs' access to the full administrative record, see Invenergy IV, 476 F. Supp. 3d at 1354–56, further supports the conclusion that USTR did not adequately explain its complete about-face on the propriety of the exclusion of bifacial solar panels.  Thus, the court determines that USTR erred by not explaining the basis for its policy change based on its preliminary findings and Plaintiffs' additional contentions.

Plaintiffs also argue that the Second Withdrawal arbitrarily and capriciously omitted USTR's consideration of alternatives to its policy reversal.  Pls.' Br. at 48–49.  Plaintiffs explain that, in their comments in response to USTR's January 2020 Notice, they suggested that USTR could narrow the Exclusion to utility grade bifacial modules, P.R. 52, 694, 1609; impose a requirement in line with international standards for verifying that imports under the Exclusion were truly bifacial modules, P.R. 697, 1609; or impose a tariff rate quota ("TRQ") on imports of bifacial panels imported under the Exclusion, P.R. 698.  Pls.' Br. at 50.  Plaintiffs contend that USTR "failed to even mention [the first two] proposed alternatives, let alone consider them."  Pls.' Br. at 51.  As to the TRQ, Plaintiffs contend that USTR's lone reference to this proposal was conclusory and illogical.  Pls.' Br. at 52.  Finally, Plaintiffs argue that USTR also neglected to consider reliance interests engendered by the issuance of the Exclusion.  Pls.' Br. at 16.

The Government acknowledges that "agencies should consider alternatives raised by commenters pursuant to notice and comment procedures." Defs.' OAQ Resps. at 7. However, the Government notes that the Second Withdrawal addressed the TRQ proposed by Plaintiffs and rejected it. Id.; Defs.' Br. at 42–43. The Government does not address Plaintiffs' reliance argument.

The court concludes that USTR did not adequately address important and "conspicuous issues" to its decision, specifically alternatives "within the ambit of the existing policy" and reliance on the previous policy. Regents, 140 S. Ct. at 1913, 1916 (citations omitted). USTR's failure to even mention two of the proposed alternatives dictates the conclusion that the Second Withdrawal was arbitrary and capricious. Id. ("The rescission memorandum contains no discussion of forbearance or the option of retaining forbearance without benefits . . . That omission alone renders Acting Secretary Duke's decision arbitrary and capricious."). This failure is particularly marked where USTR itself requested comment on several alternatives to a complete withdrawal of the Exclusion, including narrowing the definition of bifacial solar panels excluded or otherwise altering the Exclusion. January 2020 Notice, 85 Fed. Reg. at 4,756. Thus, the Second Withdrawal was an arbitrary and capricious agency decision.[14]

---

[14] The USTR Memoranda did not address significant evidence submitted by Plaintiffs regarding the need for at least a utility grade bifacial panel exclusion, Plaintiffs' proposed alternatives to outright rescission of the Exclusion, and USTR's authority in light of statutory limitations on safeguard actions: all significant issues upon which USTR specifically sought comment. See USTR Memoranda; Pls.' Br. n. 14 (citing P.R. 712, 707, 959–60, 1925–27, 2480, 2482–85) (noting evidence submitted to USTR not discussed in the Gerrish Memo); Pls.' Reply at 7; accord Defs.' Br. at 42–43. Similarly, the USTR Memoranda also did not engage with Plaintiffs' comments regarding the economic and social impacts of withdrawing the Exclusion, rather it merely concluded that the impact on "job losses" was "unclear." Gerrish Memo at 7. This conclusion was also based on consideration of the "perspective of utilities planning solar generating facilities" rather than those that had already planned facilities on the basis of the Exclusion, including solar energy producers such as Invenergy. See Gerrish Memo at 7–8; Pls.' Br. at 8. As Plaintiffs explain, planning utility grade solar energy facilities takes years of planning to obtain necessary

Finally, contrary to the Government's contentions, Defs.' Br. at 26, regardless of whether any party raised USTR's need to comply with basic APA requirements, USTR "retain[ed] a duty to examine key assumptions . . . and . . . justify [those] assumption[s] even if no one objects to it during the comment period." Nat. Res. Def. Council v. E.P.A., 755 F.3d 1010, 1023 (D.C. Cir. 2014). Furthermore, the court declines to require Plaintiffs to have exhausted arguments that USTR comply with basic APA requirements when the applicability of those requirements had already been confirmed by this court -- the same court with continuing jurisdiction over this dispute. See Invenergy I, 422 F. Supp. 3d at 1281–86; Invenergy II, 427 F. Supp. 3d at 1407. To do so would require every party in every instance to remind agencies of basic procedural requirements in every rulemaking, even where there is no indication that an agency intends to skirt those requirements. Such a result should be avoided.

