Slip Op. 22-32

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| IN RE SECTION 301 CASES | Before: Mark A. Barnett, Claire R. Kelly, and Jennifer Choe-Groves, Judges Court No. 21-00052-3JP |

**<u>OPINION AND ORDER</u>**

[Remanding the Office of the United States Trade Representative's determinations with respect to List 3 and List 4A; granting in part and denying in part Defendants' Motion to Correct the Administrative Record.]

Dated: April 1, 2022

<u>Pratik Shah</u>, Akin Gump Strauss Hauer & Feld LLP, of Washington, D.C., argued for Plaintiffs HMTX Indus. LLC, Halstead New England Corp., Metroflor Corp., and Jasco Prods. Co. LLC.  With him on the brief were <u>Matthew R. Nicely</u>, <u>James E. Tysse</u>, <u>Devin S. Sikes</u>, <u>Daniel M. Witkowski</u>, and <u>Sarah B. W. Kirwin</u>.

<u>Justin R. Miller</u>, Attorney-In-Charge, International Trade Field Office, <u>Elizabeth A. Speck</u>, Trial Attorney, and <u>Jamie L. Shookman</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for Defendants.  With them on the brief were <u>Brian M. Boynton</u>, Acting Assistant Attorney General, <u>Patricia M. McCarthy</u>, Director, <u>L. Misha Preheim</u>, Assistant Director, <u>Sosun Bae</u>, Senior Trial Counsel, and <u>Ann C. Motto</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C.  Of Counsel on the brief were <u>Megan Grimball</u>, Associate General Counsel, <u>Philip Butler</u>, Associate General Counsel, and <u>Edward Marcus</u>, Assistant General Counsel, Office of General Counsel, Office of the U.S. Trade Representative, of Washington, D.C., and <u>Paula Smith</u>, Assistant Chief Counsel, <u>Edward Maurer</u>, Deputy Assistant Chief Counsel, and <u>Valerie Sorensen-Clark</u>, Attorney, Office of the Assistant Chief Counsel, International Trade Litigation, U.S. Customs and Border Protection, of New York, N.Y.

<u>Joseph R. Palmore</u>, Morrison & Foerster LLP, of Washington, D.C., argued for Amici Curiae Retail Litigation Center, <i>et al.</i>  With him on the brief was <u>Adam L. Sorensen</u>.

<u>Christine M. Streatfeild</u>, Baker McKenzie LLP, of Washington, D.C., argued for Amici Curiae Am. Trailer World Corp., <i>et al.</i>  With her on the brief was <u>Kevin M. O'Brien</u>, as well as <u>Nancy A. Noonan</u> and <u>Angela M. Santos</u>, Arent Fox LLP, of Washington, D.C.

<u>George W. Thompson</u>, Thompson & Associates, PLLC, of Washington, D.C., for Amici Curiae Ecolab Inc., et al.

Court No. 21-00052-3JP                                                                 Page 2

Barnett, Chief Judge:  Plaintiffs HMTX Industries LLC, Halstead New England

Corporation, Metroflor Corporation, and Jasco Products Company LLC commenced the

first of approximately 3,600 cases (the "Section 301 Cases")[1] contesting the imposition

of a third and fourth round of tariffs by the Office of the United States Trade

Representative ("the USTR" or "the Trade Representative") pursuant to section 301 of

the Trade Act of 1974 ("the Trade Act"), 19 U.S.C. § 2411, *et seq*.  *See generally* Am.

Compl., HMTX Indus. LLC v. United States, Court No. 20-cv-00177 (CIT Sept. 21,

2020), ECF No. 12 ("20-177 Am. Compl.").

Defendants United States, *et al.* ("the Government") move to dismiss Plaintiffs'

claims as non-justiciable pursuant to U.S. Court of International Trade ("USCIT") Rule

12(b)(6) or, alternatively, for judgment on the agency record pursuant to USCIT Rule

56.1.  Defs.' Mot. to Dismiss or, Alternatively, Mot. for J. on the Agency R. ("Defs.'

Mot."), ECF No. 314.  Plaintiffs cross-move for judgment on the agency record.  Pls.'

Cross-Mot. for J. on the Agency R., and accompanying Mem. in Supp. of Pls.' Cross-

Mot. for J. on the Agency R. and Resp. to Defs.' Mot. to Dismiss/Mot. for J. on the

Agency R. ("Pls.' Cross-Mot. & Resp."), ECF No. 358.

The Government also moves to correct the administrative record.  Defs.' Mot. to

Correct the R. ("Defs.' Mot. Correct R."), ECF No. 441.  Plaintiffs oppose that motion, in

---

[1] This figure reflects the approximate number of cases assigned to this panel.  As of
March 31, 2022, there are approximately 318 unassigned cases raising similar claims
that are stayed pursuant to Administrative Order 21-02.

part.  Pls.' Partial Opp'n to Defs.' Mot. to Correct the Agency R. ("Pls.' Opp'n Correct

R."), ECF No. 442.

For the following reasons, the court remands the contested USTR determinations

and grants in part and denies in part the Government's motion to correct the record.

## BACKGROUND

### I.  Legal Framework

Article I, Section 8 of the U.S. Constitution vests Congress with the "Power To lay

and collect Taxes, Duties, Imposts and Excises" and to "regulate Commerce with

foreign Nations."  U.S. Const. art. I, § 8, cl. 1, 3.  Section 301 of the Trade Act, which

governs actions taken in response to a foreign country's violation of a trade agreement

or conduct that is otherwise harmful to U.S. commerce, constitutes a congressional

delegation of some of that authority to the Executive Branch.  *See* 19 U.S.C. § 2411

(2018).[2]  Specifically, section 301 sets out the circumstances under which action by the

USTR is mandatory (subject to certain exceptions), *see id.* § 2411 (a)(1)–(2),[3] and when

such action is discretionary, *see id.* § 2411(b).

This case concerns the latter scenario.  Pursuant to section 301(b), the USTR

has discretion to act when it determines that "(1) an act, policy, or practice of a foreign

---

[2] Citations to the United States Code are to the 2018 version, unless otherwise
specified.

[3] When the USTR finds that "the rights of the United States under any trade agreement
are being denied" or that "an act, policy, or practice of a foreign country--(i) violates, or
is inconsistent with, the provisions of, or otherwise denies benefits to the United States
under, any trade agreement, or (ii) is unjustifiable and burdens or restricts United States
commerce," the USTR "shall take action," 19 U.S.C. § 2411(a)(1), unless an exception
exists pursuant to section 301(a)(2), *id.* § 2411(a)(2).

country is unreasonable or discriminatory and burdens or restricts United States

commerce, and (2) action by the United States is appropriate." *Id.* When both

conditions are met, the USTR

> shall take all appropriate and feasible action authorized under subsection
> (c), subject to the specific direction, if any, of the President regarding any
> such action, and all other appropriate and feasible action within the power
> of the President that the President may direct the Trade Representative to
> take under this subsection, to obtain the elimination of that act, policy, or
> practice. Actions may be taken that are within the power of the President
> with respect to trade in any goods or services, or with respect to any other
> area of pertinent relations with the foreign country.

*Id.* § 2411(b)(2).

Subsection (c) describes the actions the USTR may take in order to implement

mandatory or discretionary actions under subsections (a) and (b). *Id.* § 2411(c). For

investigations not involving a trade agreement, the USTR must make its determination

as to whether conduct is actionable under section 301(a) or (b) and, if so, what action to

take, no later than "12 months after the date on which the investigation [was] initiated."

*Id.* § 2414(a)(2)(B). Generally, such actions must then be implemented within 30 days

of the date of the determination. *Id.* § 2415(a)(1).

Central to this litigation, section 307 of the Trade Act governs the modification or

termination of the USTR's actions taken pursuant to section 301. *See generally id.*

§ 2417. The statute provides, *inter alia*:

> (a) In general
>
> > (1) The Trade Representative may modify or terminate any action,
> > subject to the specific direction, if any, of the President with respect
> > to such action, that is being taken under section 2411 of this title
> > if—

> (A) any of the conditions described in section 2411(a)(2) of this title exist,
> (B) the burden or restriction on United States commerce of the denial rights, or of the acts, policies, and practices, that are the subject of such action has increased or decreased, or
> (C) such action is being taken under section 2411(b) of this title and is no longer appropriate.

*Id.* § 2417(a)(1).

## II.   Factual Background

On August 14, 2017, the President of the United States issued a memorandum instructing the USTR to consider, consistent with section 302(b) of the Trade Act, initiating an investigation addressing the Government of the People's Republic of China's ("China") "laws, policies, practices, or actions that may be unreasonable or discriminatory and that may be harming American intellectual property rights, innovation, or technology development." *Addressing China's Laws, Policies, Practices, and Actions Related to Intellectual Property, Innovation, and Technology*, 82 Fed. Reg. 39,007, 39,007 (Aug. 17, 2017).  The USTR initiated such an investigation on August 18, 2017.  *Initiation of Section 301 Investigation; Hearing; and Request for Public Comment: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation,* 82 Fed. Reg. 40,213 (Aug. 24, 2017) ("*Initiation Notice*").

On March 22, 2018, the USTR published a report announcing the results of the investigation.  OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, FINDINGS OF THE INVESTIGATION INTO CHINA'S ACTS, POLICIES, AND PRACTICES RELATED TO TECHNOLOGY

Transfer, Intellectual Property, and Innovation Under Section 301 of the Trade Act of 1974 (2018) ("USTR Report" or "the Report"), https://ustr.gov/sites/default/files/Section 301 FINAL.PDF.  The Report summarizes the ways in which China's conduct in the areas subject to the investigation was unreasonable and burdened U.S. commerce. *See id.*  Also on March 22, 2018, the President issued a memorandum directing the USTR, *inter alia*, to "take all appropriate action" pursuant to section 301 "to address the acts, policies, and practices of China that are unreasonable or discriminatory and that burden or restrict U.S. commerce" and to "consider whether such action should include increased tariffs on goods from China."  *Actions by the United States Related to the Section 301 Investigation of China's Laws, Policies, Practices, or Actions Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 13,099, 13,100 (Mar. 27, 2018).  In that memorandum, the President further instructed the USTR to "publish a proposed list of products and any intended tariff increases within 15 days of the date of this memorandum," subject to notice and comment pursuant to section 304(b), and, "after consultation with appropriate agencies and committees," to "publish a final list of products and tariff increases, if any, and implement any such tariffs."  *Id.*

On April 6, 2018, the USTR published notice of its determination "that the acts, policies, and practices of the Government of China related to technology transfer, intellectual property, and innovation covered in the investigation are unreasonable or discriminatory and burden or restrict U.S. commerce."  *Notice of Determination and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer,*

*Intellectual Property, and Innovation*, 83 Fed. Reg. 14,906, 14,906 (Apr. 6, 2018)

("*USTR Determination*").  Accordingly, the USTR proposed tariffs on products worth

"approximately $50 billion in terms of estimated annual trade value" in 2018.  *Id.* at

14,907.  The USTR considered the size of the action to be "appropriate both in light of

the estimated harm to the U.S. economy, and to obtain elimination of China's harmful

acts, policies, and practices."  *Id.*

On June 20, 2018, the USTR published notice of a final list of products "with an

approximate annual trade value of $34 billion" that would be subject to an additional

duty of 25 percent *ad valorem*, referred to as "List 1."  *Notice of Action and Request for*

*Public Comment Concerning Proposed Determination of Action Pursuant to Section*

*301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual*

*Property, and Innovation*, 83 Fed. Reg. 28,710, 27,711 (June 20, 2018) ("*Final List 1*").

On August 16, 2018, the USTR published notice of an additional list of products with an

approximate annual trade value of $16 billion that would be subject to an additional duty

of 25 percent *ad valorem*, referred to as "List 2."  *Notice of Action Pursuant to Section*

*301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual*

*Property, and Innovation*, 83 Fed. Reg. 40,823, 40,823–24 (Aug. 16, 2018).

During the time between the USTR's finalization of List 1 and List 2, the

President directed the USTR to identify $200 billion worth of Chinese goods on which to

impose an additional duty of 10 percent *ad valorem* "after the legal process is complete"

if China refused to change its practices.  Statement from the President Regarding Trade

with China (June 18, 2018) ("June 2018 Presidential Statement"), ECF No. 441-1; *see*

*also* USTR Robert Lighthizer Statement on the President's Additional China Trade Action (June 18, 2018), PR 27.[4]  In accordance with that direction, the USTR identified 6,031 tariff subheadings comprising goods imported from China, referred to as "List 3." *Request for Comments Concerning Proposed Modification of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 33,608, 33,608–09 (July 17, 2018) ("*List 3 NPRM*").  In proposing the additional duties, the USTR relied on its authority to modify the action pursuant to section 307(a)(1)(C) of the Trade Act.  *Id*. at 33,609.  The USTR explained that China had responded "to the initial U.S. action in the investigation by imposing retaliatory tariffs on U.S. goods[] instead of addressing U.S. concerns" regarding the unfair practices identified in the investigation.  *Id.* at 33,608.  The USTR also explained that "a supplemental $200 billion action is appropriate" because China had failed to respond favorably to the $50 billion action and instead imposed "retaliatory duties" in the amount of $50 billion on U.S. products.  *Id.* at 33,609.

The USTR later extended the public comment period concerning the List 3 duties after the President directed the USTR "to consider increasing the proposed level of the additional duty from 10 percent to 25 percent."  *Extension of Public Comment Period*

---

[4] The administrative record associated with the contested List 3 and List 4A duties is divided into a Public Administrative Record ("PR"), ECF No. 297, and a Confidential Administrative Record ("CR"), ECF No. 298.  For record documents available online, the indices contain hyperlinks to their location.  *See* PR; CR.  The Government also filed an appendix of record documents provided to the court in advance of oral argument.  *See* [Partial] Index to the Admin. R., ECF Nos. 447, 447-1 (PR 1–12), 447-2 (PR 13–20), 447-3 (PR 21–25), 447-4 (PR 26–36).

*Concerning Proposed Modification of Action Pursuant to Section 301: China's Acts,*

*Policies, and Practices Related to Technology Transfer, Intellectual Property, and*

*Innovation*, 83 Fed. Reg. 38,760, 38,760–61 (Aug. 7, 2018) ("*List 3 Cmt. Extension*").

On September 17, 2018, the President directed the USTR to impose an

additional duty of 10 percent *ad valorem* on $200 billion worth of Chinese goods, to take

effect on September 24, 2018, and to increase the additional duty to 25 percent *ad*

*valorem* on January 1, 2019.  Statement from the President (Sept. 17, 2018) ("Sept.

