In Re Section Cases, Case 1:21-cv-00052-3JP301,  Slip. Op 22-32 (CIT April 1, 2022)

**FURTHER EXPLANATION OF THE FINAL LIST 3 AND FINAL LIST 4 MODIFICATIONS IN THE SECTION 301 ACTION: CHINA'S ACTS, POLICIES, AND PRACTICES RELATED TO TECHNOLOGY TRANSFER, INTELLECTUAL PROPERTY, AND INNOVATION, PURSUANT TO COURT REMAND ORDER**

## Table of Contents

Summary ........................................................................................................................... 3

I.      Background of the Section 301 Investigation Relevant to the Remand Order .................. 4

   A.   Initial Actions Taken in the Investigation – List 1 and List 2 ......................................... 6

   B.   The List 3 Modification ................................................................................................... 9

   C.   The List 4 Modification ................................................................................................. 16

II.     USTR's Response to Significant Comments ................................................................... 22

   A.   Explanation of Documents Relied Upon in this Remand Determination ...................... 23

      1.   Statutory Factors ..................................................................................................... 24

      2.   The Federal Register Notices and Press Statements ............................................... 25

      3.   Transcripts from the Public Hearings ..................................................................... 26

   B.   Further Explanation of the Final List 3 Modification ................................................... 27

      1.   Further Explanation of the Determination to Remove Rare Earths of Critical Minerals ................................................................................................................... 29

      2.   Further Explanation of the Determination to Remove Certain U.S. Seafood Products Exported to China for Processing ............................................................. 31

      3.   Further Explanation of the Determination to Remove Chinese Antiques and Works of Art Imported from Third Countries ......................................................... 33

      4.   Further Explanation of the Determination to Remove Certain Consumer Electronics ............................................................................................................... 35

      5.   Further Explanation of the Determination to Remove Certain Health and Safety Products ................................................................................................................... 38

         a.   Medical and Healthcare Products ................................................................... 39

         b.   Precursor Chemicals for Pharmaceuticals ..................................................... 40

         c.   Safety Helmets and Bicycle Safety Lights ..................................................... 41

         d.   Children's Safety Furniture ............................................................................ 42

      6.   Further Explanation of the Determination to Remove Certain Chemicals and Other Inputs ............................................................................................................. 44

         a.   Chemicals Where China Accounted for 90 percent or more of U.S. Imports 45

         b.   Chemical Inputs for Pesticides ...................................................................... 46

    c. Certain Chemicals and Inputs for the Textile Industry .................................. 48

    d. Critical Inputs for Manufactured Goods ...................................... 51

  7. Further Explanation of the Determination Not to Remove Certain Products from the Final List 3 ........................................................................................ 53

  8. Further Explanation of USTR's Response to Comments Requesting that a Subheading be Added to List 3 .................................................................... 56

 C. Further Explanation of the Final List 4 Modification ................................... 58

  1. Further Explanation of the Determination to Remove Certain Subheadings for National Security, or Health and Safety Reasons.................................... 59

    a. Critical Minerals and Chemicals .................................................. 59

    b. Child Safety Seats ........................................................................ 62

  2. Determination to Remove Certain Subheadings Critical to U.S. Port Operations 63

    a. Cranes and Lifts............................................................................ 63

    b. Shipping Containers ...................................................................... 65

  3. Further Explanation of the Determination to Remove Certain Subheadings for U.S.-Caught Seafood Exported to China for Processing....................................... 67

  4. Further Explanation of the Determination to Remove Certain Subheadings Containing Religious Texts .................................................................... 69

  5. Further Explanation of the Determination Not to Remove Certain Products from the Final List 4............................................................................................ 72

 D. Comments Concerning Any Duties to Be Imposed and the Aggregate Level of Trade Subject to the Proposed Duties ..................................................................... 74

  1. Level of Duty to be Imposed ................................................................. 74

  2. Aggregate Level of Trade...................................................................... 78

 E. Comments Concerning Damage to the U.S Economy, the Legality and Efficacy of Tariffs, and Alternatives ............................................................................... 81

  1. Comments Addressing Damage to the United States Economy ........................... 81

  2. Comments Concerning the Legality of the Modification...................................... 84

  3. Comments Concerning the Efficacy of Tariffs .................................................. 86

  4. Comments Suggesting Alternatives to the Section 301 Action............................ 88

III. Conclusion ......................................................................................................... 89

## Summary

Plaintiffs in *In Re Section 301* cases filed complaints in the Court of International Trade (CIT) alleging that in taking the *Final List 3* and *Final List 4* modifications to the initial actions taken in the *Section 301 Investigation of China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property and Innovation* ("the investigation"), that the United States Trade Representative ("Trade Representative") failed to comply with certain requirements under the Administrative Procedure Act (APA), among other allegations that are not relevant to the CIT's Remand Order of April 1, 2022.  *See generally Am. Compl., HMTX Indus. LLC v. United States*, Court No. 20-cv-00177 (Ct. Int'l Trade Sept. 21, 2020), ECF No. 12 ("20-177 Am. Compl.").  In its Order, the CIT remanded *Final List 3* and *Final List 4* to USTR for "reconsideration or further explanation regarding the USTR's rationale for imposing the tariffs and, as necessary, the USTR's reasons for placing products on the lists or removing products therefrom."  *In Re Section 301 Cases*, Court No. 21-cv-00052-3JP (Ct. Int'l Trade Apr. 1, 2022) at 57,71, ECF No. 448 ("*CIT Opinion*").  The Office of the U.S. Trade Representative (USTR) has prepared this *Remand Determination*, under respectful protest, to provide further explanation of the Trade Representative's determination, at the direction of the President, to impose additional tariffs under the *Final List 3* and *Final List 4* modifications, as well as further explanation of the rationale underlying decisions to retain or remove certain tariff subheadings from the *Final List* 3 and *Final List 4* modifications, consistent with the *Court's Opinion* and *Order*.[1]

---

[1] Footnote 31 of the *CIT Opinion* states that "[t]o the extent the USTR decides, on remand, that certain products should have been added to or omitted from the determinations from the beginning, the USTR should also establish and describe a lawful process for implementing that decision."  In preparing this *Remand Determination*, USTR has not determined that certain products should have been added or omitted.

We begin with a discussion of the relevant background in the investigation, and the final notices for List 3 and List 4 modifications.  This *Remand Determination* will provide further explanation of the Trade Representative's rationale for determining to modify the action by imposing additional tariffs, and respond to significant comments received during the notice and comment period for the modifications, including comments identified in the *Court's Opinion*.

## I.    Background of the Section 301 Investigation Relevant to the Remand Order

On August 14, 2017, the President issued a memorandum directing the Trade Representative to "determine whether to investigate any of China's laws, policies, practices, or actions that may be unreasonable or discriminatory and that may be harming American intellectual property rights, innovation, or technology development.".  *Addressing China's Laws, Policies, Practices, and Actions Related to Intellectual Property, Innovation, and Technology*, 82 Fed. Reg. 39,007, 39,007 (President of the United States Aug. 17, 2017) [PR-13].  Following the issuance of the memorandum, USTR undertook consultations on whether to initiate an investigation with the interagency Section 301 Committee established under 15 C.F.R. §2002.3, a subordinate, staff-level body of the Trade Policy Staff Committee (TPSC), 15 C.F.R. § 2002.2. The Section 301 Committee is comprised of trade experts from, among other agencies, the Departments of Agriculture, Commerce, Defense, Labor, State, Treasury, the Small Business Administration, and U.S. Customs and Border Protection.  The function of the committee includes receiving views concerning foreign restrictions, acts, policies, and practices affecting U.S. commerce, and United States actions in response thereto through public hearings or otherwise, and to provide recommendations to the Trade Representative on such matters.  *See* 15 C.F.R § 2002.3 (b)(2-4) (2022).  The recommendations of the Section 301 Committee are discussed in Part II *infra*.

USTR also undertook consultations with the private sector advisory committees established under Section 135 of the Trade Act of 1974 (19 U.S.C. § 2155) on whether to initiate an investigation into the matters outlined in the President's August 17th memorandum.

On August 18, 2017, following these consultations, the Trade Representative initiated an investigation into certain acts, policies, and practices of the Government of China related to technology transfer, intellectual property, and innovation. *Initiation of Section 301 Investigation; Hearing; and Request for Public Comments: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 82 Fed. Reg. 40,213, 40,213 (U.S. Trade Rep. Aug. 24, 2017) (*Initiation of Section 301 Investigation*).

The initiation notice outlined the major areas of focus of the investigation, including the Chinese government's: (1) use of tools, such as its "opaque and discretionary administrative approval processes," to "regulate or intervene in U.S. companies' operations in China, in order to require or pressure the transfer of technologies and intellectual property to Chinese companies"; (2) acts, policies, and practices that "deprive U.S. companies of the ability to set market-based terms in licensing and other technology-related negotiations with Chinese companies and undermine companies' control over their technology in China"; (3) direction and unfair facilitation of the "systematic investment in, and/or acquisition of, U.S. companies and assets by Chinese companies" to obtain cutting-edge technologies and intellectual property; and (4) purported unauthorized intrusions into U.S. commercial networks and other theft of intellectual property. *Initiation of Section 301 Investigation*, 82 Fed. Reg. at 40,213-14.

Based on information obtained during the investigation, including the public submissions and the public hearing, USTR and the Section 301 Committee prepared a comprehensive report on the acts, policies, and practices under investigation, which USTR posted on its website on

March 22, 2018.  Office of the United States Trade Representative, *Findings of the Investigation into China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation Under Section 301 of the Trade Act of 1974* (Mar. 22, 2018), https://ustr.gov/sites/default/files/Section%20301%20FINAL.PDF (*Section 301 Findings*) [PR-26].  The report supported findings that each of the four categories regarding the Government of China's acts, policies, and practices that were investigated were unreasonable or discriminatory and burden or restrict U.S. commerce.  *Id.*

## A.      Initial Actions Taken in the Investigation – List 1 and List 2

On March 22, 2018, in light of the findings of the investigation, the President issued a memorandum directing the Trade Representative, among other members of the Administration, to take a range of actions in response to the Government of China's acts, policies, and practices involving the unfair and harmful acquisition of U.S. technology.  President of the United States, *Presidential Memorandum on the Actions by the United States Related to the Section 301 Investigation* (Mar. 22, 2018), https://trumpwhitehouse.archives.gov/presidential-actions/presidential-memorandum-actions-united-states-related-section-301-investigation/ (*March 2018 Presidential Memorandum*).  In the memorandum, the President specifically directed the Trade Representative to: take all appropriate action under section 301 of the Trade Act (19 U.S.C. 2411) to address the acts, policies, and practices of China that are unreasonable or discriminatory and that burden or restrict U.S. commerce; consider whether such action should include increased tariffs on goods from China,[2] and within 15 days, to propose additional tariffs on certain products of China, and initiate through the World Trade Organization a dispute

---

[2] On March 23, 2018, USTR initiated a WTO dispute by requesting consultations with the Government of China regarding certain specific aspects of China's technology regulations. *China—Certain Measures Concerning the Protection of Intellectual Property Rights,* World Trade Organization (Mar. 26, 2018), https://docs.wto.org/dol2fe/Pages/SS/directdoc.aspx?filename=q:/WT/DS/542-1.pdf (DS542).

against the Government of China to confront China's discriminatory technology licensing practices. *Id.*

Within 15 days of the issuance of the March 22nd Presidential directive, on April 6, 2018, USTR published a notice which announced a determination that the acts, policies, and practices covered in the investigation are unreasonable or discriminatory and burden or restrict U.S. commerce, and are thus actionable under Section 301(b) of the Trade Act. *Notice of Determination and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 14,906 (U.S. Trade Rep. Apr. 6, 2018) (*April 6 Notice*). USTR invited the public to comment on a proposed action of an additional duty of 25 percent on products of Chinese origin defined by 1,333 eight-digit subheadings of the Harmonized Tariff Schedule of the United States ("HTS") and with an approximate annual trade value of $50 billion. The notice explained that the amount was based on estimated annual trade values for calendar year 2018, and was appropriate in light of the estimated harm to the U.S. economy at the time, and appropriate to obtain the elimination of China's harmful acts, polices, and practices. *Id.* The proposed list of products was developed by trade analysts from several U.S. Government agencies, who identified products that benefited from Chinese industrial policies, including the Made in China 2025 industrial program, and refined by removing products identified as likely to cause disruptions to the U.S. economy or a high impact on consumers. *Id.*

On June 20, 2018, following a review by USTR and the Section 301 Committee of public comments, testimony from a three-day public hearing, and a review of the extent to which the tariff subheadings in the proposed list included products containing industrially significant

technology, including technologies and products related to the Made in China 2025 program, the

Trade Representative announced a determination to narrow the proposed list and impose

additional duties on 818 of the HTS subheadings, decreasing the approximate annual trade value

of the action to $34 billion (List 1).  *Notice of Action and Request for Public Comment*

*Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies,*

*and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed.

Reg. 28,710 (U.S. Trade Rep. June 20, 2018) (*June 20 Notice*).

The *June 20 Notice* further announced that based on a review of the public comments and

a review of tariff subheadings that cover industrially significant technology, USTR was

proposing additional duties of 25 percent on 284 tariff subheadings with an estimated annual

trade value of $16 billion.  *See id.*  The notice explained that including the additional tariff

subheadings in the Section 301 action would maintain the effectiveness of a $50 billion trade

action.  *See id.*

On August 16, 2018, in consultation with the Section 301 Committee, and following

another public hearing and the review of public comments, the Trade Representative announced

the determination to impose additional duties of 25 percent on 279 of the proposed tariff

subheadings with an approximate annual trade value of $16 billion.  The final list included

subheadings which covered products that contained industrially significant technology, including

technologies and products related to the Made in China 2025 program (List 2).  *Notice of Action*

*Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer,*

*Intellectual Property, and Innovation*, 83 Fed. Reg. 40,823 (U.S. Trade Rep. Aug. 16, 2018).

As explained, the 1,102 subheadings that made up the List 1 and List 2 actions generally

focused on products from industrial sectors that contribute to or benefit from the Made in China

2025 industrial policy, which include industries such as aerospace, information and communications technology, robotics, industrial machinery, new materials, and automobiles. These lists did not include goods commonly purchased by American consumers. *See* Press Release, United States Trade Representative, *USTR Issues Tariffs on Chinese Products in Response to Unfair Trade Practices* (June 15, 2018), https://ustr.gov/about-us/policy-offices/press-office/press-releases/2018/june/ustr-issues-tariffs-chinese-products.

## B.    *The List 3 Modification*

In response to the proposed $50 billion action, rather than change its practices and policies, China indicated that it would cause further harm to the U.S. economy by retaliating and raising tariffs on $50 billion worth of United States exports. Recognizing that $50 billion was no longer sufficient to encourage China to change its unfair practices, on June 18, 2018, the President "directed the United States Trade Representative to identify $200 billion worth of Chinese goods for additional tariffs." *See* President of the United States, *Statement from the President Regarding Trade with China* (June 18, 2018), https://trumpwhitehouse.archives.gov/briefings-statements/statement-president-regarding-trade-china-2/ (*June 2018 Presidential Directive*).[3] The President noted that unless China changes its practices, and refrains from moving forward with the announced tariffs, the additional $200 billion in U.S. tariffs "will go into effect." *Id.*

In accordance with the President's direction, on July 17, 2018, USTR issued a notice which proposed an additional 10 percent *ad valorem* duty on 6,031 tariffs subheadings with an annual trade value of $200 billion. *Request for Comments Concerning Proposed Modification of*

---

[3] This document was included in the Administrative Record following an Order permitting the United States to correct the record to include this document. *CIT Opinion* at 69.

*Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 33,608, 33,609 (U.S. Trade Rep. July 17, 2018) (*Proposed List 3*) [PR-14].  The notice explained that taking a supplemental $200 billion action, at the specific direction of the President, was appropriate in light of the statutory goal of obtaining the elimination of the acts, policies, and practices covered in the investigation, the increased burden on the U.S. economy caused by China's targeting of a substantial portion of U.S. exports to China ($130 billion in 2017) , and the need to enhance the effectiveness of the action by covering a substantial percentage of U.S. imports from China ($505 billion in 2017). *Id.*

In developing the list of 6,031 tariff subheadings included in the proposed supplemental action, USTR considered products from across all sectors of the Chinese economy.  *Id.*  This included tariff subheadings suggested by commenters in response to the *April 6 Notice*.  *Id.*  As with Lists 1 and 2, USTR sought to avoid consumer goods to the extent possible, with the selection process taking "account of likely impacts on U.S. consumers."  *Id.*  Additionally, the selection process "involved the removal of subheadings identified by analysts as likely to cause disruptions to the U.S. economy, as well as tariff lines subject to legal or administrative constraints."  *Id.*  The proposed list was developed in close consultation between USTR and the U.S. Department of Commerce.  In addition to products commented on for inclusion on List 1, the proposal for List 3 included: Made in China 2025 products not covered by Lists 1 and 2; non-consumer goods (*e.g.*, basic and intermediate goods, machinery, chemicals); select agricultural products; fish and seafood; and select consumer products (*e.g.*, furniture and auto parts).

The notice proposing the List 3 modification invited comment on: (1) whether subheadings included in the proposed action should be retained or removed or whether

subheadings should be added; (2) the level of the increase, if any, in the rate of duty; and (3) the appropriate aggregate level of trade to be covered. *Proposed List 3,* 83 Fed. Reg. at 33,609 [PR-14.]

USTR requested that comments with respect to the inclusion or removal of particular tariff subheadings "address specifically whether imposing increased duties on a particular product would be practicable or effective to obtain the elimination of China's acts, policies, and practices, and whether maintaining or imposing additional duties on a particular product would cause disproportionate economic harm to U.S. interests, including small- or medium-size businesses and consumers." *Id.* The notice requesting comments for *Proposed List 3* also announced that the Section 301 Committee would convene a public hearing. *Id.*

Subsequent to the July 17 notice, the President directed the Trade Representative to consider raising the duties for the proposed action from 10 percent to 25 percent *ad valorem.* USTR proceeded to invite interested persons to comment on the possible imposition of a 25 percent additional duty. *Extension of Public Comment Period Concerning Proposed Modification of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 38,760, 38,760 (U.S. Trade Rep. Aug. 7, 2018) (*Extension of List 3 Comment Period*) [PR-15]. The notice also extended the time for the submission of written comments, filing requests to appear at the hearing, and the submission of post-hearing rebuttal comments. *Id.* at 38,761.

