UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE MARK A. BARNETT, CHIEF JUDGE
         THE HONORABLE CLAIRE R. KELLY, JUDGE
         THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

_____
                                           :
                                           :
*In Re* Section 301 Cases                  :   Court No. 21-00052
                                           :
_____:

**BRIEF OF AMICI CURIAE RETAIL LITIGATION CENTER, INC., NATIONAL RETAIL FEDERATION, AMERICAN APPAREL & FOOTWEAR ASSOCIATION, CONSUMER TECHNOLOGY ASSOCIATION, FOOTWEAR DISTRIBUTORS AND RETAILERS OF AMERICA, JUVENILE PRODUCTS MANUFACTURERS ASSOCIATION, AND TOY ASSOCIATION**

## **TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ......................................................................................... ii

INTERESTS OF AMICI ................................................................................................ 1

INTRODUCTION .......................................................................................................... 1

BACKGROUND ............................................................................................................ 2

    A. USTR Imposed Massive Tariffs On Virtually All Chinese Products Without Responding To Public Comments ................................................. 2

    B. This Court Ordered USTR To Respond To Objections ............................. 3

    C. USTR Attempts To Respond To Comments .............................................. 4

ARGUMENT .................................................................................................................. 5

    A. USTR's Explanations Are Conclusory ....................................................... 5

    B. USTR's Explanations Are Non-Responsive ............................................... 8

CONCLUSION ............................................................................................................. 10

CERTIFICATE OF COMPLIANCE ............................................................................ 11

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Del. Dep't of Nat. Res. & Env't Control v. E.P.A.*,
    785 F.3d 1 (D.C. Cir. 2015)...............................................................................................5, 6, 8

*Getty v. Fed. Sav. & Loan Ins. Corp.*,
    805 F.2d 1050 (D.C. Cir. 1986)..................................................................................................6

*Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*,
    626 F.3d 84 (D.C. Cir. 2010).................................................................................................5, 10

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)..................................................................................................................3, 8

**Statutes, Regulations, Administrative Proceedings**

*Notice of Modification of Section 301 Action*, 83 Fed. Reg. 47974-01 (Sept. 21,
    2018) ...........................................................................................................................................3

*Notice of Modification of Section 301 Action*, 84 Fed. Reg. 43304 (Aug. 20, 2019) .......................3

*Request for Comments Concerning Proposed Modification of Action Pursuant to
    Section 301*, 83 Fed. Reg. 33608-01 (July 17, 2018).............................................................2, 6

*Request for Comments Concerning Proposed Modification of Action Pursuant to
    Section 301*, 84 Fed. Reg. 22564, 22564 (May 17, 2019) ........................................................2

**INTERESTS OF AMICI**

Amici, the Retail Litigation Center, Inc. ("RLC"), the National Retail Federation ("NRF"), the American Apparel & Footwear Association ("AAFA"), the Consumer Technology Association ("CTA"), the Footwear Distributors and Retailers of America ("FDRA"), the Juvenile Products Manufacturers Association ("JPMA"), and the Toy Association ("TA") are trade associations whose members have been hurt by the China 301 tariffs. They filed a previous amicus brief in this case, and their counsel appeared at oral argument. This Court's Aug. 15, 2022 scheduling order expressly contemplated amici's further participation at this stage. Dkt. 469. Additional information about amici can be found in the Appendix to this brief.

**INTRODUCTION**

This Court gave the United States Trade Representative ("USTR") a second chance to satisfy its most basic obligations of reasoned decision-making, but it failed—again—to do so. After the agency responded to *none* of the thousands of critical comments it received during its initial rulemaking process for List 3 and List 4 tariffs, this Court remanded to give USTR another opportunity to explain itself. In response to the many detailed objections to the proposed tariff actions, however, USTR offered only deflection and conclusory declarations.

The Court bent over backwards to allow USTR to comply with its Administrative Procedure Act obligations. Now, twice the agency has shown itself incapable of meeting its legal responsibilities. The time has come for the Court to impose the normal remedy for unlawful agency action: vacatur.

