## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| *In Re* Section 301 Cases | Court No. 21-cv-00052-3JP |
| HMTX INDUS. LLC, HALSTEAD NEW ENGLAND CORP., METROFLOR CORP., AND JASCO PRODS. CO. LLC, | |
| Plaintiffs, | Court No. 20-cv-00177-3JP |
| v. | |
| UNITED STATES OF AMERICA, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, JAMIESON GREER, U.S. TRADE REPRESENTATIVE, U.S. CUSTOMS AND BORDER PROTECTION, AND RODNEY S. SCOTT, U.S. CUSTOMS AND BORDER PROTECTION COMMISSIONER, | |
| Defendants. | |

## PLAINTIFFS' STATUS REPORT

Pursuant to this Court's December 3, 2025 Order, HMTX Plaintiffs hereby inform the Court that they filed a petition for a writ of certiorari (attached) at the United States Supreme Court on February 20, 2026. *See HMTX Indus., LLC v. United States*, No. 25-1012 (U.S. Feb. 20, 2026).

Dated:  February 27, 2026          Respectfully submitted,

                              /s/ *Matthew R. Nicely*
                             Matthew R. Nicely
                             Pratik A. Shah
                             James E. Tysse
                             Devin S. Sikes
                             Daniel M. Witkowski
                             Sarah B. W. Kirwin

                             AKIN GUMP STRAUSS HAUER & FELD LLP
                             2001 K Street, N.W.
                             Washington, D.C. 20006
                              (202) 887-4000
                              mnicely@akingump.com

                             *Counsel to Plaintiffs HMTX Industries LLC,*
                             *Halstead New England Corporation, Metroflor*
                             *Corporation, and Jasco Products Company LLC*

# ATTACHMENT

No.

# In The
# Supreme Court of the United States

HMTX Industries, LLC, et al.,

*Petitioners,*

v.

United States, et al.

On Petition for a Writ of Certiorari
to the United States Court of Appeals
for the Federal Circuit

## PETITION FOR A WRIT OF CERTIORARI

Pratik A. Shah
  *Counsel of Record*
James E. Tysse
Matthew R. Nicely
Devin S. Sikes
Daniel M. Witkowski
Haley S. Gorman
Akin Gump Strauss
  Hauer & Feld LLP
2001 K Street NW
Washington, DC 20006
202-887-4000
pshah@akingump.com

*Counsel for Petitioners*

## QUESTION PRESENTED

Section 301(b) of the Trade Act of 1974, 19 U.S.C. § 2411 (the "Trade Act"), permits the U.S. Trade Representative ("USTR") to take all "appropriate and feasible action" to "obtain the elimination" of any "unreasonable or discriminatory" foreign trade practice that "burdens or restricts United States commerce." To invoke that authority, USTR must first pass through a gauntlet of procedural safeguards. *See id*. §§ 2411-2414.

Pursuant to Section 307 of the Act, and subject to far fewer procedural requirements, USTR may also "modify or terminate" a tariff action taken under Section 301 upon a finding that (as relevant here) the initial action is "no longer appropriate." 19 U.S.C. § 2417(a)-(b). In 2018, USTR relied on its modification authority to increase *ten-fold* the scope of its original Section 301 action, which had imposed duties on $50 billion in imports from China, to impose new duties of up to 25% on up to $550 billion in imports from China—virtually the entire U.S.-China trade portfolio.

The question presented is:

Whether USTR's streamlined authority under Section 307 to "modify" an existing tariff action confers on the agency essentially unlimited power to expand the scope of that initial action, as reflected in the ten-fold expansion challenged here.

(i)

ii

## PARTIES TO THE PROCEEDINGS

**1.**  Petitioners (Plaintiffs-Appellants below) are HMTX Industries, LLC; Halstead New England Corp.; Metroflor Corporation; and Jasco Products Company LLC.

**2.**  Respondents (Defendants-Appellees below) are the United States; Office of the United States Trade Representative; Jamieson Greer, U.S. Trade Representative; United States Customs and Border Protection; and Rodney S. Scott, Commissioner of U.S. Customs and Border Protection.

iii

## RULE 29.6 STATEMENT

Petitioner HMTX Industries LLC has parent companies, HMTX Acquisition LLC, Harlan Family Share Trust, and Peter Family Share Trust, with a greater than 10% ownership interest.

Petitioner Halstead New England Corp. has parent companies, HMTX Industries LLC, HMTX Acquisition LLC, Harlan Family Share Trust, and Peter Family Share Trust, with a greater than 10% ownership interest.

Petitioner Metroflor Corporation has parent companies, HMTX Industries LLC, HMTX Acquisition LLC, Harlan Family Share Trust, and Peter Family Share Trust, with a greater than 10% ownership interest.

Petitioner Jasco Products Company LLC has no parent corporation and no publicly held corporation owns 10% or more of its stock.

iv

# TABLE OF CONTENTS

QUESTION PRESENTED...........................................i

PARTIES TO THE PROCEEDINGS.........................ii

RULE 29.6 STATEMENT .........................................iii

INTRODUCTION.......................................................1

OPINIONS BELOW ...................................................3

JURISDICTION .........................................................4

RELEVANT CONSTITUTIONAL AND
STATUTORY PROVISIONS......................................4

STATEMENT OF THE CASE ...................................5

    A. Legal Framework.........................................5

    B. Background .................................................7

        *1. Section 301 Investigation Resulting
        in Lists 1 and 2* .......................................7

        *2. Modification Resulting in List 3* .............9

        *3. Modification Resulting in List 4* ...........11

    C. Procedural History.....................................13

REASONS FOR GRANTING THE WRIT.................16

  I. The Federal Circuit's Decision Conflicts
    With This Court's Precedents Twice Over. .....16

    A. The Massive Tariff Expansion Exceeds
       USTR's Streamlined Authority to
       "Modify" An Existing Action......................16

    B. The Major Questions Doctrine
       Reinforces That USTR Exceeded Its
       "Modification" Authority Here. .................22

v

II. The Question Presented Is Exceptionally
    Important. ....................................................... 30

CONCLUSION ........................................................ 33

APPENDIX

Appendix A: Opinion of the United States
Court of Appeals for the Federal Circuit,
*HMTX Industries, LLC v. USTR* (Sept. 25,
2025)........................................................................1a

Appendix B: Opinion and Order of the United
States Court of International Trade, *In re
Section 301 Cases* (Apr. 1, 2022) ........................39a

Appendix C: Opinion and Order of the United
States Court of International Trade, *In re
Section 301 Cases* (Mar. 17, 2023) ....................112a

Appendix D: Judgment of the United States
Court of Appeals for the Federal Circuit,
*HMTX Industries, LLC v. USTR* (Sept. 25,
2025)....................................................................140a

Appendix E: 19 U.S.C.A. § 2411 ......................142a

Appendix F: 19 U.S.C.A. § 2412........................154a

Appendix G: 19 U.S.C.A. § 2413 ......................157a

Appendix H: 19 U.S.C.A. § 2414 ......................159a

Appendix I: 19 U.S.C.A. § 2415........................164a

Appendix J: 19 U.S.C.A. § 2416 ......................168a

Appendix K: 19 U.S.C.A. § 2417 ......................173a

vi

# TABLE OF AUTHORITIES

<u>C<small>ASES</small></u>:

*Biden v. Nebraska*,
   600 U.S. 477 (2023) ............ 14, 16, 17, 18, 19, 21,
                                       22, 25, 26, 28, 29

*Crowell v. Benson*,
   285 U.S. 22 (1932) ............................................. 28

*Duncan v. Walker*,
   533 U.S. 167 (2001) ........................................... 21

*FDA v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000) ..................................... 22, 30