In sum, the court concludes that the Second Withdrawal did not comply with basic APA requirements to provide an adequate explanation to facilitate judicial review and to reach a reasoned decision. Because of these errors, the court must vacate the Second Withdrawal.[15]

### III.    Vacatur of the _Second Withdrawal_ is the Proper Remedy.

Finally, the court addresses the parties' dispute about the proper remedy for its conclusion that the Second Withdrawal was not in accordance with the statute and violated the APA. Plaintiffs request that the court vacate the Second Withdrawal. Pls.' Br. at 76. While the Government

---

equipment, permits, land space, financing, and coordination with other energy providers, Invenergy's Mem. In Supp. of Pls.' Mot. for PI at 38, Nov. 1, 2019, ECF No. 57. Regents, 140 S. Ct. 1891, 1913, 1916. Thus, publication of the USTR Memoranda would not rectify the arbitrary and capricious nature of the Second Withdrawal.

[15] Having concluded that the Second Withdrawal suffers from a statutory authority defect and these APA defects, the court need not reach Plaintiffs remaining claims that the Second Withdrawal was not supported by the record evidence. See Pls.' Br. at 53–60.

concedes that vacatur is the appropriate remedy for a decision that the <u>Second Withdrawal</u> is not in accordance with the statute, it also argues that, should the court only find that USTR failed to adequately explain its decision, the court should remand the decision to USTR for further explanation.  Defs.' Br. at 50–51 (citing <u>Fla. Power & Light Co. v. Lorion</u>, 470 U.S. 729, 744 (1985)).

The court agrees with Plaintiffs that vacatur is the proper remedy.  First, the court's conclusion that USTR lacks statutory or delegated authority to withdraw an exclusion requires vacatur, as all parties agree.  <u>See</u> <u>Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n</u>, 896 F.3d 520, 536 (D.C. Cir. 2018) (holding that where an agency does not comply with the statute, vacatur is the proper remedy); Pls.' Br. at 75–76; Defs.' Br. at 50.  Furthermore, the court's conclusion that the decision was arbitrary and capricious provides an independent reason to vacate the <u>Second Withdrawal</u>.  <u>See</u> 5 U.S.C. § 706(2) (requiring that courts shall "hold unlawful and set aside" agency action that is found to be "without observance of procedure required by law").  While the court agrees with the Government that remand is the usual remedy for inadequately explained decisions, <u>Fla. Power & Light</u>, 470 U.S. at 744; <u>Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs</u>, 145 F.3d 1399, 1409 (D.C. Cir. 1998); <u>Pollinator Stewardship Council v. U.S.E.P.A.</u>, 806 F.3d 520, 532 (9th Cir. 2015), the court nonetheless concludes that remand would be ineffective to remedy the arbitrary and capricious nature of the <u>Second Withdrawal</u>.  In <u>Regents</u>, for example, the Supreme Court found that memoranda which were issued subsequent to an agency's decision, and which relied upon bases not included in the agency's original decision, could not provide adequate grounds for upholding that decision.  140 S. Ct. at 1909–10.  Rather, "[a]n agency must defend its actions based on the reasons it gave when it acted."  <u>Id.</u>  Thus, on remand, USTR would be limited to relying upon the reasoning stated in either the <u>Second Withdrawal</u> or the USTR

Memoranda, both of which omitted any mention of certain significant issues.  Moreover, because the President intervened through Proclamation 10101, the court concludes that remand would not be fruitful or appropriate.

The court thus decides that vacatur without remand is the proper remedy and will enter judgment accordingly.

## CONCLUSION

In sum, the court concludes that the Second Withdrawal of the exclusion from safeguard duties on imported bifacial solar modules must be vacated for lack of statutory authority and as arbitrary and capricious.  The court reiterates that from the start, this case has not been about the choice between one policy and another regarding imports of solar panels.  Nor has it been about whether the statutory scheme should be modified.  Those are not matters that fall within the purview of the court, and the court takes no view on the merits of the vigorously contested trade policies advocated by the parties or on the merits of legislative revision.  Rather, what are before the court are issues of statutory authority and time-honored processes that must be observed for the administration of justice.  Ultimately, for the reasons stated, the actions challenged here cannot be upheld.

Accordingly, the Second Withdrawal is vacated and Plaintiffs' motion for judgment on the administrative record is granted.  Defendants are further enjoined from enforcing the Second Withdrawal, whether through modification to the Harmonized Tariff Schedule of the United States or enforcement of duties.

**SO ORDERED.**

*/s/   Gary S. Katzmann*
Gary S. Katzmann, Judge

Dated: November 17, 2021
       New York, New York