2018 Presidential Statement"), PR 4.  On September 21, 2018, the USTR published

final notice of List 3 duties at a rate of 10 percent *ad valorem* with an effective date of

September 24, 2018.  *Notice of Modification of Action Pursuant to Section 301 Action:*

*China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual*

*Property, and Innovation*, 83 Fed. Reg. 47,974 (Sept. 21, 2018) ("*Final List 3*").  In

accordance with the President's direction, the rate of additional duty on products

covered by List 3 was set to increase to 25 percent *ad valorem* on January 1, 2019.  *Id.*

at 47,974.

As authority for the List 3 duties, the USTR relied on section 307(a)(1)(B) and

(C).  *See id.* at 47,974–75.  The USTR explained that "the burden or restriction on

United States commerce of the acts, policies, and practices that are the subject of the

Section 301 action continues to increase" and, further, that "China's unfair acts, policies,

and practices include not just its specific technology transfer and IP polices [*sic*]

referenced in the notice of initiation in the investigation, but also China's subsequent

defensive actions taken to maintain those policies."  *Id.* at 47,974.  The USTR noted that

China had "impose[d] approximately $50 billion in tariffs on U.S. goods" to persuade the United States to end the section 301 action and to protect the investigated practices, which led to "increased harm to the U.S. economy." *Id.*

With respect to subsection (C), the USTR explained that "[t]he term 'appropriate'" used in that provision links to section 301(b), which authorizes the USTR to "take all appropriate and feasible action" in order "to obtain the elimination of [the] act, policy, or practice.'' *Id.* (quoting 19 U.S.C. § 2411(b)). According to the USTR, the action that will achieve that aim "is a matter of predictive judgment, to be exercised by the [USTR], subject to any specific direction of the President." *Id.* at 47,974–75. While the USTR previously judged that "a $50 billion action would be effective in obtaining the elimination of China's policies[,] China's response . . . ha[d] shown that the current action no longer [was] appropriate." *Id.* at 47,975.

The USTR also explained that, during the public comment period, it had received more than 6,000 written submissions and held a six-day public hearing. *Id.* at 47,974. The USTR stated that it had "carefully reviewed the public comments and the testimony from the six-day public hearing" and, consequently, removed "certain tariff subheadings" from the list. *Id.* at 47,975. The final list identified "5,745 full and partial tariff subheadings." *Id.*

After several extensions of the effective date of the increase in List 3 duties issued in connection with ongoing trade negotiations, List 3 duties increased to 25 percent *ad valorem* in May or June of 2019, based on the date of export. *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to*

*Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 20,459 (May 9, 2019); *Implementing Modification to Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 21,892 (May 15, 2019); *Additional Implementing Modification to Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 26,930 (June 10, 2019).

After the List 3 duties increased to 25 percent, the USTR established an exclusion process pursuant to which importers could request exclusion of their products from List 3 duties. *Procedures for Requests to Exclude Particular Products From the September 2018 Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 29,576 (June 24, 2019). Plaintiffs obtained exclusions for certain of their imports, effective September 24, 2018, through August 7, 2020. *See, e.g.*, *Notice of Product Exclusions: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 61,674, 61,675–76. (Nov. 13, 2019); 20-177 Am. Compl. ¶¶ 49–50.

On May 17, 2019, the USTR announced its intent, at the direction of the President, to modify again the section 301 action by imposing additional duties of up to 25 percent *ad valorem* on products from China covered by 3,805 additional tariff subheadings, referred to as "List 4." *Request for Comments Concerning Proposed Modification of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg.

22,564 (May 17, 2019) ("*List 4 NPRM*"); *see also* Statement by U.S. Trade

Representative Robert Lighthizer on Section 301 Action (May 10, 2019), PR 30.  The

USTR explained that the United States and China had engaged in several rounds of

negotiation regarding issues covered by the section 301 investigation, but that China

had "retreated from specific commitments made in previous rounds" and "announced

further retaliatory action against U.S. commerce."  *List 4 NPRM*, 84 Fed. Reg. at

22,564.  The USTR proposed modifying the action pursuant to section 307(a)(1)(B) and

(C).  *Id.*

On August 20, 2019, the USTR published final notice of the List 4 duties in the

amount of 10 percent *ad valorem* on certain products identified in *List 4 NPRM*.  *Notice*

*of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to*

*Technology Transfer, Intellectual Property, and Innovation,* 84 Fed. Reg. 43,304 (Aug.

20, 2019) ("*Final List 4*").  Within *Final List 4*, the tariff subheadings were segregated

into List 4A and List 4B with separate effective dates (September 1, 2019 and

December 15, 2019, respectively).  *Id.* at 43,305.

Referencing the language of section 307(a)(1)(B), the USTR explained that "[t]he

burden or restriction on United States commerce of the acts, policies, and practices that

are the subject of the Section 301 action continues to increase."  *Id.* at 43,304.  The

USTR also explained that "China's unfair acts, policies, and practices include not just its

technology transfer and IP polices [*sic*] referenced in the notice of initiation in the

investigation, but also China's subsequent defensive actions taken to maintain those

unfair acts, policies, and practices."  *Id.* (referencing China's retaliatory imposition of

"tariffs on approximately $110 billion worth of U.S. goods" and other "non-tariff measures").

In reference to section 307(a)(1)(C), the USTR stated that "China's response has shown that the current action no longer is appropriate." *Id.* The USTR noted China's retreat from certain negotiated commitments, retaliatory actions, and currency devaluation. *Id.* at 43,305.

Lastly, the USTR stated that it had considered "the public comments" it had received "and the testimony from the seven-day public hearing, as well as the advice of the interagency Section 301 committee and appropriate advisory committees." *Id.* In response to that information, the USTR removed "[c]ertain tariff subheadings" from the final List 4 duties "based on health, safety, national security, and other factors," and staggered the effective dates for the List 4A and List 4B duties. *Id.* Thereafter, the USTR provided notice of its intent to increase the additional duty rate applicable to List 4A and List 4B from 10 percent *ad valorem* to 15 percent *ad valorem*. *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 45,821 (Aug. 30, 2019).

On December 18, 2019, the USTR indefinitely suspended the additional duties of 15 percent *ad valorem* on List 4B, but not List 4A, "[i]n light of progress in the negotiations with China." *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 69,447, 69,447 (Dec. 18, 2019).

On January 22, 2020, the USTR halved the additional duty on products covered by List 4A from 15 percent *ad valorem* to 7.5 percent *ad valorem*.  *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 85 Fed. Reg. 3741 (Jan. 22, 2020).

## III.   Procedural History

On September 10, 2020, Plaintiffs commenced an action challenging the section 301 duties imposed pursuant to List 3 and List 4A.  Summons, Compl., *HMTX Indus. LLC v. United States*, Court No. 20-cv-00177 (CIT Sept. 10, 2020), ECF Nos. 1, 2.  Count one alleges that the USTR exceeded its authority pursuant to section 307 of the Trade Act when it imposed the duties and seeks a declaratory judgment to that effect.  20-177 Am. Compl. ¶¶ 63–70.  Count two alleges violations of the Administrative Procedure Act ("APA").  *Id.* ¶¶ 71–75.  Specifically, Plaintiffs allege that USTR exceeded its authority "in promulgating List 3 and List 4A," *id.* ¶ 73, and "promulgated List 3 and List 4A in an arbitrary and capricious manner," *id.* ¶ 75.

On February 5, 2021, Plaintiffs' action, among others, was assigned to this panel.  *See, e.g.*, Order, *HMTX Indus. LLC v. United States*, Court No. 20-cv-00177 (CIT Feb. 5, 2021), ECF No. 43.  On February 10, 2021, the panel designated a "master case" under the name "*In Re* Section 301 Cases" to function as the primary vehicle by which the court would manage the litigation of the Section 301 Cases.  Std. Procedural Order No. 21-01 (Feb. 10, 2021), ECF No. 1.  After receiving input from the Parties, on March 31, 2021, the court designated Plaintiffs' case as "the sample case for purposes of the court's initial consideration and resolution of Plaintiffs' claims."  Std. Procedural Order

21-04 (Mar. 31, 2021), ECF No. 267.  The court stayed all other Section 301 Cases and

appointed a Plaintiffs' Steering Committee to aid the court's adoption of case

management procedures and coordinate the preparation of consolidated briefs and

court submissions.  *Id.*; *see also* Std. Procedural Order 21-02 (Feb. 16, 2021), ECF No.

82 (explaining the duties of the steering committee).  On April 12, 2021, the Parties filed

a Joint Status Report with a proposed briefing schedule governing disposition of the

merits of the sample case.  Joint Status Report (Apr. 12, 2021), ECF No. 274.  The

following day, the court entered a Scheduling Order.  *See* Scheduling Order (Apr. 13,

2021), ECF No. 275.[5]

On June 1, 2021, the Government filed its opening motion.  Defs.' Mot.  On

August 2, 2021, Plaintiffs filed their cross-motion and response to the Government's

motion.  Pls.' Cross-Mot. & Resp.  On August 9, 2021, several interested parties that

are plaintiffs in actions that were stayed behind this sample action filed an *amicus* brief

on whether any potential relief is limited to an importer of record.  Amicus Br. of

Interested Parties ("Interested Parties' Br."), ECF No. 362.  On August 31, 2021, the

---

[5] On July 6, 2021, a divided panel granted Plaintiffs' motion for a preliminary injunction suspending liquidation of unliquidated entries subject to the contested tariffs.  *In re Section 301 Cases*, 45 CIT __, __, 524 F. Supp. 3d 1355, 1357–72 (2021); *see also id.* at 1372–83 (Barnett, C.J., dissenting); Order (July 6, 2021), ECF No. 330 (temporarily restraining liquidation; establishing a process for implementing the preliminary injunction; and allowing the Government to instead "stipulate to refund any duties found to have been illegally collected").  On September 8, 2021, the court acknowledged the Government's acceptance of "the option to stipulate" to a refund of unlawfully collected duties "without prejudice to the issue of whether . . . refunds will be limited to [importers of record]" and ordered Defendants to liquidate subject entries "in the ordinary course."  Order (Sept. 8, 2021) at 1–2, ECF No. 408.

court granted two additional motions for leave to file an *amicus* brief.  Order (Aug. 31,

2021), ECF No. 396; Order (Aug. 31, 2021), ECF No. 397; *see also* Proposed Br. of

Amici Curiae Retail Litigation Center, Inc., *et al*. ("RLC's Br."), ECF No. 373-2; Br. of

Proposed Amici Curiae Ecolab Inc., *et al*. in Supp. of the Cross-Mot. for J. on the

Agency R. Submitted by Pls.' HMTX Indus. LLC *et al*. ("Ecolab's Br."), ECF No. 374.

On October 1, 2021, the Government filed its joint response to Plaintiffs' cross-motion

and the *amicus* briefs and a reply in support of its opening motion.  Defs.' Reply in

Supp. of Their Mot. to Dismiss, Resp. to Pls.' Cross-Mot. for J. on the Agency R., and

Resp. to *Amicus Curiae* Supporting Brs. ("Defs.' Resp. & Reply"), ECF No. 412.[6]  On

November 15, 2021, Plaintiffs filed their reply.  Pls.' Reply in Supp. of Their Cross-Mot.

for J. on the Agency R. ("Pls' Reply"), ECF No. 425.  The court heard oral argument on

February 1, 2021.  Docket Entry, ECF No. 440.

  Following oral argument, on February 15, 2022, the Government filed a partial

consent motion to correct the administrative record.  Defs.' Mot. Correct R.  On

February 16, 2022, Plaintiffs filed their response.  Pls.' Opp'n Correct R.

JURISDICTION AND STANDARD OF REVIEW

  The court has jurisdiction pursuant to 28 U.S.C. § 1581(i)(1)(B) (2018 & Supp. II

2020), which grants the court "exclusive jurisdiction of any civil action commenced

against the United States . . . that arises out of any law of the United States providing

---

[6] On October 18, 2021, the court granted the Government's motion to correct citation
errors in their opening and reply briefs.  Order (Oct. 18, 2021), ECF No. 415; *see also*
Defs.' Consent Mot. to Correct Minor Citation Errors, Ex. B, ECF No. 413-2 (corrected
pages).

for . . . tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue."

The court may properly dismiss a claim pursuant to USCIT Rule 12(b)(6) when the plaintiff's factual allegations, assumed to be true, fail to raise a legally cognizable claim.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007); *United Pac. Ins. Co. v. United States*, 464 F.3d 1325, 1327 (Fed. Cir. 2006).  USCIT Rule 56.1 provides for judgment on the agency record in an action that is before the court pursuant to 28 U.S.C. § 1581(i).  The APA directs the court to "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action."  5 U.S.C. § 706; *see also* 28 U.S.C. § 2640(e).  Additionally, the "court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be--(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or] . . . (C) in excess of statutory . . . authority; [or] . . . (E) unsupported by substantial evidence."  5 U.S.C. § 706(2).

DISCUSSION

The court first considers the Government's motion to dismiss Plaintiffs' claims based on non-justiciability.  As discussed below, because the court finds that the claims are reviewable, the court turns next to the cross-motions concerning the USTR's authority pursuant to section 307 of the Trade Act and alleged procedural violations.  Lastly, the court considers the Government's partial consent motion to correct the administrative record.

I.    **Reviewability of Plaintiffs' Claims**

    1.  **Whether List 3 and List 4A Constitute Unreviewable Presidential Action**

        a.  **Parties' Contentions**

The Government contends that Plaintiffs seek to challenge presidential—as opposed to agency—action because at each step in the modification process, "the USTR acted at 'the specific direction . . . of the President.'"  Defs.' Mot. at 22 (quoting 19 U.S.C. § 2417(a)(1)).  When the President "exercise[s] his discretion to direct action" pursuant to section 307(a)(1), the Government contends, "the action constitutes presidential action."  Defs.' Resp. & Reply at 5.  Thus, the Government contends, Plaintiffs' claims arising out of the APA must fail "because the President is not an 'agency' within the meaning of the APA."  Defs.' Mot. at 22 (citing, *inter alia*, *Franklin v. Massachusetts*, 505 U.S. 788, 800–01 (1992)).

Plaintiffs contend that the promulgation of List 3 and List 4A constitute final agency action because sections 301 and 307 of the Trade Act authorize the USTR—not the President—to act, and relevant *Federal Register* notices reflect the USTR's determination to take the specified actions.  Pls.' Cross-Mot. & Resp. at 47 (citing *Final List 3*, 83 Fed. Reg. at 47,974, and *Final List 4*, 84 Fed. Reg. at 43,304).  Plaintiffs also point to legislative history accompanying the 1988 amendments to the Trade Act that transferred authority from the President to the USTR.  *Id.* (citing H.R. REP. NO. 100-576 at 511 (1988) (conf. report)).  Plaintiffs further contend that judicial precedent supports reviewing the USTR's actions even when taken pursuant to Presidential direction.  *Id.* at 48–49 (citing, *inter alia*, *Invenergy Renewables LLC v. United States*, 43 CIT __, __,

422 F. Supp. 3d 1255, 1282–83, 1294 (2019), and *Gilda Indus., Inc. v. United States*

("*Gilda II*"), 622 F.3d 1358, 1363 (Fed. Cir. 2010)).