In advance of the public hearing, the interagency Section 301 Committee was provided and discussed testimony submitted by hearing participants ahead of the hearing. The Departments of Agriculture, Commerce, Health and Human Services, Labor, State, Treasury, Customs and Border Protection, and the Small Business Administration, participated in a 6-day

public hearing from August 20-27, 2018, during which time they questioned approximately 350 witnesses concerning their testimony regarding the proposed modification. *See Section 301 Hearings,* U.S. Trade Rep., https://ustr.gov/issue-areas/enforcement/section-301-investigations/record-section-301-investigation/section-301 (last visited July 29, 2022) (providing reference to USTR Hearing Transcripts [PR-37-43]).  Trade experts in USTR's offices of Agriculture, Textiles, and China Affairs also participated in the hearings.  At the beginning of each hearing day, the Chair of the Interagency Section 301 Committee informed witnesses and the public audience that "[t]he Section 301 Committee [would] carefully consider the testimony and the written comments" and that "[t]he 301 Committee [would] then make a recommendation to the Trade Representative on a supplemental action to be taken in the investigation." *See e.g.*, USTR Hearing Transcript, at 9 (Aug. 20, 2018) https://ustr.gov/sites/default/files/enforcement/301Investigations/0820USTR.pdf [PR-38].

Interested persons filed more than 6,000 comments in response to *Proposed List 3*.  Each comment was reviewed by staff at USTR and comments were posted to a public docket on www.Regulations.gov.  Comments were organized, sorted, and shared with industry experts within USTR for consideration of comments falling within their sectoral coverage area, (*i.e.,* industrial goods, agriculture, textiles) in order to make sector-specific recommendations on whether a subheading should be included on the final list based on a consideration of the comment, and internal analysis of the impact of inclusion or exclusion of a subheading on U.S. industry or broader U.S. interests.  The comments were also made available to members of the Section 301 Committee to review and provide comments on the inclusion of tariff subheadings corresponding to a represented agency's interests.  Consistent with USTR's statements at the public hearings regarding the function of the Section 301 Committee, federal agencies on the

committee, including the Departments of Commerce and Agriculture, Health and Human

Services, and the Small Business Administration, provided input on the development of the final

list of products through the Section 301 Committee.  In finalizing the list, USTR also consulted

the higher-level TPSC.  As discussed below, advice from the Section 301 Committee and TPSC

resulted in the removal of numerous subheadings.

On September 17, 2018, the President released a statement announcing that he had

directed the Trade Representative "to proceed with placing additional tariffs on roughly $200

billion of imports from China."  President of the United States, *Statement from the President*

(Sept. 17, 2018), https://trumpwhitehouse.archives.gov/briefings-statements/statement-from-the-

president-4/ (*September 2018 Presidential Directive*) [PR-4]. The President further directed that

"[t]he tariffs will take effect on September 24, 2018, and be set at a level of 10 percent until the

end of the year.  On January 1, [2019], the tariffs will rise to 25 percent."  *Id*.  Accordingly, on

September 21, 2018, the Trade Representative announced additional duties on a portion of the

proposed subheadings – 5,745 full and partial tariff subheadings, with an approximate annual

trade value of $200 billion.  *Notice of Modification of Section 301 Action: China's Acts, Policies,

and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed.

Reg. 47,974, 47,974-75 (U.S. Trade Rep. Sept. 21, 2018) (*Final List 3*) [PR-16].  As directed by

the President, the additional duty was initially set at 10 percent, effective September 24, 2018,

and was scheduled to increase to 25 percent on January 1, 2019.  *Id.* at 47,975.

In the Federal Register notice announcing the *Final List 3* modification, USTR explained

that USTR and the Section 301 Committee had carefully reviewed the public comments and the

testimony from the six-day public hearing and, based on this review process, had determined not

to include certain tariff subheadings proposed in the July 17 notice.  *Id.* at 47,975.  The 297 HTS

lines removed from the proposed list (286 full 8-digit lines and 11 partial 8-digit lines) as a result

of these consultations included: a partial exclusion of an electronics line to remove consumer

products; products that were subject to U.S. WTO cases on rare earths/critical materials; basic

chemical lines where China accounts for more than 90% of U.S. imports; inputs for pesticide and

other agricultural chemicals; U.S.-caught fish processed in China and shipped back to the United

States; certain health and safety products (*e.g.*, bicycle and all other safety helmets; bicycle

safety lights; rubber and plastic gloves; sanitary/hospital paper sheeting; hairnets; certain

precursor chemicals used to manufacture pharmaceuticals; certain child safety furniture); certain

agriculture products; and certain other products identified as critical inputs. *See* Press Release,

United States Trade Representative, *USTR Finalizes Tariffs on $200 Billion of Chinese Imports*

*in Response to China's Unfair Trade Practices* (Sept. 18, 2018), https://ustr.gov/about-us/policy-

offices/press-office/press-releases/2018/september/ustr-finalizes-tariffs-200. *See also*

*Conforming Amendment and Modifications to Section 301 Action: China's Acts, Policies, and*

*Practices Related to Technology Transfer, Intellectual Property, and Innovation,* 83 Fed. Reg.

49,153 (U.S. Trade Rep. Sept. 28, 2018).

Prior to the January 1 increase in additional duties to 25 percent, the President announced

that he had concluded a "highly successful meeting" with President Xi Jinping of China, where

he agreed to leave the tariffs on List 3 at the 10 percent rate to give the parties 90 days for

negotiations.  The President announced that if at the end of 90 days, an agreement had not been

reached, the additional tariffs would be raised to 25 percent.  White House, *Statement from the*

*Press Secretary Regarding the President's Working Dinner with China* (Dec. 1, 2018),

https://trumpwhitehouse.archives.gov/briefings-statements/statement-press-secretary-regarding-

presidents-working-dinner-china/ (*December 2018 White House Statement*)  [PR-29]; *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 65,198, 65,198-99 (U.S. Trade Rep. Dec. 19, 2018) (*Notice of December 2018 Delay*) [PR-17]; *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 7,966, 7,966-67 (U.S. Trade Rep. Mar. 5, 2019) (*Notice of March 2019 Delay*) [PR-18].

Citing progress in subsequent rounds of negotiations with China, at the end of the 90-day negotiation period, the Trade Representative, at the direction of the President, determined that it was no longer appropriate to raise the additional duties to 25 percent on March 2nd and that the rate of duty would remain at 10 percent until further notice.  *Notice of March 2019 Delay* [PR-18].

The United States and China continued negotiations, but in May 2019, China retreated from specific commitments agreed to in earlier rounds of negotiations.  *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation,* 84 Fed. Reg. 20,459 (U.S. Trade Rep. May 9, 2019) [PR-19].  In light of the lack of progress in negotiations with China, the President directed the Trade Representative to increase the rate of additional duty to 25 percent, effective May 10, 2019.  *Id.* In the notice announcing the duty increase, the Trade Representative also announced the establishment of a process to allow interested persons to request that particular products classified within an HTS subheading covered by the September 2018 action be excluded from the additional duties.  *Id.*

*C.*     *The List 4 Modification*

As of May 2019, China began to retreat from specific commitments and announced further retaliatory action that would further burden U.S. commerce.  In response, on May 10, 2019, the Trade Representative released a statement announcing that the President "ordered USTR to begin the process of raising tariffs on essentially all remaining imports from China, which are valued at approximately $300 billion."  *See* Press Release, United States Trade Representative*, Statement by U.S. Trade Representative Robert Lighthizer on Section 301 Action* (May 10, 2019)*,* https://ustr.gov/about-us/policy-offices/press-office/press-releases/2019/may/statement-us-trade-representative *(May 2019 Representative Robert Lighthizer Statement*) [PR-30].

On May 17, 2019, the Trade Representative, at the direction of the President, invited public comment on modifying the action being taken in the Section 301 investigation by imposing up to an additional 25 percent *ad valorem* duty on products of China classified in 3,805 full and partial tariff subheadings, with an annual trade value of approximately $300 billion. *Request for Comments Concerning Proposed Modification of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation,* 84 Fed. Reg. 22,564 (U.S. Trade Rep. May 17, 2019) [PR-20].  Consistent with the President's instruction, the proposed list of tariff subheadings covered essentially all products not covered by the action and previous lists, but sought to exclude pharmaceuticals, certain pharmaceutical inputs, select medical goods, rare earth materials, and critical minerals.  *Id.* at 22,564.

As with List 3, USTR invited comment with respect to any aspect of the proposed $300 billion tariff action, including: (1) whether subheadings included in the proposed action should

be retained or removed or whether subheadings should be added; (2) the level of the increase, if any, in the rate of duty; and (3) the appropriate aggregate level of trade to be covered. *Id.* USTR again requested that comments on the inclusion or removal of particular tariff subheadings address specifically whether imposing increased duties on a particular product would be practicable or effective to obtain the elimination of China's acts, policies, and practices, and whether imposing additional duties on a particular product would cause disproportionate economic harm to U.S. interests, including small- or medium-size businesses and consumers." *Id.*

USTR (including staff in USTR's offices Agriculture, Textiles, and China Affairs) and the Section 301 Committee, including trade experts from the Departments of Agriculture, Commerce, Labor, State, Treasury, the Small Business Administration, and U.S. Customs and Border Protection, participated in a seven-day public hearing from June 17 to June 25, 2019. Over 300 witnesses provided testimony and responded to detailed industry-specific questions posed by the Section 301 Committee in response to the testimony provided. *See Section 301 Hearings,* U.S. Trade Rep., https://ustr.gov/issue-areas/enforcement/section-301-investigations/record-section-301-investigation/section-301 (last visited July 8, 2022).

Interested persons submitted nearly 3,000 written submissions in response to the May 17 notice. As with List 3, staff at USTR reviewed each submitted comment before posting the comment to the public docket on www.Regulations.gov. Comments were again organized, sorted, and shared with industry experts within USTR for consideration of comments falling within their sectoral coverage area, (*i.e.,* industrial goods, agriculture, textiles), in order to make sector-specific recommendations on whether a subheading should be included on the final list based on a consideration of the comment, and an analysis on the impact of inclusion or exclusion

of a subheading on a U.S. industry or broader U.S. interests.  The comments were also made available to members of the Section 301 Committee to review and provide comments on the inclusion of tariff subheadings corresponding to the represented agency's interests.

Consistent with USTR's statements at the public hearings regarding the function of the Section 301 Committee, USTR consulted the Committee and the TPSC in composing the final list.  *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation,* 84 Fed. Reg. 43,304, 43,305 (U.S. Trade Rep. Aug. 20, 2019) [PR-21].  In this regard, USTR received and considered advice submitted by trade experts from the Department of Agriculture, the Department of Commerce, the Department of  Energy, the Department of Health and Human Services, and the Small Business Administration, on potential impacts to the U.S. economy, U.S. interests, or on national security, of including or excluding particular tariff subheadings.  As explained below, in some cases, these interagency deliberations resulted in the removal of subheadings from the final list.

On August 20, 2019, USTR announced the determination to modify the action in the investigation by imposing additional duties of 10 percent on a list of 3,782 full and partial tariff subheadings with an annual trade value of approximately $300 billion to be implemented in two segments, with tariffs on 3,243 subheadings taking effect on September 1, 2019 (List 4A), and tariffs on 555 subheadings taking effect January 1, 2020 (List 4B).  *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation,* 84 Fed. Reg. 43,304, 43,305 (U.S. Trade Rep. Aug. 20, 2019) [PR-21].

In the *Federal Register* notice, USTR explained that it was taking the additional action under Sections 307(a)(1)(B) and (C), at the specific direction of the President, because the

burden or restriction on United States commerce of the acts, policies, and practices that are the subject of the Section 301 action continued to increase, and because China's response to previous actions in the investigation demonstrated that those actions were no longer appropriate. *See id*.  As the notice explained*,* instead of addressing the underlying acts, policies, and practices that were the subject of the investigation, China took or threatened to take countermeasures, including imposing tariffs on approximately $110 billion worth of U.S. goods, and retreated from previous commitments.  *See id.*

With respect to products to be covered, the *Final List 4* notice explained that the Trade Representative's determination to modify the action, at the direction of the President, took into account the public comments and the testimony from the seven-day public hearing, as well as the advice of the interagency Section 301 committee.  *See id.*  The notice further explained that certain proposed subheadings were removed from the final list based on health, safety, national security, and other factors.  *See id.*  The notice further explained that the tariff subheadings subject to the additional duties had been separated into two lists – List 4A included tariff subheadings where China's share of U.S. imports from the world is less than 75 percent for each subheading, and List 4B included products where China's share of U.S. imports from the world is 75 percent or greater for each subheading.  *See id.*

The notice explained that the effective date for List 4B would be delayed until December 15, 2019.  *See id.*  The delay would provide a longer adjustment period for consumer goods with less availability outside of China.  USTR explained that "as part of USTR's public comment and hearing process, it was determined that the tariff should be delayed to December 15 for certain articles.  Products in this group included, for example, cell phones, laptop computers, video game consoles, certain toys, computer monitors, and certain items of footwear and

clothing."   *See* Press Release, United States Trade Representative, *USTR Announces Next Steps on Proposed 10 Percent Tariff on Imports from China* (Aug. 13, 2019), https://ustr.gov/about-us/policy-offices/press-office/press-releases/2019/august/ustr-announces-next-steps-proposed. The *Final List 4* notice further announced that the Trade Representative had also determined that USTR would establish a process by which interested persons could request that a particular product covered by the action be excluded from the additional duties.   *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation,* 84 Fed. Reg. 43,304, 43,305 (U.S. Trade Rep. Aug. 20, 2019) [PR-21].

Subsequently, on August 30, 2019, following China's announcement of further retaliatory tariffs that would harm the U.S. economy, and signaling by China that it did not intend to change its behavior, the Trade Representative determined to modify the action by increasing the rate of additional duty from 10 to 15 percent on products covered by the action published on August 20, 2019, in accordance with the specific direction of the President.   *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation,* 84 Fed. Reg. 45,821 (U.S. Trade Rep. Aug. 30, 2019) [PR-22].

On December 15, 2019, following the announcement of the Phase I Agreement between the United States and China, the action was further modified by suspending, until further notice, the additional duty of 15 percent on certain products of China on List 4B.   *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation,* 84 Fed. Reg. 69,447 (U.S. Trade Rep. Dec. 18, 2019) [PR-24].

In light of the scheduled entry into force of the Phase 1 Agreement, and at the specific direction of the President, the action was further modified, effective February 14, 2020, to reduce the rate of additional duty on certain products of China on List 4A from 15 percent to 7.5 percent.  *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation,* 85 Fed. Reg. 3,741 (U.S. Trade Rep. Jan. 22, 2020) [PR-25].

Each of the four lists were subsequently modified by granting product-specific exclusions for products classified within a particular tariff subheading.  Under these processes, USTR received approximately 50,000 exclusion request and approved approximately 7,000 requests.  Through subsequent processes, many of these exclusions were extended.  In March 2022, USTR reinstated 352 of the previously extended exclusions.  *Notice of Reinstatement of Certain Exclusions: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 87 Fed. Reg. 17,380 (U.S. Trade Rep. Mar. 28, 2022).  The reinstated exclusions expire at the end of 2022.  *Id.*

Additionally, covering products from all four lists, in 2020 USTR granted 99 exclusions for certain medical care products to address COVID-19.  These exclusions were subsequently extended and in November 2021, 81 of these exclusions were extended to May 31, 2022.  These exclusions currently expire November 30, 2022.  *Notice of Product Exclusion Extensions: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 87 Fed. Reg. 33,871 (U.S. Trade Rep. June 3, 2022).

On May 5, 2022, USTR announced the initiation of the Four-Year Review of the List 1 and List 2 actions, as modified by *Final List 3* and *Final List 4*, as well as by the temporary removal of duties on certain products through the product exclusions discussed above.  *Initiation*

*of Four-Year Review Process: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 87 Fed. Reg. 26,797 (U.S. Trade Rep. May 5, 2022).

## II.    USTR's Response to Significant Comments

The CIT stated in its opinion that "[t]he statute, the [Notices of Permanent Rule Making], and the comments responsive to the NPRMs frame this court's review of the USTR's concise statements of basis and purpose" contained in the *Final List 3* and *Final List 4* modifications. *See CIT Opinion* at 52.  Within this framework, the Court concluded that USTR's statements of basis and purpose in the *Final List 3* and *Final List 4* modifications did not adequately respond to the public comments that raised "significant issues."  *See CIT Opinion* at 52-57.

The Court has construed USTR's notices for the *Proposed List 3 and 4* modifications as inviting comment not only on the specific considerations listed in the *Federal Register* notices, but also on any aspect of the proposals.  *See CIT Opinion* at 51.  Consistent with the Court's *Opinion*, in addition to addressing comments on the tariff subheadings to be covered by the modification, the level of increase, if any, in additional duties, and the appropriate aggregate level of trade to be covered, USTR will also address comments regarding potential damage to the U.S. economy, comments recommending alternative courses of action, and comments concerning the legality and efficacy of tariffs.  *See CIT Opinion* at 51-53.  Below, we respond to significant comments touching on these issues, while mindful of the Court's advisement that the APA does not require USTR to provide a response comment-by-comment.

First, this *Remand Determination* will discuss the documents and materials relied upon in responding to significant comments in Part II.A *infra*.

With respect to the nature of the comments received, approximately 95 percent of the comments addressed "tariff subheadings to be covered" by the proposed lists or specific products to be covered.[4]  In Part II.B we provide further explanation of USTR's determination to remove and retain certain tariff subheadings in *Final List 3* and explain how the determinations addressed and responded to the comments.  Next, we provide a further explanation of these determinations as they pertain to *Final List 4* in Part II.C.

Finally, this *Remand Determination* will address comments that were not necessarily tied to a specific product or subheading recommendation.  These include comments that addressed the aggregate level of trade subject to the proposed modification, which we address in Part II.D, and general comments concerning damage to the economy, comments concerning the legality of the modification, comments concerning the efficacy of tariffs, and alternative courses of action, which we address in Part II.E.  We estimate that these comments account for less than three percent of the overall comments received on *Proposed List 3* and *Proposed List 4*.

## A.     *Explanation of Documents Relied Upon in this Remand Determination*

 In responding to significant comments, USTR will rely on: the statutory factors contained in sections 301(b) and 307(a)(1)(B)-(C), and the *Federal Register* notices, which the Court indicated frame its review, *see CIT Opinion* at 52, as well as press statements, the public comments themselves, and transcripts from the public hearings.  Using these public documents as a basis, USTR will provide a further explanation of the reasoning underlying the determinations to undertake the tariffs actions, and decisions to include or exclude certain products from *Final List 3* or *Final List 4*.

---

[4] Of the more than 9,000 total comments USTR received in response to Lists 3 and 4, there were approximately 440 non-product-specific comments.

1.   *Statutory Factors*

The *CIT Opinion* instructs that the statutory factors contained in sections 301(b) and 307(a)(1)(B)-(C) are to inform the Trade Representative's determination of "whether and how" to modify the action taken in the investigation.   *CIT Opinion* at 47- 50.   USTR discussed the statutory considerations in the Federal Register notices issued in the investigation, and will use these same statutory considerations to further explain the Trade Representative's decisions on "whether and how" the action would be modified.

The statute permits the Trade Representative to "modify or terminate any action" that is being taken pursuant to Section 301 "subject to the specific direction, if any, of the President." 19 U.S.C. § 2417(a)(1).   Thus, in accordance with the statute, and as we explain in further detail below, the President's specific direction informed the Trade Representative's determinations in taking *Final List 3* and *Final List 4*.