# BACKGROUND

### A. USTR Imposed Massive Tariffs On Virtually All Chinese Products Without Responding To Public Comments

Over the course of a few months in 2018 and 2019, USTR proposed and finalized massive tariffs on virtually all imports from China. In 2018, "List 3" proposed 25% duties on $200 billion in products "cover[ing] a substantial percentage of Chinese imports." *Request for Comments Concerning Proposed Modification of Action Pursuant to Section 301*, 83 Fed. Reg. 33608-01, 33609 (July 17, 2018). In 2019, USTR proposed expanding those tariffs to "essentially all products" imported from that country—another $300 billion in goods. *Request for Comments Concerning Proposed Modification of Action Pursuant to Section 301*, 84 Fed. Reg. 22564, 22564 (May 17, 2019).

USTR's proposals drew widespread opposition from a broad range of U.S. businesses and other stakeholders. As amici, their members, and others warned, slapping steep tariffs on virtually all imports from one of the United States' top trading partners would amount to a hidden tax on consumers, raising the price of everything from lightbulbs to baby cribs, and increasing inflation. *E.g.*, RILA List 3 Comment Letter, USTR-2018-0026-5887 at 1-3 (Sept. 6, 2018); RILA List 4 Comment Letter, USTR-2019-0004-2058 at 2 (June 18, 2019); CTA List 3 Comment Letter, USTR-2018-0026-5885 at 7 (Sept. 12, 2018). The full range of affected products is "purchased by nearly every American household," and the proposed tariffs could cost the average American family thousands of dollars each year. NRF List 3 Comment Letter, USTR-2018-0026-5650 at 2-3 (Sept. 11, 2018). The proposed tariffs also "pose[d] a major risk to supply chains," amici warned, and "[t]he ripple effect of these tariffs [would] be felt in every sector of the American economy." RILA List 3 Comment Letter, USTR-2018-0026-5887 at 2-4; NRF List 3 Comment Letter, USTR-2018-0026-5650 at 4.

USTR approved List 3 and List 4 tariffs without responding to a single one of these comments. *Notice of Modification of Section 301 Action*, 83 Fed. Reg. 47974-01, 47974 (Sept. 21, 2018); *Notice of Modification of Section 301 Action*, 84 Fed. Reg. 43304, 43304 (Aug. 20, 2019).

### B. This Court Ordered USTR To Respond To Objections

Plaintiffs filed this suit challenging the tariffs as unlawful under the Trade Act and the Administrative Procedure Act. Acting on cross-motions for judgment on the agency record, this Court held that USTR violated the APA by failing to respond adequately to public comments and remanded to the agency "for reconsideration or further explanation" of the List 3 and List 4 tariffs. Dkt. 448 at 71.

As this Court explained, the APA requires USTR to lay out "the basis and purpose for its action," including "consideration of the relevant factors," and "offer a rational connection between the facts found and the choice made." *Id.* at 48 (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 52 (1983)). "Conclusory statements that do not explain how a determination was reached are . . . insufficient." *Id*. In particular, "[a]n agency 'must respond in a reasoned manner to those [comments] that raise significant problems.'" *Id.* at 49 (citation omitted).

Applying these principles to USTR's List 3 and List 4 decisions, this Court found them inadequate. The Court emphasized that USTR had sought comment on "any aspect" of its proposals. Dkt. 448 at 50-51. Yet the USTR's explanation for its actions were limited to "why the USTR deemed China's ongoing and retaliatory conduct actionable"; the agency failed entirely to explain why it thought the proposed tariffs were the correct response to that conduct despite comments warning about (among other things) "the impact of the duties on the U.S. economy." Dkt. 448 at 53.

3

The procedural defects in USTR's decision-making left serious "doubt as to the legality of its chosen courses of action." *Id*. at 59.  Nonetheless, the Court remanded to afford the USTR another opportunity at explanation. *Id*. at 59-60.

### C.  USTR Attempts To Respond To Comments

USTR's remand order principally focused on its decisions to remove particular product categories from the finalized lists.  Dkt. 467 at 27-74.  For example, USTR devoted two pages to providing "Further Explanation of the Determination to Remove Chinese Antiques and Works of Art Imported from Third Countries," *id.* at 33-34; four pages on "Certain Chemicals and Inputs for the Textile Industry," *id.* at 48-51; and two pages on "Certain Subheadings for U.S.-Caught Seafood Exported to China for Processing," *id.* at 67-68.