*Federal Energy Admin. v. Algonquin SNG, Inc.*,
   426 U.S. 548 (1976) ........................................... 27

*MCI Telecomms. Corp. v. AT&T*,
   512 U.S. 218 (1994) ................ 16, 17, 18, 19, 20,
                                              22, 28, 29

*Panama Refin. Co. v. Ryan*,
   293 U.S. 388 (1935) ........................................... 26

*Solar Energy Indus. Ass'n. v. United States*,
   86 F.4th 885 (Fed. Cir. 2023) ........................... 20

*Solid Waste Agency v. U.S. Army Corps of Eng'rs*,
   531 U.S. 159 (2001) ........................................... 28

vii

*TRW Inc. v. Andrews,*
   534 U.S. 19 (2001) ............................................. 20

*West Virginia v. EPA,*
   597 U.S. 697 (2022) .................. 22, 23, 26, 28, 30

*Whitman v. American Trucking Ass'ns,*
   531 U.S. 457 (2001) .................................... 23, 27

## CONSTITUTION AND STATUTES:

U.S. CONST.
   art. I, § 8 ............................................................ 5
   art. I, § 8, cl. 1 .................................................. 4
   art. I, § 8, cl. 3 .................................................. 4

19 U.S.C.
   § 2254(b)(1)(B) ................................................ 20
   § 2411 .............................................................. 29
   § 2411(a)(1) ..................................................... 29
   § 2411(b)(1) ....................................................... 5
   § 2411(b)(2) .................................... 5, 6, 18, 29
   § 2411(c)(1)(B) ................................................. 6
   § 2412 ............................................... 5, 18, 29
   § 2412(b)(1)(B) .................................................. 5
   § 2413 ............................................... 5, 18, 29
   § 2414 ............................................... 5, 18, 29
   § 2414(a)(2)(B) ........................................... 5, 18
   § 2415 ................................................................ 5
   § 2417(a)(1) ....................................................... 6
   § 2417(a)(1)(C) ............................................... 14
   § 2417(a)(2) ....................................................... 7
   § 2481(6) .................................................. 19, 20

viii

20 U.S.C.
   § 1098bb(a)(1) ................................................... 17

28 U.S.C.
   § 1254(1) ............................................................ 4
   § 1295(a)(5) ....................................................... 4
   § 1581(i)(1)(B) ............................................... 4, 33

Pub. L. No. 100-418, § 1301(a) Title I, 102
   Stat. 1107, 1174 (1988) .................................... 20

Trade Act of 1974, Title III of Pub. L. No.
   93-618, 88 Stat. 1978 (1975) ........................ 4, 20

### OTHER AUTHORITIES:

Addressing China's Laws, Policies,
   Practices, and Actions Related to
   Intellectual Property, Innovation, and
   Technology, 82 Fed. Reg. 39,007 (Aug.
   14, 2017) ............................................................ 7

Administration of Donald J. Trump,
   *Statement on China-United States Trade*,
   2018 DAILY COMP. PRES. DOC. 432 (June
   18, 2018) ............................................................ 9

CNBC TELEVISION, *USTR Jamieson Greer*
   *on EU Tech Fines: Number of*
   *Investigations We Could Conduct to Take*
   *Action* (YOUTUBE, Dec. 18, 2025)...................... 32

CNBC TELEVISION, *Watch CNBC's Full*
   *Interview with Commerce Secretary*
   *Howard Lutnick* (YOUTUBE, Sep. 5, 2025) ....... 32

ix

Donald J. Trump (@realDonaldTrump),
    TWITTER (Aug. 1, 2019, 1:26 PM EST) ............ 12

Implementation of the U.S.-EC Beef
    Hormones Memorandum of
    Understanding, 74 Fed. Reg. 48,808
    (Sep. 24, 2009) .................................................. 24

*Jacobs, Jennifer, Shawn Donnan, Andrew
    Mayeda, & Saleha Mohsin, Trump to
    Back $200 Billion China Tariffs as Early
    as Next Week, Sources Say*, BLOOMBERG
    (Aug. 31, 2018) ................................................. 10

Modification of Action Under Section 301(b);
    Out-of-Cycle Review Under Section 182;
    and Request for Public Comment:
    Intellectual Property Laws and Practices
    of the Government of Ukraine, 70 Fed.
    Reg. 53,410 (Sep. 8, 2005) ............................... 24

Modification of Determination of Action
    Pursuant to Section 301 Concerning
    Canadian Exports of Softwood Lumber;
    Opportunity for Comment, 57 Fed. Reg.
    44,609 (Sep. 28, 1992) ...................................... 24

MORNINGS WITH MARIA, *Trump Economist
    Kevin Hassett: 'We're Looking at One of
    the Best Years We've Ever Seen'* (FOX
    BUSINESS, Jan. 16, 2026) .................................. 32

x

NEW YORK TIMES EVENTS AND THE NEW
    YORK TIMES, *Treasury Secretary Scott
    Bessent Says He's 'Evolved' on Tariffs:
    Dealbook Summit 2025* (YOUTUBE, Dec.
    3, 2025) .......................................................... 32

Notice of Action and Request for Public
    Comment Concerning Proposed
    Determination of Action Pursuant to
    Section 301, 83 Fed. Reg. 28,710 (June
    20, 2018) ............................................................. 8

Notice of Action Pursuant to Section 301, 83
    Fed. Reg. 40,823 (Aug. 16, 2018) ....................... 8

Notice of Determination and Request for
    Public Comment Concerning Proposed
    Determination of Action Pursuant to
    Section 301: China's Acts, Policies, and
    Practices Related to Technology
    Transfer, Intellectual Property, and
    Innovation, 83 Fed. Reg. 14,906 (Apr. 6,
    2018) .................................................................... 8

Notice of Modification of Section 301 Action,
    83 Fed. Reg. 47,974 (Sep. 21, 2018) ................. 10

Notice of Modification of Section 301 Action,
    84 Fed. Reg. 20,459 (May 9, 2019) ................... 11

Notice of Modification of Section 301 Action,
    84 Fed. Reg. 43,304 (Aug. 20, 2019) ................ 12

xi

Notice of Modification of Section 301 Action,
84 Fed. Reg. 45,821 (Aug. 30, 2019) ................ 12

Notice of Modification of Section 301 Action,
84 Fed. Reg. 69,447 (Dec. 18, 2019) ................. 13

Notice of Modification of Section 301 Action,
85 Fed. Reg. 3,741 (Jan. 22, 2020) ................... 13

Office of the U.S. Trade Representative,
Request for Public Comment Concerning
Proposed Modification of Action
Pursuant to Section 301 (last visited Feb.
12, 2026) .......................................................... 10

Press Release, Office of the U.S. Trade
Representative, Statement by U.S. Trade
Representative Robert Lighthizer on
Section 301 Action (Aug. 1, 2018) .................... 10

Press Release, Office of the U.S. Trade
Representative, Under Section 301
Action, USTR Releases Proposed Tariff
List on Chinese Products (Apr. 3, 2018) ............. 8

Request for Comments Concerning Proposed
Modification of Action Pursuant to
Section 301, 83 Fed. Reg. 33,608 (July
17, 2018) ............................................................ 9

Request for Comments Concerning Proposed
Modification of Action Pursuant to
Section 301, 84 Fed. Reg. 22,564 (May
17, 2019) .......................................................... 11

xii

Results of Out-Of-Cycle Review Under
    Section 182 and Termination of Action
    Under Section 301(b): Intellectual
    Property Laws and Practices of the
    Government of Ukraine, 71 Fed. Reg.
    5,899 (Feb. 3, 2006) ........................................... 24

Termination of Action: Protection of
    Intellectual Property Rights by the
    Government of Honduras, 63 Fed. Reg.
    35,633 (June 30, 1998) ...................................... 24

Termination of Section 301 Investigation
    and Action Regarding the People's
    Republic of China's Protection of
    Intellectual Property and Provision and
    Market Access to Persons Who Rely on
    Intellectual Property Protection, 60 Fed.
    Reg. 12,582 (Mar. 7, 1995) ................................ 24

*York, Erica & Alex Durante, Trump Tariffs:*
    *Tracking The Economic Impact of the*
    *Trump Trade War*, TAX FOUND. (Feb. 6,
    2026) ................................................................. 26

## INTRODUCTION

This case presents a critical question: whether there are enforceable limits on USTR's ability to expand a tariff action promulgated under Section 301 of the Trade Act for however long, by whatever amount, and by whatever means USTR chooses. After imposing tariffs on $50 billion of imports from China—an amount USTR deemed "commensurate" with the specific harms from China's trade practices that it investigated—USTR announced "supplemental" tariffs to cover another roughly $500 billion of imports, *i.e.*, virtually the entire U.S.-China trade portfolio. That radical escalation transgressed the statutory limits carefully delineated by Congress when delegating the exercise of its constitutional foreign-trade and tariffing powers to USTR.