### b. List 3 and List 4A Implicate Agency Actions That Are Judicially Reviewable

While "[a]gency action made reviewable by statute and final agency action for

which there is no other adequate remedy in a court are subject to judicial review," 5

U.S.C. § 704, presidential action is non-reviewable under the APA, *Franklin*, 505 U.S. at

800–01.  The Government's arguments for dismissal raise the question whether agency

action taken in accordance with presidential direction pursuant to section 307

constitutes non-reviewable presidential action.

For purposes of this case, the answer to that question is "no."  *Franklin* held that

the APA did not apply to a challenge to reapportionment because the President, not the

Secretary of Commerce, sent the final apportionment to Congress and thus took the

final step "affecting the States."  505 U.S. at 796–801.  Accordingly, *Franklin*'s bar on

judicial review generally is "limited to those cases in which the President has final

constitutional or statutory responsibility for the *final step* necessary for the agency action

directly to affect the parties."  *Pub. Citizen v. USTR*, 5 F.3d 549, 552 (D.C. Cir. 1993)

(emphasis added)[7] (declining APA review over a challenge to the North American Free

---

[7] The opinions of the U.S. Court of Appeals for the D.C. Circuit are not binding on this court.  However, the court finds judicial precedent from the D.C. Circuit instructive in light of the court's expertise in the area of administrative law.  *See, e.g.*, *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 535 n.14 (1978) (observing that "the vast majority of challenges to administrative agency action are brought to the [D.C. Circuit]"); s*ee generally* Richard J. Pierce, Jr., *The Special*

Trade Agreement ("NAFTA") because Congress gave the President "the discretion to

renegotiate NAFTA before submitting to Congress or to refuse to submit it at all" and it

was, therefore, the President's action, not the USTR's, that affected members of the

plaintiff-organization).[8]

      Here, the Government extends *Franklin* beyond its holding when it argues, in

effect, that *antecedent* presidential direction lacking any direct effect on relevant parties

renders List 3 and List 4A non-reviewable presidential actions.  The Government cites

no authority to support such a broad reading.  Indeed, in an analogous context, courts

review agency action taken to implement Presidential proclamations and Executive

orders—each of which are forms of presidential direction—pursuant to the APA.  *See,

e.g.*, *Sherley v. Sebelius*, 689 F.3d 776 (D.C. Cir. 2012) (conducting APA review over

agency action taken to implement an Executive order); *Chamber of Commerce of

United States v. Reich*, 74 F.3d 1322, 1326–27 (D.C. Cir. 1996) (surmising that agency

regulations based on an Executive order issued by the President would be reviewable

---

*Contributions of the D.C. Circuit to Administrative Law*, 90 GEO. L.J. 779 (2002). The
U.S. Court of Appeals for the Federal Circuit has also relied on D.C. Circuit
precedent. *See Nat'l Org. of Veterans' Advocates, Inc. v. Sec'y of Veterans Affs.*, 260
F.3d 1365, 1379–81 (Fed. Cir. 2001) ("*NOVA*") (following *Allied-Signal, Inc. v. U.S.
Nuclear Regul. Comm'n*, 988 F.2d 146, 151 (D.C. Cir. 1993)).

[8] In *Franklin*, the Court considered the importance of the President's role in the "integrity
of the [reapportionment] process" in reaching its decision.  505 U.S. at 800.  Likewise, in
*Public Citizen*, the appellate court noted that the President was considered "essential to
the integrity of international trade negotiations" as evidenced by "the requirement that
the President, and not [the USTR], initiate trade negotiations and submit trade
agreements and their implementing legislation to Congress."  5 F.3d at 552.  The D.C.
Circuit left open the possibility that "APA review of otherwise final agency actions may
well be available" when "the President's role is not essential to the integrity of the
process."  *Id.*

under the APA had plaintiffs brought such a claim); *Tate v. Pompeo*, 513 F. Supp. 3d

132 (D.D.C. 2021) (reviewing agency action taken to implement a Presidential

proclamation).  Thus, although "actions involving discretionary authority delegated by

Congress to the President" may be non-reviewable under the APA, such cases are

distinct from those "involving authority delegated by Congress to an agency."  *See*

*Detroit Int'l Bridge Co. v. Gov't of Can.*, 189 F. Supp. 3d 85, 98–105 (D.D.C. 2016).[9]

This case concerns the latter circumstance.  Congress delegated to the USTR

authority over modifications to section 301 actions.  *See* 19 U.S.C. § 2417(a)(1); H.R.

Rep. No. 100-576 at 551 (recognizing the USTR's authority to decide and implement

section 301 actions and noting that "[t]he President would not retain separate authority

---

[9] The *Detroit International* court declined to review the U.S. Department of State's
("USDS") issuance of a permit to build a bridge across an international boundary
because Congress had vested discretionary authority over bridge approvals in the
President, who had, in turn, delegated certain ministerial responsibilities to USDS by
Executive Order).  189 F. Supp. 3d 85, 98–105.  In noting the significance of the
recipient of Congress' delegation, however, the court explained that "an unreviewable
presidential action must involve the exercise of discretionary authority *vested in the
President*; an agency acting on behalf of the President is not sufficient by itself" to avoid
APA review.  189 F. Supp. 3d at 104 (emphasis added).  For this proposition, the court
cited Justice Elena Kagan, then Visiting Professor at Harvard Law School, who wrote:
>        When the challenge is to an action delegated to an agency head but
>        directed by the President, . . . the President effectively has stepped into
>        the shoes of an agency head, and the review provisions usually applicable
>        to that agency's action should govern.  Nothing in *Franklin*'s interpretation
>        of the APA or in its—or any other case's—underlying discussion of
>        separation of powers issues is to the contrary.
*Id.* (quoting Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2351
(2001)).

to take action").[10]  Consistent with the statute, the USTR engaged in a rulemaking

process, the results of which—List 3 and List 4A—"directly affect[ed] the parties."

*Franklin*, 505 U.S. at 797.

---

[10] When Congress transferred authority over section 301 actions from the President to the USTR in the 1988 amendments to the Trade Act and gave the USTR the authority to modify section 301 actions, Congress gave some indication of its reasons for preserving a role for the President.  Addressing the phrase "subject to the direction, if any, of the President," which did not include the term "specific" as ultimately enacted, the House Ways and Means Committee Report recognized "that the President could provide broad policy direction or endorse the USTR decision," but that the "details of particular actions would remain with the USTR, including modification and termination of prior retaliatory action."  H.R. REP. NO. 100-40 at 59 (1987).  Additionally, the Committee Report "recognize[d] that if there is a policy issue of major magnitude, the President could direct the USTR to take a different course of action."  *Id.* at 59–60.  However, "[t]he Committee expect[ed] that the interagency committee advisory process prior to the decision by the USTR [would] virtually eliminate the instances in which any specific direction from the President would be appropriate."  *Id.* at 59–60.  Thus, although Congress envisioned the President retaining a role with respect to broad policy direction or directing the USTR to take action relating to issues of extraordinary importance, *see id.*, Congress generally gave the USTR authority over the detailed decision-making process required by statute, *see* 19 U.S.C. § 2411, *et seq*.

Of course, what Congress envisioned is not as important as what the statute allows.  At least in this case, however, and with respect to List 3, the evidence of record is consistent with the legislative history (the record lacks evidence of presidential direction with respect to List 4A beyond the USTR's assertions in the relevant notices).  While the President offered "broad policy direction," and specifically directed the USTR regarding the size of the modification, the level of tariffs, and the date of implementation and directed the USTR to take the final action, *see* June 2018 Presidential Statement; Sept. 2018 Presidential Statement, at the hearing, the Government acknowledged that the record does not contain evidence that the President had final authority in the process of approving the final list of tariff subheadings covered by the determinations, Oral Arg. 7:50–9:40, available at https://www.cit.uscourts.gov/sites/cit/files/020122-21-00052-3JP.mp3 (time stamp from the recording).  Thus, while the USTR's modification authority is subject to the specific direction of the President, it is still the USTR that is acting for purposes of the APA.

The court thus concludes that Plaintiffs' claims are not non-reviewable pursuant
to the APA by virtue of the President's involvement.[11]  Accordingly, the court denies the
Government's motion to dismiss Plaintiffs' claims on this basis.

### 2. Political Question Doctrine

#### a. Parties' Contentions

The Government contends that Plaintiffs' claims are non-justiciable pursuant to
the political question doctrine because they implicate the President's discretionary
determinations that modification of the original section 301 action was merited.  Defs.'
Mot. at 25.  Specifically, the Government contends, Plaintiffs seek to challenge the
President's determinations (1) that the original action "was 'no longer appropriate'" and
"whether new tariffs [are] 'appropriate'"; and (2) that China's retaliatory conduct
"increased the burden on the United States economy."  *Id.* at 26–27 (citations omitted).
According to the Government, the "highly discretionary nature of what is 'appropriate'"
under the circumstances means that "the statute lacks a 'judicially discoverable and
manageable standard[].'"  *Id.* at 27 (quoting *Baker v. Carr*, 369 U.S. 186, 217 (1962))
(alteration in original); *see also id.* at 28 (discussing *Almond Bros. Lumber Co. v. United
States*, 721 F.3d 1320, 1326–27 (Fed. Cir. 2013)); Defs.' Resp. & Reply at 9–10.  The

---

[11] While the Parties dispute the applicability of *Gilda II*, that case is not dispositive of the
issues raised by the Government.  *Gilda II* addressed the automatic termination
provision set forth in section 307(c)(1).  622 F.3d at 1362–67.  That provision does not
preserve a role for presidential direction.  *See* 19 U.S.C. § 2417(c)(1).  Further, in that
case, the appellate court addressed the effect on section 307(c)(1) of the USTR's *failure
to act* in accordance with the notice requirement set forth in section 307(c)(2).  *Gilda II*,
622 F.3d at 1364–65.  The court did not address whether any action by the USTR, had
it occurred, would be subject to the APA.

Government also contends that "prudential considerations" disfavor judicial review. Defs.' Mot. at 29.  To that end, the Government contends that "[P]laintiffs invite competing policies and statements regarding United States trade policy from the Judicial Branch, potentially disrupting the conduct of United States foreign relations," such as ongoing trade negotiations with China.  *Id.*

Plaintiffs contend that their claims implicate matters of statutory interpretation and compliance with the APA, both of which present judicially manageable standards. Pls.' Cross-Mot. & Resp. at 50–51.  Thus, Plaintiffs contend, their claims neither "challenge discretionary determinations committed to the Executive Branch," *id.* at 51, nor seek judicial pronouncements on trade policy, *id.* at 52.  Plaintiffs rely on *Almond Brothers* to contend that the court may resolve arguments regarding statutory interpretation while declining to address discretionary USTR determinations.  *Id.* (citing *Almond Bros.*, 721 F.3d at 1326–27).

### b.  Plaintiffs' Claims Do Not Implicate a Non-Justiciable Political Question

A controversy may involve a political question when there is:

a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker*, 369 U.S. at 217.  While the doctrine precludes judicial review of "controversies which revolve around policy choices and value determinations constitutionally committed" to the Legislative or Executive Branches, "it goes without saying that interpreting congressional legislation is a recurring and accepted task for the federal courts."  *Japan Whaling Ass'n v. American Cetacean Soc'y*, 478 U.S. 221, 230 (1986). The court may not "shirk [its] responsibility" to ascertain the proper interpretation of a statute "merely because [its] decision may have significant political overtones."  *Id.*; *see also Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012) (explaining that resolution of the plaintiff's claim did not turn on "the courts' own unmoored determination of what United States policy toward Jerusalem should be," but instead on the "familiar judicial exercise" of deciding whether the plaintiff's "interpretation of the statute is correct, and whether the statute is constitutional," such that the political question doctrine did not apply).

The "decision that a question is nonjusticiable is not one courts should make lightly."  *El-Shifa Pharm. Indus. Co. v. United States*, 378 F.3d 1346, 1362 (Fed. Cir. 2004).  Here, however, the court readily concludes that Plaintiffs' claims do not raise non-justiciable political questions.

Plaintiffs allege, *inter alia*, that the USTR exceeded the authority provided by section 307(a)(1)(B) and (C) of the Trade Act when it promulgated List 3 and List 4A. 20-177 Am. Compl. ¶¶ 68–70, 73.  It is clear from the court's discussion, *infra*, that such claims require the court to engage in the "familiar judicial exercise" of statutory interpretation in order to ascertain whether the factual predicate for the modifications fell

within the purview of subsection (B), and whether subsection (C) is limited to reductions in, or termination of, trade actions.  *See Zivotofsky*, 566 U.S. at 196.

The court is not questioning the USTR's determination that China's subsequent defensive conduct increased the burden on U.S. commerce, Defs.' Mot. at 27–28, indeed, Plaintiffs concede that it did, Pls.' Cross-Mot. & Resp. at 31.  Instead, the issue before the court is whether that conduct increased the burden on U.S. commerce *in a legally relevant way*.  That inquiry requires the court to interpret the meaning of the statutory terms, "the acts, policies, and practices[] that are the subject of such action," in relation to this modification action.  19 U.S.C. § 2417(a)(1)(B).  Likewise, the court is not reviewing the USTR's discretionary decisions regarding the appropriateness of certain actions pursuant to subsection (C).  *See* Defs.' Mot. at 26.

For these reasons, the Government's reliance on *Almond Brothers* is misplaced. Resolution of that case turned on the appellate court's application of the APA's narrow exception to judicial review for "agency action [that] is committed to agency discretion by law," 5 U.S.C. § 701(a)(2), to the plaintiff's challenges to the terms of an agreement the USTR entered into with Canada, *see Almond Bros.*, 721 F.3d at 1322, 1325–27. While finding the substance of the terms of the agreement to fall within the USTR's discretionary authority such that there was "no law to apply," *id.* at 1327 (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971)), the court nevertheless considered, and rejected, the plaintiff's argument that the agreement failed to meet other applicable statutory requirements, *id.*

The Government's motion does not discuss the political question doctrine in relation to Plaintiffs' claims concerning the USTR's compliance with the procedural requirements set forth in the APA.  *See* Defs.' Mot. at 25–30; 20-177 Am. Compl. ¶¶ 74–75.  In its reply brief, the Government asserts that, "[i]f a case presents an unreviewable political question, then *no* review of those claims is available under the APA."  Defs.' Resp. & Reply at 10 (citing *Heckler v. Chaney*, 470 U.S. 821, 828 (1985), and *Mobarez v. Kerry*, 187 F. Supp. 3d 85, 97 (D.D.C. 2016)) (emphasis added).  The cited cases are inapposite because each addressed the unavailability of APA review of substantive—as opposed to procedural—claims.  *See Heckler*, 470 U.S. at 837–38 (finding that an agency's discretionary decision not to undertake an enforcement action was not subject to judicial review pursuant to 5 U.S.C. § 701(a)(2)); *Mobarez*, 187 F. Supp. 3d at 92 (declining to undertake APA review of the plaintiff's claim that the U.S. government failed to fulfill its alleged duty to evacuate U.S. citizens from Yemen and distinguishing such claims from reviewable "garden-variety" claims requiring statutory interpretation).