In addition, under Sections 307(a)(1)(B)-(C), in determining "whether and how" to modify the action, the Trade Representative considered whether the burden or restriction on United States commerce of the denial [of] rights, or of the acts, policies, and practices, that are the subject of such action had increased or decreased (paragraph B), and whether previous actions taken in the investigation under Section 301(b) were no longer appropriate (paragraph C). *See Final List 3*, 83 Fed. Reg. 47,974 (U.S. Trade Rep. Sept. 21, 2018) [PR-16]; *Final List*, 84 Fed. Reg. 43,304, 43,305 (U.S. Trade Rep. Aug. 20, 2019) [PR-21].

The CIT found that the List 3 and List 4 modifications were permissible under Section 307(a)(1)(B), and thus did not address the Trade Representative's reliance on Section 307(a)(1)(C) in modifying the action, at the direction of the President.   Thus, the statutory authority for these modifications are not an issue in this *Remand Determination*.   Although the

*CIT Opinion* did not address Section 307(a)(1)(C) in reviewing the statutory authority for the modifications, the Trade Representative invoked subsection C (as well as subsection B) in the determinations to modify the actions, at the direction of the President.  *See Final List 3* [PR-16]; *Final List 4* [PR-21].

As we explained in our notices, the term "appropriate" as used in Section 307(a)(1)(C) refers to Section 301(b), which requires the Trade Representative to "take all appropriate and feasible action authorized under [section 301(c)] to obtain the elimination of [the] act, policy, or practice."  *See Final List 3* [PR-16]; *Request for Comments Concerning Proposed Modification of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation,* 84 Fed. Reg. 22,564 (U.S. Trade Rep. May 17, 2019) [PR-20].  Accordingly, and as we explain in the sections that follow, in considering "whether and how" to modify the action at the direction of the President, the Trade Representative also considered whether the proposed action, including duties on particular subheadings, was appropriate – a matter of predictive judgment to obtain the elimination of China's acts, policies and practices subject to the investigation.

2.   *The Federal Register Notices and Press Statements*

The Federal Register notices on which USTR will rely in providing further explanation include statements from the President directing USTR to take certain actions, and also make reference to interagency deliberations of the Section 301 Committee.  As indicated in the CIT's *Opinion*, Presidential direction is a statutory factor for which USTR should account.  Therefore, in providing further explanation, this *Remand Determination* will provide a more detailed explanation of how the Presidential direction referenced and incorporated into *Final List 3* and *Final List 4* factored into the Trade Representative's determination to take action, the manner in

which the Trade Representative acted, and the Trade Representative's consideration of public comments in light of that direction.

Federal regulations provide for the interagency deliberations referenced in the Federal Register notices issued in the investigation, and also referenced in press statements. *See* 15 CFR §§ 2002.2(b)(8) (2022); 2002.3 (b)(2-4) (2022). In providing further explanation of USTR's decision making, this *Remand Determination* will specifically identify the Section 301 Committee member advice and recommendations referenced in the public documents issued by USTR. Identification of the specific Section 301 Committee member advice is consistent with the Court's decision in *Invenergy Renewables LLC v. United States*, 44 CIT ___, __, 476 F. Supp. 3d 1323, 1347 (2020), because USTR referenced the advice in *Final List 3* and *Final List 4*, as well as in press statements. Separately, and as we discussed above, USTR alerted the public of the Committee advisement and recommendation component of the review process at each day of the public hearings. *See e.g.*, USTR Hearing Tr., at 9 (Aug. 20, 2018), https://ustr.gov/sites/default/files/enforcement/301Investigations/0820USTR.pdf [PR-38].

Considering that the 301 Committee consultation process was disclosed to the public, in this *Remand Determination* we also provide the rationale underlying the specific Committee member recommendation. While the rationale underlying the Committee member advice were not made public, the additional details are provided for the purpose of providing the Court with a complete picture of the Committee recommendations on which USTR acted.

   *3.*  *Transcripts from the Public Hearings*

This *Remand Determination* will also refer to the transcripts of the public hearings, in particular, witness responses to questions from the Section 301 Committee, as an example of

how important policy issues raised in comments and testimony were ventilated by USTR and the Section 301 Committee.

### B.    *Further Explanation of the Final List 3 Modification*

As discussed above, for Lists 1 and 2, USTR targeted products that benefit from China's forced technology practices and industrial policies, including Made in China 2025.  By contrast, for List 3, USTR considered products from across all sectors of the Chinese economy.  *See supra* Section I.  *See also Proposed List 3*, 83 Fed. Reg. 33,608, 33,609 (U.S. Trade Rep. July 17, 2018) [PR-14].  In selecting subheadings to include, the "selection process took account of likely impacts on U.S. consumers, and involved the removal of subheadings identified by analysts as likely to cause disruptions to the U.S. economy, as well as tariff lines subject to legal or administrative constraints."  *Id.*  To aid in the consideration of the inclusion or removal of particular subheadings, USTR requested that public comments "address specifically whether imposing increased duties on a particular product would be practicable or effective to obtain the elimination of China's acts, policies, and practices, and whether maintaining or imposing additional duties on a particular product would cause disproportionate economic harm to U.S. interests, including small- or medium-size businesses and consumers."  *Id.*

An additional consideration was the aggregate level of trade to be covered by additional duties.  As previously noted, the proposed tariff action for List 3 covered 6,031 tariff subheadings.  Based on 2017 import values, the proposed tariff subheadings had a value of approximately $209 billion.  Accordingly, to maintain the $250 billion aggregate level of trade (that is, aggregated with the approximately $50 billion level of Lists 1 and 2) covered by additional duties directed by the President, only a limited number of subheadings could be removed.  In light of this, in removing particular tariff subheadings, USTR placed significant

consideration on those comments that made a clear showing that the proposed duties would be ineffective in obtaining the elimination of China's acts policies and practices or, based on the limited availability of the product outside of China, the proposed duties would likely harm the U.S. economy, or other U.S. interests, including health, safety and security.  Such considerations were consistent with the policy objectives underscored in Section 301(b) of the Trade Act.

With these considerations in mind, of the 6,031 lines proposed for the final list, the Trade Representative determined to remove 297 HTS lines (286 full 8-digit lines and 11 partial 8-digit lines).  These 297 HTS lines had an import value in 2017 of approximately $19 billion.  The removed lines included: products that were subject to U.S. WTO cases on rare earths/critical materials; a partial exclusion of an electronics line to remove consumer products; basic chemical lines where China accounts for more than 90% of U.S. imports; inputs for pesticide and other agricultural chemicals; U.S.-caught fish processed in China and shipped back to the United States; certain health and safety products; textile-related inputs; certain agriculture products; child safety furniture (*e.g.*, high-chairs, car seats, playpens); and certain other products identified as critical inputs.  *See* Press Release, United States Trade Representative, *USTR Finalizes Tariffs on $200 Billion of Chinese Imports in Response to China's Unfair Trade Practices* (Sept. 18, 2018), https://ustr.gov/about-us/policy-offices/press-office/press-releases/2018/september/ustr-finalizes-tariffs-200.

As we explain below, these 297 lines were removed because it was determined that imposing additional duties on products covered by the line would not be practicable or effective to obtain the elimination of China's acts, policies, and practices, and/or would cause disproportionate economic harm to U.S. interests, including small- or medium-size businesses

and consumers.  For all of the removed lines, public comments and testimony supported the removal.

1.  *Further Explanation of the Determination to Remove Rare Earths of Critical Minerals*

Rare earths and critical minerals, including tungsten and molybdenum, accounted for 98 of the 297 lines removed.  Rare earths and critical minerals are key industrial inputs with limited supply and were the subject of disputes at the World Trade Organization, where the United States, European Union, and Japan challenged China's restrictions on the export of various forms of rare earths, tungsten, and molybdenum, which are used in the production of various kinds of electronic goods.  *China – Measures Related to the Exportation of Rare Earths, Tungsten and Molybdenum* (DS431, DS432, DS433), World Trade Organization (Mar. 26, 2014), https://www.wto.org/english/tratop_e/dispu_e/431_432_433r_e.pdf.  Given China's previous efforts to prevent exports of rare earths and critical minerals from China, the Trade Representative determined that increasing duties on U.S. imports of these products was not likely to be effective in obtaining the elimination of China's acts, policies, and practices.  Moreover, based on comments submitted and testimony provided, additional duties on rare earths and critical minerals seemed likely to cause disproportionate economic harm to U.S. interests.

USTR received multiple comments requesting that USTR remove rare earths and critical minerals from the *Proposed List 3*, noting their limited availability outside of China and the use of rare earths and critical minerals in domestic production of certain products.  *See* Comments of Finish Thompson Inc., USTR-2018-0026-0133 (July 26, 2018) [PR-183] (noting that China dominates rare earth mining and magnet products, with 85-95 percent of the world's rare earth mining occurring in China); Comments of Electron Energy Corporation, USTR-2018-0026-0492 (Aug. 4, 2018) [PR-542] (estimating that China currently supplies more than 95 percent of the

rare earths to the world); Comments of TYK America, Inc., USTR-2018-0026-0708 (Aug. 8, 2018) [PR-758] (estimating that China accounts for 95 percent of rare earths and minerals needed to produce refractory products); Comments of Fedmet Resources Corporation, USTR-2018-0026-1118 (Aug. 16, 2018) [PR-1166] (noting that the limited capacity in third countries such as Turkey, Russia, and South America, was not sufficient for U.S. demand).

Additionally, comments noted that rare earths are used in critical industries. *See* Comments of Electron Energy Corporation, USTR-2018-0026-0492 (Aug. 4, 2018) [PR-542] (noting that approximately 70 percent of the markets they serve involve the U.S. aerospace and Department of Defense industries). Multiple comments were submitted by companies that used rare earths and minerals in the production of goods for the U.S. steel industry. *See* Comments of CCPI Inc., USTR-2018-0026-0213 (July 27, 2018) [PR-263] (noting that products under 2519.90.10 are key components of refractory material required for the American steel and foundry industry). *See also* Comments of Fedmet Resources Corporation, USTR-2018-0026-1118 (Aug. 16, 2018) [PR-1166]; Comments of TYK America, Inc., USTR-2018-0026-0708 (Aug. 8, 2018) [PR-758].

At the public hearing, multiple witnesses testified that barite was a critical component of oil and gas drilling fluids and had limited availability outside of China. *See* Testimony of Tom Eisenman, AES Drilling Fluids Holding, LLC, USTR Hearing Tr., at 162-163, 165 (Aug. 23, 2018) [PR-41] (noting that U.S. consumption outstrips production and there are limited alternatives); Testimony of David Henrick, Newpark Drilling Fluids, LLC and Excalibar Minerals, USTR Hearing Tr., at 169 (Aug. 23, 2018) [PR-41] (noting that barite is a vital safety component to oil and gas exploration); Testimony of Tim Tarpley, Petroleum Equipment and

Services Association, USTR Hearing Tr., at 183 (Aug. 23, 2018) [PR-41] (testifying that China maintains the largest barite reserves in the world).

Similarly, Stephen Lamar of American Apparel & Footwear Association testified that the rare earth magnet components they use for fasteners made in the U.S. and sold to the automotive and medical industries can only be sourced in China. *See* Testimony of Stephen Lamar, American Apparel & Footwear Association, USTR Hearing Tr., at 46 (Aug. 20, 2018) [PR-38].

In sum, given China's previous attempts to prevent the export of rare earths and critical minerals, additional duties on rare earths and critical minerals were determined not to be effective in changing China's policies and practices with respect to technology transfer and possibly disrupt numerous sectors of the U.S. economy.  As a result, the Trade Representative decided to remove subheadings covering rare earths and critical minerals on *Final List 3*.

### 2. *Further Explanation of the Determination to Remove Certain U.S. Seafood Products Exported to China for Processing*

USTR received numerous comments urging against the inclusion of seafood products that were caught in U.S. waters by U.S. fishing vessels, and then exported to China for processing, before importation back to the United States by U.S. businesses.  In written comments, representatives of the Alaska Seafood Marketing Institute asserted that Alaska's seafood industry relies heavily on Chinese processing of U.S.-caught seafood in order to remain competitive globally.  *See* Comments of Alaska Seafood Marketing Institute, USTR-2018-0026-3990 (Sept. 7, 2018) [PR-4036].  *See also* Comments of Bristol Bay Regional Seafood Development Association, USTR-2018-0026-4978 (Sept. 9, 2018) [PR-5024]; Comments of the National Restaurant Association, USTR-2018-0026-5694 (Sept. 12, 2018) [PR-5738].

At the public hearing held on August 23, 2018, Senator Dan Sullivan of Alaska testified that Alaskan pollock, Pacific cod, salmon and certain flatfish were raised, harvested, fished and

processed in the United States by U.S. shipping vessels and fisherman, and only briefly sent to China for minimal reprocessing, with minimal value added, before being imported back to the United States for domestic consumption or for export to third countries.  According to the testimony provided, Alaska accounts for 60 percent of U.S. commercial fishing.  Senator Sullivan further testified that these seafood products were essentially products "of Alaska" and that the proposed tariffs would "advantage Chinese and Russian fisherman" by making Chinese and Russian products more competitive globally.  The Senator further testified that the potential benefit to the Russian fishing industry was troubling considering that Russia maintains an embargo on U.S. seafood in response to U.S. sanctions.  *See* Testimony of Senator Dan Sullivan, USTR Hearing Tr., at 9-19 (Aug. 23, 2018) [PR-41].  *See also* Testimony of Robert DeHaan, National Fisheries Institute, USTR Hearing Tr., at 69-70 (Aug. 22, 2018) [PR-40] (noting that a substantial amount of the U.S. domestic catch is processed in China and then shipped back to the U.S., and that the proposed tariffs would harm U.S. processors, distributors, retailers and restaurants that depend on year-round supply of seafood to meet domestic demand); Testimony of Thomas Kraft, Norpac Fisheries Export, USTR Hearing Tr., at 438-439 (Aug. 23, 2018) [PR-41] (testifying that the proposed tariffs would not only hurt Norpac and its customers, but would also hurt the entire U.S. seafood industry, which is made up of a large number of independent small and medium sized businesses).

In response to questions from the Section 301 Committee regarding alternative locations for fish processing, witnesses asserted difficulties faced by small- and medium-sized businesses in finding reliable processing facilities in the short-term, a limited domestic labor force for certain secondary processing, and limited secondary processing opportunities in third countries. *See* Testimony of Robert DeHaan, National Fisheries Institute, USTR Hearing Tr., at 109-113

(Aug. 22, 2018) [PR-40] (testifying that in the short-term, small and medium sized businesses do not have the ability to quickly find new reliable and competent distribution partners to avoid the proposed tariffs, and that complex U.S. government regulations and approvals are time consuming when attempting to move a distribution business to another country).

As USTR explained in *Proposed List 3* [PR-14] and *Final List 3* [PR-16], the policy objective underlying the proposed tariffs is to exert additional economic pressure on China in order to encourage the elimination of its harmful practices by targeting products "of China." USTR viewed the comments and testimony received as being highly suggestive that additional duties on a variety of seafood products would be plainly ineffective in placing additional pressure on China because the products are essentially U.S.- made, grown, and harvested, with little value added by secondary Chinese processing.  In light of how ineffective the additional duties would likely be, the potential effects on the U.S. fishing industry, and potential benefits to competing Chinese and Russian fishing industries, the Trade Representative determined to remove eight subheadings pertaining to U.S. caught seafood.  *See Proposed List 3*, 83 Fed. Reg. 33,608, 33,609 (U.S. Trade Rep. July 17, 2018) [PR-14];  *Final List*, 83 Fed. Reg. 47,974 (U.S. Trade Rep. Sept. 21, 2018) [PR-16] (as amended by *Conforming Amendment and Modification to Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 49,153 (U.S. Trade Rep. Sept. 28, 2018) (removing two additional HTS subheadings for seafood)).

   3.  *Further Explanation of the Determination to Remove Chinese Antiques and Works of Art Imported from Third Countries*

USTR received multiple comments requesting that USTR remove certain Chinese antiques, sculptures, and other works of art from the final list.  The comments noted that because it is illegal for Chinese antiquities to be exported from China, the tariffs would only apply to

Chinese art imported from third countries and would have no effect on China.  *See* Comments of Zetterguist Galleries, USTR-2018-0026-0736 (Aug. 8, 2018) [PR-786]; Comments of Joan Canterbury, USTR-2018-0026-0335 (July 31, 2018) [PR-385]; *and* Comments of Robert Ferris, USTR-2018-0026-0074 (July 24, 2018) [PR-124].  *See also* Testimony of Eric Zetterquist, Zetterquist Galleries, USTR Hearing Tr., at 327-331 (Aug. 20, 2018) [PR-38].  Comments and witness testimony expressed that because cultural goods falling under HTS subheadings 9705 and 9706 are not of recent manufacture, that the proposed additional duties would not affect any Chinese industry, but would negatively affect small businesses and auction houses by limiting their ability to import Chinese artifacts.  *See* Comments of Global Heritage Alliance and Committee for Cultural Policy, USTR-2018-0026-0205 (July 27, 2018) [PR-255]; Comments of International Association of Professional Numismatists and the Professional Numismatists Guild, USTR-2018-0026-0201 (July 27, 2018) [PR-251]; Testimony of Peter Tompa, Global Heritage Alliance, Incorporated, USTR Hearing Tr., at 418-423 (Aug. 22, 2018) [PR-40].

USTR viewed the comments and testimony regarding Chinese antiques as being highly suggestive that additional duties on such products would be plainly ineffective in exerting additional pressure on China.  Additionally, trade data confirmed a low level of imports under subheadings 9705 and 9706 from China, further suggesting the additional duties would have a low impact and be ineffective in exacting additional economic pressure on China to encourage China to change its practices.  Given the above, the Trade Representative determined not to include subheadings 9705 and 9706 on *Final List 3*.  *See Proposed List 3,* 83 Fed. Reg. at 33,609 [PR-14]; *Final List 3*, 83 Fed. Reg. at 47,974-75 [PR-16].

4.   _Further Explanation of the Determination to Remove Certain Consumer Electronics_

USTR received numerous comments regarding the inclusion of HTS subheading 8517.62.00, which covers a large variety of products related to the transmission of electronic data, such as routers and modems, as well as consumer goods, such as smart watches, and wireless headphones.  Generally, the comments regarding the inclusion of this subheading related to the manufacturing of hardware (modems, routers, gateways, etc.,), or the effects of tariffs on consumer end-users.

For example, comments asserted that China possesses the infrastructure and low-skill labor needed for manufacturing hardware components, and that additional duties would put U.S. companies who compete with third-country manufacturers and who also use Chinese components at a disadvantage.  _See e.g._, Comments of Internet Association, USTR-2018-0026-5104 (Sept.10, 2018) [PR-5150]; Comments of eero Inc., USTR-2018-0026-0406 [PR-456]; Testimony of Timothy Amos Schallich, eero Inc., USTR Hearing Tr., at 201-203 (Aug. 21, 2018) [PR-39].