Only in brief sections near the end did USTR purport to address broader criticisms of List 3 and List 4.  The agency first addressed "the appropriate aggregate level of trade" to be covered by the proposed tariffs in less than four pages.  *Id*. at 78-81.  USTR said it "found unconvincing" comments that opposed expanding the tariffs because "the action was based on the specific direction of the President," and "the aggregate level of trade included in the President's directive . . . reflected the judgment that covering essentially all products [from China] was needed to obtain the elimination of China's" harmful trade practices.  *Id*. at 79-81.

USTR also addressed comments warning of "the potential damage to the U.S. economy" in less than four pages.  *Id.* at 81-84.  The agency acknowledged that commenters, including amici, had warned that "tariffs would result in higher prices and product unavailability," "layoffs and retail closures," and supply chain disruptions across the economy.  *Id*. at 81-82.  In response, USTR simply noted that its "notices and press statements" about previous List 1 and List 2 tariffs mentioned "consumer impact" and "did 'not include goods commonly purchased by American consumers.'"  *Id*. at 82.  As for List 3, the agency said that it "took account of likely impacts on

4

U.S. consumers," but did not mention how it did so. *Id*. at 83. And for List 4, USTR pointed to its decision to delay implementation of some tariffs for three months, and its provision for an exclusion request process. *Id*. at 83-84.

## ARGUMENT

"USTR's failure to explain its rationale in the context of the comments it received" before issuing Lists 3 and 4 led the Court to question "the legality of [USTR's] chosen courses of action." Dkt. 448 at 59. USTR has failed again. As plaintiffs show, USTR's response is inadequate because it fails to address significant comments, and offers only non-responsive, immaterial, and post hoc explanations. Amici agree, and write to emphasize that USTR's so-called responses to the major policy concerns raised by amici and their members on economic harm are impermissibly conclusory and utterly non-responsive.

### A. USTR's Explanations Are Conclusory

To pass muster under the APA, an agency must "respond to 'relevant and significant' comments" in a way that enables a reviewing court "to see what major issues of policy were ventilated . . . and why the agency reacted to them as it did." *Del. Dep't of Nat. Res. & Env't Control v. E.P.A.*, 785 F.3d 1, 15 (D.C. Cir. 2015); *see* Dkt. 448 at 49. As this Court has explained, "[c]onclusory statements that do not explain how a determination was reached are therefore insufficient." Dkt. 448 at 48 (citing *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 626 F.3d 84, 94 (D.C. Cir. 2010)).

Amici's comments warned that List 3 and List 4 tariffs, which cover $500 billion in trade and almost all products imported from China, would seriously harm U.S. consumers and businesses by raising prices, boosting inflation, and disrupting supply chains. *See* p. 2, *supra*; Dkt. 373-2 at 14-16 (amici's previous brief). In its remand response, USTR professed that it "shared the view that mitigating harm to U.S. consumers was an important consideration." Dkt. 467 at 81-

5

82. Yet USTR's main response to amici's objection that *List 3* and *List 4* tariffs threatened "higher prices," "product unavailability," "layoffs and retail closures," and supply chain disruptions was that the agency calibrated *List 1* tariffs to "have the 'lowest consumer impact,'" and did "not include goods commonly purchased by American consumers" in *List 1 or List 2*. Dkt. 467 at 82. But that is obviously unresponsive to comments on List 3 and List 4, which cover a far wider array of products than List 1 or List 2, including a vast number of consumer goods that *are* "commonly purchased by American consumers."

On List 3 itself, USTR devoted a grand total of one sentence to the concerns raised by amici and other stakeholders about potential economic harm, asserting that it "took account of likely impacts on U.S. consumers" and removed "subheadings identified by analysts as likely to cause disruptions to the U.S. economy." *Id*. at 83 (quoting 83 Fed. Reg. at 33,609). But that statement gives no indication of which "impacts" the agency considered "likely," how it reached that conclusion, or how removal of particular subheadings would "account" for them. Indeed, USTR's remand order did no more than parrot its own prior explanation published in July 2018. *Id.* Yet this Court has already rejected USTR's argument that "its determinations to omit certain tariff subheadings" from List 3 was sufficient to "reflect the USTR's consideration of comments." Dkt. 448 at 47; *see id.* at 53 (noting that USTR was obligated to respond to comments on not only "inclusion or exclusion of particular subheadings" but *also* "the concerns raised about the impact of the duties on the U.S. economy"). Merely "[s]tating that a factor was considered . . . is not a substitute for considering it." *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986).