Section 301 of the Trade Act allows USTR, a federal agency, to investigate and take action to address a foreign country's unfair trade practices. The statute also permits USTR, via tailored provisions in Section 307, to "modify or terminate" an existing Section 301 action under specific circumstances. But Congress nowhere gave USTR the vast power to engage in an open-ended trade war under that modest modification provision.

Yet that is precisely what happened here. Following a seven-month investigation, USTR determined that four discrete categories of China's practices related to intellectual property and technology transfer burdened U.S. commerce, and imposed "commensurate" tariffs on goods from China across two actions ("List 1" and "List 2") covering $50 billion worth of imports. Although amounting to one

(1)

2

of the largest tariff actions in U.S. history, Lists 1 and 2 were arguably within the authority Congress delegated to USTR under Section 301.

What USTR did after that, however, was not. After China reacted with countermeasures of its own on an equal $50 billion worth of U.S. goods imported into China, USTR retaliated immediately in extreme fashion: first imposing 10% duties (later increased to 25%) on an additional $200 billion in Chinese imports ("List 3"), and then imposing duties of 15% (later reduced to 7.5%) on approximately $120 billion more ("List 4A"). (A third tranche of "List 4B" tariffs on approximately $180 billion in additional imports, bringing the total ten-fold increase to $500 billion, has been suspended.) Although dubbed "supplemental," the tariffs now in effect dwarf the Section 301 tariff response originally deemed "appropriate" to the discrete set of Chinese practices USTR investigated—levying a nearly $75 billion annual tax on U.S. purchasers without Congressional action or imprimatur.

The text and structure of the Trade Act confirm that Congress never intended such a result. And more than 4,200 cases have been filed by importers at the Court of International Trade ("CIT") challenging it. But the Federal Circuit nonetheless blessed USTR's order-of-magnitude increase, deeming it an acceptable "modification" of the agency's initial action. That conclusion disregards decades of precedent from this Court establishing that statutory authority to "modify" allows an agency to make minor or modest changes, not radical transformations. It also

3

contravenes this Court's guidance that Congress should not be presumed to delegate the sweeping authority USTR claims without a clear statement of its intent to do so.

That USTR's "modification" continues to impose billions of dollars in taxes on the American public each month is enough to warrant this Court's review. But the obvious future consequences of the Federal Circuit's decision make this Court's review indispensable. Without intervention, the decision below arms the Executive Branch with far greater authority than Congress delegated: USTR can first impose modest "appropriate" tariffs under Section 301, pursuant to that provision's rigid safeguards, but then use Section 307's streamlined "modification" procedures to explode the scope of those tariffs for virtually any reason, at any time, on any product, by any magnitude. That the Federal Circuit is the only court of appeals with jurisdiction over Section 301 cases only makes matters worse: There is no possibility of further percolation, just the certainty of further escalation.

This Court should grant certiorari.

## OPINIONS BELOW

The Federal Circuit's opinion is reported at 156 F.4th 1236 and reproduced at App., *infra*, 1a-38a. The Court of International Trade's first opinion is reported at 570 F. Supp. 3d 1306 and reproduced at App., *infra*, 39a-111a. Its second opinion is reported at 628 F. Supp. 3d 1235 and reproduced at App., *infra*, 112a-139a.

4

## JURISDICTION

The CIT had jurisdiction under 28 U.S.C. § 1581(i)(1)(B). The Federal Circuit had jurisdiction under 28 U.S.C. § 1295(a)(5), and issued its opinion on September 25, 2025. On December 4, 2025, this Court granted an application for an extension of time to file this petition on or before February 20, 2026. This Court has jurisdiction under 28 U.S.C. § 1254(1).

## RELEVANT CONSTITUTIONAL AND STATUTORY PROVISIONS

Article I, Section 8 of the United States Constitution states

> The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States[.]

> Cl. 1.

> To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes[.]

> Cl. 3.

The relevant provisions of the Trade Act of 1974, Title III of Pub. L. No. 93-618, 88 Stat. 1978 (1975), are reproduced in the appendix to this petition. App., *infra*, 142a-175a.

5

## STATEMENT OF THE CASE

### A.  Legal Framework

The Constitution grants Congress the power to "lay and collect Taxes, Duties, Imposts and Excises," as well as to "regulate Commerce with foreign Nations." U.S. CONST. art. I, § 8.  In the Trade Act, Congress delegated to USTR the power to exercise some tariffing authority but only within specified constraints.

The Trade Act defines two types of USTR action, with different criteria: (1) "mandatory" action under Section 301(a), and (2) "discretionary" action under Section 301(b).  This case involves Section 301(b), under which USTR has discretion to act upon a showing that "an act, policy, or practice of a foreign country" is "unreasonable or discriminatory" and "burdens or restricts United States commerce."  19 U.S.C. § 2411(b)(1).  Congress imposed strict procedural requirements before USTR is permitted to take action, including: an investigation into the allegedly unreasonable activities (*id.* § 2412); consultation with committees representing the private sector and state and local governments (*id.* §§ 2412(b)(1)(B), 2415), and with the investigated foreign country (*id.* § 2413); factual findings in a written report (*id.* § 2414); and a twelve-month deadline to impose an "appropriate" action (*id.* §§ 2411(b)(2), 2414(a)(2)(B)).

After the investigation, USTR must determine whether "action by the United States is appropriate." 19 U.S.C. § 2411(b)(2).  If USTR so determines, USTR may "take all appropriate and feasible action

6

authorized under [Section 301(c)], subject to the specific direction, if any, of the President regarding any such action, and all other appropriate and feasible action within the power of the President that the President may direct the Trade Representative to take under this subsection, to obtain elimination of that act, policy, or practice." *Id.* Among other responses, Section 301(c) authorizes USTR to "impose duties or other import restrictions on the goods of" the foreign country "for such time as the Trade Representative determines appropriate." *Id.* § 2411(c)(1)(B).

Once a Section 301 action has been implemented, Section 307(a)(1) allows USTR to "modify or terminate" the action in specified circumstances:

> The Trade Representative may modify or terminate any action, subject to the specific direction, if any, of the President with respect to such action, that is being taken under [Section 301] of this title if—
>
>> (A) any of the conditions described in [Section 301(a)(2)] exist,
>>
>> (B) the burden or restriction on United States commerce of the denial rights, or of the acts, policies, and practices, that are the subject of such action has increased or decreased, or
>>
>> (C) such action is being taken under [Section 301(b)] and is no longer appropriate.