Simply put, the policy-laden questions to which the USTR directed its discretionary authority are not before the court.  *See* Defs.' Mot. at 29 (arguing that "plaintiffs invite competing policies and statements regarding United States trade policy from the Judicial Branch").  Matters of statutory interpretation and compliance with procedural requirements are independent questions the court is well-equipped to answer.  Thus, the court is not risking "the potentiality of embarrassment from multifarious pronouncements by various departments on one question."  *Baker*, 369

U.S. at 217.  Accordingly, the court denies the Government's motion to dismiss

Plaintiffs' claims based on purported non-justiciability and now turns to the merits of

those claims.

**II.     Whether the USTR Exceeded its Modification Authority Pursuant to
        Section 307 of the Trade Act**

   **1.  Standard of Review**

      **a.  Parties' Contentions**

      The Government contends that, even if the contested actions are those of the

USTR, a heightened standard of review applies, namely, whether there has been "a

clear misconstruction of the governing statute, a significant procedural violation, or

action outside delegated authority."  Defs.' Mot. at 30–31 (quoting *Gilda II*, 622 F.3d at

1363).  The Government asserts that the USTR conducts "'[a]ll functions . . . under the

direction of the President,'" *id.* at 30,[12] meaning that the court must "afford[] substantial

deference to decisions of the [USTR] implicating the discretionary authority of the

President in matters of foreign relations," *id.* (quoting *Gilda II*, 622 F.2d at 1363).

      Plaintiffs contend that the court "is the final authority on issues of statutory

construction," Pls.' Cross-Mot. & Resp. at 39 (quoting *Gilda II*, 622 F.3d at 1363), and

resolving this case requires applying the *Chevron* framework, *id.* at 39–40 (citing

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 n. 9 (1984)).

---

[12] The Government identifies 19 U.S.C. § 2171(a) as the source for this quotation, but
the phrase is instead found in *Reorganization Plan No. 3 of 1979*, 44 Fed. Reg. 69,273,
69,274 (1979) (reorganization of functions relating to international trade, section
1(b)(4)).

Plaintiffs further contend that the statute is unambiguous, but that even if it were not, the USTR's interpretation merits no deference.  *Id.* at 41–42.  Plaintiffs also contend that the Government has misconstrued the authorities upon which it seeks to rely.  Pls.' Reply at 3–5.

### b.  Analysis

In cases arising under the court's jurisdiction pursuant to 28 U.S.C. § 1581(i), the court applies the standard of review set forth in the APA.  28 U.S.C. § 2640(e).  The "court must 'decide all relevant questions of law, interpret constitutional and statutory provisions,' and 'hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  *Gilda II*, 622 F.3d at 1363 (quoting 5 U.S.C. § 706) (alteration in original).

While the Government seeks to distinguish *Gilda II* based on the underlying statute at issue,[13] *see* Defs.' Resp. & Reply at 6, that distinction is inapposite here. *Gilda II* recognizes that although the "court affords substantial deference to decisions of the Trade Representative implicating the *discretionary authority* of the President in matters of foreign relations," *id.* (citing *Maple Leaf Fish Co. v. United States*, 762 F.2d 86, 89 (Fed. Cir. 1985) (emphasis added), "[t]he judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary

---

[13] *Gilda II* addressed the USTR's interpretation of 19 U.S.C. § 2417(c)(1), the statutory provision governing automatic termination of retaliatory duties.  622 F.3d at 1362.  That provision does not involve presidential direction.

to clear congressional intent," *id.* (quoting *Chevron*, 467 U.S. at 843 n.9 (1984))

(alteration in original).  Thus, when "the intent of Congress is clear, that is the end of the

matter; for the court, as well as the agency, must give effect to the unambiguously

expressed intent of Congress."  *Id.* (quoting *Chevron*, 467 U.S. at 842–43).

Accordingly, the appellate court distinguished matters implicating presidential discretion

from those requiring statutory interpretation.  *See Gilda II*, 622 F.3d at 1363.

Here, resolving Plaintiffs' substantive claims requires the court first to interpret

the relevant statutory provisions; thus, the court "must first carefully investigate the

matter to determine whether Congress's purpose and intent on the question at issue is

judicially ascertainable."  *Timex V.I., Inc. v. United States*, 157 F.3d 879, 881 (Fed. Cir.

1998).  Accordingly, the court turns to its examination of "the statute's text, structure,

and legislative history," applying, if necessary, "the relevant canons of interpretation."

*Gazelle v. Shulkin*, 868 F.3d 1006, 1010 (Fed. Cir. 2017) (quoting *Heino v. Shinseki*,

683 F.3d 1372, 1378 (Fed. Cir. 2012)).[14]

---

[14] The Government's reliance on *Maple Leaf Fish Co.*, 762 F.2d 86, *Silfab Solar, Inc. v. United States*, 892 F.3d 1340 (Fed. Cir. 2018), and *Transpacific Steel LLC v. United States*, 4 F.4th 1306 (Fed. Cir. 2021), *cert. denied*, 2022 WL 892108 (U.S. Mar. 28, 2022), is also unpersuasive.  *See* Defs.' Mot. at 30–31; Defs.' Resp. & Reply at 11–13. *Silfab Solar* and *Maple Leaf Fish Co.* address, respectively, the extent to which the court may review findings of fact by the President or the U.S. International Trade Commission in preparation for presidential action.  *Silfab Solar*, 892 F.3d at 1349; *Maple Leaf Fish Co.*, 762 F.2d at 89–90.  In *Transpacific*, the appellate court addressed the timeliness of presidential action pursuant to section 232 of the Trade Expansion Act of 1962, 19 U.S.C. § 1862.  4 F.4th at 1318–19.  That inquiry required the court to interpret the meaning of the term "action" pursuant to 19 U.S.C. § 1862(c)(1)(B).  *Id.* at 1322.  In so doing, the court considered the statute's ordinary meaning, *id.* at 1319–22, "relevant statutory context," *id.* at 1322, and the statute's "legal and historical backdrop,"

Because the court finds that the statute is unambiguous, the court need not and does not address what, if any, deference the USTR's interpretation of the statute would be given if the statute was ambiguous.

### 2. The USTR's Authority Pursuant to Section 307(a)(1)(B)

#### a. Parties' Contentions

The Government contends that "China's subsequent actions"—retaliatory tariffs and other measures such as currency devaluation—"were not separate and distinct from their unfair trade practices investigated under section 301" but "were directly related" to the investigation and intended to permit and defend the continuation of the investigated practices. Defs.' Mot. at 32.[15]  The Government further contends that Plaintiffs' interpretation of the statute would prevent the President and the USTR from "respond[ing] to a trading partner's refusal to eliminate its unfair trade practices" and retaliatory actions. *Id.* at 33.  Such an interpretation, the Government contends, is inconsistent with both the USTR's authority to take "all 'appropriate and feasible action'  within the power of the President" to eliminate the unfair practices pursuant to section

---

*id.* at 1324 (citation omitted), before concluding that Congress' intent was plain with respect to the operative term.  These cases thus lend support for the distinction between review of discretionary decisions and statutory interpretation recognized in *Gilda II*.

[15] Indeed, the Government contends that China's defensive actions permitted the USTR to modify the section 301 action under both subsections (B) and (C).  Defs.' Mot. at 33. The Government asserts, and Plaintiffs agree, that each subsection—(B) and (C)— constitutes "an independent basis for action" and failure as to one is not a basis to overturn the action.  Defs.' Mot. at 36 n.6; Oral Arg. 1:55:10–1:55:30 (colloquy with Plaintiffs during which they agreed that each statutory basis provides independent authority for the modifications).

301(b)(2), *id.*, and legislative history surrounding the 1988 amendments to section 301 indicating congressional desire for vigorous action in response to unfair trade practices, *id.* at 37–38.

Drawing a temporal line in the sand, Plaintiffs contend that the phrase "the subject of such action" in subsection (B) cannot encompass China's defensive actions "because those actions had not yet transpired when the investigation was initiated or when USTR determined that remedial action was 'appropriate.'" Pls.' Cross-Mot. & Resp. at 31. Thus, Plaintiffs contend, "[t]he increased burden cannot come from other subsequent 'defensive' actions." *Id.* at 32; *cf.* Ecolab's Br. at 8–12 (advancing similar arguments). Plaintiffs contend that any congressional intent to permit the USTR "to prosecute a limitless trade war" would have been stated in clearer terms, "not through the tailored language of Section 307(a)(1)(B)." Pls.' Cross-Mot. & Resp. at 31–32. Plaintiffs also contend that the existence of explicit retaliation authority pursuant to section 306(b)(2) disfavors interpreting subsection (B) to allow the USTR to retaliate against a trading partner's actions under the guise of modification. *See id.* at 32–33.

The Government counters that the USTR "made the required finding that the burden on U.S. commerce had increased as a result of China's unfair trade practices, *and* its 'subsequent defensive actions taken to maintain' those practices." Defs.' Resp. & Reply at 14 (citing *Final List 3*, 83 Fed. Reg. at 47,974, and *Final List 4*, 84 Fed. Reg.

at 43,304) (emphasis added).[16]  The Government contends that the court should reject

Plaintiffs' characterization of the initial investigation as "limited and discrete," *id.* at 16,

because the investigated practices covered "China's massive 'top-down national

strategy[]' unfairly to acquire U.S. technology," which required "the mobilization and

participation of all sectors of [Chinese] society," *id.* at 15–16 & n.4 (quoting USTR

Report at 11).  The Government also contends that section 306(b)(2) applies in different

circumstances and "is irrelevant here."  *Id.* at 16.  While recognizing that resort to

legislative history is unnecessary when a statute is plain, Defs.' Mot. at 5 n.2, the

Government contends that the legislative history behind the 1988 amendments to the

Trade Act supports interpreting subsection (B) to allow the USTR to respond to

defensive conduct, Defs.' Resp. & Reply at 18 (citing 133 CONG. REC. 20,486 (1987)

(statement of Sen. Lautenberg); S. REP. NO. 100-71 (1987), at 73–74).

In their Reply, Plaintiffs contend that the Government's assertions of an

increased burden on U.S. commerce from the investigated practices are conclusory and

unavailing.  Pls.' Reply at 7–8.  Plaintiffs contend that the Government's "true argument"

for reliance on subsection (B) remains China's subsequent defensive conduct that is

distinct from the "the four discrete categories of intellectual property and technology

transfer conduct that USTR actually investigated."  *Id.* at 8.  Plaintiffs further contend

that the Government's reliance on the USTR Report constitutes a *post hoc*

---

[16] In that regard, the Government also points to a statement regarding China's
acquisition of hybrid vehicle technology from Toyota.  Defs.' Resp. & Reply at 15
(quoting Mem. from USTR General Counsel Stephen Vaughn to USTR Robert
Lighthizer (Sept. 17, 2018) ("Sept. 2018 Vaughn Mem.") at 6, PR 1).

rationalization for the USTR's action.  *Id.* at 10.  Lastly, Plaintiffs contend that the

Government's dismissal of the relevance of section 306 misses the point.  *Id.* at 10 n.3.

Plaintiffs argue that the existence of "section 306 shows that Congress understood how

to authorize 'retaliation' explicitly against another country's response to trade

proceedings or actions where it wanted to."  *Id.*

### b.  In Promulgating List 3 and List 4A, the USTR Properly Exercised Its Authority Pursuant to Section 307(a)(1)(B)

The court begins with the language of the statute.  The statute permits the USTR

to "modify or terminate *any action*, subject to the specific direction, if any, of the

President with respect to such action, that is being taken under section 2411 of this title

if—. . . the *burden or restriction* on United States commerce . . . of the *acts, policies,*

*and practices*, that are the *subject of such action* has increased or decreased."  19

U.S.C. § 2417(a)(1)(B) (emphasis added).  This case requires the court first to interpret

the meaning of the phrase, "the subject of such action," because the Parties disagree

about whether retaliatory actions taken by China can be the source of burden from the

acts, policies, and practices that were the subject of the original action.

Plaintiffs contend that the relevant phrase refers to the subject of the original

investigation.  Pls.' Cross-Mot. & Resp. at 32; Pls.' Reply at 7–9.  The plain meaning of

the terms supports that interpretation.  Black's Law Dictionary[17] defines "subject," when

used as a noun, as "[t]he matter of concern over which something is created; something

---

[17] Courts have long considered dictionary definitions to discern the ordinary meaning of a term.  *See, e.g.*, *Nix v. Hedden*, 149 U.S. 304, 306–07 (1893); *Gumpenberger v. Wilkie*, 973 F.3d 1379, 1382 (Fed. Cir. 2020).

about which thought or the constructive faculty is employed," for example, "the subject of the statute."  Black's Law Dictionary at 1465 (8th Ed. 2004); *cf.* Subject (noun), The Oxford English Dictionary, Vol. XVII at 29 (2nd Ed. 1989) ("A thing affording matter for action of a specified kind; a ground motive or cause.").  The phrase "such action," when read in context, refers to the "action" referenced in the introductory clause of section 307(a)(1).  *See* 19 U.S.C. § 2417(a)(1)(B); *cf. Solar Energy Indus. Ass'n v. United States*, Slip Op. 21-154, 2021 WL 5320790, at *9 (Nov. 16, 2021) (stating that the term "'such' is typically read to 'refer[ ] back to something indicated earlier in the text'") (citation omitted) (alteration in original).  The term "action," in the introductory clause, constitutes a reference to the action taken pursuant to section 301, i.e., the initial action. *See* 19 U.S.C. § 2417(a)(1) (cross-referencing 19 U.S.C. § 2411).  Thus, to rely on the authority provided by subsection (B), the USTR must act based on increased harm to U.S. commerce from the acts, policies, and practices that constituted the subject of the original investigation.  Indeed, the Government does not present a different textual view of the provision.  The court thus finds the text of the statute plain with respect to subsection (B) and need not resort to legislative history or other tools of statutory interpretation.

Interpreting the meaning of the phrase does not, however, end the inquiry. Instead, the Parties dispute what *was* the subject of the action and whether China's defensive conduct, occurring subsequent to the original investigation, can properly be considered the basis for an increase in the harm stemming from the subject of the action.  *See, e.g.*, Pls.' Cross-Mot. & Resp. at 32; Defs.' Resp. & Reply at 15–16.