With respect to consumer impact, comments asserted generally that the proposed tariff would make internet enabled technologies less affordable, while other comments asserted that national security and privacy risks could arise if U.S. consumers switched to cheaper Chinese devices that store user information in China.  _See e.g._, Comments of Dell Technologies, USTR-2018-0026-5923 (Sept. 12, 2018) [PR-5960]; Comments of Fitbit Inc., USTR-2018-0026-0285 (July 31, 2018) [PR-335].

In response to questions from the Section 301 Committee regarding capacity to shift production from China to other sources, including to the United States, witnesses at the hearing generally asserted that due to established and certified factories, and issues with inferior quality

products from third countries, that shifting production from China was generally not financially feasible for most companies, especially small start-ups. *See e.g.*, Testimony of Cheryl Green, BAK Industries USA, USTR Hearing Tr., at 217-219 (Aug. 21, 2018) [PR-39] (responding to questions from the Section 301 Committee). *See also* Comments of Zoom Telephonics Inc., USTR-2018-0026-5646 (Sept. 11, 2018) [PR- 5690]; Comments of Micro Center, USTR-2018-0026-3597 (Sept. 6, 2018) [PR-3643]; Comments of Aries Manufacturing, USTR-2018-0026-5343 (Sept. 10, 2018) [PR-5388].

The Section 301 Committee also sought to further understand claims that tariffs on the proposed subheading would slow U.S. technological growth, specifically with respect to the deployment of 5G networks, and the extent to which products covered by the proposed subheading were included in China's industrial program initiatives, including Made in China 2025. One witness asserted that tariffs on parts integral to the nation's 5G upgrade will delay the adoption of the upgrade across the United States. The witness also explained that "China had designated 5G and artificial intelligence as a strategic priority, and outlined state funding mechanisms in their 13th five-year plan and the Made in China 2025 Plan." *See* Testimony of Kathlene Swanson, Telecommunication Indus. Assoc., USTR Hearing Tr., at 297-300 (Aug. 22, 2018) [PR-40]. The Section 301 Committee inquired further as to whether China's focus on 5G as a strategic priority would incentivize the Chinese government to force U.S. suppliers and manufacturers to transfer technology. In response, a witness acknowledged issues with forced technology transfer. *See id.* at 299-300. However, this testimony conflicted with comments asserting that products covered by the proposed HTS subheading do not contain the type of technology targeted by China's unfair and discriminatory, acts, policies, and practices, or

technology critical for China's industrial advancement policies.  *See e.g.*, Comments of Bose Corporation, USTR-2018-0026-3671 (Sept. 6, 2018) [PR-3717].

　　　As noted above, in selecting subheadings to include in List 3, the "selection process took account of likely impacts on U.S. consumers." *See Proposed List 3*, 83 Fed. Reg. 33,608, 33,609 (U.S. Trade Rep. July 17, 2018) [PR-14].  USTR also sought to target subheadings that were strategically important or related to the "Made in China 2025" program.  *See Initiation of Section 301 Investigation; Hearing; and Request for Public Comments: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 82 Fed. Reg. 40,213, 40,213 (U.S. Trade Rep. Aug. 24, 2017) (*Initiation of Section 301 Investigation*);  *Notice of Action and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 FR 28,710, 28711 (U.S. Trade Rep. June 20, 2018) (*June 20 Notice*); *Notice of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 40,823 (U.S. Trade Rep. Aug. 16, 2018);  *Proposed List 3,* 83 Fed. Reg. 33,608 [PR-14]. Although there were conflicting public comments, USTR subject matter experts determined from reviewing the "*Made in China 2025 Key Area Technology Roadmap*"[5], that the proposed subheading included certain industrially significant technology related to the Made in China 2025 industrial program, specifically Made in China 2025's focus on next generation information technology and mobile communications systems.

---

[5] As discussed in USTR's *Findings of the Investigation*, the "Made in China 2025" Key Area Technology Roadmap (Made in China Roadmap) was released by China's National Strategic Advisory Committee on Building a Powerful Manufacturing Nation (also known as the "National Manufacturing Strategy Advisory Committee") which was established pursuant to the China's *Notice on Issuing "Made in China 2025",* with responsibility to provide advice and assessments on China's major manufacturing policies.  *See Section 301 Findings* [PR-26].

Finally, the proposed HTS subheading had an estimated annual trade value of $22 billion (2018), accounted for over 10 percent of the aggregate trade value of the proposed modification, and was, by far, the largest HTS subheading by trade value for which additional duties had been proposed.  Removal of the entire subheading would have constrained the Trade Representative's ability to consider the removal of other subheadings, and would have prevented the Trade Representative from being able to comply with the President's September 17, 2018 direction to "proceed with placing additional tariffs on roughly $200 billion of imports from China."  *See September 2018 Presidential Directive* [PR-4].

Given the value of imports under the subheading, and the inclusion of Made in China 2025 products, it was not feasible to remove the entire subheading.  However, in response to comments regarding impacts on consumers, USTR worked with the U.S. International Trade Commission, Customs and Border Protection, and the Census Bureau to create a new 10-digit statistical code that separated routing and switching apparatus from other, more consumer electronics.  This allowed USTR to include on *Final List 3* the Made in China 2025 products, while excluding consumer products.

5.  *Further Explanation of the Determination to Remove Certain Health and Safety Products*

As USTR noted, following consultations with the interagency Section 301 Committee and the review of public comments and testimony, the Trade Representative determined to remove certain health and safety products.  *See* Press Release, United States Trade Representative, *USTR Finalizes Tariffs on $200 Billion of Chinese Imports in Response to China's Unfair Trade Practices* (Sept. 18, 2018), https://ustr.gov/about-us/policy-offices/press-office/press-releases/2018/september/ustr-finalizes-tariffs-200. These included, rubber and plastic gloves, sanitary paper, hair nets, precursor chemicals used to manufacture

pharmaceuticals, bicycle and all other safety helmets, bicycle safety lights, and children's safety furniture.  *Id.  See also Final List 3* [PR-16].

### a.  **Medical and Healthcare Products**

Through the Section 301 Committee, the Department of Health and Human Services (HHS) raised concerns regarding the availability of certain medical products, including rubber and plastic gloves, sanitary paper, and hair nets and the possible threat to the health and safety of U.S. citizens.  Public comments affirmed HHS' concerns and the vital need for these products, which are utilized by healthcare workers and used widely in care settings such as hospitals, nursing homes, doctor's offices, surgery centers and laboratories to provide a critical barrier to preventing infections and ensuring quality outcomes for patients.

Several comments noted the limited availability of the products outside of China.  *See* Comments of American Health Care Association, Health Industry Distributors Association, and National Center for Assisted Living, USTR-2018-0026-5099 (Sept. 10, 2018) [PR-5145] (noting limited availability of healthcare products, including rubber and plastic gloves, sanitary paper, and hair nets); Comments of Saf-T-Gard, USTR-2018-0026-4932 (Sept. 9, 2018) [PR-4978] (noting limited availability of certain personal protective equipment outside of China); Comments of United Medical Inc., USTR-2018-0026-1238 (Aug. 17, 2018) [PR-1285] (supporting removal of gloves, as China is the primary source for imports of vinyl gloves, accounting for 96 percent of total U.S. imports); Comments of Quantum Labs, Inc., USTR-2018-0026-2388 (Aug. 29, 2018) [PR-2434] (noting a possible shortage due to the lack of domestic manufacturing).

Additionally, when asked about the viability of FDA-approved production facilities outside of China, at the hearings Medline Industries testified that while there are some FDA-

approved facilities located throughout the world, they lacked the necessary capacity. When considering "larger product categories like vinyl exam gloves, 97 percent is in China. Surgical drapes, it's 90 percent plus in China." *See* Testimony of Jim Pigott, Medline Industries, USTR Hearing Tr., at 350 (Aug. 23, 2018) [PR-41]. Furthermore, Medline Industries explained that the process to move production and create the level of capacity required would be time consuming due to the rigorous nature of the qualification process. The comment noted that even if a facility is approved, it does not mean specific products for that facility are approved. *Id. See also* Comments of Shield Line, USTR-2018-0026-3628 (Sept. 6, 2018) [PR-3674] (noting that it would require at least a year to ensure that new sources meet FDA's quality and control requirements).

Given the lack of availability of certain medical products used by the healthcare industry, possible disruptions to the U.S. economy, and possible health and safety concerns for U.S. citizens, based on interagency advice, and particularly the recommendation by HHS, the Trade Representative determined to remove certain tariff lines covering certain medical and healthcare products from the *Final List 3.*

### b.   Precursor Chemicals for Pharmaceuticals

Due to the importance of public health, pharmaceuticals were never proposed for additional duties. *See Proposed List 3*, 83 Fed. Reg. 33608, (U.S. Trade Rep. July 17, 2018) [PR-14]; *Request for Comments Concerning Proposed Modification of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, (U.S. Trade Rep. 84 Fed. Reg. 22564) (May 17, 2019) [PR-20]. During the public notice and comment process, USTR was informed that certain chemicals on the proposed list were precursor chemicals necessary for manufacturing pharmaceuticals. Due

to the limited availability of these precursor chemicals outside of China, through the 301 Committee, HHS recommended that USTR remove certain pharmaceutical inputs from *Final List 3.*

Several comments noted that these inputs had limited availability outside of China. *See* Comments of Wego Chemical Group, USTR-2018-0026-5972 (Sept. 12, 2018) [PR-6009] (noting the lack of availability for numerous chemical inputs to the U.S. market); Comments of Pharmore Ingredients, USTR-2018-0026-2638 (Aug. 31, 2018) [PR-2684] (noting limited to no production of certain chemicals in the United States); Comments of PMC Organometallix, Inc., USTR-2018-0026-3109 (Sept. 5, 2018) [PR-3155] (noting industry reliance on products from China for imports under 2930.90.91); Comments of TSI USA, Inc.(TSI), USTR-2018-0026-0971 (Aug. 14, 2018) [PR- 1020] (pre-hearing testimony that TSI does not have an alternative source for glucosamine, a product used in anti-inflammatory and pain relief products). Moreover, when questioned at the hearing about the supply of glucosamine outside of China, the representative from TSI testified that China accounts for approximately 95 percent. *See* Testimony of Larry Kolb, TSI USA, Inc. USTR Hearing Tr., at 180-181 (Aug. 27, 2018) [PR-43].

Following the recommendation of HHS, and based on health and safety concerns for consumers, due to their limited availability outside of China, the Trade Representative determined to remove certain pharmaceutical inputs from *Final List 3*.

### c.  Safety Helmets and Bicycle Safety Lights

Bicycle helmets, motorcycle helmets, other impact helmets, as well as safety lights for bicycles were also removed from the proposed list based on health and safety concerns for consumers. Public comments supported the removal of these products, noting the lack of availability outside of China and possible safety concerns. *See* Comments of Bicycle Product

Suppliers Association, the National Bicycle Dealers Association, and the PeopleForBikes Coalition, USTR-2018-0026-2824 (Sept. 2, 2018) [PR-2870] (noting that additional tariffs on helmets and lights would jeopardize the safety of cyclists); Comments of Bell Sports Inc., USTR-2018-0026-3775 (Sept. 6, 2018) [PR-3821] (noting that global capacity for helmet production outside of China is limited and that if additional duties were imposed, that consumers would likely delay or decline purchasing safety lights and helmets, which are required in many states).

Witnesses at the hearing made similar statements. *See* Testimony of Jennifer Harned, Bell Sports, 17 Incorporated., USTR Hearing Tr., at 94-95, 124-125 (Aug. 20, 2018) [PR-38] (noting that helmets and safety lights save lives and that consumers might choose to ignore safety laws by not buying a bike light or not wearing a helmet if additional duties are imposed); Testimony of Bob Margevicius, Bicycle Product Suppliers Association and Specialized Bicycle Components, USTR Hearing Tr., at 97-102, 124-125 (Aug. 20, 2018) [PR-38] (testifying there is no significant domestic production of bicycle safety accessories to scale); Testimony of Matt Moore, Quality Bicycle Products, Inc, USTR Hearing Tr., at 106 (Aug. 20, 2018) [PR-38] (noting that twenty-two states and the District of Columbia require children to wear helmets).

Taking into account the health and safety concerns raised by the comments, and the lack of availability of these products outside of China, the Trade Representative removed certain impact helmets and bicycle safety lights from *Final List 3*.

### d.  Children's Safety Furniture

The final group of products removed for health and safety reasons included safety furniture for children (*e.g.*, high-chairs, car seats, playpens).  Comments supported the removal of these products noting the lack of availability outside of China. *See* Comments of Graco

Children's Products Inc., USTR-2018-0026-5258 (Sept. 10,2018) [PR-5304].  *See also*

Testimony of Russ Torres, Graco Children's Products Inc., USTR Hearing Tr., at 232-233 (Aug.

23, 2018) [PR-41] (noting that for many of the tariff lines covering safety furniture for children,

China accounted for over 90 percent of U.S. imports); Testimony of Joe Shamie, Delta

Enterprise Corporation ("Delta Children's Products"), USTR Hearing Tr, at 94 (Aug. 23, 2018)

[PR-41] (confirming China is the leading supplier of these goods by volume and its output

cannot quickly or easily be replaced, if at all); *and* Comments of Mattel Inc., USTR-2018-0026-

3073 (Sept. 5, 2018) [PR-3119] (also asserting China accounted for approximately 87 percent of

total U.S. imports under a number of 10-digit juvenile product subheadings, with China's import

share of some of these individual subheadings reaching 99.9 percent).

     Comments also explained strict U.S. safety standards and testing required for safety

furniture for children and thus the difficulty in switching sources.  *See* Comments of Graco

Children's Products Inc., USTR-2018-0026-5258 (Sept. 10, 2018) [PR-5304] (explaining that the

Consumer Product Safety Improvement Act (CPSIA) requires children's products, including

juvenile products, to be tested by a CPSC-accredited laboratory to verify conformance with

CPSIA standards). *See also* Comments of Mattel Inc., USTR-2018-0026-3073 (Sept. 5, 2018)

[PR-3119] (asserting that U.S. industry has invested heavily in ensuring that its Chinese

suppliers manufacture in compliance with strict U.S. consumer product safety standards, and that

China supplies the vast majority of these juvenile products and with no alternative manufacturing

capacity readily available elsewhere).

     Comments also asserted that additional tariffs would also lead to rising costs of children's

products and would impact families' limited funds, which could lead families to resort to used

furniture and products, which may not meet current safety standards, putting children at greater

risk of serious injury or death.  *See* Comments of Graco Children's Products Inc., USTR-2018-0026-5258 (Sept. 10, 2018) [PR-5304] (noting that a used play yard may not come with the original assembly instructions; may have been damaged or recalled; or suffer wear and tear which risk a child's injury from tipping; or broken or loosened plastic tabs that lock playpen rails into the corners may allow rails to turn inward, collapse, and entrap an infant).  *See also* Comments of Delta Enterprise Corporation, USTR-2018-0026-3931 (Sept. 7, 2018) [PR-3977]; Comments of Mattel, Inc., USTR-2018-0026-3073 (Sept. 5, 2018) [PR-3119] (explaining that consumer registration is required for all durable infant or toddler products to improve effectiveness of recalls and safety alerts of such products).

Taking into account the lack of availability, and health and safety concerns raised in the public comments, the Trade Representative removed from List 3 children's safety furniture.

6.  *Further Explanation of the Determination to Remove Certain Chemicals and Other Inputs*

In developing List 3, USTR took into consideration the likely impact on U.S. consumers and possible disruptions to the U.S. economy, and stated that it would further consider whether the inclusion of a particular product would cause disproportionate economic harm to U.S. interests.  *See Proposed List 3,* 83 Fed. Reg. at 33,609 [PR-14].  Following consultations with the Section 301 Committee and the review of public comments and testimony, the Trade Representative determined to remove certain chemicals and other inputs for manufactured goods, textiles, and agriculture from *Final List 3*.  *See* Press Release, United States Trade Representative, *USTR Finalizes Tariffs on $200 Billion of Chinese Imports in Response to China's Unfair Trade Practices* (Sept. 18, 2018), https://ustr.gov/about-us/policy-offices/press-office/press-releases/2018/september/ustr-finalizes-tariffs-200.  As explained below, these inputs have limited availability outside of China, are necessary for use in domestic manufacturing, and

it was determined that including them in *Final List 3* would cause disproportionate economic harm to U.S. interests.

### a. Chemicals Where China Accounted for 90 percent or more of U.S. Imports

*Proposed List 3* included over 1,500 HTS subheadings pertaining to chemicals. In general, comments and testimony regarding chemicals asserted that a particular chemical was an input in domestic manufacturing and should be removed from the final list due to limited availability outside of China. *See e.g.*, Comments of National Association of Chemical Distributors, USTR-2018-0026-5602 (Sept. 11, 2018) [PR-5646] (asserting on behalf of nearly 440 international chemical distributors and their supply-chain partners that there is either no domestic or limited domestic supply of particular chemicals included in 300 HTS subheadings to fulfill market demand); Comments of CoQ10 Association, USTR 2018-0026-0378 (Aug. 1, 2018) [PR-428] (requesting the removal of input chemical primarily available from China); Comments of Supreme Resources, Inc., USTR-2018-0026-5322 (Sept. 10, 2018) [PR-5367] (noting many of the chemicals sourced by Supreme are either only, or primarily, available from Chinese sources, or are subject to worldwide capacity restraints); Comments of Society of Chemical Manufacturers & Affiliates, USTR-2018-0026-5571 (Sept. 11, 2018) [PR-5615] (noting certain chemicals can only be sourced from China or there is limited production capacity outside of China); Testimony of Matthew Moedritzer, Society of Chemical Manufacturers and Affiliates, USTR Hearing Tr., at 82-89 (Aug. 22, 2018) [PR-40] (asserting that the proposed list covers many specialty chemicals, where there are no or limited alternatives outside of China).

In consultation with the Section 301 Committee and based on the public comments regarding the limited availability of certain chemical inputs used in domestic manufacturing, the Trade Representative determined to remove subheadings for chemicals where imports of China

accounted for 90 percent or more of U.S. imports, indicating a lack of availability outside of China and/or possible disruptions to the U.S. economy.  This resulted in the removal of 76 eight-digit subheadings.

### b.  <u>Chemical Inputs for Pesticides</u>

Public comments, including testimony, generally asserted that certain active ingredients for pesticides have limited, if any, availability outside of China.  *See e.g.*, Comments of Atticus, USTR-2018-0026-3779 (Sept. 6, 2018) [PR-3825] (asserting that China is the main supplier of dicamba acid tech (HTS 2918.99.20), which is not available in sufficient quantities domestically); Comments of NEDAMCO, USTR-2018-0026-2202 (Aug. 27, 2018) [PR-2248] (noting that certain pesticide products, including those under HTS 2917.19.70 can only be sourced from China or, has limited availability domestically).