USTR's cursory discussion of economic harm with respect to List 4 is likewise deficient. The agency suggested that the government's own decision to include "all remaining imports from

China" in List 4 "necessitat[ed] the need for USTR to include consumer products." Dkt. 467 at 83. That is completely circular. Commenters were objecting to USTR's decision to include all products from China, including consumer products. *E.g.*, NRF List 4 Comment Letter, USTR-2019-0004-2358 at 2 (June 19, 2019) ("We do *not* recommend that any products be added to the proposed list, or that the proposed tariff rate be increased in any way, or that the level of trade affected be expanded."). The agency was obligated to respond with something more than a statement that it imposed tariffs on all remaining products because it had decided to impose tariffs on all remaining products.

USTR characterized some of amici's comments as "address[ing] the issue of the aggregate level of trade to be covered by the proposed modifications." Dkt. 467 at 78. It is unclear why the agency separates those objections from others addressing economic harm—the comments it cites are about "increased costs on consumer households and challenges involved in alternative sourcing," and how "additional tariffs will harm the U.S. economy." Dkt. 467 at 79. But in any event, USTR's response on these points is every bit as conclusory as its other discussion of economic harm. The agency "found [the comments] unconvincing," but did not explain why, instead falling back on its mantra that "the action was based on the specific direction of the President" and that China's unfavorable trade practices continued. *Id.* As this Court has pointed out, however, "the USTR's invocation of the President's direction does not obviate the USTR's obligation to respond to significant issues raised in the comments." Dkt. 448 at 54.[1]

---

[1] USTR's responses to comments on the legality of List 3 and List 4 tariffs were likewise conclusory. The agency said "it did not agree with CTA's comment (and similar comments)" that questioned USTR's reliance on Sections 301 and 307 of the Trade Act, and "found unpersuasive CTA's argument that the proposed modification could not be based on reasons post-dating the investigation." Dkt. 467 at 84-85. But it provided little reasoning, simply asserting that it read the relevant statutory provisions differently.

7

## B. USTR's Explanations Are Non-Responsive

USTR's explanation of List 3 and List 4 tariffs suffers from another defect: what little reasoning it provides is not actually responsive to many of the specific concerns raised in the comments. "'[S]elf-contradictory, wandering logic does not constitute an adequate explanation' of agency action." *Delaware Dep't of Nat. Res. & Env't Control*, 785 F.3d at 15 (citation omitted). There must be some "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43.

To cite one example: USTR's focus on "likely impacts on U.S. consumers," Dkt. 467 at 83, fails to grapple with the full scope of economic objections. Amici repeatedly warned that List 3 and List 4 tariffs would harm not only consumers, but also U.S. businesses, especially retailers and manufacturers, slowing growth, driving smaller companies out of business, spiking inflation, and costing hundreds of thousands of jobs. *See e.g.*, RILA List 3 Comment Letter, USTR-2018-0026-5887 at 1 ("Retailers are extremely concerned that the onslaught of tariffs slapped on our imports and the retaliatory tariffs hitting our exports will severely damage some industries"); NRF List 3 Comment Letter, USTR-2018-0026-5650 at 5 ("U.S. jobs are at stake"); CTA List 3 Comment Letter, USTR-2018-0026-5885 at 3 & 7 (Tariffs will cause "cost-crippling relocation of manufacturing, layoffs of domestic employees, and shuttering operations altogether," and "[t]ariff-driven price increases will also boost inflation"). Even if USTR's conclusory assertions about consumer harms were sufficiently reasoned, the agency offered no explanation for why it disregarded these other economic harms.