19 U.S.C. § 2417(a)(1).

7

In contrast to the procedural requirements for initial actions, Congress imposed only nebulous consultation requirements on USTR before it may "modify" an existing action under Section 307—that is, USTR need only consult with representatives of the affected domestic industry and allow other affected parties to present their views concerning the effects and appropriateness of the modification or termination. 19 U.S.C. § 2417(a)(2). Unlike with an initial Section 301 determination, the modification provision requires no investigation; no deadline; no consultations with committees representing the private sector, state and local governments, or the foreign country subject to the action; no investigatory report; and no fact-finding.

### B.  Background

#### 1.  *Section 301 Investigation Resulting in Lists 1 and 2*

In August 2017, President Trump directed USTR to initiate a Section 301 investigation into China's practices that "may be harming American intellectual property rights, innovation, or technology development." Addressing China's Laws, Policies, Practices, and Actions Related to Intellectual Property, Innovation, and Technology, 82 Fed. Reg. 39,007, 39,007 (Aug. 14, 2017). USTR eventually determined that four particular categories of Chinese government policies and actions "are unreasonable or discriminatory and burden or restrict U.S. commerce": (1) forced technology transfer through foreign ownership restrictions; (2) administrative review and licensing processes; (3) technology regulations; and

8

(4) IP theft through cyber intrusions into U.S. companies. Notice of Determination and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation, 83 Fed. Reg. 14,906, 14,906-14,907 (Apr. 6, 2018).

In its determination, USTR stated its intention to implement, under Section 301, a "duty of 25 percent on a list of products of Chinese origin" with a total value of "$50 billion in terms of estimated annual trade value for calendar year 2018." Notice of Determination, 83 Fed. Reg. at 14,907. USTR explained that $50 billion was "commensurate with an economic analysis of the harm caused by China's unreasonable technology-transfer policies to the U.S. economy, as covered by USTR's Section 301 investigation." Press Release, Office of the U.S. Trade Representative, Under Section 301 Action, USTR Releases Proposed Tariff List on Chinese Products (Apr. 3, 2018).[1] It eventually imposed that level of tariffs via two lists of Harmonized Tariff Schedule of the United States ("HTSUS") items (Lists 1 and 2) in June and August 2018, respectively. *See* Notice of Action and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301, 83 Fed. Reg. 28,710, 28,711 (June 20, 2018); Notice of Action Pursuant to Section 301, 83 Fed. Reg. 40,823 (Aug. 16, 2018). Petitioners do not challenge

---

[1] https://ustr.gov/about-us/policy-offices/press-office/press-releases/2018/april/under-Section-301-action-ustr.

9

the imposition of duties on Lists 1 and 2 products in this action.

> 2.    *Modification Resulting in List 3*

In response to the unilateral imposition of tariffs pursuant to Lists 1 and 2, China imposed 25% retaliatory duties on $50 billion worth of imports from the United States.  President Trump then reacted to China's own tariff actions by directing USTR, before List 2 was even finalized, to prepare for the imposition of additional duties on products from China with an estimated trade value of $200 billion—an amount that, when combined with the imports subject to the tariffs imposed pursuant to Lists 1 and 2, encompassed roughly half of all U.S. trade with China. Administration of Donald J. Trump, *Statement on China-United States Trade*, 2018 DAILY COMP. PRES. DOC. 432 (June 18, 2018).

One month later, USTR published notice of its proposal, under Section 307, to "modify the action in this investigation *** by taking a further, supplemental action"—specifically, "an additional 10 percent *ad valorem* duty on products [from] China *** [with] an annual trade value of approximately $200 billion," spanning 6,031 HTSUS tariff subheadings (List 3).  Request for Comments Concerning Proposed Modification of Action Pursuant to Section 301, 83 Fed. Reg. 33,608, 33609 (July 17, 2018).  USTR at this point made clear that "action at this level is appropriate in light of the level of China's announced retaliatory action ($50 billion) and the level of Chinese goods imported into the United States ($505 billion in 2017)."  *Id.*  Weeks later, USTR further announced

10

that, in light of China's retaliatory duties, USTR would propose to increase the duty on List 3 from 10% to 25%, premised once more on China's "illegal[] retaliat[ion] against U.S. workers, farmers, ranchers and businesses."  Press Release, Office of the U.S. Trade Representative, Statement by U.S. Trade Representative Robert Lighthizer on Section 301 Action (Aug. 1, 2018).[2]

Despite the overwhelming majority (~98%) of over 6,000 comments expressing deep and widespread concern for American businesses and consumers,[3] the Administration suggested—even before the truncated comment period ended—that USTR was ready to impose the new tariffs on List 3 immediately.[4]  Just twelve days after the comment deadline, without addressing any of the comments, USTR published notice of its final List 3.  Notice of Modification of Section 301 Action, 83 Fed. Reg. 47,974 (Sep. 21, 2018).

On May 9, 2019, USTR issued a Federal Register notice announcing its intention to raise tariffs on List

---

[2] https://ustr.gov/about-us/policy-offices/press-office/press-releases/2018/august/statement-us-trade-representative.

[3] Office of the U.S. Trade Representative, Request for Public Comment Concerning Proposed Modification of Action Pursuant to Section 301, https://www.regulations.gov/docket?D=USTR-2018-0026 (last visited Feb. 12, 2026).

[4] *See* Jennifer Jacobs, Shawn Donnan, Andrew Mayeda, & Saleha Mohsin, *Trump to Back $200 Billion China Tariffs as Early as Next Week, Sources Say*, BLOOMBERG (Aug. 31, 2018), https://www.bloomberg.com/news/articles/2018-08-30/trump-said-to-back-200-billion-china-tariffs-early-as-next-week.

11

3 goods to 25%.  Notice of Modification of Section 301 Action, 84 Fed. Reg. 20,459 (May 9, 2019).  USTR did not rely on any increased burden on U.S. commerce from the originally investigated Chinese trade practices to justify this increase.  *Id.*

### 3.    *Modification Resulting in List 4*

Just eight days after announcing the increase in the List 3 duty rate to 25%, USTR announced its intention to proceed under Section 307 with List 4, which would subject an additional $300 billion worth of products imported from China to up to 25% tariffs. Request for Comments Concerning Proposed Modification of Action Pursuant to Section 301, 84 Fed. Reg. 22,564 (May 17, 2019).    USTR again declared that its proposed additional action was based on China's responsive actions, not any increased burdens or restrictions from the originally investigated acts and practices:  "In light of China's failure to meaningfully address the acts, policies, and practices that are subject to this investigation and its response to the current action being taken in this investigation," USTR "propose[d] to modify the [Section 301] action" by increasing the value of products subject to tariffs by approximately $500 billion total—*i.e.*, a ten-fold increase over the initial action.  *Id.* at 22,564.

On August 1, 2019, citing China's failure to follow through on agricultural purchases and to reduce exports of fentanyl flowing into the United States (with no mention of the originally investigated acts and practices), President Trump announced on Twitter that the List 4 tariffs would become effective

12

September 1 at a rate of 10%. Donald J. Trump
(@realDonaldTrump), TWITTER (Aug. 1, 2019, 1:26 PM
EST).[5]

Later that month, USTR issued a final notice
adopting List 4 in two tranches. Notice of Modification
of Section 301 Action, 84 Fed. Reg. 43,304 (Aug. 20,
2019). List 4A would impose a 10% duty on goods
worth approximately $120 billion, effective September
1, 2019. *Id*. at 43,304. List 4B would impose a 10%
duty on the remaining goods (with limited exclusions
"based on health, safety, national security, and other
factors"), effective December 15, 2019. *Id*. at 43,305.
Once again, USTR addressed none of the nearly 3,000
comments outlining expansive harms to American
businesses and consumers, other than to claim that its
determination "takes account of the public comments."
*Id*. Just ten days later, and without receiving further
public comment, USTR published a notice increasing
the duty rate on List 4 products to 15%. Notice of
Modification of Section 301 Action, 84 Fed. Reg. 45,821
(Aug. 30, 2019).