Plaintiffs argue that the subject of the action must be limited to "the investigated intellectual property practices themselves."  Pls.' Cross-Mot. & Resp. at 25 (emphasis omitted); *see also* Pls.' Reply at 8 (distinguishing China's retaliation from the conduct "that USTR actually investigated").  The Government argues that China's retaliatory conduct was "not separate and distinct from" the investigated acts and was instead "directly related" to the acts, policies, and practices that were the subject of the investigation.  Defs.' Mot. at 32; Defs.' Resp. & Reply at 15.

Upon review of the record of the agency's proceedings and the arguments of the Parties, the court finds that the link between the subject of the original section 301 action and China's retaliation is plain on its face.  The USTR's initial determination was statutorily required to be designed to lead to the elimination of the unfair acts, policies, and practices, but without any requirement for the action to be focused on the same or similar industries.  *See* 19 U.S.C. § 2411(b)(2).  Thus, by imposing duties on $50 billion in trade, the USTR intended to disrupt the trade flow into the United States in such amount necessary to lead to the elimination of China's unfair practices.  By directly offsetting the duties on the $50 billion in trade with its own duties on $50 billion in trade from the United States, China directly connected its retaliation to the U.S. action and to its own acts, policies, and practices that the U.S. action was designed to eliminate.  *See Final List 3*, 83 Fed. Reg. at 47,974; *cf. Final List 4*, 84 Fed. Reg. at 43,304 (noting China's decision to impose tariffs on $110 billion worth of U.S. goods).

Plaintiffs' arguments that China's retaliatory conduct cannot be part of "the subject of" the action because that conduct post-dates the initial investigation and

determination are not persuasive.  Pls.' Cross-Mot. & Resp. at 31; *see also* Pls.' Reply

at 8 ("As a temporal and logical matter, the 'subject of' the section 301 action does not

encompass all 'subsequent defensive measures' China might take in retaliation for U.S.

tariffs.").  Modifications are based on activity increasing (or decreasing) the burden on

U.S. commerce after the initial determination.  19 U.S.C. § 2417(a)(1)(B).  Plaintiffs'

argument thus turns on whether the USTR found that China's retaliatory conduct

caused an increased burden on U.S. commerce from the acts, policies, and practices

that constituted the subject of the action.  Because, as discussed below, the court

concludes that it did, Plaintiffs' timing-based argument must fail.[18]

In determining whether the USTR reasonably considered China's retaliatory

actions to be within the purview of the "subject of the action," the court "may not supply

a reasoned basis for the agency's action that the agency itself has not given."  *Motor*

*Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43

(1983) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).  Nevertheless, the

---

[18] Plaintiffs also argue that "[t]he magnitude of the responsive List 3 and List 4A actions
. . . underscores their distinct nature."  Pls.' Reply at 8.  According to Plaintiffs, the
USTR deemed $50 billion "'commensurate' to the harms" resulting from the
"investigated practices."  *Id.*  The USTR explained that a $50 billion action was initially
"appropriate both in light of the estimated harm to the U.S. economy, and to obtain
elimination of China's harmful acts, policies, and practices."  *USTR Determination*, 83
Fed. Reg. at 14,907.  The USTR is not, however, statutorily required to quantify any
increase in burden or otherwise show that the increase in tariffs is commensurate to the
increased harm.  *See* 19 U.S.C. § 2417(a)(1)(B); *compare id.* § 2411(a)(3) (stating that
mandatory actions taken pursuant to section 301(a)(1) "shall be devised so as to affect
goods or services of the foreign country in an amount that is equivalent in value to the
burden or restriction being imposed by that country on United States commerce"), *with*
*id.* § 2411(b) (governing discretionary actions taken pursuant to section 301(b), which
does not contain any such limitation).

court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974).

Beyond the clear connection between the defensive, retaliatory actions and the acts, policies, and practices they seek to defend, List 3 and List 4A reference the USTR's prior determinations concerning the investigation and subsequent actions.  *See Final List 3*, 83 Fed. Reg. at 47,974; *Final List 4*, 84 Fed. Reg. at 43,304.  Given that List 3 and List 4A constitute modifications to those actions, the court also looked to the cited determinations to consider further the USTR's position regarding the scope of the subject of the original action.  The USTR broadly defined the investigation as addressing "China's Acts, Policies, and Practices *Related to* Technology Transfer, Intellectual Property, and Innovation."  *Initiation Notice*, 82 Fed. Reg. at 40,213 (emphasis added).  Thus, the investigation covered China's conduct *related to* the identified matters and not simply, as Plaintiffs contend, the acts *constituting* the identified matters.  *See id.*  Additionally, while the USTR specified four categories of acts, policies, and practices that it deemed actionable in its initial determination, the USTR described the Report as a "comprehensive" account of "the acts, policies, and practices under investigation."  *USTR Determination*, 83 Fed. Reg. at 14,907.  The Report, which is both public and contemporaneous with the USTR's initial section 301 determination, may also be considered.  *See United States v. Sci. Applications Int'l Corp.*, 502 F. Supp. 2d 75, 78 (D.D.C. 2007) ("Generally, 'when a document incorporates outside material by reference, the subject matter to which it refers

becomes a part of the incorporating document just as if it were set out in full.'") (quoting *Air Line Pilots Ass'n, Int'l v. Delta Air Lines*, 863 F.2d 87, 94 (D.C. Cir. 1988)).

In addition to summarizing the specific acts, policies, and practices related to technology transfer, intellectual property, and innovation under investigation, the USTR Report provided the historical context in which those actions arose.  The Report explained that "[c]oncerns about a wide range of unfair practices of the Chinese government . . . related to [those matters] are longstanding."  USTR Report at 4.  The Report noted that the investigation covered the Chinese government's use of "a variety of tools, including opaque and discretionary administrative approval processes, joint venture requirements, foreign equity limitations, procurements, *and other mechanisms* to regulate or intervene in U.S. companies' operations in China, in order to require or pressure the transfer of technologies and intellectual property to Chinese companies." *Id.* at 5 (emphasis added).  Indeed, as noted by the Government, China's "top-down national strategy" for acquiring technology "requires the mobilization and participation of all sectors of [Chinese] society."  *Id.* at 11.

In addition to these concerns, the Report specifically explained the reluctance among U.S. companies to "complain about China's unfair trade practices" because of concerns about "Chinese retaliation."  *Id.* at 9.  "Other mechanisms" used to regulate U.S. companies' operations in China thus included the lack of "effective recourse" for U.S. companies wanting to report "informal pressures for fear of retaliation and the potential loss of business opportunities."  *Id.* at 21.  According to the USTR, "concerns

about retaliation have enabled China's technology transfer regime to persist for more than a decade."  *Id.*; *see also id.* at 21 n.106.

The foregoing discussion of retaliation in the USTR Report provides context and explanation regarding the reasons why individual companies were unable and unwilling to pursue their own complaints against the underlying Chinese practices.  This recognition of the challenges faced by individual companies led the USTR, consistent with the direction of the President, to initiate the section 301 action in order to protect U.S. companies without them filing their own petitions and incurring the consequences of targeted retaliation.  *See id.* at 10.  Thus, even if the retaliatory actions by China were not otherwise clearly related to the acts, policies, and practices that China sought to defend from the USTR's section 301 action, the USTR Report provides a basis for regarding China's retaliatory actions as within the scope of the acts, policies, and practices that were the subject of the original action.

The USTR's rationale for List 3 and List 4A reflects this understanding of the agency's authority pursuant to subsection (B).  As the USTR explained, China's retaliation against the initial imposition constitutes conduct that is related to the specified unfair trade policies because it is intended to "maintain those policies."  *Final List 3*, 83 Fed. Reg. at 47,974; *see also Final List 4*, 84 Fed. Reg. at 43,304.  That retaliation consisted of China's imposition of tariffs on $50 billion worth of U.S. goods, *Final List 3*, 83 Fed. Reg. at 47,974, later increased to $110 billion worth of U.S. goods, *Final List 4*, 84 Fed. Reg. at 43,304, and "non-tariff measures," *id.*, including devaluing China's currency, *id.* at 43,305.  China's retaliation also caused increased harm to U.S.

commerce; a point that Plaintiffs concede.  *See, e.g.*, Pls.' Cross-Mot. & Resp. at 31.

Together, these notices reflect the USTR's recognition that Chinese retaliation was

similarly directed against the effort to challenge its unfair acts, policies, practices, just as

the threats to retaliate against individual companies were directed at maintaining those

same practices.  Accordingly, the USTR properly found an increased burden on U.S.

commerce arising from the acts that formed part of the subject of the original action.[19]

     For these reasons, the court finds that the USTR exercised its authority

consistent with section 307(a)(1)(B) when it promulgated List 3 and List 4A.  Because

subsections (B) and (C) each provided an independent basis for the determinations, the

court need not and does not reach the Parties' arguments concerning the USTR's

authority to issue the determinations pursuant to section 307(a)(1)(C).

### III.   Procedural Claims Pursuant to the APA

     The court first addresses the Government's arguments that the promulgation of

List 3 and List 4A is exempt from the APA's procedural requirements and, finding those

arguments non-meritorious, next addresses Plaintiffs' APA claims.

#### 1.   Foreign Affairs Exemption

#### a.   Parties' Contentions

     The Government contends that the promulgation of List 3 and List 4A falls under

the foreign affairs exception to the APA because they "were part of the negotiation of an

---

[19] For the same reasons, the court rejects Plaintiffs' argument that the USTR violated
the substantive provisions of the APA by failing to point to evidence of an "increased
burden" from the investigated practices.  *See* Pls.' Reply at 23–24.

international trade agreement" and "relate[d] to the President's 'overall political agenda concerning relations with another country.'"  Defs.' Mot. at 42–43 (quoting *Am. Ass'n of Exps. & Imps. v. United States*, 751 F.2d 1239, 1249 (Fed. Cir. 1985)).

Plaintiffs contend that the promulgation of List 3 and List 4A does not fall under the foreign affairs exception because "the public rulemaking" process "would [not] 'provoke definitively undesirable international consequences.'"  Pls.' Cross-Mot. & Resp. at 61–62.

### b.  The Foreign Affairs Exemption Does Not Apply

The APA exempts a rulemaking from notice and comment procedures when the agency action involves a "foreign affairs function of the United States."  5 U.S.C. § 553(a)(1) (stating that section 553 applies, "except to the extent that" a foreign affairs function "is involved").[20]  In other words, the foreign affairs exemption is intended to allow an agency to "*dispense with* [the] notice-and-comment procedures" set forth in section 553.  *E.B. v. U.S. Dep't of State*, 2022 WL 343505, at *4 (D.D.C. 2022) (emphasis added); *see also* H.R. REP. NO. 79-1980 at 257 (1946) (foreign affairs functions are "exempt[] from *all* of the requirements" set forth in section 553) (emphasis added).

When invoked, the exemption "will be construed narrowly and granted reluctantly," and "only to the extent that the excepted subject matter is clearly and

---

[20] The Government concedes that, in the event the court finds the promulgation of List 3 and List 4A to constitute agency action, the USTR's actions are subject to informal rulemaking procedures set forth in 5 U.S.C. § 553(b)–(c) unless the court finds that the foreign affairs exception applies.  Defs.' Mot. at 39.

directly involved in a foreign affairs function."  *Mast Indus., Inc. v. Regan*, 8 CIT 214,

231, 596 F. Supp. 1567, 1582 (1984) (quotations and citation omitted).  "The purpose of

the exemption [is] to allow more cautious and sensitive consideration of those matters

which 'so affect relations with other Governments that, for example, public rule-making

provisions would provoke definitely undesirable international consequences.'"  *Am.*

*Ass'n of Exps. & Imps.*, 751 F.2d at 1249 (quoting H.R. REP. NO. 79-1980 at 257).[21]

In this case, the USTR did not invoke the foreign affairs exemption to relieve the

agency from any rulemaking procedures that may apply in addition to the requirements

of section 307.[22]  *See Final List 3*, 83 Fed. Reg. at 47,974–75; *Final List 4*, 84 Fed. Reg.

at 43,304–05.  Indeed, at each step in the processes that resulted in List 3 and List 4A,

the USTR, generally consistent with both 19 U.S.C. § 2417(a)(2)–(b) and 5 U.S.C.

---

[21] Consistent with its use as an example, meeting the "definitely undesirable international consequences" standard may be enough to invoke the foreign affairs exemption but is not necessary.  *See Mast*, 8 CIT at 230, 596 F. Supp. 2d at 1581 (noting that such a finding "has not been considered necessary by courts" and, if it were, "would render the 'military or foreign affairs function' superfluous since the 'good cause' exception [set forth in section] 553(b)(B), would apply").

[22] The foreign affairs exemption "[does] not relieve an agency from any requirements imposed by law apart from this bill.  H.R. REP. NO. 79-1980 at 257.  Section 307(a)(2) and (b) require the USTR to "consult with the petitioner, if any, and with representatives of the domestic industry concerned" and to "provide [an] opportunity for the presentation of views by other interested persons affected by the proposed modification or termination" before publishing "the reasons [for]" any modification in the *Federal Register* and providing a report to Congress.  19 U.S.C. § 2417(a)(2)–(b).  At the hearing, the Government suggested that the only additional requirement found in the APA as compared to section 307 is the requirement for a reasoned explanation, such that applying the foreign affairs exemption would relieve the court from analyzing the sufficiency of the USTR's response to public comments.  Oral Arg. 59:15–1:01:00.  In other words, the Government appears to interpret section 307 to provide at least some opportunity for public comment without requiring the USTR to engage with the comments it receives to the extent required by the APA.

§ 553(b)–(c), published notices of its intended actions, accepted comments from the

public, and held public hearings prior to publishing its determinations.  *See supra*

Background Sec. II.  Thus, the Government's invocation of the exemption is entirely

*post hoc* and inconsistent with the manner in which the USTR conducted the

modification processes.[23]

  While the statute does not explicitly require an agency to invoke the foreign

affairs exemption in a final rule, the USTR's failure to make such an invocation

combined with the manner in which the USTR conducted these processes suggests that

the USTR did not intend to invoke the exemption and, at best, provides the court with an

unclear record as to whether the USTR in fact intended to invoke the exemption.  *Cf.,*

*e.g.*, *Mast*, 8 CIT at 229, 596 F. Supp. at 1580 (documenting explicit invocation of the

foreign affairs exemption).  The court, however, need not decide whether the foreign

affairs exemption may properly be invoked solely by counsel *post hoc*, because the

court finds unconvincing the Government's argument that USTR's actions "fall squarely

within the foreign affairs . . . exception."  Defs.' Mot. at 44.  Unlike in *Mast*, for example,

on which the Government seeks to rely in connection with the implementation of

international agreements, the United States and China did not enter into any trade

---

[23] Plaintiffs do not allege facial non-compliance with section 553 but, rather, deficiencies with respect to the USTR's notice-and-comment procedures.  *See* 20-177 Am. Compl. ¶¶ 74–75.

agreement until after the USTR promulgated *Final List 3* and *Final List 4*. *See* Defs.'