At the public hearing, the U.S. Department of Agriculture (USDA) and USTR, sought additional information from witnesses regarding claims of limited availability of herbicides outside of China, including glyphosate acids.  In response to questions from USDA as to whether worldwide herbicide production is dependent on China, the witness clarified that some herbicides are available from sources other than China, including domestically, and from India and Brazil.  *See* Testimony of Stuart Feldstein, Albaugh, LLC, USTR Hearing Tr., at 171-174 (Aug. 20, 2018) [PR-38].  With respect to glyphosate acid, specifically, Mike Massey of Ragan & Massey, Incorporated, clarified that glyphosate acid is available from sources other than China, but that a several months long plant approval process maintained by the Environmental Protection Agency (EPA) presents a barrier to immediate third-country sourcing.  *See* Testimony of Mike Massey, Ragan & Massey, Incorporated, USTR Hearing Tr., at 170-172 (Aug. 20, 2018)

[PR-38] (testifying there is no known dry glyphosate acids producer outside of China that has an approved plant by the EPA).

Based on the public comments and the limited availability of certain active ingredients for pesticides, USDA recommended that USTR exclude HTS subheadings covering pesticide active ingredients where imports from China are greater than 70 percent of U.S. imports. Additionally, USDA recommended the removal of the subheading covering glyphosate acid, an herbicide input which USDA determined, in its expertise, was only available from China for generic producers and was the most widely used herbicide in the United States. *See* Comments of Mike Massey, Ragan and Massey, Inc, USTR-2018-0026-0655 (Aug. 7, 2018) [PR-705] (noting that glyphosate acid is used to produce the most widely applied herbicide in the United States and there are no other sources for the product outside of China). *See also* Testimony of Mike Massey, Ragan & Massey, Incorporated, USTR Hearing Tr., at 142-146 (Aug. 20, 2018) [PR-38] (requesting the removal of glyphosate acid due to its need as an input product that is only available from an EPA approved plant in China for generic producers of glyphosate in the United States).

In light of the considerations discussed in the *Proposed List 3*, and based on the public comments and testimony regarding limited availability outside of the United States, and advice received from the interagency Section 301 Committee, including the advice of USDA, the Trade Representative determined to remove 14 eight-digit subheadings for which China accounted for 70 percent or more of U.S. imports, and one ten-digit statistical reporting number for glyphosate acid due to its lack of availability outside of China and possible disruptions and harm to the U.S. economy.

### c.   Certain Chemicals and Inputs for the Textile Industry

Public comments and testimony asserted that several inputs and chemicals for the textile industry are not produced in the United States and have limited availability outside of China. *See* Comments of Milliken, USTR-2018-0026-3918 (Sept. 7, 2018) [PR-3964] (identifying and requesting the removal of specific HTS subheadings covering chemical and other inputs that are imported from China and asserting that there is no viable U.S. alternative, either because no U.S. production exists, or the product is not sold commercially within the U.S. market); Comments of National Council of Textile Organizations, USTR-2018-0026-5204 (Sept. 10, 2018) [PR-5250] (recommending removal of certain chemicals, dyes, and finishes that are integral to the textile manufacturing process and create value added in U.S. products); Comments of Downlite, USTR-2018-0026-6146 (Apr. 28, 2021) [PR-6177] (noting that the feather and down purchased from China is a bi-product of China's poultry industry, which accounts for 80 percent of global consumption of goose and duck meat). *See also* Testimony of David Sweet, American Down and Feather Council, USTR Hearing Tr., at 155 (Aug. 24, 2018) [PR-41]; Testimony of Sara Beatty, National Council of Textile Organizations, USTR Hearing Tr., at 307-313 (Aug. 20, 2018) [PR-38] (testifying to the lack of availability of certain inputs from domestic sources).

Many comments also noted that because the additional duties were not being applied to finished textile goods, the additional duties on inputs would put domestic producers at a disadvantage. *See* Comments of National Council of Textile Organizations, USTR-2018-0026-5204 (Sept. 10, 2018) [PR-5250] (asserting that additional duties on inputs will undercut the competitiveness of the domestic textile sector); Comments of Milliken, USTR-2018-0026-3918 (Sept. 7, 2018) [PR-3964] (stating that because finished apparel products are not included, domestic production of finished products will not be competitive and their customers will simply

source their finished apparel products directly from Asia); Comments of Jo-Ann Stores, USTR-2018-0026-3976 (Sept. 7, 2018) [PR-4022] (asserting that additional duties on textile inputs, but not on finished textile products from China, will create an incentive to move production and jobs away from the United States); Prepared Testimony of LHSC Inc., USTR-2018-0026-5405 (Sept. 11, 2018) [PR-5450] (requesting that additional tariffs be placed on finished products to avoid tariff inversion and harm to domestic manufacturing). *See also* Testimony of Sara Beatty, National Council of Textile Organizations, USTR Hearing Tr., at 308-309 (Aug. 20, 2018) [PR-38] (noting the absence of finished apparel on the proposed list, which account for 93.5 percent of textile imports from China, while inputs such as fibers, yarns, and fabrics, which total just 6.5 percent of textile imports from China, are on the list, and tariffs on finished products would maximize U.S. leverage on China); Testimony of Michael Saivetz, Richloom Fabric Group, USTR Hearing Tr., at 321 (Aug. 20, 2018) [PR-38] (noting that finished goods produced in the United States would be less competitive against finished goods imported from China, creating an incentive to move jobs offshore).

Several comments noted that acrylic and rayon staple fibers entering the United States under HTS subheading 5504.10.00 were not produced in the United States and are an important input to domestic manufacturing.  *See* Comments of National Council of Textile Organizations, USTR-2018-0026-5204 (Sept. 10, 2018) [PR-5250] (noting that because there is no domestic producer, the products are included in the Miscellaneous Tariff Bill (MTB) pending in Congress); Comments of Lenzing Fibers Inc., USTR-2018-0026-3101 (Sept. 5, 2018) [PR-3147] (supporting the removal of HTS subheading 5504.10.00 because the yarns and fibers are not made in the United States, but often blended with other fibers that are made in the United States in the production of high value textile products); Comments of Parkdale, USTR-2018-0026-0485

(Aug. 4, 2018) [PR-535] (also supporting the removal of HTS subheading 5504.10.00, and noting the products are not manufactured in the United States and are available predominately from China); Comments of Buhler Quality Yarns Corp., USTR-2018-0026-2378 (Aug. 28, 2018) [PR-2424] (noting the importance of rayon staple fiber (5504.10.00) to many U.S. yarn and nonwoven manufacturers and asserting the potential for disastrous economic effects to U.S. manufacturers and workers if the products are subject to additional duties). *See also* Testimony of Sara Beatty, National Council of Textile Organizations, USTR Hearing Tr., at 312 (Aug. 20, 2018) [PR-38] (confirming that acrylic and rayon staple fibers are not produced in the United States).

Standard Textile Co. Inc. (Standard) requested USTR remove three tariff subheadings covering unbleached cotton fabric. Standard noted that unbleached cotton fabric is no longer available in the United States. Standard reported that it accounts for 97 percent of the unbleached cotton fabric imported from China. The unbleached cotton fabric is produced at Standard's wholly-owned facility in China using yarn that is spun in the United States and exported to China. Standard claimed that it is the only company that imports unbleached cotton fabric for further processing in the United States to produce finished sheets, which compete against finished sheets imported from China and third countries that are not subject to additional duties. *See* Comments of Standard Textile Company, USTR-2018-0026-4839 (Sept. 8, 2018) [PR-4885]. *See also* Testimony of Kim Heiman, Standard Textile Company, USTR Hearing Tr., at 306 (Aug. 20, 2018) [PR-38] (testifying that Standard imports fabric to support domestic jobs and produce finished sheets in the United States that compete against finished sheets imported from China and other countries, that are not subject to the additional duties).

Based on the public comments and testimony and recommendations from USTR staff and the Section 301 Committee, the Trade Representative determined to remove certain textile inputs with limited availability outside of China due to possible disruptions to the U.S. economy. Specifically, the Trade Representative determined to remove certain eight-digit HTS subheadings on chemicals and inputs for the textile industry for which China accounted for 70 percent or more of U.S. imports. Additionally, based on the lack of production in the United States, the Trade Representative removed HTS subheading 5504.10.00 and, based on comments from Standard, the Trade Representative removed subheadings for unbleached cotton. Together, this resulted in the removal of 36 tariff subheadings.

### d. **Critical Inputs for Manufactured Goods**

Through the interagency process the Department of Commerce recommended USTR remove eight tariff subheadings for certain critical inputs for manufactured goods. These included certain inputs used in the production of lithium-ion batteries, lightbulbs, and faucets. Regarding these products, comments submitted to USTR note the limited availability of the inputs outside of China, possible tariff inversions, and a limited ability to shift production. *See, e.g.*, Comments of Mitsubishi Chemical America, Inc., USTR-2018-0026-0590 (Aug. 6, 2018) [PR-640] and USTR-2018-0026-0662 (Aug. 7, 2018) [PR-712] (stating that chemical inputs for formulated electrolyte used in Lithium-ion batteries for electric vehicles are unavailable in sufficient quantities outside of China in order to meet the rapidly growing demand for electric vehicles in the United States, and that it is a difficult, costly, and lengthy process to qualify new sources); Letter of Congressman Steve Cohen (9th District, Tennessee), USTR-2018-0026-6055 (Sept. 14, 2018) [PR-6092] (stating that MCIS-US is the sole producer of electrolytes in the United States, and China is currently the only viable source of 80% of the raw materials);

Comments of Soulbrain, USTR-2018-0026-4884 (Sept. 9, 2018) [PR-4930] (stating that electrolyte is incorporated into batteries used by military vehicles and power grids, and asserting that the raw material from Korean suppliers originate from China); Comments of LEDVANCE LLC, USTR-2018-0026-3740 (Sept. 6, 2018) [PR-3786] (asserting that with no additional duties on finished LED light bulbs, additional duties on the inputs would drive domestic manufacturing to third countries); Comments of International Association of Plumbing and Mechanical Officials, USTR-2018-0026-1266 (Aug. 17, 2018) [PR-1314] (stating that tariffs on plumbing fixtures would negatively impact the delivery of water and sanitation services in the United States); Comments of Moen Incorporated, USTR-2018-0026-6047 (Sept. 13, 2018) [PR-6084] (stating that 90% of global faucet component volume is in China, and that the finishing process can only be done in China due to labor and environmental constraints); Comments of Spectrum Brands Holdings, USTR-2018-0026-5428 (Sept. 11, 2018) [PR-5473] (stating that domestic production would not be possible in the short-term because of extensive post-die cast processing and a lack of domestic capacity); Comments of Plumbing and Drainage Institute, USTR-2018-0026-5461 (Sept. 11, 2018) [PR-5506] (stating that the products are crucial to public health and safety, because they are used in storm and waste water drainage systems).

Testimony at the public hearings raised similar concerns regarding the unavailability of inputs outside of China. *See, e.g.*, Testimony of Dennis Trice, Mitsubishi Chemical America, USTR Hearing Tr., at 51-53 (Aug. 23, 2018) [PR-41] (stating that there is no viable source of inputs for lithium ion batteries outside of China and that tariffs will undermine the competitiveness of domestic automakers); Testimony of Larry Kolb, TSI USA, INC., USTR Hearing Tr., at 154-158 (Aug. 27, 2018) [PR-43] (stating that it would be cost-prohibitive to produce glucosamine in the United States, because the production process creates a tremendous

amount of waste water, which would violate domestic environmental policies); Testimony of

Craig Updyke, National Electrical Manufacturers Association, USTR Hearing Tr., at 392-393

(Aug. 21, 2018) [PR-39] (stating that tariffs on lighting ballasts would place domestic companies

at a competitive disadvantage to Chinese and foreign competitors); Testimony of Jennifer Dolin,

LEDVANCE, LLC, USTR Hearing Tr., at 370-373 (Aug. 22, 2018) [PR-40] (stating that China

is the leading global supplier of lighting components, and that the company plans to shift its

sourcing to the United States, but that tariffs would impede the company's ability to phase

production out of China); Testimony of Jeff Swartz, Moen, Inc., USTR Hearing Tr., at 452-455

(Aug. 21, 2018) [PR-39] (stating that faucet components can only be sourced from China due to

labor and environmental constraints, and that China is the only country that has been able to

meet domestic volume requirements for the past 15 years).

    Based on the comments received and advice from the interagency Section 301

Committee, and in particular, the Department of Commerce, the Trade Representative removed

eight tariff subheadings for certain critical inputs used in domestic manufacturing.

7. *Further Explanation of the Determination Not to Remove Certain Products from the Final List 3*

    Of the more 6,000 comments USTR received for List 3, the vast majority requested the

removal of specific tariff subheadings.  Some comments requested the removal of both finished

goods and inputs.  *See, e.g.*, Comments of Wagner Spray Tech Corporation, USTR-2018-0026-

4879 (Sept. 9, 2018) [PR-4925] (requesting USTR remove six 8-digit HTS subheadings for paint

sprayers and parts for paint sprayers); Comments of General Electric Company ("GE"), USTR-

2018-0026-5978 (Sept. 12, 2018) [PR-6015] (requesting USTR remove twelve 8-digit HTS

subheadings, including four for finished goods and eight for inputs).  As the Court notes, there

were also comments that supported additional duties on finished goods that compete with

domestically manufactured goods, but requested USTR remove additional duties on parts and inputs used to produce domestic goods. *See CIT Opinion* at 52, *citing* Comments of Whirlpool Corp., USTR-2018-0026-3867 (Sept. 7, 2018) [PR-3913] (requesting the removal of seven HTS subheadings for inputs used to manufacture appliances). *See also* Comments of Carrier Corporation, USTR-2018-0026-5674 (Sept. 12, 2018) [PR-5718] (requesting USTR remove eight HTS subheadings for components and replacement parts for HVAC systems, which included four HTS subheadings requested by Whirlpool). Also cited by the Court are comments from Retail Industry Leaders Association, *CIT Opinion* at 52, urging USTR to remove 8-digit subheadings for all component parts. Comments of Retail Industry Leaders Association, USTR-2018-0026-5887 (Sept. 12, 2018) [PR-5924] (noting that U.S. manufactured products could be impacted by the inclusion of component parts on the proposed list). None of these comments rose to the level of comments the Trade Representative determined to act on by removing products.

With respect to inputs and component parts, as discussed above, the Trade Representative removed certain tariff subheadings covering inputs and component parts. These included certain textile inputs, certain chemicals, and rare earths and minerals. However, to maintain the aggregate level of trade directed by the President, it was not possible for USTR to remove all inputs. Moreover, most comments urging for additional inputs to be removed failed to demonstrate how imposing the additional duties on the input would not be practicable or effective to eliminate China's acts, policies, and practices or failed to show how imposing the additional duties would cause disproportionate economic harm to U.S. interests.

Taking the Carrier and Whirlpool comments as examples, based on 2017 data, removing just one of the subheadings requested by both Carrier and Whirlpool ("8537.10.91 Control

Board"), would have reduced the aggregate level of the proposed action by more than $1.5 billion. Removing all eight HTS subheadings requested by Whirlpool would have reduced the aggregate level of the proposed action by more than $8 billion and removing the four additional HTS subheadings requested by Carrier would have reduced the aggregate level of the proposed action by an additional $2.5 billion (an aggregate value of approximately $10.5 billion). This is more than half of the total lines removed from *Proposed List 3* (approximately $19 billion).

The value of goods covered by the ten subheadings Whirlpool and Carrier requested for removal would indicate that including these subheadings would likely be effective to obtain the elimination of China's acts, policies, and practices. Additionally, many of the HTS subheadings that Whirlpool and Carrier requested for removal contain a wide range of parts for multiple products used in multiple finished products across multiple industries. For example, HTS subheading 8544.42.90, contains wire harnesses that can be used in a variety of products, including appliances, automobiles, airplanes, and air compressors. As the type of wire harness would likely vary based on their application, so would the availability of particular wire harnesses. Indeed, 2017 import data shows that just over 40 percent of U.S. imports under 8544.42.90 are from China. Thus, while the specific wire harnesses sourced by Whirlpool and Carrier may have limited availability outside of China, this does not appear to be true of wire harnesses sourced by other companies or used in other applications. Nonetheless, neither Whirlpool nor Carrier claims limited availability of wire harnesses outside of China. Rather Whirlpool simply claims higher prices to consumers, which would be expected, and Carrier claims that sourcing outside of China would not mitigate the additional duties.

Finally, in addressing economic or other harm to U.S. interests, both Whirlpool and Carrier reflect on increased costs for consumers and supply chain disruptions, but this fails to

demonstrate how the additional duties would cause <u>disproportionate</u> economic harm to U.S.

interests.[6]

     *8.   Further Explanation of USTR's Response to Comments Requesting that a Subheading be Added to List 3*

     USTR received very few comments requesting that certain subheadings be included in

the List 3 modification.  However, as the Court noted, *CIT Opinion* at 52, U.S. Steel Corporation

requested the addition of tin mill plate.  *See* Comments of U.S. Steel Corporation, USTR-2018-

0026-5447 (Sept. 11, 2018) [PR-5492] (requesting the addition of eight HTS subheadings for tin

mill products).  Additional steel products were requested by Gerdau Long Steel North America.

*See* Comments of Gerdau Long Steel North America, USTR-2018-0026-5653 (Sept. 11, 2018)

[PR-5697] (requesting the addition of HTS subheading 7301.1000, covering steel products such

as grinding balls).

     The proposed List 1 included many steel products, including the products U.S. Steel

suggested for addition to List 3.  However, the Trade Representative decided not to include the

subheadings on List 1 because the products were already subject to additional duties under

---

[6] The Court also references a comment submitted by American for Free Trade that requested that USTR open an exclusion process for List 3, noting the importance of the process when the tariffs rise to 25 percent.  Comments of Americans for Free Trade Coalition, USTR-2018-0026-6132 (Oct. 16, 2018) [PR-6163].  This comment was submitted to USTR after the publication of the final list.  *See Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation,* 83 Fed. Reg. 47,974, 47,974-75 (U.S. Trade Rep. Sept. 21, 2018) (*Final List 3*) [PR-16]. As such, USTR did not consider this comment before publishing the final list.  However, consistent with the comment's view that with the increase in tariffs to 25 percent it was important to establish an exclusion process, when USTR raised the tariffs to 25 percent, it also established a process for interested parties to request exclusions.  *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation,* 84 Fed. Reg. 20459 (U.S. Trade Rep. May 9, 2019) [PR-19].  It should also be noted that, consistent with the exclusion processes for List 1 and List 2, the exclusion process for List 3 asked requesters to provide information on whether the Chinese-origin product was sold as a final product or an input.  *Procedures for Requests to Exclude Particular Products from the September 2018 Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation,* 84 Fed. Reg. 29576 (U.S. Trade Rep. June 24, 2019).  As detailed in those procedures, and to better understand the impact of the additional duties on specific inputs used in domestic production of final products, USTR asked requesters to report the total cost of producing the final product the Chinese-origin input accounted for.  *Id.* at 29581-2.

Commerce's Section 232 investigation.  Of the 515 subheadings removed from List 1, approximately one-third of the subheadings removed were subject to additional duties under Section 232.  These goods were removed from List 1 and not included on the *Proposed List 3* due to possible economic harm to domestic industries dependent on steel and aluminum inputs.