Another example: One of the most significant (and prescient) concerns raised by amici was that the List 3 and List 4 tariffs would wreak havoc on global supply chains. *See* RILA List 3 Comment Letter, USTR-2018-0026-5887 at 2-5; RILA List 4 Comment Letter, USTR-2019-0004-2058 at 2-6; NRF List 3 Comment Letter, USTR-2018-0026-5860 at 3-5 (Sept. 12, 2018);

8

NRF List 4 Comment Letter, USTR-2019-0004-2358 at 2-5; CTA List 3 Comment Letter, USTR-2018-0026-5885 at 3-4; CTA List 4 Comment Letter, USTR-2019-0004-1833 at 4-13 (June 18, 2019); FDRA List 3 Comment Letter, USTR-2018-0026-5888 at 2-3 (Sept. 12, 2018); AAFA List 3 Comment Letter, USTR-2018-0026-5429 at 2-5 (Sept. 11, 2018); AAFA List 4 Comment Letter, USTR-2019-0004-2755 at 2-5 (July 3, 2019); Toy Association List 4 Comment Letter, USTR-2019-0004-2026 at 2-3 (June 18, 2019). As amici explained, shifting sourcing between countries "can take years." NRF List 4 Comment Letter, USTR-2019-0004-2358 at 4. And for many U.S. companies, a variety of factors (workforce education, regulations, infrastructure, etc.) makes shifting sourcing exceedingly difficult or even impossible. *Id.*; *see also* RILA List 4 Comment Letter, USTR-2019-0004-2058 at 2-3; CTA List 4 Comment Letter, USTR-2019-0004-1833 at 8. Again, these supply chain problems would not only raise prices and make products unavailable for consumers, but also shutter businesses, cost jobs, and impede growth.

At most, USTR offered only two explanations for disregarding these harms: its decision to delay implementation of List 4B tariffs for a few months (from September 1, 2019 to December 15, 2019) to "provide a longer adjustment period," and its indication that there would be an exclusion request process for List 4. Dkt. 467 at 83-84. To start, neither of those points is responsive to comments on List 3 because they relate only to List 4. *See* Dkt. 448 at 56. And for List 4, this Court has already rejected this exact argument. USTR previously contended that it responded to comments by "segregat[ing] the tariff subheadings into two lists with staggered effective dates and [by] indicat[ing] that an exclusion process would be forthcoming." *Id.* As this Court explained, these actions did "not address the composition of the list of subheadings in the first place." *Id.* at 56-57. In any event, three and a half months of delay was insufficient to address amici's comments that shifting production outside China (if feasible at all) would take "years,"

9

and would cripple smaller businesses that lack the resources to absorb that kind of dramatic change. NRF List 4 Comment Letter, USTR-2019-0004-2358 at 2-5. It also remains unexplained why USTR believed a subheading-by-subheading exclusion process would adequately ameliorate the industry-wide and economy-wide harms flagged by amici.

* * *

USTR has not done what this Court said it must do to sufficiently explain its List 3 and List 4 tariffs: "apprise the court how the USTR came to its decision to act and the manner in which it chose to act, taking account of . . . the concerns raised about the impact of the duties on the U.S. economy." Dkt. 448 at 53. In light of that "fatal" error, the tariffs must be vacated. *United Mine Workers*, 626 F.3d at 94.

## CONCLUSION

The Court should vacate the List 3 and List 4A tariffs and order defendants to refund to plaintiffs the duties they paid.

Dated: September 14, 2022

Respectfully submitted,

/s/ Joseph R. Palmore
JOSEPH R. PALMORE
ADAM L. SORENSEN
MORRISON & FOERSTER LLP
2100 L Street, NW, Ste. 900
Washington, DC 20037
(202) 887-1500
JPalmore@mofo.com

*Counsel for Retail Litigation Center, National Retail Federation, American Apparel & Footwear Association, Consumer Technology Association, Footwear Distributors and Retailers of America, Juvenile Products Manufacturers Association, and Toy Association*

**CERTIFICATE OF COMPLIANCE**

I, Joseph R. Palmore, an attorney with Morrison & Foerster LLP who is responsible for this amicus brief, dated September 14, 2022, certify that this brief complies with the page limitation set out in the Court's August 15, 2022 Scheduling Order and contains 10 pages.