In sum, in the span of one year, USTR's Section
301 tariff actions expanded from covering roughly 10%
of Chinese imports (via Lists 1 and 2, which USTR had
deemed "commensurate" with the harm caused by the
originally identified Chinese acts and practices) to
covering nearly all imports from China (via Lists 3, 4A,
and 4B). On December 18, 2019, citing a limited trade
deal with China, USTR published notice that it would

---

[5]
https://twitter.com/realDonaldTrump/status/1156979446877962
243?lang=en.

13

"suspend indefinitely the imposition of additional duties" on List 4B. Notice of Modification of Section 301 Action, 84 Fed. Reg. 69,447, 69,447 (Dec. 18, 2019). USTR also later halved the duty rate (to 7.5%) for List 4A. Notice of Modification of Section 301 Action, 85 Fed. Reg. 3,741 (Jan. 22, 2020). Otherwise, List 4A, along with Lists 1, 2, and 3, remains in effect to this day.

### C. Procedural History

1. In 2020, Petitioners, American businesses that import products subject to the List 3 and 4A tariffs, filed suit at the CIT. Their complaint seeks vacatur of those tariff actions and refunds of any duties paid on grounds that they were issued without statutory authority and in violation of the Administrative Procedure Act ("APA"). Over 4,200 additional actions have been filed raising substantially similar claims. This action was selected as the "sample case," and subsequent actions were stayed pending resolution of this action. Standard Procedural Order 21-04, *HMTX Indus., LLC v. United States*, No. 1:20-cv-00177-3JP (C.I.T. Mar. 31, 2021), ECF No. 45. Defendants moved to dismiss or, alternatively, for judgment on the agency record, while Petitioners cross-moved for judgment.

In 2022, the CIT issued its first decision. The CIT held that the List 3 and 4A tariff actions were within USTR's authority under Section 307(a)(1)(B) to "modify" an initial Section 301 action upon a determination that "the burden or restriction on United States commerce" from the targeted practices "has increased or decreased." App., *infra*, 74a-81a.

14

The CIT did not reach the parties' arguments on whether Section 307(a)(1)(C) independently supported Lists 3 and 4A. *Id.* at 81a. It then concluded that USTR failed to consider adequately thousands of comments from interested parties and ordered the agency to reconsider or further explain its tariff actions. *Id.* at 88a-98a. In 2023, after review of USTR's explanations on remand, the CIT rejected Petitioners' arguments that the determination was conclusory and *post hoc*, and entered judgment sustaining Lists 3 and 4A. *Id.* at 112a-139a.

2. In September 2025, a panel of the Federal Circuit affirmed. At the outset, it rejected USTR's argument that the List 3 and 4A tariffs were the result of discretionary decisions by the President and thus unreviewable under the APA. App., *infra*, 18a-20a.

Turning to the merits, the Federal Circuit declined to address the CIT's conclusion that USTR's actions fit within the agency's modification authority under Section 307(a)(1)(B). Instead, it held that USTR's actions were permissible on an alternative ground—namely, Section 307(a)(1)(C), which allows the agency to modify an initial Section 301 action upon a determination that "such action is 'no longer appropriate.'" App., *infra*, 20a-27a (quoting 19 U.S.C. § 2417(a)(1)(C)). The Federal Circuit dismissed as off-point this Court's intervening decision in *Biden v. Nebraska*, which limited the word "modify" to modest or incremental changes, on the ground that the circumstances in *Biden* "implicate[d] separation of powers concerns not at issue here." *Id.* at 22a (citing 600 U.S. 477, 494, 505 (2023)). The court further

15

concluded that the term "modify" in Section 307(a)(1) "is indifferent to degrees of change and contains no inherent limitations." *Id.* at 21a. It thus affirmed USTR's decision to dramatically expand the original Section 301 actions through Section 307's truncated modification procedures. *Id.* at 19a-20a.

The Federal Circuit also rejected Petitioners' arguments under the nondelegation and major questions doctrines. App., *infra*, 27a-30a. In particular, it characterized this Court's previous major-questions cases as those in which "agencies attempted to modify the very nature of their regulatory authority." *Id.* at 29a. Because USTR "modified its own *** original action in this case, not the underlying Trade Act," and because the Trade Act "permits USTR to impose and modify tariffs in response to unfair foreign trade practices," the Federal Circuit concluded "this cannot be a major questions case." *Id.* at 30a.[6]

This timely petition followed.

---

[6] The Federal Circuit also affirmed the CIT's holding that USTR's "elaboration on remand remedied" any APA procedural violations, App., *infra*, 30a-31a—an issue not raised in this petition.

16

## REASONS FOR GRANTING THE WRIT

**I.   The Federal Circuit's Decision Conflicts With This Court's Precedents Twice Over.**

### A.   The Massive Tariff Expansion Exceeds USTR's Streamlined Authority to "Modify" An Existing Action.

"[S]tatutory permission to 'modify' does not authorize 'basic and fundamental changes.'" *Biden,* 600 U.S. at 494 (quoting *MCI Telecomms. Corp. v. AT&T*, 512 U.S. 218, 225 (1994)).   Instead, in both ordinary and legal definitions, the word "carries 'a connotation of increment or limitation,' and must be read to mean 'to change moderately or in minor fashion.'"   *Id.* (citation omitted); *see also MCI*, 512 U.S. at 225-228 (relying on dictionaries published between 1987-1990, contemporaneous with Section 307's addition in the Trade Act of 1988.   Just as "[t]he authority to 'modify' statutes and regulations allows [an agency] to make modest adjustments   and additions to existing provisions," Section 307(a)(1)'s authority  to "modify" tariff actions allows USTR to make modest adjustments to its initial Section 301 action, not to "transform" it into a trade war.   *Biden*, 600 U.S. at 495.   Yet USTR's "modification" of its initial targeted action on approximately 10% of Chinese imports imposed new tariffs on nearly the entire U.S.-China trade portfolio.

1.   This Court first grappled with the scope of statutory authority to "modify" in *MCI*.   There, it canvassed dictionaries and concluded that the ordinary meaning of the term is "to change moderately or in minor fashion."   512 U.S. at 225.   "[E]xtensive"

17

and "fundamental" changes, it held, do not qualify.  *Id.* at 231.  So when the Federal Communications Commission ("FCC") tried to change a requirement at "the heart" of the statute, this Court rebuffed the attempt—even though Congress had expressly granted the agency the power to "modify any requirement" under that section.  *Id.* at 225, 229.  In so doing, this Court rejected the FCC's contention that "modify" is agnostic to the "degree" of a given change.  *Id.* at 227.

So too in *Biden*.  Under the HEROES Act, Congress expressly empowered the Education Secretary to "modify any statutory or regulatory provision applicable to" federal student loan programs in connection with a national emergency.  20 U.S.C. § 1098bb(a)(1).  Approving *MCI*'s interpretation of "modify," this Court rejected the Education Secretary's attempt to cancel $430 billion in student loan debt (in conjunction with President Biden's pandemic-based emergency declaration) as a "modification" of existing statutory and regulatory provisions.  It explained that the Secretary had, "[f]rom a few narrowly delineated situations specified by Congress," "expanded forgiveness to nearly every borrower in the country."  *Biden*, 600 U.S. at 496.  That creation of a "novel and fundamentally different loan forgiveness program" was far more than a "mere modification."  *Id.* at 496, 499-500.

The same analysis compels the same conclusion in this case:  Rocketing up the scope of tariffs ten-fold to cover nearly all imports from China is not the type of "moderate" or "minor" change authorized under

18

Section 307 as a "modif[ication]" of an initial Section 301 action. *Biden*, 600 U.S. at 496; *see id.* (rejecting Secretary's attempt to expand tailored forgiveness provisions to cover 98.5% of borrowers nationwide).