Mot. at 41 (citing *Mast*, 8 CIT at 232, 596 F. Supp. 3d at 1582).[24]

Moreover, courts have recognized that the foreign affairs exemption does not

apply simply because a rule relates to ongoing negotiations. *See, e.g.*, *East Bay*

*Sanctuary Covenant v. Trump*, 932 F.3d 742, 776 (9th Cir. 2018) (holding that the

foreign affairs exemption did not apply to an interim rule suspending asylum for certain

persons when the government claimed that the rule "directly related to ongoing

negotiations with Mexico" absent any explanation why immediate publication of the rule

furthered the negotiations). This is particularly true when, as here, some form of notice,

opportunity to comment, and explanation is otherwise required. *See* 19 U.S.C.

§ 2417(a)(2)–(b). The Government has failed to explain how the foreign affairs

exemption would "allow more cautious and sensitive consideration of [the] matters"

addressed in the contested determinations. *See Am. Ass'n of Exps. & Imps.*, 751 F.2d

at 1249.

While the court recognizes the circuit split as to whether an agency action must

have "definitely undesirable international consequences" to qualify for the foreign affairs

exemption, *see Mast*, 8 CIT at 230 & n.20, 596 F. Supp. at 1581 & n.20*,* the court is

bound by Federal Circuit precedent, which at least considers whether an action would

---

[24] While *Mast* states that "the negotiation of agreements with foreign governments . . .
'clearly and directly' involve[d] a 'foreign affairs function,'" that statement was made in
the context of negotiations under section 204 of the Agricultural Act of 1956, which
expressly granted the President power to issue regulations in conjunction with the
negotiation of international agreements limiting certain imports. 8 CIT at 217, 232, 596
F. Supp. at 1570, 1582.

have such consequences in determining whether the foreign affairs exception should

apply, *see Am. Ass'n of Exps. & Imps.*, 751 F.2d at 1249.  The Government has not

pointed to any such consequences, which would prove difficult given the considerable

public airing of the proceedings.[25]  *See supra* Background Sec. II; *Zhang v. Slattery*, 55

F.3d 732, 744–745 (2d Cir. 1995) (holding that the foreign affairs exemption did not

apply to an interim immigration rule because the record lacked evidence that subjecting

the rule to notice and comment would have undesirable international consequences and

because the focus of the rule had been at the center of a national debate for more than

six months prior to the issuance of the rule).

Accordingly, the court turns to the merits of Plaintiffs' APA claims.

**2.  Response to Comments**

**a.  Parties' Contentions**

Plaintiffs contend that the USTR failed to respond to comments in a reasoned

manner using two lines of argument.  *See* Pls.' Cross-Mot. & Resp. at 59–60; Pls.'

Reply at 25–27.  First, Plaintiffs assert that the USTR's failure to address the

"'overwhelming[]' opposition" to the imposition of List 3 and List 4A was arbitrary and

capricious.  Pls.' Reply at 26 (quoting Defs.' Resp. & Reply at 38) (alteration in original).

Second, Plaintiffs fault the USTR for failing to explain "which comments, and what

---

[25] At the hearing, the Government argued that responding to each of the thousands of comments would provoke undesirable international consequences but did not explain why or specify the nature of the consequences.  Oral Arg. 1:00:30–1:01:00.  As discussed below, however, a "comment-by-comment" response is not the standard required by the APA.

concerns raised in those comments, caused it to withdraw certain tariff headings and

products but not others."  Pls.' Cross-Mot. & Resp. at 59–60.

Amici Curiae Retail Litigation Center, Inc. and others (collectively, "RLC")

likewise contend that the USTR neither considered, nor took sufficient time to consider,

substantial objections to the modifications.  RLC's Br. at 12–15.  While framing its

arguments in terms of the APA, RLC contends that the USTR's actions are more

troubling given the statutory requirement to provide opportunity for the public to

comment.  Id. at 13–14 (citing 19 U.S.C. § 2417(a)(2)).  RLC argues that the USTR

failed to engage meaningfully with comments expressing concerns that the modification

actions would harm the U.S. economy, "act[] as a hidden tax for consumers on

everyday products," id. at 14, and disrupt "the supply chains of U.S. retailers,

manufacturers, and producers," id. at 15.

The Government contends that the USTR considered the factors relevant to the

statutory determinations pursuant to section 307(a)(1)(B) and (C).  Defs.' Mot. at 46–47,

58–59.  The Government further contends that the Federal Register notices associated

with List 3 reflect the USTR's consideration of comments in its determinations to omit

certain tariff subheadings, delay the onset of the increase in the level of List 3 duties

from 10 percent to 25 percent, and establish an exclusion process.  Id. at 58–59.  With

respect to List 4A, the Government contends that the USTR responded to comments by

stating the bases upon which it removed certain tariff subheadings, separating the

subheadings into two lists and staggering the effective date of List 4B, and establishing

an exclusion process.  Id. at 59; see also Defs.' Resp. & Reply at 41.  The Government

also contends that policy issues raised by RLC fail to provide a basis to "overturn[] the tariffs."  Defs.' Resp. & Reply at 42.

### b.  The USTR Failed to Respond Adequately to Comments

The APA requires agencies conducting notice and comment rulemaking to "incorporate in the rules adopted a concise general statement of their basis and purpose."  5 U.S.C. § 553(c).  An agency's explanation of the basis and purpose for its action must demonstrate a "consideration of the relevant factors," *State Farm*, 463 U.S. at 43 (citation omitted), and "must offer a rational connection between the facts found and the choice made," *id.* at 52 (quotations and citation omitted).  The standard that an agency's response must meet "is not particularly demanding."  *Nat'l Mining Ass'n v. Mine Safety & Health Admin.*, 116 F.3d 520, 549 (D.C. Cir. 1997) (per curiam) (quotations and citation omitted).  A court will not, however, undertake a "laborious examination of the record, formulate in the first instance the significant issues faced by the agency and articulate the rationale of their resolution."  *Auto. Parts & Accessories Ass'n v. Boyd*, 407 F.2d 330, 338 (D.C. Cir. 1968).  For "judicial review . . . to be meaningful," the agency's explanation must enable the court "to see *what major issues of policy were ventilated* by the informal proceedings and why the agency reacted to them as it did."  *Id.* (emphasis added).  Conclusory statements that do not explain how a determination was reached are therefore insufficient.  *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 626 F.3d 84, 94 (D.C. Cir. 2010).

The enabling statute informs the court's examination of an agency's basis and purpose statement and the relevance of comments received by an agency.  Agency

action through notice and comment rulemaking must be tethered to the statute.  *See,*

*e.g.*, *State Farm*, 463 U.S. at 43 (explaining that an agency cannot rely on factors

"which Congress has not intended it to consider").  Additionally, "[t]he basis and purpose

statement is inextricably intertwined with the receipt of comments."  *Action on Smoking*

*& Health v. C.A.B.*, 699 F.2d 1209, 1216 (D.C. Cir. 1983) (footnote citation omitted).  An

agency "must respond in a reasoned manner to those [comments] that raise significant

problems."  *City of Waukesha v. EPA*, 320 F.3d 228, 257 (D.C. Cir. 2003) (quotations

and citation omitted).  "Significant comments are those 'which, if true, raise points

relevant to the agency's decision *and which, if adopted, would require a change in an*

*agency's proposed rule*.'"  *City of Portland, Oregon v. EPA*, 507 F.3d 706, 715 (D.C. Cir.

2007) (quoting *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35 n.58 (D.C. Cir. 1977)).

"[F]ailure to respond to comments is significant only insofar as it demonstrates that the

agency's decision was not based on a consideration of the relevant factors."  *Sherley*,

689 F.3d at 784 (quotations and citations omitted).  "[T]he opportunity to comment is

meaningless unless the agency responds to significant points raised by the public."  *Id.*

(quotations and citation omitted).

　　　　The statute permits the USTR to "modify or terminate any action" that is being

taken pursuant to section 301 "subject to the specific direction, if any, of the President."

19 U.S.C. § 2417(a)(1).  Thus, in accordance with *State Farm*, 463 U.S. at 43, the

President's specific direction, if any, is a statutory consideration for which the agency

must account.  The statute also requires the USTR to consider whether the burden on

U.S. commerce for which action was taken pursuant to section 301 has increased or

decreased, or whether the prior action taken pursuant to section 301(b) is no longer

appropriate.  *See* 19 U.S.C. § 2417(a)(1)(B), (C).  Relatedly, section 301(b) informs the

agency's rationale by providing that the USTR is to exercise its discretionary authority to

take all "appropriate and feasible action" when a foreign country is engaging in "an act,

policy, or practice" that is "unreasonable or discriminatory and burdens or restricts

United States commerce" with the aim of obtaining the elimination of the unfair act,

policy, or practice.  *Id*. § 2411(b).  Thus, statutory factors relevant to the USTR's

determination of whether and how to modify its action include ensuring that appropriate

action is taken to eliminate discriminatory and burdensome acts and the President's

specific direction, if any.

  The notices of proposed rulemaking ("NPRM(s)") reflected these considerations.

In *List 3 NPRM*, the USTR explained that the proposed supplemental action accorded

with the President's direction as reflected in his statement "direct[ing] the United States

Trade Representative to identify $200 billion worth of Chinese goods for additional

tariffs at a rate of 10 percent" that would "go into effect" following completion of "the

legal process."  83 Fed. Reg. at 33,609 (citing June 2018 Presidential Statement).  The

notice also requested public comments:

> with respect to *any* aspect of the proposed supplemental action, including
>
> - The specific tariff subheadings to be subject to increased duties, including whether the subheadings listed in the Annex should be retained or removed, or whether subheadings not currently on the list should be added.
> - The level of the increase, *if any*, in the rate of duty.
> - The appropriate *aggregate level* of trade to be covered by additional duties.

*Id.* (emphases added); *see also List 3 Cmt. Extension*, 83 Fed. Reg. at 38,761

(extending comment period following President's direction to consider increasing the

tariff rate to 25 percent and specifically seeking comment on "the possible increase in

the rate of additional duty").  In *List 4 NPRM*, the USTR likewise explained that the

proposed supplemental action accorded with the President's direction and requested

public comments on "any aspect" of the proposal, including the abovementioned points.

84 Fed. Reg. at 22,564–65.

       Consistent with the NPRMs, submitted comments raised concerns regarding the

legality and efficacy of the tariffs, the potential for damage to the U.S. economy, and

whether alternative measures would be more effective.  *See, e.g.*, Pls.' Cross-Mot. &

Resp. at 14–15, 20–21 (citing comments); RLC's Br. at 14–16 (same); Comments of

Nat'l Foreign Trade Council, USTR-2018-0026-1843 (Aug. 22, 2018), PR 1891 (arguing

that the tariffs will not be effective and will "create a new status-quo of higher trade

barriers");[26] Comments of U.S. Chamber of Com., USTR-2018-0026-1391 (Aug. 20,

2018), PR 1439; Comments of HP Inc., USTR-2019-0004-1701 (June 17, 2019), PR

7877 (citing section 337 of the Tariff Act of 1930 as an alternative tool for accomplishing

the administration's goals without the economic costs of section 301 tariffs).

       Some comments also argued that certain products should be added to or

removed from the proposed lists.  *See, e.g.*, Comments of Ams. for Free Trade Coal.,

---

[26] The court cites the date of the record document, which is not necessarily the same as
the date the USTR associates with the document on the administrative record indices
filed with the court.

USTR-2018-0026-6132 (Sept. 26, 2018), PR 6163 (noting that List 3 needed an

exclusion process and that "the criteria for inclusion or removal from the final list were

not made public"); Comments of Rheem Mfr'g Co., USTR-2018-0026-3884 (Sept. 5,

2018), PR 3930 (supporting the retention of subheadings for air conditioners on List 3

while urging the USTR to add a subheading covering "parts" under which the indoor and

outdoor components of air conditioners enter when shipped separately, even if fully

assembled); Comments of Retail Indus. Leaders Ass'n, USTR-2018-0026-5887 (Sept.

6, 2018), PR 5924 (urging the removal of parts used in U.S. manufacturing); Comments

of U.S. Steel Corp. USTR-2018-0026-5447 (undated), PR 5492 (arguing for the

inclusion of advanced steel products (tin mill plate) as an appropriate response to the

cyber-hacking covered by the USTR Report, including of U.S. Steel itself).

        Other comments requested no increased duties on imported parts and inputs

while supporting the duties on finished goods that compete with domestically

manufactured goods.  *See, e.g.*, Comments of Whirlpool Corp., USTR-2018-0026-3867

(Sept. 5, 2018), PR 3913 (requesting the removal of several subheadings for parts that

it uses in its U.S. manufacturing operations and the addition of a subheading for

completed dishwashers competing with Whirlpool's products).

        The statute, the NPRMs, and the comments responsive to the NPRMs frame this

court's review of the USTR's concise statements of basis and purpose.  While "[a]n

agency need not respond to every comment," it must explain how it "resolved any

significant problems raised by the comments."  *Action on Smoking*, 699 F.2d at 1216.

Thus, the USTR was required to address comments regarding any duties to be

imposed, the aggregate level of trade subject to the proposed duties, and the products covered by the modifications, all in light of section 301's statutory purpose to eliminate the burden on U.S. commerce from China's unfair acts, policies, and practices and subject to the specific direction of the President, if any.

With respect to the "wisdom of the enterprise," i.e., whether to proceed with any increase in duties, the USTR explained its decisions by way of reference to China's unfair practices and stated that the increase in duties and level of trade affected by the modifications are consistent with the specific direction of the President. *See Final List 3*, 83 Fed. Reg. at 47,974–75; *Final List 4*, 84 Fed. Reg. at 43,304–05. The September 2018 Presidential Statement, in turn, provided relevant context, stating that China's unfair policies and practices relating to U.S. technology and intellectual property "plainly constitute a grave threat to the long-term health and prosperity of the United States economy." Sept. 2018 Presidential Statement.

The USTR's statements of basis and purpose thus indicate why the USTR deemed China's ongoing and retaliatory conduct actionable; however, those statements fail to apprise the court how the USTR came to its decision to act and the manner in which it chose to act, taking account of the opposition and support for the increased duties and the inclusion or exclusion of particular subheadings, the concerns raised about the impact of the duties on the U.S. economy, and the potential availability of alternative courses of action, within the context of the specific direction provided by the President.