Additional products requested for addition were primarily consumer products and included: cooking appliances and certain furniture; rifle scopes; tableware; hiking gear; log splitters; PET film; and fish oils and Omega-3 products derived from fish oil.  *See* Comments of MECO Corporation, USTR-2018-0026-0659 (Aug. 7, 2018) [PR-709]; Comments of Leupold & Stevens Inc, USTR-2018-0026-0730 (Aug. 8, 2018) [PR-780]; Comments of Pactiv LLC, USTR-2018-0026-0739 (Aug. 8, 2018) [PR-789]; Comments of Western Mountaineering, USTR-2018-0026-0812 (Aug. 10, 2018) [PR-862]; Comments of Blount International, Inc., USTR-2018-0026-1052 (Aug. 14, 2018) [PR-1101]; Comments of International Imaging Materials, Inc., USTR-2018-0026-1522 (Aug. 21, 2018) [PR-1570]; Comments of Jedwards International, Inc., USTR-2018-0026-2755 (Aug. 31, 2018) [PR-2801].  As noted above, in developing List 3, USTR sought to avoid consumer products, with the selection process taking "account of likely impacts on U.S. consumers."  *Proposed List 3*, 83 Fed. Reg. at 33,609 [PR-14].

As with the *Proposed Lists 3 and 4*, for the proposed Lists 1 and 2 USTR requested comments on whether products should be added to the action.  *See Notice of Determination and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 14,906 (U.S. Trade Rep. Apr. 6, 2018) (*April 6 Notice*); *Notice of Action and Request for Public Comment Concerning Proposed Determination of*

*Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 28,710 (U.S. Trade Rep. June 20, 2018) (*June 20 Notice*).  However, to provide the products requested for addition with a notice and comment process, the products were included as part of the *Proposed List 3.  See Proposed List 3,* 83 Fed. Reg. at  33,609 (noting that the Proposed List "included subheadings that commenters suggested for inclusion in response to the *April 6 notice*") [PR-14]*.*  Similarly, the *Proposed List 4* included subheadings that commenters suggested for additional duties in response to the *Proposed List 3*.

## C.  Further Explanation of the Final List 4 Modification

As with the List 3 modification, the CIT determined that the List 4 modification requires "reconsideration or further explanation regarding the USTR's rationale for imposing the tariffs and, as necessary, the USTR's reasons for placing products on the lists or removing products therefrom."  *CIT Opinion* at 57.

As explained above, following China's retreat from specific commitments undertaken during the negotiations, and actions or threatened actions by China to further harm the U.S. economy, the President ordered the Trade Representative to begin the process of raising tariffs on essentially all remaining imports from China, which were valued at approximately $300 billion*.  See May 2019 Representative Robert Lighthizer Statement* [PR-30].  In response to the specific direction of the President, the Trade Representative proposed to modify the action by imposing additional duties on essentially all products not included in previous actions.  *See Request for Comments Concerning Proposed Modification of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 22,564 (U.S. Trade Rep. May 17, 2019) [PR-20] ("The proposed

product list covers essentially all products not currently covered by action in this investigation"). As explained in the notice proposing the List 4 modification, USTR had also endeavored to exclude pharmaceutical inputs, select medical goods, rare earth materials, and critical minerals. *See id.*

The notice announcing the *Final List 4* modification explained that USTR considered the comments, and the advice of the Interagency Section 301 Committee, as well as appropriate advisory committees, and that the Trade Representative determined to remove certain tariff subheadings based on health, safety, national security, and other factors. *See Final List 4,* 84 Fed. Reg. 43,304, 43,305 (U.S. Trade Rep. Aug. 20, 2019) [PR-21]. Of the 3,805 lines (3,794 full 8-digit subheadings and 11 partial 8-digit subheadings) proposed for the final list, the Trade Representative determined to remove 25 HTS subheadings (22 full 8-digit subheadings and three partial 8-digit subheadings). These 25 HTS subheadings had an import value in 2018 of approximately $2.07 billion. The removed lines included: critical minerals and chemicals, child safety seats, cranes and lifts, shipping containers, U.S.-caught fish processed in China and shipped back to the United States, and religious texts. *See id.* We provide further explanation of the reasoning underlying these removals below.

1. *Further Explanation of the Determination to Remove Certain Subheadings for National Security, or Health and Safety Reasons*

a. **Critical Minerals and Chemicals**

USTR received numerous comments requesting the removal of certain critical minerals and chemicals. In general, the comments asserted that the proposed subheadings included minerals and chemicals that were vital to the defense and national security of the United States and were only available in sufficient quantities from China. *See e.g.*, Comments of Newpark Drilling Fluids LLC and AES Drilling Fluids Holdings LLC, USTR-2019-0004-2360 (June 19,

2019) [PR-8535] (stating that while some supplies of barite are available in India, Morocco, and Mexico, China accounts for over 30% of global production); Comments of American Petroleum Institute, USTR-2019-0004-2616 (June 20, 2019) [PR-8790] (stating China is the single largest source of barite available that meets API's required specifications, and estimating global production at approximately 40%); Comments of Wahl Refractory Solutions, LLC, USTR-2019-0004-0093 (May 28, 2019) [PR-6272] (stating that the raw materials have been identified as strategic materials by the Department of Defense); Comments of FX Minerals, Inc., USTR-2019-0004-0347 (June 10, 2019) [PR-6526] (stating the same); Comments of soulbrain, MI, Inc., USTR-2019-0004-2084 (June 18, 2019) [PR-8259] (stating that fluorine salts are used in batteries for American military vehicles and applications, and that the chemical is unavailable in sufficient quantities outside of China); Comments of Dastech International, Inc., USTR-2019-0004-0723 (June 12, 2019) [PR-6900] (stating that zirconyl chloride is a critical intermediate for the production of zirconium alloys used in fuel rods and other components comprising fuel assemblies for commercial nuclear reactors, and only available from China); Comments of Traxys Cometals USA LLC, USTR-2019-0004-1635 (June 17, 2019) [PR-7811] (stating that zirconium alloys are used to produce nuclear components for certain military applications, military aircraft engines, and nuclear energy reactors, and stating that the compound is only available from China); Comments of Allegheny Technologies Incorporated, USTR-2019-0004-0453 (June 10, 2019) [PR-6631] and USTR-2019-0004-2078 (June 18, 2019) [PR-8253]; USTR-2019-0004-2778 (July 3, 2019) [PR-8952] (stating the same); Comments of Westinghouse Electric Company LLC, USTR-2019-0004-2233 (June 19, 2019) [PR-8408] (stating that 95% of zirconium raw material is sourced from China); Comments of 5N Plus Semiconductors LLC, USTR-2019-0004-0565 (June 11, 2019) [PR-6742] and USTR-2019-0004-2607 (June 20, 2019)

[PR-8782] (stating that germanium is required for solar cells used in defense satellites by the U.S. government, and that germanium mines in Germany and Russia do not have the capacity required by the U.S. Government's National Defense Stockpile).

Testimony at the public hearings also raised similar concerns of national security interests in regards to certain critical minerals and chemicals. *See e.g.*, Testimony of Elliot Davis, Allegheny Technologies Inc., USTR Hearing Tr., at 375-376 (June 19, 2019) [PR-47] (stating that customers for zirconium-based products include the United States government, and companies in the global aerospace and defense sectors); Testimony of Ryan Ezell, Halliburton Company, USTR Hearing Tr., at 34-35 (June 25, 2019) [PR-51] (stating imposing tariffs on China's barite industry has the potential to "compromise U.S. national security by undermining domestic oil and gas production").

The Trade Representative determined to remove 11 HTS subheadings that were included in the list of 35 critical minerals determined by the Secretary of Interior to be critical for the economic and national security of the United States, in accordance with Executive Order No. 13,817 of December 20, 2017, *A Federal Strategy To Ensure Secure and Reliable Supplies of Critical Minerals*, 82 Fed. Reg. 60,835 (Exec. Office of the President Dec. 26, 2017)and *2018 Final List of Critical Materials*, 83 Fed. Reg. 23,295 (Dept. of the Interior May 18, 2018).  As part of the interagency review process, some of the same subheadings were identified by members of the Section 301 Committee for removal: the Department of Defense identified chloride oxides and chloride hydroxides (2827.49.50) as precursors to zirconium that are used in hypersonic and nuclear applications, and germanium (8112.92.60) for its use in infrared devices and space solar cells; the Department of Energy identified barytes (2511.10.10 and 2511.10.50) as critical for oil and gas extraction; the Department of Commerce identified barytes (2511.10.10

and 2511.10.50) and complex fluorine salts (2826.90.90) as important inputs to U.S.-based manufacturing.

Based on public comments, as well as recommendations through the interagency process by the Departments of Defense, Energy, and Commerce, the Trade Representative determined to remove certain tariff subheadings from List 4 for national security reasons. *Final List 4,* 84 Fed. Reg. 43,304, 43,305 (U.S. Trade Rep. Aug. 20, 2019) [PR-21]. This resulted in the removal of 11 HTS subheadings.

### b. Child Safety Seats

USTR received several comments requesting the removal of child safety seats from the List 4 action. Generally, the comments asserted that additional duties on child safety seats would create unnecessary safety risks to infants and children if parents are forced to resort to used car safety seats with outdated safety features. Another general concern was China's disproportionate share of global market production and the inability of domestic manufacturers to meet the annual market demand for child safety seats. *See e.g.*, Comments of Graco Children's Products, Inc., USTR-2019-0004-2865 (July 10, 2019) [PR-9039] (stating that the purchase of child safety seats is an ethical and legal obligation of the parent, that older car seats do not incorporate the newest safety features and may no longer provide adequate protection to the infant or child, that domestic manufacturers can only provide one-third of annual market demand, and that over 90% of child safety seats are manufactured in China).

Testimony given by individuals at the public hearings also raised similar safety concerns. *See* Testimony of Russ Torres, Graco Children's Products, USTR Hearing Tr., at 87-88 (June 17, 2019) [PR-45] (stating that 90% of child safety seats are imported from China and that any shift in the supply chain could introduce new safety risks).

As part of the interagency review process, the Department of Commerce recommended the removal of products linked to broader Administration initiatives regarding health and safety, including child safety seats, which had been removed from *Final List 3*.  Based on significant health and safety concerns raised by the comments and testimonies of the public, and in consideration of the recommendations made by the Department of Commerce, for health and safety reasons the Trade Representative removed certain tariff subheadings for child safety seats from *Final List 4*.  *See Final List 4* [PR-21].  *See also* Press Release, United Trade Representative, *USTR Announces Next Steps on Proposed 10 Percent Tariff on Imports from China* (Aug. 13, 2019), https://ustr.gov/about-us/policy-offices/press-office/press-releases/2019/august/ustr-announces-next-steps-proposed.  This resulted in the removal of two HTS subheadings.

2. <u>*Determination to Remove Certain Subheadings Critical to U.S. Port Operations*</u>

a. <u>**Cranes and Lifts**</u>

USTR received several comments recommending the removal of cranes and lifts from the List 4 action.  Generally, the comments asserted that cranes and lifts are essential for the movement of military cargo, as well as for national emergency and military readiness.  Comments also asserted the lack of availability of cranes and lifts from both domestic and third country manufacturers.  *See e.g.*, Comments of APM Terminals North America, Inc., USTR-2019-0004-0546 (June 11, 2019) [PR-6723] (stating that the Department of Transportation has determined that this type of crane is not available in the U.S., and that tariffs on cranes would place domestic exporters at a competitive disadvantage in the global economy); Comments of SSA Marine, Inc., USTR-2019-0004-0113 (May 30, 2019) [PR-6292] and USTR-2019-0004-1563 (June 14, 2019) [PR-7740] (stating that cranes and lifts are "critical marine equipment" that

are essential for facilitating the movement of military cargo, and that the tariff would jeopardize military readiness); Comments of Ports America Group, Inc., USTR-2019-0004-0188 (June 4, 2019) [PR-6367] (stating that tariffs could impair the ability of marine terminal operators to load and unload containerized U.S. military cargo, as well as impair the ability to respond to national emergencies, which moves over 90 percent of its cargo by sea ); Comments of Port of Oakland, USTR-2019-0004-1730 (June 17, 2019) [PR-7906] (stating that there are no domestic manufacturers of ship-to-shore cranes); Comments of South Carolina Ports Authority, USTR-2019-0004-0402 (June 10, 2019) [PR-6581] (stating the same); Comments of Northwest Seaport Alliance, USTR-2019-0004-0432 (June 10, 2019) [PR-6610] (stating that there are no domestic manufacturers of ship-to-shore cranes and there are few viable third country alternatives); Comments of Virginia Port Authority, USTR-2019-0004-0079 (May 28, 2019) [PR-6258]; Comments of USTR-2019-0004-2769 (July 3, 2019) [PR-8943] (stating that there have been no domestic manufacturers for the past three decades and that tariffs place a significant risk to the national economy).

Testimony  at the public hearings raised similar concerns regarding the unavailability of cranes and lifts outside of China.  *See, e.g.*, Testimony of John Reinhart, Virginia Port Authority, USTR Hearing Tr., at 242-243 (June 17, 2019) [PR-45] (stating that there is no domestic production of cranes and that tariffs on cranes will limit domestic exports and commerce); Testimony of Ed DeNike, SSA Terminals, USTR Hearing Tr., at 246 (June 17, 2019) [PR-45] (stating that China "manufactures 80% of cranes worldwide").

As part of the interagency review process, the Department of Commerce recommended the removal of certain lifts from *Proposed List 4* due to links with broader Administration initiatives concerning U.S.-based manufacturing.  Based on significant concerns raised by the

comments and testimonies of the public, in particular those related to operation of U.S. ports, and in consideration of the recommendation made by the Department of Commerce, the Trade Representative removed four tariff subheadings for cranes and lifts from *Final List 4*.

### b.  <u>Shipping Containers</u>

USTR received numerous comments requesting the removal of HTS subheading 8609.00.00 that covers shipping containers, including containers used in domestic intermodal transportation.[7]  Regarding containers used in intermodal transportation, comments spoke to the negative economic impact that additional duties on intermodal containers would have on domestic manufacturing, U.S. consumers and small businesses.  Comments asserted that intermodal containers are essential to a thriving U.S. manufacturing base and ultimately reduce the price of goods for businesses and individual consumers.  *See* Comments of Intermodal Association of North America, USTR-2019-0004-1820 (June 18, 2019) [PR-7996].

Additionally, comments noted U.S. reliance on intermodal transportation, asserting that it is the most effective transportation option – emphasizing its safe, reliable, environmentally sound and cost-effective nature.  *See* Comments of Intermodal Association of North America, USTR-2019-0004-1820 (June 18, 2019) [PR-7996].  *See also* Comments of Association of American Railroads, USTR-2019-0004-1930 (June 18, 2019) [PR-8106] (highlighting that "intermodal transportation accounted for approximately $18 billion in revenue for major U.S. railroads").  Comments generally assert that the additional duties would exacerbate the economic challenges of the domestic transportation industry as railroads, trucking companies, and transportation intermediaries that purchase containers will no longer have domestic sources to purchase such

---

[7] USTR received numerous comments requesting the removal of containers used to house energy storage systems. In 2021, CBP issued a tariff classification ruling that 8609.00.0000 did not include steel battery housing containers. *See* https://rulings.cbp.gov/ruling/N317967.  As such, those comments are not addressed here.

products.  *See* Comments of Intermodal Association of North America, USTR-2019-0004-1820 (June 18, 2019) [PR-7996].

Comments also asserted that there are no domestic manufacturers of intermodal containers.  *See* Comments of Association of American Railroads (USTR-2019-0004-1930) (June 18, 2019) [PR-8106].  Comments highlighted that 97 percent of all steel shipping containers are manufactured in China, and asserted that there are only two companies that are fully qualified to produce this particular type of container – both of which are located in China.  *See* Comments of Mobile Mini, Inc., USTR-2019-0004-0030 (May 22, 2019) [PR-6209].  *See also* Comments of Association of American Railroads, USTR-2019-0004-1930 (June 18, 2019) [PR-8106] (stating only two companies are fully qualified to produce, and are producing, domestic intermodal containers, both of which are located in China); *and* Comments of American Trucking Associations, USTR-2019-0004-1646 (June 17, 2019) [PR-7822] (stating the same).

Testimony at the public hearings also spoke to the unavailability of containers outside of China, as well as to the detrimental impact that tariffs on this particular product would have on small businesses, consumers, and domestic manufacturing.  *See, e.g.*, Testimony of William Begley, Sea Box Inc., USTR Hearing Tr., at 189-194 (June 19, 2019) [PR-47]; Testimony of Christopher Miner, Mobile Mini, Inc., USTR Hearing Tr., at 183-188 (June 19, 2019) [PR-47] (also highlighting the impact to the military and governmental agencies).

Based on the concerns raised by the comments and testimonies of the public regarding the availability of containers outside of China and possible harm to the U.S. economy, the Trade Representative removed HTS subheading 8609.00.00 from the final list.

3.   *Further Explanation of the Determination to Remove Certain Subheadings for U.S.-Caught Seafood Exported to China for Processing*

*Proposed List 4* contained 10 HTS subheadings covering seafood products that had been proposed for List 3, but subsequently removed.  USTR received comments urging against the inclusion of seven HTS subheadings, but supporting the inclusion of the three other subheadings. Generally, the comments asserted that additional duties should not be imposed on seafood products that are caught in U.S. waters by U.S. fishing vessels and workers, and then exported to China for processing, before importation back to the United States, or to third countries, by U.S. businesses.  *See* Joint Letter of Senators Lisa Murkowski and Dan Sullivan (Alaska), and Congressman Don Young (Alaska), USTR-2018-0026-6079 (Sept. 15, 2018) [PR-6116] (urging against the inclusion of U.S.-caught fish processed in China).  *See also* Comments of National Fisheries Institute, USTR-2018-0026-5589 (Sept. 11, 2018) [PR-5633] (same); Comments of Groundfish Forum, USTR-2019-0004-1677 (June 17, 2019) [PR-7853] (noting that secondary processing in China accounts for only 1/3 of the value of the final product); *and* Comments of Silver Bay Seafood, USTR-2019-0004-0519 (June 11, 2019) [PR-6697] (asserting that the proposed duty on salmon threatens to make re-imported Alaskan-caught salmon too expensive which could result in  U.S. consumers buying only Russian-caught chum and pink salmon products).

A few of the comments which urged against the inclusion of U.S.-caught fish advocated that the Trade Representative include in the *Final List 4* modification Alaskan pollock under three tariff subheadings (0304.75.10, 0304.75.50, and 0304, 94.10).  The comments explained that the three subheadings include predominately Russian-origin fish.  *See* Comments of Pacific Seafood Processors Association, USTR-2019-0004-2418 (June 19, 2019) [PR-8593] (stating that "Alaskan pollock" imported from China is harvested in Russia, is a product of Russia and should

be included on the final list to facilitate parity in trade with Russia, which maintains an embargo on imported pollock from Alaska).