/s/ Joseph R. Palmore

**APPENDIX**

The **Retail Litigation Center, Inc.** ("RLC") is the only trade organization dedicated to representing the retail industry in the courts. The RLC's members include many of the country's largest and most innovative retailers. Collectively, they employ millions of workers throughout the United States, provide goods and services to tens of millions of consumers, and account for tens of billions of dollars in annual sales. The RLC seeks to provide courts with retail-industry perspectives on important legal issues affecting its members, and to highlight the potential industry-wide consequences of significant pending cases. Since its founding in 2010, the RLC has participated as an *amicus* in more than 150 judicial proceedings of importance to retailers. RLC's affiliate, the Retail Industry Leaders Association ("RILA"), and RILA's members (many of which are also RLC members) submitted comments to USTR in the List 3 & 4 proceedings at issue here.

The **National Retail Federation** ("NRF") is the world's largest retail trade association and the voice of retail worldwide. The NRF's membership includes retailers of all sizes, formats and channels of distribution, representing the breadth and diversity of an industry that employs more than 52 million workers and contributes $3.9 trillion annually to GDP. As the industry umbrella group, the NRF regularly submits amicus curiae briefs in cases raising significant legal issues that are important to the retail industry. NRF and its members also submitted comments to USTR in the List 3 & 4 proceedings at issue here.

The **American Apparel & Footwear Association** ("AAFA") is the national trade association representing apparel, footwear and other sewn products companies, and their suppliers and workers, which compete in the global market. Representing more than 1,000 world famous name brands, AAFA is the trusted public policy and political voice of the apparel and footwear industry, its management and shareholders, its three million U.S. workers, and its contribution of

more than $350 billion in annual U.S. retail sales. AAFA and its members submitted comments and testified during the List 3 and List 4 proceedings.

The **Consumer Technology Association** ("CTA") represents more than 1,500 member companies in the $505 billion U.S. consumer technology industry, which supports more than 18 million U.S. jobs. Member companies come from every facet of the consumer technology industry, including manufacturers, distributors, developers, retailers, and integrators. Over 80% of CTA's members are start-ups, small and mid-sized companies as defined by the Small Business Administration. CTA's member companies are negatively impacted by the use of tariffs to address the imbalance in the US-China trade relation.

Founded in 1944, the **Footwear Distributors & Retailers of America** ("FDRA") is governed and directed by footwear executives and is the only trade organization focused solely on the footwear industry. It serves the full footwear supply chain and boosts the bottom lines of its members through innovative products, training and consulting on footwear design and development, sourcing and compliance, trade and customs, advocacy, and consumer and sales trend analysis for retailers selling shoes around the world. FDRA also runs the footwear industry's weekly podcast Shoe-In Show featuring leading footwear executives and experts discussing key business trends. FDRA members range from small family-owned footwear businesses to multi-national footwear companies. Members include the majority of U.S. footwear manufacturers, brands, retailers and importers. In all, FDRA supports nearly 500 companies and brands worldwide, representing 95% of total U.S. footwear sales, making it by far the largest and most respected American footwear trade and business association.

The **Juvenile Products Manufacturers Association** ("JPMA") is a national not-for-profit trade organization representing 95% of the prenatal to preschool industry including the producers,

importers, or distributors of a broad range of childcare articles that provide protection to infants and assistance to their caregivers. JPMA collaborates with government officials, consumer groups, and industry leaders on programs to educate consumers on the safe selection and use of juvenile products. 90% of our members are small businesses. JPMA and its members also submitted comments to USTR in the List 3 & 4 proceedings at issue here.

**The Toy Association™, Inc.** ("TA") represents more than 800 businesses—toy manufacturers, importers and retailers, as well as toy inventors, designers and testing labs—all involved in bringing safe, fun, and educational toys and games for children to market. Over 3 billion toys are sold in the U.S. each year, totaling nearly $30 billion at retail, and our members account for approximately 90% of this market. Importantly, over 95% of toy manufacturers, wholesalers, distributors in the United States are small businesses. With China supplying 85% of all toys sold in the U.S. and with no alternative manufacturing capacity readily available elsewhere, tariffs on toys cause substantial harm to consumers due to higher prices and fewer choices.

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of International Trade by using the CM/ECF system on September 14, 2022. I certify that all participants in the case are registered CM/ECF users and that service of the brief will be accomplished by the CM/ECF system.

Dated: September 14, 2022                                     /s/ Joseph R. Palmore