The statutory framework under Sections 301 and 307 of the Trade Act reinforces that conclusion. Congress permits the imposition of tariffs under Section 301(b) only after USTR jumps through a series of congressionally imposed hoops, including investigation and consultation requirements, 19 U.S.C. §§ 2412-2413, written factual findings, *id.* § 2414, and a twelve-month deadline to choose "appropriate" action, *id.* §§ 2411(b)(2), 2414(a)(2)(B). Section 307(a)(1), by contrast, contains few procedural protections and requires no further investigation or specific factual findings before USTR may "modify" the original "appropriate" action. It is thus difficult to imagine that Congress, in subjecting "modif[ications]" under Section 307 to far fewer procedural safeguards than an initial Section 301 action, meant to allow USTR to proceed with a *ten-fold escalation* of its original action, covering virtually every import from one of the U.S.'s largest trading partners.[7]

2. There is no serious dispute over whether USTR's action is sufficiently modest to qualify as a "modification" under *Biden* and *MCI*; neither the government below nor the Federal Circuit suggest it

---

[7] Had USTR fully implemented List 4 (instead of suspending List 4B), List 4 would have covered approximately $550 billion total, thereby increasing the original action from under 10% to nearly 100% of annual imports from China.

19

is. Instead, the government urged and the Federal Circuit agreed that Section 307(a)(1)(C)'s modification authority allows USTR to change an initial Section 301 action by *any* magnitude. *See* App., *infra*, 21a (holding that "modify" is "indifferent to degrees of change and contains no inherent limitations"). The only possible limitation the court identified—albeit a nonjusticiable one, according to the government— stems from other expansive language in the statute. *See id.* at 25a-28a (suggesting that the phrase "no longer appropriate" limits Section 307(a)(1)(C) modifications to those "that would have been permissible in the first instance under Section 301(b)"). But the Federal Circuit's reasons for so concluding do not hold up to scrutiny.

To the Federal Circuit, this Court's holdings in *Biden* and *MCI* as to the ordinary meaning of "modify" have no bearing on Section 307, because the Trade Act contains a definition of "modification" that "includes the elimination of any duty or import restriction." App., *infra*, 21a (quoting 19 U.S.C. § 2481(6)). The Federal Circuit posited that "the only example of a modification provided" in that definition— "elimination" of a duty—"encompasses major changes because the relative impact of a duty could be large." *Id.* From that premise, the Federal Circuit concluded "modify" as used in Section 307(a)(1) must depart from the term's ordinary meaning as laid out in *Biden* and *MCI*. *Id.* at 21a-22a.

But the definition of "modification" in Section 601(6), which not even the government raised as relevant to the interpretation of Section 307, cannot

20

bear the weight of the Federal Circuit's holding. Indeed, the Federal Circuit previously applied Section 601(6) in interpreting the term "modify" elsewhere in the Trade Act and nonetheless concluded that "[o]n any reading, a 'modification' must be a relatively minor adjustment; expansion of a 1% duty to a 50% duty is obviously not a minor change." *Solar Energy Indus. Ass'n v. United States*, 86 F.4th 885, 896, 901 (Fed. Cir. 2023) (interpreting 19 U.S.C. § 2254(b)(1)(B)) (citing *MCI*, 512 U.S. at 225).[8]

In any event, Section 307(a)—added more than a decade after Section 601(6), *see* Title III, Pub. L. No. 93-618, § 307, 88 Stat. 1978 (1975), as added Title I, Pub. L. No. 100-418, § 1301(a), 102 Stat. 1107, 1174 (1988)—grants USTR the authority to "modify or terminate" any prior action under Section 301. It is thus clear that Congress did not mean to "include[] the elimination of any duty or other import restriction," 19 U.S.C. § 2481(6), within Section 307(a)'s use of "modify"; if it had, the phrase "or terminate" would be superfluous. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to

---

[8] The Federal Circuit attempted to distinguish *Solar Energy* with reference to a separate statutory "phase-down requirement" applicable there that placed "an explicit upward limit to the President's power to 'modify' *** that is not present on USTR's power to 'modify' an action under Section 307." App., *infra*, 22a. But *Solar Energy* itself makes clear that the phase-down requirement provided an additional reason, independent of the meaning of "modify," to cabin the statute's authorization. *See Solar Energy*, 86 F.4th at 901; *see also id.* at 896 (citing *MCI* as holding that "'modify' typically connotes moderate change").

21

be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'") (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)).

Notably, *Biden* itself concerned a parallel provision allowing the Education Secretary to "waive or modify" certain statutory and regulatory provisions. There, this Court rejected the exact reasoning on which the Federal Circuit relied. *See Biden*, 600 U.S. at 498 (rejecting argument that "[b]ecause waiver allows the Secretary 'to eliminate legal obligations in their entirety,' *** the combination of 'waive or modify' allows him 'to reduce them to any extent short of waiver'—even if the power to 'modify' ordinarily does not stretch that far"). Instead, it concluded that "modify," even when paired with the authority to "waive" provisions altogether, still carried its ordinary meaning. *Id.* at 500.

The Federal Circuit's only other attempt to distinguish *Biden* similarly falls flat. The Federal Circuit contended that "in *Biden*, the Court was concerned with the power of the Secretary of Education to 'modify' 'statutory or regulatory provisions' promulgated by Congress, which implicates separation of powers concerns not at issue" in Section 307. App., *infra*, 22a (quoting 600 U.S. at 494). But nowhere did this concern surface in *Biden*'s exegesis of the "ordinar[y]" meaning of "modify," which the Court explained "alone preclude[d] the Secretary's program." 600 U.S. at 494-495, 506 n.9. Indeed, the only separation-of-powers concern mentioned by the *Biden* court stemmed from its application of the major

22

questions doctrine, triggered by the "'economic and political significance' of the Secretary's action," *id.* at 502 (quoting *West Virginia v. EPA*, 597 U.S. 697, 721 (2022)), which "reinforce[d] [the Court's] conclusion but [was] not necessary to it," *id.* at 507 (Barrett, J., concurring). As explained below, *infra* Section I.B, the major questions doctrine applies with full force to this case.

The Federal Circuit thus erred in concluding that "modify" in Section 307 carries a meaning different than its ordinary one, as articulated in *Biden* and *MCI*. USTR's authority to "modify" an initial action under Section 301 is not, in fact, "indifferent to degrees of change." App., *infra*, 21a. And because no one contends—nor could they—that USTR's expansion was a "moderate" or "minor" modification of its initial Section 301 action, the List 3 and 4A tariffs cannot stand.

## B.    The Major Questions Doctrine Reinforces That USTR Exceeded Its "Modification" Authority Here.

The major questions doctrine further undercuts USTR's claim of expansive "modification" authority under Section 307 to engage in an open-ended trade war. That doctrine implicates "cases in which the 'history and the breadth of the authority that [the agency] has asserted,' and the 'economic and political significance' of that assertion, provide a 'reason to hesitate before concluding that Congress' meant to confer" sweeping authority. *West Virginia*, 597 U.S. at 721 (alteration in original) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159-160

23

(2000)). In those cases, "something more than a merely plausible textual basis for the agency action is necessary. The agency instead must point to clear congressional authorization for the power it claims." *Id.* at 723 (internal quotation marks omitted). That is because "[e]xtraordinary grants of regulatory authority are rarely accomplished through 'modest words,' 'vague terms,' or 'subtle device[s].'" *Id.* (alteration in original) (quoting *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 468 (2001)). The doctrine thus underscores that Section 307's use of "modify" cannot support essentially limitless tariff escalations.