While the USTR pointed to the specific direction of the President in September 2018 in *Final List 3* and the specific direction of the President more generally in *Final List 4*, and, while the President's direction is statutorily significant, the USTR's invocation of the President's direction does not obviate the USTR's obligation to respond to significant issues raised in the comments.  *Cf. Sherley*, 689 F.3d at 784–85.[27]  In *List 3 NPRM*, for example, the USTR noted the President's desire for a 10 percent tariff on $200 billion worth of Chinese imports, 83 Fed. Reg. at 33,609 (citing June 2018 Presidential Statement), but did not treat that direction as dispositive in light of the USTR's solicitation of comments on a broad range of issues that could—and,

---

[27] *Sherley* involved a challenge to the National Institutes of Health's ("NIH") issuance of guidelines concerning embryonic stem-cell ("ESC") research and its failure to address comments objecting to ESC research.  689 F.3d at 784.  The D.C. Circuit held that because the guidelines implemented an Executive Order with the primary purpose of removing limitations on funding human ESC research, it was not arbitrary and capricious for the NIH not to respond to comments "diametrically opposed to the direction of the Executive Order."  *Id.* at 784–785.  *Sherley* is, however, distinguishable.  There, the NIH explicitly stated its overarching position that comments "advocating a blanket ban on all funding for [human ESC] research" were "not relevant" to the issuance of the guidelines.  *Id.* at 790 (Brown, J., concurring).  The NIH's dismissal of such comments was consistent with its notice of proposed rulemaking, which requested comments specific to the guidelines' implementation of the Executive order, not the wisdom of human ESC research generally.  *See Draft [NIH] Guidelines for Human Stem Cell Research Notice*, 74 Fed. Reg. 18,578 (Apr. 23, 2009).  Thus, the NIH did not arbitrarily ignore comments that attempted to "reopen a debate that, as a practical matter, has been foreclosed for more than a decade."  *Sherley*, 689 F.3d at 790 (Brown, J., concurring).  Here, however, the NPRMs characterized the imposition of List 3 and List 4 tariffs as "propos[als]" and expressly invited comments on "any aspect of the proposed supplemental action," including several points that arguably go to whether to impose additional duties at all.  *List 3 NPRM*, 83 Fed. Reg. at 33,609; *List 4 NPRM*, 84 Fed. Reg. 22,564.  Thus, the USTR treated the imposition of increased duties at the NPRM stage as an open question, and not one that was predetermined based on the direction of the President.  *See id.*

indeed, did—result in comments at odds with the President's direction, *see id.*; *cf. List 4 NPRM*, 84 Fed. Reg. at 22,564–65.  In other words, although the USTR indicated its willingness to consider factors other than the President's direction in the respective NPRMs, the final determinations do not explain whether or why the President's direction constituted the only relevant consideration nor do those determinations address the relationship between significant issues raised in the comments and the President's direction.[28]  Having requested comments on a range of issues, the USTR had a duty to respond to the comments in a manner that enables the court to understand "why the agency reacted to them as it did."  *Auto. Parts & Accessories Ass'n*, 407 F.2d at 338. The USTR could have explained its rationale with respect the comments in light of the specific Presidential directives it was given.  What the USTR could not do was fail to provide a response to the comments it solicited when providing the rationale for its final determinations.

With respect to List 3, the USTR indicated that it chose the products subject to the tariffs at the direction of the President.  *Final List 3*, 83 Fed. Reg. at 47,975 (noting that the USTR, "at the direction of the President, has determined not to include certain tariff subheadings listed in the Annex to the [List 3 NPRM]").  At Oral Argument, however, the Government acknowledged that the record does not reflect the President's

---

[28] Indeed, it would be anomalous to find that *Final List 3* and *Final List 4A* constitute agency actions subject to the APA's procedural requirements while finding that references invoking the President's direction, without more, satisfy the APA's requirement for a concise statement of basis and purpose.

final approval of the list of products covered by the determinations.  Oral Arg. 7:50–9:40.

The Government argues that the USTR's response to comments also is evidenced by

the USTR's subsequent decisions to delay the List 3 increase from 10 percent to 25

percent and to establish an exclusion process.  Defs.' Mot. at 58–59.  Those arguments

cannot prevail, however, because neither of the referenced decisions are contained in

*Final List 3*, which constitutes the "final agency action" at issue in this case.  *See* 5

U.S.C. § 704; *Final List 3*, 83 Fed. Reg. at 47,974–95 (stating a definitive date for the

increase to 25 percent and providing no indication of an exclusion process).[29]  The

USTR's assertion that it removed certain products from List 3 following its review of the

comments and hearing testimony fails to apprise the court of the rationale for the

product selection and how that rationale is responsive to the comments.

     With respect to List 4A, the USTR stated that "[c]ertain tariff subheadings

proposed in the [List 4 NPRM] have been removed from the final list of tariff

subheadings subject to additional duties, based on health, safety, national security, and

other factors."  *Final List 4*, 84 Fed. Reg. at 43,305.  The USTR also segregated the

tariff subheadings into two lists with staggered effective dates and indicated that an

exclusion process would be forthcoming.  *See id.*  While the USTR explained that it

separated the tariffs based on "China's share of U.S. imports," *id.*, that statement does

---

[29] While the USTR stated that it is "maintaining the prior action," *Final List 3*, 86 Fed.
Reg. at 47,975, when read in context, that statement appears to mean that it is
imposing the additional duties while maintaining the List 1 and List 2 duties already in
place.  That statement does not clearly indicate to the public or the court that the USTR
will establish an exclusion process specific to the List 3 duties.

not address the composition of the list of subheadings in the first place.  As with List 3,

the USTR also failed to connect the removal of subheadings to the comments or

address comments that, for example, urged the USTR to distinguish between parts and

finished goods.[30]

Thus, *Final List 3* and *Final List 4* require reconsideration or further explanation

regarding the USTR's rationale for imposing the tariffs and, as necessary, the USTR's

reasons for placing products on the lists or removing products therefrom.[31]

---

[30] The Government also argued that the USTR's rationale for modifying the section 301 action can be ascertained by examination of certain internal memoranda between USTR General Counsel and USTR Lighthizer.  *See* Defs.' Mot. at 58–59 (citing Mem. from USTR General Counsel Joseph Barloon to USTR Robert Lighthizer (Aug. 14, 2019) at 1, 5–6, PR 9; Mem. from USTR General Counsel Joseph Barloon to USTR Robert Lighthizer (May 7, 2019) at 2, PR 8; Mem. from USTR General Counsel Stephen Vaughn to USTR Robert Lighthizer (Dec. 14, 2018) at 2, PR 6; and Sept. 2018 Vaughn Mem. at 7–9); *see also* Oral Arg. 2:45:00–2:50:00.  The APA requires the USTR to "incorporate *in the rules adopted* a concise general statement of their basis and purpose."  5 U.S.C. § 553(c) (emphasis added).  While the statute does not preclude the court from reviewing an agency's explanation that is external to the *Federal Register* notice, *see, e.g.*, *Tabor v. Joint Bd. for Enrollment of Actuaries*, 566 F.2d 705, 711 (D.C. Cir. 1977) (explaining that "[t]he enquiry must be whether the rules and statement are published close enough together in time so that there is no doubt that the statement accompanies, rather than rationalizes the rules"), the USTR did not incorporate by reference the cited memoranda in the contested determinations and the public was not alerted to the reasoning offered therein given the nonpublic nature of the memoranda. If, on remand, the USTR seeks to rely on the contents of the memoranda as evidence of the USTR's reasons for acting when and how it did such that a future rationale is not *post hoc*, the USTR must explain why that reliance is justified in light of *Invenergy Renewables LLC v. United States*, 44 CIT __, __, 476 F. Supp. 3d 1323, 1347 (2020) (holding that a contemporaneous but nonpublic memorandum "cannot be considered as part of the grounds invoked by the [USTR] when it acted" because "adequate explanation of the agency's decision has to be made public somewhere or in some manner allowing interested parties to review and scrutinize it").

[31] To the extent the USTR decides, on remand, that certain products should have been added to or omitted from the determinations from the beginning, the USTR should also establish and describe a lawful process for implementing that decision.

### c.  Remedy

During the hearing, Plaintiffs opined that the Government has waived any request for a remand instead of outright vacatur, a position with which the Government disagreed.  Oral Arg. 2:36:30–2:37:00, 2:38:53–2:43:43, 2:46:42–2:46:59.  For their part, Plaintiffs did not present arguments for vacatur until filing a notice of supplemental authority and, even then, only summarily discussed vacatur in reference to a prior court opinion.  *See* Pls.' Suppl. Authority at 2 (discussing *Invenergy Renewables LLC v. United States*, 45 CIT __, __, 552 F. Supp. 3d 1382, 1400, 1404 (2021)).  The Government, in turn, sought to distinguish that case and, in so doing, argued for a different outcome.  *See* Defs.' Resp. Suppl. Authority at 2–3.  In a case arising under the APA, the court may—and regularly will—remand for reconsideration deficient agency action when further explanation is required.  *See* 5 U.S.C. § 706(2)(A); *see also, e.g.*, *NOVA*, 260 F.3d at 1379–80.  Thus, the court declines to find that the doctrine of waiver precludes remand here.

The court turns next to the question whether vacatur is merited in the interim notwithstanding remand to the USTR.  In certain circumstances, the court may remand agency action for further consideration while allowing the action to remain in effect.  *See NOVA*, 260 F.3d at 1367–68, 1379–81.  In *NOVA*, the Federal Circuit adopted the standard first set forth by the D.C. Circuit as to whether agency action should remain in effect when the action is remanded for further consideration.  *id.* at 1380 ("[A]n inadequately supported rule . . . need not necessarily be vacated.") (second alteration in original) (quoting *Allied-Signal*, 988 F.2d at 151).  In deciding whether to vacate, the

court considers "the seriousness of the [rule's] deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." *Allied-Signal*, 988 F.2d at 150–51 (quotations and citation omitted); *see also NOVA*, 260 F.3d at 1380 (declining to vacate when the "validity" of the contested action was "open to question" and given the "disruptive consequences" of vacatur).

While the USTR's failure to explain its rationale in the context of the comments it received leaves room for doubt as to the legality of its chosen courses of action, as in *NOVA*, the court weighs heavily the disruptive consequences of (potentially interim) vacatur. *Final List 3* and *Final List 4* constitute modifications of a prior section 301 action taken to exert leverage on China to cease unfair trade actions burdening U.S. commerce and to do so in a manner that China may no longer attempt to offset that leverage with retaliatory measures of its own. Thus, they are part of a continuum of actions taken in conjunction with ongoing negotiations with China. In addition to impacting the United States' ability to impose and retain List 3 and List 4A duties, vacating the determinations would disrupt a complex and evolving process that was designed by Congress to allow for ongoing negotiations. For now, the court declines to try to unscramble this egg. *Cf. Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 97–98 (D.C. Cir. 2002) (declining to vacate unlawful agency action when it was possible for the relevant agency to cure the defect).

At the hearing, Plaintiffs invoked *Dep't of Homeland Security v. Regents of the University of California*, 140 S. Ct. 1891 (2020), to argue that the court must vacate

USTR's List 3 and List 4 determinations.  Oral Arg. 2:38:53–2:43:43; 2:51:15–2:51:37.

In *Regents*, the U.S. Supreme Court held that the Department of Homeland Security's

("DHS") Acting Secretary Duke's explanation of her decision to rescind the Deferred

Action for Childhood Arrivals ("DACA") program relied only on the Attorney General's

explanation that DACA's provision of entitlement benefits to certain categories of aliens

was unlawful; however, that explanation was insufficient to justify DHS's rescission of

DACA's grant of forbearance of enforcement of removal proceedings against the

covered classes of persons.[32]  140 S. Ct. at 1912–14.  The twin prongs of DACA, i.e.,

benefits and forbearance, were established by DHS's implementation of DACA, and,

therefore, in rescinding DACA, DHS had to address both prongs.  *See id.* at 1913.  The

Court refused to consider subsequent reasoning provided by Acting Secretary Duke's

successor, Secretary Nielsen, after concluding that the Secretary's reasoning was

almost entirely *post hoc*.  *See id.* at 1908–09.  While Acting Secretary Duke's

contemporaneous explanation rested solely upon illegality, Secretary Nielsen pointed to

the need to foster confidence in the rule of law by rejecting "legally *questionable*"

policies and a preference for legislative solutions in addition to DACA's illegality.  *See

id.* at 1908.

---

[32] The Supreme Court declined to address the adequacy of DHS's explanation that it
relied on the Attorney General's decision that DACA was unlawful because Acting
Secretary Duke was statutorily bound by that decision.  *See Regents*, 140 S. Ct. at
1910–11.  Instead, the Supreme Court found that Duke failed to address the portion of
DACA's legality (forbearance) that was within Duke's discretion.  *See id.*

*Regents,* like *State Farm,* requires the court to review the USTR's statements of basis and purpose to ensure that important policy issues are ventilated and to understand the USTR's determinative reasons for its actions.  *Regents* also constitutes a warning to agencies regarding the impermissibility of *post hoc* reasoning as much as it constrains the court's review of such reasoning provided pursuant to a remand.  140 S. Ct. at 1908 (citing *Overton Park*, 401 U.S. at 420, for the proposition that a subsequent explanation "must be viewed critically" for impermissible *post hoc* reasoning and noting that, for example, while "[l]egal uncertainty is, of course, related to illegality[,] . . . the two justifications are meaningfully distinct").  "When an agency's initial explanation 'indicate[s] the determinative reason for the final action taken,' the agency may elaborate later on that reason (or reasons) but may not provide new ones."  *Id.* (citing *Camp v. Pitts*, 411 U.S. 138, 143 (1973) (per curiam)).  Thus, while we may remand to the USTR to further explain its determinations, *Regents* cautions that the USTR may only further explain the justifications it has given for the modifications.  *See id.*  It may not identify reasons that were not previously given unless it wishes to "deal with the problem afresh" by taking new agency action.  *Id.* (quoting *Chenery*, 332 U.S. at 201).[33]

---

[33] Plaintiffs also argue that the USTR failed to consider factors relevant to the statute when it based List 3 and List 4A on China's retaliatory conduct.  Pls.' Cross-Mot. & Resp. at 60–61.  Because the court finds that China's conduct was relevant to the USTR's determinations pursuant to section 307(a)(1)(B), *see supra*, Plaintiffs' related procedural argument must fail.

### 3. Plaintiffs' Remaining Arguments[34]

Plaintiffs also raise arguments regarding the extent of notice provided with respect to List 3, the deadlines set for the submission of comments and the permissible scope of those comments, and the amount of time the USTR allowed interested parties to testify at the hearings.  None of these arguments present additional grounds for remand or vacatur.

### a. Notice of the Legal Basis for List 3

Plaintiffs first argue that the USTR failed to provide adequate notice of the legal basis for List 3 because although the NPRM cited to section 307(a)(1)(C) exclusively, the USTR ultimately relied on section 307(a)(1)(B) and (C).  Pls.' Cross-Mot. & Resp. at 55–56; Pls.' Reply at 24–25.  The Government argues that the NPRM for List 3 complied with statutory requirements.  Defs.' Resp. & Reply at 35–37.