As explained, the policy objective underlying the proposed tariffs is to exert additional economic pressure on China in order to encourage the elimination of its harmful practices by targeting products of China. *See Request for Comments Concerning Proposed Modification of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation,* 84 Fed. Reg. 22,564, 22,565 (U.S. Trade Rep. May 17, 2019) [PR-20]. Additionally, in proposing the List 4 modification USTR noted that it would consider whether imposing additional duties on a particular product would cause disproportionate economic harm to U.S. interests. *See id.* USTR viewed the comments and testimony received as being highly suggestive that additional duties on a variety of seafood products would be ineffective in placing additional pressure on China because the products are essentially U.S.- made, grown, and harvested, with little value added by secondary Chinese processing, and would instead cause substantial harm to the U.S. fishing industry. Furthermore, as part of the interagency review process, the Department of Commerce recommend the removal of U.S.-caught seafood from the final list.

As additional duties on domestically harvested fish were unlikely to be effective in exerting additional economic pressure on China and in light of the potential negative effects on the U.S. fishing industry, and potential benefits to competing fishing industries, and considering the recommendations of the interagency Section 301 Committee, the Trade Representative determined to remove seven of the 10 proposed subheadings pertaining to seafood.

4. _Further Explanation of the Determination to Remove Certain Subheadings_
_Containing Religious Texts_

USTR received comments, as well as public testimony urging against the inclusion of

HTS subheading 4901.99.00, covering printed books, brochures, leaflets and other printed

matter, on the final list. As explained below, the Trade Representative determined to remove

certain products containing culturally sensitive products, such as religious texts, due to limited

availability outside of China, and the possibility of harm to U.S. interests, including small

businesses.

Approximately one third of the comments regarding this proposed subheading related to

the inclusion of religious texts, including Bibles. Comments asserted that due to the unique

paper, printing, and binding needs of Bible production, that there are no domestic facilities with

the ability to produce any significant portion of volume needed to meet the demand of the U.S.

market. Comments also asserted that U.S. production of Bible text moved to China decades ago

because of specialized printing requirements due to the product's unique size, typical print on

unusually thin paper, and frequent use of non-standard covers made of leather or other durable

materials. Further, comments asserted that the transition of printing to third countries would be

lengthy and complex, creating potential shortages and increased prices that would be passed to

the American consumer. _See_ Comments of BroadStreet Publishing Group LLC, USTR-2019-

0004-2153 (June 18, 2019) [PR-8328]; Comments of Crossway, USTR-2019-0004-1569 (June

14, 2019) [PR-7746]; Comments of HarperCollins Christian Publishing, USTR-2019-0004-0547

(June 11, 2019) [PR-6724] and USTR-2019-0004-2392 (June 18, 2019) [PR-8567] (noting that

of all books regularly printed in China, Bibles are the most complex).

Other comments highlighted the historic treatment given to books of all kind – noting that

the United States government has particularly recognized that "an unhampered circulation of

knowledge and religious thought is a fundamental characteristic of the United States." *See* Comments of HarperCollins Christian Publishing, USTR-2019-0004-2392 (June 19, 2019) [PR-8567].  Public comments spoke to the harm that would be inflicted on the publishers of books, but also asserted that limiting the availability of religious texts would "damage fundamental American values, including the first amendment, free speech, and religious liberty." *See* Comments of the Independent Book Publishers Association, USTR-2019-0004-1726 (June 17, 2019) [PR-7902].  *See also* Comments of BroadStreet Publishing Group LLC, USTR-2019-0004-2153 (June 18, 2019) [PR-8328]; Comments of First Book, USTR-2019-0004-1750 (June 18, 2019) [PR-7926]; Comments of HarperCollins Christian Publishing, USTR-2019-0004-2392 (June 19, 2019) [PR-8567].

Hearing participants expounded on the belief that outreach efforts of churches, nonprofit organizations, ministries, schools and other organizations would be negatively affected by the impact of the tariffs, as Bibles may become impractically priced to the average consumer.  *See* Testimony of Mark Schoenwald, HarperCollins Christian Publishing, USTR Hearing Tr., at 80 (June 18, 2019) [PR-46]; Testimony of Stan Jantz, Evangelical Christian Publisher's Association and Biblica, USTR Hearing Tr. at 93-96, 98-99. (June 18, 2019) [PR-46].

At the public hearing, the Section 301 Committee sought further information from witnesses regarding the availability of third-country sources for the production of specialty texts. For example, a representative from the Department of Commerce questioned a witness to expand on any attempts to source Bibles domestically or from other countries.  Mark Schoenwald of HarperCollins Christian Publishing ("HCCP") testified that there were attempts made to source Bibles in Colombia, South America.  Schoenwald testified that HCCP spent millions of dollars and sent a team to Colombia for 3 years – asserting inconsistencies in quality and capacity.

Schoenwald further testified to unsuccessful attempts to source in Korea and Italy.  *See*
Testimony of Mark Schoenwald, HarperCollins Christian Publishing, USTR Hearing Tr., at 105-106 (June 18, 2019) [PR-46].

A representative from the Small Business Administration questioned whether U.S.
printing companies would benefit from more business resulting from publishers switching away
from Chinese printing companies.  In response, Stan Jantz of Evangelical Christian Publisher's
Association testified to the issue of capacity – noting that while there is some capability for
domestic printing, a great number of printers have gone out of business, and that even if a
portion of Bible printing were moved to the United States, domestic printers would not be able to
meet demand.  *See* Testimony of Stan Jantz, Evangelical Christian Publishers Association,
USTR Hearing Tr., at 114 (June 18, 2019) [PR-46].  Luisa Simpson of the Association of
American Publishers added that significant capital investment and lead times would be required
in order to train the domestic workforce in this particular kind of printing process.  *See*
Testimony of M. Luisa Simpson, Association of American Publishers, USTR Hearing Tr., at 115
(June 18, 2019) [PR-46] (further detailing that there is not much interest from domestic
producers to shift specialized printing to the U.S.).  Moreover, hearing participants testified that a
great majority, if not all of their memberships, are small businesses.  *See* Testimony of Stan
Jantz, Evangelical Christian Publishers Association, USTR Hearing Tr., at 118 (June 18, 2019)
[PR-46]; Testimony of M. Luisa Simpson, Association of American Publishers, USTR Hearing
Tr., at 118 (June 18, 2019) [PR-46]; *and* Testimony of Jamie Fiocco, American Booksellers
Association, USTR Hearing Tr., at 118 of (June 18, 2019) [PR-46]. Jamie Fiocco of the
American Booksellers Association further detailed that imposing tariffs on these products would
disproportionately harm small and medium-sized businesses as independent bookstores typically

operate on very thin margins.  *See* Testimony of Jamie Fiocco, American Booksellers

Association, USTR Hearing Tr., at 67 (June 18, 2019) [PR-46].

In announcing the *Final List 4* modification, USTR stated in determining the final list of

tariff subheadings that USTR had considered "the testimony from the seven-day public hearing,

as well as the advice of the interagency Section 301 committee… ." and that "[c]ertain tariff

subheadings proposed in the May 17 notice have been removed from the final list of tariff

subheadings subject to additional duties, based on health, safety, national security, and other

factors."  *See Final List 4,* 84 Fed. Reg. at  43,305 [PR-21].  *See also* Press Release, United

Trade Representative, *USTR Announces Next Steps on Proposed 10 Percent Tariff on Imports

from China* (Aug. 13, 2019), https://ustr.gov/about-us/policy-offices/press-office/press-

releases/2019/august/ustr-announces-next-steps-proposed.

As part of that interagency review process, the Small Business Administration

recommend removal of HTS subheading 4901.99.00 on the basis that inclusion of the

subheading would cause "significant harm" to small business interests.  Given the limited

printing capacity outside of China and the potential impact on small businesses, as well as in

consideration of the recommendation of the Small Business Administration, the Trade

Representative determined to remove a subset of printed materials, specifically religious texts

contained in 4901.99.0040, from the final list.

5. *Further Explanation of the Determination Not to Remove Certain Products from the
Final List 4*

As with *Proposed List 3*, the vast majority of comments submitted in response to

*Proposed List 4* requested the removal of specific tariff subheadings.  As discussed above, the

Trade Representative determined to remove some products from *Final List 4* in response to

comments.  This resulted in the removal of 25 subheadings, out of the 3,805 subheadings

proposed, with an annual trade value in 2018 of approximately $2.07 billion.  Considering that

the value of the proposed modification was approximately $300 billion, and the specific direction

of the President to place tariffs on goods of China with a value of approximately $300 billion,

and the Trade Representative's determination that this was the appropriate level for the List 4

modification, the Trade Representative had limited flexibility in removing additional tariff

subheadings that would significantly decrease the overall trade value of the modification.  *See*

*May 2019 Representative Robert Lighthizer Statement* [PR-30]; *Request for Comments*

*Concerning Proposed Modification of Action Pursuant to Section 301: China's Acts, Policies,*

*and Practices Related to Technology Transfer, Intellectual Property, and Innovation,* 84 Fed.

Reg. 22,564, 22,565 (U.S. Trade Rep. May 17, 2019) [PR-20].

      For example, in order to meet the President's direction that the Trade Representative

identify $300 billion in goods of China for additional duties, USTR included on (*Proposed List*

*4*) 194 of the 297 tariff lines removed from *Final List 3*.  Although comments were submitted

requesting that certain subheadings be removed again, it was not possible to do so in all cases.

*See* Comments of Consumer Technology Association, USTR-2019-0004-1833 (June 18, 2019)

[PR-8009] (requesting the removal of the 10-digit code covering consumer electronics that was

created in response to comments under List 3); Comments of Zurn Industries, USTR-2019-0004-

0333 (June 10, 2019) [PR-6512] (requesting the removal of certain inputs under 8481.90.10,

8481.90.30, and 8481.90.50);  Comments of American Chemistry Council, USTR-2019-0004-

2880 (Apr. 28, 2021) [PR-9054] (requesting the removal of certain Chinese chemicals removed

from List 3 and added to List 4); Comments of Buhler Quality Yarns Corp., USTR-2019-0004-

1906 (June 18, 2019) [PR-8082] (requesting the removal of tariff subheading covering rayon

staple fiber).  Despite the Trade Representative's determination to remove these products from

*Final List 3*, in light of the President's direction to place additional duties on $300 billion in products and, as discussed in further in detail in Section D *infra*, the need to cover essentially all products not covered by previous actions, the Trade Representative determined to include these products on the *Final List 4*. Of the 194 tariff lines removed from List 3 and included on *Proposed List 4*, 180 were on the *Final List 4.*

Given the Trade Representative's lack of flexibility to remove entire tariff subheadings from the *Proposed List 4*, to address comments claiming a lack of availability of particular products under a tariff subheading or that the additional duties would cause severe economic harm -- despite additional duties at just ten percent -- the Trade Representative determined to establish an exclusion process to allow interested persons to request that particular products classified with an HTS subheading be excluded. *See Final List 4,* 84 Fed. Reg. at 43,305 [PR-21].

**D.    *Comments Concerning Any Duties to Be Imposed and the Aggregate Level of Trade Subject to the Proposed Duties***

As discussed below, in determining the level of duties to be imposed, and the aggregate level of trade for *Final List 3* and *Final List 4*, the Trade Representative considered: (1) the specific direction of the President, (2) statutory factors, and (3) the public comments and testimony.

1.    *Level of Duty to be Imposed*

Regarding the level of increase in the rate of duty, most comments addressing this aspect of the proposed modifications did so in the context of the proposed duty on an individual product basis. For example, comments indicated that they agreed with the proposed additional duties of 25 percent on particular subheadings. *See e.g.*, Comments of MECO Corporation, USTR-2018-0026-3579 (Sept. 6, 2018) [PR-3625] (suggesting additional duties of 25 percent on grills and at

least 25 percent on grill components to address unfair Chinese competition and intellectual property theft); Comments of American Keg Company, USTR-2018-0026-4943 (Sept. 9, 2018) [PR-4989] (asserting that tariffs of 25 percent on imported kegs would help to level the playing field for domestic produced kegs); Comments of Coalition for a Prosperous America, USTR-2019-0004-0459 (June 10, 2019) [PR-6637] (encouraging tariffs of 25 percent on all imports of China and asserting that tariffs will, over five years, deliver substantial growth in output, employment, and investment to the U.S. economy).

Other comments suggested additional duties exceeding the proposed 25 percent level. *See e.g.*, Comments of Arizona Safe Outlet, USTR-2018-0026-1394 (Aug. 20, 2018) [PR-1442]; *and* Comments of Parker Safe Sales, LLC, USTR-2018-0026-1300 (Aug. 17, 2018) [PR-1348] (asserting that tariffs at the 25 to 35 percent level on steel safes imported under 8303.0000.00 were needed in order to combat imports of Chinese products). *See also* Comments of Tate & Lyle Ingredients Americas LLC, USTR-2018-0026-5884 (Sept. 12, 2018) [PR 5921] (suggesting tariffs on sucralose of at least 25 percent to level the playing field in response to unfair Chinese trade practices, including alleged IP theft, and dumping); Comments of Mid America Cabinets, USTR-2018-0026-4990 (Sept. 9, 2018) [PR-5036] (asserting that tariffs on kitchen cabinets at 25 percent is too low, would result in a loss of U.S. jobs, and supporting tariffs of 150 percent); Comments of Donald Kurth, USTR-2019-0004-1992 (June 18, 2019) [PR-8168]  (supporting tariff increase by at least 25 percent on all imported goods and 50 percent on technical products for ten years); Comments of Atlas Tool and Die Works, Inc. DBA Atlas Tool Works, USTR-2019-0004-1814 (June 18, 2019) [PR-7990] (asserting that China's harmful practices decimated telecommunication equipment manufacturing in the United States and supporting tariffs of 25 percent, or more, on all goods of China).

Other comments asserted that tariffs at the 10 percent level would severely limit competitiveness or result in severe economic harm. *See e.g.*, Comments of Schermerhorn Bros. Co., USTR-2018-0026-2025 (Aug. 22, 2018) [PR-2072] (suggesting that tariffs at even 10 percent would make plastic bags imported from China by U.S. companies uncompetitive with imports from third countries).

In determining the level of duty to be imposed (as well as the appropriate aggregate level of trade to be covered), the Trade Representative considered the statutory provisions regarding discretionary actions taken by the Trade Representative under section 301(b) of the Trade Act, provisions governing the modification of such actions under section 307(a) of the Trade Act, and the specific direction of the President. *See Proposed List 3*, 83 Fed. Reg. 33,608, 33,609 (U.S. Trade Rep. July 17, 2018) [PR-14]. *See also* 19 U.S.C. § 2411(b); 19 U.S.C. § 2417(a).

The governing statutory framework authorizes modification of an action taken under section 301(b) upon a determination by the Trade Representative of the applicability of sections 307(a)(1)(B) or (C) of the Trade Act, subject to the specific direction, if any, of the President. *See supra* Section II. The framework also provides that any modification be consistent with the Congressional policy directive in section 301(b)(2) which instructs the Trade Representative to take "all appropriate and feasible action authorized under [section 301(c)], subject to the specific direction, if any, of the President… to obtain the elimination of the act, policy or practice."

As explained in *Final List 3,* the determination of the appropriate action that will result in the elimination of an act, policy, or practice is a matter of predictive judgment to be exercised by the Trade Representative, subject to the specific direction, if any of the President. *See Final List 3*, 83 Fed. Reg. 47,974, 47,974-75 (U.S. Trade Rep. Sept. 21, 2018) [PR-16]. In determining the level of duty to be imposed for List 3 and List 4, the Trade Representative sought to make a

judgment that would strike the appropriate balance between exerting an appropriate amount of pressure on China to eliminate its harmful practices, while encouraging China to meaningfully engage in negotiations, against comments suggesting additional duties would result in severe economic harm to U.S. consumers and industries.  *See id.* at 47,975.  *See also Proposed List 3,* 83 Fed. Reg. at 33,609 [PR-14]; *Final List 4,* 84 Fed. Reg. 43,304, 43,305 (U.S. Trade Rep. Aug. 20, 2019) [PR-21].

Further, as the statute directs, the determination by the Trade Representative was also subject to the specific direction, if any, of the President.  *See* 19 U.S.C. §§ 2411(b)(2), 2417(a)(1)(B)-(C).  As detailed in *Final List 3* and *Final List 4*, the President exercised his discretion to direct the Trade Representative to take specific action.  *See Final List 3,* 83 Fed. Reg.  at 47,975 [PR-16]; *Final List 4* [PR-21].  The direction included specific instructions on the level of duty increase, as well as on increasing the overall trade value of the action which we discuss later on.  The President's direction was a key element in the Trade Representative's determination of the level of duty increase.

 For *Final List 3,* consistent with the President's specific direction, and mindful of comments that asserted consumers or U.S. businesses would suffer severe economic harm if the tariffs were raised to 25 percent, the Trade Representative determined to initially set the duties at 10 percent for three months. *Final List 3,* 83 Fed. Reg. at 47,975 [PR-16].  *See also* Comments of Precision Consumer Products Group, USTR-2018-0026-1615 (Aug. 21, 2018) [PR-1663] (suggesting that the Section 301 Committee consider an extension to allow companies appropriate time to adjust supply chains and find alternative factories).  Initially setting the duties at 10 percent and announcing their scheduled increase to 25 percent (as well as delaying the announcement of an exclusion process for *Final List 3*) served as a negotiating tool in

discussions with China.  *See December 2018 White House Statement* [PR-29] (delaying increase in duties on List 3 to allow negotiations with China to continue)*; Notice of December 2018 Delay* [PR-17] (same); *Notice of March 2019 Delay* [PR-18] (same).

Similarly for *Final List 4*, mindful of comments that a 25 percent tariff would lead to severe economic harm, the Trade Representative, at the specific direction of the President, initially determined to impose the additional duties at the 10 percent level, and to further delay the imposition of the 10 percent tariff on products where China's share of U.S. imports from the world is 75 percent or greater by three months to "provide a longer adjustment period for U.S. interested persons."  *See Final List 4,* 84 Fed. Reg. at 43,305 [PR-21].  Furthermore, as discussed above, given the Trade Representative's lack of flexibility in removing tariff subheadings from *Proposed List 4*, to address the unavailability of particular products outside of China and possible severe economic harm, the Trade Representative also determined to establish an exclusion process.  *See id.*  Unlike List 3, where the Trade Representative had greater flexibility in removing products from the final list and did not establish an exclusion process for products subject to additional duties at the ten percent level, for *Final List 4*, the exclusion process was established for products subject to additional duties at the ten percent level.

2. *Aggregate Level of Trade*

Similarly, in considering the appropriate aggregate level of trade, the Trade Representative considered the specific direction of the President, and the statutory factors discussed above, in addition to public comments.