1. This is a classic example of a "major questions" case. As in *West Virginia*, USTR (1) "claim[ed] to discover in a long-extant statute an unheralded power representing a transformative expansion in [its] regulatory authority," (2) "located that newfound power in the vague language of an ancillary provision[] of the Act" that "had rarely been used in the preceding decades," and (3) took action of "vast economic and political significance." 597 U.S. at 716, 724 (alterations in original) (internal quotation marks and citations omitted).

*First*, although USTR claimed below that the power to inflate duties and prosecute a trade war was critical to trade policy, USTR has almost never used those modification authorities—and certainly never to wage a trade war. Specifically, until this episode, it had invoked its Section 307(a)(1)(C) authority only five other times in the provision's four-decade history— always (as USTR admitted in the CIT) to "reduce,

24

terminate or delay section 301 actions," Ct. App. J.A. 9778 n.6, *HMTX Indus., LLC v. United States*, No. 23-1891 (Fed. Cir. Feb. 20, 2024), ECF No. 47-5—never to transform them.[9]  And it had invoked its authority under 307(a)(1)(B) just once—also to *terminate* duties. *See* Implementation of the U.S.-EC Beef Hormones

---

[9] In three of those instances, including in a prior action against China, USTR terminated the action completely.  *See* Termination of Section 301 Investigation and Action Regarding the People's Republic of China's Protection of Intellectual Property and Provision and Market Access to Persons Who Rely on Intellectual Property Protection, 60 Fed. Reg. 12,582, 12,583 (Mar. 7, 1995) ("Section 307(a)(1)(C) of the Trade Act authorizes the USTR to terminate any action *** if, inter alia, the USTR determines that the action being taken under section 301(b) of the Trade Act is no longer appropriate."); Results of Out-Of-Cycle Review Under Section 182 and Termination of Action Under Section 301(b): Intellectual Property Laws and Practices of the Government of Ukraine, 71 Fed. Reg. 5,899 (Feb. 3, 2006); Termination of Action: Protection of Intellectual Property Rights by the Government of Honduras, 63 Fed. Reg. 35,633 (June 30, 1998).  On another occasion, USTR decided to terminate in part a Section 301 action after "the Government of Ukraine *** addressed one of the two issues *** that were the basis of *** the Trade Representative's finding that Ukraine's inadequate IPR protections were actionable under Section 301(b)."  Modification of Action Under Section 301(b); Out-of-Cycle Review Under Section 182; and Request for Public Comment: Intellectual Property Laws and Practices of the Government of Ukraine, 70 Fed. Reg. 53,410, 53,411 (Sep. 8, 2005).  In the last instance, USTR delayed implementation of a Section 301(b) action to allow for completion of review under a trade agreement.  *See* Modification of Determination of Action Pursuant to Section 301 Concerning Canadian Exports of Softwood Lumber; Opportunity for Comment, 57 Fed. Reg. 44,609 (Sep. 28, 1992).

25

Memorandum of Understanding, 74 Fed. Reg. 48,808 (Sep. 24, 2009).

*Second*, as USTR admitted in internal deliberations, its "supplemental" tariff actions here are unprecedented: "[W]e are not aware of prior investigations where a Trade Representative was called upon to use Section 307 modification authority to increase the level of trade action in order to achieve the statutory goal of obtaining the elimination of harmful policies covered by the investigation." Ct. App. J.A. 5922, *HMTX Indus., LLC v. United States*, No. 23-1891 (Fed. Cir. Feb. 20, 2024), ECF No. 47-3. USTR has never relied on Section 307 to increase tariffs by any amount, much less to expand their application to multiples of the original Section 301 action and by hundreds of billions of dollars. As in *Biden*, the agency "has never previously claimed powers of this magnitude." 600 U.S. at 501; *see also id.* at 501-502 (compared to "past waivers and modifications issued under the Act," which were "modest and narrow in scope," economic impact of "between $469 billion and $519 billion" is "staggering by any measure").

*Third*, USTR's List 3 and 4 actions undeniably are of vast economic and political significance. USTR initially investigated and identified four specific categories of IP/technology-transfer acts, policies, or practices that, in USTR's expert view, warranted imposition of tariffs on $50 billion of annual imports from China as "commensurate" with the harm to U.S. economic interests. USTR then "modified" that action to impose tariffs on essentially all trade with China,

26

representing several hundred billion dollars of imported Chinese goods annually—effectively taxing all U.S. consumers and businesses. The unprecedented escalation cost the American economy billions in GDP and over 100,000 jobs.[10]

The action has obvious political ramifications (domestic and foreign) as well. Over 9,000 comments from consumers, businesses, farmers, and groups, representing every facet of the American economy, made their opposition to the actions clear. And over 4,200 lawsuits have been filed in the CIT to challenge USTR's actions. "A decision of such magnitude and consequence on a matter of earnest and profound debate across the country must rest with Congress itself, or an agency acting pursuant to a clear delegation from that representative body." *Biden*, 600 U.S. at 504 (internal quotation marks and alteration omitted).

2. Insofar as the major questions doctrine might be characterized as a means of avoiding nondelegation concerns, *see West Virginia*, 597 U.S. at 736-742 (Gorsuch, J., concurring), it is likewise implicated here. This Court has long required Congress to "lay down by legislative act an intelligible principle to which the [agency delegee] *** is directed to conform." *See Panama Refin. Co. v. Ryan*, 293 U.S. 388, 429-430 (1935) (citation omitted). And because "the degree of agency discretion that is acceptable varies according

---

[10] *See, e.g.*, Erica York & Alex Durante, *Trump Tariffs: Tracking The Economic Impact of the Trump Trade War*, TAX FOUND. (Feb. 6, 2026), https://taxfoundation.org/tariffs-trump-trade-war/.

27

to the scope of the power congressionally conferred," Congress "must provide substantial guidance on [agency actions] that affect the entire national economy." *Whitman*, 531 U.S. at 475.

That substantial guidance is lacking under the Federal Circuit's interpretation of Section 307(a)(1)(C). In its view, that provision allows USTR to increase an initial Section 301 action in any amount, limited only by USTR's discretionary judgment that (1) the initial action is "no longer appropriate" to eliminate the targeted practice and (2) the "modified" action would be so appropriate, *see* App., *infra*, 25a. And crucially, USTR can do so without undertaking the specific investigation, consultation, and fact-finding steps Congress mandated in order to guide USTR's determination of what action is "appropriate" for initial Section 301 determinations. If the Federal Circuit is right, there is no intelligible principle guiding USTR's (apparently unbounded) modification discretion. *Compare* App., *infra*, 21a-22a, 25a-26a, *with, e.g., Federal Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 559-560 (1976) (upholding trade statute against nondelegation challenge where statute (1) "establishes clear preconditions to Presidential action"; (2) permits the President to "act only to the extent 'he deems necessary to adjust the imports of such article and its derivatives so that such imports will not threaten to impair the national security'"; and (3) "[a]rticulates a series of specific factors to be considered by the President in exercising his authority" thereunder).

28

The canon of constitutional avoidance—and by extension the major questions doctrine—counsel against adopting an interpretation of Section 307(a)(1)(C) that raises this concern. Importantly, this is so even if this Court does not actually find the delegation unconstitutional. It is enough that the Federal Circuit's interpretation raises "serious doubt[s]" on that score, *Crowell v. Benson*, 285 U.S. 22, 62 (1932), because the avoidance canon applies to an "administrative interpretation of a statute [that] invokes the outer limits of Congress' power" without "a clear indication that Congress intended that result." *Solid Waste Agency v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172-173 (2001).