Section 553(b) requires an agency engaged in rulemaking to publish in the *Federal Register* a "reference to the legal authority under which the rule is proposed" and "either the terms or substance of the proposed rule or a description of the subjects and issues involved."  5 U.S.C. § 553(b)(2)–(3).[35]  This notice "need not specify every

---

[34] Because the court is remanding *Final List 3* and *Final List 4*, the court need not further address the issue of remedy in relation to Plaintiffs or *Amici Curiae* at this time. *See generally* Interested Parties' Br. (arguing that non-importer plaintiffs in other cases that bore the cost of the section 301 duties have both constitutional and statutory standing to challenge the USTR's actions and the court's authority to provide relief is not limited to importers of record).

[35] Plaintiffs do not specify the precise subsection of section 553(b) they believe the USTR violated.  Because the NPRM contained a "reference to the legal authority under which the rule is proposed," i.e., section 307(a)(1)(C), Plaintiffs appear to argue that the

precise proposal" that an agency "may ultimately adopt," but must "fairly apprise

interested parties of the issues involved."  *Mid Continent Nails Corp. v. United States*,

846 F.3d 1364, 1373 (Fed. Cir. 2017) (quotations and citations omitted).  Notice is

deemed adequate for purposes of the APA if "an agency's final rule is a 'logical

outgrowth'" of the agency's notice of proposed rulemaking.  *Id.* (citation omitted).  "A

final rule is a logical outgrowth of [a] proposed rule 'only if interested parties should

have anticipated that the change was possible, and thus reasonably should have filed

their comments on the subject during the notice-and-comment period.'"  *Veteran Justice

Grp., LLC v. Sec'y of Veterans Affairs*, 818 F.3d 1336, 1344 (Fed. Cir. 2016) (citation

omitted) (alteration in original).

      The USTR's failure to cite to section 307(a)(1)(B) in *List 3 NPRM* as an additional

or alternative authority for the modification is not fatal to its rulemaking.  The notice is

clear that the USTR proposed to modify the section 301 action by setting increased

duties on additional specified imports from China and requested comments on various

aspects of the proposal.  *See List 3 NPRM*, 83 Fed. Reg. at 33,609.  In explaining the

basis for the modification, the USTR also explained that China had failed to "address[]

U.S. concerns with the unfair practices found in the investigation," *id.* at 33,608, and

"refus[ed] to change its acts, policies, and practices," such that "it ha[d] become

apparent that U.S. action at this level is not sufficient to obtain the elimination of China's

acts, policies, and practices covered in the investigation," *id.* at 33,609.  Anyone wanting

---

USTR's failure to cite section 307(a)(1)(B) rendered the NPRM deficient pursuant to
section 553(b)(3).

to comment on such findings, either to support or rebut the notion that China's unfair practices continued to burden U.S. commerce, and whether such burden continued apace or had increased or decreased relative to the investigation, had notice of the opportunity to do so.

Thus, Plaintiffs argument that the "USTR's defective notice . . . left a record-vacuum" rings hollow.  *See* Pls.' Cross-Mot. & Resp. at 56.  The USTR "fairly apprise[d] interested parties of the issues involved," and the USTR's reliance on subsection (B) in addition to subsection (C) in the final rule constituted a "logical outgrowth" of the proposed rule.  *See Mid Continent*, 846 F.3d at 1373.

### b.  Comment Deadlines and Time to Testify

Plaintiffs next argue that the USTR failed to provide meaningful opportunity to comment on List 3 by setting a simultaneous deadline for written and post-hearing rebuttal comments and limiting testimony at the public hearings to five minutes per person.  *See* Pls.' Cross-Mot. & Resp. at 56–57.  Plaintiffs raise similar arguments with respect to List 4A, while noting that, for that proceeding, post-hearing rebuttal comments were due one week after the hearing.  *See id.*; *cf.* RLC's Br. at 10–12 (advancing similar arguments).  Plaintiffs also argue that, by explicitly limiting rebuttal comments to "rebutting or supplementing testimony at the hearing" in the NPRM for List 4A, the USTR arbitrarily departed from its practice with respect to List 1, List 2, and List

3.  Pls.' Cross-Mot. & Resp. at 57–58 (citation omitted); *see also List 4 NPRM*, 84 Fed.

Reg. at 22,565.

The Government argues that the simultaneous deadlines with respect to List 3

resulted from the USTR providing an extension of time for all comments, Defs.' Mot. at

52 (citing *List 3 Cmt. Extension*, 83 Fed. Reg. at 38,761), and the USTR intended the

post-hearing rebuttal comments to be responsive to arguments raised at the hearing,

not the written submissions, Defs.' Mot. at 53; Defs.' Resp. & Reply at 38.  In any event,

the Government contends, the APA does not require any opportunity for the submission

of rebuttal comments or an in-person hearing during informal rulemaking proceedings;

thus, the USTR's procedures in that regard could not have violated the APA.  Defs.'

Mot. at 53–54.

Plaintiffs' arguments lack merit.  The APA did not require the USTR to provide

interested parties with an opportunity to submit rebuttal comments.  *See* 5 U.S.C.

§ 553(c).  More importantly, the NPRM for List 3 clearly limited rebuttal comments to

"post-hearing rebuttal comments."  *List 3 NPRM*, 83 Fed. Reg. at 33,609.  Thus, the

USTR was within its discretion to set simultaneous deadlines for "written" and "post-

hearing rebuttal comments" when it extended the deadlines for all List 3 comments.

*See Vt. Yankee*, 435 U.S. at 543 ("Absent constitutional constraints or extremely

compelling circumstances the administrative agencies should be free to fashion their

own rules of procedure and to pursue methods of inquiry capable of permitting them to

discharge their multitudinous duties.") (quotations and citations omitted).

The USTR's decision to limit oral testimony to five minutes per person also did not violate the APA, which gives agencies discretion as to whether a rulemaking will involve an "opportunity for oral presentation."  5 U.S.C. § 553(c).  Absent a statutory directive, the amount of time allowed for each person to testify is the type of line-drawing exercise best left to the USTR.  *See, e.g., Vt. Yankee*, 435 U.S. at 543.  The public hearings for List 3 and List 4 ran for six and seven days, respectively, demonstrating ample opportunity for public participation.  *See Final List 3*, 83 Fed. Reg. at 47,975; *Final List 4*, 84 Fed. Reg. at 43,304.

The USTR also did not arbitrarily depart from past practice when it cautioned that post-hearing rebuttal comments for List 4 "should be limited to rebutting or supplementing" hearing testimony.  *List 4 NPRM*, 84 Fed. Reg. at 22,565.  The *Federal Register* notices for List 1, List 2, and List 3 likewise provided for "post-hearing rebuttal comments" and, thus, did not explicitly provide for replies to written comments.  *See List 3 NPRM*, 83 Fed. Reg. at 33,609; *Final List 1*, 83 Fed. Reg. at 28,712; *USTR Determination*, 83 Fed. Reg. at 14,908.  Indeed, with respect to List 3, given the simultaneous deadlines for written and post-hearing rebuttal comments, there was no need for the USTR to have articulated such a limitation.  *See List 3 Cmt. Extension*, 83 Fed. Reg. at 38,761.

Accordingly, the USTR did not have an established practice of allowing replies to written comments that it departed from with respect to List 4.  *See Ranchers–Cattlemen Action Legal Found. v. United States*, 23 CIT 861, 884–85, 74 F. Supp. 2d 1353, 1374 (1999) (explaining that identification of an "agency practice" is predicated upon the

existence of "a uniform and established procedure . . . that would lead a party, in the absence of notification of a change, reasonably to expect adherence to the established practice or procedure").  Even if the USTR had such a practice, the USTR's cautionary language used nonmandatory terms.  *See List 4 NPRM*, 84 Fed. Reg. 22,565 (post-hearing rebuttal comments for List 4 "*should be* limited to rebutting or supplementing" hearing testimony) (emphasis added); *see also AT&T v. United States*, 307 F.3d 1374, 1379–80 (Fed. Cir. 2002) (stating that "[a] caution, however, is not a prohibition").  Thus, interested parties were not explicitly precluded from responding to another party's written submission.

Courts, recognizing that "[w]ith more time most parties could improve the quality of their comments," ask whether there is evidence that a party would provide more meaningful comments if given more time or opportunity.  *Sichuan Changhong Elec. Co. v. United States*, 30 CIT 1886, 1892, 466 F. Supp. 2d 1323, 1328 (2006); *see also Omnipoint Corp. v. FCC*, 78 F.3d 620, 630 (D.C. Cir. 1996) (finding that seven-day comment period did not violate APA where plaintiff "failed to identify any substantive challenges it would have made had it been given additional time").  Plaintiffs have pointed to no such evidence in connection with the foregoing arguments.  Indeed, as the Government asserts, Plaintiffs fail to "explain *why* they would need to rebut any of the initial written comments (or, for that matter anything discussed at the hearing), when, as the administrative record demonstrates, the written commenters and hearing

participants overwhelmingly *agreed* with the plaintiffs' position, that the tariffs should not go into effect."  Defs.' Resp. & Reply at 38.[36]

Thus, for the reasons discussed above, Plaintiffs' additional procedural arguments do not provide any further basis to remand or vacate the USTR's determinations.

## IV.   The Government's Motion to Correct the Administrative Record

The Government seeks to correct the administrative record by adding two documents (and provide an accompanying certification): The June 2018 Presidential Statement and a supplemental section 301 report titled UPDATE CONCERNING CHINA'S ACTS, POLICIES, AND PRACTICES RELATED TO TECHNOLOGY TRANSFER, INTELLECTUAL PROPERTY, AND INNOVATION (2018)  ("Supplemental 301 Report").  Defs.' Mot. Correct R. at 1, Ex. B.  The Government contends that "[t]he U.S. Trade Representative was aware of the contents of both of these documents and they would have been considered when making the challenged decisions."  *Id.* at 2–3.[37]  Plaintiffs "take no position on the motion with respect to [the June 2018 Presidential Statement]" given the Parties' and the USTR's respective references to that document.  Pls.' Opp'n Correct R. at 1.

---

[36] Because the court finds that Plaintiffs' arguments lack merit, the court does not reach the Government's argument that the court should account for the asserted "urgent need for action" when examining the adequacy of the USTR's procedures.  See Defs.' Mot. at 55; Defs.' Resp. & Reply at 39–40.

[37] The Government also states that "the USTR considered . . . the facts contained in the [Supplemental 301 Report]," Defs.' Mot. Correct R. at 3, but that assertion goes further than the declaration attached to the Government's motion, which asserts that the USTR "was aware of the contents of [the Supplemental 301 Report]" and it "would have been considered" by the USTR.  Decl. by Megan Grimball ¶ 6 (Feb. 15, 2022), ECF No. 441-3.

Plaintiffs contend that the court should deny the motion with respect to the

Supplemental 301 Report because it post-dates the USTR's consideration of the List 3

duties, was not cited by the USTR in the contested determinations or by the Parties in

their litigation briefs, and the Government failed to demonstrate the USTR's

consideration of the document. *Id.* at 1–2.

The court will grant the Government's motion with respect to the June 2018

Presidential Statement and the accompanying certification but will deny the motion with

respect to the Supplemental 301 Report.

For purposes of APA review, the administrative record consists of "all documents

and materials directly or indirectly considered by agency decisionmakers." *Ammex, Inc.*

*v. United States*, 23 CIT 549, 555, 62 F. Supp. 2d 1148, 1156 (1999) (quoting

*Thompson v. U. S. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989)).  The obvious

corollary to this rule is that "materials that were neither directly *nor* indirectly considered

by agency decisionmakers," even if relevant, "should not be included" in the record.  *Id.*

(citation omitted).  To correct the record, the movant must "show that the documents to

be included were before the agency decisionmaker."  *Pac. Shores Subdivision, Cal.*

*Water Dist. v. U.S. Army Corps of Eng'rs*, 448 F. Supp. 2d 1, 6 (D.D.C. 2006).  That

showing requires the movant to "put forth concrete evidence and identify reasonable,

non-speculative grounds for [its] belief that the documents were considered by the

agency."  *Fort Sill Apache Tribe v. Nat'l Indian Gaming Comm'n*, 345 F. Supp. 3d 1, 9

(D.D.C. 2018) (quotations and citation omitted) (alteration in original) (granting motion to

correct the record to include 39 documents indirectly considered by an agency when the

documents were referenced in a letter directly considered by the agency in reaching its final decision).

The Supplemental 301 Report could not have been directly or indirectly considered by the USTR in reaching its decision to issue *Final List 3* because the document did not exist at the time.  The Government argues instead, with respect to both List 3 and List 4A, that the "contents" of the Supplemental 301 Report "*would have been* considered" by the USTR.  Defs.' Mot. Correct R. at 1–2 (emphasis added).  The Government offers no authority for including in the record a document that was not, itself, directly or indirectly considered by the USTR, even if its "contents" were, in some unexplained fashion, considered.  On that point, however, the Government makes no showing that the contents of the Supplemental 301 Report *were* considered by the USTR; the Government merely surmises that they "would have been."[38]

Thus, the court will grant the Government's motion with respect to the June 2018 Presidential Statement and the accompanying certification and deny the Government's motion with respect to the Supplemental 301 Report.

CONCLUSION AND ORDER

In accordance with the foregoing, it is hereby

**ORDERED** that the Government's motion to dismiss (ECF No. 314) is **DENIED**; it is further

---

[38] That the Supplemental 301 Report was published on the USTR's website in November 2018, *see* Defs.' Mot. Correct R. at 2, alone does not demonstrate the USTR's direct or indirect consideration of the facts contained therein when deciding whether to impose the List 3 or List 4A duties.

**ORDERED** that the Government's motion for judgment on the agency record (ECF No. 314) and Plaintiffs' cross-motion for judgment on the agency record (ECF No. 358) are each **GRANTED IN PART** and **DENIED IN PART**; it is further

**ORDERED** that *Final List 3* and *Final List 4* are remanded to the USTR for reconsideration or further explanation consistent with this opinion; it is further

**ORDERED** that the USTR shall file its remand results on or before June 30, 2022; it is further

**ORDERED** that, within 14 days of the USTR's filing of the remand results, the Parties shall file a joint status report and proposed schedule for the further disposition of this litigation; and it is further

**ORDERED** that the Government's partial consent motion to correct the administrative record (ECF No. 441) is **GRANTED IN PART** and **DENIED IN PART**.

/s/ Mark A. Barnett
Mark A. Barnett, Chief Judge

/s/ Claire R. Kelly
Claire R. Kelly, Judge

/s/ Jennifer Choe-Groves
Jennifer Choe-Groves, Judge

Dated: April 1, 2022
       New York, New York