Comments which could be construed to address the issue of the aggregate level of trade to be covered by the proposed modifications generally expressed opposition to the proposed modifications in their entirety, rather than suggesting that the Trade Representative target a

different aggregate level of trade than had been proposed.  As an example, the National Retail Federation, recommended against the expansion of the trade action at any level, especially before the holiday season, and recommended against the inclusion of any additional products, citing increased costs on consumer households and challenges involved in alternative sourcing.  *See* Comments of National Retail Federation, USTR-2018-0026-5650 (Sept. 11, 2018) [PR-5694]. *See also* Comments US-China Business Council, USTR-2019-0004-0447 (June 10, 2019) [PR-6625] (opposing any further tariffs on List 4 and stating that previous tariffs on Chinese imports had already damaged the U.S. economy); Comments of National Foreign Trade Council, USTR-2019-0004-0466 (June 10, 2019) [PR-6644] (opposing tariffs and asserting that additional duties on $300 billion of imports of China is the wrong approach given ongoing negotiations between the United States and China, and asserting that additional tariffs will harm the U.S. economy).

As evidenced in *Final List 3* and *Final List 4*, the Trade Representative found unconvincing those comments which opposed expanding the aggregate trade value of the action. As we explained, increasing the aggregate trade value of the action was based on the specific direction of the President, and findings that the burden or restriction on United States commerce of the acts, policies, and practices, that are the subject of the action had increased, and that previous actions taken in the investigation were no longer appropriate to obtain the elimination of China's acts, policies, and practices.  *See Final List*, 83 Fed. Reg. 47,974 (U.S. Trade Rep. Sept. 21, 2018) [PR-16]*; Final List 4,* 84 Fed. Reg. 43,304 (U.S. Trade Rep. Aug. 20, 2019) [PR-21].  In fact, no public comment disputed that the prior $50 billion action had not been effective in obtaining the elimination of China's unfair acts, or disputed that China continued to impose increasing levels of harm on the U.S. economy.

As discussed in the *Federal Register* notices, USTR invited comments on the *Proposed List 3* and *Proposed List 4* modifications following the specific direction of the President.  *See* President of the United States, *Statement from the President Regarding Trade with China* (June 18, 2018),  https://trumpwhitehouse.archives.gov/briefings-statements/statement-president-regarding-trade-china-2/ (*June 2018 Presidential Directive*) (directing the Trade Representative to "identify $200 billion worth of Chinese goods for additional tariffs at a rate of 10 percent" and that the $200 billion aggregate level would be implemented "if China refuses to change its practices, and also if it insists on going forward with the new tariffs that it has recently announced" following the legal process); *Request for Comments Concerning Proposed Modification of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 33, 608, 33,609 (U.S. Trade Rep. July 17, 2018) [PR-14]; *Request for Comments Concerning Proposed Modification of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation,* 84 Fed. Reg. 22,564, 22,565 (U.S. Trade Rep. May 17, 2019) [PR-20] (stating that in accordance with the direction of the President, the Trade Representative proposes a modification of the action to include an additional $300 billion).  As we discussed in *Final List 3* and *Final List 4*, the President's direction was central to the Trade Representative's determination of the appropriate aggregate level of the trade action.  *See Final List 3,* 83 Fed. Reg at  47,974-75 [PR-16]*; Final List 4,* 84 Fed. Reg. at 43,305 [PR-21].

The aggregate level of trade included in the President's directive and reflected in *Final List 3* (approximately $250 billion, when combined with Lists 1 and 2), reflected the need to cover a substantial percentage of U.S. imports from China ($505 billion in 2017) as China's

announced $50 billion retaliation covered a substantial percentage of U.S goods exported to China ($130 billion in 2017). *See Proposed List 3*, 83 Fed. Reg. at 33,609 [PR-14]. The Trade Representative determined that covering a substantial percentage of U.S. goods exported from China was appropriate to obtain the elimination of China's harmful acts, policies, and practices. *See Final List 3,* 83 Fed. Reg. at 47,974-75 [PR-16].

Similarly, the aggregate level of trade included in the President's directive and reflected in *Final List 4* reflected the judgment that covering essentially all products not covered by previous actions was needed to obtain the elimination of China's acts, policies and practices. *See Request for Comments Concerning Proposed Modification of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 22,564 (U.S. Trade Rep. May 17, 2019) [PR-20].

**E.      *Comments Concerning Damage to the U.S Economy, the Legality and Efficacy of Tariffs, and Alternatives***

In its *Opinion*, the Court referenced several submitted comments which noted concerns regarding: (1) the potential damage to the U.S. economy, (2) the legality and (3) efficacy of the tariffs, and (4) suggestions that alternative measures would be more effective. We discuss comments addressing these issues and USTR's response below.

1.    *Comments Addressing Damage to the United States Economy*

With respect to damage to the U.S economy, the National Retail Federation (NRF), for example, commented on the *Proposed List 3* that it "strongly opposes any efforts to include or add consumer products to the list of products subject to additional tariffs, be they 10 percent or 25 percent." Comments of National Retail Federation, USTR-2018-0026-5650 (Sept.11, 2018) [PR-5694]. NRF's comment noted that the tariffs would result in higher prices and product unavailability. *Id.* Similarly, the Retail Industry Leaders Association (RILA) commented that it

"supports the Administration's efforts to hold our trading partners accountable; however, we are opposed to the use of tariffs, more specifically tariffs on consumer products."  Comments of Retail Industry Leaders Association, USTR-2018-0026-5887 (Sept. 12, 2018) [PR-5924]. RILA's comment also notes the risk of rising prices, which could result in layoffs and retail closures.  *Id.*

For *Proposed List 4*, NRF and RILA submitted similar comments.  *See* Comments of National Retail Federation, USTR-2019-0004-2358 (June 19, 2018) [PR-8533]; *and* Comments of Retail Industry Leaders Association, USTR-2019-0004-2058 (June 18, 2019) [PR-8233]. RILA noted that for many of the products on List 4, China is the primary source and shifting to other sources will take time.  *See* Comments of Retail Industry Leaders Association, USTR-2019-0004-2058 (June 18, 2019) [PR-8233].

As reflected in USTR's notices and press statements, USTR shared the view that mitigating harm to U.S. consumers was an important consideration in developing and finalizing lists of products that would be subject to additional duties.  Specifically, in developing List 1, USTR noted that the proposed list was compiled by selecting products to have the "lowest consumer impact." *Notice of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 FR 14,906, 14907 (U.S. Trade Rep. Apr. 6, 2018).  When Final List 2 was published, USTR noted that 1,102 separate U.S. tariff subheadings that make up List 1 and List 2 did "not include goods commonly purchased by American consumers."  *See* Press Release, United States Trade Representative, *USTR Issues Tariffs on Chinese Products in Response to Unfair Trade Practices* (June 15, 2018), https://ustr.gov/about-us/policy-offices/press-office/press-releases/2018/june/ustr-issues-tariffs-chinese-products.

Similarly, the selection process for *Proposed List 3* "took account of likely impacts on U.S. consumers, and involved the removal of subheadings identified by analysts as likely to cause disruptions to the U.S. economy." *Proposed List 3*, 83 Fed. Reg. at  33,609 [PR-14]. While *Proposed List 4* proposed raising duties on essentially all remaining imports from China, thus necessitating the need for USTR to include consumer products, USTR requested interested parties to address whether imposing additional duties on a particular product would cause disproportionate economic harm to U.S. interests, including consumers. *Request for Comments Concerning Proposed Modification of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation,* 84 Fed. Reg. 22,564 (U.S. Trade Rep. May 17, 2019) [PR-20].

In publishing *Final List 4*, the Trade Representative determined to apply additional duties on products where China's share of U.S. imports from the world is less than 75 percent, but would delay additional duties for products where China's share of imports from the world is 75 percent or greater to "provide a longer adjustment period." *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation,* 84 Fed. Reg. 43,304 (U.S. Trade Rep. Aug. 20, 2019) (*Final List 4*) [PR-21].  In a press release the Trade Representative explained that "as part of USTR's public comment and hearing process, it was determined that the tariff should be delayed to December 15 for certain articles.   Products in this group include, for example, cell phones, laptop computers, video game consoles, certain toys, computer monitors, and certain items of footwear and clothing."  *See* Press Release, United States Trade Representative, *USTR Announces Next Steps on Proposed 10 Percent Tariff on Imports from China* (Aug. 13, 2019), https://ustr.gov/about-us/policy-offices/press-office/press-releases/2019/august/ustr-announces-

next-steps-proposed.  In other words, in response to public comments, the Trade Representative

decided to delay additional duties on certain consumer products.  Many of the 8-digit

subheadings that were delayed were the same 8-digit subheadings identified by RILA and NRF.

*See* Comments of National Retail Federation, USTR-2019-0004-2358 (June 19, 2018) [PR-

8533]; *and* Comments of Retail Industry Leaders Association, USTR-2019-0004-2058 (June 18,

2019) [PR-8233].  Further, in order to address comments concerning the potential for damage  to

the U.S. economy and consumers, as part of the List 4 modification, the Trade Representative

also determined to establish a process where interested persons could request that a product be

excluded from the additional duties.  *See Final List 4,* 84 Fed. Reg. at 43.305 [PR-21].

   2.   _Comments Concerning the Legality of the Modification_

As noted in the *Opinion*, some comments challenged the Trade Representative's reliance

on Sections 301 and 307 in modifying the trade action.  *See CIT Opinion* at 51.  For example, the

Consumer Technology Association ("CTA") argued that Section 301 of the Trade Act did not

authorize the List 3 modification because "the tariffs came well outside the 30-day limit imposed

by Section 305 of the Trade Act" and because the proposed modification was based on

"impermissible reasons post-dating the Section 301 investigation –namely, China's response to

the $50 billion action.  Comments of CTA, USTR-2018-0026-5885 (Sept. 12, 2018) [PR-5922]

(internal quotes omitted).  The comment also argued that Section 307 of the Trade Act only

provides authority to terminate an existing action.  *See id.*

As evidenced in notices issued for *Final List 3* and *Final List 4*, the Trade Representative

did not agree with CTA's comment (and similar comments) which inaccurately described the

application of Sections 301, 305, or 307 of the Trade Act to the modifications.  With respect to

CTA's "time limit" argument, the time limitation in Section 305(a) does not apply to actions

taken under Section 307 of the Trade Act.  By its very terms, Section 305(a) applies to actions

taken under Section 304(a)(1)(B) of the Trade Act.  As explained in the notice announcing the

List 3 modification that the action was being taken pursuant to Sections 307(a)(1)(B) and (C).

*See Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related*

*to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 47,974 (U.S. Trade

Rep. Sept. 21, 2018) (*Final List 3*) [PR-16]; *Notice of Modification of Section 301 Action:*

*China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and*

*Innovation,* 84 Fed. Reg. 43,304 (U.S. Trade Rep. Aug. 20, 2019) (*Final List 4*) [PR-21].

The Trade Representative also found unpersuasive CTA's argument that the proposed

modification could not be based on reasons post-dating the investigation.  In *Final List 3*, USTR

explained how China's retaliatory action was inextricably linked and related to China's acts,

policies, and practices under investigation.  *See Final List 3,* 83 Fed. Reg. at 47,974-5 [PR-16].

*See also Final List 4,* 84 Fed. Reg. at 43,304-5 [PR-21].  USTR explained that China's unfair

acts, policies, and practices included not just its specific technology transfer and IP policies

referenced in the notice of initiation in the investigation, but also China's subsequent defensive

actions taken to maintain those policies (to include increased tariffs to further protect its

policies), which had resulted in increased harm to the U.S. economy following the one-year

period of investigation.  These actions met the requirements for modifying an action under

Section 307(a)(1)(B), which the CIT agreed, see *CIT Opinion* at 36, as well as the requirements

under Section 307(a)(1)(C).

USTR also disagreed with arguments that Section 307 of the Trade Act only provides the

authority to terminate an action.  Nothing in the text of the statute supports such a limited

interpretation, as the statute specifically authorizes the Trade Representative to "*modify or*

terminate" any action, subject to the specific direction of the President, including in circumstances described in Section 307(a)(1)(B) where the burden or restriction on United States commerce of the denial of rights, or of the acts, policies, and practices, that are the subject of such action has *increased* or decreased.  *See* 19 U.S.C. § 2417(a)(1)(B)-(C) (emphasis added).

 *3.* <u>Comments Concerning the Efficacy of Tariffs</u>

 Other commenters urged the Trade Representative not to apply additional tariffs, but rather to engage with China in negotiations.  The U.S. Chamber of Commerce commented that "now is the time to hold serious discussions with China."  Comments of U.S. Chamber of Commerce, USTR-2018-0026-1391 (Aug. 20, 2018) [PR-1439].  The American Chemistry Council noted that "the Administration should work closely with like-minded trading partners to address long-standing problems with China through constructive negotiation, rather than through the blunt instrument of tariffs."  Comments of the American Chemistry Council, USTR-2018-0026-5181 (Sept. 10, 2018) [PR-5227].  The National Foreign Trade Council commented that tariffs would not change China's behavior and so encouraged USTR to "negotiate directly with China."  Comments of National Foreign Trade Council, USTR-2018-0026-1843 (Aug. 22, 2018) [PR-1891].  Similarly, the National Association of Manufacturers urged the "administration to negotiate a comprehensive, enforceable, rules-based trade agreement with China" and the Consumer Technology Association urged USTR to "re-engage China in bilateral negotiations."  Comments of National Association of Manufacturers, USTR-2019-0004-1340 (June 13, 2019) [PR-7517]; Comments of Consumer Technology Association, USTR-2019-0004-1833 (June 18, 2019) [PR-8009].

 The Trade Representative agreed with comments suggesting negotiations with China, but was not persuaded by comments which suggested that negotiations alone could be successful in

obtaining the elimination of the harmful practices without accompanying economic pressure through additional tariffs.  Actions by China both prior to and during the investigation evidenced the negotiations alone would not be sufficient.  As detailed in USTR's *Findings of Investigation*, before taking the 301 action, the Trade Representative had been engaged in negotiations with China regarding its technology transfer policies since at least 2010.  These negotiations did not result in a change in China's practices, despite at least eight bilateral commitments from China not to use technology transfer as a condition for market access and to permit technology transfer decisions to be negotiated independently by businesses.  *See Section 301 Findings,* at 6-8 [PR-26] (providing a timeline of China's bilateral commitments relating to technology transfer from 2010  to 2016).  And as explained in *Final List 3 and Final List 4*, China's conduct during the investigation indicated that previous actions were not sufficient to encourage China to change its acts, policies, and practices, and that more substantial trade actions were needed to encourage negotiations.  *See Final List 3,* 83 Fed. Reg. at 47,974-75 [PR-16] (announcing additional duties and explaining that in government-to-government communications China made clear it would not change its policies in response to the $50 billion action, and that China has been unwilling to offer meaningful modifications to its unfair practices despite engagement at the Ministerial level); *Final List 4,* 84 Fed. Reg.  at 43,304-05 [PR-21] (announcing additional duties and explaining that China had retreated from specific commitments made in previous rounds of negotiations and had instead imposed further retaliatory action against U.S. commerce).

Moreover, in directing the Trade Representative to impose additional duties on List 3, the President indicated that negotiations with China would continue and were an important part of any resolution.  *See September 2018 Presidential Directive* [PR-4].  *See also* Press Release, U.S. Trade Representative, *USTR Finalizes Tariffs on $200 Billion of Chinese Imports in Response to*

*China's Unfair Trade Practices (Sept. 18, 2018),* https://ustr.gov/about-us/policy-offices/press-office/press-releases/2018/september/ustr-finalizes-tariffs-200 (*stating,* "The Administration will continue to encourage China to allow for fair trade with the United States"); *Final List 4*, 84 Fed. Reg. at 43,304 [PR-21] (*stating* "the United States is engaging with China with the goal of obtaining the elimination of the acts, policies, and practices covered in the investigation"); *December 2018 White House Statement* [PR-29] (delaying increase in duties on List 3 to allow negotiations with China to continue)*; Notice of December 2018 Delay* [PR-17] (same); *Notice of March 2019 Delay* [PR-18] (same).

    *4.  Comments Suggesting Alternatives to the Section 301 Action*

    Other comments suggested that USTR not increase duties under Section 301, but rather take action under alternative provisions of U.S. law.  For example, HP Inc. (HP) suggested that USTR use Section 337 of the Tariff Act, noting that broad based tariffs under Section 301 are a less effective tool against imports that infringe on U.S. patents and trademarks.  Comments of HP, USTR-2019-0004-1701 (June 17, 2019) [PR-7877].

    As noted above, the initiation notice for this 301 investigation outlined four broad areas that relate to Chinese laws, policies, and practices and actions related to intellectual property, innovation, and technology that may encourage or require the transfer of American technology and intellectual property to enterprises in China or that may otherwise negatively affect American economic interests.  *Initiation of Section 301 Investigation*, 82 Fed. Reg. at 40,213-14.  This broader set of issues could not be addressed through the Section 337 process, which as HP notes, only considers whether the imported product is unfairly competing with U.S. goods, including by infringing on intellectual property rights under U.S. patent and trademark law.  Comments of HP, USTR-2019-0004-1701 (June 17, 2019) [PR-7877].  Rather, a broad-

based response such as Section 301, would be a more effective tool in responding to China's broad policies.

Considering the President's March 22, 2018 directive to the Trade Representative to, *inter alia*, "take all appropriate action under section 301 of the Trade Act…to address the acts, policies, and practices of China… " and the President's directives to take subsequent action under section 301, in requesting broad-based comments, USTR did not intend to invite comments on alternative measures to an action under Section 301 of Trade Act.  President of the United States, *Presidential Memorandum on the Actions by the United States Related to the Section 301 Investigation* (Mar. 22, 2018), https://trumpwhitehouse.archives.gov/presidential-actions/presidential-memorandum-actions-united-states-related-section-301-investigation/ (*March 2018 Presidential Memorandum*) (emphasis added)*; May 2019 Representative Robert Lighthizer Statement* [PR-30].

As reflected in *Final List 3* and *Final List 4*, USTR continued to consider Section 301 of the Trade Act to be the appropriate measure to address China's acts, policies, and practices. Moreover, to address the defensive actions taken by China to maintain its harmful practices, which impacted a broad range of products from the United States, the Trade Representative determined to broaden the scope of the action to include more goods imported from China.  *See Final List 3,* 83 Fed. Reg. at 47,974-5 [PR-16]; *Final List 4*, 84 Fed. Reg. at 43,304 [PR-21].

## III.    Conclusion

Consistent with the *Court's Opinion* and *Order*, this *Remand Determination*, prepared under respectful protest, provides further explanation of the Trade Representative's determination, at the direction of the President, to impose additional tariffs under the *Final List 3* and *Final List 4* modifications.  Moreover, the *Remand Determination* explains the Trade

Representative's rationale for the decision making in the context of the comments received, addressing the rationale underlying decisions to retain or remove certain tariff subheadings from the *Final List 3* and *Final List 4* modifications, as well as comments addressing other aspects of the proposed supplemental actions.  As shown, the Trade Representative's determination on each aspect of the determination were made in consideration of the public comments and testimony, as well as statutory considerations, including the direction of the President.


_____

Juan A. Millan
Assistant U.S. Trade Representative for Monitoring and Enforcement