As a result, even if the authority to "modify" provides a "plausible textual basis" in Section 307 for Lists 3 and 4A, it falls far short of a "clear statement" justifying the transformation of a $50 billion tariff action based on a targeted Section 301 investigation to a $370 billion (or $550 billion with List 4B) tariff action on USTR's say-so. *West Virginia*, 597 U.S. at 723-724. As noted, the "best interpretation" of Section 307(a)(1), *Biden*, 600 U.S. at 511 (Barrett, J., concurring), gives USTR the power to "change [Section 301 actions] moderately or in minor fashion," not "transform them." *Id.* at 494-495. This Court has repeatedly declined to defer to an agency interpretation relying on its authority to "modify" to make a major change. *See id.*; *MCI*, 512 U.S. at 229. Although the Federal Circuit read Section 307 to give USTR unbridled authority, "the word 'modify' simply cannot bear that load." *Biden*, 600 U.S. at 498.

29

3.  The Federal Circuit, for its part, did not find that USTR's action lacked vast political and economic significance.  Nor did it disagree that the Lists 3 and 4A tariffs are a "new" use of USTR's authority under Section 307(a)(1).  App., *infra*, 30a.  It nonetheless held that the major questions doctrine did not apply to this suit because "the statute permits USTR to impose and modify tariffs in response to unfair foreign trade practices, and Congress afforded USTR substantial discretion in determining what trade actions are appropriate."  *Id.*  USTR's interpretation of Section 307, it concluded, is thus not the type of "transformation of USTR's regulatory authority" at issue in other major-questions cases.  *Id.*

As discussed (pp. 16-22, *supra*), the Federal Circuit's conclusion misunderstands the statutory scheme.  Unlike Section 307, Section 301 requires "a panoply of statutory procedures," Br. for Appellees 28, *HMTX Indus., LLC v. United States*, No. 23-1891 (Fed. Cir. Feb. 20, 2024), ECF No. 42, including a robust investigation, consultations, and factual findings, *see* 19 U.S.C. §§ 2411-2414, before it authorizes USTR to take "appropriate and feasible action," 19 U.S.C. § 2411(a)(1) & (b)(2).  Given those restrictions on an initial tariff action, Congress would have expected USTR to act in a similarly deliberate manner under Section 301 before exploding an action's size—in magnitude and scope—instead of invoking Section 307's "much simpler" and highly "streamlined procedures," Br. for Appellees 4, 28, *HMTX Indus.*, No. 23-1891, ECF No. 42.  *See Biden*, 600 U.S. at 511 (Barrett, J., concurring) (explaining that the major questions doctrine "reflect[s] 'common sense as to the

30

manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency'") (quoting *Brown & Williamson Tobacco Corp.*, 529 U.S. at 133).

Yet the Federal Circuit endorsed USTR's gambit to do just the opposite. "[S]keptic[ally]" addressing such "assertions of extravagant statutory power" is exactly what the major questions doctrine is for. *West Virginia*, 597 U.S. at 724 (internal quotation marks omitted).

## II. The Question Presented Is Exceptionally Important.

This case warrants the Court's review not only because of the massive ongoing impacts of the Lists 3 and 4A tariffs, but because of the future ramifications of allowing the Federal Circuit's decision to stand uncorrected. Given the CIT's exclusive jurisdiction, that decision will govern *all* Section 301/307 actions. Unless reversed, any presidential administration can impose modest tariffs pursuant to stringent congressional safeguards and then turn around immediately to expand those tariffs massively in size and scope—as a matter of pure discretion and subject to virtually no process. That is no "modification." This Court's review is necessary to prevent such a bait-and-switch.

Most pressingly, the Lists 3 and 4A tariffs remain in effect, with billions of dollars in taxes imposed on American businesses, farmers, and consumers each month. So long as they remain in place, they continue to increase prices, threaten supply chains, and jeopardize American jobs. If the more than 4,200

31

substantially similar cases (currently stayed pending final resolution of this one) are evidence of anything, it is that the widespread and devastating present effects of USTR's List 3 and 4A "modifications" alone warrant this Court's attention.

Making matters worse, the decision below did not just give a one-time blessing to USTR's actions. Instead, the Federal Circuit provided a roadmap for how any administration can bypass the carefully crafted procedures laid out by Congress to wage a limitless trade war.

As Congress made clear in Section 301, when USTR seeks to impose tariffs in response to a foreign counterpart's unfair trade practices, it must do so with deliberation pursuant to that provision's robust procedural safeguards. But once USTR has an initial Section 301 action in hand, all it needs to do before terminating or "modifying" that action is comply with Section 307's "streamlined" procedures, Br. for Appellees 4, *HMTX Indus.*, No. 23-1891, ECF No. 42. No consultation with the targeted country. No advice from relevant committees. And no new investigation or written fact-findings to support USTR's discretionary determinations.

That all makes sense if Section 307(a)(1) merely allows USTR to terminate its Section 301 action or make modifications—*i.e.* modest adjustments—within the action's initial scope. But according to the decision below, nothing stops USTR from deciding that a $1 *million* tariff action is "appropriate" based on a thorough Section 301 investigation targeting a discrete trade practice, and then "modifying" that

32

action under Section 307 to a $1 *trillion* action covering the entire trade portfolio—just because the targeted nation responded with its own $1 million tariff (or for virtually any other policy reason that USTR can subsequently think of). That hypothetical differs from this case only in the precise numbers.

The need for immediate review is only underscored by this Administration's repeated statements that it plans to rely more heavily on Section 301 (and thus Section 307) if this Court holds in *Learning Resources, Inc. v. Trump*, No. 24-1287, consol. with No. 25-250 (U.S.) (argued Nov. 5, 2025), that the President does not have the sweeping tariff power he claims under the International Emergency Economic Powers Act. The issue will then become a (quickly) recurring one.[11]

This Court need not wait to step in. As the sample case selected to represent thousands of similarly situated parties, this case presents an

---

[11] *See, e.g.*, CNBC TELEVISION, *Watch CNBC's Full Interview with Commerce Secretary Howard Lutnick*, at 06:35 (YOUTUBE, Sep. 5, 2025), https://www.youtube.com/watch?v=gx24QIEqbS0&t=371s; NEW YORK TIMES EVENTS AND THE NEW YORK TIMES, *Treasury Secretary Scott Bessent Says He's 'Evolved' on Tariffs: Dealbook Summit 2025*, at 10:24 (YOUTUBE, Dec. 3, 2025), https://www.youtube.com/watch?v=x_kUqOifBnc&t=624s; CNBC TELEVISION, *USTR Jamieson Greer on EU Tech Fines: Number of Investigations We Could Conduct to Take Action*, at 04:23 (YOUTUBE, Dec. 18, 2025), https://www.youtube.com/watch?v=zEto_G57irI; MORNINGS WITH MARIA, *Trump Economist Kevin Hassett: 'We're Looking at One of the Best Years We've Ever Seen'*, at 11:30 (FOX BUSINESS, Jan. 16, 2026), https://www.foxbusiness.com/video/6387812560112.

33

ideal—indeed, the only possible—vehicle for review. The record is fully developed, and it cleanly presents the question of whether the Federal Circuit correctly interpreted USTR's statutory authority to "modify" an earlier tariff action under Section 307(a)(1). Further percolation will not bring clarity because there will be no percolation at all; any challenge to future actions under Sections 301 and 307 must be brought in the CIT and reviewed in the Federal Circuit. *See* 28 U.S.C. § 1581(i)(1)(B).

## CONCLUSION

The petition for a writ of certiorari should be granted.

Respectfully submitted.

Pratik A. Shah
  *Counsel of Record*
James E. Tysse
Matthew R. Nicely
Devin S. Sikes
Daniel M. Witkowski
Haley S. Gorman
AKIN GUMP STRAUSS
  HAUER & FELD LLP

*Counsel for Petitioners*

February 20, 2026